**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------X

IN RE                                                    MASTER FILE 06-MD-1738
VITAMIN C ANTITRUST LITIGATION                           (DGT)(JO)

This Document Relates To:

ALL CASES

-------------------------------------------------------X

**BRIEF OF AMICUS CURIAE**
**THE MINISTRY OF COMMERCE OF THE PEOPLE'S REPUBLIC OF CHINA**
**IN SUPPORT OF THE DEFENDANTS' MOTION TO DISMISS THE COMPLAINT**

## Sidley Austin LLP

ATTORNEYS FOR AMICUS CURIAE
THE MINISTRY OF COMMERCE OF THE
PEOPLE'S REPUBLIC OF CHINA

787 SEVENTH AVENUE
NEW YORK, NEW YORK  10019
(212) 839-5300

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

INTEREST OF THE AMICI ...................................................................................................1

BACKGROUND .....................................................................................................................4

I.      Allegations of the Complaint ........................................................................................4

II.     The Regulation of the Vitamin C Export Industry in China................................................5

        A.      The Nature and Regulatory Role of the Chamber of Commerce of
                Medicines and Health Products Importers & Exporters ...........................................5

        B.      The Vitamin C Sub-Committee ...............................................................................9

                1.      Initial Regulations Mandating Coordination (So-Called "Voluntary
                        Self-Restraint") in Establishing Export Price and Quantity .......................10

                2.      Revised Regulation of Export Pricing and Quantity: Verification
                        and Chop ................................................................................................14

ARGUMENT .........................................................................................................................15

I.      Dismissal Is Mandated By The Foreign Sovereign Compulsion Doctrine.........................15

II.     The Act of State Doctrine Also Mandates Dismissal .......................................................21

III.    This Suit Should Be Dismissed Based on Principles of International Comity .................23

CONCLUSION.......................................................................................................................25

# TABLE OF AUTHORITIES

## FEDERAL CASES

Agency of Canadian Car & Foundry Co. v. American Can Co., 258 F. 363
(2d Cir. 1919)...................................................................................................2

Alfred Dunhill of London, Inc. v. Republic of Cuba, 425 U.S. 682 (1976), cert.
denied, Saksand Co. v. Republic of Cuba, 425 U.S. 991 (1976)................................22

Certified O.N.E. Shipping Ltd. v. Flota Mercante Grancolombiana, S.A.,
830 F.2d 449 (2d Cir. 1987)
cert. denied, 488 U.S. 923, (1988) ................................................16, 17, 19, 22, 23, 25

Continental Ore Co. v. Union Carbide and Carbon Corp., 370 U.S. 690 (1962) .............20

Dames & Moore v. Regan, 453 U.S. 654 (1981)................................................................21

Int'l Ass'n of Machinists & Aerospace Workers v. OPEC, 649 F.2d 1354
(9th Cir. 1981) cert. denied, 454 U.S. 1163 (1982) ......................................................23

Interamerican Refining Corp. v. Texaco Maracaibo, Inc., 307 F. Supp. 1291,
1298 (D. Del. 1980) .......................................................................................................16

Japan Line, Ltd. v. Los Angeles County, 441 U.S. 434 (1979)........................................21

Liu v. Republic of China, 892 F.2d 1419 (9th Cir. 1989)..................................................22

Mannington Mills, Inc. v. Congoleum Corp., 595 F.2d 1287
(3d Cir. 1979)...................................................................................16, 17, 18, 25

Maple Flooring Mfrs Ass'n v. U.S., 268 U.S. 563 (1925)....................................................6

Matsushita Electric Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S. Ct.
1348 (1985)........................................................................................................................3

McElderry v. Cathay Pacific Airways, Ltd., 678 F. Supp. 1071
(S.D.N.Y. 1988) ...............................................................................16, 17, 24

Oetjen v. Central Leather Co., 246 U.S. 297 (1918) ........................................................22

Robinson v. Government of Malaysia, 269 F.3d 133 (2d Cir. 2001) ..................................2

Timberlane Lumber Co. v. Bank of America, N.T. and S.A, 549 F.2d 597
(9th Cir. 1976)...............................................................................16, 22, 23, 24, 25

Trugman-Nash, Inc. v. New Zealand Dairy Board, Milk Prod. Holdings (North America), Inc., 954 F. Supp. 733 (S.D.N.Y. 1997) ...........................................16, 19, 23

U.S. v. Curtiss-Wright Export Corp., 299 U.S. 304 (1936)................................................21

U.S. v. Javino, 960 F.2d 1137 (2d Cir. 1992) cert. denied, Javino v. U.S., 506 U.S. 979 (1992)...........................................................................................................2

U.S. v. Pink, 315 U.S. 203 (1942) ......................................................................................2

U.S. v. Sisal Sales Corp., 274 U.S. 268 (1927) .................................................................20

W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp., Int'l, 493 U.S. 400 (1990) ..........21, 22

## TREATISE

P. Areeda & H. Hovenkamp, ANTITRUST LAW, ¶ 274c (2d ed. 2000).........................15

## INTEREST OF THE AMICI

In this lawsuit, plaintiffs seek to recover treble damages from four Chinese manufacturers of vitamin C, and the affiliates of one of these manufacturers, based on conduct that was compelled by Chinese law.  Because the conduct that allegedly violated U.S. antitrust law occurred entirely in the territory of China, and because the defendants were required by the laws of China to engage in that conduct, this lawsuit cannot be resolved without interfering with Chinese industrial policy respecting the operation of domestic firms within China and without impermissible inquiry into the motives of the Chinese government.  Accordingly, three closely related doctrines, the foreign sovereign compulsion doctrine, the act of state doctrine, and principles of international comity, mandate dismissal of this action.

*Amicus* the Ministry of Commerce of the People's Republic of China (hereinafter "the Ministry")[1]  is deeply interested in the prompt and proper resolution of this lawsuit.  The Ministry is a component of the State Council (the central Chinese government) and is the highest administrative authority in China authorized to regulate foreign trade, including export commerce.  It is the equivalent in the Chinese governmental system of a cabinet level department in the U.S. governmental system.  The Ministry formulates strategies, guidelines and policies concerning domestic and foreign trade and international economic cooperation, drafts and enforces laws and regulations governing domestic and foreign trade, and regulates market operation to achieve an integrated, competitive and orderly market system.

If this Court were to find the defendants' conduct violated U.S. antitrust laws, it would improperly penalize defendants for the sovereign acts of their government and would adversely affect implementation of China's trade policy.  The Ministry therefore files this brief

---

[1]      The Ministry was initially known as the Ministry of Foreign Trade and Economic Cooperation.  This brief uses the term "Ministry" to refer to both this predecessor entity and the current Ministry of Commerce.

to inform the Court of the regulatory scheme that governed defendants during the period encompassed by the Complaint[2] and that dictated the conduct alleged to violate U.S. antitrust laws. The Ministry accordingly supports the defendants' request that this action be dismissed.

The information the Ministry is providing is properly considered in connection with a motion to dismiss under Rule 12(b) because each of the foreign sovereign compulsion doctrine, the act of state doctrine, and principles of international comity implicate this Court's subject matter jurisdiction. See Robinson v. Gov't of Malaysia, 269 F.3d 133, 141 n.6 (2d Cir. 2001) (a district court "must" consider materials outside complaint if they "may result in the dismissal of the complaint for want of jurisdiction"). Indeed, both the United States Supreme Court and the Second Circuit have recognized that the statements of a foreign government about the scope and meaning of its laws are to be given binding and conclusive effect by U.S. courts. See U.S. v. Pink, 315 U.S. 203, 218-21 (1942) (statement of Soviet Commissariat for Justice concerning extraterritorial effect of nationalization decree deemed "conclusive"); Agency of Canadian Car & Foundry Co. v. American Can Co., 258 F. 363, 368-69 (2d Cir. 1919) (authoritative representation by Russian government is "binding and conclusive in the courts of the United States"). Since 1978, the U.S. government has encouraged foreign governments to present their views concerning pending judicial proceedings directly to the U.S. courts,[3] and the

---

[2]    The "Relevant Period" referenced in the Complaint is December, 2001 through the present.

[3]    See Letter from Solicitor General McCree to Legal Adviser Hansell (May 2, 1978), reprinted in U.S. Dep't of State, 1978 Digest of United States Practice in International Law 560, reprinted in part in 73 Am. J. Int'l L. 122, 125 (1979); Department of State Circular Diplomatic Note to Chiefs of Mission in Washington, D.C. (Aug. 17, 1978), reprinted in U.S. Dep't of State, 1978 Digest of United States Practice in International Law 560, reprinted in part in 73 Am. J. Int'l L. 122, 124 (1979); see also Letter from Deputy Legal Adviser Marks (June 15, 1979) (described in 73 Am. J. Int'l L. 669, 678-79 (1979)). A copy of the foregoing is submitted herewith as Exhibit A to the declaration of Joel M. Mitnick, dated June 29, 2006 ("Mitnick Decl.").

U.S. Solicitor General has taken the position that a foreign government's submission of its views in the form of an amicus curiae brief should be "dispositive."[4]

It is particularly appropriate to accord the views of the Ministry dispositive weight here because the Complaint employs terms that have very different meanings under Chinese law, and within the Chinese regulatory system, than those same terms have in the United States. Plaintiffs allege that a Chinese "trade association" facilitated an illegal cartel, which "coordinated" vitamin C export pricing as part of a series of "voluntary" or "self-restraint" agreements. In fact, the "association," or "social organization," is a Ministry-supervised entity authorized by the Ministry to regulate vitamin C export prices and output levels, and the price "coordination," or so-called "voluntary self-restraint," it facilitated is a government-mandated price and output control regime. Because China's ongoing transition from a state-run command economy to a market-driven economy is utterly foreign to the economic history and traditions of the United States, there is a very significant risk of misunderstanding by U.S. lawyers and judges of the regulatory concepts China has adopted to manage this transition. Accordingly, the Ministry files this amicus brief to explain those very different concepts as well as to emphasize that the conduct alleged in the complaints here is mandated by Chinese law. Properly understood, China's regulation of vitamin C exports mandates dismissal of this lawsuit.

---

[4]     See Brief for United States as Amicus Curiae Supporting Appellants, <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 106 S.Ct. 1348 (1985) (No. 83-2004) at 17 (explicit and detailed statement by foreign government should be "given dispositive weight"), Mitnick Decl., Ex. B.

# BACKGROUND

## I.     Allegations of the Complaint

In January 2005, Plaintiffs Animal Science Products Inc. and the Ranis Company ("plaintiffs") filed the first Complaint in this action (the "Complaint")[5] in which they allege that defendants, four Chinese manufacturers and exporters of raw vitamin C products, and affiliates of one of these manufacturers,[6] violated Section 1 of the Sherman Act by agreeing on the price and volume of vitamin C products exported from China to the United States.

Specifically, plaintiffs allege that the defendants formed "a cartel to control prices and the volume of exports for vitamin C. . . . [and] successfully reached an autonomy agreement" in which they allegedly agreed "to control export quantities and achieve stable and enhanced price goals," "to restrict their exports of vitamin C in order to create a shortage of supply in the international market," and "to 'restrict quantity to safeguard prices, export in a balanced and orderly manner and adjust dynamically.'" Compl. ¶ 43.  Plaintiffs allege that, as a result of the cartel, the prices of vitamin C products exported from China to the United States increased from $2.50 per kilogram in December, 2001, to as high as $7 per kilogram in December, 2002, and that they, as purchasers of vitamin C products, were forced to pay higher prices as a result. Compl. ¶ 45.

Plaintiffs further allege that in 2003, defendants met and agreed to limit production levels further and increase prices (Compl. ¶ 52), and that in 2004, defendants agreed to suspend production in an effort to stabilize prices (Compl. ¶ 56).

---

[5]     Subsequent complaints have not been consolidated into a single complaint, but all of the complaints make substantially identical allegations.

[6]     The Chinese defendants are:  Hebei Welcome Pharmaceutical Co. Ltd., Jiangsu Jiangshan Pharmaceutical Co. Ltd., Northeast Pharmaceutical Group Co. Ltd., Weisheng Pharmaceutical Co. Ltd., and China Pharmaceutical Group, Ltd.  In addition, the Ministry is informed that a defunct U.S. affiliate of one of these defendants was also named in the Complaint.

Plaintiffs claim that the meetings held by defendants, and the agreements to which defendants were party, were "facilitated by the efforts of their trade association," the Western Medicine Department of the Association of Importers and Exporters of Medicines and Health Products of China.[7]  Compl. ¶ 43.  This "association," it is alleged, also "coordinated" the meetings at which defendants agreed to the limitations of sales and exports to the United States (Compl. ¶ 46), called a late 2003 "emergency meeting" attended by the defendants in which the "association" discussed how the defendants were to "rationalize the market and restrain and limit the production levels of vitamin C to increase prices" (Compl. ¶ 53), and met with the defendants at the "China Exhibition of World Pharmaceutical Ingredients," during which they "devised plans to rationalize the market and to limit production levels and increase prices" (Compl. ¶ 54).

## II.    The Regulation of the Vitamin C Export Industry in China

### A.    The Nature and Regulatory Role of the Chamber of Commerce of Medicines and Health Products Importers & Exporters

As an initial matter, the allegations of the Complaint rest on a fundamental misunderstanding concerning the nature of the Chamber of Commerce of Medicines and Health Products Importers & Exporters ("Chamber") and its role in the vitamin C industry in China. The Complaint characterizes the Chamber as a mere "trade association" that has facilitated the collusive actions of a "cartel." Compl. ¶ 43.  In fact, the Chamber is vastly different from a U.S. trade association, or private Chamber of Commerce.  Rather, it is an entity under the Ministry's direct and active supervision that plays a central role in regulating China's vitamin C industry. What the Complaint describes as a "cartel,"[8] and an "ongoing combination and conspiracy to

---

[7]    The official Chinese name of this entity translates as the "Chamber of Commerce of Medicines and Health Products Importers and Exporters."  As described infra, this entity, among other things, regulates China's import and export of pharmaceuticals (or "Western medicines") and health care products, including vitamin C.

[8]    In their Complaint, and before Magistrate Judge Orenstein, plaintiffs sound a simplistic

suppress competition" through price-fixing (Compl. ¶¶ 43-44), is a regulatory pricing regime mandated by the government of China – a regime instituted to ensure orderly markets during China's transition to a market-driven economy and to promote, in this transitional period, the profitability of the industry through coordination of pricing and control of export volumes. Most importantly, this regime was established to safeguard the national interests of China.[9]

      The United States has never had a state-run command economy with state-owned industries. In the years following the Civil War, chambers of commerce and other trade associations sprang up voluntarily throughout the country as a means of gathering and providing information to members of particular industries. See Maple Flooring Mfrs. Ass'n v. U.S., 268 U.S. 563 (1925). The proliferation of numerous voluntary commercial and trade organizations led President Taft to note the need for a central organization in touch with such groups throughout the United States. President William Howard Taft, Third Annual Message to Congress (Dec. 5, 1911). This, in turn, led to the creation the following year of the U.S. Chamber of Commerce, an entirely voluntary, non-governmental organization created to, among other things, represent business interests before the federal government.

---

but very misleading theme: defendants here have "stepped into the shoes" of a defunct cartel of European and Japanese vitamin manufacturers, many of whom pleaded guilty to criminal price fixing charges. Hr'g Tr. 48:2-3, May 3, 2006. This theme is a blatant attempt to "poison the well" before the Court has an opportunity to understand the fundamentally different conditions under which the Chinese vitamin C export industry operated from its European and Japanese counterparts. Other than that both industries involved vitamin C, the circumstances of how those industries priced their export products could not have been more different.

[9]    As China carried out its economic reform beginning in 1978, namely through de-centralizing Government control over, and direct management of, economic activities by permitting state-owned entities to have decision-making power and by encouraging wide private ownership in the economic sector, China was concerned about the possible effects (as it saw them) of unfettered competition between and among enterprises, including that it could retard the orderly development of a stable domestic vitamin C industry and adversely effect levels of employment in that industry. The Government attempted to temper the effects of economic reform in its regulation of domestic and foreign commerce.

The origins and purposes of that institution stand in stark contrast to those of the similarly-named, but functionally very different, Chamber here.  Prior to the advent of any free market system in China, the government itself participated in and controlled the manufacturing and exporting of goods.  Only a number of state-owned national exporting entities were allowed to engage in exporting, and no private enterprises or manufacturing enterprises were allowed to export directly.  These designated state-owned national exporting enterprises functioned to regulate exports under the Ministry's direction.  Subsequently, however, when other types of enterprises (both private and state-owned) were allowed to obtain export licenses, the function of regulating export had to be stripped away from these state-owned national exporting entities so that they were not in the position of regulating the exports of their competitors.  The Chamber was established, in part, to serve that role with respect to imports and exports of pharmaceutical products, including vitamin C; it regulates the export of those products under the authority and direction of the Ministry and the General Administration of Customs ("Customs").[10]

---

[10]   The Chamber described its role in Chinese foreign commerce during the Relevant Period as:

> To meet the need of building the *socialist market economy* and *deepening the reform of foreign economic and trade management system*, the China Chamber of Commerce of Medicines & Health Products Importers & Exporters was established in May 1989 in an effort to boost the sound development of foreign trade in medicinal products.  As a social body formed along business lines and enjoying the status of legal person, the Chamber is composed of economic entities registered in the People's Republic of China dealing in medicinal items as authorized by the departments under the [S]tate Council responsible for foreign economic relations and trade as well as organizations empowered by them.  *It is designated to coordinate import and export business in Chinese and Western medicines* and provide service for its member enterprises.  Its over 1100 members are scattered all over China.  The Chamber abides by the state laws and administrative statutes, *implements its policies and regulations governing foreign trade, accepts the guidance and supervision of the responsible departments under the States Council.  The very purpose is to coordinate and supervise the import and export operations in this business, to maintain business order and protect fair competition, to safeguard the legitimate rights and interests of the state, the trade and the members and to promote the sound development of foreign trade in medicinal items.*

Although the Chamber is denominated a "social organization," this term also has a very different meaning under Chinese law than it has in the United States.  The Chinese notion of a "social organization" includes within its scope the various "chambers" that exist under Chinese law for the purpose, when authorized, of regulating specific industries (e.g., the Chamber regulates certain pharmaceutical industries, including the vitamin C industry).[11]  See the Ministry's implementing regulation for the administration of "social organizations" (including "chambers") in foreign trade, Measures for Administration over Foreign Trade and Economic Social Organizations (February 26, 1991) Arts. 2 and 14 ("Measures for Administration"), Mitnick Decl., Ex. D (emphasis added) ("Social organizations established with *coordination and industry regulation functions as authorized by [the Ministry]* must implement the administrative rules and regulations relating to foreign trade and economy.").  As discussed, infra, regulation over export pricing and output levels was a specific vitamin C "industry regulation function" delegated by the Ministry to the Chamber.

---

China Chamber of Commerce of Medicines & Health Products Importers & Exporters, Publication of Administration and Regulation (2003), at 3 (emphasis added), Mitnick Decl., Ex. C.

This document, along with all Ministry rules or regulations cited herein and attached to the Mitnick Declaration, have been authenticated under the procedures of Federal Rule of Evidence 902(3), which governs self-authentication of foreign public documents. First, an authorized official of the Ministry or the Chamber, as applicable, attested in the presence of a P.R.C. notary public to the authenticity of each document. (In the case of the Chamber, the attestation was also in the presence of a Ministry official who further authenticated the Chamber attestation.) Next, the attestation was further certified by the Consular Department of the P.R.C. Ministry of Foreign Affairs and the U.S. Embassy in Beijing. See Mitnick Decl., document index, for a summary of the attestation(s) and certification(s) applicable to each such document. Translations of all Chinese language documents attached to the Mitnick Declaration are certified by a qualified translation agency and further notarized by a P.R.C. notary public.

[11]     "Chambers [defined as 'chambers of commerce of importers and exports'] are social organizations." Notice of [Ministry] Regarding Printing and Distribution of Several Regulations for Personnel Management of Chambers of Commerce for Importers and Exporters (Sept. 23, 1994) ("Notice Regarding Chamber Personnel Management") at 1, Mitnick Decl., Ex. E.

The Ministry's authority over the Chamber is plenary:  covering such aspects as the Chamber's selection of its leaders, its personnel management system, its budget and accounting systems and its salary structure.  Id. Art. 16.  See also, Notice Regarding Chamber Personnel Management, Annex II, 4 (Ministry shall verify and approve Chamber's authorized number of personnel); Annex III, 8 (Chamber's general working staff "shall be chosen primarily from the employees in service of their membership organizations or the competent authorities in charge of foreign trade and economics and the public institutions directly under their leadership"); Annex IV, 13 (candidates for senior positions within the Chamber "are recommended by [the Ministry] or recommended by over 1/3 of the [C]hamber's member companies and approved by [the Ministry]"); and Annex V, 17 (Ministry shall "verify and approve the total amount of salary of the [C]hamber").  The Chamber, in turn, must submit to the Ministry its "annual working plan and arrangements of major events," including all "important meetings and activities."  Measures for Administration, Art. 21.  Similarly, the Chamber "must implement the administrative rules and regulations relating to foreign trade and economy."  Id. Art. 14.  In short, the Chamber is the instrumentality through which the Ministry oversees and regulates the business of importing and exporting medicinal products in China.

**B.    The Vitamin C Sub-Committee**

Throughout the Relevant Period, the Chamber exercised its regulatory authority with respect to vitamin C exports through its Vitamin C Sub-Committee.  The Sub-Committee was established in 1997, at the Ministry's order, against a backdrop of "intense competition and challenges from the international [vitamin C] market."  Approval for Establishing VC Sub-Committee of China Chamber of Commerce of Medicines & Health Products Importers & Exporters (issued March 23, 1998), Mitnick Decl., Ex. F.  The Sub-Committee, operated under the Chamber's direction and administration, is responsible for "coordinating the Vitamin C

export market, price and customers of China, to improve the competitiveness of Chinese Vitamin C produce in the world market and promote the healthy development of Vitamin C export of China." Id. ¶ 2.

Only companies that exported vitamin C in certain specified volumes were eligible to be members of the Sub-Committee. Charter of Vitamin C Sub-Committee of China Chamber of Commerce of Medicines and Health Products Importers and Exporters (October 11, 1997) Art. 11 ("Vitamin C Sub-Committee Charter"), Mitnick Decl., Ex. G. Pursuant to the Vitamin C Sub-Committee Charter, only Sub-Committee members "have the right to export Vitamin C and are simultaneously qualified to have Vitamin C export quota." Id. Art. 12. With this right come a series of "obligations," including the duty to "comply with the . . . regulations of the Vitamin C Sub-Committee and implement [its] resolution," and to export and supply vitamin C "only to those foreign trade enterprises verified by the Sub-Committee." Id. Art. 15(1)&(2). Most significantly for purposes of this case, members are obligated to *"[s]trictly execute export coordinated price set by the Chamber and keep it confidential."* Id. Art. 15(6) (emphasis added). The Charter further provides that any "failure to implement any resolution or regulation of the Sub-Committee and failure to perform any member's obligation shall be punished by the Sub-Committee." Id. Art. 16. Authorized punishments include "warning, open criticism and even revocation of . . . membership," and imposition of monetary penalties. Id. In addition, the Sub-Committee may recommend, through the Chamber, that the Ministry "suspend and even cancel the Vitamin C export right of such violating member," id., resulting in a total ban on participation in exporting altogether.

> 1.  **Initial Regulations Mandating Coordination (So-Called "Voluntary Self-Restraint") in Establishing Export Price and Quantity**

Shortly after it mandated the establishment of the Vitamin C Sub-Committee, the Ministry, acting in conjunction with the State Drug Administration, promulgated a new

regulation authorizing and requiring the Chamber and Sub-Committee to limit the production of

vitamin C for export and to set export prices. Notice Relating to Strengthening the

Administration of Vitamin C Production and Export ("1997 Ministry & SDA Notice"), Mitnick

Decl., Ex. H. The regulation limited participation in the vitamin C export industry to those

companies qualified to be members of the Sub-Committee, then required all such eligible entities

to "participate in such [Sub-Committee] and subject themselves to the coordination of the [Sub-

Committee]." Id. at 2. The Sub-Committee, in turn, was required to *"formulate and adjust [the]*

*export coordination price, which the Vitamin C export enterprises must strictly implement."* Id.

(emphasis added).

Under this regulation, qualified vitamin C manufacturers and import and export

companies were able to receive a Vitamin C export quota license. The issuance of Vitamin C

export licenses was subject to two criteria. First, the export volume was required to be in

compliance with the export quota. Second, the export price was required to be no lower than the

price established by the Vitamin C Subcommittee's coordinated price agreements. See id. ("The

organizations that [are] authorized by [the Ministry] to issue export licenses [were to] strictly

verify the qualification of Vitamin C export and operation of the enterprises, and verify their

export contracts and issue export license according to the Vitamin C coordinated price and

volume quotas."). In addition, the volume to be exported by each qualified entity under this

"Production and Export Licensing System" was determined by the Ministry, in conjunction with

the State Drug Administration and "relevant departments." Id. at 1-2. Attempts to circumvent

the verification process were subject to penalties, including a reduction in an entity's export

quota or the revocation of its exporting license. Id. para. 7 ("Vitamin C Export Coordination

Group shall timely organize meetings for the major Vitamin C export enterprises . . . to . . .

formulate and adjust export coordination price, which the Vitamin C export enterprises must

11

strictly implement in accordance with.  With respect to enterprises competing at low price and reducing price through any disguised means, a penalty shall be imposed . . . .") and para. 10 (". . . penalties [for violating provisions of Paragraph 7] shall be . . . the Vitamin C export quota may be reduced, in the worst case their Vitamin C export right shall be revoked").

As the foregoing makes clear, price "coordination" within this regulatory system does not mean that prices are established independently or, even, by "voluntary" agreement among manufacturers, as that term is normally understood in the West.  Rather, the decisions to limit the volume of exports and to set export prices were made by the Ministry.  The Ministry chose to implement these policies by limiting vitamin C exporting rights to certain qualified entities, compelling those entities to participate in a subcommittee of a Ministry-approved and supervised regulatory body, and requiring that subcommittee to set export prices that exporters were then required to implement, subject to a verification system that included severe penalties for non-compliance.  Within this system, therefore, "coordination" refers to the government mandated multilateral process in which prices were set—as opposed to a unilateral process in which the Ministry alone set prices.  (Indeed, the Sub-Committee was originally designated the "Vitamin C *Coordination* Group," and was referred to by that name in the 1997 Ministry & SDA Notice.  see id. at 2.)  The industry participants in this multilateral process, thus, acted pursuant to governmental compulsion; when establishing price controls, they were exercising governmental regulatory power; and the price controls developed through this multilateral process were legally binding and governmentally-enforced.[12]

---

[12]    Plaintiffs rely heavily on a document from the Chamber's website that states:

In December 2001, through efforts by the Vitamin C Chapter of the China Chamber of Commerce of Medicines and Health Products Importers and Exporters, the manufacturers were able to successfully reach a self-restraint agreement, whereby they would voluntarily control the quantity and pace of exports, so as to achieve the goal of stabilizing and raising export prices.

This system of Ministry-mandated and Chamber-administered "coordination" was adopted to forestall potential market disorders that might have limited the development of a healthy vitamin C export industry during China's transition from a command economy to a market-driven economy. See Interim Regulations of the Ministry of Foreign Trade and Economic Cooperation on Punishment for Conduct at Exporting at Lower-Than-Normal Price (March 20, 1996), Mitnick Decl., Ex. I (explaining that the Ministry promulgated interim regulations to "ensure orderly development of the country's export trade, safeguard the legitimate rights and interests of the State and enterprises and prevent conduct of exporting at lower-than-normal price"). A system of government-mandated "coordination" among industry participants served the Ministry's goal of transitioning to a healthy market-based economy: it established mandatory coordinated export price and output levels (thereby forestalling what the government feared could be destructive export competition before the foundation for a healthy industry could be laid) by vitamin C manufacturers, although the Ministry itself did not decide what specific prices should be. Instead, this governmental function was delegated to market participants and the Chamber, in their capacities as Vitamin C Sub-Committee members, acting in a coordinated fashion.

----

Letter from William Isaacson and Alana Rutherford to Honorable James Orenstein (May 12, 2006) at 3 and Exhibit C (emphasis added); see also Hr'g Tr. 47-48, May 3, 2006; Pretrial Order (JO), May 4, 2006, 2-3. In the context of the Ministry's regulation of the vitamin C industry through the Chamber, however, the characterizations by the Chamber of the conduct as "self-restraint" and "voluntary" are unremarkable. The vitamin C industry was under a direct Ministry order to reach a "coordinated" agreement in order to stabilize export pricing. Thus, it is understandable that the Chamber would express its pleasure publicly that the parties were able to comply with the Ministry's order to coordinate pricing and quantities on their own (i.e., "voluntarily" and in "self-restraint") as opposed to requiring more direct Ministerial intervention to reach that result. Indeed, as discussed in Point II.B.2., infra, this regulatory system was expressly enacted "to promote [among other things] industry self-discipline."

**2.    Revised Regulation of Export Pricing and Quantity: Verification and Chop**

In 2002, the Ministry changed the way in which compliance with the Chamber's "coordination" was confirmed by abolishing the Export Licensing System and establishing a so-called "verification and chop" system.  <u>See</u> Notice Issued by the Ministry of Foreign Trade and Economic Cooperation and the General Administration of Customs for the Adjustment of the Catalogue of Export Products Subject to Price Review by the Customs ("2002 Ministry & Customs Notice"), Mitnick Decl., Ex. J.  The Ministry adopted this new system "in order to accommodate the new situations since China's entry into WTO, maintain the *order* of market competition, make active efforts to avoid anti-dumping sanctions imposed by foreign countries on China's exports, *promote industry self-discipline* and facilitate the healthy development of exports."  <u>Id.</u> at 1, Preamble (emphasis added).  The Ministry explained that this new system would be both "convenient for exporters while it is conducive for the Chambers to coordinate export price and industry self-discipline."  <u>Id.</u> at 2, para. 4.  The basis of the new system was a process of *"industry-wide negotiated prices."*  <u>Id.</u> at 2, para. 3 (emphasis added).

Under this system, the Chamber reported the "coordinated," or "industry-wide negotiated," prices for vitamin C exports to Customs.  <u>Id.</u>  Manufacturers were required to submit documentation to the Chamber which indicated both the amount and price of vitamin C to be exported.  The Chamber "verified," *i.e.,* approved, the contract price and volume.  If the price was at or above the minimum acceptable price set by coordination through the Chamber, the Chamber affixed a special seal, known as a "chop," on the contract and returned it to the manufacturer.  Upon export, the contract was reviewed by Customs and allowed to go through only if the contract bore the Chamber's "chop."  <u>Id.</u>  The penalty for violating the system was draconian: withholding of the Chamber's "chop" meant complete denial by Customs of the ability to export.

In 2003, the "verification and chop" system was continued with respect to several commodities industries, including the vitamin C industry. Vitamin C exporters were required to submit contracts to the Chamber, which "verified" the exporters' submissions *based on the industry agreements* and in accordance with the relevant regulations promulgated by the Ministry of Commerce . . . and the General Administration of Customs." Announcement of Ministry of Commerce of the People's Republic of China, General Administration of Customs of the People's Republic of China (November 29, 2003) (Exhibit 2, para. C) (emphasis added), Mitnick Decl., Ex. K. "Enterprises exporting by forging the [Verification & Chop] on the contracts will be punished by the Customs and Chambers of Commerce according to relevant rules." Id. at 1. Through its 2003 announcement, in conjunction with the General Administration of Customs, the Ministry extended this system throughout the Relevant Period.

**ARGUMENT**

**I.     Dismissal Is Mandated By The Foreign Sovereign Compulsion Doctrine**

"Under the foreign sovereign compulsion doctrine the courts will immunize private defendants from antitrust liability for conduct that is actually compelled, not merely permitted by a foreign sovereign acting within its jurisdiction. In that case, the acts of the private party 'become effectively acts of the sovereign.'" P. Areeda & H. Hovenkamp, ANTITRUST LAW, ¶ 274c at 406-07 (2d ed. 2000), quoting Interamerican Refining Corp. v. Texaco Maracaibo, Inc., 307 F. Supp. 1291, 1298 (D. Del. 1980) (other citations omitted).[13]

---

[13]     In their Antitrust Enforcement Guidelines for International Operations, the U.S. Department of Justice and the Federal Trade Commission provide the following illustration of conduct that they acknowledge cannot be challenged under U.S. antitrust law:

> Assume for the purpose of this example that the overseas production cutbacks have the necessary effects on U.S. commerce to support jurisdiction. As for the participants from the two countries that did not impose any penalty for a failure to reduce production, the Agencies would not find that sovereign compulsion precluded prosecution of this agreement. As for participants from the country that did compel production cut-backs

U.S. courts, including the Second Circuit, have recognized that they lack subject matter jurisdiction over antitrust actions that challenge private conduct that is compelled by a foreign government. Certified O.N.E. Shipping Ltd. v. Flota Mercante Grancolombiana, S.A., 830 F.2d 449, 453 (2d Cir. 1987) cert. denied 488 U.S. 923, (1988); Mannington Mills, Inc. v. Congoleum Corp., 595 F.2d 1287, 1293 (3d Cir. 1979); Timberlane Lumber Co. v. Bank of America, N.T. and S.A, 549 F.2d 597, 606-07 (9th Cir. 1976);  Trugman-Nash, Inc. v. New Zealand Dairy Bd., Milk Prod. Holdings (North America), Inc., 954 F. Supp. 733, 736 (S.D.N.Y. 1997); McElderry v. Cathay Pacific Airways, Ltd., 678 F. Supp. 1071, 1080 (S.D.N.Y. 1988); cf. Interamerican, 307 F. Supp. at 1296-98 (granting summary judgment on the merits based on the defense).

The foreign sovereign compulsion doctrine is "[a] corollary to the act of state doctrine"; it recognizes "that corporate conduct which is compelled by a foreign sovereign is . . . protected from antitrust liability, as if it were an act of the state itself." Timberlane, 549 F.2d at 606. "When the causal chain between a defendant's alleged conduct and plaintiff's injury cannot be determined without an inquiry into the motives of the foreign government, claims under the

_____

through the imposition of severe penalties, the Agencies would acknowledge a defense of sovereign compulsion.

Greatly increased quantities of commodity X have flooded into the world market over the last two or three years, including substantial amounts indirectly coming into the United States. Because they are unsure whether they would prevail in an antidumping and countervailing duty case, U.S. industry participants have refrained from filing trade law petitions. The officials of three foreign countries meet with their respective domestic firms and urge them to "rationalize" production by cooperatively cutting back. Going one step further, one of the interested governments orders cutbacks from its firms, subject to substantial penalties for non-compliance. Producers from the other two countries agree among themselves to institute comparable cutbacks, but their governments do not require them to do so.

Antitrust Enforcement Guidelines for International Operations, issued by the U.S. Department of Justice and the Federal Trade Commission (April, 2005), Illustrative Example K, Section 3.32.

antitrust laws are dismissed" for lack of subject matter jurisdiction. <u>O.N.E. Shipping</u>, 830 F.2d

at 453 (affirming jurisdictional dismissal based on the defense); see also <u>McElderry</u>, 678 F.

Supp. at 1080 (same). The doctrine is applicable where "the foreign decree was basic and

fundamental to the alleged antitrust behavior and more than merely peripheral to the overall

illegal course of conduct." <u>Mannington Mills</u>, 595 F.2d at 1293.

The foreign sovereign compulsion doctrine is fully applicable – and dispositive –

here. Chinese law, promulgated by the Ministry and administered through the Chamber,

compelled defendants, as members of the Vitamin C Sub-Committee, to coordinate export prices

and maximum export volumes and to abide by those requirements. Under the Ministry's

regulations, defendants were compelled to become participating members of the Vitamin C Sub-

Committee, 1997 Ministry & SDA Notice at 2 Ex. H, and Vitamin C Sub-Committee Charter,

Art. 12, Ex. G, they were compelled to *"formulate and adjust [the] export coordination price,"*

1997 Ministry & SDA Notice at 2 (emphasis added), Ex. H, and they were compelled to abide by

and implement that "coordinated" price, <u>id.</u>, and Vitamin C Sub-Committee Charter, Art. 15(6),

Ex. G. Defendants would not have been eligible to export vitamin C at all if they failed to

participate in these price-setting and production-limiting activities. 1997 Ministry & SDA

Notice, Ex. H; Vitamin C Sub-Committee Charter, Art. 12, Ex. G. Government entities policed

defendants' compliance with the resulting prices and volume limits, and non-compliance would

subject defendants to severe penalties, including, among other things, reduction in export quotas

(resulting in further economic loss), and, possibly, loss of export rights. 1997 Ministry & SDA

Notice at 2, Ex. H; Vitamin C Sub-Committee Charter, Art. 16, Ex. G; 2002 Ministry & Customs

Notice at 2, Ex. J.

As noted above, while China is in the process of moving actively from its former

state-run command economy to a market economy more of a type familiar to the United States,

the current economic system is transitional and there remains a level of active state direction and coordination that has no analogue in the United States. Thus, for example, one would not find in the United States a government mandate to "maintain order in market competition," to "promote industry self-discipline," or to mandate export pricing and output levels "based on the *industry agreements*"; nor would one find a governmentally-directed organization, such as the Chamber, directing parties to attend meetings, such as those referred to in the complaints, to discuss prices or export quotas, with a view to maximizing industry profitability in export commerce.

That, however, is precisely the transitional framework under which the vitamin C industry functioned throughout the Relevant Period. Thus, while the Government did not, itself, determine specific prices or quantities, it most emphatically did insist on those matters being determined *through industry coordination*. That, of course, is all that is alleged in the complaints here and that is conduct that was compelled by the Chinese government in the interests of insuring "order in market competition."

It is thus clear that these mandates of Chinese law were "basic and fundamental to the alleged antitrust behavior and more than merely peripheral to the overall illegal course of conduct." <u>Mannington Mills</u>, 595 F.2d at 1293. The central allegations of the Complaint are that defendants "agreed to control export quantities and achieve stable and enhanced price goals," and that plaintiffs were injured because the price of vitamin C products "has been fixed, raised, maintained and stabilized at artificial and non-competitive levels." Compl. ¶¶ 43 and 62. The decision to control export quantities and require coordinated export prices was made by the Ministry. Defendants were compelled to implement these decisions through participation in the Vitamin C Sub-Committee. Similarly, the Complaint alleges that the allegedly unlawful prices and production limits were established through defendants' "participat[ion] in meetings and conversations in China and elsewhere in which the prices, volume of sales and exports to the

United States, and markets for vitamins were discussed and agreed upon." Compl. ¶ 46. Again, contrary to the allegations of the complaint, defendants were compelled by the Ministry to engage in these very activities. The government-supervised Chamber facilitated and coordinated those meetings, and was required to advise the Ministry of such meetings.

        Accordingly, the price "coordination" alleged in the complaint cannot serve as a basis for the imposition of antitrust liability. Indeed, just as in O.N.E. Shipping, this "antitrust suit represents a direct challenge to [the Ministry's medicinal product export] laws and to the legality of [defendants'] agreements under those laws." 830 F.2d at 451. Those "laws were designed to promote the development of a strong [Chinese medicinal products industry] and to assist [China's] economic development." Id. Accordingly, here, as in O.N.E. Shipping, "the causal chain between a defendant's alleged conduct and plaintiff's injury cannot be determined without an inquiry into the motives of the [Ministry]." Id. at 453. See also Trugman-Nash, Inc., 954 F. Supp. at 736 (New Zealand dairy producers entitled to defense of foreign sovereign compulsion where New Zealand law required export licensing board to disapprove "of sales price competition among New Zealand dairy producers in respect of exports to nations like the United States that restrict import quantities").[14]

---

[14]    The arguments of the United States in its amicus brief in Matsushita (see footnote 4, supra) apply here with equal force:

> [T]he court of appeals should have given dispositive weight to the statement submitted to the district court by the Japanese Government, which indicated explicitly that part of petitioners' conduct was compelled. The court's rejection of petitioners' sovereign compulsion defense has caused deep concern to the Government of Japan and to the governments of other countries that are significant trading partners of the United States and threatens to affect adversely the foreign policy of the United States. Mitnick Decl., Ex. B at 6.

> The court of appeals erred in rejecting petitioners' sovereign compulsion defense. The Government of Japan explained in the MITI [Ministry of International Trade] Statement that it "directed" petitioners "to enter into" the check price agreement.... [T]hat explicit and detailed statement by a foreign sovereign that it mandated the check price agreement

Finally, this case stands in stark contrast to those where courts have deemed the foreign sovereign compulsion doctrine inapplicable.  For example, in Continental Ore Co. v. Union Carbide and Carbon Corp., 370 U.S. 690 (1962), the Court held that the defense was not available to a Canadian entity that was given the exclusive right to import vanadium oxide into Canada, but then decided, "within its area of discretionary powers," to use that right to conspire with a U.S. subsidiary to boycott and destroy a competitor.  Id. at 706-07.  The Supreme Court emphasized that there was "no indication that [any] official within the . . . Canadian government approved or would have approved of" this conduct, and that no "law in any way compelled discriminatory purchasing."  Id.  Here, the Ministry not only approved defendants' conduct in establishing export limits and price coordination, it compelled that very conduct.

Similarly, plaintiffs do not—and cannot—allege that defendants entered into a price-fixing conspiracy, then worked to secure laws or regulations that blessed their arrangements.  Cf. U.S. v. Sisal Sales Corp., 274 U.S. 268 (1927) (conspiracy formed in the United States for the purpose of monopolizing sales to the United States was not immunized simply because one element of the conspiracy involved securing laws that recognized the conspirators as exclusive traders and imposed discriminatory sales taxes on rivals).  Here, the Ministry imposed the relevant laws on defendants.  Indeed, the impetus for these and other price coordination measures was not to endorse existing price-fixing conspiracies, but to prevent disorderly competition.

---

in accordance with its laws ... should have been given dispositive weight.  It follows that the foreign sovereign compulsion defense precluded use of the check price agreement as a basis for liability under the Sherman Act.  Id. at 12.

The MITI Statement also explained that MITI had directed the regulations [through] the Japan Machinery Exporters Association.... Id.

In sum, Chinese Law mandated the participation of entities engaged in vitamin C export to coordinate with respect to export pricing and volume quotas and to adhere to such limits. Each defendant conducted itself as Chinese law required when it participated in Sub-Committee meetings at which agreements were reached with respect to pricing and volume controls. Refusal to subject oneself to the coordination of the Sub-Committee and the Chamber is unlawful under relevant regulations and would result in severe punishment, either through monetary penalty or loss of ability to participate in the industry altogether. Because all of the elements of the foreign sovereign compulsion doctrine are satisfied, this lawsuit should therefore be dismissed.

## II.    The Act of State Doctrine Also Mandates Dismissal

The act of state doctrine also forbids judicial inquiry into China's motives in regulating its foreign commerce. The act of state doctrine differs from the foreign sovereign compulsion defense in that the act of state doctrine is grounded in principles of federalism and reflects the view that the courts, in deciding whether to accord recognition to certain foreign acts of state, might hinder the conduct of foreign affairs by the Executive Branch. W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp., Int'l, 493 U.S. 400, 404 (1990). The Supreme Court has acknowledged "the very delicate, plenary and exclusive power of the President as the sole organ of the federal government in the field of international relations." U.S. v. Curtiss-Wright Export Corp., 299 U.S. 304, 320 (1936). See also Japan Line, Ltd. v. Los Angeles County, 441 U.S. 434, 448-49 (1979) and Dames & Moore v. Regan, 453 U.S. 654, 669 (1981). "The conduct of the foreign relations of our government is committed by the Constitution to the executive and legislative – 'the political' – departments of the government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision." Oetjen v. Central Leather Co., 246 U.S. 297, 302 (1918).

The act of state doctrine, in essence, is "designed primarily to avoid judicial inquiry into the acts and conduct of the officials of the foreign state, its affairs and its policies and the underlying reasons and motivations for the actions of the foreign government. Such an inquiry is foreclosed under the act of state doctrine." O.N.E. Shipping, 830 F.2d at 452 (citing Hunt v. Mobil Oil Corp., 550 F.2d 68, 73 (2d Cir. 1977), cert. denied, 434 U.S. 984, 98 S.Ct. 508 (1977)). See also W.S. Kirkpatrick 493 U.S. at 404.

The burden of proving an act of state rests on the party asserting the applicability of the doctrine. Alfred Dunhill of London, Inc. v. Republic of Cuba, 425 U.S. 682, 684-85, (1976), cert. denied, Saksand Company v. Republic of Cuba, 425 U.S. 991 (1976). "[T]his burden requires that a party offer some evidence that the government acted in its sovereign capacity and some indication of the depth and nature of the government's interest." Liu v. Republic of China, 892 F.2d. 1419, 1432 (9th Cir. 1989) (citing Timberlane, 549 F.2d at 607-08).

The act of state doctrine mandates that this Court decline to exercise jurisdiction over this action. As set forth above, the conduct alleged to have been violative here was compelled by the Chinese government. The Chinese government compelled such conduct in its oversight of its foreign trade regulation. Any determination by this Court into the conduct as alleged by the plaintiffs will necessarily invoke an inquiry into the legitimacy of China's foreign policy concerning the manufacture and export of vitamin C. To permit the validity of the policy-making decisions of China "to be reexamined and perhaps condemned by [this] court[] would very certain[ly] 'imperil the amicable relations between [the two] governments and vex the peace of nations." Oetjen, 246 U.S. at 304. It cannot be denied that the possibility of insult to China is significant – "the granting of any relief would in effect amount to an order from a domestic court instructing a foreign sovereign to alter its chosen means" of regulating domestic conduct. See

Int'l Ass'n of Machinists & Aerospace Workers v. OPEC, 649 F.2d 1354, 1361 (9th Cir. 1981)

cert. denied, 454 U.S. 1163 (1982).  Such an inquiry is prohibited by the act of state doctrine – if

China's regulation of its foreign policy implicates U.S. interests as alleged, then the proper

forum for such discussions between the United States and China is not in this Court.

**III.      This Suit Should Be Dismissed Based on Principles of International Comity**

        Principles of international comity also render the exercise of jurisdiction over the

Complaint inappropriate.  Comity

> is the recognition which one nation allows within its territory to the
> legislative, executive or judicial acts of another nation, having due
> regard both to international duty and convenience, and to the rights
> of its own citizens or of other persons who are under the protection
> of its laws.

O.N.E. Shipping, 830 F.2d at 451 n.3 (quoting Hilton v. Guyot, 159 U.S. 113, 163-64 (1895)).

The Second Circuit has adopted the multi-factor test set forth in Timberlane for determining

when comity principles require courts to decline to exercise jurisdiction over the conduct of

foreign actors.  See U.S. v. Javino, 960 F.2d 1137, 1142-43 (2d Cir. 1992) cert. denied, Javino v.

U.S., 506 U.S. 979 (1992); O.N.E. Shipping, 830 F.2d at 451.  Here, virtually all of these factors

militate in favor of dismissal.

        First, for all of the reasons discussed above, there is an irreconcilable conflict

between the requirements of U.S. antitrust law and the laws and policies of China.  See

Timberlane, 549 F.2d at 614 (courts must examine "the degree of conflict with foreign law or

policy").  Simply put, Chinese law mandates conduct that U.S. antitrust law proscribes.  See

Trugman-Nash, Inc., 954 F. Supp. at 736 (dismissing on comity grounds after finding "actual

and material conflict between American antitrust law and New Zealand law in respect of the

marketing of dairy export produce"); McElderry, 678 F. Supp. at 1079 (dismissing on comity

grounds based on "direct conflict between" U.S. antitrust law and the law of the United

Kingdom).  And that Ministry-mandated conduct, all of which occurs in China, is far more "importan[t] to the violations charged" than any "conduct within the United States." Timberlane, 549 F.2d at 614.

Accordingly, an exercise of jurisdiction cannot achieve "compliance" with U.S. antitrust law:  as Chinese entities with their principal places of business in China, defendants cannot export vitamin C at all if they do not comply with the laws of China.  See id. (courts must consider the nationality of the parties and their principal places of business and the extent to which enforcement by either state can be expected to achieve compliance).  This lawsuit, therefore, cannot compel defendants to conform their future conduct to the requirements of U.S. antitrust law, because they will remain subject to the Ministry's price-coordination requirements.

Those requirements of Chinese law, moreover, were not adopted with "the explicit purpose to harm or effect American commerce," nor were any such harms or effects reasonably foreseeable.  See id.  To the contrary, the Ministry adopted these requirements to prevent self-destructive price competition during China's transition from a state-run to a market-driven economy.  As a consequence, the "significance of effects on the United States" is far smaller than the significance of the effects in China.  Id.  The price coordination and production limits plaintiffs challenge lie at the very heart of the Ministry's efforts to oversee and facilitate a sweeping transformation of China's entire economic system.  Whatever effects defendants' compliance with the Ministry's requirements has allegedly caused in the United States, those effects plainly do not implicate an historic transformation of the U.S. economy.

Finally, and as a consequence, punishing defendants (through an award of treble damages) for their compliance with mandates that the Ministry has deemed essential for the development of a stable market-driven economy can only adversely affect relations between the United States and China.  See id. at 609 (noting that nations "have sometimes resented and

protested, as excessive intrusions into their own spheres, broad assertions of authority by American courts"); Mannington Mills, 595 F.2d at 1297 (warning against a "provincial approach" to the exercise of antitrust jurisdiction over foreign conduct and noting examples of hostile reactions by British and Canadian authorities to such exercises).  Insofar as China's sovereign policy decisions about how best to manage its economic transformation conflict with the policies embodied in U.S. antitrust laws, that conflict should be addressed "through diplomatic channels," and not through "the unnecessary irritant of a private antitrust action." O.N.E. Shipping, 830 F.2d at 454.

## CONCLUSION

For all of the foregoing reasons, this Court should decline to exercise jurisdiction and should dismiss the Complaint.

Dated:

SIDLEY AUSTIN LLP

By: _____
Joel M. Mitnick (JM-0044)
Tracey R. Seraydarian (TS-5988)

787 Seventh Avenue
New York, NY 10019
(212) 839-5300

Of Counsel:

Joseph R. Guerra*
Sidley Austin LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000
*Not admitted to the Eastern District
 of New York

Attorneys for Amicus Curiae
The Ministry of Commerce of the
People's Republic of China