# Exhibit B



1985 WL 669663                                                                    Page 1
1985 WL 669663 (U.S.)


For opinion see 106 S.Ct. 1348

**Briefs and Other Related Documents**

<<Material appearing in DIGEST section, including Topic and Key Number
classifications, Copyright 2006 West Publishing Company>>

Supreme Court of the United States.
MATSUSHITA ELECTRIC INDUSTRIAL CO., LTD., et al., petitioners,
v.
ZENITH RADIO CORPORATION, et al.
**No. 83-2004.**
October Term, 1984.
January 4, 1985.
ON PETITION FOR A WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE
THIRD CIRCUIT

Brief for The United States as Amicus Curiae
Rex E. Lee, Solicitor General, J. Paul McGrath, Assistant Attorney General,
Lawrence G. Wallace, Deputy Solicitor General, Charles F. Rule, Deputy Assistant
Attorney General, Carolyn F. Corwin, Assistant to the Solicitor General, Charles S.
Stark, Robert B. Nicholson, Edward T. Hand, Spencer W. Waller, Attorneys,
Department of Justice, Washington, D.C. 20530, (202) 633- 2217.

David H. Small, Assistant Legal Adviser, Elizabeth M. Teel, Ronald W. Kleinman,
Attorney-Advisers, Department of State, Washington, D.C. 20520.

*I QUESTIONS PRESENTED
1. Whether a court of appeals may reverse summary judgment for the defendants in
an antitrust conspiracy case without considering whether all of defendants'
allegedly culpable actions were more consistent with an inference of conspiracy
than with an inference of independent action.

2. Whether the court of appeals erred in concluding that a finder of fact could
find Japanese companies liable for a violation of the Sherman Act based on conduct
compelled by the Government of Japan.

3. Whether a district court may exclude expert testimony it finds to be
untrustworthy when the data on which the experts relied are "of the type" on which
other experts in the field reasonably rely.

*III TABLE OF CONTENTS

Statement ... 1

Discussion ... 6

Conclusion ... 20

TABLE OF AUTHORITIES

Cases:

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1985 WL 669663
1985 WL 669663 (U.S.)

Adjusters Replace-A-Car, Inc. v. Agency Rent-A-Car, Inc., 735 F.2d 884 ... 12

American Tobacco Co. v. United States, 328 U.S. 781 ... 8

Arthur S. Langenderfer, Inc. v. S.E. Johnson Co., 729 F.2d 1050 ... 12

Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398 ... 15

Bogosian v. Gulf Oil Corp., 561 F.2d 434, cert. denied, 434 U.S. 1086 ... 8

Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690 ... 14

First National Bank v. Cities Service Co., 391 U.S. 253 ... 6, 7, 8, 9, 10, 11, 13

General Foods Corp., 3 Trade Reg. Rep. (CCH) ¶ 22,142 (Apr. 6, 1984) ... 12

Gillespie v. United States Steel Corp., 379 U.S. 148 ... 7

Interamerican Refining Corp. v. Texaco Maracaibo, Inc., 307 F. Supp. 1291 ... 14

International Telephone & Telegraph Co., 3 Trade Reg. Rep. (CCH) ¶ 22,188 (July 25, 1984) ... 12

Interstate Circuit, Inc. v. United States, 306 U.S. 208 ... 8

Kreuzer v. American Academy of Periodontology, 735 F.2d 1479 ... 8

Linseman v. World Hockey Ass'n, 439 F. Supp. 1315 ... 14

Monsanto Co. v. Spray-Rite Service Corp., No. 82-914 (Mar. 20, 1984) ... 9

*IV  Northeastern Telephone Co. v. American Telephone & Telegraph Co., 651 F.2d 76, cert. denied, 455 U.S. 943 ... 12

Parker v. Brown, 317 U.S. 341 ... 15

Southern Pacific Communications Co. v. American Telephone & Telegraph Co., 740 F.2d 980 ... 12

Theatre Enterprises, Inc. v. Paramount Film Distributing Corp., 346 U.S. 537 ... 8

Timberlane Lumber Co. v. Bank of America, N.T. & S.A., 549 F.2d 597 ... 14

United States v. Watchmakers of Switzerland Information Center, Inc., 1963 Trade Cas. (CCH) ¶ 70,600 ... 14

Weit v. Continental Illinois National Bank & Trust Co., 641 F.2d 457, cert. denied, 455 U.S. 988 ... 8

William Inglis & Sons Baking Co. v. ITT Continental Baking Co., 668 F.2d 1014, cert. denied, 459 U.S. 825 ... 12

Statutes:

Antidumping Act of 1916, 15 U.S.C. 72 ... 2

Clayton Act § 7, 15 U.S.C. 18 ... 2

Robinson-Patman Act, 15 U.S.C. 13(a) ... 2

Sherman Act, 15 U.S.C. 1 et seq.:

  § 1, 15 U.S.C. 1 ... 2

  § 2, 15 U.S.C. 2 ... 2, 12

  Wilson Tariff Act § 73, 15 U.S.C. 8 ... 2

Miscellaneous:

  73 Am. J. Int'l L. (1979):

  p. 124 ... 17

  p. 678 ... 17

Easterbrook, The Limits of Antitrust, 63 Tex. L. Rev. 1 (1984) ... 11

49 Fed. Reg. 36813 (1984) ... 18

*1 This brief is filed in response to the Court's invitation to the Solicitor General to express the views of the United States.

STATEMENT

1. In this 14-year-old lawsuit, respondents Zenith Radio Corporation and National Union Electric Corporation, American television manufacturers, charge that 24 companies (21 of which are petitioners here) participated in a 20-year conspiracy to drive American television manufacturers out of business by selling televisions at artificially high prices in Japan and at artificially low prices in the United States. [FN1] Respondents named as defendants all Japanese television manufacturers, their United States subsidiaries, and several Japanese trading companies, as *2 well as Sears Roebuck & Co. and Motorola, Inc., which were major customers of the Japanese companies. Respondents claimed that various aspects of the alleged conspiracy violated Sections 1 and 2 of the Sherman Act, 15 U.S.C. 1 and 2; Section 2(a) of the Robinson-Patman Act, 15 U.S.C. 13(a); Section 7 of the Clayton Act, 15 U.S.C. 18; Section 73 of the Wilson Tariff Act, 15 U.S.C. 8; and the Antidumping Act of 1916, 15 U.S.C. 72.

FN1. Respondents also alleged that the purported conspiracy involved the sale of consumer electronic products other than television sets. However, the case has focused almost entirely on television sets. See Pet. App. 247a n.7.

During eight years of discovery the parties produced hundreds of thousands of documents and took hundreds of depositions. However, respondents took no substantive deposition of any Japanese businessman alleged to have been involved in the conspiracy (see Pet. App. 402a-406a, 795a-799a).

Petitioners filed motions for summary judgment. The district court adopted a comprehensive case management procedure for resolving these motions on the enormous record. The court required respondents to identify--with preclusive effect--all the evidence on which they planned to rely at trial; [FN2] the court then held a five-week evidentiary hearing and ruled on the admissibility of that evidence before considering the summary judgment motions. In brief, the court ruled that, for various reasons, a large part of the evidence on which respondents chiefly relied

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

was inadmissible and thus could not be used to defeat summary judgment (see Pet.
App. 668a-776a, 777a-987a, 988a-1110a). The district court subsequently ruled, in a
430-page opinion, that all petitioners were entitled to summary judgment on all
antitrust counts, primarily because respondents had failed to present any
admissible, probative evidence that would establish the existence of the alleged
conspiracy (id. at 236a-667a). The district court found it unnecessary to rule on
petitioners' contention that much of their allegedly anticompetitive conduct was
compelled by the Government of *3 Japan and thus could not form the basis of an
antitrust violation (id. at 255a n.19, 387a-394a). [FN3]

> FN2. Respondents' Final Pretrial Statement, which constituted their complete
> offer of proof on the antitrust claims, exceeded 17,000 pages. See Pet. App.
> 268a.
>
> FN3. In 1977 and 1978, at respondents' request, the Antitrust Division
> conducted a thorough examination of what respondents characterized as the
> most probative evidence of the alleged conspiracy. Like the district court,
> the Division found "no evidence of concerted predatory conduct intended to
> destroy and supplant the U.S. color TV industry, either at an earlier period
> of time or at the present time." Pet. App. 23a (statement of Assistant
> Attorney General John H. Shenefield).

In an earlier opinion the district court rejected most of respondents' dumping
claims on the ground that the products sold in the United States and the products
sold in Japan were not sufficiently comparable to support such claims (Pet. App.
1111a-1214a). In its opmion granting summary judgment on the antitrust claims the
district court rejected the remaining dumping claims (id. at 632a n.372).

2. The court of appeals reversed the district court's grant of summary judgment on
all antitrust counts, except as to defendants Sony, Sears, and Motorola (Pet. App.
34a-197a). The court of appeals explicitly approved the innovative procedure used
by the district court to resolve the summary judgment motions on the massive record
(id. at 60a-66a). The court of appeals concluded, however, that many of the
district court's evidentiary rulings were wrong. In particular, the court of
appeals concluded that the district court had erred in excluding certain records of
Japanese administrative proceedings against some petitioners in connection with
resale price maintenance activities in Japan, various internal documents of
petitioners (e.g., diaries and memoranda), and the testimony of respondents'
experts based on those records and documents. Id. at 64a-162a.

After thus augmenting the body of evidence to be weighed in deciding the summary
judgment motions, the court of appeals proceeded to consider whether respondents'
antitrust theory could withstand scrutiny in light of *4 that body of evidence. In
the court of appeals' view, a fact-finder reasonably could conclude from the
admissible evidence that: (a) petitioners agreed to stabilize prices of televisions
in Japan; (b) the domestic and international competitive situation of the Japanese
television manufacturing industry gave petitioners a motive to enter into the
alleged conspiracy; (c) petitioners entered into formal written agreements that
established minimum prices (or "check prices") for television sets sold for export
to the United States; (d) petitioners allocated customers in the United States by
means of the "five-company rule," pursuant to which each petitioner agreed to sell
directly to only five customers in the United States (including each manufacturer's
United States sales subsidiary); (e) petitioners' prices for televisions sold in
the United States were substantially lower than their prices for comparable
televisions in Japan and, in fact, were "dumping prices" from which a fact-finder
could infer predatory intent; and (f) petitioners deceived the Japanese and
American governments as to the prices being charged in the United S ates, by

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

systematically giving secret rebates to United States purchasers, in a context in which each petitioner knew that its Japanese rivals were systematically giving rebates (Pet. App. 169a-180a). The court of appeals concluded that this amounted to sufficient evidence of the alleged conspiracy to preclude the entry of summary judgment for petitioners on the antitrust counts (id. at 180a).

  The court of appeals rejected petitioners' contention that they were entitled to summary judgment because the Japanese Ministry of International Trade and Industry (MITI) had compelled the check price agreement and the five-company rule, both of which the court regarded as key evidence of the conspiracy alleged by respondents (Pet. App. 188a-189a). In support of their contention, petitioners had cited a formal statement submitted by MITI to the district court in 1975 (id. at 6a-14a). The court of appeals "assume[d], without deciding, that a *5 government-mandated export cartel arrangement fixing minimum export prices would be outside the ambit of section 1 of the Sherman Act" (id. at 188a) and also "assume[d]" that MITI in fact had mandated the check price agreement (id. at 220a). The court nevertheless relied on the check price agreement as one of the crucial pieces of evidence of the alleged conspiracy that would preclude the grant of summary judgment (id. at 179a). The court stated that it was unclear whether the check prices "were in fact determined by the Japanese Government" and asserted that there was "no record evidence suggesting that the five-company rule originated with the Japanese Government" (id. at 188a-189a). [FN4]

>     FN4. The court of appeals affirmed the grant of summary judgment in favor of
>     defendants Motorola and Sears because there was no evidence that either
>     company was aware of the resale price maintenance conspiracy in Japan, the
>     five-company rule, or the alleged concerted action by the other defendants to
>     evade the check price agreements imposed by MITI (Pet. App. 176a, 180a-183a).
>     The court also affirmed summary judgment in favor of defendant Sony on the
>     grounds that Sony never gave rebates, never sold at dumping prices, and
>     occupied the high end of the price spectrum (id. at 183a-185a).

  The same panel of the court of appeals issued a separate opinion reversing the district court's dismissal of the dumping charges except as to Sony, Sears, and Motorola. Pet. App. 198a-223a. The court concluded that the products sold in Japan and the products sold in the United States were sufficiently comparable for purposes of the Antidumping Act (id. at 211a-214a); that there was evidence of a significant price differential between the two categories of products (id. at 216a-218a); and that there was a genuine issue as to whether petitioners acted with the requisite specific intent (id. at 218a-223a). [FN5]

>     FN5. None of the questions presented in the petition explicitly addresses the
>     antidumping charges. However, petitioners state that they challenge the
>     antidumping decision insofar as it rests on the same conspiracy evidence as
>     the antitrust charges. Pet. 8.

                              *6 DISCUSSION
  The decision below is one that has significant practical implications for both antitrust policy and the conduct of our nation's foreign trade policy. In evaluating evidence of the antitrust conspiracy alleged in this case, the court of appeals failed to adhere to this Court's precedents, in particular First National Bank v. Cities Service Co., 391 U.S. 253 (1968). The immediate result of that error is that this massive, 14-year-old case must proceed to trial, although the district court's grant of summary judgment in favor of petitioners very likely should have been affirmed. That consequence in itself may tend to discourage foreign companies from engaging in vigorous price competition in the United States for fear of incurring treble damages liability under United States antitrust laws. In addition,

        ©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the court of appeals' failure to apply the proper standard in evaluating evidence of conspiracy is likely to discourage district courts from resolving complex antitrust claims on motions for summary judgment in appropriate cases.

The court of appeals also erred in rejecting petitioners' contention that certain aspects of their conduct were compelled by the Government of Japan and therefore could not serve as a predicate for antitrust liability. On this record, the court of appeals should have given dispositive weight to the statement submitted to the district court by the Japanese Government, which indicated explicitly that part of petitioners' conduct was compelled. The court's rejection of petitioners' sovereign compulsion defense has caused deep concern to the Government of Japan and to the governments of other countries that are significant trading partners of the United States and threatens to affect adversely the foreign policy of the United States.

In view of these important practical considerations, we believe review by this Court is warranted on the first two questions presented by the petition. [FN6] We recognize *7 that this case comes to the Court in an interlocutory posture. In our view, however, this is one of those unusual cases that warrant plenary review in such a posture. The question whether respondents' evidence of conspiracy suffices to avert summary judgment must necessarily be resolved in the present posture of the case if it is to be resolved at all. Guidance from this Court on that issue could materially assist in efficient resolution of this litigation, which has already consumed extraordinary amounts of the time and resources of the parties and the judicial system. See, e.g., Gillespie v. United States Steel Corp., 379 U.S. 148, 153-154 (1964). If the Court were to agree with our submission that the court of appeals erred in failing to analyze the evidence of conspiracy in light of the Cities Service standard, we believe it would be proper for the court of appeals on remand to conclude that the district court's grant of summary judgment in favor of petitioners on the antitrust claims should be affirmed. [FN7] Moreover, the foreign trade policy concerns raised by the court of appeals' decision on the sovereign compulsion issue are of immediate and practical importance, regardless of the procedural posture of the case.

     FN6. We take no position on the third question raised by the petition, involving the admissibility of expert testimony.

     FN7. Although the court of appeals held admissible much of the evidence the district court excluded, the two courts appear to have considered essentially the same body of evidence, since the district court was willing to assume the admissibility of much of respondents' evidence (see Pet. App. 253a-254a n.18). Even if the district court failed to consider evidence the court of appeals held admissible, the court of appeals on remand could conclude that this was harmless error because application of the Cities Service standard to the admissible evidence leads to the conclusion that petitioners were entitled to summary judgment in any event.
     The antitrust claims form the greater part of this litigation and present the more significant legal issues; moreover, guidance from this Court concerning the evaluation of evidence of the alleged antitrust conspiracy would assist on remand in dealing further with the issue of specific intent in connection with the antidumping claims.

1. The court of appeals' approach to analysis of the evidence in this case is inconsistent with this Court's *8 precedents. In First National Bank v. Cities Service Co., 391 U.S. at 280, 285-288, this Court ruled that an antitrust plaintiff who seeks to prove the existence of an anticompetitive conspiracy solely on the basis of circumstantial evidence in the form of parallel conduct can survive a motion for summary judgment only by showing that the evidence to be introduced is

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1985 WL 669663                                                  Page 7
1985 WL 669663 (U.S.)

more consistent with the inference that the conduct resulted from the alleged
conspiracy than with the inference that it resulted from independent action.
Indeed, evidence of parallel conduct normally will be probative of an
anticompetitive agreement only if it is shown to be inconsistent with the
independent competitive interests of the defendants and therefore unlikely to occur
in the absence of collusion. See Kreuzer v. American Academy of Periodontology, 735
F.2d 1479, 1487-1488 (D.C. Cir. 1984); Weit v. Continental Illinois National Bank &
Trust Co., 641 F.2d 457, 462- 465 (7th Cir. 1981), cert. denied, 455 U.S. 988
(1982); Bogosian v. Gulf Oil Corp., 561 F.2d 434, 446 (3d Cir. 1977), cert. denied,
434 U.S. 1086 (1978). [FN8]

     FN8. In Theatre Enterprises, Inc. v. Paramount Film Distributing Corp., 346
     U.S. 537, 541-542 (1954), this Court rejected the contention that a
     conspiracy must be inferred where the plaintiff proved only parallel conduct
     and the defendants showed that their behavior was consistent with individual
     self interest. In cases in which this Court has approved inference of a
     conspiracy from parallel behavior, that behavior was inconsistent with the
     hypothesis that each defendant made an independent business decision to act
     as it did. See, e.g., American Tobacco Co. v. United States, 328 U.S. 781,
     800-808 (1946); Interstate Circuit, Inc. v. United States, 306 U.S. 208, 222-
     225 (1939).

 The Cities Service rule safeguards against the possibility that parallel behavior
that manifests only the workings of a competitive market might be deemed illegal.
It is particularly important that courts adhere strictly to that rule when it is
alleged that defendants have violated the antitrust laws by charging prices that
are too low, in order to avoid imposing penalties on independent, unilateral
conduct that has the effect of reducing *9 prices, increasing competition, and
thereby directly benefiting consumers. Just last Term, the Court admonished in
Monsanto Co. v. Spray-Rite Service Corp., No. 82-914 (Mar. 20, 1984), slip op. 8,
that permitting the inference of an anticompetitive agreement from highly ambiguous
evidence "could deter or penalize perfectly legitimate conduct."

 Here respondents alleged that petitioners engaged in a broad conspiracy to
maintain high prices for television sets sold in Japan and low prices for sets
exported to the United States. The district court applied the Cities Service
standard to evidence of petitioners' parallel conduct (Pet. App. 346a-357a) and
concluded that that conduct--involving alleged dumping prices and secret rebates--
was more reasonably explained as independent competitive behavior than as collusion
(id. at 494a-502a). The court of appeals implicitly conceded the general validity
of the Cities Service standard. [FN9] It concluded, however, that the standard was
inapplicable here because respondents had adduced not merely evidence of parallel
conduct, but also "direct" evidence that petitioners colluded in some ways,
including a resale price maintenance agreement in connection with sales in Japan
and the check price agreement and five-company rule in connection with exports to
the United States (Pet. App. 164a-166a). In evaluating the evidence of parallel
conduct, the court of appeals focused only on whether the alleged conspiracy was a
plausible explanation for petitioners' conduct, not on whether a fact-finder
reasonably could find it to be the more probable explanation.

     FN9. See Pet. App. 164a. Although the court of appeals did not mention Cities
     Service, it cited several Third Circuit decisions that applied the Cities
     Service principle.

 The existence of the "direct" evidence cited by the court of appeals does not
justify its failure to apply the Cities Service standard. That evidence was
"direct" only with respect to agreements concerning resale prices in Japan and use

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of check prices (i.e., minimum prices) and the *10 five-company rule for exports to the United States. Those agreements did not have any necessary tendency to prove the alleged agreement to charge low, predatory prices in the United States, which the court of appeals found that respondents were required to prove in order to establish antitrust injury (see Pet. App. 167a-168a, 178a); [FN10] at best, agreements concerning resale prices in Japan, check prices, and the five-company rule would constitute circumstantial evidence of the existence of the alleged agreement involving pricing at predatory levels. Thus, the "direct" evidence cited by the court of appeals does not obviate the need for the central inquiry required by Cities Service--whether the parallel low pricing behavior the court viewed as the crucial element of the alleged conspiracy (see Pet. App. 177a-179a) was more reasonably viewed as the result of independent business decisions by petitioners than as the result of collusion. [FN11]

> FN10. For example, the court of appeals recognized that an agreement among petitioners that fixed minimum prices for the United States market (i.e., the check price agreement) would tend to keep prices up and would "in isolation protect * * * competitors like [respondents] from competition," so that respondents could not, "absent other circumstances," maintain this lawsuit "because they could not show the requisite injury to their business or property." Pet. App. 178a. In order to prove antitrust injury under their theory, respondents were required to prove that petitioners agreed to set predatory prices. See id. at 177a-179a.

> FN11. We agree with the court of appeals that "direct evidence of some kinds of concert of action like price fixing in Japan may be circumstantial evidence of a broader conspiracy" (Pet. App. 165a). The issue here, however, is whether the existence of such evidence changes the standard under which ambiguous evidence consisting of consciously parallel conduct is evaluated on motions for summary judgment.

Had the court of appeals correctly focused on the Cities Service inquiry, we believe it should have concluded--as did the Antitrust Division in its 1977- 1978 investigation of the evidence in this case (see page 3 note 3, supra)-- that petitioners' parallel pricing conduct was at *11 least as consistent with independent conduct as with the alleged conspiracy. As the district court found (Pet. App. 473a-503a), the alleged secret rebates and sales at dumping prices were fully consistent with independent efforts by petitioners to penetrate a new market by offering low prices that evaded regulatory constraints imposed by Japan and the United States (i.e., check prices and antidumping laws). It was not inconsistent with petitioners' independent self interest for them to keep their own rebates secret or to fail to report the secret rebates given by their Japanese rivals, since detection of the rebates could have exposed each petitioner to liability for violations of antidumping laws. Although such independent conduct might support a claim for damages under the Antidumping Act of 1916 (as respondents contend), [FN12] it is insufficient to support a finding of conspiracy to violate the antitrust laws under the Cities Service standard.

> FN12. The court of appeals determined that petitioners were not entitled to summary judgment on respondents' Antidumping Act claims. See page 5, supra. We take no position on the correctness of that conclusion.

Moreover, the court of appeals' failure to apply the Cities Service standard led it to disregard the economic logic of respondents' allegations. Respondents' antitrust conspiracy theory turns on the claim that petitioners agreed to charge low prices in the United States market in order to drive United States manufacturers out of business. If petitioners priced in such a way that their sales

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

in the United States market were unprofitable in the short run in the hope that long-run sales at monopoly prices would make their alleged strategy profitable overall, then a conspiracy might be the most probable explanation of the evidence. [FN13] On the other hand, if petitioners *12 sold at prices that were below respondents' costs but nonetheless were still profitable, then petitioners' behavior would be perfectly consistent with their independent self interest. [FN14] The court of appeals never analyzed respondents' evidence of below-cost pricing (which consisted almost entirely of expert testimony based on assumptions about petitioners' costs, see Pet. App. 473a, 1056a-1077a) to see whether the evidence of parallel pricing behavior supported a viable theory of anticompetitive collusion. [FN15]

> FN13. One commentator has concluded that such a theory makes no sense in the circumstances of this case. See Easterbrook, The Limits of Antitrust, 63 Tex. L. Rev. 1, 26-27 (1984) ("The predation-recoupment story [in this case] * * * does not make sense, and we are left with the more plausible inference that the Japanese firms did not sell below cost in the first place. They were just engaged in hard competition.").

> FN14. Such considerations have led the courts of appeals to conclude that strong evidence of below-cost pricing is vital to a determination that a low-price strategy amounts to unlawful predation that violates Section 2 of the Sherman Act. See, e.g., Southern Pacific Communications Co. v. American Telephone & Telegraph Co., 740 F.2d 980, 1002-1007 (D.C. Cir. 1984); Adjusters Replace-A-Car, Inc. v. Agency Rent-A-Car, Inc., 735 F.2d 884, 888-891 (5th Cir. 1984); Arthur S. Langenderfer, Inc. v. S.E. Johnson Co., 729 F.2d 1050, 1056-1058 (6th Cir. 1984); William Inglis & Sons Baking Co. v. ITT Continental Baking Co., 668 F.2d 1014, 1031-1039 (9th Cir. 1981), cert. denied, 459 U.S. 825 (1982); Northeastern Telephone Co. v. American Telephone & Telegraph Co., 651 F.2d 76, 86-88 (2d Cir. 1981), cert. denied, 455 U.S. 943 (1982). The Federal Trade Commission has reached a similar conclusion. See, e.g., International Telephone & Telegraph Co., 3 Trade Reg. Rep. (CCH) ¶ 22,188, at 23,081- 23,085 (July 25, 1984); General Foods Corp., 3 Trade Reg. Rep. (CCH) ¶ 22,142, at 22,974-22,976 (Apr. 6, 1984).

> FN15. Indeed, the court of appeals never considered whether respondents had adduced any evidence that petitioners' prices were below any measure of cost. Rather, the court merely summarily characterized respondents' evidence as indicating that petitioners sold "at prices * * * below the prices at which [respondents] could successfully compete" and that "produced losses" for petitioners. Pet. App. 167a, 179a.
> The district court's opinions indicate that respondents' evidence of "below cost" sales consisted solely of the testimony of their chief expert, Dr. DePodwin, that four petitioners sometimes sold their products in the United States at prices below some measure of their costs. Pet. App. 473a, 1065a. Dr. DePodwin's testimony, in turn, was "a mathematical construction" based on certain assumptions about petitioners' costs (ibid.). The district court noted that "far more reliable evidence of [petitioners'] costs was available to [respondents] in discovery, but * * * they had not availed themselves of it" (id. at 473a n.200; see id. at 1065a-1069a).

*13 The court of appeals' failure to apply the Cities Service standard in this case is an error of considerable significance to the maintenance of competition. Cities Service teaches that even the most complicated antitrust cases may be resolved on summary judgment when the plaintiff has failed to adduce sufficient evidence of an anticompetitive conspiracy. The district court here devoted an extraordinary effort to devising an innovative and efficient method that would

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

allow a responsible resolution of this massive case without the delay and expense of a trial. The court of appeals' rejection of the Cities Service inquiry in a case like this one is likely to discourage district courts from making the effort necessary to develop and apply such exemplary case management procedures. We believe the court of appeals' approach ultimately will diminish the willingness of district courts to attempt to resolve complex antitrust litigation on motions for summary judgment in appropriate cases, thus reducing the opportunities for efficient handling of such litigation, including efficient disposition of unmeritorious claims against lawful competitors.

Indeed, the court of appeals' decision has aroused deep concern in Japan that other Japanese manufacturers attempting to penetrate the United States market will be subject to burdensome litigation and the possibility of an award of treble damages if they engage in vigorous price competition. We agree that the decision may encourage United States companies to use the antitrust laws as a weapon to deter lawful price competition by foreign companies. To the extent the decision is perceived and applied in this manner, it could defeat the basic purpose of the antitrust laws--enhancement of consumer welfare through preservation of a competitive economic system. [FN16]

FN16. Respondents mistakenly suggest (e.g., Br. in Opp. 5, 22) that if the Court grants review in this case it will be required to sift through the entire record. In fact, the Court would be required to decide only whether the court of appeals failed to apply the proper legal standard in evaluating the evidence of conspiracy. If the Court should reverse on this point, it could remand the case to the court of appeals for further proceedings consistent with the Court's opinion.

*14 2. The court of appeals erred in concluding that a fact-finder could find Japanese companies liable for a Sherman Act violation based on conduct compelled by the Government of Japan. The courts have properly recognized that anticompetitive private conduct that is compelled by a foreign sovereign does not give rise to antitrust liability under United States law. See, e.g., Timberlane Lumber Co. v. Bank of America, N.T. & S.A., 549 F.2d 597, 606-607 (9th Cir. 1976); Interamerican Refining Corp. v. Texaco Maracaibo, Inc., 307 F. Supp. 1291, 1297-1298 (D. Del. 1970). Cf. Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 706-707 (1962). [FN17] This sovereign compulsion defense is based largely on considerations of international comity and fairness to antitrust defendants who have been constrained to obey the mandates of a foreign sovereign. [FN18] It also constitutes *15 judicial recognition that conduct compelled by foreign sovereigns often raises foreign policy concerns that are primarily the province of the Executive Branch.

FN17. In Continental Ore Co. v. Union Carbide & Carbon Corp., antitrust defendants contended that the Canadian government had compelled them to engage in the anticompetitive acts at issue there. This Court concluded, however, that the defense was not available because there was "no indication that [any] official within the * * * Canadian Government approved or would have approved of" the anticompetitive conduct, or that any Canadian law otherwise compelled the conduct. 370 U.S. at 706-707. The Court had no occasion to discuss a situation in which, as here, the record includes a statement by a foreign government that it has compelled some or all of the allegedly anticompetitive conduct at issue.
It appears that only one court has found that the facts of the case before it would support a sovereign compulsion defense. See Interamerican Refining Corp. v. Texaco Maracaibo, Inc., supra. Other courts have concluded that the defendant involved failed to prove that their conduct was compelled. See,

e.g., Timberlane Lumber Co. v. Bank of America, 549 F.2d at 608; Linseman v. World Hockey Ass'n, 439 F. Supp. 1315, 1324 (D. Conn. 1977); United States v. Watchmakers of Switzerland Information Center, Inc., 1963 Trade Cas. (CCH) ¶ 70,600, at 77,456-77,457 (S.D.N.Y. 1962).

FN18. The sovereign compulsion defense differs from the act of state doctrine, which "precludes the courts of this country from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory." Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 401 (1964). It differs also from the state action doctrine applicable to domestic antitrust disputes, which reflects the view that, while the Sherman Act's proscription of anticompetitive conduct is the supreme law of the land, Congress generally did not intend by its silence in the Sherman Act to prohibit action of a state that may restrain competition. See Parker v. Brown, 317 U.S. 341, 351 (1943).

  Petitioners contended below that certain aspects of their conduct--the check price agreement and the five-company rule--were compelled by the Government of Japan and therefore could not serve as the basis for imposition of antitrust liability. [FN19] Petitioners relied on a written statement sent to the district court by the Ministry of International Trade and Industry of the Government of Japan. That statement (the "MITI Statement") addressed "certain agreements entered into among [petitioners], as well as certain regulations of the Japan Machinery Exporters Association [JMEA]" (Pet. App. 8a). The MITI Statement began by affirming that both the check price agreement and the JMEA regulations (which included the five-company rule) "have come into existence pursuant to the direction of MITI" (ibid.). After a detailed discussion of MITI's powers and its involvement in the creation and implementation of the agreements and regulations at issue, the MITI Statement declared (id. at 12a) that when MITI

      FN19. Respondents contend (Br. in Opp. 22-23) that petitioners have not preserved their argument concerning sovereign compulsion. However, the pleadings make it plain that petitioners did raise the argument in the court of appeals (see pages 37-44 & n.34 of the petitioners' brief filed in the court of appeals) and that respondents disputed it at length (see pages 79-88 of the respondents' reply brief filed in the court of appeals).

  directed [petitioners] to conclude * * * such agreement and regulation relating to the minimum prices at which televisions could be sold for the United *16 States market and other matters, [petitioners] had no alternative but to establish the agreement and regulation in compliance with the said direction.

  The district court found it unnecessary to decide whether petitioners had established their sovereign compulsion defense (Pet. App. 255a n.19, 387a-394a). However, the court of appeals reached that question and concluded that summary judgment could not be granted on the defense (id. at 188a-189a). The court of appeals never referred explicitly to the MITI Statement. The court "assume[d], without deciding, that a government-mandated export cartel arrangement fixing minimum export prices would be outside the ambit of" the Sherman Act (id. at 188a). The court also noted (id. at 178a) that petitioner's check price agreement appeared "to have been encouraged, if not mandated, by MITI." The court nevertheless stated that it could not "be said with any degree of certainty that the minimum prices, claimed by [respondents] to be dumping prices, were in fact determined by the Japanese Government," because "[i]t is possible to conclude that the government merely provided an umbrella under which [petitioners] * * * fixed their own export prices." In addition, there was "abundant evidence suggesting that many [petitioners] departed from the agreed-upon minimums and took steps to conceal

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1985 WL 669663                                                    Page 12
1985 WL 669663 (U.S.)

their departure from MITI." Finally, the court asserted that there was "no record evidence suggesting that the five-company rule originated with the Japanese Government." Id. at 188a-189a. In its discussion of the evidence of conspiracy, the court of appeals expressly cited both the check price agreement and the five-company rule as supporting a possible inference of illegal conspiracy, which would preclude the grant of summary judgment for petitioners. Id. at 179a.

  The court of appeals erred in rejecting petitioners' sovereign compulsion defense. The Government of Japan explained in the MITI Statement that it "directed" petitioners "to enter into" the check price agreement (Pet. App. 11a), supervised the establishment of the agreement to ensure that MITI's intention was correctly reflected, **17** exercised continuous direction and supervision of the terms of the agreement, [FN20] and was empowered and prepared to enforce Japanese government policy as embodied in that agreement (id. at 8a-11a). [FN21] On this record, that explicit and detailed statement by a foreign sovereign that it mandated the check price agreement in accordance with its laws (id. at 12a) should have been given dispositive weight. [FN22] It follows that the sovereign compulsion defense **18** precluded use of the check price agreement as a basis for liability under the Sherman Act. The court of appeals therefore erred in leaving open the possibility that on remand liability might be predicated on that agreement. See Pet. App. 179a. [FN23]

     FN20. The court of appeals held that a fact-finder could conclude that the Government of Japan did not "determine" the minimum price levels under the check price agreement and apparently rejected petitioners' sovereign compulsion defense on that basis. See Pet. App. 188a-189a. In so holding, the court erred in failing to give weight to the explanation in the MITI Statement that MITI exercised "direction and supervision concerning minimum prices at which televisions could be sold for exportation to the United States * * * continuously from 1963 until February 28, 1973" (id. at 11a).

     FN21. In conveying this explanation to the district court, the Japanese Government properly sought to present its showing on the sovereign compulsion issue directly to the court. This Court has approved a procedure under which a foreign government may convey its views to the Court directly in cases in which it has an interest by the filing of a brief as amicus curiae. See 73 Am. J. Int'l L. 124 (1979). The State Department has encouraged foreign governments to communicate their views directly to United States courts. See ibid.; id. at 678-679.
     The court of appeals nevertheless appears to have wholly disregarded the MITI Statement in rejecting petitioners' foreign sovereign compulsion defense. In declining to give weight to, or even to acknowledge, the MITI Statement, the court of appeals failed to accord the proper respect due a foreign government that has taken appropriate steps to convey its views to a United States court in connection with litigation.

     FN22. The MITI Statement also explained that MITI had directed the regulations of the Japan Machinery Exporters Association, which included the five-company rule. The court of appeals therefore erred in concluding that there was "no record evidence" (Pet. App. 189a) suggesting that the five-company rule was compelled by the Japanese Government. The MITI Statement did not explicitly single out the five-company rule as an example of conduct required by MITI. The Government of Japan recently transmitted a diplomatic Note Verbale that states unequivocally that the Japanese Government did mandate the five-company rule. See Br. of the Gov't of Japan 2a. However, the court of appeals did not have the benefit of the Note Verbale.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

> FN23. We do not suggest that a court is precluded from considering compelled conduct for all purposes in an antitrust case. There are circumstances in which it would be appropriate, e.g., to consider the existence of compelled conduct as evidence that some other alleged event has taken place. However, the court of appeals erred in relying on the compelled conduct in this case as a possible predicate for liability, rather than merely as evidence of the existence of some other fact.

The court of appeals' disregard for the explicit assurance of the Japanese Government that it required export restraints at issue in this case threatens to do serious damage to the foreign trade relations of the United States. Restrictions imposed by governments in connection with exports by their national companies are a significant feature of contemporary international trade. In some instances, foreign governments have imposed such restrictions on exports to the United States at the request of our government, acting to implement our international trade policy. [FN24] Such restrictions have assumed a special importance in our trade relations with Japan, as evidenced by, e.g., the controls on automobile exports to the United States imposed by MITI in 1981, in a manner similar to imposition of the check price agreement at issue here (see Pet. App. 25a-26a). [FN25]

> FN24. For example, in establishing a government policy for the steel industry, President Reagan recently directed the United States Trade Representative to "negotiate 'surge control' arrangements or understandings and, where appropriate, suspension agreements with countries whose exports to the United States have increased significantly in recent years due to an unfair surge in imports" and to "reaffirm existing measures with countries that have voluntarily restrained their exports to our market." 49 Fed. Reg. 36813 (1984).

> FN25. In imposing those controls, the Government of Japan may well have relied on the view that the defense of sovereign compulsion would be available to Japanese automobile manufacturers that conformed their conduct to the controls. A letter dated May 7, 1981, from the Attorney General of the United States to the Ambassador of Japan, advised the Government of Japan that the voluntary restraint arrangement involving export of Japanese-built automobiles to the United States "would properly be viewed as having been compelled by the Japanese government, acting within its sovereign powers" and that, in the Justice Department's view, compliance of Japanese automobile companies with the program "would not give rise to violations of United States antitrust laws" (Pet. App. 26a). We are advised by the United States Trade Representative that extension of this arrangement, which has important implications for this country's domestic economic and international trade policies, will be considered in the near future.

*19 The Japanese Government and other important United States trading partners have read the court of appeals' rejection of the sovereign compulsion defense in this case as indicating that imposition of voluntary restraints by foreign governments can readily subject the foreign companies involved to burdensome litigation and possible treble damages liability in this country, despite clear evidence that the foreign sovereign has mandated the allegedlv anticompetitive conduct. In response to the decision, these and other foreign governments understandably may be reluctant to accommodate proposals by the United States to resolve trade controversies by the imposition of voluntary restraint agreements on their own manufacturers. [FN26] Such a response could deprive the United States of a tool that has proved valuable in the resolution of difficult international trade disputes. Review by this Court is warranted in order to make clear that the court of appeals erred in concluding that the compelled conduct *20 at issue in this case

©   2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1985 WL 669663                                          Page 14
1985 WL 669663 (U.S.)


could form the predicate for a finding of antitrust liability on remand.

> FN26. In addition to the Government of Japan (see Br. of the Gov't of Japan
> 1a-4a), the Governments of Australia, Canada, France, the Republic of Korea,
> Spain, and the United Kingdom have formally advised the Department of State
> of their serious concern about the potential adverse impact on their trade
> relations with the United States of the court of appeals' treatment of the
> sovereign compulsion issue. We are lodging copies of the communications
> received by the State Department from these governments with the Clerk of the
> Court and providing copies to counsel.

CONCLUSION

 The petition for a writ of certiorari should be granted as to the first and second
questions presented.

Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.
1985 WL 669663

**Briefs and Other Related Documents (Back to top)**

• 1985 WL 669662 (Appellate Brief) Reply Brief for Petitioners (Oct. 24, 1985)

• 1985 WL 669661 (Appellate Brief) Brief for Respondents (Oct. Term 1985)

• 1985 WL 669668 (Appellate Brief) Brief of the Semiconductor Industry Association
as Amicus Curiae in Support of Respondents (Sep. 06, 1985)

• 1985 WL 669667 (Appellate Brief) Brief for the United States as Amicus Curiae
Supporting Petitioners (Jun. 17, 1985)

• 1985 WL 669666 (Appellate Brief) Motion of American Association of Exporters and
Importers and Consumers for World Trade for Leave to File Brief as Amici Curiae and
Brief as Amici Curiae in Support of the Petitioners (Jun. 16, 1985)

• 1985 WL 669660 (Appellate Brief) Brief for Petitioners (Jun. 14, 1985)

• 1985 WL 669665 (Appellate Brief) Motion for Leave to File Brief Amici Curiae and
Brief of the Governments of Australia, Canada, France, and the United Kingdom of
Great Britain and Northern Ireland as Amici Curiae in Support of Petitioners (Jun.
14, 1985)

• 1985 WL 669664 (Appellate Brief) Motion for Leave to File Brief Amicus Curiae and
Brief for the Government of Japan as Amicus Curiae in Support of Petitioners (Jun.
04, 1985)

• 1985 WL 669659 (Appellate Brief) Supplemental Brief for Petitioners Pursuant to
Rule 22.6 (Jan. 23, 1985)

• 1985 WL 669658 (Appellate Brief) Supplemental Brief of Respondents in Response to
the Brief of the United States as Amicus Curiae (Jan. 14, 1985)

• 1984 WL 565879 (Appellate Brief) Supplemental Brief of Petitioners (Jul. 23,
1984)

• 1984 WL 565878 (Appellate Brief) Reply Brief for Petitioners (Jul. 18, 1984)

• 1984 WL 565877 (Appellate Brief) Supplemental Brief of Respondents (Jul. 17,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1985 WL 669663                                                    Page 15
1985 WL 669663 (U.S.)

1984)


• <u>1984 WL 565881</u> (Appellate Brief) Motion of American Association of Exporters and
Importers and Consumers for World Trade for Leave to File Brief as Amici Curiae and
Brief as Amici Curiae in Support of the Petition for a Writ of Certiorari (Jul. 07,
1984)


• <u>1984 WL 565880</u> (Appellate Brief) Motion for Leave to File Brief Amicus Curiae and
Brief of the Government of Japan as Amicus Curiae in Support of the Petition for A
Writ of Certiorari (Jul. 06, 1984)


END OF DOCUMENT

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.