**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

-------------------------------------------------------

IN RE
VITAMIN C ANTITRUST LITIGATION

MASTER FILE 06-MD-1738
(DGT) (JO)

This Document Relates To: 05-6059,
06-149, 06-897, 06-5561

-------------------------------------------------------

## AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs, through their attorneys, bring this civil action on behalf of themselves and all others similarly situated in New York, Arizona, the District of Columbia, Florida, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Nebraska, Nevada, New Mexico, North Carolina, North Dakota, Pennsylvania, South Dakota, Tennessee, Vermont, West Virginia and Wisconsin ("the Class Jurisdictions") for damages and declaratory relief against the above named defendants ("Defendants"). Plaintiffs, upon personal knowledge as to their own actions and upon information and belief with respect to all other allegations, respectfully allege the following:

### INTRODUCTION

1.       This case arises out of a long-running conspiracy beginning no later than December 2001, and continuing until present, among Defendants and their co-conspirators with the purpose and effect of fixing prices, creating supply restraints, allocating market share, and committing other unlawful practices designed to inflate the prices of bulk Vitamin C ("Vitamin C") and products made with or from Vitamin C sold

indirectly to Plaintiffs and other consumers across the United States, including New York. Plaintiffs Richard Keane, Karen Haines, and Gerard Shannon, bring this action on behalf of themselves and all others similarly situated in New York pursuant to the N.Y. Gen. Bus. § 349. Plaintiffs Mark Schamel, Viviane Melo, Sandra Jeffreys, Dana Erichsen, Laurel Rose, Christine Poon, Linda Kohlenberg, Melissa Harris, Kaitlyn Johnson, Tausha Moeller, Lorene Culler, Dr. Carl Martin, D.V.M., Timothy Purdy, Ronald Kaufman, Jennifer Clark, Mark Kuchta, Kathleen Davis, Heather and Cory Rosene, Curt Badger, Follansbee Pharmacy, Diana Kitch, Stephanie Karol, and Christopher Murphy bring this action on behalf of themselves and all others similarly situated pursuant to the following relevant state statutes:

| Arizona | A.R.S. §§ 44-1401, *et. seq.* |
|---|---|
| District of Columbia | D.C. Code §§ 28-4501, *et. seq.*<br>D.C. Code §§ 28-3901, *et. seq.* |
| Florida | Florida Statutes §§ 501.204, *et seq.* |
| Iowa | IA. Rev. Stat. §§ 553.1, *et seq.* |
| Kansas | Kan. Stat. Ann. §§ 50-101, *et seq.* |
| Maine | 10 M.R.S.A. §§ 1101, *et seq.*<br>5 M.R.S.A. §§ 205-A, *et seq.* |
| Massachusetts | Mass. Gen. Laws Ch. 93A *et seq.* |
| Michigan | M.C.L.A. §§ 445.772, *et seq.* |
| Minnesota | Minn. Stat. Ann. §§ 325D.49, *et seq.* |
| Nebraska | Neb. Rev. Stat. §§ 59-801, *et seq.*<br>Neb. Rev. Stat. §§ 59-1601, *et seq.* |
| Nevada | Nev. Rev. Stat. §§ 598A.010, *et seq.* |
| New Mexico | N.M. Stat. Ann. §§ 57-1-1, *et seq.* |

|                  | N.M. Stat. Ann. § 57-12-3                                                              |
|------------------|----------------------------------------------------------------------------------------|
| North Carolina   | N.C. Gen. Stat. §§ 75-1, *et seq.*                                                      |
| North Dakota     | N.D. Cent. Code §§ 51-08.1, *et seq.*<br>N.D. Cent. Code § 51-15-02                     |
| Pennsylvania     | 73 Pa. Cons. Stat. Ann. §201-1 *et seq.*                                                |
| South Dakota     | S.D. Codified Laws Ann. §§ 37-1-3, *et seq.*<br>S.D. Codified Laws Ann. § 37-26-6       |
| Tennessee        | Tenn. Code Ann. §§ 47-25-101, 47-25-105,<br>47-25-106<br>Tenn. Code Ann. § 47-18-104   |
| Vermont          | 9 Vt. Stat. Ann. §§ 2451, *et seq.*                                                     |
| West Virginia    | W. Va. Code §§ 47-18-1, *et seq.*<br>W. Va. Code § 46A-6-104, §§ 47-11A-1, *et<br>seq.* |
| Wisconsin        | Wis. Stat. §§ 133.01, *et seq.*                                                         |

2.      Defendants and their co-conspirators have formed an international cartel to illegally restrict competition in the Vitamin C market, targeting and severely burdening consumers in the various Class Jurisdictions, including New York. The conspiracy has existed at least during the period from December 2001 to the present (the "Class Period"), and has affected hundreds of millions of dollars of commerce for products commonly found in households throughout the Class Jurisdictions, raising the cost of Vitamin C and products made with or from Vitamin C to Plaintiffs and consumers in the Class Jurisdictions, including New York.

3.      The charged combination and conspiracy consists of continuing agreements, understandings, and actions by Defendants and their co-conspirators. Through their actions, Defendants fixed, stabilized, and maintained the price of Vitamin

C and products made with or from Vitamin C sold to consumers in the Class

Jurisdictions, including New York.

4.    The acts in furtherance of the conspiracy by Defendants and their co-

conspirators have included, upon information and belief, the following wrongful conduct

and horizontal agreements:

> a.    Participating in meetings and conversations in which Defendants and their co-conspirators discussed and agreed to the prices at which Vitamin C should be sold;
>
> b.    Participating in meetings and conversations in which Defendants and their co-conspirators discussed and agreed to restrict their exports of Vitamin C in order to create a shortage of supply in the market; and
>
> c.    Facilitating, effectuating, implementing, monitoring, and concealing the contract, combination and conspiracy to raise the prices of Vitamin C sold by Defendants.

## JURISDICTION

5.    This Court has jurisdiction pursuant to 28 U.S.C. § 1332. The matter in

controversy exceeds $5,000,000 exclusive of interest and costs when the claims of

individual class members are aggregated, and is between citizens of different states.

Venue is proper in the United States District Court for the Eastern District of New York

pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the

claim occurred in this judicial district.

6.    Personal jurisdiction comports with due process under the United States

Constitution.

7.    Plaintiffs Richard Keane, Karen Haines, and Gerard Shannon bring this

civil action pursuant to the consumer protection statute of New York, N.Y. Gen. Bus. §

349. Plaintiffs Mark Schamel, Viviane Melo, Sandra Jeffreys, Dana Erichsen, Laurel

Rose, Christine Poon, Linda Kohlenberg, Melissa Harris, Kaitlyn Johnson, Tausha Moeller, Lorene Culler, Dr. Carl Martin, D.V.M., Timothy Purdy, Ronald Kaufman, Jennifer Clark, Mark Kuchta, Kathleen Davis, Heather and Cory Rosene, Curt Badger, Follansbee Pharmacy, Diana Kitch, Stephanie Karol, and Christopher Murphy bring this civil action pursuant to the antitrust, deceptive and unfair trade practices, and consumer protection statutes of the following Class Jurisdictions:

| | |
|---|---|
| Arizona | A.R.S. §§ 44-1401, *et. seq.* |
| District of Columbia | D.C. Code §§ 28-4501, *et. seq.*<br>D.C. Code §§ 28-3901, *et. seq.* |
| Florida | Florida Statutes §§ 501.204, *et seq.* |
| Iowa | IA. Rev. Stat. §§ 553.1, *et seq.* |
| Kansas | Kan. Stat. Ann. §§ 50-101, *et seq.* |
| Maine | 10 M.R.S.A. §§ 1101, *et seq.*<br>5 M.R.S.A. §§ 205-A, *et seq.* |
| Massachusetts | Mass. Gen. Laws Ch. 93A *et seq.* |
| Michigan | M.C.L.A. §§ 445.772, *et seq.* |
| Minnesota | Minn. Stat. Ann. §§ 325D.49, *et seq.* |
| Nebraska | Neb. Rev. Stat. §§ 59-801, *et seq.*<br>Neb. Rev. Stat. §§ 59-1601, *et seq.* |
| Nevada | Nev. Rev. Stat. §§ 598A.010, *et seq.* |
| New Mexico | N.M. Stat. Ann. §§ 57-1-1, *et seq.*<br>N.M. Stat. Ann. § 57-12-3 |
| North Carolina | N.C. Gen. Stat. §§ 75-1, *et seq.* |
| North Dakota | N.D. Cent. Code §§ 51-08.1, *et seq.*<br>N.D. Cent. Code § 51-15-02 |
| Pennsylvania | 73 Pa. Cons. Stat. Ann. §201-1 *et seq.* |

| South Dakota | S.D. Codified Laws Ann. §§ 37-1-3, *et seq.*<br>S.D. Codified Laws Ann. § 37-26-6 |
| Tennessee | Tenn. Code Ann. §§ 47-25-101, 47-25-105,<br>47-25-106<br>Tenn. Code Ann. § 47-18-104 |
| Vermont | 9 Vt. Stat. Ann.. §§ 2451, *et seq.* |
| West Virginia | W. Va. Code §§ 47-18-1, *et seq.*<br>W. Va. Code § 46A-6-104, §§ 47-11A-1, *et<br>seq.* |
| Wisconsin | Wis. Stat. §§ 133.01, *et seq.* |

8.     This Complaint is also filed under Section 16 Clayton Act, 15 U.S.C. § 26 to enjoin Defendants, and their officers, agents, employees, or representatives from engaging in the unlawful contract, combination, and conspiracy in restraint of trade or commerce of Vitamin C and products made with or from Vitamin C.

9.     Without limiting the generality of the foregoing, Defendants (directly or through agents who were at the time acting with actual and/or apparent authority and within the scope of such authority) have:

  a.  transacted business in the Class Jurisdictions including New York;

  b.  contracted to supply or obtain services or goods in the Class Jurisdictions including New York;

  c.  intentionally availed themselves to the benefits of doing business in the Class Jurisdictions including New York;

  d.  produced, promoted, sold, marketed, and/or distributed their products or service in the Class Jurisdictions including New York and, thereby, have purposefully profited from their access to markets in the Class Jurisdictions including New York;

  e.  caused tortious damage by act or omission in the Class Jurisdictions including New York;

    f.   caused tortious damage in the Class Jurisdictions including New York by acts or omissions committed outside such jurisdiction while (i) regularly doing or soliciting business in such jurisdiction, and/or (ii) engaging in other persistent courses of conduct within such jurisdiction, and/or (iii) deriving substantial revenue from goods used or consumed or services rendered in such jurisdiction;

    g.   committed acts and omissions which Defendants knew, or should have known, would cause damage (and, in fact, did cause damage) in the Class Jurisdictions, including New York, to Plaintiffs and other consumers in the Class Jurisdictions while (i) regularly doing or soliciting business in such jurisdiction, and/or (ii) engaging in other persistent courses of conduct within such jurisdiction, and/or (iii) deriving substantial revenue from goods used or consumed or services rendered in such jurisdiction;

    h.   engaged in a conspiracy with others doing business in the Class Jurisdictions including New York that caused tortious damage in the Class Jurisdictions including New York; and

    i.   otherwise had the requisite minimum contacts with the Class Jurisdictions including New York such that, under the circumstances, it is fair and reasonable to require Defendants to come to this Court to defend this action.

10.    Plaintiffs Richard Keane (a resident of Queens County, New York), Karen Haines (a resident of Westchester County, New York), and Gerard Shannon (a resident of Cayuga County, New York), like millions of other New Yorkers, purchased Vitamin C, either in straight form or as constituted in other products, in New York. In addition, a substantial part of the unfair and deceptive trade and commerce, as well as the arrangement, contract, agreement, trust, combination, conspiracy, unfair or deceptive practices, and/or unfair and deceptive uniform and common course of conduct giving rise to Plaintiffs' claims, occurred within New York, including, among other things, the indirect sale of Vitamin C and products made with or from Vitamin C to Plaintiffs and to consumers in the Class Jurisdictions including New York at supra-competitive prices.

11.     As a result of the distribution and sale of their products directly or through their subsidiaries, affiliates or agents to consumers in the Class Jurisdictions including New York, Defendants obtained the benefits of the laws of the Class Jurisdictions including New York and the markets of the Class Jurisdictions including New York for their products.

## PARTIES

### A.     Plaintiffs

12.     Plaintiff Richard Keane is a resident of Queens County, New York.  He indirectly purchased beverages made with or from Vitamin C and vitamin supplements containing Vitamin C in New York, manufactured by one or more of the Defendants during the Class Period, and was injured by the anti-competitive conduct alleged in this Complaint.

13.     Plaintiff Karen Haines is a resident of Westchester County, New York. She indirectly purchased beverages made with or from Vitamin C in New York, manufactured by one or more of the Defendants during the Class Period, and was injured by the anti-competitive conduct alleged in this Complaint.

14.     Plaintiff Gerard Shannon is a resident of Cayuga County, New York.  He indirectly purchased Vitamin C and/or products made with or from Vitamin C in New York, manufactured by one or more of the Defendants during the Class Period, and was injured by the anti-competitive conduct alleged in this Complaint.

15.     Plaintiff Mark Schamel is a resident of Washington, D.C.  He indirectly purchased Vitamin C and/or products made with or from Vitamin C in Washington D.C.,

manufactured by one or more of the Defendants during the Class Period, and was injured by the anti-competitive conduct alleged in this Complaint.

16.    Plaintiff Sandra Jeffreys is a resident of St. Johns County, Florida. She indirectly purchased Vitamin C chewable tablets in Florida, manufactured by one or more of the Defendants during the Class Period, and was injured by the anti-competitive conduct alleged in this Complaint.

17.    Plaintiff Viviane Melo is a resident of Broward County, Florida. She indirectly purchased Vitamin C and/or products made with or from Vitamin C in Florida, manufactured by one or more of the Defendants during the Class Period, and was injured by the anti-competitive conduct alleged in this Complaint.

18.    Plaintiff Dana Erichsen is a resident of Woodbury County, Iowa. She indirectly purchased Vitamin C and/or products made with or from Vitamin C in Iowa, manufactured by one or more of the Defendants during the Class Period, and was injured by the anti-competitive conduct alleged in this Complaint.

19.    Plaintiff Laurel Rose is a resident of Johnson County, Kansas. She indirectly purchased Vitamin C pills in Kansas, manufactured by one or more of the Defendants during the Class Period, and was injured by the anti-competitive conduct alleged in this Complaint.

20.    Plaintiff Linda Kohlenberg is a resident of Oakland County, Michigan. She indirectly purchased Vitamin C and/or products made with or from Vitamin C in Michigan, manufactured by one or more of the Defendants during the Class Period, and was injured by the anti-competitive conduct alleged in this Complaint.

21.     Plaintiff Christine Poon is a resident of Wayne County, Michigan.  She indirectly purchased Vitamin C and/or products made with or from Vitamin C in Michigan, manufactured by one or more of the Defendants during the Class Period, and was injured by the anti-competitive conduct alleged in this Complaint.

22.     Plaintiff Melissa Harris is a resident of Ramsey County, Minnesota.  She indirectly purchased Vitamin C and/or products made with or from Vitamin C in Minnesota, manufactured by one or more of the Defendants during the Class Period, and was injured by the anti-competitive conduct alleged in this Complaint.

23.     Plaintiff Lorene Culler is a resident of Hall County, Nebraska.  She indirectly purchased Vitamin C pills in Nebraska, manufactured by one or more of the Defendants during the Class Period, and was injured by the anti-competitive conduct alleged in this Complaint.

24.     Plaintiff Kaitlyn Ann Johnson is a resident of Lancaster County, Nebraska.  She indirectly purchased Vitamin C and/or products made with or from Vitamin C in Nebraska, manufactured by one or more of the Defendants during the Class Period, and was injured by the anti-competitive conduct alleged in this Complaint.

25.     Plaintiff Tausha Moeller is a resident of Hall County, Nebraska.  She indirectly purchased Vitamin C and/or products made with or from Vitamin C in Nebraska, manufactured by one or more of the Defendants during the Class Period, and was injured by the anti-competitive conduct alleged in this Complaint.

26.     Plaintiff Dr. Carl Martin, D.V.M. is a resident of Douglas County, Nebraska.  He indirectly purchased Vitamin C to be used for animal feed in Nebraska,

6722                                      10

manufactured by one or more of the Defendants during the Class Period, and was injured by the anti-competitive conduct alleged in this Complaint.

27.     Plaintiff Timothy Purdy is a resident of Clark County, Nevada. He indirectly purchased Vitamin C and/or products made with or from Vitamin C in Nevada, manufactured by one or more of the Defendants during the Class Period, and was injured by the anti-competitive conduct alleged in this Complaint.

28.     Plaintiff Ronald Kaufman is a resident of Mecklenburg County, North Carolina. He indirectly purchased Vitamin C pills and beverages and cereals made with or from Vitamin C and in North Carolina, manufactured by one or more of the Defendants during the Class Period, and was injured by the anti-competitive conduct alleged in this Complaint.

29.     Plaintiff Jennifer Clark is a resident of Burleigh County, North Dakota. She indirectly purchased Vitamin C and/or products made with or from Vitamin C in North Dakota, manufactured by one or more of the Defendants during the Class Period, and was injured by the anti-competitive conduct alleged in this Complaint.

30.     Plaintiff Mark Kuchta is a resident of Minnehaha County, South Dakota. He indirectly purchased Vitamin C and/or products made with or from Vitamin C in South Dakota, manufactured by one or more of the Defendants during the Class Period, and was injured by the anti-competitive conduct alleged in this Complaint.

31.     Plaintiff Kathleen C. Davis is a resident of Anderson County, Tennessee. She indirectly purchased Vitamin C and/or products made with or from Vitamin C in Tennessee, manufactured by one or more of the Defendants during the Class Period, and was injured by the anti-competitive conduct alleged in this Complaint.

32.     Plaintiff Curt Badger is a resident of Dane County, Wisconsin.  He
indirectly purchased Vitamin C pills in Wisconsin, manufactured by one or more of the
Defendants during the Class Period, and was injured by the anti-competitive conduct
alleged in this Complaint.

33.     Plaintiffs Heather and Cory Rosene are residents of La Crosse County,
Wisconsin.  They indirectly purchased Vitamin C and/or products made with or from
Vitamin C in Wisconsin, manufactured by one or more of the Defendants during the
Class Period, and were injured by the anti-competitive conduct alleged in this Complaint.

34.     Plaintiff Follansbee Pharmacy is a resident of Brooke County, West
Virginia.  It indirectly purchased Vitamin C and/or products made with or from Vitamin
C in West Virginia, manufactured by one or more of the Defendants during the Class
Period, and was injured by the anti-competitive conduct alleged in this Complaint.

35.     Plaintiff Diana Kitch is a resident of Wichita, Kansas who has indirectly
purchased Vitamin C and/or products made with or from Vitamin C in Kansas,
manufactured by one or more of the Defendants during the Class Period, and was injured
by the anti-competitive conduct alleged in this Complaint.

36.     Plaintiff Stephanie Karol is a resident of Collier County, Florida who has
indirectly purchased Vitamin C and/or products made with or from Vitamin C in Florida,
manufactured by one or more of the Defendants during the Class Period, and was injured
by the anti-competitive conduct alleged in this Complaint

37.     Plaintiff Christopher Murphy is a resident of Essex County, Massachusetts
who has indirectly purchased Vitamin C and/or products made with or from Vitamin C in

Massachusetts manufactured by one or more of the Defendants during the Class Period, and was injured by the anti-competitive conduct alleged in this Complaint.

**B.      Defendants**

38.      Defendant Hebei Welcome Pharmaceutical Co. Ltd. ("Hebei Welcome") is a Chinese corporation with operations in the Hebei province of China. Hebei Welcome is a joint venture between North China Pharmaceutical Holding Co. Ltd., Hong Kong Sanwei Intl. Co. Ltd. and Hong Kong Jinxian Co. Ltd. Hebei Welcome's main product is Vitamin C in the forms of crystalline, direct compressible, calcium, and sodium salts. Hebei Welcome is registered to do business in the United States at 815 W. Naomi Ave., Arcadia, CA 91007.

39.      Defendant Jiangsu Jiangshan Pharmaceutical Co., Ltd. ("Jiangsu Jiangshan") is a Chinese corporation based in the Jiangsu province of China. Jiangsu Jiangshan was founded in 1990 as a joint venture between Jiangsu Glucose Factory Zhongshan Co. (H.K.), Jiangsu Provincial Medicine & Health Product Import and Export Co. and Expert Assets Ltd.

40.      Defendant Northeast Pharmaceutical (Group) Co. Ltd. ("Northeast Pharmaceutical") is a Chinese corporation based in the Liaoning province of China. Northeast Pharmaceutical is the largest pharmaceutical enterprise in China. It has produced Vitamin C since the early 1990s. In 2003, Northeast Pharmaceutical registered a total export value of $100 million for its Vitamin C products. Shares of Northeast Pharmaceutical are traded on the Shenzen stock exchange.

41.     Defendant Weisheng Pharmaceutical Co. Ltd.  ("Weisheng") is a Chinese corporation based in the Hebei province of China.  Weisheng is an affiliate of the major pharmaceutical corporation China Pharmaceutical Group Ltd.

42.     Defendant Shijiazhuang Pharmaceutical (USA), Inc., ("Shijiazhuang") is a Chinese corporation based in the Hebei province of China.  Shijiazhuang is an affiliate of Weisheng and the major pharmaceutical corporation China Pharmaceutical Group Ltd. Shijiazhuang is registered to do business in California at 5460 N. Peck Road, Suite A, Arcadia, CA 91006.

43.     Defendant China Pharmaceutical Group Ltd. ("China Pharmaceutical") is a Hong Kong corporation based in the Hebei province of China.  China Pharmaceutical was renamed from its former corporate name China Pharmaceutical Enterprise and Investment Corporation Ltd. on May 7, 2003.  The shares of China Pharmaceutical are traded on the Hong Kong stock exchange.  China Pharmaceutical owns, controls, and dominates its affiliates Weisheng and Shijiazhuang and through these affiliates is engaged in the business of manufacturing and selling Vitamin C.  Collectively, Weisheng, Shijiazhuang and China Pharmaceutical are referred to hereinafter as China Pharmaceutical.

C.      **Additional Defendants**

44.     As additional information may come to light, Plaintiffs reserve the right to add defendants as they become known to them.

45.     The acts alleged in this Complaint were, upon information and belief, authorized, ordered or done by officers, agents, employees, or representatives of each Defendant while actively engaged in the management of its business or affairs.

## CO-CONSPIRATORS

46.      Various other individuals, partnerships, corporations, organizations, firms, and associations not yet made defendants in this Complaint (the "Co-Conspirators") and presently unknown to Plaintiffs, participated as Co-Conspirators in the violations alleged herein, and performed acts and made statements in furtherance of the combination in restraint of trade and unfair business practices alleged herein.

47.      The true names and capacities, whether individual, corporate, associate, representative, or otherwise, of defendants named herein as DOES 1 through 100 are unknown to Plaintiffs at this time, and are therefore sued by such fictitious names. Plaintiffs will amend this complaint to allege the true names and capacities of DOES 1 through 100 when they become known to Plaintiffs.  Each of DOES 1 through 100 is in some manner legally responsible for the violations of law alleged herein.

48.      The acts charged in this Complaint as having been done by Defendants and the DOE defendants were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management of the Defendants' business or affairs.

## CLASS ACTION ALLEGATIONS

49.      This action is brought by Plaintiffs Richard Keane, Karen Haines, and Gerard Shannon on behalf of themselves and all others similarly situated in New York, and pursuant to Fed. R. Civ. P. 23, as representatives of the New York members of the Class.  In particular, Plaintiffs assert that a class action is appropriate under Fed. R. Civ. P. 23(b)(2) and (b)(3).

6722                                              15

50.     The New York sub-Class represented by Plaintiffs Richard Keane, Karen

Haines, and Gerard Shannon is defined as:

> All persons or entities who reside in New York who indirectly
> purchased Vitamin C or products made with or from Vitamin C
> manufactured by any Defendant or Co-Conspirator from at least
> December 2001 to the present. Excluded from the class are all
> governmental entities, Defendants and their subsidiaries and
> affiliates.

51.     This action is brought by Plaintiffs Mark Schamel, Viviane Melo, Sandra

Jeffreys, Dana Erichsen, Laurel Rose, Christine Poon, Linda Kohlenberg, Melissa Harris,

Kaitlyn Johnson, Tausha Moeller, Lorene Culler, Dr. Carl Martin, D.V.M., Timothy

Purdy, Ronald Kaufman, Jennifer Clark, Mark Kuchta, Kathleen Davis, Heather and

Cory Rosene, Curt Badger, Follansbee Pharmacy, Diana Kitch, Stephanie Karol, and

Christopher Murphy on behalf of themselves and all others similarly situated within the

Class Jurisdictions, and pursuant to Fed. R. Civ. P. 23 as representatives of the Class. In

particular, Plaintiffs assert that a class action is appropriate under Fed. R. Civ. P. 23(b)(2)

and (b)(3).

52.     The "Damages Class" is defined as:

> All persons or entities who reside in the Class Jurisdictions who
> indirectly purchased Vitamin C or products made with or from
> Vitamin C manufactured by any Defendant or Co-Conspirator
> from at least December 2001 to the present. Excluded from the
> class are all governmental entities, Defendants and their
> subsidiaries and affiliates.

> The "Injunctive Class" is defined as:

> All persons or entities that purchased Vitamin C manufactured by
> Defendants for delivery in the United States.

53.     Although the exact size of the Class is unknown, the total number of Class

members in each state is in the millions. Based upon the nature of the trade and

commerce involved, the total number of Class members in each state is such that joinder

of the claims of all Class members would be impracticable.

54.     Plaintiffs' claims are typical of the claims of the Class, and Plaintiffs will

fairly and adequately protect the interests of the Class.  Plaintiffs have no relevant

conflicts of interest with other members of the Class and have retained competent counsel

experienced in class action and antitrust litigation.

55.     Common questions of law and fact exist, including:

a.     whether Defendants have engaged, and have combined with others
       to engage, in unfair and deceptive conduct;

b.     whether Defendants' unfair, deceptive and unlawful conduct has
       caused a legally cognizable injury to the Class by increasing the
       prices paid by Class members for Vitamin C or products made
       with or from Vitamin C above what would have prevailed in a
       competitive market;

c.     whether Defendants' unfair, deceptive and unlawful conduct has
       caused a legally cognizable injury to the Class by invading legally
       protected rights of Class members;

d.     the nature and extent of damages sustained by the Class and the
       appropriate measure of damages for those injuries;

e.     whether the Class is entitled to nominal damages or other relief
       requested; and

f.     whether Defendants actively concealed the violation alleged
       herein.

These and other questions of law and fact are common to the Class and

predominate over any questions affecting only individual Class members.

56.     Class action treatment is a superior method for the fair and efficient

adjudication of the controversy described herein. The class action vehicle provides an

efficient method for the enforcement of the rights of Plaintiffs and members of the Class,

and such litigation can be fairly managed. Plaintiffs know of no unusual problems of management and notice.

57.     It is desirable for the claims of Plaintiffs and members of the Class to be consolidated into a single proceeding so as to provide small claimants with a forum in which to seek redress for the violations of the laws of the Class Jurisdictions including New York.

58.     The difficulties that may exist in the management of the class action are far outweighed by the benefits of the class action procedure, including but not limited to providing claimants with a suitable method for the redress of their claims.

59.     Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

### TRADE AND COMMERCE

60.     The activities of Defendants and their Co-Conspirators were within the flow of, and were intended to, and did have a substantial effect on the commerce of Vitamin C and products made with or from Vitamin C in the Class Jurisdictions including New York.

61.     During the time encompassed by the violations alleged, Defendants sold and shipped substantial quantities of Vitamin C to businesses in the Class Jurisdictions including New York. Those businesses incorporated the Vitamin C into other products, and then sold those goods to consumers and businesses in the Class Jurisdictions including New York.

62.     The contract, combination, and conspiracy consists, upon information and

belief, of a continuing agreement, understanding, and concert of action between and among Defendants and their Co-Conspirators, the substantial terms of which were and are to fix, stabilize, and maintain prices of Vitamin C; to coordinate price increases for the sale of Vitamin C; and to control the supply of Vitamin C in the Class Jurisdictions including New York.

63.     By imposing restrictive agreements on others, Defendants have engaged in unfair and deceptive acts and practices, including, but not limited to, direct involvement and control of unfair and deceptive competition. Defendants have entered into unfair and deceptive combinations of capital, skill and acts with others for the purpose and with the intent and effect of creating and carrying out unfair and deceptive restrictions in trade and commerce; increasing the price and limiting and reducing the supply of Vitamin C; and restraining trade and preventing competition in the relevant market.

64.     The acts in furtherance of the conspiracy by Defendants have included, on information and belief, the following wrongful conduct and horizontal agreements:

        a.        participating in meetings and conversations on a periodic basis since at least December 2001, in which Defendants and their Co-Conspirators discussed and agreed to fix, raise, stabilize, and maintain the prices for Vitamin C;

        b.        participating in meetings and conversations, on a periodic basis since at least December 2001, in which Defendants and their Co-Conspirators discussed and agreed to control and restrict export quantities of Vitamin C from China;

        c.        facilitating, effectuating, implementing, monitoring, and concealing the contract, combination, and conspiracy to raise the prices of Vitamin C sold; and

        d.        selling Vitamin C to customers throughout the United States at artificially inflated and non-competitive prices.

65.    For the purposes of formulating and effectuating the aforesaid contract, combination, and conspiracy, Defendants and their Co-Conspirators did those things that they conspired to do.

## VITAMIN C

66.    Vitamin C (also known as ascorbic acid) is a water-soluble vitamin. Vitamin C plays an important role in the biosynthesis of collagen in skin and of connective tissue, bones and teeth. It is believed to enhance the functioning of the immune system by acting as an antioxidant.

67.    The manufacture of Vitamin C is a multi-million dollar a year industry worldwide. The global market for Vitamin C is over $500 million per year. Approximately 55% of global Vitamin C consumption is for pharmaceutical-related uses, 35% is for food and beverage uses, and the remaining 10% is for the feed industry. The United States market for Vitamin C exceeds $100 million per year. This conspiracy involving Vitamin C has thus affected millions of dollars worth of commerce in products found in nearly every American household.

68.    Defendants manufacture Vitamin C for bulk sales to customers. Defendants sell Vitamin C to food and pharmaceutical distributions and manufacturers in the United States for human consumption. Defendants also sell Vitamin C to manufacturers and users of animal feed and animal nutrition products. Each of the Defendants produces in excess of 15,000 metric tons of Vitamin C annually.

69.    During the Class Period, Defendants dominated the international market for Vitamin C. Defendants' Vitamin C currently accounts for over 60 percent of the global Vitamin C market. Defendants have a competitive advantage because they have

manufacturing costs of $2.30 per kilogram or less and are the only manufacturers worldwide who can produce Vitamin C for a cost below $4.50 to $5 per kilogram. Manufacturers in China also enjoy a competitive advantage relative to manufacturers in other nations because, until recently, China employed a fixed currency exchange rate which undervalues the Yuan, making Chinese exports of Vitamin C to the United States less expensive.

## HISTORY OF VITAMIN C MARKET

70.     China began producing and exporting Vitamin C in the late 1950s. In 1969, Chinese scientists developed a two-stage fermentation process to manufacture Vitamin C, which resulted in a significant cost advantage compared to European producers. This technology began to be commercially employed in China in the 1980s.

71.     In the early period of Vitamin C manufacturing, the Chinese manufacturers had a reputation for poor product quality. Today, however, Chinese manufacturers are able to sell at premium prices and supply full range of Vitamin C products, the great majority of which are of bulk ascorbic acid.

72.     In the 1990s, Chinese manufacturers did not play a major role in the Vitamin C market as three European manufacturers, F. Hoffmann La Roche, Ltd. ("Roche"), Merck KgaA ("Merck"), and BASF AG ("BASF"), and a Japanese company, Takeda Chemical Industries, Ltd. ("Takeda") dominated the worldwide Vitamin C market. During the period from 1990 to 1995, these companies engaged in their own conspiracy to suppress competition and fix prices for Vitamin C (the "First Vitamin C Conspiracy"). This conspiracy was addressed in the *In re Vitamins Antitrust Litigation*

and resulted in final settlements and judgments for the benefit of a certified class of vitamin purchasers.

73.    In the 1990s, competition from manufacturers of Vitamin C in China began to rise, and in late 1995 this increase in competition undermined the First Vitamin C Conspiracy until it reportedly disbanded.

74.    In 1995, thirteen Chinese Vitamin C manufacturers reportedly met and agreed to form their own cartel to limit production and stabilize prices of Vitamin C. This attempt to control the market reportedly failed.

75.    Towards the end of 1995, world Vitamin C prices slumped and were ultimately cut in half by early 1996. By 1997, the industry in China included as many as 22 competitors.

76.    The rest of the 1990s saw the Chinese Vitamin C industry go through a period of consolidation. Strong price competition by Chinese competitors reduced the number of competitors by driving European competitors from the market. The end result is an industry consisting primarily of the four manufacturer Defendants in this case, Hebei Welcome, Jiangsu Jiangshan, Northeast Pharmaceutical, and Weisheng (the "Defendant Manufacturers").

## BACKGROUND OF ANTITRUST VIOLATIONS

77.    In 2001, the price of Vitamin C remained relatively low. By that time, Takeda had withdrawn from the market and sold its manufacturing capacity to BASF. European competitors Merck and Roche also indicated their intention to withdraw from the market. In addition, BASF announced that it would halt its new production line in Takeda, Japan. By the end of 2001, with the exception of Roche and BASF, all major

Vitamin C competitors outside China were either acquired by other companies or simply dropped out of the business.

78.     By 2001, Defendants had captured approximately 60 percent of the worldwide market for Vitamin C. Defendants currently control 82 thousand metric tons – or approximately 68 percent of the worldwide production capacity for Vitamin C.

79.     Defendants' dominance in the market enabled the formation of a cartel to control the prices and volume of exports for Vitamin C, starting in or around December 2001. At a meeting of the Western Medicine Department of the Association of Importers and Exporters of Medicines and Health Products of China (the "Association") in December 2001, Defendants and the Association successfully reached an agreement in which Chinese manufacturers of Vitamin C agreed to control export quantities and achieve stable and enhanced price goals. The cartel members agreed to restrict their exports of Vitamin C in order to create a shortage of supply in the international market. The cartel members agreed to "restrict quantity to safeguard prices, export in a balanced and orderly manner and adjust dynamically." The agreements of the cartel members were facilitated by the efforts of the Association. Thus began an ongoing combination and conspiracy to suppress competition by fixing the price and controlling export sale volumes of Vitamin C offered to customers in the United States and elsewhere (the "Second Vitamin C Conspiracy").

80.     The formation of the cartel and the resulting agreements reached during the beginning of the Second Vitamin C Conspiracy quickly raised the market price for Vitamin C. The price of Vitamin C in the United States rose from approximately \$2.50 per kilogram in December 2001 to as high as \$7 per kilogram in December 2002.

Further, Defendant China Pharmaceutical reported in its 2003 annual report that average prices during 2002 rose from $3.20 per kilogram to $5.90 per kilogram, an increase of 84 percent. China Pharmaceutical also reported gross profit margins for its Vitamin C production of 60.2 percent in 2002, an increase of 28.1 percent.

81.     During the Class Period, Defendants and their Co-Conspirators have participated in meetings and conversations in China and elsewhere in which the prices, volume of sales, and exports to the United States were discussed and agreed upon. These meetings have also been coordinated with trade association meetings for associations in which Defendants are members.

82.     At the above-described meetings and during the Class Period, Defendants and their Co-Conspirators agreed to and did eliminate, suppress, and limit competition. Specific actions by Defendants included, but were not limited to, the following:

> a.   discussing the production volumes and prices of Vitamin C for export to the United States and elsewhere;
>
> b.   agreeing to control the supply of Vitamin C for export to the United States and elsewhere;
>
> c.   agreeing to increase and maintain the price of Vitamin C in the United States and elsewhere; and
>
> d.   agreeing to control the worldwide market for Vitamin C.

83.     During the Second Vitamin C Conspiracy, executives from Defendant corporations had knowledge of, and cautioned one another against the adverse effects of the First Vitamin C Conspiracy.

84.     Defendants' illegal concerted conduct has been facilitated by their power in the Vitamin C market. Defendants' sales constitute approximately 60 percent of all Vitamin C sales in the world. Further, Defendants account for virtually 100 percent of

the manufacturers who have the capability to produce Vitamin C for a cost below $4.50 to $5 per kilogram.

85.     Although non-cartel members BASF and DSM (which acquired the interest of Roche) control 30 to 40 percent of the worldwide market for Vitamin C, the cartel has been successful because these European manufacturers have higher manufacturing costs for Vitamin C than those of the Defendants.  Defendants have been able to set a floor price in which the European manufacturers cannot compete, yet which is still above the competitive price for Vitamin C.  For example, Defendants understand that price levels can be stabilized at $6 per kilogram or higher - a price twice as high as 2001/2002 prices - because the European manufacturers face costs of production beginning anywhere from $4.50 to over $5 per kilogram.  Further, as the cartel has taken steps to restrain production and increase prices, European competitors have shown a willingness to follow price increases rather than undercut the new cartel price levels.

86.     The collusive price fixing that began in 2001 helped contribute to remarkable price increases in 2003.  Defendants' continued supply restrictions combined with unanticipated increases in world demand for Vitamin C in 2003, attributable in part to an outbreak of severe acute respiratory syndrome ("SARS") – which Vitamin C is believed to help in treating or preventing – in the Spring and Summer of 2003, pushed the price of Vitamin C even higher.  Prices jumped to as high as $15 per kilogram in April 2003.

87.     By approximately the third quarter of 2003, although prices remained at supra-competitive levels, cartel members began opportunistically reducing prices to obtain increased sales in the enormously profitable market.  Spikes in demand for

Vitamin C increased the temptation among cartel members to undercut prices in order to obtain super-normal profits that were still substantially above competitive prices. Labeled a "price war" by the industry, the competition actually reflected price reductions at levels above collusively arranged prices.

88.     To address the price cutting, the Association called an "emergency meeting" in late November or early December 2003, which was attended by representatives from each Defendant.  At the meeting, it was discussed how Defendants would rationalize the market and restrain and limit the production levels of Vitamin C to increase prices.

89.     In December 2003, Defendants and their representatives, together with members of the Association, met at the annual China Exhibition of World Pharmaceutical Ingredients.  At this exhibition, Defendants and the Association met and devised plans to rationalize the market, limit production levels and increase prices.  The Association also warned Defendants that it was impossible for any of them to monopolize the market to the detriment of the others.

90.     The emergency meeting called by the Association and other efforts by cartel members were successful.  Prices for Vitamin C in December 2003 increased from a low of $4.20 per kilogram at the beginning of the month to over $9 per kilogram by the end of the month.

91.     In June of 2004, in reaction to price reductions from their highs in December 2003, Defendants agreed to shut down production for equipment maintenance. Defendants also agreed on export volumes to the United States.  These supply restrictions again resulted in the stabilization of prices.

92.     Despite some price decreases in 2004, the collusive arrangements of the cartel have continued to maintain prices well above those of a competitive market.  The cartel established by Defendants and their Co-Conspirators continues its illegal conduct today.

93.     During the Second Vitamin C Conspiracy, Defendants have sold and shipped their Vitamin C to businesses that incorporate the Vitamin C into other products including, but not limited to, foods, beverages, and in the production of vitamins packaged for consumer use and animal feeds.  These businesses then sell Vitamin C or products made with or from Vitamin C to consumers and businesses in the Class Jurisdictions including New York.

## IMPERMISSIBLE MARKET EFFECTS

94.     The contract, combination, and conspiracy alleged herein had the following effects, among others:

      a.     prices paid by Plaintiffs and members of the Class for Vitamin C or products made with or from Vitamin C were fixed, raised, maintained, and stabilized at artificially high and noncompetitive levels;

      b.     indirect purchasers of Vitamin C or products made with or from Vitamin C were deprived of the benefits of free and open competition; and

      c.     competition between and among Defendants and their Co-Conspirators in the sale of Vitamin C was unreasonably restrained.

95.     As a result, Plaintiffs and members of the Class have been injured in their business and property in that they paid more for products made with or from Vitamin C than they otherwise would have paid in the absence of Defendants' unlawful contract, combination, and conspiracy.

## FRAUDULENT CONCEALMENT

96.     Plaintiffs incorporate by this reference each of the preceding paragraphs. Plaintiffs and members of the Class had no knowledge of the violations described above until recently.  Throughout the Class Period, Defendants and their Co-Conspirators have effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from Plaintiffs and members of the Class.

97.     Defendants and their Co-Conspirators have engaged in a successful, illegal price-fixing conspiracy that was by its nature self-concealing.  Defendants' wrongful conduct was carried out in part through means and methods that were designed and intended to avoid detection, and which, in fact, successfully precluded detection. Although Plaintiffs exercised due diligence throughout the Class Period, they could not have discovered Defendants' unlawful scheme and conspiracy at any earlier date, because of Defendants' effective, affirmative, and fraudulent concealment of their activities.

98.     Defendants periodically withheld supply of Vitamin C to create an artificial supply shortage, generating a level of artificial demand to drive up prices, while publicly stating that the price fluctuations were due to other factors.

99.     Plaintiffs have exercised due diligence by promptly investigating the facts giving rise to the claims asserted herein upon having reasonable suspicion of the existence of Defendants' conspiracy, and by seeking discovery as to the matters asserted herein, to the extent permitted by law.

## VIOLATIONS ALLEGED

### COUNT I

#### New York Sub-Class
#### (Violation of New York Gen. Bus. Law § 349)

100. Plaintiffs hereby adopt and incorporate by this reference each of the preceding paragraphs as if fully set forth herein.

101. Defendants' actions described herein constitute deceptive acts and practices in the conduct of business, substantially affecting trade or commerce in New York in violation of the New York Consumer Protection from Deceptive Acts and Practices, Gen. Bus. Law § 349.

102. Beginning no later than December 2001 and continuing to the present, each of the Defendants named herein, directly or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed Vitamin C in New York.

103. During the Class Period, Defendants have engaged in unfair and deceptive acts and practices including those described herein and/or combinations of capital, skill, and acts with others with the intent, purpose and effect of creating and carrying out restrictions in trade and commerce; increasing the price and limiting and reducing the supply of Vitamin C products; and restraining trade and preventing competition in the relevant markets of Vitamin C products, thereby enabling Defendants to perpetuate their monopoly.

104. As a direct and proximate result of Defendants' unlawful, unfair and deceptive acts and practices including combinations and contracts to restrain trade and monopolize the relevant markets, consumers in New York have suffered injury and have been deprived of the benefits of free and fair competition on the merits.

6722

29

105.    Plaintiffs and members of the New York sub-Class ask this Court for no

more than their actual damages in an amount to be proved at trial as a result of the

wrongful conduct alleged, plus interest and costs under Gen. Bus. Law § 349.

### COUNT II

**Class Jurisdictions**
**(Violations of the Antitrust, Deceptive and Unfair Trade Practices, and Consumer
Protection Statutes of the Class Jurisdictions)**

106.    Plaintiffs hereby adopt and incorporate by this reference each of the

preceding paragraphs as if fully set forth herein.

107.    Defendants' actions described herein constitute violations of the antitrust,

deceptive and unfair trade practices, and consumer protection statutes, substantially

affecting trade or commerce throughout the United States, including the Class

Jurisdictions.  The foregoing conduct has been, and continues to be, conducted in

violations of the following statutes:

| | |
|---|---|
| Arizona | A.R.S. §§ 44-1401, *et. seq.* |
| District of Columbia | D.C. Code §§ 28-4501, *et. seq.*<br>D.C. Code §§ 28-3901, *et. seq.* |
| Florida | Florida Statutes §§ 501.204, *et seq.* |
| Iowa | IA. Rev. Stat. §§ 553.1, *et seq.* |
| Kansas | Kan. Stat. Ann. §§ 50-101, *et seq.* |
| Maine | 10 M.R.S.A. §§ 1101, *et seq.*<br>5 M.R.S.A. §§ 205-A, *et seq.* |
| Massachusetts | Mass. Gen. Laws Ch. 93A *et seq.* |
| Michigan | M.C.L.A. §§ 445.772, *et seq.* |
| Minnesota | Minn. Stat. Ann. §§ 325D.49, *et seq.* |

6722

30

| | |
|---|---|
| Nebraska | Neb. Rev. Stat. §§ 59-801, *et seq.* |
| | Neb. Rev. Stat. §§ 59-1601, *et seq.* |
| Nevada | Nev. Rev. Stat. §§ 598A.010, *et seq.* |
| New Mexico | N.M. Stat. Ann. §§ 57-1-1, *et seq.* |
| | N.M. Stat. Ann. § 57-12-3 |
| North Carolina | N.C. Gen. Stat. §§ 75-1, *et seq.* |
| North Dakota | N.D. Cent. Code §§ 51-08.1, *et seq.* |
| | N.D. Cent. Code § 51-15-02 |
| Pennsylvania | 73 Pa. Cons. Stat. Ann. §201-1 *et seq.* |
| South Dakota | S.D. Codified Laws Ann. §§ 37-1-3, *et seq.* |
| | S.D. Codified Laws Ann. § 37-26-6 |
| Tennessee | Tenn. Code Ann. §§ 47-25-101, 47-25-105, 47-25-106 |
| | Tenn. Code Ann. § 47-18-104 |
| Vermont | 9 Vt. Stat. Ann.. §§ 2451, *et seq.* |
| West Virginia | W. Va. Code §§ 47-18-1, *et seq.* |
| | W. Va. Code § 46A-6-104, §§ 47-11A-1, *et seq.* |
| Wisconsin | Wis. Stat. §§ 133.01, *et seq.* |

108.     Beginning no later than December 2001 and continuing to the present, each of the Defendants named herein, directly or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed Vitamin C throughout the United States, including the Class Jurisdictions.

109.     During the Class Period, Defendants have engaged in unfair and deceptive acts and practices including those described herein and/or combinations of capital, skill, and acts with others with the intent, purpose and effect of creating and carrying out restrictions in trade and commerce; increasing the price and limiting and reducing the

supply of Vitamin C products; and restraining trade and preventing competition in the relevant markets of Vitamin C products, thereby enabling Defendants to perpetuate their monopoly.

110.    As a direct and proximate result of Defendants' unlawful, unfair and deceptive acts and practices including combinations and contracts to restrain trade and monopolize the relevant markets, consumers throughout the United States, including the Class Jurisdictions, have suffered injury and have been deprived of the benefits of free and fair competition on the merits.

## COUNT III

### Unjust Enrichment

111.    Plaintiffs hereby adopt and incorporate by this reference each of the preceding paragraphs as if fully set forth herein.

112.    Defendants benefited from their unlawful acts through the overpayment for Vitamin C and products made with or from Vitamin C by Plaintiffs and members of the Class. It would be inequitable for Defendants to be permitted to retain the benefits of these overpayments, which were conferred by Plaintiffs and members of the Class and retained by Defendant.

113.    Plaintiffs and the members of the Class are entitled to have returned to each of them the amount of such overpayments as damages or restitution.

## THE NEED FOR INJUNCTIVE RELIEF

114.    It is in the public interest to enjoin Defendants from continuing to operate a conspiracy and combine to fix the prices of Vitamin C.

115.    Plaintiffs and the class will continue to be injured by Defendants' ongoing

6722                                        32

conduct in violation of the antitrust laws of the United States in the absence of injunctive relief.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs pray that this Court:

A.      Determine that this action may be maintained as a class action pursuant to Rule 23(b)(2) and (3) of the Federal Rules of Civil Procedure and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to all members of the plaintiff classes, including the New York sub class;

B.      Declare that Defendants have engaged in unfair and deceptive acts, practices, and/or combinations of capital, skill and acts with others sufficient to constitute a trust for the purpose of creating or carrying out restrictions in trade or commerce, limiting and reducing the production and increasing the price of merchandise or a commodity, and preventing competition in the manufacturing, making, transporting, selling and/or purchasing of merchandise, products, or a commodity;

C.      Adjudge and decree that Defendants and each of them have engaged in an unlawful contract, combination, and conspiracy in restraint of trade or commerce, in violation of the New York Consumer Protection from Deceptive Acts and Practices, Gen. Bus. Law § 349 granting standing to indirect purchasers for antitrust injuries, and that the Court award Plaintiffs and members of the New York sub-Class no more than their actual damages in an amount to be proved at trial as a result of the wrongful conduct alleged, plus interest and costs under Gen. Bus. Law § 349;

D.      Adjudge and decree that Defendants and each of them have engaged in an

unlawful contract, combination, and conspiracy in restraint of trade or commerce in violation of the antitrust, deceptive and unfair trade practices, and consumer protection statutes of the Class Jurisdictions, and an unlawful civil conspiracy in violation of common law, substantially affecting trade or commerce throughout the United States, and that the Court award Plaintiffs and members of the Class (i) actual damages in an amount to be proved at trial as a result of the wrongful conduct alleged, plus interest and costs; (ii) treble damages; and (iii) all other damages available under the laws of the Class Jurisdictions;

E.     Adjudge and decree that the unlawful combination and conspiracy alleged herein is an unreasonable restraint of trade or commerce in violation of the Section 1 of the Sherman Act, 15 U.S.C. § 1;

F.     Adjudge and decree that the Defendants and each of them have been unjustly enriched and that the Court return to Plaintiff and members of the Class the amount of such overpayments as damages or restitution;

G.     Award Plaintiffs and the other members of the Class the costs of the suit, including reasonable attorneys' fees;

H.     Award Plaintiffs and the other members of the Class pre-judgment and post-judgment interest on the above sums at the highest rate allowed by law;

I.     Award Plaintiffs and the other members of the Class a permanent injunction under Section 16 Clayton Act, 15 U.S.C. § 26, enjoining Defendants, and their officers, agents, employees, or representatives from engaging in this unlawful contract, combination, and conspiracy in restraint of trade or commerce; and

J.      Grant such other and further relief as this Court deems to be just and

equitable.

**JURY DEMAND**

Plaintiffs demand a trial by jury on all claims for which they are entitled to a jury

trial.

Dated: November 1, 2006

Respectfully submitted,

_____  /s/_____

Kenneth G. Walsh
**Straus & Boies, LLP**
Two Depot Plaza, Suite 203
Bedford Hills, NY 10507
Tel: (914) 244-3200
Fax: (914) 244-3260

**Plaintiffs' Liaison and Co-Lead Counsel**

David Boies                                   Daniel E. Gustafson
Timothy D. Battin                          Daniel C. Hedlund
**Straus & Boies, LLP**                   Amanda M. Martin
4041 University Drive, Fifth Floor   **Gustafson Gluek, PLLC**
Fairfax, VA  22030                          650 Northstar East
Tel: (703) 764-8700                        608 Second Avenue South
Fax: (703) 764-8704                        Minneapolis, MN 55402
                                                      Tel: (612) 333-8844
**Plaintiffs' Co-Lead Counsel**        Fax: (612) 339-6622

**Plaintiffs' Co-Lead Counsel**

6722                                    35

Daniel Hume
David Kovel
**Kirby McInerney & Squire**
830 Third Ave.
New York, NY 10022
Tel: (212) 371-6600
Fax: (212) 751-2540

Richard A. Lockridge
W. Joseph Bruckner
Heidi M. Silton
Darla Boggs
**Lockridge, Grindal, Nauen, PLLP**
100 Washington Avenue South, Ste. 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

Dianne M. Nast
**RodaNast, PC**
801 Estelle Drive
Lancaster, PA 17601
Tel: (717)-892-3000
Fax: (717) 892-1200

Joseph R. Saveri
**Lieff, Cabraser, Heimann & Bernstein, LLP**
Embarcadero Center West
275 Battery Street, Suite 3000
San Francisco, CA 94111
Tel: (415) 956-1000
Fax: (415) 956-1008
Dennis Stewart
**Hulett Harper Stewart LLP**
550 West C Street, Suite 1600
San Diego, CA 92101
Tel: (619) 338-1133
Fax: (619) 338-1139

Garrett Blanchfield
**Reinhardt Wendorf & Blanchfield**
E-1250 Firth Nat'l Bank Building
332 Minnesota Street
St. Paul, MN 55101
Tel: (651) 287-2100
Fax: (651) 287-2103

Natalie Finkelman Bennett
**Shepherd, Finkelman, Miller & Shah**
35 E. State Street
Media, PA 19063
Tel: (610) 891-9880
Fax: (610) 891-9883

Kenneth A. Wexler
Edward A. Wallace
**Wexler Toriseva Wallace**
One North LaSalle Street, Suite 2000
Chicago, IL 60602
Tel: (312) 346-2222
Fax: (312) 346-0022

Christopher Moscone
Rebecca Bedwell-Coll
**Moscone, Emblidge & Quadra, LLP**
180 Montgomery Street, Suite 1240
San Francisco, CA 94104
Tel: (415) 362-3599
Fax: (415) 362-7332

Joseph Goldberg
David A. Freedman
**Freedman Boyd Daniels Hollander & Goldberg, PA**
20 First Plaza, Suite 700 (87102)
PO Box 25326
Albuquerque, NM 87125
Tel: (505) 842-9960
Fax: (505) 842-0761

Edward M. Gergosian
Robert Gralewski, Jr.
**Gergosian & Gralewski, LLP**
550 West C Street, Suite 1600
San Diego, CA 92101
Tel: (619) 230-0104
Fax:  (619) 230-0124

Andrew Nickelhoff
**Sachs Waldman, PC**
1000 Farmer St.
Detroit, MI 48226
Tel: (313) 496-9429
Fax: (313) 965-4602

Jeffrey A. Bartos
**Guerrieri, Edmond, Clayman & Bartos PC**
1625 Massachusetts Ave., NW
Washington, DC 20036
Tel: (202) 624-7400
Fax: (202) 624-7420

Susan LaCava, SC
23 N. Pinckney, Suite 300
Madison, WI 53703
Tel: (608) 258-1335
Fax: (608) 258-1669

James Wyatt
**Wyatt & Blake, LLP**
435 East Morehead St.
Charlotte, NC 28202
Tel: (704) 331-0767
Fax: (704) 331-0773

Scott D. Gilchrist
**Cohen & Malad, LLP**
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Tel: (317) 636-6481
Fax:  (317) 636-2593

Wyatt B. Durrette, Jr.
Christine Williams
**Durrette Bradshaw, PLC**
600 East Main Street
Twentieth Floor
Richmond, VA 23219
Tel: (804) 775-6900
Fax: (804) 775-6911

Gregory J. Erlandson
**Bangs, McCullen, Butler, Foye, & Simmons, LLP**
818 St. Joseph St.
P.O. Box 2670
Rapid City, SD 57709
Tel: (605) 343-1040
Fax: (605) 343-1503

Angela Drake
**Lowther Johnson, LLC**
901 St. Louis Street, 20th Floor
Springfield, MO 65806
Tel: (417) 866-7777
Fax: (417) 866-1752

Andrew S. Friedman
Francis J. Balint, Jr.
**Bonnett, Fairbourn, Friedman, & Balint, PC**
2901 North Central Ave., Suite 1000
Phoenix, AZ 85012
Tel: (602) 274-1100
Fax: (602) 274-1199

6722

Van Bunch
**Bonnett, Fairbourn, Friedman,**
**& Balint, PC**
57 Carriage Hill
Signal Mountain, TN 37377
Tel: (423) 886-9736
Fax: (423) 886-9739

Michael G. Simon
Kevin Pearl
**Frankovitch, Anetakis, Colantonio &**
**Simon**
337 Penco Road
Weirton, WV 26062
Tel: (304) 723-4400
Fax: (304) 723-5892

Tim J. Moore
Robert W. Coykendall
**Morris Laing, Evans, Brock &**
**Kennedy CHTD**
300 N. Mead, Suite 200
Wichita, KS 67202
Tel: (316) 262-2671
Fax:  (316) 262-6226

Ralph M. Stone
Thomas G. Ciarlone, Jr.
**Shalov Stone & Bonner LLP**
485 Seventh Ave, Suite 1000
New York, NY 10018
Tel: (212) 239-4340
Fax: (212) 239-4310

Marc A. Wites
**Wites & Kapetan, PA**
4400 North Federal Highway
Lighthouse Point, FL 33064
Tel: (954) 570-8989
Fax: (954) 354-0205

Michael R. Freed
**Brennan, Manna & Diamond, PL**
76 South Laura St., Suite 2110
Jacksonville, FL 32202
Tel: (904) 366-1500
Fax: (904) 366-1501

Roberta D. Liebenberg
Donald L. Perelman
Gerard A. Dever
**Fine, Kaplan and Black R.P.C.**
1845 Walnut Street, 23rd Floor
Philadelphia, PA 19103
Tel: (215) 567-6565
Fax:  (215) 568-5872

Jayne A. Goldstein
**Mager & Goldstein LLP**
One Liberty Place, 21st Floor
1650 Market Street
Philadelphia, PA 19103
Tel: (215) 640-3280
Fax:  (215) 341-0855

Kenneth G. Gilman
David Pastor
Daniel D'Angelo
**Gilman and Pastor LLP**
225 Franklin Street, 16th Floor
Boston, MA 02110
Tel: (617) 742-9700
Fax: (617) 742-9701

*Plaintiffs' Counsel*