**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

-----------------------------------------------------------x

IN RE
VITAMIN C ANTITRUST LITIGATION

This Document Relates To:

MASTER FILE 1:06-MD-1738
(DGT)(JO)

-----------------------------------------------------------x

ANIMAL SCIENCE PRODUCTS, INC., *et al.,*

                          Plaintiffs,

                vs.

HEBEI WELCOME PHARMACEUTICAL
CO., LTD., *et al.,*

                        Defendants.

Case No. 1:05-CV-00453(DGT)(JO)

-----------------------------------------------------------x

## MEMORANDUM OF DEFENDANT NORTHEAST PHARMACEUTICAL GROUP CO., LTD. IN SUPPORT OF MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS

GREENBERG TRAURIG, LLP
Attorneys for Defendant Northeast Pharmaceutical
Group Co., Ltd.
The MetLife Building
200 Park Avenue
New York, NY 10166
Tel: (212) 801-9200

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................1

STATEMENT OF FACTS ......................................................................2

    A.    Ranis's Allegations ...............................................................2

    B.    Ranis Has Admitted That It Is Asserting The Antitrust Claim As An "Assignee" ......................................................................2

    C.    The Sales Contract And the Arbitration Clause. ....................3

ARGUMENT ....................................................................................4

    A.    Ranis Has Breached Its Obligation To Arbitrate Its Dispute With NEPG. .........................................................................4

    B.    The Court Should Compel Arbitration Under Section 206 of the FAA. ............................................................................5

        1.    There Is A Strong Federal Policy In Favor Of Arbitration.........5

        2.    The Scope of the Arbitration Clause Encompasses the Asserted Claims. ...................................................6

    C.    NEPG Can Invoke The Arbitration Clause In The Sales Contract Signed In The Name of NEP I/E. ...........................................9

    D.    Ranis Cannot Avoid Arbitration With NEPG By Purporting To Base Its Claims Solely On Sales By NEPG's Co-Defendants. ..............9

    E.    CIETAC Is An Appropriate Forum For Arbitration..............14

REQUEST FOR INTERIM STAY ............................................................17

CONCLUSION ..................................................................................19

i

## TABLE OF AUTHORITIES

**Page**

**Federal Cases**

*ACE Capital Re Overseas Ltd. v. Cent. United Life Ins. Co.*, 307 F.3d 24 (2d Cir. 2002)..................................................................................................................5

*Acquaire v. Canada Dry Bottling*, 906 F. Supp. 819 (E.D.N.Y. 1995)..........................7

*American Stock Exch., LLC v. Mopex, Inc.*, 215 F.R.D. 87 (S.D.N.Y. 2002)................11

*China National Metal Prod. Imp./Exp. Co. v. Apex Digital, Inc.*, 379 F.3d 796 (9th Cir. 2004) .....................................................................................................16

*Citrus Marketing Bd. of Israel v. J. Lauritzen A.S.*, 943 F.2d 221 (2d Cir. 1991) .....................13

*David L. Threlkeld & Co. v. Metallgesellschaft*, 923 F.2d 245 (2d Cir. 1991)...............................5

*Drews Distrib., Inc. v. Silicon Gaming, Inc.*, 245 F.3d 347 (4th Cir. 2001) .................14

*Egon v. Del-Val Fin. Corp.*, 1991 WL 13726 (D.N.J. Feb. 1, 1991) ...........................18

*Genesco, Inc. v. T. Kakiuchi & Co., Ltd*, 815 F.2d 840 (2d Cir. 1987)..........................6

*Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20 (1991) ............................14, 15

*In re Currency Conversion Fee Antitrust Litigation*, 265 F. Supp. 2d 385 (S.D.N.Y, 2003)..................................................................................................10, 11

*In re Currency Conversion Fee Antitrust Litigation*, 361 F. Supp. 2d 237 (S.D.N.Y. 2005)........................................................................................................11

*Jiangsu Changlong Chem., Co., Inc. v. Burlington Bio-Medical & Scientific Corp.*, 399 F. Supp. 2d 165 (E.D.N.Y. 2005) .............................................................16

*JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163 (2d Cir. 2004)........................passim

*Landis v. North American Co.*, 299 U.S. 248 (1936) ....................................................18

*LaSala v. Needham & Co., Inc.*, 399 F. Supp. 2d 421 (S.D.N.Y. 2005) ......................18

*Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading, Inc.*, 252 F.3d 218 (2d Cir. 2001)......................................................................................................................7

*McCowan v. Sears, Roebuck & Co.*, 908 F.2d 1099 (2d Cir. 1999)...............................13

*Miller & Co. v. China National Mineral's Imp. & Exp. Co.*, 1991 WL 171268
 (N.D. Ill. 1991) ........................................................................................................16

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*, 473 U.S. 614 (1985) ........................passim

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1 (1983) ................................6

*Orange Chicken, L.L.C. v. Nambe Mills, Inc.*, 2000 WL 185866 (S.D.N.Y. 2000).....................13

*Paramedics Electromedia Commercial, Ltd. v. GE Med. Sys. Info. Techs., Inc.*,
 369 F.3d 645 (2d Cir. 2004) .........................................................................................5

*Pennzoil Exploration and Prod. Co. v. Ramco Energ. Ltd.*, 139 F.3d 1061 (5th
 Cir. 1998)..................................................................................................................7

*Progressive Cas. Ins. v. C.A. Reaseguradora*, 991 F.2d 42 (2d Cir. 1993) ..................................6

*Rivers v. Walt Disney Co.*, 980 F. Supp. 1358 (C.D.Ca 1997)....................................................18

*Sea Spray Holdings, Ltd. v. Pali Fin. Group, Inc.*, 269 F. Supp. 2d 356 (S.D.N.Y.
 2003)..........................................................................................................................4

*Smith/Enron Cogeneration Lt'd P'Ship., Inc. v. Smith Cogneration Int'l, Inc.*, 198
 F.3d 88 (2d Cir. 1999) .................................................................................................4

*Vimar Seuros y Reaseguros, S.A. v. M/V Sky Reffer*, 515 U.S. 528 (1995)...........................15, 17

*Waldman v. Village of Kiryas Joel*, 207 F.3d 105 (2d Cir. 2000) ...........................................11, 12

**Federal Statutes**

15 U.S.C. § 1 ........................................................................................................1, 2, 16, 17

9 U.S.C. § 201 .................................................................................................................4

9 U.S.C. § 206 ........................................................................................................4, 5, 19

9 U.S.C. § 3 ........................................................................................................4, 13, 19

**Federal Rules**

Fed. R. Civ. Proc. 26(c) .................................................................................................17

**Other Authorities**

Zhao Xiuwen & Lisa A. Kloppenberg, *Reforming Chinese Arbitration Law and
 Practices in the Global Economy*, 31 U. Dayton L. Rev. 421 (2006)......................................15

**INTRODUCTION**

Plaintiff The Ranis Company, Inc. ("Ranis") claims that it is an assignee of (and shares common ownership with) a company ("the Assignor") which made direct purchases of ascorbic acid (a/k/a vitamin C) from the defendants in this action, including defendant Northeast Pharmaceutical Group Co., Ltd. ("NEPG"). Purporting to stand in the shoes of the Assignor, Ranis has asserted a claim for horizontal price-fixing under Section 1 of the Sherman Act, 15 U.S.C. § 1, against NEPG and the other defendants based on the Assignor's direct purchases of vitamin C from defendants. Ranis, in support of its claim that it has standing in this action, has recently produced a sales contract for ascorbic acid ("the Sales Contract") between the Assignor and Northeast Pharm. I/E Corp. ("NEP I/E"), which is part of NEPG. The Sales Contract contains a broad arbitration clause covering "all disputes in connection" with the agreement. As the alleged assignee of the Assignor's rights and obligations under the Sales Contract, Ranis is bound by this broad arbitration clause, and the antitrust claim it makes in this action is subject to arbitration.

Under the broad arbitration clause, any case connected with the Sales Contract that cannot be settled through negotiation "may only be submitted for arbitration to the China International Economic and Trade Arbitration Commission" ("CIETAC") in Beijing. Instead of complying with the broad arbitration clause, however, Ranis commenced this action in United States federal court. Because Ranis has ignored its obligation to arbitrate, NEPG is entitled to an order compelling Ranis to do so before CIETAC, and to a stay of all proceedings of Ranis's claims pending the outcome of arbitration. In addition, the interests of judicial economy and fairness strongly favor an interim stay of all proceedings related to Ranis' claims pending resolution of this motion.

## STATEMENT OF FACTS

**A.     Ranis's Allegations**

Ranis alleges that defendants, NEPG and other Chinese ascorbic acid manufacturer/exporters, formed "a cartel to control prices and the volume of exports for vitamin C" and agreed "to control export quantities and achieve stable and enhanced price goals," "to restrict their export of vitamin C in order to create a shortage of supply in the international market," and "to restrict quantity to safeguard prices, export in a balanced and orderly manner and adjust dynamically" in violation of the Sherman Act.  (Serota Decl., Exh A ¶ 43) (The complaint in this action is attached as Exhibit A to the Declaration of James I. Serota, Esq., dated October 16, 2006 ("Serota Decl.")).  Ranis alleges that defendants, including NEPG, "sell vitamin C in the United States and throughout the world." (*Id.*, ¶ 16)  Further, Ranis alleges that it brings this action on its own behalf and on behalf of all persons or entities "who directly purchased vitamin C for delivery in the United States from any of defendants or their co-conspirators." (*Id.*, ¶ 18). Ranis alleges that the prices charged by defendants for vitamin C for export to the United States were "super competitive" (*Id.*, ¶ 52) as a result of the cartel's activities and that "plaintiffs paid more for vitamin C and substitute products than they would have paid in the absence of the illegal combination and conspiracy, and as a result they have been injured and have suffered damages." (*Id.*, ¶ 63).  The Complaint seeks "joint and several judgments . . . against defendants and each of them." (*Id.*, ¶ 68).

**B.     Ranis Has Admitted That It Is Asserting The Antitrust Claim As An "Assignee"**

Despite purporting to represent plaintiffs who made direct purchases of vitamin C from defendants, Ranis's complaint alleged no direct purchases by Ranis of vitamin C from any of the defendants.  On March 6, 2006, defense counsel asked Ranis's counsel to reveal the basis for Ranis's standing in this case, as none of defendants' records reflected sales to Ranis.  (Serota

2

Decl., Exh B). On March 10, 2006, counsel for Ranis replied by letter stating that "Ranis is an assignee of the direct purchaser and has the right to assert all claims relating to the purchases of vitamin C, ascorbic acid, or related products as might have been asserted by the direct purchaser." (*Id.*, Exh C). Ranis's counsel declined to reveal the Assignor's identity, and stated that information and records related to Ranis's standing would only be revealed only in discovery. (*Id.*).

Subsequently, Ranis's counsel insisted that such information would be disclosed only subject to a protective order, and limited to "lawyers' eyes only" review, even with respect to the name of the Assignor and sales records that originated from defendants themselves. (Serota Decl., Exh. D). On August 25, 2006, defendants agreed to treat the identity of the purchaser as confidential without prejudice to their right to challenge such designation at a later date; plaintiffs accepted that proposal on August 29. (*Id.*, Exh. E). Ranis's counsel then revealed the Assignor, and on September 1, 2006, in support of Ranis's contention that it has standing in this action, produced the sales contract between the Assignor and NEP I/E, which is part of NEPG,[1] as well as the contract between the Assignor and defendant Hebei Welcome Pharmaceutical Co Ltd. ("Hebei"). (*Id.*, Exh. F-I) (Exh G, H and I are filed under seal).

## C.    The Sales Contract And the Arbitration Clause.

The Sales Contract between the Assignor and NEP I/E contains "Quantity," "Unit Price," and "Total Amount" terms for ascorbic acid. (Serota Decl., Exh. G). Further, the Sales Contract

---

[1] NEP I/E is a division of Northeast Pharmaceutical Factory (the "Factory"). The Factory is the core unit within NEPG and is not a company under China's Company law. All of the vitamin C related operations and assets of the NEP I/E are wholly owned by NEPG and are recorded on NEPG's financial statements. Among these assets are all vitamin C related contracts executed by the I/E Corp., including all sales of vitamin C and vitamin C products for export to the United States. Those contracts are made by or on behalf of NEPG. (Declaration of Ge Yaping, dated September 30, 2006 ("Ge Yaping Decl."), ¶¶ 2-4).

includes a broad arbitration clause providing for arbitration in Beijing under the rules of

CIETAC providing:

> Arbitration: All disputes in connection with this Contract or the execution thereof shall be settled friendly through negotiations.  In case no settlement can be reached, the case may only be submitted for arbitration to the China International Economic and Trade Arbitration Commission in accordance with the provisional Rules of Procedures promulgated by said Arbitration Committee.  [T]he Arbitration shall take place in Beijing and the decision of the Arbitration Committee shall be final and binding upon both parties, neither party shall seek recourse to a law court nor other authorities to appeal for revision of the decision.

(Serota Decl., Exh. G).

## ARGUMENT

**A.     Ranis Has Breached Its Obligation To Arbitrate Its Dispute With NEPG.**

As assignee of all rights and obligations under the Sales Contract, Ranis stands in the

shoes of the Assignor and is bound by all the terms of the assigned agreement.  *Sea Spray*

*Holdings, Ltd. v. Pali Fin. Group, Inc.*, 269 F. Supp. 2d 356, 362 (S.D.N.Y. 2003) (holding that

an assignee never stands in a better position than its assignor).  One of the terms of the Sales

Contract is a broad arbitration clause.  By bringing this lawsuit against NEPG based, in part, on

NEPG's sales of vitamin C to the Assignor, Ranis has breached its obligation to arbitrate "all

disputes in connection with" the Sales Contract.  (Serota Decl., Exh. G).  Ranis has also ignored

NEPG's demand for arbitration.  (*Id.*, Exh. J filed under seal).  As a result, NEPG is entitled to

an order compelling arbitration pursuant to Section 206 of the Federal Arbitration Act ("FAA"),

9 U.S.C. § 206 (1999),[2] and a stay of proceedings pursuant to Section 3 of the FAA.

---

[2]     Section 206 of the FAA is applicable to this motion because the arbitration clause, concerning international commerce and involving citizens of different nations, is governed by the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 (the "New York Convention") to which the United States and the People's Republic of China ("the PRC") are both parties.  The United States implemented the New York Convention in Chapter 2 of the FAA.  *See* 9 U.S.C. § 201; *Smith/Enron Cogeneration Lt'd P'Ship., Inc. v. Smith Cogneration Int'l, Inc.*, 198 F.3d 88, 92 (2d Cir. 1999) (holding that federal district court can compel enforcement of an arbitration clause in an international commercial contract under Chapter 2 of the FAA).

**B.** **The Court Should Compel Arbitration Under Section 206 of the FAA.**

    **1.** **There Is A Strong Federal Policy In Favor Of Arbitration.**

Pursuant to Section 206 of the FAA a court "may direct that arbitration be held in accordance with the agreement . . ." 9 U.S.C § 206. Courts will compel arbitration under this section if: (1) the parties agreed to arbitrate, and (2) the scope of the arbitration agreement encompasses the asserted claims. *See ACE Capital Re Overseas Ltd. v. Cent. United Life Ins. Co.*, 307 F.3d 24, 33-34 (2d Cir. 2002) (compelling arbitration where the parties' agreement included a broad arbitration clause that covered the claims at issue). The arbitration agreement here satisfies these conditions.

Requiring Ranis to arbitrate its claim against NEPG would be in accord with the strong federal policy in favor of enforcing arbitration agreements. *See Paramedics Electromedia Commercial, Ltd. v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 653 (2d Cir. 2004) (noting that "[f]ederal policy strongly favors the enforcement of arbitration agreements" and affirming district court's grant of motion to compel arbitration). This federal policy "applies with special force" where, as here, the dispute is international in nature. *See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*, 473 U.S. 614, 631 (1985) (compelling arbitration of international antitrust claims); *see also David L. Threlkeld & Co. v. Metallgesellschaft*, 923 F.2d 245, 248 (2d Cir. 1991) (noting that the "federal policy [that] strongly favors arbitration . . . is even stronger in the context of international business transactions" and granting motion to compel arbitration).

The Supreme Court has held that antitrust conspiracy claims brought under Section 1 of the Sherman Act, particularly those involving intentional commerce, are subject to arbitration. *Mitsubishi Motors Corp.*, 473 U.S. at 618. In *Mitsubishi*, the Court held that enforcement of the parties' arbitration agreement, which provided for arbitration by the Japan Commercial Arbitration Association was required by "concerns of international comity, respect for the

capacities of foreign and transnational tribunals, and sensitivity to the need of international commercial system for predictability in the resolution of disputes." 473 U.S. at 629. The Court rejected the argument that an international arbitration panel should not consider and decide a Sherman Act conspiracy claim. *Id.* at 637 ("There is no reason to assume at the outset of the dispute that international arbitration will not provide an adequate mechanism ... And so long as the prospective litigant effectively may vindicate its statutory cause of action in the arbitral forum, the statute will continue to serve both its remedial and deterrent function.").

The FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Genesco, Inc. v. T. Kakiuchi & Co., Ltd*, 815 F.2d 840, 844 (2d Cir. 1987). "[U]nder the FAA, 'any doubts concerning the scope of the arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability.'" *JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 171 (2d Cir. 2004) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983)); *see also Progressive Cas. Ins. v. C.A. Reaseguradora*, 991 F.2d 42, 48 (2d Cir. 1993) ("unless it can be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute, the dispute should be submitted to arbitration.").

## 2.    The Scope of the Arbitration Clause Encompasses the Asserted Claims.

In determining whether a particular claim is within the scope of an arbitration clause, "a court should classify the particular clause as either broad or narrow." *JLM Industries, Inc.*, 387 F.3d at 171 (internal quotation and citation omitted). Here, the arbitration clause, providing for the arbitration of "*all* disputes in connection with this Contract or the execution thereof" (Serota Decl., Exh. G) (emphasis added), must be considered expansive in scope and characterized as

"broad." *See Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading, Inc.*, 252 F.3d 218, 225 (2d Cir. 2001) (describing an arbitration clause covering "any dispute arising from" the agreement as "sweeping"); *Pennzoil Exploration and Prod. Co. v. Ramco Energ. Ltd.*, 139 F.3d 1061, 1067 (5th Cir. 1998) (observing that a clause requiring arbitration of disputes "connected with" the contract is a "broad" arbitration clause); *Louis Dreyfus Negoce S.A.*, 252 F.3d at 226 (example of "broad" arbitration clause language including "arising in connection with"); *Acquaire v. Canada Dry Bottling*, 906 F. Supp. 819, 835 (E.D.N.Y. 1995) (holding that provision in contract that required arbitration of disputes "concerning the interpretation or application of" the contract was "broad," and that an arbitration clause does not have to use the "most sweeping language imaginable" to be considered "broad").

Because the arbitration clause here at issue is broad, a "presumption of arbitrability" arises. *Louis Dreyfus Negoce S.A.*, 252 F.3d at 224-5 ("When the parties use expansive language in drafting an arbitration clause, presumably they intend all issues that touch matters within the main agreement to be arbitrated . . .") (citation and internal quotation marks omitted).  Where an arbitration clause is broad, arbitration is *not limited* to matters of breach of contract or contract interpretation. *JLM Industries*, 387 F.3d at 176 (noting that the Second Circuit has rejected the notion that the presence of breach of contract or contract interpretation issues are prerequisite to sending a matter to arbitration).  Instead, under a broad arbitration clause, the court should order even collateral matters to be arbitrated if they *"touch matters"* within the agreement. *Louis Dreyfus Negoce S.A.*, 252 F.3d at 225 (emphasis added).

In *JLM Industries*, *supra*, plaintiffs alleged that they had shipped chemicals on ships owned by subsidiaries of the defendants, and that defendants had conspired to fix the prices for shipping chemicals charged by their subsidiaries.  387 F.3d at 167.  The shipping contracts

between plaintiffs' and the defendants' subsidiaries contained a clause requiring arbitration of "[a]ny and all differences arising out of this [contract]." *Id.* The Second Circuit found that the claims for horizontal price-fixing in violation of the Sherman Act were subject to arbitration because they "unquestionably involve a core issue of the contracts between the parties — allegations that the price terms set forth in those contracts have been artificially inflated as a result of the price-fixing conspiracy among the [defendants]." *Id.* at 176.

In the instant case, the allegedly inflated price at which plaintiff's Assignor purchased vitamin C from NEPG does not merely touch on the antitrust claim, but goes to the heart of it. *Id.* at 176 (allegations of inflated price term "unquestionably involve a core issue of the contracts between the parties"). Ranis alleges that a price fixing conspiracy between NEPG and the other defendants lead to inflated prices for vitamin C sold by the defendants and purchased by the Assignor. Specifically, Ranis alleges that NEPG "sells vitamin C to food and pharmaceutical distributors and manufacturers in the United States" (Serota Decl., Exh. A, ¶ 28), that NEPG agreed to "increase and maintain prices of vitamin C for the sale of vitamin C in the United States and elsewhere" (*Id.*, ¶ 47(c)), that the Assignor purchased vitamin C from defendants (*Id.*, ¶ 63), and that the Assignor "paid more for vitamin C and substitute products" than it "would have paid in the absence of the illegal combination and conspiracy." (*Id.*). The allegedly inflated price of the vitamin C purchased by the Assignor from NEPG is a term of the Sale Contract. (Serota Decl., Exh. G). Accordingly, Ranis's antitrust claim against NEPG is a dispute within the scope of the broad arbitration clause contained in the Sales Contract. *Id.*

**C.    NEPG Can Invoke The Arbitration Clause In The Sales Contract Signed In The Name of NEP I/E.**

In a letter to the Magistrate Judge in this action, Ranis advanced a number of arguments as to why its claims in this action against NEPG are not subject to arbitration. (Serota Decl., Exh. K). None of these arguments, however, provide a basis for Ranis to avoid arbitration.

Notwithstanding that Ranis has proffered the Sales Contract between the Assignor and NEPG to support standing to sue NEPG as a direct purchaser, Ranis has suggested that the arbitration clause is not applicable to this action because the Sales Contract was between the Assignor "and an entity named Northeast Pharm. I/E Corp., which is not a named defendant in this action." (Serota Decl., Exh. K at 1). However, NEP I/E is merely the division used by NEPG Factory for the export of vitamin C which in turn is the core unit but not a separate company within NEPG. All of the vitamin C related operations and assets of NEP I/E are wholly owned by NEPG and are recorded on NEPG's financial statements. Among these assets are all vitamin C related contracts executed by the NEP I/E, including all sales of vitamin C and vitamin C products for export to the United States. (Ge Yaping Decl., ¶¶ 2-4). Thus, NEPG must be considered a party to the Sales Contract.

**D.    Ranis Cannot Avoid Arbitration With NEPG By Purporting To Base Its Claims Solely On Sales By NEPG's Co-Defendants.**

Before the Magistrate Judge, Ranis has suggested that it can avoid arbitration of its antitrust claim against NEPG because it is also asserting claims for which NEPG is allegedly joint and severally liable based on direct purchases it made from defendant Hebei, whose sales contracts do not include arbitration clauses.

Ranis appears to be making one or more of three possible arguments, none of which support the conclusion that it is not bound to arbitrate these claims. First, Ranis asserts that because NEPG is alleged to have "conspired" with the other defendants, at least one of which

9

supposedly does not have an arbitration clause in some of its sales contracts with Ranis, no part of Ranis's antitrust claim against NEPG is subject to arbitration. Second, Ranis argues that even if its claim based on its direct purchases from NEPG is subject to arbitration, Ranis can nonetheless pursue before this court a separate, non-arbitrable antitrust claim because NEPG is jointly and severally liable for damages arising from sales made by its alleged co-conspirator Hebei. Third, Ranis argues that it can avoid arbitration by simply abandoning any claim of standing or damages based on its direct purchases from NEPG, and thereby limit its antitrust claim in this action to purchases from other defendants without implicating the Sales Contract and the arbitration clause. None of these arguments is supportable under the case law.

As to plaintiff's first possible argument, the mere fact that Ranis has asserted a cause of action based on an alleged conspiracy cannot eviscerate the arbitration clause. There is nothing inherently non-arbitrable about conspiracy claims. *Mitsubishi*, 473 U.S. at 620, 640 (requiring arbitration of Sherman Act conspiracy claims); *JLM Indus., Inc.*, 387 F.3d at 175 (holding that plaintiff's "claims regarding a conspiracy among the [defendants] in violation of the Sherman Act are arbitrable"). That one of NEPG's co-defendants does not have an arbitration clause in its sales agreement with Ranis does not mean Ranis's antitrust claim is not within the scope of NEPG's arbitration clause or that Ranis can avoid arbitrating its claim against NEPG. In *In re Currency Conversion Fee Antitrust Litigation*, 265 F. Supp. 2d 385, 390 (S.D.N.Y. 2003), plaintiffs alleged a large-scale antitrust conspiracy between a number of financial institutions. Some, but not all, of the defendants had agreements with plaintiffs that contained broad arbitration clauses. *Id.* at 397. The Court held that plaintiffs' antitrust conspiracy claims were within the scope of those arbitration clauses and ordered plaintiffs who had signed agreements with such clauses to arbitration. *Id.* at 409-10. The fact that the arbitration clauses did not

encompass claims against *all* the defendants in the antitrust conspiracy case and that non-signatory plaintiffs might continue in federal court did not prevent enforcement of the arbitration clauses as to the claims of signatory plaintiffs. *Id.*[3] In *JLM*, 387 F.3d 163, 178 n.7, the Second Circuit cited the allegation of conspiracy and claim for joint liability as a basis for finding the claims against all defendants to be arbitrable as inextricably intertwined.

Ranis's second potential argument suggests that even if its Sherman Act claim based on its direct purchases from NEPG is subject to arbitration, it still has a non-arbitrable claim against NEPG based on NEPG's alleged joint and several liability for the sales of its alleged co-conspirators. In other words, Ranis suggests that its antitrust claim against NEPG can be divided into arbitrable (based on direct purchases from NEPG) and non-arbitrable (based on purchases from NEPG's alleged co-conspirators) portions, and that the supposed non-arbitrable issue of NEPG's joint and several liability for its co-conspirators' sales must proceed before this Court.

Any such theory is flawed in that it ignores the rule against splitting a claim. *See e.g. Waldman v. Village of Kiryas Joel*, 207 F.3d 105, 110 (2d Cir. 2000) (holding that plaintiff could not "split" his claim based on series of closely related transactions into various suits based on different legal theories). A party must bring in *one action* all legal theories arising out of the same transaction or series of transactions. *American Stock Exch., LLC v. Mopex, Inc.*, 215 F.R.D. 87, 91 (S.D.N.Y. 2002). To determine whether two actions spring from the same "transaction" or "series of transactions," the courts look to whether the underlying facts of the two actions are related in "time, space, origin or motivation," whether the two actions could form "a convenient trial unit" and whether treating the "various overlapping facts" as a single

---

[3]        In a later decision, the court held, in light the Second Circuit's decision in *JLM Indus. Inc., supra*, that the non-signatory defendants could also avail themselves of the arbitration clauses because the signatory plaintiffs' claims against the non-signatory defendants implicated the agreements containing the arbitration clause and because the non-signatory defendants had a sufficiently close relationship with the signatory defendants. *In re Currency Conversion Fee Antitrust Litigation*, 361 F. Supp. 2d 237, 263-64 (S.D.N.Y. 2005).

transaction or series of related transactions would have "conformed to the parties' expectations." *Waldman*, 207 F.3d at 111-112.

Ranis in its Complaint alleges a single, unitary horizontal price fixing conspiracy amongst the defendants.  (Serota Decl., Exh A ¶ 43).  Any antitrust claim by Ranis against NEPG based on NEPG's direct sales presents the same factual issues essential to any claim by Ranis against NEPG based on its co-defendants' sales relating to meetings, government compulsion, whether any agreement was formed and other related issues.  Thus, a claim against NEPG based on its direct sales and claim against NEPG based on the sales of its co-defendants are related in "time, space, origin or motivation," as it is the *same* alleged agreement on price between the same parties during the same time period that is the essential basis for either claim. Further, the issues of direct and joint and several liability form a "convenient trial unit" because they involve the same alleged agreement to fix prices, with only minor differences of proof regarding evidence of purchases by Ranis.  *Waldman*, 207 F.3d at 111-112 (two actions would have formed convenient trial unit because they involved the same incidents with only minor differences regarding witnesses and evidence).  Finally, treating Ranis's claims against NEPG based on NEPG's direct sales and the sales of its co-conspirators as a single transaction or series of related transactions would conform to the parties expectations.  Ranis plead the antitrust claim that way in the Complaint.  Thus, clearly, Ranis views any claim for damages against NEPG for either its sales or the sales of its co-conspirators as arising from the same alleged unlawful agreement to fix prices.  *Id.* (holding that treating two actions as based a on series of related transactions conformed with plaintiff's expectations because plaintiff "viewed all of the overlapping facts as arising from the same polluted spring of pervasive entanglement").

If Ranis were allowed to violate the rule against claim splitting by dividing its antitrust claim against NEPG into two separate actions, one before an arbitration panel and one before this Court, both depending on identical facts and legal issues, the arbitration clause and the Sherman Act which command joint and several liability would be eviscerated. Ranis would potentially be able to hold NEPG alone responsible in an arbitration for the joint and several liability of all defendants and a second time in Federal court for the exact same offense along with all the current defendants. Second Circuit law, however, does not permit such a violation of the strong federal policy in favor of arbitration and of the rule against claim splitting. *McCowan v. Sears, Roebuck & Co.*, 908 F.2d 1099, 1106-08 (2d Cir. 1999) (holding that plaintiff could not proceed with lawsuit against defendant because the lawsuit arose from the same controversy as claims in another lawsuit by the same plaintiff against the same defendant that had been ordered to arbitration).[4] Accordingly, Ranis cannot split its claim and cannot impair NEPG's rights under the arbitration agreement by litigating before this Court the issue of NEPG's alleged agreement to fix prices in the guise of determining joint and several liability, because the identical issue must also be addressed by the arbitration panel. *Id.*

Finally, Ranis's letter to the Magistrate Judge suggests that to avoid arbitration, Ranis may be prepared to limit its antitrust claim by basing its allegations of standing and damages

---

[4] In *McCowan*, the stayed action included a second defendant who did not have standing to invoke the arbitration agreement. *Id.* The *McCowan* court reserved the issue of whether that defendant was also entitled to a mandatory stay under Section 3 of the FAA. *Id.* In *Citrus Marketing Bd. of Israel v. J. Lauritzen A.S.*, 943 F.2d 221, 224 (2d Cir. 1991), the Second Circuit held that *McCowan* should not be read as overruling the Second Circuit rule that a defendant who does not have standing to invoke an arbitration agreement cannot appeal to the automatic stay provisions of Section 3 of the FAA where a co-defendant does have a right to arbitration of the plaintiff's claim and to an automatic stay. However, a defendant that does not have standing to invoke an arbitration clause can ask for a stay pending the outcome of the arbitration as to its co-defendant by appealing to the inherent power of the district court to control the disposition of cases on its docket. *Id.*; *see also Orange Chicken, L.L.C. v. Nambe Mills, Inc.*, 2000 WL 185866, at *1 (S.D.N.Y. 2000) (holding that action should be stayed, pursuant to inherent powers of the court, as to defendant who could not invoke arbitration agreement because arbitration between plaintiff and co-defendant implicated plaintiff's claims against the defendant who did not have right to arbitration and created risk of inconsistent results).

solely on purchases from NEPG's co-defendant Hebei, in the hope of avoiding implicating NEPG's arbitration clause.   This, of course, would be in complete contradiction to Ranis's Complaint which clearly does not restrict the bases for standing and damages to the direct sales of only a single defendant.  (Serota Decl., Exh A ¶¶ 15, 28, 32, 49, 63).  Moreover, Ranis's production of the Sales Contract between the Assignor and NEPG in support of its claim that it has standing is an admission that Ranis bases its antitrust claim in part on that agreement. Having brought a federal lawsuit based in part on its purchases and agreements with NEPG, Ranis cannot now retroactively limit the scope of this dispute in an attempt to circumvent an arbitration clause which encompasses that dispute. *Drews Distrib., Inc. v. Silicon Gaming, Inc.*, 245 F.3d 347 (4th Cir. 2001) (holding that a party cannot "retroactively restrict or eliminate its contractual obligation to arbitrate a dispute by fashioning a limited complaint").

**E.      CIETAC Is An Appropriate Forum For Arbitration.**

Before the Magistrate Judge, Ranis has suggested that CIETAC has deficiencies as an arbitral forum and, therefore, countervailing considerations relieve Ranis of the responsibility to arbitrate its claims against NEPG.  Ranis's mere speculation about how CIETAC will adjudicate its dispute with NEPG cannot serve as a basis to avoid arbitration. *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 30 (1991) (rejecting "host of challenges to the adequacy of arbitration procedures" as "far out of step with our current strong endorsement of the federal statutes favoring" arbitration) (internal quotation and citations omitted).

Ranis has insinuated in its letter to the Magistrate Judge that CIETAC is not an appropriate forum for the arbitration of its dispute with NEPG because of supposed bias against non-Chinese companies in that forum.  This speculation is insufficient to void Ranis's contractual obligation to arbitrate its claim against NEPG in Beijing.  A court should "decline to indulge the presumption that the parties and arbitral body conducting a proceeding will be unable

or unwilling to retain competent, conscientious and impartial arbitrators." *Mitsubishi Motors*, *supra*, 473 U.S. at 634. "Skepticism about the ability of foreign arbitrators" the Supreme Court has held, must "give way to contemporary principles of international comity and commercial practice." *Vimar Seuros y Reaseguros, S.A. v. M/V Sky Reffer*, 515 U.S. 528, 537 (1995); *see also Gilmer*, 30-32 (rejecting challenges to arbitration based on speculation of bias on the part of arbitrators).

CIETAC has a history of more than 50 years arbitrating international economic disputes. CIETAC's awards have been enforced by competent courts of more than 140 countries and regions. CIETAC brochure, *cited in* Zhao Xiuwen & Lisa A. Kloppenberg, *Reforming Chinese Arbitration Law and Practices in the Global Economy*, 31 U. Dayton L. Rev. 421 (2006). In accordance with Article 14 of China's Arbitration Law of 1994, arbitration institutions, including CIETAC, are "independent from administrative organs and they are not subject to any administrative organs and neither are they affiliated to each other." (Serota Decl., Exh. L). Furthermore, Article 8 of the Arbitration Law provides that arbitration shall be conducted independently according to the law and shall not be subject to interference from governmental entities, social organizations, or individuals." *Id.*

It is also not true that only a Chinese national may sit as a presiding arbitrator in a CIETAC proceeding. The CIETAC "may appoint arbitrators from foreign nationals with specialized knowledge in law, economy and trade, science and technology." *(Id.*, Exh. L at Art. 67). Currently, there are approximately 700 arbitrators on CIETAC's Panel of Arbitrators for international or foreign related disputes. Among these arbitrators, there are about 270 foreign nationals, including many from the United States. *See* CIETAC Panel of Arbitrators, *available at* http://www.cietac.org.cn/english/arbitrators/arbitrators_n1.htm, attached to the Serota Decl. as

Exh. M. Moreover, parties may agree to appoint arbitrators from outside of the CIETAC's Panel

of Arbitrators and such outside arbitrators may act as co-arbitrator, presiding arbitrator or sole

arbitrator upon confirmation of the Chairman of the CIETAC. CIETAC Arbitration Rules,

Art. 21 attached to the Serota Decl. as Exh. N. Under CIETAC Arbitration Rules, parties can

choose a U.S. arbitrator on the CIETAC's Panel of Arbitrators or even an arbitrator outside the

CIETAC Panel of Arbitrators as the presiding arbitrator.

Moreover, CIETAC's rules provide measures to avoid biased arbitrators. Those rules

provide that any arbitrator selected by CIETAC or the parties must make a written disclosure of

any facts or circumstances likely to give rise to justifiable doubts as to his/her impartiality or

independence. (Serota Decl., Exh. N at Art. 25). Parties have the right to make written

challenges to the appointment of an arbitrator. (*Id.*, Exh. N at Art. 26).

In granting motions to compel arbitration before CIETAC and having enforced CIETAC

arbitration awards, the U.S. courts have found that CIETAC is an appropriate forum. *China

National Metal Prod. Imp./Exp. Co. v. Apex Digital, Inc.*, 379 F.3d 796 (9th Cir. 2004)

(enforcing CIETAC arbitration award); *Jiangsu Changlong Chem., Co., Inc. v. Burlington Bio-

Medical & Scientific Corp.*, 399 F. Supp. 2d 165, 169 (E.D.N.Y. 2005) (enforcing CIETAC

arbitration award and holding that the "procedures employed by the [CIETAC] Tribunal satisfied

Burlington's due process rights to notice and to be heard"); *Miller & Co. v. China National

Mineral's Imp. & Exp. Co.*, 1991 WL 171268 at *8 (N.D. Ill. 1991) (granting motion to compel

arbitration before CIETAC).

Ranis has also speculated that CIETAC will not apply United States antitrust law to its

claim against NEPG thereby depriving Ranis of its rights under the Sherman Act. However,

*nothing* in CIETAC's rules, the Sales Contract, or the arbitration clause prohibits the arbitration

panel from applying the Sherman Act.  To the contrary, CIETAC's rules allow the arbitration

panel to "*examine the case in any manner it deems appropriate unless otherwise agreed by the*

*parties.*"  (Serota Decl., Exh. N at Art. 28).  Thus, under CIETAC's rules not only is the

arbitration panel free to apply the Sherman Act if it wishes, the parties can stipulate as to how the

case will be examined.  Ranis's assertion that the Sherman Act will not be applied to its claims

against NEPG is thus mere speculation that cannot prevent enforcement of the arbitration clause.

*See Vimar Seuros y Reaseguros, S.A.*, 515 U.S. at 540 (1995) (holding that speculation

concerning what law would be applied by a foreign arbitral panel is not properly considered by

an American court prior to arbitration itself); *JLM Indus., Inc.*, 387 F.3d at 182 (rejected as

speculative plaintiff's concern that London arbitration panel would apply British law to

plaintiff's price fixing claim).  In *Mitsubishi*, the agreement at issue contained an arbitration

clause requiring arbitration in Japan and a choice of law clause that provided that Swiss law

governed the agreement.  473 U.S. at 637, n.19. The Supreme Court, however, held that the

choice of law clause did not provide a basis to avoid arbitration of plaintiff's antitrust claim

connected with the agreement because it was merely speculative as to whether the Japanese

arbitration panel would view that choice of law clause as precluding the application of the

Sherman Act.   Here, where there is no choice of law clause at all in the Sales Contract, the

CIETAC panel is not constrained in its choice of law, and is free to apply the Sherman Act.

## REQUEST FOR INTERIM STAY

Pursuant to the inherent power of the court to manage its docket and Rule 26(c) of the

Federal Rules of Civil Procedure with regard to discovery, NEPG seeks a stay of all proceedings

related to Ranis' claims in this matter until thirty days after the Court disposes of the instant Motion to Compel Arbitration.[5]

A court's power to stay its proceedings is "incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. North American Co.*, 299 U.S. 248, 254 (1936). When determining whether to grant stays, courts apply a balancing test, weighing the interests of the court, the parties, non-parties and the public. *LaSala v. Needham & Co., Inc.*, 399 F. Supp. 2d 421, 427 (S.D.N.Y. 2005).

It is likely that this Court will compel arbitration of Ranis' claims since arbitration is especially favored in the international context and for the other reasons articulated in far more detail above. There is Supreme Court precedent directly on point supporting arbitration in contexts very similar to this one. Therefore, any judicial time invested in deciding the motions to dismiss and resolving anticipated discovery disputes will likely be wasted if this case is determined to be sent to arbitration.[6] *Rivers v. Walt Disney Co.*, 980 F. Supp. 1358, 1361 (C.D.Ca 1997) (Staying the proceedings has the added benefit of reserving jurisdictional and other preliminary questions for the court eventually assigned to adjudicate the consolidated actions, thus saving a "great deal" of the Court's time and energy.)

Here, the potential savings of judicial resources in the likely event that this action is arbitrated and the potential for prejudice to NEPG without a stay greatly outweigh the slight, if any, detriment to Ranis from a stay. *Rivers v. Walt Disney Co.*, 980 F. Supp. at 1362 n.5 (*citing*

---

[5]    NEPG asks for the stay to continue for thirty days after the Motion to Compel is decided so that it will not have to incur expenses related to discovery during the pendency of this Motion. In the event the Motion to Compel is denied, the thirty-day window will allow NEPG to collect documents and otherwise prepare for discovery without running the risk of missing deadlines once discovery commences.

[6]    The likelihood that judicial resources would be wasted in determining the motions to dismiss is heightened because NEPG's co-defendants are separately moving to compel arbitration of Ranis' claims against them.

*Egon v. Del-Val Fin. Corp.*, 1991 WL 13726 (D.N.J. Feb. 1, 1991) ("[E]ven if a temporary stay can be characterized as a delay prejudicial to plaintiffs, there are considerations of judicial economy and hardship to defendants that are compelling enough to warrant such a delay.").

Accordingly, granting a stay of all proceedings related to Ranis' claims pending the outcome of this motion to compel arbitration is appropriate here.

## CONCLUSION

For the above stated reasons, pursuant to 9 U.S.C. § 3, 206 the Court should grant defendant NEPG's motion to compel Ranis to honor its contractual obligations to arbitrate its Sherman Act claims against NEPG and stay Ranis's claims against NEPG for the duration of the arbitration. In addition, the Court should grant an interim stay of Ranis' claims while this motion to compel arbitration is pending.

Dated: October 16, 2006                    Respectfully Submitted,


                                           GREENBERG TRAURIG, LLP

                                           *James Ian Serota*

                                           James I. Serota, Esq. (Bar #JS 6802)
                                           Kenneth A. Lapatine, Esq. (Bar #KL 3985)
                                           William A. Wargo, Esq. (Bar #WW 9417)
                                           The MetLife Building
                                           200 Park Avenue
                                           New York, NY 10166
                                           Tel:  (212) 801-9200
                                           Fax:  (212) 801-6400

                                           Attorneys for Defendant Northeast
                                           Pharmaceutical Group Co., Ltd.