## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

**ANIMAL SCIENCE PRODUCTS, INC.,**
2864 FM 1275
Nacogdoches, TX 75961,

**THE RANIS COMPANY, INC.,**
PO Box 2749
Elizabeth, New Jersey 07208, and

**MAGNO-HUMPHRIES LABORATORIES, INC.,**
8800 SW Commercial Street
Tigard, Oregon 97223,

Plaintiffs,

– v. –

**HEBEI WELCOME PHARMACEUTICAL CO. LTD.,**
815 W. Naomi Ave., Arcadia, CA 91007,

**JIANGSU JIANGSHAN PHARMACEUTICAL CO. LTD.,**
No. 1 Jiangshan Road, Jingjing, Jiangsu, China, 214500,

**JSPC AMERICA, INC.,**
2744 La Salle Pointe, Chino Hills, CA 91709,

**LEGEND INGREDIENTS GROUP, INC.,**
13860 Benson Ave. #B, Chino, CA 91710,

**NORTHEAST PHARMACEUTICAL GROUP CO. LTD.,**
No.37 Zhonggong North Street, Tiexi District, Shenyang, China 110026,

**WEISHENG PHARMACEUTICAL CO. LTD.,**
236 Yellow River Road, Shijiazhuang, Hebei, China,

**SHIJIAZHUANG PHARMACEUTICAL (USA) INC.,**
5460 N. Peck Road, Arcadia, CA 91006,

**CHINA PHARMACEUTICAL GROUP, LTD.,**
Room 3805, 38th Floor, Central Plaza, 18 Harbour Road, Wanchai, Hong Kong,

Case No. 1:05-CV-00453(DGT)(JO)
**Master File: 06-MD-1738**

SECOND AMENDED
CLASS ACTION COMPLAINT

JURY TRIAL DEMAND

**NORTH CHINA PHARMACEUTICAL GROUP CORP.,**
388 Heping East Road, Shijiazhuang, Hebei, China,

**NORTH CHINA PHARMACEUTICAL CO., LTD.,**
388 Heping East Road, Shijiazhuang, Hebei, China, and

**NORTH CHINA PHARMACEUTICAL GROUP IMPORT AND EXPORT TRADE CO., LTD.,**
219 Heping East Road, Shijiazhuang, Hebei, China,

Defendants.

## SECOND AMENDED COMPLAINT FOR ANTITRUST VIOLATIONS

Plaintiffs, by and through their undersigned attorneys, bring this action on their own behalf and all others similarly situated for treble damages and injunctive relief under the antitrust laws of the United States against the above-named defendants, demanding a trial by jury.  For its Complaint against defendants, plaintiffs allege the following:

## I.    NATURE OF THE ACTION

1.    This case arises out of a conspiracy among all defendants and their co-conspirators with the purpose and effect of fixing prices, controlling the support of vitamin C to be exported to the United States and worldwide, and committing other unlawful practices designed to inflate the prices of vitamin C sold to plaintiffs and other purchasers in the United States and elsewhere.  In particular, the above-named defendants' acts related to price-fixing and supply restraints in the distribution and sale of vitamin C (a/k/a ascorbic acid) constitute per se violations of Section 1 of the Sherman Act.

2.    Defendants have established an illegal cartel that is ongoing today and that has deliberately targeted and severely burdened consumers in the United States.  The cartel and illegal conspiracy has existed since at least December 2001.  The cartel has affected hundreds of

2

millions of dollars of commerce in products found in nearly every American household. The conspiracy has included communications and meetings in which defendants have agreed to limit competition, control supply, and increase prices for vitamin C and vitamin C products in the United States.

## II.     JURISDICTION AND VENUE

3.      Plaintiffs bring this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 4 and 16, to obtain injunctive relief and to recover treble damages and the costs of suit, including reasonable attorneys' fees, and to obtain injunctive relief against defendants for the injuries sustained by plaintiffs by reason of defendants' violations of the Sherman Act.

4.      This Court has jurisdiction over plaintiffs' Complaint pursuant to 28 U.S.C. § 1337 and 15 U.S.C. §§ 1, 15, 22, and 26.

5.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and (c) and 15 U.S.C. §§ 15, 22, and 26.

6.      Jurisdiction over all defendants comports with the United States Constitution and 15 U.S.C. §§ 15, 22, and 26 and the long-arm statute of the State of New York.

## III.    PARTIES

7.      Plaintiff Animal Science Products, Inc. ("Animal Science") is a Texas corporation with its principal place of business in Nacogdoches, Texas.

8.      Plaintiff The Ranis Company, Inc. ("Ranis") is a New Jersey corporation with its principal place of business in Elizabeth, New Jersey. An affiliate of Ranis, a direct purchaser of vitamin C, has conveyed, assigned, and transferred to Ranis all rights, title, and interest in and to all causes of action it may have under the laws of the United States of America or any State

3

thereof relating to vitamin C, ascorbic acid, or related vitamin products during the period from 2000 through the date of the assignment.

9.     Plaintiff Magno-Humphries Laboratories, Inc. ("MHL") is an Oregon corporation with its principal place of business in Tigard, Oregon.  MHL directly purchased vitamin C and vitamin C products from Defendants JSPC America, Inc. and Legend Ingredients Group, Inc., during the class period and at least as early as 2001.

10.    Defendant Hebei Welcome Pharmaceutical Co. Ltd. ("Hebei Welcome") is a Chinese corporation with operations in the Hebei province of China.  Hebei Welcome is a joint venture between North China Pharmaceutical Holding Co. Ltd., Hong Kong Sanwei Intl. Co. Ltd. and Hong Kong Jinxian Co. Ltd.  Hebei Welcome's main product is vitamin C in the forms of crystalline, direct compressible, calcium, and sodium salts. Hebei Welcome is registered to do business in the United States at 815 W. Naomi Ave., Arcadia, CA 91007.

11.    Defendant Jiangsu Jiangshan Pharmaceutical Co., Ltd. ("Jiangsu Jiangshan") is a Chinese corporation based in the Jiangsu province of China.  Jiangsu Jiangshan was founded in 1990 as a joint venture between Jiangsu Glucose Factory Zhongshan Co. (H.K.), Jiangsu Provincial Medicine & Health Product Import and Export Co. and Expert Assets Ltd.  JSPC America, Inc. and Legend Ingredients Group, Inc. were California corporations and subsidiaries or affiliates of Jiangsu Jiangshan during the class period.

12.    Defendant JSPC America, Inc. ("JSPC America") was a California corporation and registered to do business in California at 2744 La Salle Pointe, Chino Hills, CA 91709 until November 24, 2003.  JSPC America was a subsidiary or affiliate of Jiangsu Jiangshan during the class period.

4

13.     Defendant Legend Ingredients Group, Inc. ("Legend") is a California corporation and registered to do business in California at 13860 Benson Ave. #B, Chino, CA 91710.  Legend was a subsidiary or affiliate of Jiangsu Jiangshan during the class period.

14.     Defendant Northeast Pharmaceutical (Group) Co. Ltd. ("Northeast Pharmaceutical") is a Chinese corporation based in the Liaoning province of China.  Northeast Pharmaceutical is the largest pharmaceutical enterprise in China.  It has produced vitamin C since the early 1990s.  In 2003, Northeast Pharmaceutical registered a total export value of $100 million for its vitamin C products.  Shares of Northeast Pharmaceutical are traded on the Shenzen stock exchange.  Northeast Pharmaceutical is named as a defendant by Animal Science but is not named as a defendant by Ranis or MHL.

15.     Defendant Weisheng Pharmaceutical Co. Ltd. ("Weisheng") is a Chinese corporation based in the Hebei province of China.  Weisheng is an affiliate of the major pharmaceutical corporation China Pharmaceutical Group Ltd.

16.     Defendant Shijiazhuang Pharmaceutical (USA), Inc., ("Shijiazhuang") is a Chinese corporation based in the Hebei province of China. Shijiazhuang is an affiliate of Weisheng and the major pharmaceutical corporation China Pharmaceutical Group Ltd. Shijiazhuang is registered to do business in California at 5460 N. Peck Road, Suite A, Arcadia, CA 91006.

17.     Defendant China Pharmaceutical Group Ltd. ("China Pharmaceutical") is a Hong Kong corporation based in the Hebei province of China.  China Pharmaceutical was renamed from its former corporate name China Pharmaceutical Enterprise and Investment Corporation Ltd. on May 7, 2003.  The shares of China Pharmaceutical are traded on the Hong Kong stock exchange.  China Pharmaceutical owns, controls and dominates its affiliates Weisheng and

5

Shijiazhuang and through these affiliates is engaged in the business of manufacturing and selling vitamin C. Collectively, Weisheng, Shijiazhuang and China Pharmaceutical are referred to hereinafter as China Pharmaceutical.

18.     Defendant North China Pharmaceutical Group Corp. ("North China") is a Chinese corporation based in the Hebei province of China. North China was founded in 1953 and is engaged in the business of manufacturing and selling vitamin C, including through its subsidiaries.

19.     Defendant North China Pharmaceutical Co., Ltd. ("NCPC") is a Chinese corporation based in the Hebei province of China. It is a subsidiary of North China and its shares are traded on the Shanghai stock exchange.

20.     Defendant North China Pharmaceutical Group Import & Export Trade Co., Ltd. ("NCPCIE") is a Chinese corporation based in the Hebei province of China. It is a subsidiary of NCPC and was established in 1988. NCPCIE has a total export value of over $100 million and ranks first in the Chinese pharmaceutical sector. NCPCIE has a branch in the United States. Collectively, North China, NCPC, and NCPCIE are referred to hereinafter as North China.

21.     Each of these defendants, directly and through affiliates that they dominate and control in this country and outside the United States, is engaged in the business of manufacturing and selling vitamin C in the United States and throughout the world.

22.     Each of these defendants, directly and through affiliates that they dominate and control in this country and outside the United States, has colluded to control output and set artificial prices for vitamin C pursuant to illegal horizontal agreements. These horizontal practices were designed to, and in fact did, have a substantial and adverse impact in the United States.

6

23.     The acts charged in this Complaint as having been done by defendants Hebei, Jiangsu, NEPG, China Pharmaceutical, and North China and their co-conspirators were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management of defendants' business or affairs, and continue to the present day.

## IV.    CLASS ACTION ALLEGATIONS

24.     Plaintiff Animal Science brings this action on its own behalf, and under Rule 23(b)(2) and (3) of the Federal Rules of Civil Procedure, as representatives of a class defined as: all persons or entities, or assignees of such persons or entities, who purchase vitamin C manufactured by defendants for delivery in the United States, other than pursuant to a contract with a Defendant containing an arbitration clause, requiring injunctive relief against defendants to end defendants' antitrust violations (the "injunctive relief" class).  Plaintiffs Ranis and MHL bring this action on their own behalfs, and under Rule 23(b)(3) of the Federal Rules of Civil Procedure, as representatives of a class, defined as:  all persons or entities, or assignees of such persons or entities, who directly purchased vitamin C for delivery in the United States, other than pursuant to a contract containing an arbitration clause, from any of defendants or their co-conspirators, other than Northeast Pharmaceutical, from December 1, 2001 to the present (the "damages" class).   Each class primarily includes pharmaceutical companies, food and beverage manufacturers, feed mills, premix blenders, vitamin packagers for human distribution, and distributors.  Excluded from the classes are all governmental entities, defendants, their co-conspirators, and their respective subsidiaries and affiliates.

25.     Members of the classes are numerous and joinder is impracticable.

7

26.     Plaintiffs' claims are typical of the members of the classes.  Plaintiffs and all members of the plaintiff classes were damaged by the same wrongful conduct by defendants.

27.     Plaintiffs will fairly and adequately protect and represent the interests of the plaintiff classes.  The interests of plaintiffs are coincident with, and not antagonistic to, those of the classes.

28.     Plaintiffs are represented by counsel who are experienced and competent in the prosecution of complex class action and antitrust litigation.  Undersigned counsel are counsel approved by the Court to represent the certified class in *In re Vitamins Antitrust Litig.*, MDL No. 1285, Misc. No. 99-0197 (D.D.C.) (Hon. Thomas F. Hogan).

29.     Questions of law and fact common to the members of the classes predominate over questions, if any, that may affect only individual members because defendants have acted on grounds generally applicable to each of the entire classes.  Such generally applicable conduct is inherent in defendants' collusion.

30.     Questions of law and fact common to the classes include:

(a)     whether defendants combined, agreed, and conspired among themselves to fix, maintain, or stabilize prices of and control exports for vitamin C;

(b)     the existence and duration of the horizontal agreements alleged in this Complaint to fix, maintain, or stabilize prices of, and control exports for, vitamin C;

(c)     whether each defendant was a member of, or participant in, the combination and/or conspiracy alleged in this Complaint;

8

(d)   whether and to what extent the conduct of defendants caused injury to the business or property of plaintiffs and the plaintiff classes; and, if so, the appropriate measure of damages;

(e)   whether defendants' agents, officers or employees participated in telephone calls and meetings in furtherance of the conspiracy alleged herein; and

(f)   whether plaintiffs and members of the plaintiff classes are entitled to declaratory and/or injunctive relief.

31.   Class action treatment is the superior (if not the only) method for the fair and efficient adjudication of this controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress on claims that it might not be practicable to pursue individually, substantially outweigh the difficulties, if any, that may arise in management of this class action.

## V.   **TRADE AND COMMERCE**

32.   Vitamin C (also known as ascorbic acid) is a water-soluble vitamin.  Vitamin C plays an important role in the biosynthesis of collagen in skin and of connective tissue, bones and teeth.  It is thought to enhance the functioning of the immune system by acting as an antioxidant.

33.   The manufacture of vitamin C is a multi-million dollar a year industry worldwide. The United States market for vitamin C exceeds $100 million per year.  The conspiracy here

9

involving vitamin C has affected millions of dollars of commerce in products found in nearly every American household.

34.    Defendants are manufacturers of raw vitamins for bulk sales to customers. Defendants sell vitamin C to food and pharmaceutical distributions and manufacturers in the United States for human consumption.  The vitamins manufactured by defendants are commonly used in the United States as an ingredient in food and beverage products and the production of vitamins packaged for consumer use under major brand names.

35.    Defendants also sell vitamin C to manufacturers and users of animal feed and animal nutrition products.  The bulk vitamin products manufactured by defendants are used as an ingredient in animal nutrition products and animal feed premixes.

36.    The global market for vitamin C alone is over $500 million.  Approximately 55% of global vitamin C consumption is for pharmaceutical-related uses, 35% is for food and beverage uses, and the remaining 10% is for the feed industry.

37.    During the period described in this Complaint, the international market for vitamin C was dominated by defendants.  Vitamin C sales by defendants currently account for over 60 percent of the global market for vitamin C products.  Defendants have a competitive advantage because they have manufacturing costs of $2.30/kg or less and are the only manufacturers worldwide who can produce vitamin C for a cost below $4.50 to $5 per kilogram. Manufacturers in China also enjoy a competitive advantage relative to manufacturers in other nations because China employs a fixed currency exchange rate which undervalues the Yuan, making Chinese exports of vitamin C to the United States less expensive.  Each defendant manufacturer produces in excess of 15,000 metric tons of vitamin C annually.

38.     During the period of this Complaint, the conduct of defendants and their co-conspirators has taken place in and affected the interstate and foreign trade and commerce of the United States.

39.     The conduct of defendants and their co-conspirators has directly, substantially and foreseeably restrained such trade and commerce.

## VI.     FACTUAL BACKGROUND

40.     China began producing and exporting vitamin C in the late 1950s.  In 1969, Chinese scientists developed a two-stage fermentation process to manufacture vitamin C, which resulted in a significant cost advantage compared to European producers.  The technology began to be commercially employed in China in the 1980s.

41.     In the early period of the manufacture of vitamin C by Chinese manufacturers, China had a reputation for poor product quality.  This is no longer the case.  Chinese manufacturers are now able to supply a full range of vitamin C products, which are sold at premium prices.  The great majority of sales of vitamin C are of bulk ascorbic acid.

42.     In the early 1990s, the worldwide vitamin C market was dominated by the European manufacturers F. Hoffmann La Roche, Ltd. ("Roche"), Merck KgaA ("Merck"), and BASF AG ("BASF") and the Japanese company Takeda Chemical Industries, Ltd. ("Takeda"). During 1990 to 1995, these companies engaged in a combination and conspiracy to suppress competition and fix prices for vitamin C.  This conspiracy was uncovered in *In re Vitamins Antitrust Litigation* and has resulted in final settlements and judgments with these companies for the benefit of a certified class of vitamin purchasers.

43.     During the 1990s, competition from manufacturers of vitamin C in China undermined this early conspiracy until it reportedly disbanded in late 1995.

11

44.     During 1995, it was reported that thirteen Chinese manufacturers of vitamin C met and agreed to form their own cartel to limit production of vitamin C to stabilize prices. This attempt to control the market reportedly failed.

45.     From the end of 1995, world vitamin C prices slumped and were cut in half by early 1996. By 1997, the industry in China included as many as 22 competitors. One purpose of strong price competition by Chinese competitors during this period was to drive European competitors from the market.

46.     Through the end of the 1990s the reduction in vitamin C prices and other factors resulted in an industry consolidation in China to five major manufacturers – the five manufacturer defendants in this case, Hebei Welcome, Jiangsu Jiangshan, Northeast Pharmaceutical, Weisheng, and North China (the "defendant manufacturers").

A.     **Violations of Antitrust Laws**

47.     In 2001, the price of vitamin C remained relatively low. By that time, Takeda had withdrawn from the market and sold its manufacturing capacity to BASF. European competitors Merck and Roche also indicated their intention to withdraw from the market. In addition, BASF announced that it would halt its new production line in Takeda, Japan. By the end of 2001, with exception of Roche and BASF, all major vitamin C competitors outside China were either bought up by other companies or simply dropped out of the business.

48.     Further, by 2001, defendants had captured approximately 60 percent of the worldwide market for vitamin C. Defendants also currently control 82 thousand metric tons or approximately 68 percent of the worldwide production capacity for vitamin C.

49.     With this change in market conditions, beginning in December 2001, defendants and their co-conspirators formed a cartel to control prices and the volume of exports for vitamin

C.  At a meeting of the Western Medicine Department of the Association of Importers and

Exporters of Medicines and Health Products of China (the "Association") in December 2001,

defendants and the Association successfully reached an autonomy agreement for Chinese

manufacturers of vitamin C in which they agreed to control export quantities and achieve stable

and enhanced price goals.   The cartel members agreed to restrict their exports of vitamin C in

order to create a shortage of supply in the international market.  The cartel members agreed to

"restrict quantity to safeguard prices, export in a balanced and orderly manner and adjust

dynamically."  The agreements of the cartel members were facilitated by the efforts of their trade

association.

50.     Defendants thus began their ongoing combination and conspiracy to suppress

competition by fixing the price and controlling export sale volumes of vitamin C offered for sale

to customers in the United States and elsewhere.  The ongoing combination and conspiracy,

engaged in by the defendants and their co-conspirators, is an illegal and unreasonable restraint of

interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

51.     The formation of the cartel in December 2001 resulted in price increases of

vitamin C in the United States from approximately $2.50 per kilogram in December 2001 to as

high as $7 per kilogram during December 2002.  Defendant China Pharmaceutical reported in its

2003 annual report that average prices during 2002 rose from $3.20 per kilogram to $5.90 per

kilogram, an increase of 84 percent.  China Pharmaceutical also reported gross profit margins for

its vitamin C production of 60.2 percent in 2002, an increase of 28.1 percent.

52.     During the period of the charged combination and conspiracy, defendants and

their co-conspirators have participated in meetings and conversations in China and elsewhere in

which the prices, volume of sales and exports to the United States, and markets for vitamins were

13

discussed and agreed upon. These meetings have also been coordinated with trade association meetings for associations in which defendants are members.

53.     At the above-described meetings and during the period of the conspiracy, defendants and others agreed to and did eliminate, suppress, and limit competition, including by:

(a)     discussing the production volumes and prices of vitamin C for export to the United States and elsewhere;

(b)     agreeing to control the supply of vitamin C for export to the United States and elsewhere;

(c)     agreeing to increase and maintain prices of vitamin C for the sale of vitamin C in the United States and elsewhere; and

(d)     agreeing to control the worldwide market for vitamin C.

54.     The chief executives of Jiangsu Jiangshan, Weisheng and Hebei Welcome attended the above-described meetings.  These executives elected the Deputy General Manager of North China the President of a vitamin C sub-committee that reached agreements on fixing prices and limiting the supply of vitamin C for export.

55.     During the period of the cartel, executives from the defendants have also warned each other against the adverse effects of the past price wars in vitamin C.

56.     Defendants' illegal concerted conduct has been facilitated by their concentrated control over sales of vitamin C.  Together, defendants' sales constitute approximately 60 percent of all vitamin C sales in the world and virtually 100 percent of the manufacturers who can produce vitamin C for a cost below $4.50 to $5 per kilogram.

57.     Although non-cartel members BASF and DSM (which acquired the interests of Roche) control 30 to 40 percent of the worldwide market for vitamin C, the cartel has been

successful because the European manufacturers have higher manufacturing costs for vitamin C

than Chinese manufacturers which sets a floor below which the European manufacturers cannot

compete. Defendants understand that price levels may be stabilized at $6 per kilogram or higher

– a price twice as high as 2004 prices – because the European manufacturers face costs of

production of $4.5 to over $5 per kilogram. Further, as the cartel has taken steps to restrain

production and increase prices, European competitors have shown that they would follow price

increases rather than undercut the new cartel price levels.

58.     Following the collusive price increases achieved in 2002, during 2003, the

combination of supply restrictions by the cartel and unanticipated increases in world demand for

vitamin C, attributable in part to the outbreak of SARS in the Spring and Summer of 2003,

allowed the cartel to achieve remarkable price increases. Prices jumped to as high as $15 per

kilogram in April 2003.

59.     By approximately the third quarter of 2003, although prices remained at super

competitive levels, cartel members began opportunistically reducing prices to obtain increased

sales in the enormously profitable market. Spikes in demand for vitamin C increased the

temptation among cartel members to undercut each other's prices in order to grab super-normal

profits that still were substantially above competitive prices.  Labeled a "price war" by the

industry, the competition actually reflected price reductions at levels above collusively arranged

prices.

60.     To address the price cutting, the Association called an "emergency meeting" in

late November or December 2003, which was attended by representatives of each of the

defendants. The Association discussed with defendants at the meeting how they would

rationalize the market and restrain and limit the production levels of vitamin C to increase prices.

61.     In December 2003, defendants and their representatives, together with members of the Association, also met at the annual China Exhibition of World Pharmaceutical Ingredients. At this exhibition, defendants and the Association again met and devised plans to rationalize the market and to limit production levels and increase prices.  The Association also warned defendants that it was impossible for any of them to monopolize the market to the detriment of the others.

62.     The emergency meeting called by the Association and other efforts by cartel members were successful.  Prices for vitamin C in December 2003 increased from a low of $4.20 per kilogram at the beginning of the month to over $9 per kilogram by the end of the month.

63.     In June of 2004, in reaction to price reductions from their highs in December 2003, defendants agreed to also shut down production for equipment maintenance.  Defendants have also continued to agree on export volumes to the United States.  These supply restrictions again have had the result of stabilizing prices.

64.     Despite some price decreases in 2004, the collusive arrangements of the cartel have continued to maintain prices well above those of a competitive market.

65.     The cartel established by defendants and their co-conspirators continues its illegal conduct today.

**B.      The Impermissible Effect on Relevant Markets**

66.     During the conspiracy, prices of vitamin C have not followed the laws of supply and demand existing in a competitive market.

67.     Due to defendants' price fixing and market allocation activity, price increases have taken place in vitamin C despite reductions in the cost of production.

### C.   Benefit to Defendants

68.   Each defendant has substantially benefited from its participation in this illegal price-fixing conspiracy.

## VII.   INJURY TO PLAINTIFFS

69.   Defendants' combination and conspiracy has had the following effects, among others:

> (a)   The price of vitamin C products purchased by plaintiffs (and the plaintiff classes) has been fixed, raised, maintained and stabilized at artificial and non-competitive levels; and

> (b)   Competition in the sale of vitamin C has been restrained.

70.   During the period covered by this Complaint, plaintiffs have purchased vitamin C from defendants and/or are purchasers of vitamin C manufactured by defendants, and thus require injunctive relief.  By reason of the alleged violations of the antitrust laws, plaintiffs paid more for vitamin C and substitute products than they would have paid in the absence of the illegal combination and conspiracy, and as a result they have been injured and have suffered damages in an amount presently undetermined.

## VIII.   THE NEED FOR INJUNCTIVE RELIEF

71.   It is in the public interest to enjoin defendants from continuing to operate a conspiracy and combine to fix the prices of vitamins.

72.   Plaintiffs and the class will continue to be injured by defendants' ongoing conduct in violation of the antitrust laws of the United States in the absence of injunctive relief.

## IX.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray:

73.     That the Court determine that this action may be maintained as a class action pursuant to Rule 23(b)(2) and (3) of the Federal Rules of Civil Procedure and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to all members of the plaintiff classes;

74.     That the unlawful combination and conspiracy alleged herein be adjudged and decreed to be an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

75.     That plaintiffs and each class member of the damages class recover three-fold their damages, as provided by law, determined to have been sustained by each of them as a result of purchases, other than pursuant to a contract containing an arbitration clause, from all defendants, other than Northeast Pharmaceutical, (using such damage methodologies as may be appropriate at trial), and that joint and several judgments in favor of plaintiffs and the plaintiff classes be entered against defendants and each of them, other than Northeast Pharmaceutical;

76.     That defendants be enjoined from continuing the currently ongoing unlawful combination and conspiracy alleged herein and other appropriate injunctive relief;

77.     That plaintiffs and the plaintiff classes recover their costs of this suit, including reasonable attorneys' fees, as provided by law; and

78.     That plaintiffs and the plaintiff classes be granted such other, further and different relief as the nature of the case may require or as may be deemed just and proper by this Court.

79.     Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues triable of right by a jury.

Dated:  September 27, 2007

Respectfully submitted,

   /s/ Alanna C. Rutherford
Alanna C. Rutherford (AR0497)
BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue, 7th Floor
New York, New York 10022
Tel: (212) 446-2300
Fax: (212) 446-2350

Michael D. Hausfeld
Brian A. Ratner
COHEN, MILSTEIN, HAUSFELD &
   TOLL, P.L.L.C.
1100 New York Avenue, NW
West Tower, Suite 500
Washington, DC  20005
Tel.:  (202) 408-4600
Fax:  (202) 408-4699

Brent W. Landau
COHEN, MILSTEIN, HAUSFELD &
   TOLL, P.L.L.C.
One South Broad Street, Suite 1850
Philadelphia, PA  19107
Tel.:  (215) 825-4012
Fax:  (215) 825-4001

William A. Isaacson
Tanya Chutkan
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue, NW, Suite 800
Washington, DC  20015
Tel.:  (202) 237-2727
Fax:  (202) 237-6131

James T. Southwick
SUSMAN GODFREY L.L.P
1000 Louisiana, Suite 5100
Houston, TX  77002
Tel.: (713) 651-9366
Fax: (713) 654-6666

Arthur N. Bailey
Arthur N. Bailey & Associates
111 West Second Street, Suite 4500
Jamestown, NY 14701
Tel:  (716) 664-2967
Fax:  (716) 664-2983

*Counsel for Plaintiffs*
*Animal Science Products, Inc., The Ranis Company, Inc.,*
*and Magno-Humphries Laboratories, Inc.*

## CERTIFICATE OF SERVICE

This is to certify that on this 27th day of September 2007, there were true and correct copies of the Plaintiffs' Second Amended Class Action Complaint served electronically and via overnight delivery on the following counsel of record:

James I. Serota, Esq.
Kenneth Lapatine, Esq.
Rachel Izower, Esq.
Greenberg Traurig, LLP
200 Park Avenue
New York, NY 10166
serotaj@gtlaw.com
lapatinek@gtlaw.com
izowerr@gtlaw.com
Tel: 212-801-9200
Fax: 212-801-6400
*Attorneys for Defendant*
*Northeast Pharmaceutical Group Co., Ltd.*

Stephen V. Bomse, Esq.
Heller Ehrman LLP
333 Bush Street
San Francisco, CA 94104
stephen.bomse@hellerehrman.com
Tel: 415-772-6000
Fax: 772-6268

Richard S. Goldstein, Esq.
Heller Ehrman LLP
Times Square Tower
7 Times Square
New York, NY 10036
richard.goldstein@hellerehrman.com
Tel: 212-832-8300
Fax: 212-763-7600
*Attorneys for Defendant*
*Jiangsu Jiangshan Pharmaceutical Co., Ltd.*

Charles H. Critchlow, Esq.
Darrell Prescott, Esq.
Douglas M. Tween, Esq.
Baker & McKenzie LLP
1114 Avenue of the Americas
New York, NY 10036
Charles.H.Critchlow@bakernet.com
Darrell.Prescott@bakernet.com
Douglas.Tween@bakernet.com
Tel: 212-626-4100
Fax: 212-310-1600
*Attorneys for Defendant*
*Hebei Welcome Pharmaceutical Co., Ltd.*

Daniel S. Mason, Esq.
Joseph Bell, Esq.
Athena Hou, Esq.
Zelle, Hoffman, Voelbel, Mason & Gette LLP
44 Montgomery Street, Suite 3400
San Francisco, CA 94104
dmason@zelle.com
jbell@zelle.com
ahou@zelle.com
Tel: 415-693-0700
Fax: 415-693-0770
*Attorneys for Defendants Weisheng*
*Pharmaceutical Co., Ltd.,*
*Shijiazhuang Pharmaceutical (USA) Inc., and*
*China Pharmaceutical Group, Ltd.*

/s/ Alanna C. Rutherford
Alanna C. Rutherford, Esq.
Boies, Schiller & Flexner LLP,
575 Lexington Avenue

7th floor
New York, NY 10022
arutherford@bsfllp.com
Tel:  212-446-2300
Fax: 212-446-2350

*Counsel for Plaintiffs*