UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------- x

IN RE VITAMIN C                          <u>MEMORANDUM AND</u>
ANTITRUST LITIGATION                     <u>ORDER</u>

                                         06-mdl-1738 (DGT)

-------------------------------------------------- x

TRAGER, J.

        Plaintiffs in this case allege that defendants, Chinese

corporations that manufacture and sell vitamin C,[1] formed an

illegal cartel to fix prices and limit supply for exports of

vitamin C, including those to the United States.  Plaintiffs

bring this action under Section 1 of the Sherman Act and Sections

4 and 16 of the Clayton Act, 15 U.S.C. §§ 4, 16.  Defendants now

move to dismiss, on the grounds that their price-fixing

activities were compelled by the Chinese government.


                        **Background**

        The following facts, which are drawn from the complaints,[2]

are assumed to be true for purposes of this motion to dismiss.

        China began producing vitamin C in the late 1950s, and by

_____

        [1] Plaintiffs have filed a second amended complaint adding
two defendants that do not manufacture vitamin C.  Defendants
have moved to dismiss the second amended complaint.

        [2] There are multiple complaints in this consolidated multi-
district litigation action, but all recite essentially the same
background facts.

1969 its scientists had developed a two-stage fermentation process to manufacture vitamin C, resulting in a significant cost advantage compared to European producers. China began employing this technology commercially in the 1980s. Chinese vitamin C manufacturers were able to overcome an early reputation for poor product quality, and now supply a full range of vitamin C products at premium prices. Most sales of vitamin C are of bulk ascorbic acid.

In the early 1990s, European manufacturers F. Hoffmann LaRoche, Ltd., Merck KgaA, and BASF AG and the Japanese company Takeda Chemical Industries, Ltd. dominated the worldwide vitamin C market. From 1990 to 1995, these companies conspired to suppress competition and fix prices for vitamin C. They were sued in <u>In re Vitamins Antitrust Litigation</u>, MDL No. 1285, Misc. No. 99-0197 (D.D.C.) (Hon. Thomas F. Hogan). Competition from Chinese manufacturers of vitamin C undermined this early conspiracy during the 1990s, until it reportedly disbanded in late 1995.

During 1995, it was reported that thirteen Chinese manufacturers of vitamin C met and agreed to form their own cartel to limit production of vitamin C to stabilize prices. This attempt at market control reportedly failed. From the end of 1995, world vitamin C prices slumped and were cut in half by

early 1996.  By 1997, there were as many as 22 competitors in the Chinese vitamin C manufacturing market.  Strong competition by Chinese competitors during this period allowed the Chinese to drive European manufacturers from the market.  By the end of the 1990s, the reduction in vitamin C prices and other factors resulted in industry consolidation in China to four major manufacturers, all of which are defendants in this case - Hebei Welcome Pharmaceutical Co. Ltd. ("Hebei Welcome"), Jiangsu Jiangshan Pharmaceutical Co. Ltd. ("Jiangsu Jiangshan"), Northeast Pharmaceutical Group Co. Ltd. ("NEPG") and Weisheng Pharmaceutical Co. Ltd. ("Weisheng") (collectively, the "defendant manufacturers").

The price of vitamin C remained relatively low in 2001, by which time Takeda had withdrawn from the market and sold its manufacturing capacity to BASF.  Merck and Roche also announced their intention to withdraw from the vitamin C market.  BASF announced that it would halt its new production line in Takeda, Japan.  By 2001, defendants had captured approximately 60 percent of the worldwide market for vitamin C.  Currently, defendants control 82 thousand metric tons, or approximately 68 percent, of the worldwide production capacity for vitamin C.

According to the complaints, beginning in December 2001, defendants and their co-conspirators formed a cartel to control

prices and the volume of exports for vitamin C. At a meeting of the Western Medicine Department of the Association of Importers and Exporters of Medicines and Health Products of China (the "Association") in December 2001, defendants and the Association reached an agreement for Chinese manufacturers of vitamin C in which they agreed to control export quantities and raise prices. The cartel members agreed to restrict their exports of vitamin C in order to create a shortage of supply in the international market. Specifically, the cartel members agreed to "restrict quantity to safeguard prices, export in a balanced and orderly manner and adjust dynamically." The complaints further allege that the agreements of the cartel members were facilitated by the efforts of their trade association.

According to the complaints, the formation of the cartel in December 2001 led to price increases of vitamin C in the United States from approximately $2.50 per kilogram in December 2001 to as high as $7 per kilogram in December 2002. Defendant China Pharmaceutical reported in its 2003 annual report that average prices during 2002 rose from $3.20 per kilogram to $5.90 per kilogram, an 84 percent increase. China Pharmaceutical also allegedly reported that gross profit margins for its vitamin C production were 60.2 percent in 2002, an increase of 28.1 percent.

Plaintiffs allege that together, defendants' sales constitute approximately 60 percent of the worldwide vitamin C market and "virtually 100 percent of the manufacturers who can produce vitamin C for a cost below $4.50 to $5 per kilogram." Plaintiffs acknowledge that non-cartel members BASF and DSM control 30 to 40 percent of the worldwide market for vitamin C, but note that the European manufacturers have higher manufacturing costs for vitamin C than Chinese manufacturers.

The complaints allege that following the collusive price increases in 2002, during 2003 the combination of the cartel's supply restrictions and increases in world demand for vitamin C – attributable in part to the outbreak of SARS in Spring and Summer of 2003 – allowed the cartel to achieve prices as high as $15 per kilogram in April 2003.  By the third quarter of 2003, however, cartel members began reducing prices to increase their sales.  According to the complaints, despite the price cuts, prices remained substantially above competitive levels.

Plaintiffs allege that the Association called an "emergency meeting" in late November or December 2003 to address the price cutting, which was attended by representatives of each of the defendants.  At the meeting, the Association discussed with defendants how they would rationalize the market and limit the production of vitamin C to increase prices.

In December 2003, defendants and members of the Association also met at the annual China Exhibition of World Pharmaceutical Ingredients, where they devised plans to rationalize the market and limit production levels and increase prices. The Association warned defendants that it was impossible for any of them to monopolize the market to the detriment of the others. As a result of the meetings and other efforts by cartel members, prices for vitamin C in December 2003 increased from $4.20 per kilogram at the beginning of the month to over $9 per kilogram by the end of the month.

In June 2004, following some price declines, defendants agreed to shut down production for equipment maintenance in order to boost prices back toward their December 2003 highs. Defendants also agreed to restrict exports to the United States to further stabilize prices. Plaintiffs allege that defendants' anticompetitive activities are ongoing.

Defendants move to dismiss on grounds of act of state, foreign sovereign compulsion and international comity. In addition, plaintiffs have filed a second amended complaint adding a direct purchaser plaintiff and two defendants. The two newly added defendants and, separately, the original defendants, move to dismiss the second amended complaint for failure to include any factual allegations regarding the newly added defendants or

to explain how their addition affects the conspiracy alleged in the second amended complaint.

## Discussion

### (1)

### Motion to dismiss under act of state, foreign sovereign compulsion and international comity doctrines

Defendants do not deny the allegations in the complaints for purposes of their motion to dismiss. Rather, they argue that their actions were compelled by the Chinese Ministry of Commerce ("Ministry").[3] They invoke the doctrines of act of state, foreign sovereign compulsion and international comity as defenses to suit. Each of these defenses rests on different doctrinal underpinnings, but they are all premised on an act by a foreign government.

The act of state doctrine derives from both separation of powers and respect for the sovereignty of other nations. It holds that the courts of one nation may not sit in judgment of the public acts of another sovereign within its own borders. See Republic of Austria v. Altmann, 541 U.S. 677, 700 (2004). The reasons for the doctrine were outlined by the Supreme Court over

---

[3] The Ministry was formerly known as the Ministry of Foreign Trade and Economic Cooperation ("MOFTEC"). Both entities will be referred to as the Ministry herein.

a century ago:

> Every sovereign state is bound to respect the
> independence of every other sovereign state and the
> courts of one country will not sit in judgment on the
> acts of the government of another done within its own
> territory.  Redress of grievances by reason of such
> acts must be obtained through the means open to be
> availed of by sovereign powers as between themselves.

Underhill v. Hernandez, 168 U.S. 250, 252 (1897).  Thus, any

censure of another country's acts within its own territory is

reserved to diplomatic channels and does not come within the

purview of the courts.  See Oetjen v. Central Leather Co., 246

U.S. 297, 304 (1918) ("To permit the validity of the acts of one

sovereign state to be reexamined and perhaps condemned by the

courts of another would very certainly imperil the amicable

relations between governments and vex the peace of nations."

(internal quotation marks omitted)).  The Supreme Court has built

upon the foundations of the act of state doctrine to note that,

in the context of adjudicating the legality of expropriations by

a foreign state, "[p]iecemeal dispositions of this sort involving

the probability of affront to another state could seriously

interfere with negotiations being carried on by the Executive

Branch and might prevent or render less favorable the terms of an

agreement that could otherwise be reached."  Banco Nacional de

Cuba v. Sabbatino, 376 U.S. 398, 432 (1964).  Thus, the act of

state doctrine is aimed at reserving for the executive branch

decisions that may significantly affect international relations.[4]

The defense of foreign sovereign compulsion, on the other hand, focuses on the plight of a defendant who is subject to conflicting legal obligations under two sovereign states. Rather than being concerned with the diplomatic implications of condemning another country's official acts, the foreign sovereign compulsion doctrine recognizes that a defendant trying to do business under conflicting legal regimes may be caught between the proverbial rock and a hard place where compliance with one country's laws results in violation of another's.

---

[4] A plurality of the Supreme Court has recognized a commercial exception to the act of state doctrine, pursuant to which "the concept of an act of state should not be extended to include the repudiation of a purely commercial obligation owed by a foreign sovereign or by one of its commercial instrumentalities." Alfred Dunhill of London, Inc. v. The Rupublic of Cuba, 425 U.S. 682, 695 (1976). The Second Circuit, however, has not adopted this exception. See Braka v. Bancomer, S.N.C., 762 F.2d 222, 225 (2d Cir. 1985) ("We leave for another day consideration of the possible existence in this Circuit of a commercial exception to the act of state doctrine under Dunhill."). Even if the exception were recognized within this Circuit, defendants and the Ministry have made a compelling argument for why the Chinese government's involvement – to the extent it exists – in defendants' price-fixing scheme amounts to a public, rather than commercial, act. Namely, they argue that the government was working to guide the vitamin C industry in China's transition from a command to a market economy. If so, and if – as defendants and the Ministry argue – defendants were acting in a governmental capacity when they fixed prices, it is not even clear that the Sherman Act would apply, as it is directed at private actors.

Finally, international comity

is the recognition which one nation allows within its
territory to the legislative, executive or judicial
acts of another nation, having due regard both to
international duty and convenience, and to the rights
of its own citizens, or of other persons who are
under the protection of its laws.

Hilton v. Guyot, 159 U.S. 113, 164 (1895).  The Ninth and Third

Circuits have each set forth a list of factors to be weighed in

determining whether to assert jurisdiction,[5] but in any event,

---

[5] The factors given by the Ninth Circuit in Timberlane
Lumber Co. v. Bank of America, N.T. & S.A., 549 F.2d 597, 614
(9th Cir. 1976) are:
> [1] the degree of conflict with foreign law or
> policy,
> [2] the nationality or allegiance of the parties and
> the locations or principal places of businesses or
> corporations,
> [3] the extent to which enforcement by either state
> can be expected to achieve compliance,
> [4] the relative significance of effects on the
> United States as compared with those elsewhere,
> [5] the extent to which there is explicit purpose to
> harm or affect American commerce,
> [6] the foreseeability of such effect, and
> [7] the relative importance to the violations charged
> of conduct within the United States as compared with
> conduct abroad.

The factors listed by the Third Circuit in Mannington Mills,
Inc. v. Congoleum Corp., 595 F.2d 1287, 1297-98 (3d Cir. 1979)
are:
> 1. Degree of conflict with foreign law or policy;
> 2. Nationality of the parties;
> 3. Relative importance of the alleged violation of
> conduct here compared to that abroad;
> 4. Availability of a remedy abroad and the pendency
> of litigation there;
> 5. Existence of intent to harm or affect American
> commerce and its foreseeability;

abstention from exercising jurisdiction for reasons of
international comity depends on the existence of a "true conflict
between domestic and foreign law." Hartford Fire Ins. Co. v.
California, 509 U.S. 764, 798 (1993). No conflict exists for
this purpose unless Chinese law requires defendants "to act in
some fashion prohibited by the law of the United States," or
unless defendants "claim that their compliance with the laws of
both countries is otherwise impossible." Id. at 799.

These defenses rest on facts that are not found within the
complaints – namely, whether the Chinese government required
defendants to fix prices in violation of the Sherman Act.
Nevertheless, defendants insist that this case may be properly
dismissed at the pleadings stage[6] because the Ministry has

---

6. Possible effect upon foreign relations if the
court exercises jurisdiction and grants relief;
7. If relief is granted, whether a party will be
placed in the position of being forced to perform an
act illegal in either country or be under conflicting
requirements by both countries;
8. Whether the court can make its order effective;
9. Whether an order for relief would be acceptable in
this country if made by the foreign nation under
similar circumstances;
10. Whether a treaty with the affected nations has
addressed the issue.

[6] Defendants assert that courts "routinely consider, and
often grant, dismissal of [similar] cases ... at the Rule 12
motion stage," but they cite only four cases, all of which were
decided between 1971 and 1983. Of those four, one was decided
after discovery was completed, Van Bokkelen v. Grumman Aerospace

11

submitted an amicus brief detailing the Ministry's role in orchestrating and maintaining the vitamin C cartel. According to defendants, the Ministry's brief must be accepted as true, because it is the official position of the government of China.

### a.    The Ministry's amicus brief

The Chinese government's appearance as amicus curiae is unprecedented. It has never before come before the United States as amicus to present its views. This fact alone demonstrates the importance the Chinese government places on this case.

The Ministry is the "highest administrative authority in China authorized to regulate foreign trade," and is "the equivalent in the Chinese governmental system of a cabinet level department in the U.S. governmental system." Ministry Br. at 1. The Ministry argues that the body plaintiffs have characterized as a "trade association" that facilitated the actions of the alleged cartel is in fact the Chamber of Commerce of Medicines and Health Products Importers & Exporters ("Chamber"). The Chamber is "an entity under the Ministry's direct and active

---

Corp., 432 F. Supp. 329 (E.D.N.Y. 1977), and three were dismissed based on the allegations in the complaint, see Hunt v. Mobil Oil Corp., 410 F. Supp. 10 (S.D.N.Y. 1975); Clayco Petroleum Corp. v. Occidental Petroleum Corp., 712 F.2d 404 (9th Cir. 1983); Occidental Petroleum Corp. v. Buttes Gas & Oil Co., 331 F. Supp. 92 (C.D. Cal. 1971).

supervision that plays a central role in regulating China's vitamin C industry."  Ministry Br. at 5.  In contrast to the voluntary, non-governmental chambers of commerce that exist in the United States, chambers of commerce in China have played a central role in China's shift from a command economy to a market economy.  Id. at 7.  In particular, the Ministry asserts that the Chamber stepped into the shoes of stated-owned national exporting entities when those entities stopped regulating exports of pharmaceutical products, including vitamin C.  Id.

The Chamber had its origins in 1991, when the Ministry promulgated Measures for Administration over Foreign Trade and Economic Social Organizations.  Mitnick Decl. Ex. D ("Ministry Measures").  Article 14 of the Ministry Measures dictates that "Social organizations established with coordination and industry regulation functions as authorized by [the Ministry] must implement the administrative rules and regulations relating to foreign trade and economy."  Id. at 5 (emphasis added).  The Ministry represents that the Chamber was one of those social organizations authorized to implement rules and regulations, thus imbuing it with governmental regulatory authority.  Indeed, the Ministry asserts that the Chamber "act[s] in the name, with the authority, and under active supervision, of the Ministry," thus performing "a governmental function so authorized under Chinese

law."  Statement in <u>In re Vitamin C Antitrust Litigation</u>, June 9,

2008.  The Ministry Measures further provide in Article 17 that

the Ministry "shall be directly responsible for the daily

management of social organizations established with coordination

and industry regulation functions."  Ministry Measures, at 5.

In 1997, the Ministry and State Drug Administration ("SDA")

issued a notice ("the notice") requiring strict control of

vitamin C production, in light of "intense competitions and

challenges from the international market."  1997 MOFTEC & SDA

Notice, Mitnick Decl. Ex. H at 1.  The notice required the

Chamber to establish a Vitamin C Coordination Group (later known

as the Vitamin C Sub-Committee), which was to "coordinate with

respect to Vitamin C export market, price and customers, and to

organize the enterprises in contacting foreign entities."  <u>Id.</u>

¶ 6.  The notice further explained that "[t]he specific method

for coordination shall be formulated by the Chamber, and filed to

[the Ministry] for record."  <u>Id.</u>

In 1998, the Ministry acknowledged and approved a request

(apparently from the Chamber) to establish a Vitamin C Sub-

Committee within the Chamber.  Approval for Establishing VC Sub-

Committee of China Chamber of Commerce of Medicines & Health

Products Importers & Exporters, Mitnick Decl. Ex. F.  The

Ministry declared that "[t]he major responsibilities of VC Sub-

Committee are: to be responsible for coordinating the Vitamin C export market, price and customers of China, to improve the competitiveness of Chinese Vitamin C produce in the world market and promote the healthy development of Vitamin C export to China."  Id.  The Sub-Committee charter ("the charter"), which predated the formal establishment of the Sub-Committee by several months, provides that the Sub-Committee "shall coordinate and administrate market, price, customer and operation order of Vitamin C export."  Charter of Vitamin C Sub-Committee of China Chamber of Commerce of Medicines and Health Products Importers and Exporters, Mitnick Decl. Ex. G, Art. 7.

The charter limits membership in the Sub-Committee to vitamin C exporters whose export volume in any year from 1994 to 1996 exceeded 200 tons, and specifies that "[o]nly members of the Sub-Committee have the right to export Vitamin C and are simultaneously qualified to have Vitamin C export quota."  Id., Arts. 11, 12.  The charter goes on to list among members' obligations that members "shall voluntarily adjust their production outputs according to changes of supplies and demands on international market."  Id., Art. 15(3).  The charter also requires members to "strictly execute export coordinated price set by the Chamber and keep it confidential."  Id., Art. 15(6).

The charter provides for sanctions for "failure to perform

any member's obligation," including "warning, open criticism and even revocation of its membership." Id., Art. 16.  In describing the ultimate penalty for non-compliance, the charter notes that the Sub-Committee "will suggest to the competent governmental department, through the Chamber, to suspend and even cancel the Vitamin C export right of such violating member." Id.

In 2002, the Ministry changed the method of price review "in order to accommodate the new situations since China's entry into WTO."  2002 MOFTEC & Customs Notice, Mitnick Decl. Ex. J at 1. The new regulation subjected 30 categories of export products (including vitamin C) to "Price Verification and Chop" by their respective chambers, and no longer subjected them to supervision and review by customs.  Id. ¶ 1.  The procedure for Price Verification and Chop calls for exporters to send the export contracts to the relevant chambers for verification before Customs declaration.  Announcement of Ministry of Commerce of the People's Republic of China, General Administration of Customs of the People's Republic of China (No. 36,2003) ("Announcement No. 36,2003"), Exhibit 2: Procedures for Implementing the Verification and Chop System on Export Commodities ¶ A, Mitnick Decl. Ex. K.  "If it is verified that the contracts comply, the Chamber shall fill in the Verification and Chop Form of China Chamber of Commerce for the relevant chamber and affix the

counter-forgery V&C chop to the V&C Form and to the export contracts at the blocks where the prices and quantities are specified, and then deliver them back to the exporters."  Id. Customs will only allow for export those shipments that are accompanied by export contracts with the required chop. Announcement No. 36,2003.

Based on this regulatory framework for the Chamber and Vitamin C Sub-Committee, defendants and the Ministry argue that defendants were compelled under Chinese law to collectively set a price for vitamin C exports.  Although they are careful to note that "the Ministry itself did not decide what specific prices should be," Ministry Br. at 13, defendants and the Ministry assert that defendants could not have exported vitamin C that did not conform to the agreed-upon price.

**b.  The underlying documents**

Plaintiffs attack the exhibits attached to the Ministry's brief as mere notices and charter documents of a nongovernmental organization.  They allege that the Ministry has not pointed to a single law or regulation compelling a price or price agreement at issue in the Complaint.  They note, furthermore, that the price collusion complained of in the Complaint began in December 2001, long after the Chamber and Vitamin C Sub-Committee were

established and purportedly compelled to set prices, and only

after defendants had achieved the market power necessary to

sustain above-market prices.

Plaintiffs point to publicly available records of the

Chamber and its Vitamin C Subcommittee in support of their

position that defendants' price agreements were voluntary:

> In December 2001, efforts by the Vitamin C Sub-
> Committee of China Chamber of Commerce of Medicines
> and Health Products Importers and Exporters, each
> <u>domestic manufacturers were able to reach a self-</u>
> <u>regulated agreement successfully</u>, whereby they would
> <u>voluntarily control</u> the quantity and pace of exports,
> to achieve the goal of stabilization while raising
> export prices.  Such <u>self-restraint measures</u>, mainly
> based on "restricting quantity to safeguard prices,
> export in a balanced and orderly manner and adjust
> dynamically" <u>have been completely implemented by each</u>
> <u>enterprises' own decisions and self-restraint,</u>
> <u>without any government intervention</u>.[7]

Printout from website of China Chamber of Commerce of Medicines

and Health Products Importers and Exporters Information, Pls.'

Mem. in Opp'n to Defs' Mot. to Dismiss ("Pls.' Opp'n"), Ex. D

(emphasis added).

Plaintiffs also rely on an expert in Chinese law, Professor

---

[7] The Ministry argues that such documents should not be
taken at face value.  The Ministry argues that many of the terms
appearing in defendants' and the Chamber's documents have
meanings in the context of China's government and economic policy
that are quite different from their literal translations.  Among
the controversial terms are "social organization," "voluntary
self-restraint," "coordination," "industry self-discipline," and
"verification."

James V. Feinerman, who concludes based on a review of the Ministry's brief and its exhibits that defendants' conduct was not compelled by Chinese law.  Pls.' Opp'n Ex. K ("Feinerman Decl.").  As an initial matter, Professor Feinerman disputes the authenticity of many of the Ministry's exhibits, on the basis that they do not contain a chop, that they are not governmental laws or regulations, that they are not specific to vitamin C, or that they are mis-translated.  Regarding the Ministry's 1998 approval of a request to establish the Vitamin C Sub-Committee, Professor Feinerman notes that the document merely "authorizes the creation of the entity."  Id., ¶ 16.  He points out that this "reflects the reality in China that an organization not expressly allowed would be prohibited, in contrast to the long-standing Western norm that anything not expressly prohibited is allowed." Id.  Accepting Professor Feinerman's characterization leads to the conclusion that a cartel in China could only exist with governmental sanction.  At that point it becomes difficult to differentiate between a cartel that was voluntarily formed by its members, who then had to seek governmental approval, and a cartel that was mandated by governmental fiat.

With the benefit of discovery, plaintiffs submitted a supplemental memorandum and exhibits which, they contend, demonstrate that defendants voluntarily restricted export volume

and fixed prices for vitamin C. For example, the minutes from a November 16, 2001 meeting of defendants held under the auspices of the Chamber show that the defendants agreed by hand voting to restrict output and fix prices at CIF 3.00/kg effective January 1, 2001. Minutes of Meeting by Officials of Vitamin C Manufacturers, Pls.' Supp. Mem. in Opp'n to Defs.' Mot. to Dismiss ("Pls.' Supp. Mem.") Ex. 14 at 3-4.

Defendants admit that the minimum export price subject to verification and chop has been $3.35 per kilogram since May 2002. Northeast Pharma. Group Co.'s Third Amended Response to Pls.' Second Set of Interrogatories, Pls.' Supp. Mem. Ex. 2 at 18. Notwithstanding this mandated price, defendants have sold vitamin C above that price since its implementation. Dep. of Ning Hong, Pls.' Supp. Mem. Ex. 5 at 68-70. For example, according to documents produced by defendant Jiangsu Jiangshan, in June 2003

> [O]ur company organized a meeting on market analysis
> among the six domestic manufacturers and the China
> Chamber of Commerce of Medicines & Health Products in
> Qing Dao. We all agreed to set the floor price at
> 9.20 USD/kg, hoping to slow down the speed of market
> price falling, also hoping to strengthen the
> confidence of middle suppliers and customers.
> Looking at the effect a couple of weeks later of this
> month, the effect of this price limitation is very
> limited, every manufacturer quoted prices lower than
> the floor price.

Import/Export Department June Work Summary ¶ 5, Pls.' Supp. Mem. Ex. 8 (emphasis added).

In addition, the person responsible for negotiating export contracts for one of defendants testified in his deposition that he was aware of some price having been mandated by the government, but he could not remember what it was. Dep. of Ning Hong, at 68.[8] This testimony suggests that the hand of government was not weighing as heavily on defendants as defendants and the Ministry would have this court believe.

Several of the documents plaintiffs attach as exhibits to their supplemental brief appear to be notes from meetings or the musings of defendants' employees. As such, it is unclear whether they would qualify as business records or otherwise be admissible as evidence. Although their provenance is unclear, these documents do provide glimpses into what may have been defendants'

---

[8] The deponent testified as follows:
Q.  Does the Chamber review the contracts to determine whether a minimum export price has been met?
A.  They might, I think they should.
* * *
Q.  Are you the main person responsible for negotiating prices of vitamin C with U.S. customers?
A.  Yes, I handled the very specific processes.  I do that.
Q.  Are you aware of any minimum export price today for vitamin C?
A.  I think so.  I feel that it might be.
Q.  Do you know what it is?
A.  I can't recall.
* * *
Q.  No one has ever told you that the Chamber won't approve a contract with a price below $335 cents, have they?
A.  I cannot recall.
Dep. of Ning Hong, at 68-70.

thinking regarding price-fixing.  For example, plaintiffs have

procured a document entitled "Thought on Coordinated Production

Termination," in which the author writes:

> We are reluctant to admit the fact that the chamber
> of commerce will continue to be a major force in
> coordinating companies of this industry, particularly
> in a difficult situation.  The role of the chamber of
> commerce as the industrial association will be
> intensified rather than weakened in the future.
> Therefore, there is no need for us to go beyond
> coordination of the chamber of commerce, which will
> do no good to our current or future work.  The work
> of the chamber of commerce will be supported by the
> Ministry of Commerce.  We should not regard the
> coordination simply as authoritarianism of the
> chamber of commerce.

Thought on Coordinated Production Termination, Pls.' Supp. Mem.,

Ex. 12.[9]  The author continues:

> The act of deciding production or prices based on
> coordination is a kind of monopoly whatever the
> reasons.  However, I believe we should not have any
> worry since the Ministry of Commerce is a friend of
> the court in the lawsuit.  If we won the lawsuit, it
> would be hard for foreigners to make more trouble.
> Even if we lost the case, the government would take
> the foremost part of responsibility.  After all, we
> need to do many things in a more hidden and smart
> way.

Id.

Documents such as these - if they are to be credited -

suggest a complex interplay between the Chamber and defendants

that makes it difficult at this stage to determine the degree of

---

[9] Plaintiffs do not describe the source of this document.
It bears Bates number JJBA11-1.

defendants' independence in making pricing decisions.

**c.    Authority of the brief**

The authority of the Ministry's brief is critical to
defendants' motion, because, as noted above, the documents on
which defendants rely to demonstrate governmental compulsion of
their anti-competitive acts suggest on their face that
defendants' acts were voluntary rather than compelled.
Defendants contend that the Ministry's brief must be taken as
conclusive on the issue of Chinese law – and particularly on the
question of whether defendants' conduct was mandated by Chinese
law, citing <u>United States v. Pink</u>, 315 U.S. 203, 218-21 (1942),
and <u>Agency of Canadian Car & Foundry Co. v. American Can Co.</u>, 258
F. 363, 368-69 (2d Cir. 1919).  In <u>Pink</u>, the Court was
determining the intended extraterritorial effect of a Russian
decree, and was presented with an official declaration from the
Russian official charged with interpreting existing Russian law.
315 U.S. at 220.  The Court held that the declaration was
"conclusive" on the issue of the Russian decree's intended
extraterritorial effect.  <u>Id.</u>  Similarly, the Second Circuit in
<u>American Can</u> had before it a certificate from the Russian
ambassador to the United States, which it accepted as "binding
and conclusive ... on the matters to which it relates."  258 F.

at 368-69.

Plaintiffs counter that Fed. R. Civ. P. 44.1, which was first adopted in 1966, permits a court to "consider any relevant material or source, including testimony," when determining foreign law.  Plaintiffs assert that Rule 44.1 allows courts wide discretion to determine foreign law, and that they are not bound to accept the assertions of foreign sovereigns.

Indeed, post-Rule 44.1 decisions from the Second Circuit have adopted a softer view toward the submissions of foreign governments.  In <u>Karaha Bodas Co., LLC v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara ("Pertamina")</u>, 313 F.3d 70 (2d Cir. 2002), the Ministry of Finance of the Republic of Indonesia asserted that under Indonesian law, certain funds belonged to the Republic of Indonesia.  The Second Circuit agreed that "a foreign sovereign's views regarding its own laws merit - although they do not command - some degree of deference."  <u>Karaha Bodas</u>, 313 F.3d at 92.  After independently analyzing the relevant Indonesian law, the court accepted the Republic of Indonesia's interpretation, noting: "Where a choice between two interpretations of ambiguous foreign law rests finely balanced, the support of a foreign sovereign for one interpretation furnishes legitimate assistance in the resolution of interpretive dilemmas."  <u>Id.</u>

More recently, the Second Circuit opted not to follow an affidavit from the Chilean Corporation of Judicial Assistance of the Region Metropolitana ("Central Authority") regarding a child custody matter under the Hague Convention.  Villegas Duran v. Arribada Beaumont, 534 F.3d 142, 148 (2d Cir. 2008).  There was a question of whether the Central Authority had all the relevant information at the time it made its affidavit, but the court held that "even if [the affidavit] is authoritative, the district court was not bound to follow it."  Id. (citing Karaha Bodas, 313 F.3d at 92).

The Ministry's Brief is, therefore, entitled to substantial deference, but will not be taken as conclusive evidence of compulsion, particularly where, as here, the plain language of the documentary evidence submitted by plaintiffs directly contradicts the Ministry's position.

**d.  Role of the Chinese government in defendants' agreement to fix prices**

All three of defendants' defenses rest on the proposition that their collusion on prices for vitamin C was due to acts of the Chinese government.  Although the parties argue whether the defenses raised by defendants are jurisdictional, the issue at this stage of the case is whether there is a factual dispute as

to the alleged compulsion.[10]

Many of the cases defendants rely upon in support of their motion to dismiss involved much clearer examples of government compulsion. For example, the court in <u>Truqman-Nash, Inc. v. New Zealand Diary Board</u>, 954 F. Supp. 733 (S.D.N.Y. 1997), was charged with considering the effect of the New Zealand Dairy Board Act of 1961, a formally codified New Zealand law. In that case the court interpreted the language of the statute as "mandat[ing] Board disapproval of sales price competition among New Zealand dairy producers in respect of exports to nations like the United States that restrict import quantities." <u>Id.</u> at 736. Accordingly, the court held that there was "an actual and

---

[10] The Ministry asserts that if the court exercises jurisdiction over this action "[i]t cannot be denied that the possibility of insult to China is significant." Ministry Br. at 22. Not every court agrees with this basis for abstention. The Ninth Circuit has noted:

> Federal judges cannot dismiss a case because a foreign government finds it irksome, nor can they tailor their rulings to accommodate a non-party . . .. If a foreign government finds the litigation offensive, it may lodge a protest with our government; our political branches can then respond in whatever way they deem appropriate – up to an including passing legislation.... If courts were to take the interests of foreign governments into account, they would be conducting foreign policy by deciding whether it serves our national interests to continue with the litigation...."

<u>Patrickson v. Dole Food Co., Inc.</u>, 251 F.3d 795, 803-05 (9th Cir. 2001) (Kozinski, J.).

material conflict between American antitrust law and New Zealand law in respect of the marketing of dairy export produce," entitling defendants "to invoke the doctrines of act of state, foreign sovereign compulsion, and international comity." Id.

Similarly, the Second Circuit has applied the act of state doctrine to affirm dismissal of an antitrust case brought by a liquid bulk cargo tanker service that was shut out from importing and exporting Colombian liquid gas that challenged Colombia's cargo reservation laws. O.N.E. Shipping Ltd. v. Flota Mercante Grancolombiana, S.A., 830 F.2d 449, 450 (2d Cir. 1987). Colombia began enforcing a series of cargo reservation laws it had passed years before which required that imports and exports of certain types of cargo be transported exclusively by Colombian carriers, and the plaintiff sued the beneficiaries of these laws for violations of the Sherman Act, including conspiracy to fix prices. Id. at 450-51. Although the plaintiff alleged that the defendants manipulated the Colombian government into implementing the cargo reservation laws, the court held that the plaintiff's allegations "make clear that its antitrust suit is premised on contentions that it was harmed by acts and motivations of a foreign sovereign which the district court would be called on to examine and pass judgment on." Id. at 452-53. The court refused to investigate the motives of the Colombian government, stating:

"When the causal chain between a defendant's alleged conduct and plaintiff's injury cannot be determined without an inquiry into the motives of the foreign government, claims made under the antitrust laws are dismissed."  Id. at 453.

Other cases relied upon by defendants were decided on a fuller record.  For example, defendants rely heavily on Interamerican Refining Corp. v. Texaco Maracaibo, Inc., 307 F. Supp. 1291 (D. Del. 1970), as a case supporting their argument of foreign sovereign compulsion.  That case was decided on summary judgment, however, after discovery was complete.  Id. at 1302. The case involved a boycott against an oil refiner by suppliers of Venezuelan crude oil which held concessions from the Venezuelan government.  The defendants argued that their boycott was ordered by the Venezuelan government, and the court granted summary judgment based on its conclusion that the defendants had, indeed, been compelled by their government to boycott the plaintiff.

The court refused to consider whether the order to boycott was "legal or 'compulsive' under the laws of Venezuela," holding that "[o]nce governmental action is shown, further examination is neither necessary nor proper."  Id. at 1301.  Nevertheless, the court explicitly noted in that case that "[n]othing in the materials before the Court indicates that defendants either

procured the Venezuelan order or that they acted voluntarily pursuant to a delegation of authority to control the oil industry." <u>Id.</u> at 1297.  In this case, on the other hand, the parties vigorously dispute whether defendants instigated formation of the Vitamin C Sub-Committee and whether defendants' actions in fixing prices were voluntary.

Thus, although both <u>Trugman-Nash</u> and <u>O.N.E. Shipping</u> involved dismissals of antitrust suits due to the involvement of foreign governments in anticompetitive activities, they differ from the present case in that there was no dispute in those cases as to the effect of the respective governmental acts.  Here, on the other hand, the parties hotly contest both the origin and even existence of government compulsion.  The Ministry has been forthright in its admission that Chinese law is not as transparent as that of the United States or other constitutional or parliamentary governments.[11]  Rather than codifying its

_____

[11] At oral argument, counsel for the Ministry explained:

> [T]he laws of the government of China do not have . . . quite the same transparency as the laws of the United States, in the sense that there are statute books that are available, that there are lengthy Congressional statements of intent, where you can read what the debates were all about.
> The way the Chinese system operates is that you have the state council and the state council is then composed of a number of key ministries.  The Ministry of Commerce is not some backwater regulator in a small city in China.  The Ministry of Commerce is the

statutes, the Chinese government apparently frequently governs by regulations promulgated by various ministries. In addition, according to the Ministry, private citizens or companies may be authorized under Chinese regulations to act in certain circumstances as government agents. June 9, 2008 Statement in <u>In Re Vitamin C Antitrust Litigation</u> at 2.

It is this last circumstance that so complicates the question of compulsion in this case. It is not clear from the record at this stage of the case whether defendants were performing government function, whether they were acting as private citizens pursuant to governmental directives or whether they were acting as unrestrained private citizens. Indeed, even the formation of the Vitamin C Sub-Committee is shrouded in mystery, as it was apparently authorized in response to a request by unidentified applicants who were, quite likely, defendants here.

If defendants wished to form a cartel, they would have had to ask for government sanction, at least according to plaintiffs' expert, who opined that in China "an organization not expressly allowed would be prohibited." Feinerman Decl. ¶ 16. It is not

_____

preeminent regulator of the economy, export economy of the People's Republic.

Tr. of Mot., June 5, 2007, at 46-47.

clear that this scenario of defendants making their own choices and then asking for the government's imprimatur - which may or may not have occurred in this case - would qualify as the type of governmental act or compulsion contemplated by the defenses raised by defendants.

In support of their motion, defendants and the Ministry stress the importance to China of being able to manage the transition from a command to a market economy. The court does not question that goal or even China's methods of doing so. But the record as it stands is simply too ambiguous to foreclose further inquiry into the voluntariness of defendants' actions.[12] Accordingly, defendants' motion to dismiss is denied.

## (2)

### Motions to dismiss second amended complaint

Plaintiffs filed a second amended complaint ("SAC") adding Magno-Humphries Laboratories, Inc. ("MHL") as a direct purchaser class representative and adding JSPC America, Inc. ("JSPC") and Legend Ingredients Group, Inc. ("Legend") as defendants. The SAC

---

[12] One area that appears to be ripe for discovery is the degree to which defendants coordinated pricing before and after December 2001. If the apparatus and mandate for price-fixing was in place as of 1991 (when the Chamber was formed) or 1997 (when the Vitamin C Sub-Committee was formed), but no price-fixing occurred until market power was achieved, plaintiffs would have a stronger argument that defendants' actions were voluntary.

explains that MHL directly purchased vitamin C and vitamin C products from JSPC and Legend.  SAC ¶ 9.  JSPC and Legend are described as California corporations that were (in the case of JSPC) or are (in the case of Legend) subsidiaries or affiliates of Jiangsu Jiangshan during the class period.  Id. ¶ 12, 13. Other than these identifications of MHL, JSPC and Legend, the SAC copies verbatim the allegations of the first amended complaint, which are summarized above.

JSPC and Legend move to dismiss the SAC as to themselves because the SAC does not make any allegations against them personally.  The original defendants move to dismiss the SAC in its entirety because, they contend, the addition of JSPC and Legend fundamentally changes the conspiracy that had been alleged in the earlier complaints.  Specifically, the earlier complaints alleged a horizontal conspiracy among Chinese vitamin C manufacturers.  According to defendants, however, JSPC and Legend are, or were, California corporations that never manufactured vitamin C.  Thus, their addition changes the conspiracy charged from a horizontal conspiracy to a hybrid horizontal/vertical conspiracy, the details of which are not disclosed in the SAC. All defendants argue that the SAC falls short of the pleading standards set forth by the Supreme Court in Bell Atl. Corp. v. Twombly, 127 S.Ct. 1955, 1965 (2007), and by the Second Circuit

in <u>In re Elevator Antitrust Litig.</u>, 502 F.3d 47 (2d Cir. 2007).

Plaintiffs respond that the SAC is remarkably detailed in its description of the conspiracy, and that it goes above and beyond the requirements of <u>Twombly</u> and <u>In re Elevator Antitrust Litig.</u>. Plaintiffs further argue that those cases do not establish heightened pleading standards for antitrust cases. That may be true, but even Fed. R. Civ. P. 8(a)(2) requires a "short and plain statement of the claim showing that the pleader is entitled to relief." The SAC is indeed quite detailed in its pleading of a conspiracy among Chinese vitamin C manufacturers, but it does not explain how two California resellers could have been part of the manufacturer cartel. Thus, the SAC both fails to provide notice to JSPC and Legend as to what they are alleged to have done wrong and changes the nature of the originally-charged conspiracy.

Accordingly, the SAC is dismissed with leave to replead within 30 days to allege what actions JSPC and Legend have taken that have harmed plaintiffs.

## Conclusion

For the foregoing reasons, defendants' motion to dismiss the complaints under the act of state doctrine, foreign sovereign compulsion and international comity is denied. Defendants' motions to dismiss the SAC are granted. Plaintiffs have 30 days to replead the SAC to make allegations against JSPC and Legend.

Dated:      Brooklyn, New York
            November 6, 2008

                              SO ORDERED:

                              _____/s/_____
                              David G. Trager
                              United States District Judge