**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE<br>**VITAMIN C ANTITRUST LITIGATION**<br><br>**This Document Relates To:**<br><br>**ANIMAL SCIENCE PRODUCTS, INC. and**<br>**THE RANIS COMPANY, INC.**<br><br>                               **Plaintiffs,**<br><br>          – v. –<br><br>**HEBEI WELCOME PHARMACEUTICAL CO.**<br>**LTD.; et al.,**<br>                               **Defendants.** | MASTER FILE 06-MD-1738<br>(DGT)(JO)<br><br><br><br><br>Case No. CV 05-453 (DGT)(JO) |

---

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, IN THE**
**ALTERNATIVE, FOR DETERMINATION OF FOREIGN LAW AND ENTRY OF**
**JUDGMENT PURSUANT TO RULE 44.1, FED. R. CIV. P.**

---

ORRICK, HERRINGTON & SUTCLIFFE LLP

Stephen V. Bomse
The Orrick Building
405 Howard Street
San Francisco, CA  94105-2669
Tel:  (415) 773-5700
Fax:  (415) 773-5759

Richard S. Goldstein
Annabelle Chan
666 Fifth Avenue
New York, NY  10103-0001
Tel:  (212) 506-5000
Fax:  (212) 506-5151

Jonathan M. Palmer
719 Second Avenue
Suite 1000
Seattle, WA  98104-7097
Tel:  (206) 839-4300
Fax:  (206) 839-4301

*Attorneys for Defendant*
*Jiangsu Jiangshan Pharmaceutical Co., Ltd.*

GREENBERG TRAURIG, LLP
   James I. Serota
   Kenneth Lapatine
   200 Park Avenue
   New York, NY 10036
   Tel:  (212) 801-2277
   Fax: (212) 801-6400

*Attorneys for Defendant*
*Northeast Pharmaceutical Group Co., Ltd.*

ZELLE HOFFMAN
VOELBEL & MASON LLP
   Daniel Mason
   Joseph Bell
   Jiangxiao Hou
   44 Montgomery Street, Suite 3400
   San Francisco, CA  94101
   Tel:  (415) 693-0700
   Fax: (415)693-0770

*Attorneys for Defendant*
*Shijiazhuang Pharma. Weisheng*
*Pharmaceutical (Shijiazhuang) Co., Ltd.*

BAKER & McKENZIE LLP
   Charles H. Critchlow
   Darrell Prescott
   Christopher Chinn
   1114 Avenue of the Americas
   New York, NY 10036-7703
   Tel:  (212) 626-4476
   Fax:  (212) 626-4120

*Attorneys for Defendant*
*Hebei Welcome Pharmaceutical Co., Ltd.*

# TABLE OF CONTENTS

**Page**

I.   PRELIMINARY STATEMENT ................................................................1

II.  STATEMENT OF THE CASE ...............................................................6

    A.   China's Transition to a Market Economy and Its Export Commerce
        Policies.................................................................................6

    B.   The Role of Import and Export Chambers and the Development and
        Implementation of Chinese Trade Policy Regarding Vitamin C.........................10

        1.   The Role of Import and Export Chambers .........................................10

        2.   Chamber Regulation of Vitamin C Exports .......................................12

        3.   Establishment of the Vitamin C Subcommittee ...................................14

        4.   Regulation Prior to the End of 2001 ..............................................15

        5.   Regulation of Vitamin C During the Alleged Conspiracy Period...........17

        6.   The Self-Discipline System ......................................................21

            a.   The Principle of Self-Discipline ..........................................21

            b.   Self-Discipline in Operation................................................23

        7.   Summary ...........................................................................25

III. DISCUSSION................................................................................26

    A.   The Applicable Legal Standard ......................................................27

    B.   The Effect of the Government of China's Statements Regarding the Nature
        of Chinese Law Applicable to This Case ............................................30

        1.   Conclusive Effect ................................................................31

        2.   Substantial Deference ...........................................................35

    C.   The Record ...........................................................................36

    D.   Defendants Are Entitled to Judgment................................................44

        1.   Foreign Sovereign Compulsion...................................................48

        2.   The Act of State Doctrine.........................................................53

        3.   International Comity ..............................................................57

IV.  CONCLUSION .............................................................................60

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Access Telecom, Inc. v. MCI Telecomm. Corp.*,
197 F.3d 694 (5th Cir. 1999) ......................................................................29, 34

*Agency of Canadian Car & Foundry Co. v. American Can Co.*,
258 F. 363 (2d Cir. 1919) ...................................................................................31

*Banco de Espana v. Federal Reserve Bank of New York*,
114 F.2d 438 (2d Cir. 1940) ...............................................................................31

*Banco Nacional de Cuba v. Sabbatino*,
376 U.S. 398 (1964) ............................................................................................56

*Chevron v. Natural Resources Defense Council, Inc.*,
467 U.S. 837 (1984) ............................................................................................35

*Clayco Petroleum Corp. v. Occidental Petroleum Corp.*,
712 F.2d 404 (9th Cir. 1983) ..............................................................................59

*Coastal States Marketing, Inc. v. Hunt*,
694 F.2d 1358 (antitrust action referencing "Defendants' Motion to Determine
Foreign Law")......................................................................................................30

*Curley v. AMR Corp.*,
153 F.3d 5 (2d Cir. 1998) ...................................................................................28

*El Pollo Loco, S.A. de C.V. v. El Pollo Loco, Inc.*,
344 F. Supp. 2d 986 (S.D. Tex. 2004)................................................................30

*Evangelista v. Ashcroft*,
359 F.3d 145 (2d Cir. 2004) ...............................................................................35

*Financial Matters, Inc. v. Pepsico, Inc.*,
1993 WL 378844 (S.D.N.Y. Sept. 24, 1993) (omitting citations)............................28

*Hilton v. Guyot*,
159 U.S. 113 (1895) ............................................................................................57

*Hoffmann-LaRoche Ltd. v. Empagran, S.A.*,
542 U.S. 155 (2004) .......................................................................................33, 59

*Hunt v. Mobil Oil Corp.*,
410 F. Supp. 10 (S.D.N.Y. 1975) *aff'd*, 550 F.2d 68 (2d Cir. 1977).................27, 56

*Hunt v. Mobil Oil Corp.*,
   550 F.2d 68 (2d Cir. 1977) ................................................................................................55, 56

*Instituto Per Lo Sviluppo Economico Dell'Italia Meridionale v. Sperti Prods., Inc.*,
   323 F. Supp. 630 (S.D.N.Y. 1971) ...............................................................................................28

*Inter Medical Supplies, Ltd. v. EBI Medical Systems, Inc.*,
   181 F.3d 446 (3d Cir. 1999) .............................................................................................................37

*Interamerican Refining Corp. v. Texaco Maracaibo, Inc.*,
   307 F. Supp. 1291 (D. Del. 1970) ................................................................................28, 29, 49, 56

*International Association of Machinists v. OPEC*,
   649 F.2d 1354 (9th Cir. 1981) ................................................................................................54, 55

*Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*,
   313 F.3d 70 (2d Cir. 2002) ...................................................................................................34, 35

*Kashfi v. Phibro-Salomon, Inc.*,
   628 F. Supp. 727 (S.D.N.Y. 1986) ...............................................................................................28

*Noto v. Cia Secula Di Armanento*,
   310 F. Supp. 639 (S.D.N.Y. 1993) ...............................................................................................37

*O.N.E. Shipping Ltd. v. Flota Mercante Grancolombian, S.A.*,
   830 F.2d 449 (2d. Cir. 1987) .......................................................................................49, 52, 55

*In re Oil Spill by the Amoco Cadiz*,
   954 F.2d 1279 (7th Cir. 1992) ...........................................................................................34, 35, 36

*Rutgerswerke AG v. Abex Corp.*,
   2002 WL 1203836 (S.D.N.Y. Jun 4. 2002) ...............................................................................29

*Salem v. United States Lines Co.*,
   370 U.S. 31 (1962) ............................................................................................................................39

*Seetransport Wiking Trader Schiffahrtsgesellschaft MBH & Co. v. Navimpex Centrala Navala*,
   29 F.3d 79 (2d Cir. 1994) ...............................................................................................................28

*Singh v. Gonzales*,
   468 F.3d 135 (2d Cir. 2006) ...........................................................................................................35

*Southern Motor Carriers Rate Conference, Inc. v. United States*,
   471 U.S. 48 (1985) ...............................................................................................................50, 51, 52

iii

*Trugman-Nash, Inc. v. New Zealand Dairy Bd.*,
    954 F. Supp. 733 (S.D.N.Y. 1997) ................................................................... 27, 49

*United States v. BCCI Holdings (Luxembourg), S.A.*,
    977 F. Supp. 1 (D.D.C. 1997) .......................................................................... 29

*United States v. Cook*,
    922 F.2d 1026 (2d Cir. 1991) ......................................................................... 39

*United States v. Mitchell*,
    985 F.2d 1275 (4th Cir. 1993) ........................................................................ 30

*United States v. Pink*,
    315 U.S. 203 (1942) ................................................................................. 31, 32

*United States v. Schatzle*,
    901 F.2d 252 (2d Cir. 1990) ........................................................................... 39

*Van Bokkelen v. Grumman Aerospace Corp.*,
    432 F. Supp. 329 (E.D.N.Y. 1977) ................................................................. 27

*In re Vitamin C Antitrust Litig.*,
    584 F. Supp. 2d 546 (E.D.N.Y. 2008) ......................................................... *passim*

## FEDERAL STATUTES

15 U.S.C. § 15 ............................................................................................ 33

Fed. R. Civ. P. 12 ........................................................................ 1, 27, 31, 55, 58, 44

Fed. R. Civ. P. 23 ......................................................................................... 59

Fed. R. Civ. P. 44.1 ................................................................................ 1, 28, 30, 60

Fed. R. Civ. P. 56 ......................................................................................... 27

Fed. R. Crim. P. 26.1 ..................................................................................... 30

Fed. P. Evid. 702 .......................................................................................... 39

Local Rule 56.1 ............................................................................................. 6

# I. PRELIMINARY STATEMENT

Defendants[1] respectfully submit this Memorandum of Law in support of their motion for summary judgment or, in the alternative, for the Court to determine foreign law and enter judgment thereon in Defendants' favor pursuant to Rule 44.1, Fed. R. Civ. P. At issue are allegations that, since the end of 2001, the defendant Chinese vitamin C manufacturers have met under the auspices of a supposed "trade association" and conspired to fix the prices and reduce the output of vitamin C exported to the United States. However, the so-called "trade association" at whose direction and under whose authority Defendants met, was, in fact, a designated representative of the Chinese government, and the meetings that it convened took place in order to further that government's clearly-enunciated and long-standing trade policy towards vitamin C exports. As a result, Defendants' actions are immune from liability in a private antitrust action on the basis of foreign sovereign compulsion, the act of state doctrine and principles of international comity.

When those issues were before the Court previously on Defendants' motion to dismiss under Rule 12, the Court acknowledged the obvious importance that the Chinese government attaches to this case, as reflected in its unprecedented willingness to appear and explain to the Court that the actions that Defendants took were the result of the government's direction given in furtherance of China's state policy. *In re Vitamin C Antitrust Litig.*, 584 F. Supp. 2d 546, 552 (E.D.N.Y. 2008) (hereafter, "*In re Vitamin C*"). In fact, not only did China submit an initial

---

[1] This motion is made on behalf of defendants Hebei Welcome Pharmaceutical Co., Ltd.; Jiangsu Jiangshan Pharmaceutical Co., Ltd.; Northeast Pharmaceutical Group Co., Ltd. ("NEPG"); and Shijiazhuang Pharma. Weisheng Pharmaceutical (Shijiazhuang) Co., Ltd. (collectively, "Defendants"). Defendants JSPC America, Inc. and China Pharmaceutical Group, Ltd. ("CPG") have submitted separate motions for summary judgment, and defendant NEPG has submitted a separate motion based on its status as an injunctive-relief only defendant. Defendant CPG has a pending motion to dismiss for lack of personal jurisdiction (D.E. 286), as do defendants North China Pharmaceutical Group Corp.; North China Pharmaceutical Co., Ltd.; and North China Pharmaceutical Group Import and Export Trade Co., Ltd. (D.E. 372).

statement in the form of an *amicus curiae* brief,[2] but it thereafter submitted a further statement

directly to the Court under its own formal auspices ratifying that earlier brief and confirming that

it had been "reviewed and edited word-for-word in Beijing" by government officials and

represents the official views of the Chinese government.[3]   Nonetheless, the Court declined to

dismiss the case at that time in view of its uncertainty about the nature of Chinese law (which, as

the Court observed, is not as readily transparent as the law of some other nations).  *In re Vitamin

C*, 584 F. Supp. 2d at 559.  The Court further stated that it had questions about whether the

alleged conspiracy originated with Defendants (acting privately once they had obtained market

power), and whether such actions were only thereafter ratified by the Chinese government at

Defendants' behest.  For those reasons, the Court concluded that the record, as it then stood, was

"simply too ambiguous to foreclose further inquiry into the voluntariness of defendants'

actions."  *Id.*

Both the case and the record are now in a materially different posture, and Defendants'

motion for judgment as to the nature and operation of Chinese law – a matter that, in all events,

involves an issue of law for determination by the Court (*see* Section III.A., *infra*) – is ripe for

adjudication in their favor.  In addition to the unequivocal statements from the Chinese

government that remain an essential part of the record before the Court and are entitled to

dispositive weight or, at a minimum, to "substantial deference," Defendants now have submitted

---

[2] Brief Of *Amicus Curiae* The Ministry Of Commerce Of The People's Republic Of China In Support Of Defendants' Motion To Dismiss The Complaint, filed September 22, 2006 (D.E. 69), appending pertinent statutes and regulations (D.E. 70) (hereinafter, the "*Amicus* Submission") (attached as Exhibit 1 to the Declaration of Annabelle Chan In Support Of Defendants' Motion For Summary Judgment Or, In The Alternative, For A Determination Of Foreign Law And Entry Of Judgment Pursuant To Rule 44.1, Fed. R. Civ. P., dated August 31, 2009 ("Chan Decl.").  China's submission to this Court was styled in the form of a brief because the U.S. government has stated that this is the appropriate mechanism for a sovereign to present a formal statement to a U.S. Court.  *Amicus* Submission at pp. 2-3, *citing, inter alia*, Brief for the United States as *Amicus Curiae* Supporting Appellants, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, (No. 83-2004), 1985 WL 669663, *17 (Jan. 4, 1985). *See also* September 29, 2008 letter to the Court from China's U.S. Counsel (D.E. 331) (Chan Decl., Ex. 2).

[3] *See* Statement in *In re Vitamin C Antitrust Litigation*, dated June 9, 2008, submitted by the Ministry of Commerce of the People's Republic of China (D.E. 306) (Chan Decl., Ex. 3).

the expert report of Professor Shen Sibao, a Chinese legal scholar, law school dean, and practitioner for more than a quarter-century who regularly advises Chinese authorities and assisted in the drafting of China's trade law.[4]

Professor Shen's Report,[5] which stands completely without rebuttal from any Chinese legal expert proffered by Plaintiffs, amplifies and places in context the statements offered by the Chinese government demonstrating not only the existence of long-standing government regulation of the vitamin C export trade, but also the reasons for such regulation in light of China's ongoing transformation from a command economy to a "socialist market economy." Professor Shen's Report further confirms the official status of the particular Chamber of Commerce that was responsible for implementing government policy with respect to vitamin C exports, as well as the role that the Chinese government played in directing formation of the Vitamin C Subcommittee within the Chamber in the mid-1990s as a mechanism to ensure the furtherance of government interests. That Subcommittee continued to regulate price and quantity both prior to as well as throughout the supposed conspiracy period alleged by Plaintiffs.

In light of the submissions of the Chinese government and the expert Report of Professor Shen, the record is now clear that there was regulated and mandated coordination of pricing and output under the auspices of the Chamber prior to 2001 and thereafter. In fact, the Chinese government actually sent representatives from what is now the Ministry of Commerce (or, MOFCOM) to meetings of the Vitamin C Subcommittee to instruct and remind the company

---

[4] *See* Report of Professor Shen Sibao, dated February 19, 2009 ("Shen Rep.") (Chan Decl., Ex. 4). Defendants also have submitted the Report of Professor James B. Speta. *See* Report of Professor James B. Speta, dated February 20, 2009) ("Septa Rep.") (Chan Decl., Ex. 5). Professor Speta is an expert on regulated industries, who concluded that under long-established principles of regulation under U.S. law, the vitamin C industry in China carries all the hallmarks of a regulated industry. *See id.* at ¶ 38.

[5] Professor Shen personally reviewed and signed the English version of his report, (Chan Decl., Ex. 4). Thus, it is equally operative with the Chinese text. Professor Shen also personally reviewed the document quotations set forth in the English version of his report for accuracy of translation. In some instances, there are minor differences between Professor Shen's translations (utilized in this memorandum) and the translations provided with documents that are exhibits to the Chan Declaration. However, the differences are not material.

representatives in attendance of their obligations to act in "unison" and in furtherance of state interests as they competed with one another in foreign trade.

The record further shows that China's overarching trade policies have remained relatively constant throughout this transitional period. And although the mechanisms employed to implement those policies have varied somewhat over time, the government at all times has required companies in China to operate in a manner consistent with, and designed to promote, its declared national interests. For Defendants, that meant submitting to supervision and control of both price and output of vitamin C manufactured for export.

For a number of years, China subjected vitamin C manufacturing to specific export quotas and other regulations that were intended to avoid excess capacity and resulting price wars that the government viewed as a threat to the development of a stable and profitable vitamin C export industry. When China acceded to the World Trade Organization at the end of 2001, the government further transitioned to a system in which vitamin C exporters were expected to maintain at least minimum prices at all times (a requirement enforced through a system known as "verification and chop"). In addition, the Chinese government continued to enforce the price and output restrictions that were implemented not only through the verification and chop system, but through a process known as "self-discipline," pursuant to which the Chamber would convene the companies when needed in order to reach and implement agreements regarding prices and output restrictions so that China could maintain a stable and profitable vitamin C export industry.

Self-discipline is a well-established concept within China. It is one of the mechanisms that China relies upon to secure conduct consistent with government policy. It is a "voluntary" system only in the sense that parties are expected to reach consensus among themselves. However, there is no discretion to refuse to participate in the coordination process and no

4

discretion to act in a manner inconsistent with government objectives. Those objectives were to ensure stability and further the profitability of key industries by avoiding what China regards as inappropriate or "harmful" forms of competition that would impede the development of industries that China considers to be important to its development as an economic power.

In its November 2008 opinion, this Court observed:

> defendants and the Ministry have made a compelling argument for why the Chinese government's involvement – to the extent it exists – in defendants' price-fixing scheme amounts to a public, rather than commercial, act. Namely, they argue that the government was working to guide the vitamin C industry in China's transition from a command to a market economy. If so, and if – as defendants and the Ministry argue – defendants were acting in a governmental capacity when they fixed prices, it is not even clear that the Sherman Act would apply, as it is directed at private actors.

*In re Vitamin C*, 584 F. Supp. 2d at 550.

The statutes and regulations here, as explained by the Chinese government and by an authoritative expert, are clear and compelling in support of but one conclusion: that Defendants were acting in furtherance of a declared state interest (to wit: in a governmental capacity) as part of a structure and process mandated by the Chinese government. The government of China has expressly acknowledged the pertinent facts and confirmed to this Court that all of the actions that are the subject of Plaintiffs' Third Amended Complaint in this litigation were taken in compelled obedience to the requirements of Chinese national trade policy as overseen and implemented by the Chamber under instructions from MOFCOM, utilizing the process of "self-discipline" among its members. Defendants' motion for summary judgment, or in the alternative, for a determination of foreign law and entry of judgment in their favor, therefore, should be granted.

## II.  STATEMENT OF THE CASE[6]

For the past two decades, China has been transitioning towards a market-oriented

economy based upon particular Chinese traditions and principles – a system that China's own

constitution refers to as a "socialist market economy."  Firms in China have been expected to

compete for export business, but to do so in a coordinated manner that avoids what China

regards as "harmful" or "destructive" competition.  In that way, China believes, it can build solid

and profitable domestic industries that will benefit China's economic development as it emerges

from decades of state-directed economic activity conducted through state-owned enterprises.

That policy was spelled out in a series of official statements from relevant government agencies

and high-ranking government officials.  It has remained in effect throughout the alleged

conspiracy period, and was implemented through a variety of mechanisms as part of a system of

regulatory oversight that, as the Chinese government has advised the Court, was binding on

Defendants, which are companies located and doing business in China,[7] requiring them to

engage in the conduct that is the subject of Plaintiffs' Third Amended Complaint.

### A.      China's Transition to a Market Economy and Its Export Commerce Policies

"Since the 1990's, China's economic structure has been undergoing the transition from a

command model to a free market."[8]  That transition has been "painful" because "[u]nlike the

simultaneous change of both political and economic systems in Eastern Europe, China is

switching gradually to the market economy while keeping the political structure intact.  This path

is long and rocky because the government has to walk a fine line between the creation of a

---

[6] In accordance with Local Rule 56.1, Defendants submit herewith a statement of material facts as to which there is no genuine issue to be tried.  As indicated above, Defendants also submit herewith the Chan Declaration, which attaches the evidentiary materials relied upon in this memorandum.  The memorandum references directly the evidentiary materials attached to the Chan Declaration.

[7] Third Amended Complaint, ¶¶ 10, 11, 13, 14 (Chan Decl., Ex. 6).

[8] Yong Huang, *Pursuing the Second Best: The History, Momentum, and Remaining Issues of China's Anti-Monopoly Law*, 75 Antitrust L.J. 117, 121 (2008) ("Huang") (Chan Decl., Ex. 7).

dynamic private sector and the maintenance of a socialist country."[9]  The journey is still far from complete, and its destination is not an economic system that is congruent with American notions of a free market economy.  To the contrary, China's own constitution describes its economic system as a "socialist market economy."[10]

An important part of this process has been the creation of ostensibly "private" firms that quickly embraced the world of international trade.[11]  However, with no tradition of private enterprise to build on, the result was a chaotic system that produced remarkable successes, but also led to over-expansion, unsustainable pricing and irresponsible investments.

The Chinese government, understandably, viewed this situation with consternation.  In 1987, then-Vice Minister (later Minister) of MOFTEC,[12] Li Lanqing, told the Working Conference of the National Economic System Reform that although China's foreign trade system had not operated successfully during the period of centralized control, matters became chaotic when that control was relaxed.[13]  Thus, he said, while there was a need to continue to allow the free market to develop, it also was necessary to avoid excessive competition that failed to take account of state interests.  To do so, the country needed to put in place a new system of administrative controls in order to better regulate trade competition.[14]

Echoing these sentiments, in a 1994 speech, Li's successor, Minister Wu Yi, observed:

> [O]ur country's socialist market economy is still in a nascent stage. . . .  Some enterprises after their operational discretion has expanded have not formed their own mechanism enabling

---

[9] *Id.* at 118-19.
[10] Xian Fa [Constitution of the People's Republic of China], Art. 15 (2004) (P.R.C.), translation available at http://english.gov.cn/2005-08/05/content_20813.htm (last visited August 25, 2009) (Chan Decl., Ex. 8).
[11] Many of these firms have significant regional or local Chinese government ownership with management drawn from party appointees, as is the case with Defendants. Indeed, defendant NEPG is wholly government-owned.
[12] The Chinese Ministry of Trade and Economic Cooperation ("MOFTEC") is the predecessor to the Chinese Ministry of Commerce ("MOFCOM"), under whose auspices China's *Amicus* Submission was made.
[13] Li Lanqing, *Problems of the Reform of 1988 Foreign Trade Regime*, published in Research of Macro Economy (1987) ("Li"), at 2 (Chan Decl., Ex. 9).
[14] Shen Rep. at ¶ 25 (Chan Decl., Ex. 4).

self-determination operation, and accountability for their profits or losses, self-discipline and self-development. *The phenomenon of blind competition among domestic companies and disruption of market order is still notable in certain time periods.*[15]

The challenges posed by the transition from a state-run system, and the fact that China does not view economic and political issues as separate, has resulted in a successful, but uniquely Chinese, approach to foreign trade. In pursuing this transition, three major principles, or themes, emerged early on, and have remained central to China's foreign trade policy.

The first is a persistent concern with what China refers to, variously, as "harmful," "excessive" or "malignant" competition. While that concept is less uniquely "Chinese" than many think, and finds parallels in the justification for certain regulated industries in the U.S.,[16] it is a prominent feature of Chinese economic policy. Thus, for example, Professor Bruce Owen, a noted economist from Stanford who has written widely about China's economic development and its competition policies, has observed that, both historically and continuing until today, "excessive competition" is "a major perceived problem in the Chinese economy."[17] As Defendants' expert Professor Shen has stated:

> [S]ince China's transition from the planned economy and decentralization of control on the right to conduct foreign trade, the Chinese government has always been concerned with maintaining "market order"....The Chinese government is concerned that "excessive competition" or "malignant competition" engaged by Chinese companies against each other would place an entire Chinese industry's profitability and sustainability at risk and in the context of foreign trade would divert profit away from China.[18]

---

[15] *Minister Wu Yi's Comments on the Reform of Import and Export Chambers of Commerce*, Xu Guomin, Machinery Electronic Products Market (1994), Issue 10 ("Wu"), at 1 (emphasis added) (Chan Decl., Ex. 10).
[16] Professor James Speta notes in his expert report in this case that "the 'destructive competition' rationale" was the basis "for U.S. regulation of the railroads and several other transportation industries." Speta Rep. at ¶ 20 (Chan Decl., Ex. 5). *See also* Richard J. Pierce, Jr., *Economic Regulation: Cases and Materials* (1994) at 21-22 (Chan Decl., Ex. 11).
[17] Bruce M. Owen, *et. al.*, *China's Competition Policy Reforms: The Anti-Monopoly Law and Beyond*, 75 Antitrust L.J. 231, 248 (2008) ("Owen") (Chan Decl., Ex. 12).
[18] Shen Rep. at ¶ 28 (Chan Decl., Ex. 4).

The second principle guiding China's foreign trade policy is that competition must take into account not merely private interests, but also the interests of the state. Minister Li's 1987 address stressed this point.[19] A similar theme is echoed in MOFTEC's 1991 Provisions on Strengthening the Coordination and Regulation of Export Commodities, which refers to the need "to build a healthy foreign trade operation order so as to…safeguard the nation's overall interest."[20]

The third and final principle – critical to implementation of the others – is that, in foreign trade, China's companies should "unite and act in unison." That is, they should coordinate as well as compete. Professor Shen points out that, according to Minister Li, "[a] main task in the 1988 foreign trade system reform" was "to improve the administration of foreign trade and to implement the policy *to unite and act in unison in foreign trade.*"[21] Two years later, the "State Council's Decision on Several Matters Concerning Further Reforming and Perfecting the Foreign Trade System" pointed out the need to "[i]mprove export operation, strengthen coordination and regulation, and *to unite and act in unison in foreign trade.*"[22] MOFTEC said the same in 1991 when it observed that "strengthening the coordination and regulation of export commodities" involved "motivat[ing] various foreign trade companies [] *to unite and act in unison in foreign trade….*"[23]

---

[19] Li, *supra*, at 1-2 (Chan Decl., Ex. 9).

[20] Provisions on Strengthening the Coordination and Regulation of Export Commodities, MOFTEC (1991), para. 1 (Chan Decl., Ex. 13). Numerous other statements make the same point. *See, e.g.*, Li, *supra*, at 1-2 (Chan Decl., Ex. 9); Wu, *supra*, at 1-2 (Chan Decl., Ex. 10); The State Council's Decision on Several Matters Concerning Further Reforming and Perfecting the Foreign Trade System (executed on December 9, 1990, issued on January 1, 1991), Guo Fa No. 70, at 5 (Chan Decl., Ex. 14).

[21] Shen Rep. at ¶ 29 (Chan Decl., Ex. 4).

[22] The State Council's Decision on Several Matters Concerning Further Reforming and Perfecting the Foreign Trade System (executed on December 9, 1990, issued on January 1, 1991), Guo Fa No. 70, at 5 (emphasis added) (Chan Decl., Ex. 14). The State Council is the highest executive organ of state power and administration and, as such, has authority over all Chinese ministries.

[23] Shen Rep. at ¶ 29(2) (Chan Decl., Ex. 4) (quoting Provisions on Strengthening the Coordination and Regulation of Export Commodities, MOFTEC (February 21, 1991), para. 1) (emphasis added) (Chan Decl., Ex. 13).

In short, from an early point in its economic transformation, China's foreign trade policy has combined the freedom to compete with an appropriate regard for broader state interests and concern for the dangers (and limits) of a market-driven system that needed to be curbed:

> In sum, the clear policy of China during the past decades, and continuing until today is that there should be private enterprise and competition among such enterprises. However, that competition always should be carried out with regard to the broader national interest of China to avoid "excessive" or "malignant competition" that can disrupt "market order," thereby threatening the profitability and sustainability of Chinese domestic industry. To that end, in order to avoid this threat, Chinese companies are required to unite and act in unison in foreign trade against foreign competition.[24]

In the case of vitamin C, these economic regulatory policies were implemented through the Chamber of Commerce system and the activities of the government-mandated Vitamin C Subcommittee that are at issue in this litigation.

**B.    The Role of Import and Export Chambers and the Development and Implementation of Chinese Trade Policy Regarding Vitamin C**

**1.    The Role of Import and Export Chambers**

Chambers of Commerce have played a central role in administering the mixed system of competition and coordination that China has embraced on its path to a "socialist market economy." While Plaintiffs' Third Amended Complaint continues to refer disingenuously to these organizations as "trade associations," and their papers have described them as "NGOs," these characterizations are both misconceived and inaccurate. The Chinese government not only has affirmed the official roles that certain Chambers play in implementing government trade policy, but has described the nature and sources of the delegated authority in detail.

---

[24] *Id.* at ¶ 30.

The Chamber was established in 1989 by the State Council of China,[25] at a time when China began to change its political and economic systems, and started the gradual process of moving away from a centrally-planned economy.[26]  It "is an entity under [MOFCOM's] direct and active supervision, that plays a central role in regulating China's vitamin C industry."[27]  This Court's earlier opinion on Defendants' motion to dismiss indicates that the Court fully understands the official status and role of Chambers in implementing China's foreign trade policy.  *In re Vitamin C*, 584 F. Supp. 2d 546, 552-54 (E.D.N.Y. 2008).  Nonetheless, explaining how that role emerged is important because it places in context the actions that Plaintiffs have challenged.

Although the involvement of the Chambers dates back to the 1980s,[28] a convenient starting point is Minister Wu Yi's 1994 speech in which she spoke directly to the vital role of the Chambers in the reform of China's foreign trade system.  After noting the problems posed by the "phenomenon of blind competition," Minister Wu stated that the solution was "to reform the chambers and make them have the ability to carry out the heavy duty of coordination, guidance, consultation, and service . . . ."[29]  Thus, she concluded, "[c]ertain government functions will be gradually reduced and be transferred to these Chambers."[30]  Lest there be any doubt that the role she envisioned for the Chambers was to regulate and coordinate the export trade of their respective members in order to further China's national interests, Minister Wu pointedly noted:

---

[25] *Amicus* Submission at pp. 6-9 (Chan Decl., Ex. 1); China Chamber of Commerce of Medicines & Health Products Importers & Exporters, Publication of Administration and Regulation, at p. 4 (2003) (Chan Decl., Ex. 15).
[26] *See* Li, *supra*, p. 1-2 (Chan Decl., Ex. 9).
[27] *Amicus* Submission at p. 5 (Chan Decl., Ex. 1).  MOFCOM "is a component of the State Council (the central Chinese government) and is the highest administrative authority in China authorized to regulate foreign trade, including export commerce." *Id.* at p. 1.  It "formulates strategies, guidelines and policies concerning domestic and foreign trade and international economic cooperation, drafts and enforces laws and regulations governing domestic and foreign trade, and regulates market operation to achieve an integrated, competitive and orderly market system." *Id.*
[28] *See* Li, *supra*, at p. 4 (Chan Decl., Ex. 9).
[29] Wu, *supra*, at 1 (Chan Decl., Ex. 10).
[30] *Id.* at 2 (emphasis added).

> Coordination means that all Chambers of Commerce must...have the "big trade" ideology, and coordinate the import and export transactions of members from the perspective of safeguarding the interests of the members and the normal order of China's foreign trade. Enterprises having the right to operate foreign trade...shall be subject to the coordination of the Import and Export Chambers of Commerce. Coordination is a mandatory task of the chambers of commerce.[31]

Not all Chambers were given official trade coordination responsibilities. Rather, as Professor Shen explains, these organizations fall into two major categories: "those that have been assigned certain regulatory or administrative functions," a category that includes the import and export Chambers referenced above, and those that operate on a voluntary basis and are akin to what American law refers to as "trade associations."[32] "The Chamber that is responsible for vitamin C belongs to the first category as it assumed regulatory functions authorized by the government since its inception."[33] It operates under the authority of MOFCOM which, in turn, is "directly responsible for the daily management of [such] organizations."[34]

## 2. Chamber Regulation of Vitamin C Exports

Vitamin C exports have been subject to active regulation by the Chinese government since at least 1990. This has included regulation under a "quota and licensing" system, as well as other forms of price and output controls.[35] China adopted those policies in order to ensure an

---

[31] *Id.* at 4; *see also* Shen Rep. at ¶¶ 29(2), 34 (Chan Decl., Ex. 4); Provisions on Strengthening the Coordination and Regulation of Export Commodities, MOFTEC (February 22, 1991), para. 1 (stating that the import and export chambers were to be responsible for coordinating member behavior in order to implement the policy of acting in unity in foreign trade.) (Chan Decl., Ex. 13).

[32] Shen Rep. at ¶ 38 (Chan Decl., Ex. 4).

[33] *Id.*; *see also Amicus* Submission at pp. 9-10 (Chan Decl., Ex. 1); Measures for Administration over Foreign Trade and Economic Social Organizations, MOFTEC (promulgated on February 26, 1991, effective on February 26, 1991), art. 1 (Chan Decl., Ex. 16). Indeed, as Professor Shen points out, at their formation these Chambers "were staffed with personnel transferred directly from the government," and their leaders continue to be appointed under the direct supervision of the government. Shen Rep. at ¶¶ 33, 35, 40 (Chan Decl., Ex. 4).

[34] Shen Rep. at ¶ 39 (Chan Decl., Ex. 4).

[35] Provisions on Strengthening the Coordination and Regulation of Export Commodities, MOFTEC (February 22, 1991), para. 2 (Chan Decl., Ex. 13).

orderly export market and maintain a stable and profitable export trade in businesses, such as vitamin C, that it considered strategically important to the country's developing economy.

In 1990, pursuant to MOFTEC's Notification of Adjusting Export Good Classification Catalogue and Strengthening Regulation of Export Goods, Marketing and Sales, vitamin C was classified as a Category II product, meaning that the Chamber was expected to "coordinate and regulate the market, customers, price and other aspects [of vitamin C export trade]."[36] In 1992, pursuant to MOFTEC's Interim Regulation of Export Products, vitamin C was listed as one of 38 products subject to quota administration because they were deemed "of great importance to China's export."[37] Such products were "uniformly regulated and coordinated by the respective Import and Export Chambers of Commerce."[38] Not only were all companies "engaged in producing and selling [such] goods" required to join the relevant Chambers, but the Chambers were required to adopt "specific coordination and regulation method[s]," which were to be "strictly implemented *after discussion and approval by the member meetings*."[39]

In 1995, three of China's Vice Premiers directed MOFTEC to focus specifically on competition issues in the vitamin C industry.[40] "Following these instructions, in [early] 1996, MOFTEC held an emergency meeting with [*inter alia*] the main exporters and manufacturers [of vitamin C], the Chamber and officials from the State Drug Administration . . . ."[41] The purpose of the meeting was to "strengthen the regulation of vitamin C export, protect the hard-earned

---

[36] Notification of Adjusting Export Good Classification Catalogue and Strengthening the Regulation of Export Goods, Marketing and Sales, MOFTEC (January 23, 1990), at 2 (Chan Decl., Ex. 17).

[37] Interim Regulation of Export Goods, MOFTEC (promulgated on December 29, 1992), Order No. 4, at p. 1 (Chan Decl., Ex. 18).

[38] *Id*. at 1-2.

[39] *Id*. at 2 (emphasis added).

[40] Shen Rep. at ¶ 51 (Chan Decl., Ex. 4).

[41] *Id*.

international market share, and promote the healthy development of [vitamin C] export."[42]  As subsequently reported to the State Council, the meeting identified several important problems facing the industry, including inadequate export prices and excessive numbers of competing export firms.[43]  In the government's view, low price competition and export disorder represented "serious hidden dangers to [China's] vitamin C export's further healthy development."[44]

### 3.   Establishment of the Vitamin C Subcommittee

As a result of the Chinese government's concerns about the state of the country's vitamin C export trade, MOFTEC and the SDA directed the Chamber to establish a specific "Vitamin C Subcommittee" within the Chamber.  The purpose of doing so was

> to rectify the operational order and optimize the operational team of vitamin C export, realize the scale-operation on export, improve the competitiveness of [Chinese] vitamin C products in the international market, promote the healthy development of vitamin C export and maintain the interest of [China] and [its] enterprises .
> . . .[45]

According to that same Notice, "[t]he main responsibilities of [the Vitamin C Subcommittee] are to coordinate with respect to vitamin C export market, price and customers … ."[46]  The Notice further instructed the Subcommittee to "timely organize meetings for the major vitamin C export enterprises according to the domestic and international market development, to conduct studies on market strategies, timely formulate and adjust export

---

[42] Emergency Notice of Holding Vitamin C Export Work Meeting, Foreign Trade Regulation Department of MOFTEC (January 31, 1996), at 2 (Chan Decl., Ex. 19).
[43] *See* MOFTEC's Report to State Council Concerning Current Vitamin C Export Issues and Suggestions for Solutions, Wu Yi (1996), Waijingmao Guanfa No. 185, p. 1-2 (Chan Decl., Ex. 20).
[44] *Id.* at 3.
[45] 1997 Notice Relating to Strengthening the Administration of Vitamin C Production and Export (promulgated by MOFTEC on November 27, 1997), Guan Fa No. 664, introductory para. (Chan Decl., Ex. 21).  This 1997 directive predates the Chamber's subsequent 1998 request, pursuant to that directive, for approval of an implementing charter.
[46] *Id.* at para. 6.

coordination price, which the vitamin C enterprises must strictly implement in accordance with."[47]

MOFTEC thereafter approved creation of the Subcommittee in 1998, including its responsibility for "coordinating…vitamin C export market, price and customers . . . ."[48] Subcommittee membership was mandatory in order to maintain the right to export vitamin C.[49]

### 4.      Regulation Prior to the End of 2001

The foregoing events established both the structural framework for regulation of vitamin C export trade and its rationale.  Although, as we explain below, the mechanisms that the Chamber and the Vitamin C Subcommittee used to implement the government's policy goals have evolved over time, the policies themselves have remained constant and furnish both the backdrop for understanding China's regulatory framework as well as an explanation of why MOFCOM has advised the Court categorically that the activities challenged here were undertaken pursuant to government regulation in furtherance of China's national interests.

Plaintiffs allege that the agreements to coordinate vitamin C prices through the Vitamin C Subcommittee began only at the end of 2001.  However, the record shows that the Subcommittee was mindful of its obligations and provided active control over the country's vitamin C export trade from its inception.  The record further shows that MOFTEC, itself, played an active role in the regulatory process.

---

[47] *Id.* para. 7.  "The Subcommittee performs coordination, direction, consultation, service and supervision & inspection functions over its members."  Charter of Vitamin C Subcommittee of China Chamber of Commerce of Medicines and Health Products Importers and Exporters (promulgated on Oct. 11, 1997), Art. 5 (Chan Decl., Ex. 22).

[48] MOFTEC Approval for Establishing VC Sub-Committee of China Chamber of Commerce of Medicines and Health Products Importers & Exporters (promulgated on March 23, 1998), Ren Lao Zi No. 175, at para. 1 (Chan Decl., Ex. 23).

[49] 1997 Notice Relating to Strengthening the Administration of Vitamin C Production and Export (promulgated by MOFTEC on November 27, (1997), Guan Fa No. 664, para. 6 ("All enterprise[s] qualified to operate Vitamin C export *shall* participate in such Coordination Group . . . .") (emphasis added) (Chan Decl., Ex. 21).

For example, a 1997 MOFTEC and SDA regulation states that the "scale" of VC production "shall be strictly controlled[;]" that MOFTEC and the State Drug Administration intended to consult with each other about export volume and quotas; that the Chamber was expected to "improve the coordination on Vitamin C export" and "timely report to MOFTEC about the relevant issues and problems[;]" that exporters were expected to "report the export situations to the chamber at regular intervals[;]" and that any company violating its obligations would face a reduction, or even a loss, of its export quota.[50]

In early 1999, the Chamber convened a general meeting of the Vitamin C Subcommittee, which was attended not only by representatives of the Chamber and the manufacturers, but also by officials from MOFTEC. The Subcommittee was praised for its work in "market" and "price" coordination, including punishing deviations.[51] A report of the meeting indicates that the Subcommittee expressed its gratitude for the "leadership" of the Chamber and for "the support of [various government departments] such as the MOFTEC Department of Trade Administration . . . ."[52]

Government representatives from the Foreign Trade Department of MOFTEC also met in late 2000, to review and renew past production quotas. Echoing the words of governmental policy pronouncements from the 1990s, the head of the Chamber reminded the exporting manufacturers of their duty to "unite together [and] act in unison to face the foreign [parties]" in order to "strive to gain more benefits in exporting VC."[53] The parties further discussed a mandated minimum price of $5.10/kg. that previously had been put into effect.[54] In light of

---

[50] *Id.* at paras. 1, 5, 9, 10; *see also* Speta Rep. at ¶ 26 (Chan Decl., Ex. 5).
[51] Notice Regarding the Distribution of Documents, Including Minutes of the Third Meeting of the Members of the Vitamin C Subcommittee (February 1, 1999), Bates No. NEPG075766, at 2 (Chan Decl., Ex. 24).
[52] *Id.*
[53] Notes from the Sixth General Meeting of Members of the Vitamin C Branch (December 4, 2000), Bates No. NEPG 042592, at 1 (Chan Decl., Ex. 25).
[54] *Id.* at 2.

then-existing conditions, the Subcommittee members suggested terminating that export price.[55]

Qiao Haili, the presiding Secretary-General of the Subcommittee, replied that he would report on

that recommendation to MOFTEC in order to seek its "approval."[56]

Of particular note, at a meeting held in April 2001 – only a few months before the

supposed conspiracy allegedly was formed – a senior MOFTEC official reminded the

Subcommittee members that vitamin C "has been strictly regulated since 1997."[57]  He continued:

> MOFTEC attaches importance to the establishment and
> development of the Chamber and requires the Subcommittee to act
> proactively.  *Enterprises need to obey the industry agreements and
> industry rules.  When enterprises are maximizing their profits, they
> also need to consider the interest of the State as a whole.*[58]

### 5.    Regulation of Vitamin C During the Alleged Conspiracy Period

Although Plaintiffs assert that the conspiracy in this case began at a meeting in November

2001, the preceding discussion shows that there was no such "bright line" divide between that

meeting and the meetings that had been convened by the Chamber through its Vitamin C

Subcommittee in prior years.  To the contrary, the Vitamin C Subcommittee had been meeting

periodically since its creation in order to carry out the government's policy-based mandate that

had led to its formation in 1997.

The event that prompted the November 2001 meeting was the EU's threat of an anti-

dumping case against the industry.  That threat, in turn, prompted diplomatic notes from Chinese

Missions in Europe to MOFTEC expressing a fear that the U.S. might follow suit, and

MOFTEC's forwarding of the report to the Chamber for review and deliberation.[59]  The

---

[55] *Id.*
[56] *Id.*
[57] Deposition Exhibit 173, Memorandum, April 13, 2001, Bates No. JJPC0043064-66, at 2 (Chan Decl., Ex. 26).
[58] *Id.*  (emphasis added).
[59] Brussels Newsletter, dated September 19, 2001, Issue No. 270, titled "Our Vitamin C Is In Danger of An
Antidumping Suit by the European Union," Bates No. JJPC0049428 (Chan Decl., Ex. 27); Fax from German
Embassy Commercial Counselor's Office to MOFTEC Department of Treaty and Law, dated November 5, 2001,

response, consistent with prior meetings and with implementation of Chinese government policy, was to "enhance[e] the self-discipline of the industry" through an agreement to maintain prices and "restrict[] the export volume" to 35,500 tons overall, with specific allocations further agreed to.[60] This was not the first time that the Chamber had insisted on such explicit quotas; the record reflects similar allocations going back several years.[61]

While the purpose and approach of the Chamber (acting through the Subcommittee) remained constant, China's accession to the WTO at the end of 2001 prompted the government to revise some of its regulatory mechanisms governing export trade, including its regulation of vitamin C. Thus, in mid-2002, China instituted a new approach, abolishing quotas and instead continuing review and control under Chamber auspices through a new system called "verification and chop."[62] That system was aimed both at avoiding anti-dumping cases and dealing with the continuing challenges to market order from excess production and intermittent "malignant" price competition.[63] The Chinese government continued to require vitamin C exporters to be members of the Vitamin C Subcommittee and comply with the industry coordination process implemented through the Chamber and the Vitamin C Subcommittee.[64] In accordance with the procedures set forth by MOFCOM and the General Administration of Customs, exporters of vitamin C were required to obtain specific clearance of export sales contracts (evidenced by an official seal, or "chop") certifying that the Chamber verified, "*i.e.,*

"Regarding European Union May Bring An Antidumping Suit Against Our Vitamin C" (forwarded to the Chamber on November 7, 2001), Bates No. JJPC0055588 (Chan Decl., Ex. 28).
[60] China Chamber of Commerce of Medicines & Health Products Importers & Exporters, Notice for Distributing Minutes of Meeting by Heads of Vitamin C Manufacturers, (November 20, 2001), Yi Shang Zi No. 112, Bates No. JJPC0043068-73 (Chan Decl., Ex. 29).
[61] *See* Document of Jiangsu Jiangshan Pharmaceutical Co., Ltd., Report Regarding Applying To Borrow VC Export License In Advance (January 10, 1996) Jiang Yao (96) Zi No. 007, Bates No. JJPC0055625 ("MOFTEC approved our company's export quota to be 3,500 tons in 1995.") (Chan Decl., Ex. 30).
[62] 2002 MOFTEC and Customs Notice, Notice Issued by the MOFTEC and the General Administration of Customs for the Adjustment of the Catalogue of Export Products Subject to Price Review by the Customs (promulgated by MOFTEC on March 29, 2002), Mao Fa No. 187 (Chan Decl., Ex. 31).
[63] *Id.*, preamble.
[64] *Amicus* Submission at pp. 14-15 (Chan Decl., Ex. 1).

approved, the contract price and volume."[65]  Only with this "verification and chop" could the

exporter get approval from the General Administration of Customs to export.[66]

Through this mechanism, the Chamber also continued its general oversight of export

volume and price in the vitamin C industry, convening meetings, as conditions warranted, to

discuss and implement agreements to maintain export pricing order, mainly through compelled

reductions in output.[67]  According to a MOFTEC notice about the revised system, one purpose

was to "accommodate the new situation[] since China's entry into [the] WTO . . . ."[68]  However,

the new system also was meant to "maintain the order of market competition…promote industry

self-discipline and facilitate the healthy development of exports."[69]  The same notice further

asserted that the new system was based on a process of "industry-wide negotiated prices . . . ."[70]

Its approach, the Ministry explained, would be "convenient for exporters while it is conducive

for the Chambers to coordinate export price and industry self-discipline."[71]

Whatever new mechanisms may have been put into operation in 2002, there is no

indication that China intended to abandon the basic trade policies that had led to creation of the

regulatory regime that operated in the 1980s and 1990s.  To the contrary, concern with excessive

competition remained an important matter for the Chinese – indeed, it remains so today (*see* pp.

---

[65] *Id.* at p. 14; *see* Public Notice Issued by MOFCOM and General Administration of Customs of the PRC, dated November 29, 2003 (2003), No. 36., Ex. 2 at para. C (Chan Decl., Ex. 32).

[66] *Amicus* Submission at p. 14 (Chan Decl., Ex. 1).

[67] These reductions, resulting from self-discipline discussions among the members, were not voluntary.  Thus, in 2004, when Weisheng took a different view of what its production shutdown should be, it was forced to go along "under the mandatory requirement of the Chamber," and was penalized for a temporary failure to acquiesce by not being allowed to run a production line.  Excerpts of transcript of June 12, 2008 deposition of Feng Zhenying ("Feng Tr."), 83:8-19, 86:24-87:8 (Chan Decl., Ex. 33); *see also* excerpts of transcript of July 3, 2008 deposition of Wang Qi ("Wang Tr."), 202:20-203:7 (Chan Decl., Ex. 34); June 2004 Work Summary, Import/Export Department, dated July 4, 2004, Bates No. JJPC 036840, p. 2 (Chan Decl., Ex. 35).

[68] 2002 MOFTEC & Customs Notice, Notice Issued by the Ministry of Foreign Trade and Economic Cooperation and the General Administration of Customs for the Adjustment of the Catalogue of Export Product Subject to Price Review by the Customs (promulgated March 29, 2002, Effective May 1, 2005), Mao Fa No. 187, introductory para. (Chan Decl., Ex. 31).

[69] *Id.*

[70] *Id.* at 2, para. 3.

[71] *Id.* at 2, para. 4.

45-46, *infra*) – as does its interest in ensuring the success of key industries (including vitamin C). According to a 2003 statement from the Chamber, it "accepts the guidance and supervision of the responsible departments under the States Council" and has the "very purpose," *inter alia*, to "maintain business order and protect fair competition," while "safeguard[ing] the legitimate rights and interests of the state, the trade and the members . . . ."[72]

The record shows that the Chamber continued to be actively involved in price and output discussions and that it was responsible for convening Defendants to address price and output issues when it believed that such action was required. *Every meeting* referenced in Plaintiffs' Third Amended Complaint was called, and presided over, by the Chamber – a fact that belies any suggestion that Defendants were operating their own private cartel outside the orbit of the Chinese government and its policy objectives.[73]  Thus, as Professor Shen states:

> [B]oth before and after the commencement of the period in which Defendants are alleged to have acted illegally under U.S. antitrust law, the vitamin C manufacturers were required to act in accordance with the same policy and to do so by participating in the activities of the Chamber's Vitamin C Sub-committee.[74]

That, of course, is not just the position of Defendants or their expert, but also of the Chinese government, which has advised the Court that the actions Defendants took during the alleged conspiracy period were required by the government.  Referring to that period, the government's submission to this Court states:

> Each defendant conducted itself as Chinese law required when it participated in Sub-Committee meetings at which agreements were reached with respect to pricing and volume controls.  Refusal to subject oneself to the coordination of the Sub-Committee and the Chamber is unlawful under relevant regulations and would result

---

[72] China Chamber of Commerce of Medicines and Health Products Importers & Exporters, Publication of Administration and Regulation, at p. 4. (Chan Decl., Ex. 15).
[73] Wang Tr. at 221:21-222:3 (Chan Decl., Ex. 34).
[74] Shen Rep. at ¶ 57 (Chan Decl., Ex. 4).

in severe punishment, either through monetary penalty or loss of ability to participate in the industry altogether.[75]

6.     **The Self-Discipline System**

    a.     **The Principle of Self-Discipline**

The essence of the regulatory structure that operated both prior to 2001 and, to an even greater extent thereafter, is a long-standing principle of Chinese society known as "self-discipline." The fact that self-discipline is a uniquely Chinese principle makes an explanation of the process somewhat complicated. At base, however, the concept is that parties who are subject to the obligation of self-discipline are expected to understand what is required of them (*i.e.,* the objective to be achieved) and, then, through their own efforts, find a way to achieve that objective, thereby fulfilling their obligations to the regulatory authority.

Although the self-discipline process can be described as "voluntary" in the sense that it is meant to work through consensus, it is emphatically *not* voluntary in terms of (a) participation in the process and (b) the obligation to reach a solution that effectuates the underlying national policy that it is designed to further. Explaining the concept in his Report, Professor Shen states:

> In China's regulatory context enterprises are expected to discuss matters among themselves with a view towards reaching a consensus as to how best to go about furthering the required coordination in a manner consistent with "the interest of the State as a whole" and, in doing so, are expected to follow Chinese laws, and regulations under the leadership of the Chambers of Commerce....
>
> Properly understood, what the government is compelling is the active participation of the industry in a mandated process which must be obeyed. Chinese governmental control is a quite different process from what takes place in other countries, and the fact that...terms such as "self-discipline" or "voluntary self-restraint"

---

[75] *Amicus* Submission at p. 21 (Chan Decl., Ex. 1).

> are used does not change the forcefulness or compulsion which
> attaches to such directives when given in China . . . .[76]

Defendants' obligation to engage in this self-disciplinary process is not merely implied.

Thus, the 2002 Charter of the Subcommittee expressly refers to it as "a self-disciplinary industry

organization" composed of vitamin C exporters.[77]  The 2002 Charter also specified objectives

that were to be met through the process of self-discipline.  They include "coordinat[ing] and

guid[ing] the vitamin C import and export business…maintain[ing] the normal working order of

vitamin C import and export operations, … ensur[ing] fair competition, … protect[ing] the

national interest the legal rights and interests of its members and . . . promot[ing] the healthy

development of the vitamin C import and export trade."[78]  Notably, these principles track almost

identically the statements of purpose that were enumerated in the original 1997 Charter.

Even more directly, Article 8 of the 2002 Charter states that one of the "functions" of the

Subcommittee was to "coordinate and guide vitamin C import and export business activities,

promote self-discipline in the industry, maintain the normal order of vitamin C import and export

operations and protect the interests of the state, the industry and its members."[79]  Members –

anyone who wished to export vitamin C – were expected to "comply" with the Charter, which

included the "[o]bligations" to "[i]mplement the resolutions and agreements of the

Subcommittee" and to "[a]ctively participate in various activities organized by the Subcommittee

. . . ."[80]  Any member who "fail[s] to implement the resolutions of the Subcommittee" or "fail[s]

---

[76] Shen Rep. at ¶¶ 72, 75 (Chan Decl., Ex. 4).
[77] Charter of Vitamin C Sub-Committee of China Chamber of Commerce of Medicines and Health Products
Importers and Exporters (2002) Bates No. JJPC0055589, at Section 1, Article 3 (Chan Decl., Ex. 36).
[78] Id. at Section 1, Article 4.
[79] Id. at Section 2, Article 8.
[80] Id. at Section 3, Article 17(1)-(4).

to implement the industry agreements" shall be "punish[ed]" through "criticism, . . . warning, temporarily suspen[ded] membership, and termination of membership."[81]

### b.  Self-discipline in Operation

Consistent with the structure described above, the record shows that the Chamber convened Defendants when it believed that market conditions so required in order to evaluate the companies' pricing and other behavior in light of prevailing industry circumstances.  The Chamber called these meetings with the objective of reaching a self-disciplined consensus consistent with its delegated responsibility to implement MOFCOM policy.  The companies gave candid input and freely expressed disagreements, as the process of self-discipline contemplated they would.

Reaching consensus was not always a simple or speedy process.  As Plaintiffs have pointed out, there are a number of documents that speak in the language of consensus.  But, for the reasons that already have been described, those documents are wholly consistent with the unique Chinese principle of self-disciplinary regulation.  As Professor Shen explains:

> [A]lthough there are documents indicating that on occasion there were extended discussions, and occasions where agreements were not reached, this does not demonstrate a lack of compulsion or regulation, but rather is inherent in the idea that the parties were mandated to engage in self-discipline to achieve basic policies, but had freedom in deciding the manner in which coordination was to be achieved consistent with national goals.[82]

The Chamber relied mainly on production restraints and inventory controls to maintain industry profitability and stability during the alleged conspiracy period.  Thus, documents from this period repeatedly refer to the Chamber directing the parties to agree upon coordinated

---

[81] *Id.* at Section 3, Article 19.
[82] Shen Rep. at ¶ 73 (Chan Decl., Ex. 4).

production shutdowns in order to curb excessive price competition.[83]   Additionally, also in place was a $3.35/kg. minimum price that was constant throughout the period, as well as periodic prices set above this level, as discussed and set by the Subcommittee from time to time in the performance of its self-discipline responsibilities.   However, those price agreements were less prominent and the notes of Subcommittee meetings during this period focus increasingly on production stoppage agreements or agreements to store inventories in a common warehouse in order to reduce export quantities.   For example, at a December 2005 meeting presided over by Qiao Haili, of the Chamber, Defendants scheduled a "suspension of production" that was to be enforced by inspection; "[i]f production is not suspended in accordance with the schedule, the Chamber of Commerce will stop issuing export verification and approval seals until the enterprise suspends its production."[84]

Equally notable, far from concealing its efforts in the manner of a clandestine cartel, the Chamber – consistent with its government-delegated function – openly reported the Subcommittee's accomplishments on its public Web site.   Commenting on that public posting by the Chamber, the Chinese government stated the following in its *Amicus* Submission:

> The vitamin C industry was under a direct Ministry order to reach a "coordinated" agreement in order to stabilize export pricing. Thus, it is understandable that the Chamber would express its pleasure publicly that the parties were able to comply with the Ministry's order to coordinate pricing and quantities on their own (i.e., "voluntarily" and in "self-restraint") as opposed to requiring more direct Ministerial intervention to reach that result. Indeed...this regulatory system was expressly enacted "to promote [among other things] industry self-discipline."[85]

---

[83] *See id.* at ¶ 61; Weekly Work Report (Week 36th) (September 30, 2006), Bates No. NEPG 035282, at 1 ("various VC manufacturers in China will successively suspend production...") (Chan Decl., Ex. 37); Minutes of November 16, 2005 meeting, Bates No. JJPC0043567-43567.03, at 3 (reflecting that Qiao Haili of the Chamber was to follow up and determine with the "Chairman of the Chamber" "[w]hether we should have a production shutdown ...") (Chan Decl., Ex. 38).

[84] Chamber of Commerce Meeting Minutes (December 23, 2005), Bates No. JJPC0040755 (Chan Decl., Ex. 39).

[85] *Amicus* Submission at p. 13, n.12 (Chan Decl., Ex. 1).

Elaborating on this same point in a supplemental Statement in June 2008, the government reiterated that, as had been "explained in the Ministry's *amicus* brief,"

> the system of regulation that the Ministry imposed on China's vitamin C export industry centered around a process not a price....[T]he Ministry specifically charged the [Chamber] with the authority and responsibility, subject to Ministry oversight, for regulating, through consultation, the price of vitamin C manufactured for export from China so as to maintain an orderly export.[86]

### 7.    Summary

In short, vitamin C has been regulated by the Chinese government for many years as one of China's strategic products, which the Chinese government considers important to the country's economic development.  Summarizing the situation, Professor Shen states:

> In the case of vitamin C, the Defendants were at all times required to act in a coordinated fashion consistent with government economic policy and the national interest in avoiding harmful export competition.  In reaching agreement as to specific actions, the parties were acting pursuant to a regulatory process that is well-understood and applied broadly in China, known as "self-discipline."
>
> ...
>
> *It is important to understand that the mandatory policy goals themselves were neither subject to debate, nor could they be ignored. The policy of the government was mandatory and participation in the process designed to implement that policy was mandatory.*  Thus, at all times it was mandatory for companies subject to regulation under a regime of self-discipline to participate in the government's mandated process in order to further China's goals of avoiding harmful and destructive forms of competition.[87]

Those comments, in turn, are echoed by the Chinese government, itself, in its submissions to this Court:

---

[86] Ministry of Commerce of the People's Republic of China, Statement in *In re Vitamin C Antitrust Litigation,* dated June 9, 2008, at 2 (Chan Decl., Ex. 3).
[87] Shen Rep. at ¶¶ 11-12 (emphasis added) (Chan Decl., Ex. 4).

[W]hile China is in the process of moving actively from its former state-run command economy to a market economy more of a type familiar to the United States, the current economic system is transitional and there remains a level of active state direction and coordination that has no analogue in the United States. Thus, for example, one would not find in the United States a government mandate to "maintain order in market competition," to "promote industry self-discipline," or to mandate export pricing and output levels "based on the *industry agreements*"; nor would one find a governmentally-directed organization, such as the Chamber, directing parties to attend meetings, such as those referred to in the complaints, to discuss prices or export quotas, with a view to maximizing industry profitability in export commerce.

That, however, is precisely the transitional framework under which the vitamin C industry functioned throughout the [alleged conspiracy period]. Thus, while the Government did not, itself, determine specific prices or quantities, it most emphatically did insist on those matters being determined *through industry coordination*. That…is conduct that was compelled by the Chinese government in the interests of insuring "order in market competition."[88]

## III. DISCUSSION

Although the procedural posture of the litigation is materially different from what it was in November 2008, we do not write on a clean slate in terms of the issues that are critical to the disposition of the litigation. Now, as before, Defendants agree with the Court that "[a]ll three of defendants' defenses rest on the proposition that their [actions were] due to acts of the Chinese government." *In re Vitamin C*, 584 F. Supp. 2d at 557. Similarly, the Court has correctly pointed out that, although foreign compulsion, act of state and comity have different "doctrinal underpinnings" and, hence, involve somewhat different proof, they, too, "are all premised on an act by a foreign government." *Id.* at 550. Given the prior proceedings in the case, Defendants do not propose to re-plow old ground or restate the basic legal principles relevant to the defenses they assert. Instead, we believe that the Court would be better served by our focusing on areas

---

[88] *Amicus* Submission at pp. 17-18 (Chan Decl., Ex. 1).

and issues that have been illuminated by the proceedings in this case subsequent to Defendants'
Rule 12 motion.

Simply put, the overriding issue presented here is whether the conduct that Plaintiffs
allege involved actions that Defendants took on account of the requirements of Chinese law.
Defendants say that it did, and their position is supported not only by the reports of experts on
Chinese law and regulated industries, respectively, but by the government of China.  In the
absence of any competing expert opinion on behalf of Plaintiffs, that issue comes down to
Plaintiffs' request for this Court simply to disregard those submissions – including the statements
of the Chinese government.  That is a burden that Plaintiffs cannot carry with respect to any of
the three grounds asserted as a basis for the present motion.  Before turning to those issues,
however, three preliminary points need to be addressed: *first*, the nature of the present motion
and the standard under which it should be considered; *second*, the weight to be given to the
statements that the Chinese government has submitted to the Court and, *third*, the record.

A.      **The Applicable Legal Standard**

This is a motion in the alternative, either for summary judgment under Rule 56, or for
determination of foreign law and for entry of judgment based upon such determination under
Rule 44.1.  Under either approach, Plaintiffs cannot defeat Defendants' motion simply by
presenting supposedly disputed issues of "fact" regarding the nature and operation of Chinese
law.  We are aware of no case in which the defenses of sovereign compulsion or act of state (let
alone international comity) have been the subject of a trial.  To the contrary, these defenses have
been adjudicated under Rule 12 as a pleading matter – either for failure to state a claim or, on
occasion, for lack of subject matter jurisdiction, *see, e.g., Van Bokkelen v. Grumman Aerospace
Corp.*, 432 F. Supp. 329 (E.D.N.Y. 1977); *Hunt v. Mobil Oil Corp.*, 410 F. Supp. 10 (S.D.N.Y.
1975) *aff'd*, 550 F.2d 68 (2d Cir. 1977); *Trugman-Nash, Inc. v. New Zealand Dairy Bd.*, 954 F.

Supp. 733 (S.D.N.Y. 1997) – or have been resolved at the summary judgment stage. *See, e.g.*, *Interamerican Refining Corp. v. Texaco Maracaibo, Inc.*, 307 F. Supp. 1291 (D. Del. 1970).

Courts are divided about the proper procedural approach because the issues of sovereign compulsion, act of state and comity do not fit neatly into any specific procedural "box." That is true, in large measure, because of the nature of the inquiry that a court is called upon to make in a case in which the central issue is the meaning and requirements of foreign law. However, regardless of approach, it is clear that such a determination does not involve questions of fact, even though a determination of such questions may involve an inquiry into the "fact" of what the relevant law is. *See* Fed. R. Civ. P 44.1 and Advisory Comments. Rather, the content and operation of foreign law is an issue of law to be determined, in the first instance, in the district court, subject to *de novo* review on appeal. *Id.*; *see also Curley v. AMR Corp.*, 153 F.3d 5, 11 (2d Cir. 1998) ("[P]ursuant to Fed. R. Civ. P. 44.1, a court's determination of foreign law is treated as a question of law.") (citing *Seetransport Wiking Trader Schiffahrtsgesellschaft MBH & Co. v. Navimpex Centrala Navala*, 29 F.3d 79, 81 (2d Cir. 1994) ("Because questions of foreign law are treated as questions of law under Fed. R. Civ. P. 44.1, we subject the District Court's determinations on the foreign law issues to *de novo* review.")).

As determinations of foreign law are questions of law for the court, summary judgment is the appropriate stage at which to resolve disputes regarding the interpretation, content, and application of such law. *Kashfi v. Phibro-Salomon, Inc.*, 628 F. Supp. 727, 738 (S.D.N.Y. 1986); *accord Financial Matters, Inc. v. Pepsico, Inc.*, 1993 WL 378844, *5 (S.D.N.Y. Sept. 24, 1993) ("Disputes over foreign law raise issues of law, not fact, and summary judgment is still an appropriate remedy.") (granting defendants' motion for summary judgment) (omitting citations); *Instituto Per Lo Sviluppo Economico Dell'Italia Meridionale v. Sperti Prods., Inc.*, 323 F. Supp.

630, 635 (S.D.N.Y. 1971) (Summary judgment appropriate for question of foreign law).

Moreover, conflicting evidence or expert opinions regarding foreign law do not preclude

summary judgment. *See Access Telecom, Inc. v. MCI Telecomm. Corp.*, 197 F.3d 694, 713

(5th Cir. 1999) ("[D]ifferences of opinion among experts on the content, applicability or

interpretation of foreign law do not create a genuine issue as to any material fact under

Rule 56.") (omitting citation); *Rutgerswerke AG v. Abex Corp.*, 2002 WL 1203836, at *16

(S.D.N.Y. Jun 4. 2002). In short, when all that is in dispute is foreign law, as is the case here,

there is no material issue of fact to proceed past the summary judgment stage. *United States v.*

*BCCI Holdings (Luxembourg), S.A.*, 977 F. Supp. 1, 6 (D.D.C. 1997) ("Any difference of

opinion that the parties or their experts may have regarding the interpretation of a provision of

foreign law does not create a genuine issue of material fact.") (citations omitted).

This point was addressed in a directly pertinent context in *Interamerican Refining Corp.*

*v. Texaco Maracaibo, Inc.*, *supra*, 307 F. Supp. 1291. In considering the defendants' motion for

summary judgment on the ground that a ministry of the Venezuelan government required the

conduct at issue, the plaintiffs urged that whether the "action taken by the Ministry" had been

compelled was "a question of fact" to be resolved at trial. *Id.* at 1301. The court rejected that

argument even though it acknowledged that "whether or not a foreign official 'ordered' certain

conduct is an evidentiary question." *Id.* Rather, it held that the only issue properly before the

court was the "existence" of the government action because "[o]nce governmental action is

shown, further examination is neither necessary nor proper." *Id.*

Summary judgment, therefore, is appropriate here even though Plaintiffs may assert that

there is evidence of a conflicting nature regarding compulsion. As Defendants explain below,

that conflict is more apparent than real since adherence to the goals and the process of self-

discipline that the government compelled is not inconsistent with internal debate and disagreement among Defendants. *See* pp. 47-48, *infra*. More important, as just noted, determining what Chinese law requires is not precluded by such supposed "fact" differences in any event because that determination is an issue of law, not fact.

For the same reasons, Defendants motion also may be addressed directly under Rule 44.1 and Defendants, therefore, move in the alternative for a determination of foreign law under Rule 44.1 and for entry of judgment based upon such a determination. While Rule 44.1 does not, by its terms, contemplate a specific "motion" for determination of the content of foreign law, several cases (including at least one antitrust case) have entertained such motions. *See United States v. Mitchell*, 985 F.2d 1275,1280 (4th Cir. 1993) (motion under parallel Fed. R. Crim. P. 26.1); *Coastal States Marketing, Inc. v. Hunt*, 694 F.2d 1358, 1370 (antitrust action referencing "Defendants' Motion to Determine Foreign Law"); *El Pollo Loco, S.A. de C.V. v. El Pollo Loco, Inc.*, 344 F. Supp. 2d 986, 987 (S.D. Tex. 2004) (same).

As this Court has recognized, the central issue in this case is whether Defendants' actions were taken as a result of the requirements of Chinese law. That issue is now in the correct posture for determination, and the Court has at its disposal sufficient procedural tools to resolve it definitively.

**B.      The Effect of the Government of China's Statements Regarding the Nature of Chinese Law Applicable to This Case**

Determining foreign law sometimes entails a complex inquiry involving expert submissions or, even, independent inquiry by a court. That process is greatly simplified here, however, because China has submitted multiple statements to the Court describing the nature of its laws and regulatory policies applicable to vitamin C exports, and it has advised the Court in

unambiguous terms that Defendants' allegedly unlawful conduct was required by the Chinese government.

There is only a narrow range of disagreement regarding the effect of such submissions. Defendants maintain that China's statements deserve conclusive weight, thereby entitling them to judgment in this case without more. In its opinion denying Defendants' Rule 12 motion, on the other hand, the Court concluded that the government's statements are entitled to "substantial deference," but are not conclusive. *In re Vitamin C*, 584 F. Supp. 2d at 557. Defendants continue to believe that the submissions of the Chinese government should be regarded as conclusive for reasons that we now explain. However, "substantial deference" is a more than sufficient basis for the Court to grant Defendants' motion in this case.

1.     **Conclusive Effect**

Several decisions of the United States Supreme Court and the Court of Appeals for the Second Circuit say that the official statement of a foreign government as to the meaning and operations of its laws must be deemed conclusive by a United States court. *See, e.g., United States v. Pink*, 315 U.S. 203, 218-21 (1942); *Banco de Espana v. Federal Reserve Bank of New York*, 114 F. 2d 438, 443 (2d Cir. 1940); *Agency of Canadian Car & Foundry Co. v. American Can Co.*, 258 F. 363, 368-69 (2d Cir. 1919). Moreover, the submissions by the Chinese government in this case are not limited to a description of applicable law, but include direct and unequivocal representations that the Chinese government compelled the conduct that Plaintiffs challenge.

The United States has taken the position in both litigation and official agency policy statements that such representations should be deemed conclusive. That position was articulated initially in an *amicus curiae* brief filed by the United States in the so-called "Japanese Electronics Products Cases," in which the government urged the Supreme Court to reverse a

decision of the Third Circuit on the ground, *inter alia,* that the Japanese government had

submitted a clear statement that Japan had compelled the conduct at issue.  Brief for United

States as *Amicus Curiae* Supporting Petitioners in *Matsushita Elec. Co. v. Zenith Radio Corp.*

(No. 83-2004), 1985 WL 669667 (June 17, 1985) ("U.S. *Amicus* Br.").  According to the United

States, that statement should have been taken at "face value" as "conclusive" evidence of foreign

sovereign compulsion:

> Claims of compulsion are appropriately entertained when the
> foreign government, unambiguously informs the court that the
> conduct at issue was compelled, because in such instances the
> depth of that government's interest is most clearly expressed.
> When such a statement is submitted it generally should be deemed
> conclusive as to the existence and meaning of the foreign
> sovereign's domestic law.  *United States v. Pink,* 315 U.S. 203,
> 220 (1942).
> …
>
>  [Thus], [o]nce a foreign government presents a statement dealing
> with subjects within its area of sovereign authority… *American
> courts are obligated to accept that statement at face value*; the
> government's assertions concerning the existence and meaning of
> its domestic law generally should be deemed "conclusive."

U.S. *Amicus* Br. at *9, 22 (emphasis added).

The United States' brief in *Matsushita* explained that there is a delicate interplay between

litigation and foreign relations, particularly in the rare case where a sovereign government cares

enough to make its views known to the court through an official statement.  *Compare In re*

*Vitamin C*, 584 F. Supp. 2d at 556-57.  Thus, the government noted

> the "strong sense" repeatedly expressed by the judiciary that its
> involvement in the resolution of questions directly touching on the
> interests of other nations may in some circumstances "hinder rather
> than further this country's pursuit of goals both for itself and for
> the community of nations as a whole in the international sphere"—
> [matters that] traditionally have been regarded as central features
> of American jurisprudence."

S. *Amicus* Br. at *17-18 (citations omitted).

*Matsushita,* ultimately, was reversed by the Supreme Court without reaching the

sovereign compulsion issue. However, the United States has continued to adhere to its position

in that case. Thus, the 1995 Antitrust Enforcement Guidelines for International Operations,

issued by the Department of Justice (and the Federal Trade Commission), state that those

agencies "regard [a] foreign government's formal representation" that certain conduct was

compelled and subject to sanction for non-compliance as "sufficient to establish that the conduct

in question has been compelled as long as that representation contains sufficient detail to enable

the Agencies to see precisely how the compulsion would be accomplished under local law."[89]

There is a particularly strong policy reason for according definitive weight to

governmental submissions regarding compulsion in private antitrust actions because protection

of U.S. competition policy does not depend upon private judicial enforcement. While section 4

of the Clayton Act gives such parties the right to enforce the United States antitrust laws under

certain conditions, primary enforcement responsibility rests with the government itself.

Moreover, exercise of enforcement authority by the government is subject to precisely the kind

of balancing process that is meant to be applied where delicate foreign relations considerations

are implicated. The same is not possible where private plaintiffs sue. *See Hoffmann-LaRoche*

*Ltd. v. Empagran, S.A.,* 542 U.S. 155, 171 (2004) ("[P]rivate plaintiffs often are unwilling to

exercise the degree of self-restraint and consideration of foreign governmental sensibilities

generally exercised by the U.S. government.").

In concluding that "substantial," but not "conclusive" deference should be given to

China's statements in this case, the Court relied, principally, on a 2002 Second Circuit case,

---

[89] 1995 Antitrust Enforcement Guidelines for International Operations (promulgated by the Dept. of Justice, April 5, 1995) ("Antitrust Guidelines"), at § 3.32, available at http://www.usdoj.gov/atr/public/speeches/0166.htm (last accessed on August 20, 2009) (Chan Decl., Ex. 40).

*Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 313 F.3d 70, 92 (2d Cir. 2002). Upon closer scrutiny, however, *Karaha Bodas* does not support that standard in the current litigation.

As an initial matter, the Second Circuit's decision did not reject a standard of conclusive deference and, in fact, actually agreed with and adopted the foreign sovereign's interpretation of its laws. Moreover, not only did the Second Circuit fail to disavow or distinguish the earlier Supreme Court and Second Circuit cases mentioned above, but no party even cited any of those cases in their briefs.[90] Rather, the defendant cited and relied on an earlier Seventh Circuit decision, *In re Oil Spill by the Amoco Cadiz*, 954 F.2d 1279, 1312 (7th Cir. 1992).

That case did not involve a request for application of a "conclusive deference" standard, nor did *Access Telecom, Inc. v. MCI Telecomm. Corp.*, 197 F.3d 694 (5th Cir. 1999), which was cited by the court. *Access Telecom* did not involve a submission by a foreign government at all. The issue there was whether to give weight to a government publication (an Official Circular) that, arguably, was not even within the jurisdiction of the issuing agency and was ambiguous on its face. Given those facts, the Fifth Circuit understandably refused to "credit the [agency's] determination without analysis." 197 F.3d at 714. Equally important, the court contrasted the situation before it with the facts in *Amoco Cadiz*, in which "because the Republic of France was before the court…the Seventh Circuit accepted its interpretation of [its own] law." *Id.*

There also is an obvious distinction between a case, such as *Karaha Bodas* or *Amoco Cadiz*, where the government is a party to the litigation, and a case, such as *Matsushita* or the present litigation, in which the government offers its statement as a non-party. In the former

---

[90] *See Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, Brief of Respondent-Appellant, 2002 WL 32487752 (July 8, 2002); *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, Reply Brief of Respondent-Appellant-Cross-Appellee, 2002 WL 32487753 (July 24, 2002).

situation, giving conclusive weight to a litigant's assertions about a controlling issue in the case would allow one of the litigants to declare itself the winner of the lawsuit. (It is notable that, even in that situation, courts have held that the government's views about its own laws are entitled to substantial consideration. *See Karaha Bodas,* 313 F.3d at 92.) On the other hand, where the government, as a non-party, states that it compelled certain conduct, it does so not as a litigant seeking to protect its own rights, but as the entity that is best situated to describe the meaning and effect of its laws. In that circumstance, conclusive weight is appropriate.

### 2.      Substantial Deference

Even if the Court declines to give conclusive weight to China's statements regarding its law, the outcome is the same under a "substantial deference" standard. In fact, there is only a narrow difference between the two approaches. *See, e.g., Chevron v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844 (1984); *Singh v. Gonzales*, 468 F.3d 135, 138-39 (2d Cir. 2006). In *Chevron*, the Supreme Court stated that "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency" that is responsible for enforcement of the statute. 467 U.S. at 844. In applying *Chevron*, the Second Circuit has determined that "substantial deference" should be afforded to an agency's interpretation of the laws it administers. *Singh,* 468 F. 3d at 138. "Substantial deference" means that a court "reject[s] [the agency's] interpretation only if it is 'arbitrary, capricious or manifestly contrary to the statute.'" *Id.* at 138-39 (quoting *Evangelista v. Ashcroft*, 359 F.3d 145, 150 (2d Cir. 2004) and *Chevron*, 467 U.S. at 844)).

This approach has been applied to the representations of a foreign government regarding its laws. Thus, for example, in *Amoco Cadiz*, even though the Seventh Circuit was not asked to give France's interpretation conclusive weight, the court all but did so under the rubric of "substantial deference," stating that "[c]ourts of this nation routinely accept plausible

35

constructions of laws by the agencies charged with administering them . . . . Giving the conclusions of a sovereign nation less respect than those of an administrative agency is unacceptable." 954 F.2d at 1312 (omitting citations).

## C.     The Record.

Not only is the procedural posture of the litigation now materially different than it was when the issues raised here were presented previously, but so is the state of the record. In particular, Defendants have augmented the record with the reports of two experts, Professors Shen Sibao and James Speta. Plaintiffs do not respond directly to those reports. Instead, they have submitted the report of a "trade" expert, with no background or claimed expertise regarding China or Chinese law, whose "very narrow" purpose was simply to "compare and contrast" statements made and relied upon by the Chinese government (in its *Amicus* Submission) or by Professor Shen (in his Report) with various publicly-available English language documents. As a consequence, the state of the record is that Defendants' position is supported not only by the official statements of the Chinese government, but by the unrebutted report of an expert on Chinese law as well as that of an expert on American and comparative regulatory law.

Professor Shen Sibao is a noted Chinese legal scholar and a distinguished legal practitioner in China for over 25 years. He is the Dean of the Law School of the University of International Business & Economics in Beijing, a leading law school in China with a special focus on international law and economic law.[91]

As Defendants' many references to his Report above reflect, Professor Shen's submission

---

[91] *See* Shen Rep. at ¶ 1 (Chan Decl., Ex. 4). Professor Shen also has participated in the drafting and revision of the Foreign Trade Law, the Corporation Law and the Arbitration Law as well as regulations and administrative rules related to foreign trade issues. *Id.* at ¶ 4. In addition to his numerous other qualifications as described in his expert Report, Professor Shen serves as a Special Advisor to the Supreme People's Court and has acted as special counsel to MOFCOM on various matters. *Id.* at ¶¶ 1-5 & Appendix A .

is an important addition to the record in this case.[92] His Report places the vitamin C regulatory

scheme in its proper historical context by explaining the process of transforming China's

economy from a command economy to a modified market economy through an overview of the

relevant political and economic reforms as well as policy statements and speeches of Chinese

government officials.[93] He demonstrates that in the mid-1980s, as part of the reform of its

political and economic systems, rather than directing each individual company's business

activities, the Chinese government adopted administrative means to control and supervise foreign

trade on a macro-level to achieve its national policy objectives.[94] As a result, many Chinese

companies began to engage in aggressive forms of competition, which, in the view of the

Chinese government, was unacceptable and contrary to the country's national interest. This, in

turn, led the government to delegate its regulatory functions to entities, such as the Chamber, that

could coordinate and regulate market competition for purposes of advancing China's national

interests.[95] Professor Shen further demonstrates that vitamin C products have been subject to

active regulation by the Chinese government since at least 1990 and that the Chamber has been

given the authority and responsibility for the regulation and coordination of vitamin C exports.[96]

Similarly, Professor Speta, an expert on regulatory policy, explains the close analogy

between the regulatory structure described in the respective submissions of the Ministry and

---

[92] Because foreign governments do not often appear directly to explain their law to the court, "expert testimony is the most common way to determine foreign law...." *Inter Medical Supplies, Ltd. v. EBI Medical Systems, Inc.*, 181 F.3d 446, 459 (3d Cir. 1999) (omitting internal quotations and citations). In fact, absent direct presentations by the government, the "best source [of foreign law] is the expert who has studied the foreign law, has practiced law in the country of its origin, and who can translate and interpret it in the idiom of the American lawyer." Benjamin Busch, *Outline on How to Find, Plead, and Prove Foreign Law in U.S. Courts with Sources and Materials*, 2 Int'l L. 437, 439 (1967-1968) (Chan Decl., Ex. 41). *See also* 21 Am. Jur. Proof of Facts 2d 1, § 12 ("Frequently, the aid of an expert witness is desirable or even essential in relation to the interpretation and explanation of foreign written law, especially that of other than a common-law country."); *Noto v. Cia Secula Di Armanento*, 310 F. Supp. 639, 647 (S.D.N.Y. 1993) (granting defendants' motion for summary judgment on the basis of defendant's unchallenged foreign-law expert).
[93] *See, e.g.*, Shen Rep. ¶¶ 8, 21-31 (Chan Decl., Ex. 4).
[94] *Id.* at ¶ 23.
[95] *Id.* at ¶¶ 24-27, 30, 40, 42.
[96] *Id.* at ¶¶ 47-48, 63.

Professor Shen, and the approach to regulated industries in the U.S.  Professor Speta's central point is that there is a very close correlation between the type of regulation engaged in by China with respect to vitamin C and regulatory structures that are deemed lawful under U.S. antitrust law and policy.[97]

By contrast, Dr. Stern's Report is not a proper expert report at all.  It does not even purport to rebut the reports of either Professor Shen or Professor Speta.  To the extent that it addresses any issues relevant to the litigation, it fails, even on its own terms, to support the limited assertions that Dr. Stern makes about those matters.

Dr. Stern may well be credentialed in the field of "international trade."  However, that expertise is beside the point not only of the issues in this case, but of what Dr. Stern was asked to do as an "expert."  Specifically, Dr. Stern's assigned task was simply to read the submissions of the Chinese government and Professor Shen and then "compare and contrast" those submissions with statements in various other public documents authored by Chinese officials, among others.  In fact, Dr. Stern not only conceded that she is not an expert on Chinese law but she, herself, objected to a description of her work as "opining" on any subject whatsoever.[98]  Moreover, while the only conceivable purpose of what Dr. Stern has done is to seek to impeach the Chinese government's submissions in this case, she emphatically has distanced herself from any assertion that the Chinese government has made false representations to the Court.  To the contrary, Dr. Stern testified that she has "a very high respect for the government of China" and confirmed that "it certainly is not [her] intention to suggest that there was a – an attempt to mislead the Court."[99]

---

[97] *See generally* Speta Rep. (Chan Decl., Ex. 5).
[98] Excerpts of the transcript of the July 28, 2009 deposition of Paula Stern ("Stern Tr.") at 16:4-7; 75:23-76:11 (Chan Decl., Ex. 42).
[99] *Id.* at 38:14-38:23.

The only legitimate function of expert testimony is to provide evidence where lay people cannot be expected to comprehend the evidence on a particular subject because of the need for particularized knowledge or training. Reading documents in order to evaluate whether they say consistent or inconsistent things does not come close to meeting that standard. *See United States v. Cook*, 922 F.2d 1026, 1036 (2d Cir. 1991) ("Expert testimony is only admissible when such testimony is helpful to the trier of fact. Such testimony is unnecessary where the jury is capable of comprehending the facts and drawing the correct conclusions from them. Indeed, the judge in his discretion may exclude expert testimony when it is not helpful to the jury.") (citing Fed. R. Evid. 702; *Salem v. United States Lines Co.*, 370 U.S. 31, 35 (1962); *United States v. Schatzle*, 901 F.2d 252, 257 (2d Cir. 1990)).

The fact that Dr. Stern's Report is not proper expert testimony is reason enough not to consider it. Its deficiencies, however, are far more fundamental. While Dr. Stern offers her personal characterization of certain documents as being "contradictory," or as standing in "stark contrast" with the submissions of the Chinese government and Professor Shen in this case, that characterization fails even cursory scrutiny.[100]

The thrust of Dr. Stern's position is that various Chinese officials have asserted that China has become a "market economy." Those assertions, she states, contradict a claim that the Chinese government compelled Defendants to coordinate their pricing or production of vitamin C. But, an examination of what Dr. Stern cites (not to mention what she misstates or ignores) belies her proffered assessment. That is true for a number of reasons.

*First*, as Dr. Stern acknowledges, the term "market economy" is not a phrase for all seasons.[101] It requires context. That context in this case is competition, yet, all of the statements

---

[100] *See* Report of Dr. Paula Stern, dated June 5, 2009 ("Stern Rep.") at p. 5 (Chan Decl., Ex. 43).
[101] *See* Stern Tr. at 69:3-73:4 (Chan Decl., Ex. 42).

to which Dr. Stern's Report directs the Court were made in the context of international trade laws and disputes. Many of them, in fact, were made in the very specific context of anti-dumping and countervailing duty matters in which the term "market economy" is a term of art – related, importantly, to *domestic*, not export, pricing.[102] Even the statements that were made in other contexts still relate to trade issues. Yet, as a committee that Dr. Stern co-chaired observed in its lengthy report, "[t]rade [policies] and competition policies are designed to address these economic distortions from different sources."[103]

     *Second,* there is a matter of grammar – verb tense, to be precise. Early in her Report, Dr. Stern asserts that China has "repeatedly and consistently" stated that it "*has achieved* the status of a market economy" – a statement that is neither a quote, nor linked to any cited source.[104] Yet, when one looks at the documents that *are* cited or quoted by Dr. Stern, they refer nearly uniformly to the undisputed fact that China is merely in the *process* of transitioning from a command to a market economy (a "socialist" market economy). Thus, among the statements that Dr. Stern actually quotes are: about China having "pledged to continue making reforms to move the government…toward a market economy[;]"[105] to China having "continued unswervingly the basic policy of reform" subsequent to its accession to the WTO;[106] to China having made a "commitment" to "opening-up" its economy when it joined the WTO; and to the fact that China agreed, in 2006, that it "would continue to deepen its reform and opening-up,"

---

[102] *See, e.g.,* Stern Rep. at p. 10 n.43 & 47 (Chan Decl., Ex. 43) (citing to Comments of Bruce Mitchell and Ned Marshak to U.S. Department of Commerce Assistant Secretary for Import Administration, Re: Separate Rates Practice in Antidumping Proceedings Involving Non-Market Economy Countries on behalf of Bureau of Free Trade for Imports and Exports (BOFT), 1 June 2004, at pp. 16-17 (Chan Decl., Ex. 44); and Comments of Wang Shichun, Director General BOFT Re: Public Hearings on U.S. China Joint Commission on Commerce and Trade Working Group on Structural Issues on Recognition of China as a Market Economy for Purposes of U.S. Antidumping Law, 19 May 2004, at p. 1 (Chan Decl., Ex. 45).

[103] *See* International Competition Policy Advisory Committee to the Attorney General and the Assistant Attorney General for Antitrust, Final Report, Chapter 5: Where Trade and Competition Intersect, 201 (2000) (Chan Decl., Ex. 46).

[104] *See* Stern Rep. at p. 1 (emphasis added) (Chan Decl., Ex. 43).

[105] *Id.* at p. 4.

[106] *Id.* at p. 8.

although even then it would do so while "balancing" that effort with the interests of its "domestic development."[107]

To the same effect, while Dr. Stern asserts, again without quotation or citation, that China says it "has achieved" an economy in which "individuals and enterprises make independent market driven decisions regarding pricing…[,]"[108] a few paragraphs later she is forced to acknowledge that what China's various statements, whether "[t]aken together or separately," actually present is a "picture of an economic regulatory policy that *reduces* the role of government in setting prices . . . ."[109] That concession is scarcely surprising since, at yet another point in her Report, Dr. Stern quotes a MOFCOM representative as observing that as of 2002 all that China had "established [was] a *preliminary system* of market economy."[110]

The distinctions between Dr. Stern's personal characterizations and what the documents say is striking, and undermines the entire thesis of her Report. China unquestionably *has* said "repeatedly and consistently" that it is in the process of transitioning to a form of market economy, known as a "socialist market economy." In fact, it said so directly in its *Amicus* Submission in this case.[111] But the key point is that being somewhere on the road towards a destination and having arrived are two different things.

---

[107] *Id.*
[108] *Id.* at p. 1.
[109] *Id.* at p. 5.
[110] *Id.* at p. 10 (emphasis added). Sometimes, Dr. Stern's hyperbole gives way to outright misrepresentation. Seeking to support an assertion that China had committed itself to a system in which "individuals and enterprises are able to make unrestrained, individual economic decisions," Dr. Stern invokes a professor who she quotes as saying that "China has lived up to and perhaps even exceeded the pace of certain reform demands." *Id.* at p. 4, n.15-16. The actual quotation, however, says the following: "And while China has lived up to and perhaps even exceeded the pace of certain reform demands, *in other instances the pace of reform has not been as quick as some [WTO] members, such as the United States, would like.*" Chad, Bown, "U.S.-China Trade Conflicts." The Fletcher Forum of World Affairs (2009) at 32-33 (emphasis added) (Chan Decl., Ex. 47). (At her deposition, Dr. Stern said that she "regret[ted]" her error in omitting the second half of the sentence, and attempted to pass off that failing as a problem of "copy editing.") (Stern Tr. at 63:6-66:23) (Chan Decl., Ex. 42).
[111] *See Amicus* Submission at pp. 17-18 (Chan Decl., Ex. 1).

*Third,* while Dr. Stern may have undertaken – in her words – a "very narrow" assignment to "*compare and contrast*" China's statements in this case and elsewhere, she appears simply to have ignored anything that does not fit her story.  Thus, while the United States repeatedly has not only declined to classify China as a market economy, but has noted various ways in which the Chinese government continues to intervene in the country's economy,[112] Dr. Stern barely notes that fact in passing – without providing even a scintilla of detail.  Similarly, she cites an article by a Chinese competition expert, Professor Huang Yong, for one peripheral point, but neglects to mention Professor Huang's far more pertinent observation (made in 2008) that "China is switching gradually to the market economy."  Nor does she bother to mention his further statement that "[e]ven though the Chinese government has come a long way, excessive intervention still widely exists all over the country . . . ."[113]  Then, there are the words of Chinese official Dai Yunlou who Dr. Stern cites enthusiastically for the proposition that "China has changed...a lot,"[114] while failing to mention Mr. Dai's further observations (a) that "the question of whether a country is a market economy necessarily is a question of degree and not absolutes" and (b) that "governments worldwide intervene in their economies."[115]

Even more distressing, in her apparent eagerness to "contrast" as opposed to simply compare, Dr. Stern ignores the very document she seeks to call into question, the Chinese

---

[112] *See, e.g.,* March 29, 2007 Memorandum for David M. Spooner, Assistant Secretary for Import Administration, from Shauna Lee-Alaia and Lawrence Norton, Office of Policy, Import Administration, Re:  Countervailing Duty Investigation of Coated Free Sheet Paper from the People's Republic of China – Whether the Analytical Elements of the *Georgetown Steel* Opinion are Applicable to China's Present-Day Economy, at 3 ("The Department concluded that, while China has enacted significant and sustained economic reforms, the PRC Government has preserved a significant role for the state in the economy.  Indeed, the limits the PRC Government has placed on the role of market forces are sufficient to preclude China's designation as a market economy under U.S. antidumping law." ) (Chan Decl., Ex. 48); 2007 Report to Congress on China's Compliance with the WTO by the United States Trade Representative at 38 ("China ... has not yet developed a fully functioning market economy...") (Chan Decl., Ex. 49).

[113] Huang, *supra*, 75 Antitrust L.J. at 118, 120 (Chan Decl., Ex. 7).

[114] Stern Rep. at p. 9 (Chan Decl., Ex. 43).

[115] Excerpt of transcript of June 3, 2004 hearing before the International Trade Administration, Import Administration, Department of Commerce, U.S.-China Joint Commission on Commerce and Trade Working Group on Structural Issues, testimony of Dai Yunlou at 43:2-13 (Chan Decl., Ex. 50).

government's *Amicus* Submission.  Yet far from being at odds with what it has said elsewhere, the Chinese government has been forthright in describing the transitional nature of its economic system, and the relationship of that system to the matters at issue in this case:

> [W]hile China is in the process of moving actively from its former state-run command economy to a market economy more of a type familiar to the United States, the current economic system is transitional and there remains a level of active state direction and coordination that has no analogue in the United States.[116]

*Fourth,* and finally, as China's Mr. Dai has noted, whether a country has a market economy is a question of "degree" and "governments worldwide intervene in their economies." Dr. Stern admitted at her deposition that a country can have a market economy and yet have regulated industries.[117]  One need look no further than the United States for proof of that fact. Professor Speta devotes his entire report to explaining that regulated industries exist in market economies.  The Antitrust Modernization Commission similarly devoted an entire chapter of its report to that point.[118]  Included as Annex A to that chapter was a listing of no less than 31 situations where this country substitutes regulation for competition.

China has said – "repeatedly and consistently" – that it is moving towards an economic system that looks a good deal more like what we in the U.S. recognize as, predominantly, a market-based economic system in which the government plays a less prominent and direct role than previously was the case in China.  But that no more excludes the existence of areas of regulation than the presence of regulated industries and exemptions from the Sherman Act "contradict" the status of the United States as having a "market economy."  In short, the statements that Dr. Stern cites to the Court do not establish a basis to reject the statements of

---

[116] *Amicus* Submission at pp. 17-18 (Chan Decl., Ex. 1).
[117] Stern Tr. at 76:12-14 (Chan Decl., Ex. 42).
[118] *See* Antitrust Modernization Commission, Report and Recommendations, Chapter IV, Government Exceptions to Free Market Competition (April 2007) (Chan Decl., Ex. 51).

43

Professor Shen, let alone those of the Chinese government, regarding China's regulation of vitamin C either before or during the alleged conspiracy period.

**D.      Defendants Are Entitled to Judgment**

We come, then, to the core question in the litigation: whether the acts alleged by Plaintiffs were taken pursuant to Chinese law and policy. We understand the Court's earlier hesitance to dismiss the litigation under Rule 12 where, as its opinion notes, the relationship between Defendants and the government (meaning both the Ministry of Commerce and the Chamber) is "complex" and the nature of Chinese law may not be as readily discernible as that of many other countries. *See In re Vitamin C*, 584 F. Supp. 2d at 556, 559. However, with the record now further developed, the law more fully explained by a Chinese legal scholar and an expert on regulated industries, and the case in a different procedural posture, Defendants submit that the legal issues are ripe for disposition in their favor.

The government of China repeatedly has expressed its strong interest in maintaining a stable and profitable export trade in certain strategically important industries. Vitamin C is one of those industries. To that end – that is, in order to fulfill the stated objectives of its public policy – China has required the Chamber and its Vitamin C Subcommittee to administer and oversee a regulatory process that is implemented through a peculiarly Chinese system of compliance known as "self-discipline." During the alleged conspiracy period, that system did not involve the direct specification of prices or output, other than a minimum price designed to avoid anti-dumping litigation. Instead, it sought to implement its policy objectives through a mandatory coordination process designed to further Chinese national interests.

**It is that process and the pursuit of China's underlying policy objectives through the process that were compelled.** As the Chinese government pointed out in its initial submission to the Court, the regulatory system at issue here did not involve a top-down mandate to set

specific "collective prices." Rather, it involved a "process of coordination" among private firms acting pursuant to, and under, government regulatory oversight. "[W]hile the government did not, itself, determine specific prices or quantities, it most emphatically did insist on those matters being determined *through industry coordination*."[119] The "decision to control export quantities and require coordinated export prices was made by the Ministry. Defendants were compelled to implement these decisions *through participation in the Vitamin C Sub-Committee*."[120]

Both China's objectives and the process it chose to implement them are distinctively Chinese. As stated by Professor Huang: "To comprehend [China's approach to regulatory and competition policy] one has to stand in the shoes of the Chinese and possess a deep understanding about political and economical reality of the country's past and present, as well as specific characteristics of the Chinese marketplace."[121] But, the fact that China's approach to regulation may be "Chinese" does not make that approach any less compulsory, or any less worthy of respect or acceptance.

The description of the Chinese regulatory system that Defendants, together with Professor Shen and, of course, the Chinese government, have provided is clear and definitive. It also is consistent with the understandings of independent academic commentators – many of whom, it should be added, disagree with major aspects of China's approach to regulation.[122] We previously have noted the comments of Professor Bruce Owen of Stanford, who has observed the ongoing Chinese concern with so-called "harmful" competition. Owen also has commented on

---

[119] *Amicus* Submission at p. 18 (emphasis added) (Chan Decl., Ex. 1).
[120] *Id.* (emphasis added).
[121] Huang, *supra*, 75 Antitrust L.J. at 117-18 (Chan Decl., Ex. 7); *see also* Owen, *supra*, 75 Antitrust L.J. at 238 ("competition policy in a country does not happen in a vacuum; instead, it is closely tied to the economic, political, and legal contexts of the country. This is particularly so in China.") (Chan Decl., Ex. 12).
[122] *See* Huang, *supra*, 75 Antitrust L. J. at 129-30 (Chan Decl., Ex. 7); Owen, *supra*, at 75 Antitrust L.J. at 247-49 (Chan Decl., Ex. 12).

the relationship between this concern and the Chinese government's approach to regulation

through self-discipline under the aegis of various Chambers of Commerce:

> Partly because of [perceptions about excessive competition] the
> government has taken some measures to rein in "excessive
> competition." *Most of those measures involve what is called
> "industrial self-discipline," adopted under the direct supervision of
> the government.  Under the practice of "industrial self-discipline,"
> the major companies in an industry reach price agreements or
> other agreements to limit competition, in an effort to stabilize the
> market.  The trade associations that were converted from
> government ministries played important roles in the adoption of
> this "industrial self-discipline."*  Indeed, this practice was officially
> sanctioned by the government in 1998.[123]

To the same effect, Professor Eleanor Fox of NYU, together with Judge Dennis Davis of

South Africa, explain that the Chinese government has formulated strategies and measures to

avoid WTO concerns, including "government mandates that the trade associations of various

industries regulate price and output level."[124]  Some of these trade organizations, they add, are

"supervised by the Ministry of Commerce."  Most important, "[c]*ompliance with the self-

regulatory price/output levels is mandatory . . . .*"[125]

This approach not only applied during the conspiracy period alleged by Plaintiffs, but

remains an integral element of Chinese competition policy.  Thus, China's new Anti-Monopoly

Law, which came into effect in 2007, provides that trade associations "shall strengthen industry

---

[123] Owen, *supra*, 75 Antitrust L.J. at 248-49 (emphasis added) (Chan Decl., Ex. 12).
[124] Eleanor Fox & Dennis Davis, *Industrial Policy and Competition – Developing Countries as Victims and Users*, in 2006 Fordham Corp. L. Inst. International Law & Policy, ch. 8 at 156 (Barry Hawk, ed.) ("Fox & Davis") (Chan Decl., Ex. 52).  Professor Huang Yong of China – who, like Owen and Fox, is critical of some aspects of China's approach to regulatory policy – joins them in acknowledging the existence of the government's use of various Chambers of Commerce "to eliminate 'vicious competition' or cutthroat price wars." Huang, *supra*, 75 Antitrust L.J. at 129 (Chan Decl., Ex. 7).  As he further observes, "in [Chinese] legislators' eyes there are two kinds of competition:  the good and the bad. ...  The legislators believe the latter type is a race to the bottom and harms Chinese enterprises...and they further believe trade associations ought to promote 'self-discipline' among competitors and avoid such price wars." *Id.* at 129-30; *see also* R. Hewitt Pate, What I Heard in the Great Hall of the People – Realistic Expectations of Chinese Antitrust, 75 Antitrust L.J. 195, 202 (2008) (Chan Decl., Ex. 53).
[125] Fox & Davis, *supra*, at 156 (emphasis added) (Chan Decl., Ex. 52). *See also*, Eleanor Fox, *An Anti-Monopoly Law for China – Scaling the Walls of Government Restraints*, 75 Antitrust L.J. 173,179 (2008) (noting that certain trade associations "are, to an extent, emanations of the state or work closely in tandem with the state") (Chan Decl., Ex. 54).

self-regulation, guide business operations in their industries in competing in accordance with the law and *safeguard the competitive order in the market*."[126]

Defendants readily anticipate Plaintiffs' response. They contend that what Defendants describe is a system of permissive private consensus, not government compulsion, and that consensus and compulsion are antithetical, not synonymous. Let us first note what is correct about Plaintiffs' position and, then, explain what is fatally wrong with it.

It is correct that the regulatory system that China has adopted involves discussion, disagreement and consensus-building as aspects of its regulatory process of "self-discipline." The documents that Defendants have produced – and to which Plaintiffs repeatedly point in discovery and in their pleadings – show precisely that. But those facts do not reflect an absence of regulation.

This litigation exists only because Plaintiffs contend that Defendants have taken certain actions on a coordinated basis through the Chamber. Production shutdowns were orchestrated, implemented and inspected for compliance.[127] Prices well above the minimum "verification and chop" amounts were the subject of conversation and agreement as well.[128] Those matters not only are undisputed but, as Plaintiffs point out, the existence of such coordination was announced publicly by the Chamber on its Web site. All of these actions not only were approved by the Chamber, but took place at meetings that it called and over which it presided.

---

[126] Anti-Monopoly Law of the People's Republic of China (promulgated by the Standing Committee of the National People's Congress on August 30, 2007 and effective August 1, 2008), Art. 11, translation available at http://www.chinalawandpractice.com/Article/1690083/PRC-Anti-monopoly-Law.html (last accessed July 21, 2009) (Chan Decl., Ex. 55). The Anti-Monopoly law exempts "an agreement [that] was reached … for purposes of securing legitimate interests in foreign trade and foreign economic cooperation." *Id.* at Art. 15(6).

[127] *See, e.g.*, Chamber of Commerce Meeting Minutes (December 23, 2005), Bates No. JJPC0040755 (Chan Decl., Ex. 39); Report on the Investigation on the Shutdown of Production of Weisheng Pharmaceutical Co., Ltd. (April 19, 2006), Bates No. NEPG037113 (Chan Decl., Ex. 56); *see also* excerpts of the transcript of the June 19, 2008 deposition of Zhang Yingren ("Zhang Tr.") at 141:12-16 ("In accordance with the request of the Chamber of Commerce, other people from Welcome had inspected the shutdown for repairs and maintenance of facilities at other VC manufacturers.") (Chan Decl., Ex. 57).

[128] *See* VC Division Meeting Memorandum, 24/2/03, Bates No. JJPC0043573 (reflecting that export price for vitamin C is set at RMB 106/kg though the "centralized" price is RMB 95/kg or above) (Chan Decl., Ex. 58).

The essential point for the current motion, thus, is not that there was no coordination resulting from consensus. The point is that the "consensus" refers only to the operation of the self-discipline process. What was *not* a matter of "consensus," *i.e.*, what was "compelled," was (a) participation in the self-discipline process and (b) using that process to implement the mandatory objectives of the process in pursuit of government policy – "to act in unison" in foreign trade as to matters of price and output. Defendants were not free to reject coordination – in the vernacular, to "just say no" – when called upon to do so by the Chamber. That compulsion is what led to the coordinated activities that Plaintiffs allege as the basis of their antitrust case. Defendants say so. Academic observers say so. *And, so does the Chinese government.* Thus understood, there is no inconsistency between Defendants' position (let alone, the statements of the Chinese government), on the one hand, and the supposedly "contradictory" evidence referred to and relied upon by Plaintiffs, on the other. Defendants, therefore, are entitled to summary judgment on each of the three grounds raised by their motion.

## 1.    Foreign Sovereign Compulsion

For the reasons explained above, Defendants submit that the Court should give conclusive weight to the statement of the Chinese government that the government compelled Defendants' conduct. That should be a sufficient basis to grant Defendants' motion. The same result should be reached under a "substantial deference" standard in light of the record presented here. China plainly had a policy of regulating vitamin C exports in the country's national interests, and the process that it chose to implement that policy was compulsory, not optional.

In fact, this is as strong a compulsion case as can be imagined. There is no question that the Chamber was not merely aware of, but directly participated in, the very activities that ostensibly constitute the "conspiracy." Since it is by now also indisputable that the Chamber functioned in an official capacity in its dealings with vitamin C export matters, the consequence

is that the government did not merely adopt policies or enact laws demanding particular behavior, it was an integral part of the actions that are said to be unlawful. Thus, unlike other compulsion cases in which there was at least one intervening step in the process from official mandate to private implementation, here the two are integrated and inextricable.

Regarding purpose, China's interest in promoting the profitability of its export trade in certain important commodities is no different than the stated direction to the New Zealand Dairy Board to avoid "a direct or indirect reduction of the overall returns to the New Zealand dairy industry" in deciding whether to grant an export application. *Trugman-Nash, Inc. v. New Zealand Dairy Board*, 954 F. Supp. 733, 736 (S.D.N.Y. 1997). Some form of protectionist motive – including an avoidance of price competition – nearly always lies behind government regulation of foreign trade. *See, e.g., O.N.E. Shipping Ltd. v. Flota Mercante Grancolombian, S.A.*, 830 F.2d 449, 453 (2d. Cir. 1987) ("[T]he liquid bulk cargo service of [defendants] has been important to Colombia's economy and the Colombian government has so represented."); *Interamerican*, 307 F. Supp. at 1295 ("[T]he government opposed any sales to a bonded refinery in New York harbor, because of the low prices at which such a refinery could sell.").

The fact that the government chose a particularly Chinese method to implement its stated interests also is of no moment. Not only are governments free to approach questions of regulation in accordance with their own norms and traditions, but regulations that are "not cast in the terms of a Biblical commandment, 'Thou shalt not,'" are no less compulsory on that account. *Trugman-Nash*, 954 F. Supp. at 736. United States law is clear on this point.

The existence of regulatory compulsion is further confirmed and placed in context by Professor James Speta, an expert on regulated industries who explains that under well-established principles of regulation, the vitamin C industry has all the characteristics of a

regulated industry.  In reaching his conclusion, Professor Speta observed:  (i) that there is

evidence that Chinese government policy has identified reasons why unregulated competition

should not prevail in the industry; (ii) that there is a governmental body charged with supervising

the industry in a comprehensive manner according to that policy; and (iii) that supervision has in

fact occurred.[129]

The regulatory principles that applied to the vitamin C export industry are reflected in a

leading Supreme Court decision on regulated industries, *Southern Motor Carriers Rate*

*Conference, Inc. v. United States*, 471 U.S. 48 (1985).  That case involved the regulation of

motor carriers that participated in state regulatory proceedings conducted by agencies that had

been delegated oversight responsibility for rate setting under state law.  Under those state

systems, members were expected to consult and agree, if possible, on collective rates, although

"every [member] remain[ed] free to submit [its own] rate proposals . . . ." *Id.* at 51.  Three of the

four statutes at issue explicitly permitted collective rate making by the common carriers.  In the

fourth state, Mississippi, the legislature did not specifically address collective rate making.  The

statute simply provided that "the Commission is to prescribe 'just and reasonable' rates for the

intrastate transportation of general commodities." *Id.* at 63.

The United States argued that, without more direct compulsion, there was no basis for

antitrust immunity.  However, the Supreme Court rejected that position, holding that it had never

been Congress's intent to "compromise the States' ability to regulate their domestic commerce."

*Id.* at 56.  To the contrary, so long as there was a clearly-articulated state policy, the obligation to

participate in the process was sufficient to confer immunity, even if private parties were both

permitted and encouraged to act together independent of the government, and even if the policy

was "permissive" in the sense that individual carriers could choose to go their own way.

---

[129] Speta Rep. at ¶ 38 (Chan Decl., Ex. 5).

Specifically, the Court held that it is perfectly acceptable for a state, in the exercise of its sovereign authority, to adopt an "anticompetitive" policy and that a "private party acting pursuant to an anticompetitive regulatory program need not 'point to a specific, detailed legislative authorization' for its challenged conduct." *Id.* at 64 (omitting citation). In fact, said the Court, "[i]f more detail than a clear intent to displace competition were required of the legislature, States would find it difficult to implement through regulatory agencies their anticompetitive policies . . . . Requiring express authorization for every action that an agency might find necessary to effectuate state policy would diminish, if not destroy its usefulness." *Id.* (omitting citation).

Defendants submit that the Vitamin C Subcommittee is the functional equivalent of the Southern Motor Carriers Rate Conference, the Chamber is the functional equivalent of the Mississippi Public Service Commission and MOFCOM and its predecessor MOFTEC are the functional equivalent of the legislature that gave authority to the Chamber to act in accordance with the public purpose of furthering the economic interest of China.[130]

This Court's opinion denying Defendants' motion to dismiss expressly recognized the "complex interplay between the Chamber and defendants that makes it difficult to determine the degree of defendants' independence in making pricing decisions." *In re Vitamin C*, 584 F. Supp. 2d at 556; *see also id.* at 555 ("Accepting Professor Feinerman's characterization leads to the conclusion that a cartel in China could only exist with governmental sanction. At that point it becomes difficult to differentiate between a cartel that was voluntarily formed by its members,

---

[130] While in its *amicus* brief in *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, the United States distinguished the application of the state action defense articulated in *Southern Motor Carriers Rate Conference* to conduct compelled by a foreign government, 1985 WL 669667, at *9, Defendants submit that the principle underlying the state action doctrine, which is grounded on the notion that Congress should not be presumed to have interfered with state authority to regulate commerce even where participation in such regulation is permissive, is at least equally applicable to the present case in which one sovereign should not compromise the ability of another sovereign to regulate its domestic commerce when that sovereign has directed its citizens to engage in the subject activity.

who then had to seek governmental approval, and a cartel that was mandated by governmental fiat."); *id.* at 550 n.4. Consistent with that observation, Professor Speta has concluded that this "complex interplay" between the Chamber and Defendants indicates that the vitamin C export industry is a regulated industry.[131]  Thus, even if the Court were not prepared to give dispositive weight to the Chinese government's statement that the conduct at issue is compelled, the Court should reach the same conclusion applying the principles articulated in *Southern Motor Carriers Rate Conference* to China's relationship to the vitamin C industry.  If domestic companies would have been granted immunity under those principles, no less accommodation should be afforded to foreign companies acting under compulsion by a foreign sovereign.  It is no more appropriate for a United States court to impose oversight on the competition and trade policies of a foreign sovereign than it is to impose control over the processes of a state regulatory commission.

Just as in *O.N.E. Shipping*, this suit "represents a direct challenge to [China's regulation of vitamin C exports] and to the legality of [Defendants'] agreements under those laws[,]" which were "designed to promote the development of a strong [vitamin C export trade] and to assist [China's] economic development." 830 F.2d at 451.  Yet, as stated by the Chinese government, "What the Complaint describes as a 'cartel,' and an 'ongoing combination and conspiracy to suppress competition' through price-fixing…is a regulatory pricing regime mandated by the government of China – a regime instituted…to promote, in this transitional period, the profitability of the industry through coordination of pricing and control of export volumes.  Most importantly, this regime was established to safeguard the national interests of China."[132] Regulation designed to fulfill that purpose by compelling the conduct challenged by Plaintiffs

---

[131] Speta Report at ¶ 38 (Chan Decl., Ex. 5).
[132] *Amicus* Submission at p. 6 (Chan Decl., Ex. 1).

here is immune from challenge under the sovereign compulsion doctrine and judgment in

Defendants' favor, therefore, should be granted on that ground.

### 2.    The Act of State Doctrine

Foreign sovereign compulsion "focuses on the plight of a defendant who is subject to

conflicting legal obligations under two sovereign states." *In re Vitamin C*, 584 F. Supp. 2d at

551. The act of state doctrine, by contrast, "derives from both separation of powers and respect

for the sovereignty of other nations. It holds that the courts of one nation may not sit in

judgment of the public acts of another sovereign within its own borders." *Id.* at 550 (omitting

citation). Perhaps most important, "[a]lthough in some cases the sovereign act in question may

compel private behavior, *such compulsion is not required"* by the doctrine.[133]

The act of state doctrine is peculiarly apt in this case in which, as the Court has observed,

the "unprecedented" appearance of the Chinese government before the Court "demonstrates the

importance the Chinese government places on this case." *In re Vitamin C*, 584 F. Supp. 2d at

552. The nature of that interest is evident from the facts reviewed above, including the materials

cited in the Report from Professor Shen and, of course, the statements of the Chinese

government. China also has an obvious interest in being able to adopt its own economic policy,

which includes a deep and ingrained belief in the importance of avoiding "harmful" or

"malignant" competition. The fact that this country does not necessarily share that belief is

something that China might choose to consider at some later date as a matter of its own

legislative policy. But, it does not justify a court in the United States declaring China's policies

illegitimate by refusing to allow China to regulate certain of its own domestic companies in

accordance with its own views of appropriate competition policy and regulation and with a view

towards its own national interests.

---

[133] Antitrust Guidelines, *supra*, § 3.33 (emphasis added) (Chan Decl., Ex. 40).

Unlike the sovereign compulsion defense, which has been relied upon in only a small number of cases – principally because foreign governments are not often willing to affirm that they have, in fact, compelled the conduct in issue – the act of state doctrine has been applied frequently, including in antitrust cases. Many of those decisions were cited and described to the Court in connection with Defendants' motion to dismiss and we do not recapitulate that discussion here.[134] However, we do wish to highlight, briefly, some of the more important decisions in which act of state has been held applicable, and dispositive.

In *International Association of Machinists v. OPEC*, 649 F.2d 1354 (9th Cir. 1981), which affirmed dismissal of a price-fixing suit against the OPEC cartel, the Ninth Circuit noted that applying U.S. antitrust principles "would in effect amount to an order from a domestic court instructing a foreign sovereign to alter its chosen means of allocating and profiting from its own valuable natural resources." *Id.* at 1361. That observation speaks directly to the current litigation where China, for reasons it deems satisfactory to itself, has elected to treat vitamin C as an industry of importance to the government and has "chosen [certain] means" by which it wishes to profit from that important resource. As the Ninth Circuit further observed, "[t]o participate adeptly in the global community, the United States must speak with one voice and pursue a careful and deliberate foreign policy. The political branches of our government are able to consider the competing economic and political considerations…in order to carry on foreign relations in accordance with the best interests of the country as a whole. The courts, in contrast, focus on single disputes and make decisions on the basis of legal principles . . . . When the courts engage in [such] piecemeal adjudication…they risk disruption of our country's international diplomacy." *Id.* at 1358.

---

[134] *See* Defendants' Memorandum In Support of Motion to Dismiss ("Defs. Motion to Dismiss") (D.E. 67) at pp. 14-23; Defendants' Reply Memorandum In Support of Motion to Dismiss (D.E. 72) at pp. 16-23.

Both in its Rule 12 opinion as well as at oral argument of that motion, the Court raised repeated questions about the "reasons" why the Chinese government took the actions it did, as well as whether such government action was the product of manipulation or importuning by the manufacturers. *See, e.g., In re Vitamin C*, 584 F. Supp. 2d at 555-56, 559; Transcript of Oral Argument on Motion to Dismiss, June 5, 2007, at 19:22-20:24, 29:15-30:20 (Chan Decl., Ex. 59). It is precisely that type of inquiry that the Second Circuit, among many other courts, has said is forbidden by act of state principles. Thus, in *O.N.E. Shipping, supra*, which cited and relied in part on *OPEC*, the court upheld dismissal on the ground that the act of state doctrine precluded inquiry into Colombia's adoption of certain protectionist shipping laws, notwithstanding a contention that the plaintiffs were not challenging Colombia's laws but, rather, were opposed to the defendants' "manipulation of these laws." 830 F.2d at 452 (omitting internal quotations). Noting that a resolution of that issue would require inquiry into the "motives of the foreign government," the Court held that such an inquiry was impermissible. *Id.* at 453.

Similarly, in *Hunt v. Mobil Oil Corp.*, 550 F.2d 68 (2d Cir. 1977), the plaintiffs argued that various private companies had enlisted Libya's aid in a scheme to exclude the plaintiff from the market by seizing its assets. In affirming dismissal on act of state grounds, the Court noted that although the "skilled pleader" did not name Libya or directly challenge the propriety of Libya's actions (just as Plaintiffs here studiously avoided mentioning the true nature of the Chamber), the case would not be viable "unless the judicial branch examines into the motivation of the Libyan action and that inevitably involves its validity." 550 F.2d at 77. Noting the obvious impropriety of inquiring into the policy choices of a foreign state, the court further stated:

> The American judiciary is being asked to make inquiry into the
> subtle and delicate issue of the policy of a foreign sovereign, a
> Serbonian Bog, precluded by the act of state doctrine . . . .

550 F.2d at 77.[135]

Defendants submit that act of state principles apply here for an additional – and particularly compelling – reason.  Plaintiffs not only challenge China's right to apply its competition policy, but come before the Court to assert, in effect, that China has misrepresented what that policy is and how its laws operate.  If a challenge to underlying *motivation* raises unacceptable dangers of undermining "respect for the sovereignty of nations" and interfering with the conduct of American foreign relations by the executive branch, then those considerations apply with far greater force to a request for this Court to disregard the very *existence* of official acts and policies, such as those that China has said apply to the conduct that Plaintiffs allege.  In *Interamerican Refining, supra,* the plaintiffs sought to discredit the existence of a valid government policy through the affidavit of a Venezuelan attorney.  Citing one of the leading Supreme Court act of state decisions, *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398 (1964), the court said that such an inquiry was flatly barred by act of state principles.  307 F. Supp. at 1299.

For reasons already explained at length, Defendants submit that there is no basis in this record to dispute that Defendants' actions were compelled by the Chinese government, as the government has said that they were.  Yet even if that were not the case, because the act of state doctrine is not premised upon the existence of compulsion, but upon separation of powers and

---

[135] *See also* the district court opinion, in which Judge Weinfeld pointed out that the act of state doctrine was not rendered inapplicable because the "plaintiffs were not complaining 'of the acts of foreign states…but rather only of the defendants' conduct in 'catalyzing' those acts." *Hunt v. Mobil Oil Corp.*, 410 F. Supp. 10, 24 (S.D.N.Y. 1975) (omitting citations).

the respect for the integrity of foreign sovereign states, the argument for judgment in

Defendants' favor under the act of state doctrine is straightforward and compelling.

### 3.      International Comity

International comity is the third ground for granting Defendants' dismissal motion, and

Defendants submit that there are compelling reasons for the Court to do so even if it declines to

rule in their favor as a matter of law on the basis of sovereign compulsion or act of state.

While comity, unlike the other doctrines, is a matter committed to this Court's sound

discretion, the exercise of that discretion is grounded in important considerations of policy that

apply here with substantial force.  Thus, the Department of Justice has emphasized the important

role that comity plays in determining whether to bring an enforcement action in situations that

implicate the interests of other nations:

> In enforcing the antitrust laws, the Agencies consider international
> comity.  Comity itself reflects the broad concept of respect among
> co-equal sovereign nations and plays a role in determining the
> "recognition which one nation allows within its territory to the
> …[acts] of another nation."  Thus, in determining whether
> to…bring an action…each Agency takes into account whether
> significant interests of any foreign sovereign would be affected.[136]

As this Court noted in its November 2008 opinion, comity depends upon the existence of

a "true conflict" and, thus, upon the existence of Chinese laws and policies that are at odds with

American antitrust law.  *In re Vitamin C*, 584 F. Supp. 2d at 552.  However, as with the act of

state doctrine, that does not require proof of "compulsion":

> The Agencies…take full account of comity factors beyond whether
> there is a conflict with foreign law.  In deciding whether or not to
> challenge an alleged antitrust violation, the Agencies would, as
> part of a comity analysis, consider whether one country encourages

---

[136] Antitrust Guidelines, *supra*, at § 3.2 (*citing Hilton v. Guyot*, 159 U.S. 113, 186 (1895)) (Chan Decl., Ex. 40).

> a certain course of conduct, leaves parties free to choose among
> different strategies, or prohibits some of those strategies.[137]

There can be no debate that "significant interests of a foreign state" are directly implicated by this litigation. This Court said precisely that in its earlier opinion, which noted that "[t]he Chinese government's appearance as amicus curiae is unprecedented…[and] alone demonstrates the importance the Chinese government places on this case." *In re Vitamin C*, 584 F. Supp. 2d at 552. While that fact, without more, indicates the important role that comity considerations should play here, there are several additional factors that underscore why dismissal on comity grounds is appropriate.

The Court not only has acknowledged China's strong interest in this litigation, it also noted that both the "defendants and the [government] stress the importance to China of being able to manage the transition from a command to a market economy." *Id.* at 559. Commenting on that observation, the Court stated that it did "not question that goal or even China's methods of doing so." *Id.* While the Court concluded that the record as it then stood was "too ambiguous" to dismiss the case under Rule 12, Defendants submit that the fact that China is in a transitional process militates strongly against subjecting Chinese companies to potential treble damage liability for acts that were taken with the clear imprimatur of the Chinese government during this transitional period.

That conclusion is reinforced still further by the fact that private litigation is not needed to ensure that United States competition policy is protected. The federal government is the primary enforcer of American antitrust law and there is no doubt that it is fully aware of this much-publicized litigation. Unlike the situation in a private lawsuit, the government is in a position to balance competing enforcement and foreign relations considerations in deciding

---

[137] *Id.*; *see also id.* at § 3.32 ("Foreign government measures short of compulsion…can be relevant in a comity analysis.").

whether to bring an action – as it has said that it does.[138]  Moreover, as Defendants have pointed out, the lack of an incentive to take foreign relations considerations into account was one of the reasons cited by the Supreme Court in its *Empagran* decision for limiting the extraterritorial reach of U.S. antitrust law.  *See* 542 U.S. at 171.

The Ninth Circuit made a similar point in an earlier act of state decision, *Clayco Petroleum Corp. v. Occidental Petroleum Corp.*, 712 F.2d 404, 409 (9th Cir. 1983).  The court of appeals in that case noted that act of state concerns play no role in government enforcement actions because the "political branch[es]" of government can balance enforcement and foreign relations considerations in deciding whether to proceed.  In "private suits," by contrast, application of the act of state doctrine "remains necessary to protect the proper conduct of national foreign policy."  *Id.*

In this case, not only is the suit at bar a private damages action, but the two "representative" direct-purchaser plaintiffs are both very small purchasers – one of which has not even been in the business at all for several years, and one of which did not buy a single dollar's worth of vitamin C from any Chinese manufacturer.[139]  Moreover, both of these plaintiffs became litigants only after they were solicited to do so by counsel.[140]  While that may be permissible as a matter of ethics or, even, Rule 23, it surely speaks to the appropriate balance of considerations that should inform a comity inquiry in this litigation.

---

[138] *See id.* at § 3.2.

[139] *See* Motion of JSPC America, Inc. for summary judgment (filed concurrently).

[140] *See* Declaration of Richard Goldstein In Support of Defendants' Supplemental Motion to Dismiss, sworn to October 26, 2007 (D.E. 221), Ex. A (attaching Defendants' Memorandum of law in Opposition to the Motion of the Ranis Company for Class Certification, dated August 2, 2007, filed under seal) at pp. 31-32.

## IV. CONCLUSION

For the reasons and upon the authorities set forth herein, Defendants' motion for summary judgment or, in the alternative, motion for determination of foreign law and entry of judgment pursuant to Rule 44.1, should be granted, and the Third Amended Complaint should be dismissed in its entirety, with prejudice.

Dated: New York, New York
      August 31, 2009

Respectfully Submitted,

ORRICK, HERRINGTON & SUTCLIFFE LLP

By: _____
Stephen V. Bomse (*pro hac vice*)
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Tel: (415) 773-5700
Fax: (415) 773-5759
Email: sbomse@orrick.com

Richard S. Goldstein (RG 9560)
Annabelle Chan (AC 2349)
666 Fifth Avenue
New York, NY 10103
Tel: (212) 506-5325
Fax: (212) 506-5151
Email: rgoldstein@orrick.com
Email: anchan@orrick.com

Jonathan M. Palmer (*pro hac vice*)
719 Second Avenue
Suite 1000
Seattle, WA 98104-7097
Tel: (206) 839-4300
Fax: (206) 839-4301
Email: jmpalmer@orrick.com

*Attorneys for Defendant*
*Jiangsu Jiangshan Pharmaceutical Co., Ltd.*

60

GREENBERG TRAURIG, LLP
    James I. Serota
    Kenneth Lapatine
    200 Park Avenue
    New York, New York  10036
    Tel: (212) 801-2277
    Fax: (212) 801-6400

    *Attorneys for Defendant*
    *Northeast Pharmaceutical Group Co., Ltd.*

ZELLE HOFFMAN
VOELBEL & MASON LLP
    Daniel Mason
    Joseph Bell
    Jiangxiao Hou
    44 Montgomery Street, Suite 3400
    San Francisco, CA  94101
    Tel: (415) 693-0700
    Fax: (415) 693-0770

    *Attorneys for Defendant*
    *Shijiazhuang Pharma. Weisheng*
    *Pharmaceutical (Shijiazhuang) Co., Ltd.*

BAKER & McKENZIE LLP
    Charles H. Critchlow
    Darrell Prescott
    Christopher Chinn
    1114 Avenue of the Americas
    New York, New York  10036-7703
    Tel: (212) 626-4476
    Fax: (212) 626-4120

    *Attorneys for Defendant*
    *Hebei Welcome Pharmaceutical Co., Ltd.*