# EXHIBIT 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X

IN RE                                                  MASTER FILE 06-MD-1738
VITAMIN C ANTITRUST LITIGATION                         (DGT)(JO)

This Document Relates To:

ALL CASES

-------------------------------------------------------X

# BRIEF OF AMICUS CURIAE
## THE MINISTRY OF COMMERCE OF THE PEOPLE'S REPUBLIC OF CHINA
## IN SUPPORT OF THE DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

## Sidley Austin LLP

ATTORNEYS FOR AMICUS CURIAE
THE MINISTRY OF COMMERCE OF THE
PEOPLE'S REPUBLIC OF CHINA

787 SEVENTH AVENUE
NEW YORK, NEW YORK 10019
(212) 839-5300

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. ii

INTEREST OF THE AMICI ................................................................................................ 1

BACKGROUND ................................................................................................................. 4

I.       Allegations of the Complaint ................................................................................. 4

II.      The Regulation of the Vitamin C Export Industry in China.................................. 5

         A.       The Nature and Regulatory Role of the Chamber of Commerce of
                  Medicines and Health Products Importers & Exporters ........................... 5

         B.       The Vitamin C Sub-Committee ................................................................. 9

                  1.       Initial Regulations Mandating Coordination (So-Called "Voluntary
                           Self-Restraint") in Establishing Export Price and Quantity ...................... 10

                  2.       Revised Regulation of Export Pricing and Quantity: Verification
                           and Chop .................................................................................................. 14

ARGUMENT ..................................................................................................................... 15

I.       Dismissal Is Mandated By The Foreign Sovereign Compulsion Doctrine.......................... 15

II.      The Act of State Doctrine Also Mandates Dismissal ........................................... 21

III.     This Suit Should Be Dismissed Based on Principles of International Comity ................... 23

CONCLUSION................................................................................................................... 25

# TABLE OF AUTHORITIES

## FEDERAL CASES

Agency of Canadian Car & Foundry Co. v. American Can Co., 258 F. 363
(2d Cir. 1919)................................................................................................2

Alfred Dunhill of London, Inc. v. Republic of Cuba, 425 U.S. 682 (1976), cert.
denied, Saksand Co. v. Republic of Cuba, 425 U.S. 991 (1976)................22

Certified O.N.E. Shipping Ltd. v. Flota Mercante Grancolombiana, S.A.,
830 F.2d 449 (2d Cir. 1987)
cert. denied, 488 U.S. 923, (1988) ............................16, 17, 19, 22, 23, 25

Continental Ore Co. v. Union Carbide and Carbon Corp., 370 U.S. 690 (1962) ..............20

Dames & Moore v. Regan, 453 U.S. 654 (1981)................................................21

Int'l Ass'n of Machinists & Aerospace Workers v. OPEC, 649 F.2d 1354
(9th Cir. 1981) cert. denied, 454 U.S. 1163 (1982) ...................................23

Interamerican Refining Corp. v. Texaco Maracaibo, Inc., 307 F. Supp. 1291,
1298 (D. Del. 1980) ....................................................................................16

Japan Line, Ltd. v. Los Angeles County, 441 U.S. 434 (1979)..........................21

Liu v. Republic of China, 892 F.2d 1419 (9th Cir. 1989)..................................22

Mannington Mills, Inc. v. Congoleum Corp., 595 F.2d 1287
(3d Cir. 1979)..................................................................16, 17, 18, 25

Maple Flooring Mfrs Ass'n v. U.S., 268 U.S. 563 (1925)....................................6

Matsushita Electric Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S. Ct.
1348 (1985)....................................................................................................3

McElderry v. Cathay Pacific Airways, Ltd., 678 F. Supp. 1071
(S.D.N.Y. 1988) ...........................................................16, 17, 24

Oetjen v. Central Leather Co., 246 U.S. 297 (1918) ......................................22

Robinson v. Government of Malaysia, 269 F.3d 133 (2d Cir. 2001) ..................2

Timberlane Lumber Co. v. Bank of America, N.T. and S.A, 549 F.2d 597
(9th Cir. 1976)................................................................16, 22, 23, 24, 25

ii

Trugman-Nash, Inc. v. New Zealand Dairy Board, Milk Prod. Holdings (North America), Inc., 954 F. Supp. 733 (S.D.N.Y. 1997) .................................................16, 19, 23

U.S. v. Curtiss-Wright Export Corp., 299 U.S. 304 (1936)...............................................21

U.S. v. Javino, 960 F.2d 1137 (2d Cir. 1992) cert. denied, Javino v. U.S., 506 U.S. 979 (1992)..................................................................................................................2

U.S. v. Pink, 315 U.S. 203 (1942) ........................................................................................2

U.S. v. Sisal Sales Corp., 274 U.S. 268 (1927) ................................................................20

W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp., Int'l, 493 U.S. 400 (1990) ..........21, 22

## TREATISE

P. Areeda & H. Hovenkamp, ANTITRUST LAW, ¶ 274c (2d ed. 2000)...........................15

## INTEREST OF THE AMICI

In this lawsuit, plaintiffs seek to recover treble damages from four Chinese manufacturers of vitamin C, and the affiliates of one of these manufacturers, based on conduct that was compelled by Chinese law. Because the conduct that allegedly violated U.S. antitrust law occurred entirely in the territory of China, and because the defendants were required by the laws of China to engage in that conduct, this lawsuit cannot be resolved without interfering with Chinese industrial policy respecting the operation of domestic firms within China and without impermissible inquiry into the motives of the Chinese government. Accordingly, three closely related doctrines, the foreign sovereign compulsion doctrine, the act of state doctrine, and principles of international comity, mandate dismissal of this action.

*Amicus* the Ministry of Commerce of the People's Republic of China (hereinafter "the Ministry")[1] is deeply interested in the prompt and proper resolution of this lawsuit. The Ministry is a component of the State Council (the central Chinese government) and is the highest administrative authority in China authorized to regulate foreign trade, including export commerce. It is the equivalent in the Chinese governmental system of a cabinet level department in the U.S. governmental system. The Ministry formulates strategies, guidelines and policies concerning domestic and foreign trade and international economic cooperation, drafts and enforces laws and regulations governing domestic and foreign trade, and regulates market operation to achieve an integrated, competitive and orderly market system.

If this Court were to find the defendants' conduct violated U.S. antitrust laws, it would improperly penalize defendants for the sovereign acts of their government and would adversely affect implementation of China's trade policy. The Ministry therefore files this brief

---

[1]    The Ministry was initially known as the Ministry of Foreign Trade and Economic Cooperation. This brief uses the term "Ministry" to refer to both this predecessor entity and the current Ministry of Commerce.

to inform the Court of the regulatory scheme that governed defendants during the period encompassed by the Complaint[2] and that dictated the conduct alleged to violate U.S. antitrust laws. The Ministry accordingly supports the defendants' request that this action be dismissed.

The information the Ministry is providing is properly considered in connection with a motion to dismiss under Rule 12(b) because each of the foreign sovereign compulsion doctrine, the act of state doctrine, and principles of international comity implicate this Court's subject matter jurisdiction. See Robinson v. Gov't of Malaysia, 269 F.3d 133, 141 n.6 (2d Cir. 2001) (a district court "must" consider materials outside complaint if they "may result in the dismissal of the complaint for want of jurisdiction"). Indeed, both the United States Supreme Court and the Second Circuit have recognized that the statements of a foreign government about the scope and meaning of its laws are to be given binding and conclusive effect by U.S. courts. See U.S. v. Pink, 315 U.S. 203, 218-21 (1942) (statement of Soviet Commissariat for Justice concerning extraterritorial effect of nationalization decree deemed "conclusive"); Agency of Canadian Car & Foundry Co. v. American Can Co., 258 F. 363, 368-69 (2d Cir. 1919) (authoritative representation by Russian government is "binding and conclusive in the courts of the United States"). Since 1978, the U.S. government has encouraged foreign governments to present their views concerning pending judicial proceedings directly to the U.S. courts,[3] and the

---

[2]    The "Relevant Period" referenced in the Complaint is December, 2001 through the present.

[3]    See Letter from Solicitor General McCree to Legal Adviser Hansell (May 2, 1978), reprinted in U.S. Dep't of State, 1978 Digest of United States Practice in International Law 560, reprinted in part in 73 Am. J. Int'l L. 122, 125 (1979);  Department of State Circular Diplomatic Note to Chiefs of Mission in Washington, D.C. (Aug. 17, 1978), reprinted in U.S. Dep't of State, 1978 Digest of United States Practice in International Law 560, reprinted in part in 73 Am. J. Int'l L. 122, 124 (1979); see also Letter from Deputy Legal Adviser Marks (June 15, 1979) (described in 73 Am. J. Int'l L. 669, 678-79 (1979)).  A copy of the foregoing is submitted herewith as Exhibit A to the declaration of Joel M. Mitnick, dated June 29, 2006 ("Mitnick Decl.").

U.S. Solicitor General has taken the position that a foreign government's submission of its views in the form of an amicus curiae brief should be "dispositive."[4]

It is particularly appropriate to accord the views of the Ministry dispositive weight here because the Complaint employs terms that have very different meanings under Chinese law, and within the Chinese regulatory system, than those same terms have in the United States. Plaintiffs allege that a Chinese "trade association" facilitated an illegal cartel, which "coordinated" vitamin C export pricing as part of a series of "voluntary" or "self-restraint" agreements. In fact, the "association," or "social organization," is a Ministry-supervised entity authorized by the Ministry to regulate vitamin C export prices and output levels, and the price "coordination," or so-called "voluntary self-restraint," it facilitated is a government-mandated price and output control regime. Because China's ongoing transition from a state-run command economy to a market-driven economy is utterly foreign to the economic history and traditions of the United States, there is a very significant risk of misunderstanding by U.S. lawyers and judges of the regulatory concepts China has adopted to manage this transition. Accordingly, the Ministry files this amicus brief to explain those very different concepts as well as to emphasize that the conduct alleged in the complaints here is mandated by Chinese law. Properly understood, China's regulation of vitamin C exports mandates dismissal of this lawsuit.

---

[4] See Brief for United States as Amicus Curiae Supporting Appellants, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S.Ct. 1348 (1985) (No. 83-2004) at 17 (explicit and detailed statement by foreign government should be "given dispositive weight"), Mitnick Decl., Ex. B.

## BACKGROUND

### I.    Allegations of the Complaint

In January 2005, Plaintiffs Animal Science Products Inc. and the Ranis Company ("plaintiffs") filed the first Complaint in this action (the "Complaint")[5] in which they allege that defendants, four Chinese manufacturers and exporters of raw vitamin C products, and affiliates of one of these manufacturers,[6] violated Section 1 of the Sherman Act by agreeing on the price and volume of vitamin C products exported from China to the United States.

Specifically, plaintiffs allege that the defendants formed "a cartel to control prices and the volume of exports for vitamin C. . . . [and] successfully reached an autonomy agreement" in which they allegedly agreed "to control export quantities and achieve stable and enhanced price goals," "to restrict their exports of vitamin C in order to create a shortage of supply in the international market," and "to 'restrict quantity to safeguard prices, export in a balanced and orderly manner and adjust dynamically.'" Compl. ¶ 43.  Plaintiffs allege that, as a result of the cartel, the prices of vitamin C products exported from China to the United States increased from $2.50 per kilogram in December, 2001, to as high as $7 per kilogram in December, 2002, and that they, as purchasers of vitamin C products, were forced to pay higher prices as a result. Compl. ¶ 45.

Plaintiffs further allege that in 2003, defendants met and agreed to limit production levels further and increase prices (Compl. ¶ 52), and that in 2004, defendants agreed to suspend production in an effort to stabilize prices (Compl. ¶ 56).

---

[5]    Subsequent complaints have not been consolidated into a single complaint, but all of the complaints make substantially identical allegations.

[6]    The Chinese defendants are:  Hebei Welcome Pharmaceutical Co. Ltd., Jiangsu Jiangshan Pharmaceutical Co. Ltd., Northeast Pharmaceutical Group Co. Ltd., Weisheng Pharmaceutical Co. Ltd., and China Pharmaceutical Group, Ltd.  In addition, the Ministry is informed that a defunct U.S. affiliate of one of these defendants was also named in the Complaint.

4

Plaintiffs claim that the meetings held by defendants, and the agreements to which defendants were party, were "facilitated by the efforts of their trade association," the Western Medicine Department of the Association of Importers and Exporters of Medicines and Health Products of China.[7] Compl. ¶ 43. This "association," it is alleged, also "coordinated" the meetings at which defendants agreed to the limitations of sales and exports to the United States (Compl. ¶ 46), called a late 2003 "emergency meeting" attended by the defendants in which the "association" discussed how the defendants were to "rationalize the market and restrain and limit the production levels of vitamin C to increase prices" (Compl. ¶ 53), and met with the defendants at the "China Exhibition of World Pharmaceutical Ingredients," during which they "devised plans to rationalize the market and to limit production levels and increase prices" (Compl. ¶ 54).

## II.   The Regulation of the Vitamin C Export Industry in China

### A.   The Nature and Regulatory Role of the Chamber of Commerce of Medicines and Health Products Importers & Exporters

As an initial matter, the allegations of the Complaint rest on a fundamental misunderstanding concerning the nature of the Chamber of Commerce of Medicines and Health Products Importers & Exporters ("Chamber") and its role in the vitamin C industry in China. The Complaint characterizes the Chamber as a mere "trade association" that has facilitated the collusive actions of a "cartel." Compl. ¶ 43. In fact, the Chamber is vastly different from a U.S. trade association, or private Chamber of Commerce. Rather, it is an entity under the Ministry's direct and active supervision that plays a central role in regulating China's vitamin C industry. What the Complaint describes as a "cartel,"[8] and an "ongoing combination and conspiracy to

---

[7]   The official Chinese name of this entity translates as the "Chamber of Commerce of Medicines and Health Products Importers and Exporters." As described infra, this entity, among other things, regulates China's import and export of pharmaceuticals (or "Western medicines") and health care products, including vitamin C.

[8]   In their Complaint, and before Magistrate Judge Orenstein, plaintiffs sound a simplistic

suppress competition" through price-fixing (Compl. ¶¶ 43-44), is a regulatory pricing regime mandated by the government of China – a regime instituted to ensure orderly markets during China's transition to a market-driven economy and to promote, in this transitional period, the profitability of the industry through coordination of pricing and control of export volumes. Most importantly, this regime was established to safeguard the national interests of China.[9]

The United States has never had a state-run command economy with state-owned industries. In the years following the Civil War, chambers of commerce and other trade associations sprang up voluntarily throughout the country as a means of gathering and providing information to members of particular industries. See Maple Flooring Mfrs. Ass'n v. U.S., 268 U.S. 563 (1925). The proliferation of numerous voluntary commercial and trade organizations led President Taft to note the need for a central organization in touch with such groups throughout the United States. President William Howard Taft, Third Annual Message to Congress (Dec. 5, 1911). This, in turn, led to the creation the following year of the U.S. Chamber of Commerce, an entirely voluntary, non-governmental organization created to, among other things, represent business interests before the federal government.

---

but very misleading theme: defendants here have "stepped into the shoes" of a defunct cartel of European and Japanese vitamin manufacturers, many of whom pleaded guilty to criminal price fixing charges. Hr'g Tr. 48:2-3, May 3, 2006. This theme is a blatant attempt to "poison the well" before the Court has an opportunity to understand the fundamentally different conditions under which the Chinese vitamin C export industry operated from its European and Japanese counterparts. Other than that both industries involved vitamin C, the circumstances of how those industries priced their export products could not have been more different.

[9]    As China carried out its economic reform beginning in 1978, namely through de-centralizing Government control over, and direct management of, economic activities by permitting state-owned entities to have decision-making power and by encouraging wide private ownership in the economic sector, China was concerned about the possible effects (as it saw them) of unfettered competition between and among enterprises, including that it could retard the orderly development of a stable domestic vitamin C industry and adversely effect levels of employment in that industry. The Government attempted to temper the effects of economic reform in its regulation of domestic and foreign commerce.

The origins and purposes of that institution stand in stark contrast to those of the similarly-named, but functionally very different, Chamber here. Prior to the advent of any free market system in China, the government itself participated in and controlled the manufacturing and exporting of goods. Only a number of state-owned national exporting entities were allowed to engage in exporting, and no private enterprises or manufacturing enterprises were allowed to export directly. These designated state-owned national exporting enterprises functioned to regulate exports under the Ministry's direction. Subsequently, however, when other types of enterprises (both private and state-owned) were allowed to obtain export licenses, the function of regulating export had to be stripped away from these state-owned national exporting entities so that they were not in the position of regulating the exports of their competitors. The Chamber was established, in part, to serve that role with respect to imports and exports of pharmaceutical products, including vitamin C; it regulates the export of those products under the authority and direction of the Ministry and the General Administration of Customs ("Customs").[10]

---

[10]     The Chamber described its role in Chinese foreign commerce during the Relevant Period as:

> To meet the need of building the *socialist market economy* and *deepening the reform of foreign economic and trade management system*, the China Chamber of Commerce of Medicines & Health Products Importers & Exporters was established in May 1989 in an effort to boost the sound development of foreign trade in medicinal products. As a social body formed along business lines and enjoying the status of legal person, the Chamber is composed of economic entities registered in the People's Republic of China dealing in medicinal items as authorized by the departments under the [S]tate Council responsible for foreign economic relations and trade as well as organizations empowered by them. *It is designated to coordinate import and export business in Chinese and Western medicines* and provide service for its member enterprises. Its over 1100 members are scattered all over China. The Chamber abides by the state laws and administrative statutes, *implements its policies and regulations governing foreign trade, accepts the guidance and supervision of the responsible departments under the States Council. The very purpose is to coordinate and supervise the import and export operations in this business, to maintain business order and protect fair competition, to safeguard the legitimate rights and interests of the state, the trade and the members and to promote the sound development of foreign trade in medicinal items.*

7

Although the Chamber is denominated a "social organization," this term also has a very different meaning under Chinese law than it has in the United States.  The Chinese notion of a "social organization" includes within its scope the various "chambers" that exist under Chinese law for the purpose, when authorized, of regulating specific industries (e.g., the Chamber regulates certain pharmaceutical industries, including the vitamin C industry).[11]  See the Ministry's implementing regulation for the administration of "social organizations" (including "chambers") in foreign trade, Measures for Administration over Foreign Trade and Economic Social Organizations (February 26, 1991) Arts. 2 and 14 ("Measures for Administration"), Mitnick Decl., Ex. D (emphasis added) ("Social organizations established with *coordination and industry regulation functions as authorized by [the Ministry]* must implement the administrative rules and regulations relating to foreign trade and economy.").  As discussed, infra, regulation over export pricing and output levels was a specific vitamin C "industry regulation function" delegated by the Ministry to the Chamber.

---

China Chamber of Commerce of Medicines & Health Products Importers & Exporters, Publication of Administration and Regulation (2003), at 3 (emphasis added), Mitnick Decl., Ex. C.

This document, along with all Ministry rules or regulations cited herein and attached to the Mitnick Declaration, have been authenticated under the procedures of Federal Rule of Evidence 902(3), which governs self-authentication of foreign public documents.  First, an authorized official of the Ministry or the Chamber, as applicable, attested in the presence of a P.R.C. notary public to the authenticity of each document.  (In the case of the Chamber, the attestation was also in the presence of a Ministry official who further authenticated the Chamber attestation.)  Next, the attestation was further certified by the Consular Department of the P.R.C. Ministry of Foreign Affairs and the U.S. Embassy in Beijing.  See Mitnick Decl., document index, for a summary of the attestation(s) and certification(s) applicable to each such document.  Translations of all Chinese language documents attached to the Mitnick Declaration are certified by a qualified translation agency and further notarized by a P.R.C. notary public.

[11]     "Chambers [defined as 'chambers of commerce of importers and exports'] are social organizations."  Notice of [Ministry] Regarding Printing and Distribution of Several Regulations for Personnel Management of Chambers of Commerce for Importers and Exporters (Sept. 23, 1994) ("Notice Regarding Chamber Personnel Management") at 1, Mitnick Decl., Ex. E.

8

The Ministry's authority over the Chamber is plenary: covering such aspects as the Chamber's selection of its leaders, its personnel management system, its budget and accounting systems and its salary structure. Id. Art. 16. See also, Notice Regarding Chamber Personnel Management, Annex II, 4 (Ministry shall verify and approve Chamber's authorized number of personnel); Annex III, 8 (Chamber's general working staff "shall be chosen primarily from the employees in service of their membership organizations or the competent authorities in charge of foreign trade and economics and the public institutions directly under their leadership"); Annex IV, 13 (candidates for senior positions within the Chamber "are recommended by [the Ministry] or recommended by over 1/3 of the [C]hamber's member companies and approved by [the Ministry]"); and Annex V, 17 (Ministry shall "verify and approve the total amount of salary of the [C]hamber"). The Chamber, in turn, must submit to the Ministry its "annual working plan and arrangements of major events," including all "important meetings and activities." Measures for Administration, Art. 21. Similarly, the Chamber "must implement the administrative rules and regulations relating to foreign trade and economy." Id. Art. 14. In short, the Chamber is the instrumentality through which the Ministry oversees and regulates the business of importing and exporting medicinal products in China.

**B.     The Vitamin C Sub-Committee**

Throughout the Relevant Period, the Chamber exercised its regulatory authority with respect to vitamin C exports through its Vitamin C Sub-Committee. The Sub-Committee was established in 1997, at the Ministry's order, against a backdrop of "intense competition and challenges from the international [vitamin C] market." Approval for Establishing VC Sub-Committee of China Chamber of Commerce of Medicines & Health Products Importers & Exporters (issued March 23, 1998), Mitnick Decl., Ex. F. The Sub-Committee, operated under the Chamber's direction and administration, is responsible for "coordinating the Vitamin C

export market, price and customers of China, to improve the competitiveness of Chinese Vitamin C produce in the world market and promote the healthy development of Vitamin C export of China." Id. ¶ 2.

Only companies that exported vitamin C in certain specified volumes were eligible to be members of the Sub-Committee. Charter of Vitamin C Sub-Committee of China Chamber of Commerce of Medicines and Health Products Importers and Exporters (October 11, 1997) Art. 11 ("Vitamin C Sub-Committee Charter"), Mitnick Decl., Ex. G. Pursuant to the Vitamin C Sub-Committee Charter, only Sub-Committee members "have the right to export Vitamin C and are simultaneously qualified to have Vitamin C export quota." Id. Art. 12. With this right come a series of "obligations," including the duty to "comply with the . . . regulations of the Vitamin C Sub-Committee and implement [its] resolution," and to export and supply vitamin C "only to those foreign trade enterprises verified by the Sub-Committee." Id. Art. 15(1)&(2). Most significantly for purposes of this case, members are obligated to *"[s]trictly execute export coordinated price set by the Chamber and keep it confidential."* Id. Art. 15(6) (emphasis added). The Charter further provides that any "failure to implement any resolution or regulation of the Sub-Committee and failure to perform any member's obligation shall be punished by the Sub-Committee." Id. Art. 16. Authorized punishments include "warning, open criticism and even revocation of . . . membership," and imposition of monetary penalties. Id. In addition, the Sub-Committee may recommend, through the Chamber, that the Ministry "suspend and even cancel the Vitamin C export right of such violating member," id., resulting in a total ban on participation in exporting altogether.

1.   **Initial Regulations Mandating Coordination (So-Called "Voluntary Self-Restraint") in Establishing Export Price and Quantity**

Shortly after it mandated the establishment of the Vitamin C Sub-Committee, the Ministry, acting in conjunction with the State Drug Administration, promulgated a new

10

regulation authorizing and requiring the Chamber and Sub-Committee to limit the production of vitamin C for export and to set export prices.  Notice Relating to Strengthening the Administration of Vitamin C Production and Export ("1997 Ministry & SDA Notice"), Mitnick Decl., Ex. H.  The regulation limited participation in the vitamin C export industry to those companies qualified to be members of the Sub-Committee, then required all such eligible entities to "participate in such [Sub-Committee] and subject themselves to the coordination of the [Sub-Committee]." Id. at 2.  The Sub-Committee, in turn, was required to *formulate and adjust [the] export coordination price, which the Vitamin C export enterprises must strictly implement."* Id. (emphasis added).

Under this regulation, qualified vitamin C manufacturers and import and export companies were able to receive a Vitamin C export quota license.  The issuance of Vitamin C export licenses was subject to two criteria.  First, the export volume was required to be in compliance with the export quota.  Second, the export price was required to be no lower than the price established by the Vitamin C Subcommittee's coordinated price agreements.  See id. ("The organizations that [are] authorized by [the Ministry] to issue export licenses [were to] strictly verify the qualification of Vitamin C export and operation of the enterprises, and verify their export contracts and issue export license according to the Vitamin C coordinated price and volume quotas.").  In addition, the volume to be exported by each qualified entity under this "Production and Export Licensing System" was determined by the Ministry, in conjunction with the State Drug Administration and "relevant departments." Id. at 1-2.  Attempts to circumvent the verification process were subject to penalties, including a reduction in an entity's export quota or the revocation of its exporting license. Id. para. 7 ("Vitamin C Export Coordination Group shall timely organize meetings for the major Vitamin C export enterprises . . . to . . . formulate and adjust export coordination price, which the Vitamin C export enterprises must

11

strictly implement in accordance with.  With respect to enterprises competing at low price and reducing price through any disguised means, a penalty shall be imposed . . . .") and para. 10 (". . . penalties [for violating provisions of Paragraph 7] shall be . . . the Vitamin C export quota may be reduced, in the worst case their Vitamin C export right shall be revoked").

As the foregoing makes clear, price "coordination" within this regulatory system does not mean that prices are established independently or, even, by "voluntary" agreement among manufacturers, as that term is normally understood in the West.  Rather, the decisions to limit the volume of exports and to set export prices were made by the Ministry.  The Ministry chose to implement these policies by limiting vitamin C exporting rights to certain qualified entities, compelling those entities to participate in a subcommittee of a Ministry-approved and supervised regulatory body, and requiring that subcommittee to set export prices that exporters were then required to implement, subject to a verification system that included severe penalties for non-compliance.  Within this system, therefore, "coordination" refers to the government mandated multilateral process in which prices were set—as opposed to a unilateral process in which the Ministry alone set prices.  (Indeed, the Sub-Committee was originally designated the "Vitamin C *Coordination* Group," and was referred to by that name in the 1997 Ministry & SDA Notice. see id. at 2.)  The industry participants in this multilateral process, thus, acted pursuant to governmental compulsion; when establishing price controls, they were exercising governmental regulatory power; and the price controls developed through this multilateral process were legally binding and governmentally-enforced.[12]

---

[12]   Plaintiffs rely heavily on a document from the Chamber's website that states:

In December 2001, through efforts by the Vitamin C Chapter of the China Chamber of Commerce of Medicines and Health Products Importers and Exporters, the manufacturers were able to successfully reach a self-restraint agreement, whereby they would voluntarily control the quantity and pace of exports, so as to achieve the goal of stabilizing and raising export prices.

This system of Ministry-mandated and Chamber-administered "coordination" was adopted to forestall potential market disorders that might have limited the development of a healthy vitamin C export industry during China's transition from a command economy to a market-driven economy. See Interim Regulations of the Ministry of Foreign Trade and Economic Cooperation on Punishment for Conduct at Exporting at Lower-Than-Normal Price (March 20, 1996), Mitnick Decl., Ex. I (explaining that the Ministry promulgated interim regulations to "ensure orderly development of the country's export trade, safeguard the legitimate rights and interests of the State and enterprises and prevent conduct of exporting at lower-than-normal price"). A system of government-mandated "coordination" among industry participants served the Ministry's goal of transitioning to a healthy market-based economy: it established mandatory coordinated export price and output levels (thereby forestalling what the government feared could be destructive export competition before the foundation for a healthy industry could be laid) by vitamin C manufacturers, although the Ministry itself did not decide what specific prices should be. Instead, this governmental function was delegated to market participants and the Chamber, in their capacities as Vitamin C Sub-Committee members, acting in a coordinated fashion.

---

Letter from William Isaacson and Alana Rutherford to Honorable James Orenstein (May 12, 2006) at 3 and Exhibit C (emphasis added); see also Hr'g Tr. 47-48, May 3, 2006; Pretrial Order (JO), May 4, 2006, 2-3. In the context of the Ministry's regulation of the vitamin C industry through the Chamber, however, the characterizations by the Chamber of the conduct as "self-restraint" and "voluntary" are unremarkable. The vitamin C industry was under a direct Ministry order to reach a "coordinated" agreement in order to stabilize export pricing. Thus, it is understandable that the Chamber would express its pleasure publicly that the parties were able to comply with the Ministry's order to coordinate pricing and quantities on their own (i.e., "voluntarily" and in "self-restraint") as opposed to requiring more direct Ministerial intervention to reach that result. Indeed, as discussed in Point II.B.2., infra, this regulatory system was expressly enacted "to promote [among other things] industry self-discipline."

2. **Revised Regulation of Export Pricing and Quantity: Verification and Chop**

In 2002, the Ministry changed the way in which compliance with the Chamber's "coordination" was confirmed by abolishing the Export Licensing System and establishing a so-called "verification and chop" system. See Notice Issued by the Ministry of Foreign Trade and Economic Cooperation and the General Administration of Customs for the Adjustment of the Catalogue of Export Products Subject to Price Review by the Customs ("2002 Ministry & Customs Notice"), Mitnick Decl., Ex. J. The Ministry adopted this new system "in order to accommodate the new situations since China's entry into WTO, maintain the *order* of market competition, make active efforts to avoid anti-dumping sanctions imposed by foreign countries on China's exports, *promote industry self-discipline* and facilitate the healthy development of exports." Id. at 1, Preamble (emphasis added). The Ministry explained that this new system would be both "convenient for exporters while it is conducive for the Chambers to coordinate export price and industry self-discipline." Id. at 2, para. 4. The basis of the new system was a process of *"industry-wide negotiated prices."* Id. at 2, para. 3 (emphasis added).

Under this system, the Chamber reported the "coordinated," or "industry-wide negotiated," prices for vitamin C exports to Customs. Id. Manufacturers were required to submit documentation to the Chamber which indicated both the amount and price of vitamin C to be exported. The Chamber "verified," *i.e.*, approved, the contract price and volume. If the price was at or above the minimum acceptable price set by coordination through the Chamber, the Chamber affixed a special seal, known as a "chop," on the contract and returned it to the manufacturer. Upon export, the contract was reviewed by Customs and allowed to go through only if the contract bore the Chamber's "chop." Id. The penalty for violating the system was draconian: withholding of the Chamber's "chop" meant complete denial by Customs of the ability to export.

14

In 2003, the "verification and chop" system was continued with respect to several commodities industries, including the vitamin C industry. Vitamin C exporters were required to submit contracts to the Chamber, which "verified" the exporters' submissions *based on the industry agreements* and in accordance with the relevant regulations promulgated by the Ministry of Commerce . . . and the General Administration of Customs." Announcement of Ministry of Commerce of the People's Republic of China, General Administration of Customs of the People's Republic of China (November 29, 2003) (Exhibit 2, para. C) (emphasis added), Mitnick Decl., Ex. K. "Enterprises exporting by forging the [Verification & Chop] on the contracts will be punished by the Customs and Chambers of Commerce according to relevant rules." Id. at 1. Through its 2003 announcement, in conjunction with the General Administration of Customs, the Ministry extended this system throughout the Relevant Period.

**ARGUMENT**

I.      **Dismissal Is Mandated By The Foreign Sovereign Compulsion Doctrine**

"Under the foreign sovereign compulsion doctrine the courts will immunize private defendants from antitrust liability for conduct that is actually compelled, not merely permitted by a foreign sovereign acting within its jurisdiction. In that case, the acts of the private party 'become effectively acts of the sovereign.'" P. Areeda & H. Hovenkamp, ANTITRUST LAW, ¶ 274c at 406-07 (2d ed. 2000), quoting Interamerican Refining Corp. v. Texaco Maracaibo, Inc., 307 F. Supp. 1291, 1298 (D. Del. 1980) (other citations omitted).[13]

---

[13]     In their Antitrust Enforcement Guidelines for International Operations, the U.S. Department of Justice and the Federal Trade Commission provide the following illustration of conduct that they acknowledge cannot be challenged under U.S. antitrust law:

> Assume for the purpose of this example that the overseas production cutbacks have the necessary effects on U.S. commerce to support jurisdiction. As for the participants from the two countries that did not impose any penalty for a failure to reduce production, the Agencies would not find that sovereign compulsion precluded prosecution of this agreement. As for participants from the country that did compel production cut-backs

15

U.S. courts, including the Second Circuit, have recognized that they lack subject matter jurisdiction over antitrust actions that challenge private conduct that is compelled by a foreign government. Certified O.N.E. Shipping Ltd. v. Flota Mercante Grancolombiana, S.A., 830 F.2d 449, 453 (2d Cir. 1987) cert. denied 488 U.S. 923, (1988); Mannington Mills, Inc. v. Congoleum Corp., 595 F.2d 1287, 1293 (3d Cir. 1979); Timberlane Lumber Co. v. Bank of America, N.T. and S.A., 549 F.2d 597, 606-07 (9th Cir. 1976); Trugman-Nash, Inc. v. New Zealand Dairy Bd., Milk Prod. Holdings (North America), Inc., 954 F. Supp. 733, 736 (S.D.N.Y. 1997); McElderry v. Cathay Pacific Airways, Ltd., 678 F. Supp. 1071, 1080 (S.D.N.Y. 1988); cf. Interamerican, 307 F. Supp. at 1296-98 (granting summary judgment on the merits based on the defense).

The foreign sovereign compulsion doctrine is "[a] corollary to the act of state doctrine"; it recognizes "that corporate conduct which is compelled by a foreign sovereign is . . . protected from antitrust liability, as if it were an act of the state itself." Timberlane, 549 F.2d at 606. "When the causal chain between a defendant's alleged conduct and plaintiff's injury cannot be determined without an inquiry into the motives of the foreign government, claims under the

_____

through the imposition of severe penalties, the Agencies would acknowledge a defense of sovereign compulsion.

Greatly increased quantities of commodity X have flooded into the world market over the last two or three years, including substantial amounts indirectly coming into the United States. Because they are unsure whether they would prevail in an antidumping and countervailing duty case, U.S. industry participants have refrained from filing trade law petitions. The officials of three foreign countries meet with their respective domestic firms and urge them to "rationalize" production by cooperatively cutting back. Going one step further, one of the interested governments orders cutbacks from its firms, subject to substantial penalties for non-compliance. Producers from the other two countries agree among themselves to institute comparable cutbacks, but their governments do not require them to do so.

Antitrust Enforcement Guidelines for International Operations, issued by the U.S. Department of Justice and the Federal Trade Commission (April, 2005), Illustrative Example K, Section 3.32.

16

antitrust laws are dismissed" for lack of subject matter jurisdiction. O.N.E. Shipping, 830 F.2d at 453 (affirming jurisdictional dismissal based on the defense); see also McElderry, 678 F. Supp. at 1080 (same). The doctrine is applicable where "the foreign decree was basic and fundamental to the alleged antitrust behavior and more than merely peripheral to the overall illegal course of conduct." Mannington Mills, 595 F.2d at 1293.

The foreign sovereign compulsion doctrine is fully applicable – and dispositive – here. Chinese law, promulgated by the Ministry and administered through the Chamber, compelled defendants, as members of the Vitamin C Sub-Committee, to coordinate export prices and maximum export volumes and to abide by those requirements. Under the Ministry's regulations, defendants were compelled to become participating members of the Vitamin C Sub-Committee, 1997 Ministry & SDA Notice at 2 Ex. H, and Vitamin C Sub-Committee Charter, Art. 12, Ex. G, they were compelled to *"formulate and adjust [the] export coordination price,"* 1997 Ministry & SDA Notice at 2 (emphasis added), Ex. H, and they were compelled to abide by and implement that "coordinated" price, id., and Vitamin C Sub-Committee Charter, Art. 15(6), Ex. G. Defendants would not have been eligible to export vitamin C at all if they failed to participate in these price-setting and production-limiting activities. 1997 Ministry & SDA Notice, Ex. H; Vitamin C Sub-Committee Charter, Art. 12, Ex. G. Government entities policed defendants' compliance with the resulting prices and volume limits, and non-compliance would subject defendants to severe penalties, including, among other things, reduction in export quotas (resulting in further economic loss), and, possibly, loss of export rights. 1997 Ministry & SDA Notice at 2, Ex. H; Vitamin C Sub-Committee Charter, Art. 16, Ex. G; 2002 Ministry & Customs Notice at 2, Ex. J.

As noted above, while China is in the process of moving actively from its former state-run command economy to a market economy more of a type familiar to the United States,

the current economic system is transitional and there remains a level of active state direction and coordination that has no analogue in the United States. Thus, for example, one would not find in the United States a government mandate to "maintain order in market competition," to "promote industry self-discipline," or to mandate export pricing and output levels "based on the *industry agreements*"; nor would one find a governmentally-directed organization, such as the Chamber, directing parties to attend meetings, such as those referred to in the complaints, to discuss prices or export quotas, with a view to maximizing industry profitability in export commerce.

That, however, is precisely the transitional framework under which the vitamin C industry functioned throughout the Relevant Period. Thus, while the Government did not, itself, determine specific prices or quantities, it most emphatically did insist on those matters being determined *through industry coordination*. That, of course, is all that is alleged in the complaints here and that is conduct that was compelled by the Chinese government in the interests of insuring "order in market competition."

It is thus clear that these mandates of Chinese law were "basic and fundamental to the alleged antitrust behavior and more than merely peripheral to the overall illegal course of conduct." Mannington Mills, 595 F.2d at 1293. The central allegations of the Complaint are that defendants "agreed to control export quantities and achieve stable and enhanced price goals," and that plaintiffs were injured because the price of vitamin C products "has been fixed, raised, maintained and stabilized at artificial and non-competitive levels." Compl. ¶¶ 43 and 62. The decision to control export quantities and require coordinated export prices was made by the Ministry. Defendants were compelled to implement these decisions through participation in the Vitamin C Sub-Committee. Similarly, the Complaint alleges that the allegedly unlawful prices and production limits were established through defendants' "participat[ion] in meetings and conversations in China and elsewhere in which the prices, volume of sales and exports to the

18

United States, and markets for vitamins were discussed and agreed upon." Compl. ¶ 46. Again, contrary to the allegations of the complaint, defendants were compelled by the Ministry to engage in these very activities. The government-supervised Chamber facilitated and coordinated those meetings, and was required to advise the Ministry of such meetings.

Accordingly, the price "coordination" alleged in the complaint cannot serve as a basis for the imposition of antitrust liability. Indeed, just as in O.N.E. Shipping, this "antitrust suit represents a direct challenge to [the Ministry's medicinal product export] laws and to the legality of [defendants'] agreements under those laws." 830 F.2d at 451. Those "laws were designed to promote the development of a strong [Chinese medicinal products industry] and to assist [China's] economic development." Id. Accordingly, here, as in O.N.E. Shipping, "the causal chain between a defendant's alleged conduct and plaintiff's injury cannot be determined without an inquiry into the motives of the [Ministry]." Id. at 453. See also Trugman-Nash, Inc., 954 F. Supp. at 736 (New Zealand dairy producers entitled to defense of foreign sovereign compulsion where New Zealand law required export licensing board to disapprove "of sales price competition among New Zealand dairy producers in respect of exports to nations like the United States that restrict import quantities").[14]

---

[14]    The arguments of the United States in its amicus brief in Matsushita (see footnote 4, supra) apply here with equal force:

> [T]he court of appeals should have given dispositive weight to the statement submitted to the district court by the Japanese Government, which indicated explicitly that part of petitioners' conduct was compelled. The court's rejection of petitioners' sovereign compulsion defense has caused deep concern to the Government of Japan and to the governments of other countries that are significant trading partners of the United States and threatens to affect adversely the foreign policy of the United States. Mitnick Decl., Ex. B at 6.

> The court of appeals erred in rejecting petitioners' sovereign compulsion defense. The Government of Japan explained in the MITI [Ministry of International Trade] Statement that it "directed" petitioners "to enter into" the check price agreement.... [T]hat explicit and detailed statement by a foreign sovereign that it mandated the check price agreement

Finally, this case stands in stark contrast to those where courts have deemed the foreign sovereign compulsion doctrine inapplicable. For example, in <u>Continental Ore Co. v. Union Carbide and Carbon Corp.</u>, 370 U.S. 690 (1962), the Court held that the defense was not available to a Canadian entity that was given the exclusive right to import vanadium oxide into Canada, but then decided, "within its area of discretionary powers," to use that right to conspire with a U.S. subsidiary to boycott and destroy a competitor. <u>Id.</u> at 706-07. The Supreme Court emphasized that there was "no indication that [any] official within the . . . Canadian government approved or would have approved of" this conduct, and that no "law in any way compelled discriminatory purchasing." <u>Id.</u> Here, the Ministry not only approved defendants' conduct in establishing export limits and price coordination, it compelled that very conduct.

Similarly, plaintiffs do not—and cannot—allege that defendants entered into a price-fixing conspiracy, then worked to secure laws or regulations that blessed their arrangements. <u>Cf. U.S. v. Sisal Sales Corp.</u>, 274 U.S. 268 (1927) (conspiracy formed in the United States for the purpose of monopolizing sales to the United States was not immunized simply because one element of the conspiracy involved securing laws that recognized the conspirators as exclusive traders and imposed discriminatory sales taxes on rivals). Here, the Ministry imposed the relevant laws on defendants. Indeed, the impetus for these and other price coordination measures was not to endorse existing price-fixing conspiracies, but to prevent disorderly competition.

---

in accordance with its laws ... should have been given dispositive weight. It follows that the foreign sovereign compulsion defense precluded use of the check price agreement as a basis for liability under the Sherman Act. <u>Id.</u> at 12.

The MITI Statement also explained that MITI had directed the regulations [through] the Japan Machinery Exporters Association.... <u>Id.</u>

In sum, Chinese Law mandated the participation of entities engaged in vitamin C export to coordinate with respect to export pricing and volume quotas and to adhere to such limits. Each defendant conducted itself as Chinese law required when it participated in Sub-Committee meetings at which agreements were reached with respect to pricing and volume controls. Refusal to subject oneself to the coordination of the Sub-Committee and the Chamber is unlawful under relevant regulations and would result in severe punishment, either through monetary penalty or loss of ability to participate in the industry altogether. Because all of the elements of the foreign sovereign compulsion doctrine are satisfied, this lawsuit should therefore be dismissed.

## II.     The Act of State Doctrine Also Mandates Dismissal

The act of state doctrine also forbids judicial inquiry into China's motives in regulating its foreign commerce. The act of state doctrine differs from the foreign sovereign compulsion defense in that the act of state doctrine is grounded in principles of federalism and reflects the view that the courts, in deciding whether to accord recognition to certain foreign acts of state, might hinder the conduct of foreign affairs by the Executive Branch. W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp., Int'l, 493 U.S. 400, 404 (1990). The Supreme Court has acknowledged "the very delicate, plenary and exclusive power of the President as the sole organ of the federal government in the field of international relations." U.S. v. Curtiss-Wright Export Corp., 299 U.S. 304, 320 (1936). See also Japan Line, Ltd. v. Los Angeles County, 441 U.S. 434, 448-49 (1979) and Dames & Moore v. Regan, 453 U.S. 654, 669 (1981). "The conduct of the foreign relations of our government is committed by the Constitution to the executive and legislative – 'the political' – departments of the government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision." Oetjen v. Central Leather Co., 246 U.S. 297, 302 (1918).

21

The act of state doctrine, in essence, is "designed primarily to avoid judicial inquiry into the acts and conduct of the officials of the foreign state, its affairs and its policies and the underlying reasons and motivations for the actions of the foreign government. Such an inquiry is foreclosed under the act of state doctrine." O.N.E. Shipping, 830 F.2d at 452 (citing Hunt v. Mobil Oil Corp., 550 F.2d 68, 73 (2d Cir. 1977), cert. denied, 434 U.S. 984, 98 S.Ct. 508 (1977)). See also W.S. Kirkpatrick 493 U.S. at 404.

The burden of proving an act of state rests on the party asserting the applicability of the doctrine. Alfred Dunhill of London, Inc. v. Republic of Cuba, 425 U.S. 682, 684-85, (1976), cert. denied, Saksand Company v. Republic of Cuba, 425 U.S. 991 (1976). "[T]his burden requires that a party offer some evidence that the government acted in its sovereign capacity and some indication of the depth and nature of the government's interest." Liu v. Republic of China, 892 F.2d. 1419, 1432 (9th Cir. 1989) (citing Timberlane, 549 F.2d at 607-08).

The act of state doctrine mandates that this Court decline to exercise jurisdiction over this action. As set forth above, the conduct alleged to have been violative here was compelled by the Chinese government. The Chinese government compelled such conduct in its oversight of its foreign trade regulation. Any determination by this Court into the conduct as alleged by the plaintiffs will necessarily invoke an inquiry into the legitimacy of China's foreign policy concerning the manufacture and export of vitamin C. To permit the validity of the policy-making decisions of China "to be reexamined and perhaps condemned by [this] court[] would very certain[ly] 'imperil the amicable relations between [the two] governments and vex the peace of nations." Oetjen, 246 U.S. at 304. It cannot be denied that the possibility of insult to China is significant – "the granting of any relief would in effect amount to an order from a domestic court instructing a foreign sovereign to alter its chosen means" of regulating domestic conduct. See

Int'l Ass'n of Machinists & Aerospace Workers v. OPEC, 649 F.2d 1354, 1361 (9th Cir. 1981)

cert. denied, 454 U.S. 1163 (1982). Such an inquiry is prohibited by the act of state doctrine – if

China's regulation of its foreign policy implicates U.S. interests as alleged, then the proper

forum for such discussions between the United States and China is not in this Court.

III.    **This Suit Should Be Dismissed Based on Principles of International Comity**

Principles of international comity also render the exercise of jurisdiction over the

Complaint inappropriate. Comity

> is the recognition which one nation allows within its territory to the
> legislative, executive or judicial acts of another nation, having due
> regard both to international duty and convenience, and to the rights
> of its own citizens or of other persons who are under the protection
> of its laws.

O.N.E. Shipping, 830 F.2d at 451 n.3 (quoting Hilton v. Guyot, 159 U.S. 113, 163-64 (1895)).

The Second Circuit has adopted the multi-factor test set forth in Timberlane for determining

when comity principles require courts to decline to exercise jurisdiction over the conduct of

foreign actors. See U.S. v. Javino, 960 F.2d 1137, 1142-43 (2d Cir. 1992) cert. denied, Javino v.

U.S., 506 U.S. 979 (1992); O.N.E. Shipping, 830 F.2d at 451. Here, virtually all of these factors

militate in favor of dismissal.

First, for all of the reasons discussed above, there is an irreconcilable conflict

between the requirements of U.S. antitrust law and the laws and policies of China. See

Timberlane, 549 F.2d at 614 (courts must examine "the degree of conflict with foreign law or

policy"). Simply put, Chinese law mandates conduct that U.S. antitrust law proscribes. See

Trugman-Nash, Inc., 954 F. Supp. at 736 (dismissing on comity grounds after finding "actual

and material conflict between American antitrust law and New Zealand law in respect of the

marketing of dairy export produce"); McElderry, 678 F. Supp. at 1079 (dismissing on comity

grounds based on "direct conflict between" U.S. antitrust law and the law of the United

23

Kingdom). And that Ministry-mandated conduct, all of which occurs in China, is far more "importan[t] to the violations charged" than any "conduct within the United States." Timberlane, 549 F.2d at 614.

Accordingly, an exercise of jurisdiction cannot achieve "compliance" with U.S. antitrust law: as Chinese entities with their principal places of business in China, defendants cannot export vitamin C at all if they do not comply with the laws of China. See id. (courts must consider the nationality of the parties and their principal places of business and the extent to which enforcement by either state can be expected to achieve compliance). This lawsuit, therefore, cannot compel defendants to conform their future conduct to the requirements of U.S. antitrust law, because they will remain subject to the Ministry's price-coordination requirements.

Those requirements of Chinese law, moreover, were not adopted with "the explicit purpose to harm or effect American commerce," nor were any such harms or effects reasonably foreseeable. See id. To the contrary, the Ministry adopted these requirements to prevent self-destructive price competition during China's transition from a state-run to a market-driven economy. As a consequence, the "significance of effects on the United States" is far smaller than the significance of the effects in China. Id. The price coordination and production limits plaintiffs challenge lie at the very heart of the Ministry's efforts to oversee and facilitate a sweeping transformation of China's entire economic system. Whatever effects defendants' compliance with the Ministry's requirements has allegedly caused in the United States, those effects plainly do not implicate an historic transformation of the U.S. economy.

Finally, and as a consequence, punishing defendants (through an award of treble damages) for their compliance with mandates that the Ministry has deemed essential for the development of a stable market-driven economy can only adversely affect relations between the United States and China. See id. at 609 (noting that nations "have sometimes resented and

24

protested, as excessive intrusions into their own spheres, broad assertions of authority by American courts"); <u>Mannington Mills</u>, 595 F.2d at 1297 (warning against a "provincial approach" to the exercise of antitrust jurisdiction over foreign conduct and noting examples of hostile reactions by British and Canadian authorities to such exercises). Insofar as China's sovereign policy decisions about how best to manage its economic transformation conflict with the policies embodied in U.S. antitrust laws, that conflict should be addressed "through diplomatic channels," and not through "the unnecessary irritant of a private antitrust action." <u>O.N.E. Shipping</u>, 830 F.2d at 454.

## CONCLUSION

For all of the foregoing reasons, this Court should decline to exercise jurisdiction and should dismiss the Complaint.

Dated:

SIDLEY AUSTIN LLP

By: _____

Joel M. Mitnick (JM-0044)
Tracey R. Seraydarian (TS-5988)

787 Seventh Avenue
New York, NY 10019
(212) 839-5300

Of Counsel:

Joseph R. Guerra*
Sidley Austin LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000
*Not admitted to the Eastern District
of New York

Attorneys for Amicus Curiae
The Ministry of Commerce of the
People's Republic of China

25

# EXHIBIT 2



**SIDLEY**

| | | |
|---|---|---|
| SIDLEY AUSTIN LLP | BEIJING | LOS ANGELES |
| 787 SEVENTH AVENUE | BRUSSELS | NEW YORK |
| NEW YORK, NY 10019 | CHICAGO | SAN FRANCISCO |
| (212) 839 5300 | DALLAS | SHANGHAI |
| (212) 839 5599 FAX | FRANKFURT | SINGAPORE |
| | GENEVA | SYDNEY |
| | HONG KONG | TOKYO |
| | LONDON | WASHINGTON, D.C. |

jmitnick@sidley.com
(212) 839-5871

FOUNDED 1866

September 29, 2008

**FILED BY ECF**
**COURTESY COPY BY HAND**

The Honorable James Orenstein
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:  *In re: Vitamin C Antitrust Litigation,* MDL No. 1738

Dear Judge Orenstein:

I have read the transcript of the hearing held in this matter before you on September 10, 2008 and Your Honor's docket Minute Entry of the same date. On behalf of my client, the Ministry of Commerce of the People's Republic of China, I write to address an issue that was raised at the hearing.

In both their written submission with respect to the pending motion to compel and at the hearing, plaintiffs suggested that the fact of the Ministry's common interest with the defendants somehow disqualifies the Ministry as an *amicus*[1]. *See, e.g.,* Transcript of Hearing before Hon.

---

[1] At the Ministry's first appearance in this litigation, I identified that the Ministry had two interests in this litigation, one that the Ministry had in common with the defendants and one that was an independent interest of the Ministry. With respect to the common interest, I stated that the Ministry desired to present its views as a foreign sovereign of the regulatory framework governing these specific defendants in order to "present[ ] the predicates for what Mr. Bomse [one of defense counsel] and others have described as a foreign sovereign compulsion defense." (Transcript of hearing before Hon. James Orenstein, May 3, 2006, at 38.) As stated more recently, "by challenging the compelled conduct, the plaintiffs in essence challenge under US antitrust law the Chinese government's right to compel compliance by its own corporate citizens, and solely within its borders, of a pricing regime designed by the Chinese government for the purpose of maintaining an orderly export market." Letter of J. Mitnick to Hon. James Orenstein, dated August 29, 2008. It should, therefore, come as no surprise that the Ministry and the defendants have coordinated their strategies in connection with their common interest in having the complaint dismissed. *See, e.g.,* Letter of Richard S. Goldstein to Hon. David G. Trager, dated June 26, 2006 (informing Judge Trager in advance of defendants' knowledge that the Chinese government would seek permission to submit an *amicus* brief on defendants' behalf). In addition, I articulated an interest in the litigation that the Ministry held independently of the defendants. "The government very much would like to be able to assist the Court in establishing the principle that these specific kinds of Chinese laws resulted in compelled conduct that created an immunity from antitrust law. The

Sidley Austin LLP is a limited liability partnership practicing in affiliation with other Sidley Austin partnerships



The Honorable James Orenstein
September 29, 2008
Page 2

James Orenstein, September 10, 2008, at 36 ("[The Ministry has] taken the position as an amicus which traditionally is an impartial friend of the Court."). Yet the Ministry has explained from the outset that it sought the form of *amicus* status only because, "[s]ince 1978, the U.S. government has encouraged foreign governments to present their views concerning pending judicial proceedings directly to the U.S. courts, and the U.S. Solicitor General has taken the position that a foreign government's submission of its views in the form of an amicus curiae brief should be 'dispositive.'" Brief of Amicus Curiae, the Ministry of Commerce, in Support of Motion to Dismiss, at 1-2, citations to supporting authority omitted; *see, also,* Application [to Judge Trager] for Permission to File a Brief Amicus Curiae at 2; transcript of hearing before Hon. James Orenstein, May 3, 2006, at 40-41. Accordingly, the Ministry's appearance in this proceeding to express the views of a foreign sovereign, even an interested foreign sovereign (as would be the case in *all* foreign sovereign compulsion cases), is procedurally proper.

The Ministry would again like to express its appreciation to the Court for granting it permission to submit a brief letter statement in connection with the pending motion to compel. Although the Ministry did not seek permission to argue at the hearing, it would, of course, be pleased to entertain any request by the Court for further assistance.

Respectfully submitted,

Joel M. Mitnick
Counsel for *Amicus* The Ministry
of Commerce of the People's
Republic of China

NY1 6741442

---

Chinese government's interest in having the Court hear that view and establish that principle is completely independent of the defendants' interest in having themselves released from the case." (*Id.* at 43-44.)

# EXHIBIT 3

Authorized Translation

# 中 华 人 民 共 和 国 商 务 部

## MINISTRY OF COMMERCE OF THE PEOPLE'S REPUBLIC OF CHINA
## 2, DONG CHANG'AN STREET, BEIJING, CHINA 100731

## STATEMENT IN *IN RE* VITAMIN C ANTITRUST LITIGATION

June 9, 2008

### Introduction

*Amicus* The Ministry of Commerce of the People's Republic of China (the "Ministry") authorizes its Department of Treaty and Law to respectfully submit this Statement (together with an authorized English translation) in response to plaintiffs' April 24, 2008 Supplemental Memorandum in Opposition to Defendants' Motion to Dismiss ("Supplemental Opposition"). At the outset, the Ministry would like to express its continuing appreciation to this Court for permitting the Ministry to submit to the Court the official views of the People's Republic of China.

The Ministry would also like to take this opportunity to ratify the *amicus* filing that was submitted previously on its behalf. Although in filing that brief the Ministry followed the procedures advised by the U.S. State Department with respect to the preferred method by which a foreign government should make its views known to a U.S. court, the Ministry wants the Court to know that it participated actively in the drafting of that brief, which was reviewed and edited word-for-word in Beijing by officials of the Ministry and the U.S. counsel engaged by the Ministry. That brief accurately sets forth the views and understandings of certain PRC government agencies, serving as an official view on behalf of the Ministry. The Ministry's U.S. counsel, acting within the scope of its authorization,

submitted relevant documents to this Court on behalf of the Ministry in line with U.S. law and applicable procedures. The Ministry will assume the Court's familiarity with the contents of its *amicus* brief and will not repeat the facts or arguments it contains.

## The Regulatory Regime

The Supplemental Opposition reflects a misunderstanding of the nature of the PRC government's regulation of the vitamin C industry that the Ministry's initial *amicus* brief was intended to dispel. Throughout their submission, plaintiffs trivialize China's organs of regulation where those organs differ in structure or function from ones more familiar to the plaintiffs.

As explained in the Ministry's *amicus* brief, the system of regulation the Ministry imposed on China's vitamin C export industry centered around a process not a price. The Ministry was careful to direct its U.S. counsel to explain to the Court that specific chambers of commerce, *when authorized by the Ministry to regulate*, act in the name, with the authority, and under the active supervision, of the Ministry. When acting in this manner, a chamber performs a governmental function so authorized under Chinese law. In this case, the Ministry specifically charged the Chamber of Commerce of Medicines and Health Products Importers and Exporters (the "Chamber") with the authority and responsibility, subject to Ministry oversight, for regulating, through consultation, the price of vitamin C manufactured for export from China so as to maintain an orderly export.

In summary, the Ministry wishes that this Court would continue to trust and adopt the views contained in the *amicus* brief submitted by the Ministry, and support the Defendants' Motion to Dismiss.

Accordingly, the Chinese government respectfully submits that, to the extent the plaintiffs take issue with the Chinese government's sovereign actions over the conduct

2

solely of its own citizens, that issue should not be addressed in the courts of the United States but rather through bilateral trade negotiations conducted by the executive branches of the respective sovereign nations involved consistent with recognized norms of international law and diplomacy.

Respectfully submitted,

Department of Treaty and Law
Ministry of Commerce of the
People's Republic of China

[affixed seal]

3

# EXHIBIT 4

## REPORT OF PROFESSOR SHEN SIBAO

**Dean and Professor of Law**
University of International Business & Economics
Beijing, China

**Dean**
Law School of Shanghai University
Shanghai, China

## I.      INTRODUCTION

### *Summary of Credentials*

1.      I am a Professor of Law, a doctoral advisor and the Dean of the Law School of the University of International Business & Economics in Beijing, China, which is a leading law school in China with a special focus on international law and economic law.  I also serve conjunctively as the Dean of the Law School of Shanghai University in Shanghai, China.  I have taught several law courses, including in particular, courses on China's Foreign Trade Law, international commercial laws, and corporate investment law.  I am a member of the Law Group of the Degree Commission of the State Council of China and the Social Science Commission of the Ministry of Education of China, a specially-invited advisor to China Council for the Promotion of International Trade, and the Chairman of China International Economic Law Studies Association.

2.      I have been admitted as an attorney to practice law in China for twenty five years.  I serve as a Special Advisor to the Supreme People's Court, a member of the Central Government Senior Officials Lecturer Group and the main speaker at the Central Legal System Seminar.  I have been a senior arbitrator and Vice Chairman at the China International Economic and Trade Arbitration Commission for ten years as well as an arbitrator at many other Chinese and international arbitration institutes including The Commercial Arbitration Chamber of Paris, the Korea International Commercial Arbitration Commission, and the London Grain and Feed Trade Association.  I am also a mediator at the United Nations International Center for Settlement of Investment Disputes.

3.      I have also studied extensively abroad and in the US.  From 1981 to 1983, I was in the Parker School Program at Columbia University in Comparative Law.  From 1999 to 2000, I was a visiting scholar on the Fulbright Program teaching at Brooklyn Law School. My curriculum vitae is attached hereto as Appendix A.

4.      I have researched and written extensively on issues related to China's Foreign Trade Law, foreign trade issues and international economic trade dispute resolutions.  I have also participated in the drafting and revision of the Foreign Trade Law, the Corporation Law and the Arbitration Law as well as regulations and administrative rules related to foreign trade issues.  I have been a special counsel to the China Ministry of Commerce ("MOFCOM") previously known as

1


EXHIBIT
218
4/16/09

the China Ministry of Foreign Trade and Economic Cooperation ("MOFTEC") (both entities sometimes being collectively referred to as "MOFCOM") on various matters, and I am in charge of several research programs sponsored by the Department of Treaty and Law, Department of Foreign Trade, and Department of Trade in Services of the MOFCOM.   A list of my publications is attached hereto as Appendix B.

### *Nature of Assignment*

5.    I have been retained by Defendants in this case as a Chinese legal expert to furnish this Report to explain the nature of the regulatory system that operated in China under the supervision of China Chamber of Commerce of Medicines and Health Products Importers & Exporters (the "Chamber") with authority delegated by MOFCOM, and that applied to the Defendants, as manufacturers of vitamin C throughout the period relevant to this litigation and to further consider whether certain public materials of the Chamber or documents referred to by the Plaintiffs and referenced by this Court are inconsistent either with this regulatory system or with Defendants having been obliged by the Chinese government to establish a coordinated pricing and output regime for vitamin C exported from China.

6.    In undertaking this assignment, I have reviewed Plaintiffs' Third Amended Complaint, various papers submitted by both sides in connection with Defendants' Joint Motion to Dismiss including Memoranda of Law and Supporting Papers, the Amicus Curiae Brief of MOFCOM and supporting exhibits, the Supplemental Declaration of MOFCOM, the Declaration of Professor James V. Feinerman dated November 14, 2008 ("Feinerman Decl.") and this Court's November 6, 2008 Memorandum and Order.  I have also reviewed documents produced by Defendants and deposition testimony taken of them, relevant Chinese laws, regulations and research literature, and have consulted with knowledgeable government officers regarding the Chinese export regulatory regime.   My hourly rate is US$600.

### *Summary of Conclusions*

7.    Based on my experience and expertise, as above described, and the analysis that I have made of the facts regarding the regulation of vitamin C, the following is a summary of my conclusions, the basis for which will be set forth at length in the sections and paragraphs which thereafter follow:

8.    Over approximately the past 30 years, China has been in the process of transforming its economy from a command economy, sometimes referred to as a "planned economy," in which the State controls entirely both domestic and international trade, to a modified market economy, referred to as a "socialist market economy" in which private enterprises are permitted to exist and operate for profit subject, however, to government control designed to cause certain important Chinese industries to operate in a coordinated fashion in order to insure their stability and further their profitability by avoiding what China regards as

inappropriate forms of harmful competition that would impede the development of successful and profitable industries that China regards as being in its national interest as an emerging economic power in the world.

9.     Consistent with this important national economic policy, vitamin C has, for many years, been regarded as a strategically important industry in China and has been subject to mandatory industry coordination in order to avoid what China considers to be "harmful" competition, thereby helping to promote the development of a strong export commerce in this area.  Although the mechanisms that have been employed to ensure this coordination and overall national profitability have varied somewhat over time, as circumstances have changed, at all times vitamin C was a regulated commodity with controls exerted over price and/or output in order to advance the national interest, as above described.

10.    One of the principal ways in which China has implemented its regulatory interests in many critical areas of economic development is through the creation and operation of what are referred to as "China Chambers of Commerce for Import and Export" (the "Import and Export Chambers").  In the case of strategic industries, including vitamin C, these chambers represent the Chinese government in the sense that they are charged with enforcing government economic policy with respect to industries of concern. This role is reflected in various regulations and directives promulgated by MOFCOM.  Companies that are subject to the oversight of the Import and Export Chambers are required to participate in the relevant chambers and are subject to their rules.  A refusal to abide by such rules is subject to sanction, including loss of the right to export entirely.

11.    In the case of vitamin C, the Defendants were at all times required to act in a coordinated fashion consistent with government economic policy and the national interest in avoiding harmful export competition.  In reaching agreement as to specific actions, the parties were acting pursuant to a regulatory process that is well-understood and applied broadly in China, known as "self-discipline." That process, by design, involved communications among the relevant parties with a goal of seeking agreement on a unified course of action that would implement the mandatory goals of Chinese policy as I have described above.  This approach was efficient in the sense that the companies involved in the industry were in the best position to know how to best implement the mandatory goals of Chinese national industrial policy.

12.    It is important to understand that the mandatory policy goals themselves were neither subject to debate, nor could they be ignored.  The policy of the government was mandatory and participation in the process designed to implement that policy was mandatory.  Thus, at all times it was mandatory for companies subject to regulation under a regime of self-discipline to participate in the government's mandated process in order to further China's goals of avoiding harmful and destructive forms of competition.  Furthermore, the Chamber regulating vitamin C operated in an active oversight fashion and was empowered to insure such cooperation.  That fact is seen quite vividly in the fact that on

3

almost all occasions when the Defendants in this case met to discuss price or output, it was under the auspices of, and with the direct participation of, the Chamber.

13.     During at least some portions of the transitional period from a command to a socialist market economy, the Chinese government did not itself establish specific export prices or quotas as the means of carrying out its mandatory policies.  Instead, as explained in the preceding paragraph, the Chinese government established the policy goals, created a mandatory process of regulation through the Chamber and then required the vitamin C exporters to engage in that process with the goal of implementing the policy through their own interactions and self discipline, all under the supervision of the Chamber.  In no way was participation in the process, or refusal to act in a manner consistent with China's national economic policy, "voluntary" in the sense that it could be ignored.  The policy was mandatory as was participation in the process of coordination through the Chamber.

14.     The Chinese regulation and supervision policy to which I refer has been in place since at least the mid-1980's as a function of basic governmental policy.  It has applied based upon Chinese national economic goals adopted with respect to certain Chinese industries and economic sectors viewed as critical to China, regardless of the size or presence of those industries overseas, and regardless of their market power or lack thereof in an overseas context.  To understand the regulation that has taken place since 2001, one must first understand the historical context, and how that regulation has developed and evolved over time.  In the paragraphs which follow, I will describe that evolution, based in large part upon my personal experience, and on the facts and record in this case as furnished to me and informed by my expertise.

## II.     ANALYSIS

### A.     The China Legal System

15.     Before turning to a more detailed discussion of the regulatory system as applied to vitamin C, I believe that it may be useful to provide some initial comments regarding the nature of the Chinese legal system and those characteristics of it that are a product of China's specific social and cultural history and environment. It is important to understand the nature of this legal system in evaluating the balance of this Report.

16.     In China "law," in the sense of obligations that must be obeyed, comes from a variety of different sources. In very general terms, Chinese law begins with the Constitution which is the highest source of legal obligation. There then are laws promulgated by the National People's Congress Standing Committee, administrative rules and regulations formulated by the State Council (which is

4

China's Central Government[1]) and regulatory documents promulgated by individual ministries or departments (such as MOFCOM). It is normal for these types of law to be expressed at a level of generality that then must be applied and implemented in specific contexts.

17.     That process occurs through decisions, notices, official minutes of meetings issued by the State Council, Government Ministries, and the like, that also have binding authority within their scope. Many official requirements are also transmitted through communications that may consist of department documents or oral directions, even including telephone calls. It is not the form of communication that creates its binding character, but the source and authority of the party giving the direction. Regardless of form, to the extent that these directions come from people in superior authority they are no less binding and obligatory on subordinates and companies than any other type of "law". This is a long-standing system in China as a way of thinking and acting that still exists in China even during its on-going transition to a more market-based economic system.

## B.     MOFCOM's Regulatory Role

18.     MOFCOM is a component of the State Council and is the highest level of Chinese government administrative authority that regulates foreign and domestic trade. It has authority to draft and implement trade related laws, regulations, policies and directives.[2] It may also issue its own regulations, rules, measures or instructions on trade issues, which it retains the full authority to interpret and apply, either directly or through delegation.

19.     Most importantly, MOFCOM's interpretation of its own regulations and policies carries decisive weight under Chinese law.

20.     As the State regulator of trade, MOFCOM may delegate some of its own administrative functions and authority to entities it oversees and manages. As set forth below, in this case it has delegated such administrative functions and authority to the Chamber. Thus, the Chamber in carrying out these delegated functions, acts in an official capacity.

---

[1] "The State Council is the Central Government of the People's Republic of China and is the executive body of the highest organ of State power." Constitution of People's Republic of China, art. 85.
[2] Such directives may appear in various forms of official documents issued by Chinese government departments, such as "Decision," "Notice," "Reply," and "Meeting Minutes." Official Documents Handling Measures of the State Administration, art. 9. They carry legal authority under Chinese law. *Id.*, art. 2 (the official documents (including telegraph) of the administrations are instruments with legal validity and standard format formed in the administrative process of the administrations, are important tools for administration by law and public functions.)

5

C. **China's Export Regulatory Reform and Policy of Coordinating Export To Advance National Interest**

21.    China's economic system has been developed through two stages, the stage of a planned economy and the stage of transition into a socialist market economy, which started in 1978 and which transition was formally announced in 1993.  In the planned economy era (1949-1978), the Chinese government had a monopoly on foreign trade business in which MOFTEC had centralized control of foreign trade and allowed only designated specialized state-owned import and export companies to engage in foreign trade in accordance with mandatory State trade plans.

22.    At the time there were eight main specialized import and export companies responsible for foreign trade in eight corresponding consortiums of industries: chemical industry, food stuffs, metal and minerals, textiles, native products and animal by-products, machinery and electronic products, light industries and equipment.  Each designated specialized import and export company was a part of MOFTEC.  The leaders of specialized companies were MOFTEC officials – they were appointed by MOFTEC, had correspondent government official rank and their personnel files were kept by the government. Profit and loss was calculated at the national level; there was no individual corporate accountability for profit and loss.

23.    As explained in a seminal speech by then MOFTEC Minister Li Lanqing[3] at the Working Conference of National Economic System Reform, as China commenced to reform its political and economic systems and to open its doors and domestic markets to the outside in the mid-1980s, the government gradually released its central planning and direct control of individual companies' business activities. Instead, it began to rely on economic, legal and political measures, and adopted administrative means to control and supervise foreign trade on a macro-level to achieve national policy objectives.[4]

24.    After decentralization and a relaxation of centralized controls, many Chinese companies had begun to engage in aggressive forms of competition without a great deal of careful planning or an appreciation of the consequences of their activities over the longer term.   These companies ignored China's strong national interest in maintaining the long term stability and profitability of Chinese industries, and instead had exported at hugely discounted prices in a manner inconsistent with these national policy objectives.[5]

25.    As observed by Minister Li, the foreign trade did not operate successfully when the government had centralized control, but it became chaotic when the

---

[3] Mr. Li served as Vice Minster of MOFTEC in 1986-1990, Minister of MOFTEC in 1990-1993, and Vice Premier of State Council in charge of foreign trade in 1993-2003.
[4] Li Lanqing, *Problems of the Reform of 1988 Foreign Trade Regime*, published in Research of Macro Economy (1987), p.30.
[5] *Id.*

6

government decentralized control. [6] At a national policy level China did not consider aggressive competition acceptable in the national interest and it therefore put in place new administrative controls to make sure that companies did not act without regard to broader state interests as they began to operate privately.

26.    In implementing these controls,  because the government was no longer directly controlling individual companies' activities, addressing these issues necessarily required the government to delegate its regulatory functions to entities that could coordinate and regulate market competition for the purpose of advancing the national interest in ensuring that competition was orderly and conducted in a manner so as to assure industries were not exposed to foreign trade sanctions, and, in addition, earned economically appropriate returns consistent with state objectives to become a successful industrial nation on a global basis.

27.    The then MOFTEC Minister Wu Yi[7] summarized the situation the Chinese government was grappling with as follows, in a speech given in 1994:

> As import and export operation continue to open, more and more companies will engage in import and export trade.  In particular after our country "reinstates its GATT membership," in the future the number of import and export commodities subject to the State's direct regulation will further decrease.  However, our country's socialist market economy currently is still in a nascent stage.  Many economic activities are not standardized.  Some enterprises after their operational discretion has expanded have not formed their own mechanism enabling self-determination operation, the accountability for their profits or losses, self-discipline and self-development.  The phenomenon of blind competition among domestic companies and disruption of market order is still notable in certain time periods.

> For many years, this problem has needed urgent resolution but is not well settled yet.  It has seriously affected the healthy development of our country's export trade and caused direct economic losses to the country. ... Therefore, we need to reform the chambers and make them to have the ability to carry out the heavy duty of coordination, guidance, consultation, and service ... In foreign trade operations, we need to greatly strengthen and perfect import and export coordination and service mechanisms, including strengthening and promoting the functions of Import and Export Chambers and other intermediaries.  Certain government functions will be gradually reduced and be transferred to these Chambers.[8]

---

[6] *Id.*

[7] Madam Wu served as the Minister of MOFTEC in 1993-1998, Commissioner of State Council (equivalent to Vice Premier of State Council) in 1998-2002, and Vice Premier of State Council in 2003-2008.

[8] *Minister Wu Yi's Comments on the Reform of Import and Export Chambers of Commerce*, Xu Guomin, Machinery Electronic Products Market (1994) Issue 10. Speeches by government officials, such as Minister

28.     As noted above, since China's transition from the planned economy and decentralization of control on the right to conduct foreign trade, the Chinese government has always been concerned with maintaining "market order," which in its view would facilitate maintaining and promoting its national interest in developing successful and profitable national industries. The Chinese government is concerned that "excessive competition" or "malignant competition" engaged by Chinese companies against each other would place an entire Chinese industry's profitability and sustainability at risk and in the context of foreign trade would divert profit away from China.[9]

29.     To address these concerns and to advance the national interest of developing successful domestic industries and ensuring overall national profitability, the Chinese government formulated an important national policy which requires Chinese exporting companies to "unite and act in unison in foreign trade."[10] This policy was an important objective of China's export trade reform and was stated in official directives, specifically, e.g.:

(1)     Li Lanqing, the then minister of MOFTEC, stated in his speech at the Working Conference of National Economic System Reform[11]: "In consideration of the above major issues, the goals and direction of the reform are relatively clear. To reform foreign trade system is to implement individual accountability of profits and losses, release the control of [foreign trade] operation, strengthen regulation, unite in foreign trade and further develop foreign trade."[12] A main task in the 1988 foreign trade system reform was "to improve the administration of foreign trade and to implement the policy to unite and act in unison in foreign trade."[13] The establishment of import and export chambers of commerce was one of the specific measures to implement this task.[14]

(2)     The "Provisions on Strengthening the Coordination and Regulation of Export Commodities" issued by MOFTEC in 1991 states that "strengthening the coordination and regulation of export commodities aims to implement the policy of rectifying and improving [export] and furthering reform policy, to put into full play major export channels, motivate various foreign trade

---

Li and Minister Wu occupy a particular place in Chinese legislative and regulatory policy-making. Such speeches, on major topics of government policy, are intended to provide broad direction to other government officials and to the public and frequently serve as the basis for more specific legislation on the topic at issue.

[9] *See, e.g.,* Owen, Sun and Zheng, *China's Competition Policy Reforms: The Anti-Monopoly Law and Beyond,* 75 Antitrust L.J. 231, 249 (2008). *See also supra* note 8, *Minister Wu Yi's Comments on the Reform of Import and Export Chambers of Commerce,* Xu Guomin, Machinery Electronic Products Market (1994) Issue 10.

[10] *See* "The State Council's Decision on Several Matters concerning Further Reforming and Perfecting the Foreign Trade System" issued in 1990, Guo Fa [1990] No.70.

[11] *See supra* note 4, p.31.

[12] *See supra* note 4, p.31.

[13] *See supra* note 4, p.36.

[14] *Id.*

8

companies, to unite and act in unison in foreign trade, and to build a healthy foreign trade operation order so as to expand export, enhance economic efficiency and safeguard the nation's overall interest."[15] The Provisions authorized the designated foreign trade companies and Import and Export Chambers to conduct coordination and regulation and to implement the policy of acting in unity in foreign trade.

(3)   "The State Council's Decision on Several Matters concerning Further Reforming and Perfecting the Foreign Trade System" issued in 1990, provides that one major task of carrying out further reform is to "improve export operation, strengthen coordination and regulation, and to unite and act in unison in foreign trade."[16]

30.   In sum, the clear policy of China during the past decades, and continuing until today is that there should be private enterprise and competition among such enterprises. However, that competition always should be carried out with regard to the broader national interest of China to avoid "excessive" or "malignant competition" that can disrupt "market order," thereby threatening the profitability and sustainability of Chinese domestic industry.  To that end, in order to avoid this threat, Chinese companies are required to unite and act in unison in foreign trade against foreign competition.

31.   It is in that sense that the entire economic system of China is designated not just as a "market economy" but as a "*socialist* market economy." Under this political and economic backdrop and to implement this export policy, the Import and Export Chambers were established to bridge the gap and to serve as government delegates in regulating foreign trade.[17]  As set forth below, Import and Export Chambers generally, and the Chamber regulating vitamin C in particular, were assigned certain government functions by MOFTEC and were required to coordinate and regulate exports and implement the mandatory industry self-discipline mechanism among export enterprises.

---

[15] Provisions on Strengthening the Coordination and Regulation of Export Commodities, MOFTEC, 1991, para. 1.
[16] Decision on Several Matters concerning Further Reforming and Perfecting the Foreign Trade System, State Council, 1990, Guo Fa [1990] No.70 ("...MOFTEC shall make all specialized general corporations and the import and export chambers of commerce continue to play their roles, strengthen the coordination and regulation of import and export commodities, maintain the normal operation order of foreign trade, and act in unison and uniformly in foreign trade....Various foreign trade companies should follow the unified coordination and regulation. MOFTEC and its authorized units are authorized to prescribe necessary punishment against violators [of coordination and regulation]. The specialized general corporations should make their own operational decisions with accountability for their own losses and profits. MOFTEC is to take the lead to procedurally establish industries' import and export group corporations and act in unison and uniformly in foreign trade. ") Here, the "specialized general corporations" refers to the designated foreign trade companies designated to conduct foreign trade.
[17] *See supra* note 4.

**D.**   **The Formation of Import and Export Chambers and Their "Coordination" Function**

32.   The Chamber was one of the national Import and Export Chambers established by the government in an effort to reform its foreign trade regime for the purpose of transforming from a planned economy to a "socialist market economy." The responsibility and power to control import and export business was transferred to the Import and Export Chambers from the specifically designated state-owned national import and export entities which had been entrusted with the exclusive right to conduct import and export business. These chambers were delegated to regulate and coordinate the import and export of the major consortiums of national industries: medicine and health products; food stuffs, native products and animal by-products; light industries; metal, minerals, and chemical products; machinery and electronic products; and textiles. Specifically, the Chamber was given the authority by the Chinese government to coordinate and regulate the import and export of medicine and health products, including vitamin C products.

33.   At their formation, the Import and Export Chambers were staffed with personnel transferred directly from the government, and they were delegated responsibility to perform certain governmental regulatory functions. For certain important trade issues, they were instructed to establish subcommittees which were directed to coordinate "on a basis consistent with common interests."[18]

34.   Thus, the State Council's 1994 Decision on Further Deepening the Reform of Foreign Trade System provide ten specific areas of responsibility for these chambers, most of which are governmental and some of which are private in nature: (1) maintaining import and export operational order and protecting member companies' interests; (2) responding to foreign anti-dumping charges; (3) providing member companies with information and advisory services; (4) mediating trade disputes among members; (5) reflecting enterprises' requests and opinions to the government and offering proposals for policies formulated by the government; (6) supervising and directing member companies to operate under the laws; (7) participating in the organization of the quota bidding for the import and export commodities as authorized by competent governmental authorities; (8) participating in the organization of export fair and foreign exhibitions; (9) conducting external business exchange and communication as well as market research; (10) recommending to governmental law enforcement authorities to take measures to punish enterprises in violation of the coordination regulations or punishing violators directly in accordance with industry-wide agreements. The functions described in the above (1), (2), (6), (7) and (10) were regulatory functions previously performed by MOFTEC which the Import and Export Chambers were directed to perform in an official capacity on its behalf.

---

[18] *See supra* note 4, p.36.

35.     As further evidence of the Import and Export Chambers' governmental nature and their role in the regulatory regime, MOFCOM effectively appoints the candidates for the senior positions of these chambers, and verifies and approves these chambers' authorized number of personnel and the total amount of their salaries.[19]  MOFCOM has the authority to "approve the establishment and dismissal of the Import and Export Chambers of Commerce and subcommittees, and regulate them accordingly."[20]

### E.     The Differing Nature of Chinese Import and Export Chambers

36.     Plaintiffs' expert Professor James V. Feinerman has suggested that the conduct alleged in Plaintiffs' Complaint was not compelled as a matter of Chinese law because the fact that "the defendants are members of a social organization that requires government approval for its establishment does not, by itself, mean that the government of China required their alleged conduct."[21]  To reach this conclusion, Professor Feinerman primarily relies on China's Regulations on the Registration and Management of Social Organizations[22] which required all civil organizations to seek prior approval from and register with relevant government agencies prior to their establishment.[23]

37.     This analysis by Professor Feinerman is incorrect because it does not recognize that there are different kinds of "social organizations" under Chinese law with different attributes.  Under Chinese law, "social organization" is a broad legal term as it stands apart from an individual, an enterprise, an institution and a government office.  The Regulations on the Registration and Management of Social Organizations cited by Professor Feinerman set forth the basic requirements to form all types of social organizations; it does not speak to the nature of an entity – whether it is a private organization or a government delegate.  By analogy, Professor Feinerman's conclusion is the equivalent of saying an apple cannot be proved to be an apple because it is a fruit, which exists in tens of thousands of types.

38.     During the Chinese economic system reform, a large number of organizations were set up and called themselves "associations" or "chambers of

---

[19] MOFTEC's Notice Regarding Printing and Distribution of Several Regulations for Personnel Management of Chambers of Commerce for Importers and Exporters (September 23, 1994).  Historically, personnel of chambers of commerce were actually transferred from the state organs and state-owned foreign trade companies, which were the government instrument to control foreign trade.  During their terms in the chambers, some government officials also held joint positions in either state organs or in state-owned foreign trade companies.  For example, the 1991 Minutes of the Meeting with Import and Export Chambers of Commerce issued by the General Office of MOFTEC provides: "To continue to strengthen the leader team of chambers of commerce, chambers' personnel assigned from the foreign trade companies should rotate. This procedure is currently necessary and effective and the length of the rotation period could be between two years and four years."

[20] *See supra* note 4, pp. 36-37.

[21] Feinerman Decl., ¶12.

[22] Exhibit C to Feinerman Decl.

[23] Feinerman Decl., ¶¶6-10.

11

commerce."[24]  Currently in China, social organizations such as "trade associations" or "chambers of commerce" subject to Regulations on the Registration and Management of Social Organizations can be classified into two major categories: (1) those that have been assigned certain regulatory or administrative functions, such as the China Council for the Promotion of International Trade, to which I myself am a consultant, as well as the national Import and Export Chambers mentioned above, and (2) those trade associations which are purely voluntary, having no regulatory function, and having full discretion as to the institutional size and the choice of staff.  The latter are private civil organizations.  The Chamber that is responsible for vitamin C belongs to the first category as it assumed regulatory functions authorized by the government since its inception.

39.    The Chamber is a "foreign trade and economic social organization established with coordination and industry regulation functions" as set forth in the 1991 Measures for Administration over Foreign Trade and Economic Social Organizations ("1991 Measures").  Trade associations are "foreign trade and economic social organizations" but not all have the "coordination and industry regulation functions."  MOFCOM is "directly responsible for the daily management of social organizations established with coordination and industry regulation functions."[25]  By contrast, MOFCOM does not directly supervise "social organizations" that do not have coordination and industry regulation functions.[26]  As the government entity authorized to interpret the 1991 Measures, MOFCOM is charged with determining if an organization is a foreign trade and economic social organization established with coordination and industry regulation functions.[27] Most important, we should understand that the Import and Export Chambers were established pursuant to the directives of MOFCOM and have been delegated to perform specific regulatory governmental functions.

40.    The national Import and Export Chambers are also vastly different from typical chambers of commerce in western countries as I understand them.  The Chinese Import and Export Chambers are established by the government in a "from top to bottom" fashion and have been delegated with regulatory functions since their formation.  With respect to key industries and export, membership in them is mandatory to ensure the implementation of Chinese government policy and regulation.  Leaders of Chinese Import and Export Chambers are either appointed by the government, or selected under the supervision of the government.  By contrast, chambers of commerce in the western countries are usually initiated by private companies and memberships are voluntary.  These

---

[24] However, the title of "China Chamber of Commerce of Import and Export" remains in the exclusive use of the few designated Chambers that were established pursuant to the directives of the Chinese government.
[25] Measures for Administration over Foreign Trade and Economic Social Organizations, MOFTEC, promulgated on February 26, 1991, art. 17.  "The authority of interpreting this regulation is with MOFTEC," art. 25.
[26] Cf. Id., art. 18.
[27] Id., art. 25.

western countries chambers of commerce are independent of government and do not assume governmental functions.   Their officers are freely elected by member companies without government involvement or directive.

### F.     The Coordination Authority of the Import and Export Chambers

41.     As explained above, the function of Import and Export Chambers that have regulatory authority is to further the underlying economic policies and interests of the State by ensuring coordination and orderly competition of foreign trade enterprises. Compliance with government policy, and thus with the requirements of the Chamber designed to implement and further such policies is mandatory.

42.     To ensure that China's national policy was properly implemented, MOFTEC required companies engaging in foreign trade to follow the Import and Export Chambers' regulatory directions. "The Chambers of Commerce and their subcommittees shall be comprised of enterprises that have the right to conduct foreign trade business.  The enterprises having the right to conduct the foreign trade business of grain and oil, native products, animal by-products, textile, costume, light industry products, art-crafts, metals, minerals, chemicals, and machinery and electronic products must join relevant chambers of commerce and subcommittees; otherwise they shall not be allowed to engage in the manufacture or distribution of such products. The Chambers of Commerce have the right to coordinate and advise on market, customer, price, et al. … For enterprises that do not follow the coordination, their [chamber] memberships will be suspended and their right to operate [foreign trade business] will be temporarily revoked by MOFTEC.  For serious violations, MOFTEC will revoke their membership and operation right."[28]

43.     "All foreign trade enterprises must be subject to the unified coordination and regulation, and MOFTEC and its authorized authorities shall take necessary disciplinary actions against any enterprise that violate such coordination and regulation."[29]  Furthermore, "all relevant departments of the Ministry shall continue to support the Chambers of Commerce with their coordination and service, so that the Chambers can assist the Ministry with macro-administration."[30]

44.     In 1994, the then MOFTEC Minister Wu Yi instructed Import and Export Chambers on their regulatory coordination functions as follows:

> Coordination means that all Chambers of Commerce must establish industry awareness, have the 'big trade' ideology, and coordinate the

---

[28] *See supra* note 4 at p.36.

[29] Decision on Matters concerning Further Reforming and Perfecting the Foreign Trade System, State Council, Guofa [1990] No. 70, 1990.

[30] Minutes of Meeting with Import and Export Chambers of Commerce, General Office of MOFTEC, 1991.

import and export transactions of members from the perspective of safeguarding the interests of the members and the normal order of China's foreign trade.  Enterprises having the right to operate foreign trade, including foreign-invested enterprises, shall be subject to the coordination of the Import and Export Chambers of Commerce. Coordination is a mandatory task of the chambers of commerce. With respect to the individual enterprise in violation of relevant government regulations and the industry-wide agreement, causing great losses to the country and other companies, the Chambers of Commerce shall punish these enterprises in accordance with the industry-wide agreement. Additionally, the Chambers of Commerce may propose to the competent authority to sanction such enterprises.  In the future, to facilitate the coordination of the chambers of commerce, MOFTEC will set up several examples by seriously punishing enterprises which do not follow the coordination process.[31]

45.    In 1994, the General Administration of Customs promulgated Interim Measures of the China Customs on Appraisal of Prices of Commodities to Be Exported and its Implementing Rules.  These Interim Measures explicitly provide that when the Customs appraised the export sales price on an export declaration, it would first refer to "the export price coordinated by China Import and Export Chambers of Commerce…"[32]  If the export price on the declaration was lower than the chambers' coordinated price, "the Customs shall report the relevant information to China's import and export chambers of commerce and national authorities of foreign exchange administration."[33]  "Specific punishment measures shall be decided by the import and export chambers of commerce and national authorities of foreign exchange administration."[34]  It is explicit that, the export price coordinated by the chambers be followed by each exporter, which is ensured by the price review of the Customs and the Import and Export Chambers' power to impose punishment on violations.

46.    As will be set forth in greater detail and supportive citation below, the general obligations described above apply to the exporters of vitamin C. Thus, directions from the Chamber in coordinating and regulating the medicine and health product industry are to be followed by its members because the Chamber is an authorized industry regulator with authority delegated by the Chinese government.  The four Chinese manufacturer Defendants are required to be members of the Chamber and must comply with directions from the Chamber.[35]

---

[31] *See supra* note 8.
[32] The Interim Measures of the China Customs on Appraisal of Prices of Commodities to be Exported and its Implementing Rules, General Administration of Customs, 1994, art.4.
[33] *Id.*
[34] *Id.*
[35] The 1997 MOFTEC and SDA Notice Relating to Strengthening the Administration of Vitamin C Production and Export ("1997 MOFTEC and SDA Notice") provides all companies qualified to operate vitamin C export business must join the Vitamin C Subcommittee.

Defendants who fail to follow the Chamber's regulatory directions are subject to export ban and other severe penalties.

### G.   The Regulatory Role of Chamber Under the Licensing and Quota Regime

47.   The export of vitamin C products has been subject to active regulation by the Chinese government since at least 1990 under the export quota and export licensing system and the Chamber has been given the authority and responsibility for the regulation and coordination of vitamin C export.[36] This regulation has continuously been in effect in various forms and mechanisms, adopted as a matter of national policy with respect to the economic activities of certain key industries. Thus, with respect to vitamin C, in 1990, vitamin C was classified as a "Category II" export product, the export of which was conducted in accordance with a government-mandated "guiding export plan" and by designated and licensed foreign trade companies.  "Category II" export products were those that were subject to "limited international market demand capacity, quota restriction, fierce competition, and price sensitivity."[37]

48.   The Chamber was explicitly provided with the "coordination and regulation" functions to administer "Category II" exports, including vitamin C. With respect to the "Category II" exports, "the Import and Export Chambers of commerce shall coordinate and regulate the market, customers, price and other aspects in accordance with the product's specific circumstances, in particular organize the chamber members to fix a nationally uniform export price plan regularly or at any time needed, and be in charge of supervision and implementation."[38]  "The relevant Import and Export Chambers of Commerce shall form respective sub-committees or coordination management teams to be responsible for coordinating and regulating [Category II exports]."[39]

49.   Vitamin C exports have been subject to this State-mandated "coordination" process involving the participation of industry members.  It is not a voluntary process.  The 1992 Interim Regulation of Export Products subjected 38 types of products including vitamin C to the planned quota administration. According to the 1992 Interim regulation, the 38 kinds of goods were classified as "Category I" exports, which are "resource products of large export amount and concerning the livelihood of the nation and the people, and traditional export products of large export amount and of great importance to China's export."  The 1992 Interim Regulation again prescribed the mandatory "coordination" process: "Export goods subject to coordination shall be uniformly regulated and coordinated by the respective Import and Export Chambers of Commerce.

---

[36] *See* Notification of Adjusting Export Good Classification Catalogue and Strengthening Regulation of Export Goods Marketing and Sales, MOFTEC (January 23, 1990).
[37] *See id.*
[38] *See id.*
[39] *See id.*

Enterprises engaged in producing and selling goods subject to export quota license system must join relevant Import and Export Chambers of Commerce. The specific coordination and regulation method shall be strictly implemented after discussion and approval by the member meetings."[40]

50.     The implementation of this mandatory "coordination" process was ensured by the regulations under the quota and licensing system. The 1995 MOFTEC Regulations on the Allocation of Export Quotas similarly provides that one of the prerequisites for obtaining an allocation of export quotas is "to join the relevant Import and Export Chamber of Commerce and be voluntarily subject to the coordination." Additionally, the 1996 Provisions on the Regulation of Licenses provided that when the price in the export contract is lower than the coordinated price set by the relevant Import and Export Chamber of Commerce, the export licensing authority shall refuse to issue the export license.

51.     The Chinese Government specifically focused on vitamin C and the need to ensure that its national policy directives were achieved at around this same period of time. At the end of 1995, three Vice Premiers instructed MOFTEC to address the problems in the vitamin C industry. Following these instructions, in 1996 MOFTEC held an emergency meeting with its local provincial offices, main exporters and manufacturers, the Chamber and officials from State Drug Administration ("SDA")[41] to "strengthen the regulation of vitamin C export, protect the hard-earned international market share, and promote the healthy development of [vitamin C] export."[42] After the meeting, MOFTEC then sent a report to the State Council, identifying several problems, including Chinese vitamin C's excessive reliance on export, low export prices and too many competing exporting channels.[43] MOFTEC observed, among other things, that Chinese vitamin C manufacturers built an overcapacity in response to the high profit and strong demand in the international market in the earlier years, and the foreign manufacturers attempted to reclaim market share by lowering prices.[44] MOFTEC concluded: " price competition in the current vitamin C export is mainly a competition between Chinese vitamin C manufacturers and international conglomerates; the competition among Chinese vitamin C manufacturers is only secondary."[45] Low price competition and export disorder were "serious hidden dangers to [China's] vitamin C export's further healthy development."[46]

---

[40] Interim Regulation of Export Goods, MOFTEC, MOFTEC Order No.4 (December 29, 1992).

[41] SDA was at that time the highest level of Chinese government administrative authority directly under the State Council that regulated food and pharmaceutical products; as of March 2008, SDA has become part of the Ministry of Public Health.

[42] Emergency Notice of Holding Vitamin C Export Work Meeting, Foreign Trade Regulation Department of MOFTEC, January 31, 1996.

[43] MOFTEC's Report to State Council Concerning Current Vitamin C Export Issues and Suggestions for Solutions, Wu Yi, [1996] Waijingmao Guanfa No. 185, p.3.

[44] Id.

[45] Id.

[46] Id. at p 5. Consequently, MOFTEC proposed draconian measures including a ban on any new vitamin C manufacturing facility or expansion in the next three years, a production restriction on existing vitamin C

**H.**   **The Establishment of the Vitamin C Subcommittee**

52.   This Court's November 6, 2008 Memorandum and Order questioned whether the Vitamin C Subcommittee was established at the request of private parties or defendants in this case.[47] It was not. In 1997, MOFTEC and SDA jointly issued a regulation and required the Chamber to establish the Vitamin C Subcommittee.[48] As MOFTEC and SDA noted at that time, "[Chinese] vitamin C export encounter[ed] intense competition and challenges from the international market."[49] "In order to rectify the operational order and optimize the operational team of vitamin C export, realize the scale-operation on export, improve the competitiveness of [Chinese] vitamin C products in the international market, promote the healthy development of vitamin C export and maintain the interest of [China] and enterprises," MOFTEC and SDA announced several measures including requiring the Chamber to establish the Vitamin C Subcommittee.[50]

53.   The coordination and regulatory functions of the Vitamin C Subcommittee were explicitly mandated by MOFTEC and SDA: "The main responsibilities of this [Vitamin C Subcommittee] are to coordinate with respect to vitamin C export market, price and customers…"[51] "All enterprise qualified to operate vitamin C export shall participate in [the Vitamin C Subcommittee.]"[52]

54.   MOFTEC and SDA set forth a general framework for this "coordination" process, involving participation by industry members, charging the Chamber with the responsibility of implementing the specific regulatory coordination method to be effectuated via a "subcommittee" related to some specific products, i.e. vitamin C products, which are organized by the Chamber and operating under its active supervision and direction: "[The Vitamin C Subcommittee] shall timely organize meetings for the major vitamin C export enterprises according to the domestic and international market development, to conduct studies on market strategies, timely formulate and adjust export coordination price, which the vitamin C enterprises must strictly implement in accordance with."[53] The licensing agencies authorized by MOFTEC were required to rigorously examine enterprises' qualifications to export Vitamin C products, the exporting enterprises' export contracts and issue

manufacturers, control on total export amount and adjusting existing quota allocation method to promote scaled export.

[47] November 6, 2008 Court Memorandum and Order, at p.30.

[48] 1997 Notice Relating to Strengthening the Administration of Vitamin C Production and Export (1997), MOFTEC Guan Fa No. 664, issued on November 27, 1997, art. 6.

[49] *Id.*, introductory paragraph.

[50] *Id.*, para. 6.

[51] *Id.*, para. 6.

[52] *Id.*

[53] *Id.*, para. 7.

export license in accordance with vitamin C's coordinated export price and quota quantity. Violations were subject to serious punishment.[54]

55. The requirement that the Chamber and the Subcommittee be responsible for "coordinating the China vitamin C export market, price and customers" was reiterated as one of the functions for the Vitamin C Subcommittee when MOFTEC approved the establishment of the Vitamin C Subcommittee.[55] This authority to "coordinate and administrate market, price, customer and operation order of vitamin C export" was subsequently incorporated in the Vitamin C Subcommittee's Charter.[56]

56. This Court's November 6, 2008 Memorandum and Order further states that "One area that appears to be ripe for discovery is the degree to which defendants coordinated pricing before and after December 2001. If the apparatus and mandate for price-fixing was in place as of 1991 (when the Chamber was formed) or 1997 (when the Vitamin C Sub-Committee was formed), but no price-fixing occurred until market power was achieved, plaintiffs would have a stronger argument that defendants' actions were voluntary." The answer to this question is that, as set forth above, vitamin C exports have been subject to the mandatory coordination and regulation since as early as 1990 and the vitamin C manufacturers' participation in the coordination process was mandatory because their membership in the Vitamin C Subcommittee and compliance with its directives was mandatory on pain of losing the right to export for non-compliance.

57. The events alleged in the Complaint in this case flow not from voluntary activity, but rather are simply a continuation of the mandatory governmental regulation that I have described and which was in place for nearly 10 years before. Thus, the first alleged conspiracy meeting that the Complaint cites was a meeting convened by the Chamber at MOFTEC's direction in response to alerts from the Chinese government that its industries were running the risk of dumping.[57] Thereafter, and continuing throughout the period during which the Defendants are accused of conspiring, meetings were convened as appropriate by the Chamber and the members of the Vitamin C Subcommittee for the purpose of implementing the national competition policy of maintaining a profitable vitamin C industry in China through coordination of price and output. Thus, both before and after the commencement of the period in which Defendants are alleged to have acted illegally under U.S. antitrust law, the vitamin C manufacturers were required to act in accordance with the same policy and to do so by participating in the activities of the Chamber's Vitamin C Sub-committee.

---

[54] *Id.*, paras. 9 and 10. Sanctions will be imposed on export enterprises in violation of the relevant provisions of this notice. Once verified, the sanctions could range from the reduction of export quotas to the cancellation of export qualifications, according to with the seriousness of the violation.

[55] MOFTEC Approval for Establishing VC Sub-Committee of China Chamber of Commerce of Medicines and Health Products Importers & Exporters (March 23, 1998).

[56] Charter of Vitamin C Sub-Committee of China Chamber of Commerce of Medicines and Health Products Importers & Exporters, dated October 11, 1997.

[57] Minutes of Meeting by Officials of Vitamin C Manufacturers, JJPC 0043070.

**I.      The Chamber's Regulatory Role in the Post-2001 Verification and
Chop System**

58.      The Chamber's government-delegated authority in "coordination and
industry regulation" was extended following China's accession into the WTO in
December 2001.  In 2002, as delegated jointly by MOFCOM and the General
Administration of Customs, the Chamber implemented a "verification and chop"
system to replace the previous export quota restriction for the purpose of
continuing the Chambers' "coordination of prices and industry self-regulation"
pursuant to basic Chinese national policy requiring the continued regulation and
supervision of certain key industries.[58]

59.      Vitamin C products are one out of 36 types of products which are
particularly controlled by the State and subject to the verification and chop
system.  Exporting companies are required to hold memberships in the Vitamin C
Subcommittee and comply with the industry coordination enforced by the
Chamber and the Vitamin C Subcommittee.  The Chamber and the Vitamin C
Subcommittee acted within their role and authority granted by MOFCOM when
engaging industry members in meetings to discuss the vitamin C market, price
and extent of production.[59]

60.      Details of the "verification and chop" procedure are provided in the 2003
Announcement of MOFCOM and the General Administration of Customs (Notice
No. 36).[60]  For those commodities that have been subject to "verification and
chop," before declaring to the Customs, the export company shall send the export
contract, both the original and the copy thereof, to the relevant Import and Export
Chambers for review and approval.  The relevant chamber shall then review and
approve the proposed export contract submitted by exporting companies based on
the industry-wide coordination it has supervised.[61]  Upon approval, the Import
and Export Chamber is required to provide a "Chop Form" and the export
contract to the exporting company after stamping an anti-fake seal for verification
on the designated place of the "Chop Form," as well as on the final price and
quantity indicated on the export contract.  The exporting company is required to
present the original copy of the stamped "Chop Form" and the export contract to
the Customs for export declaration.  The Chamber's legal authority to review and
place its "chop" of approval on a manufacturer's export contract is one of many
indicia of the governmental authority that MOFCOM delegated to the Chamber to
regulate the Vitamin C industry.

61.      It is also important to understand that the implementation of the
verification and chop mechanism, following China's accession to the WTO, did

---

[58] *See* MOFTEC and Customs Notice of Adjustment of the Catalogues of Export Products Subject to Price
Review by the Customs, MAO FA [2002] No. 187 (March 29, 2002), art. 4.
[59] *Id.*.
[60] 2003 No. 36 Public Notice Issued by MOFCOM and General Administration of Customs of the PRC,
dated November 29, 2003.
[61] *Id.*

19

not in any way change the level of control that the government maintained over the vitamin C industry. Just as it was before the implementation of verification and chop, the Vitamin C Subcommittee remained a government-authorized coordination organization, within the Chamber, which was set up in accordance with national regulations and policies and was delegated with authority to regulate export on behalf of the government. The price-coordinating meetings and industry-wide agreements regarding production cutbacks, export quotas and other measures that were facilitated by the Vitamin C Subcommittee continued to serve to advance national interests I have described above, and to maintain the proper export order with which the government was concerned.

62.     There has been at all times a national economic policy requiring coordination within key industrial segments, such as vitamin C, in order to avoid harmful forms of price competition that were considered antithetical to the national interest. Acting through the Chamber, the vitamin C manufacturers were obligated to carry out that policy under the auspices of the Chamber by coordination of price and output. This was true in the period after 2001 as well as in the years before, as I have also described above. The mechanism through which this was to be accomplished was not the key point. Rather, the essential point was that the manufacturers were required to act in a coordinated fashion to further national Chinese economic policy.

63.     Measures adopted after 2001, such as the verification and chop system, price coordination and production and supply restraints retain the same mandatory nature as the export restraint measures implemented since 1990. Enterprises' participation of export coordination led by the Chamber, including discussion of the market, price, output and export volume under the direction of the Chamber, and the making of and compliance with the coordinated measures are all required practice since 1990. Defendants' right to export will be forfeited if they refuse to participate in the coordination or fail to follow a coordinated measure.

## J.     The Mandatory "Coordination" Mechanism During the Alleged Conspiracy Period

64.     This Court's November 6, 2008 Memorandum and Order correctly observed that the word "coordination" has a particular meaning in the context of China's government and economic policy.[62] In the context of Chinese economic regulation and policy, the term "coordination" entails a regulatory process, conducted by the Chamber under the direction and authorization of MOFCOM, which involves mandatory discussion among industry members in order to find appropriate regulatory measures to advance China's national interests and to reduce foreign trade disputes.

65.     As set forth in analysis above, the Chamber's coordination function was granted by MOFCOM pursuant to Chinese laws and policy. The coordination and

---

[62] November 6, 2008 Memorandum and Order, at p.18, n.7.

20

regulation conducted by Chambers is an important regulatory means in the country's foreign trade system as China is transforming from a central, direct administrative system to a socialist market economy where the government is expected to monitor and control individual companies' market activities on a policy level, delegating and assigning the specifics of regulation downward. The purpose of coordination is to have domestic companies compete in the international market as a unity, to build healthy foreign trade operational order, expand China's export, and advance China's collective interest.[63] The implementation of the mandatory process is assured by the regulatory authority of Chambers and MOFCOM.

66.     As this Court's November 6, 2008 Memorandum and Order also notes, Plaintiffs allege that "the Ministry has not pointed to a single law or regulation compelling a price or price agreement at issue."[64] But Plaintiffs misunderstand China's export regulatory system. Chinese laws and regulations put in place a mandatory "industry coordination" process for exports of important national interest and the Chinese government entrusted the Chamber to find the most appropriate industry measures through the mandatory regulatory process. That process mandates that industry members discuss market circumstances, pricing and other relevant factors in order to find the most appropriate coordination measure. Once appropriate measures (such as quota, price or volume restriction, or mandated joint activities) are adopted by the Chamber, such measures become mandatory as a matter of Chinese law and regulatory practice. That is a regulatory process mandated by the Chinese government under Chinese laws and regulations, and implemented by the Chamber with authority granted to it by the Chinese government.

67.     As this Court's November 6, 2008 Memorandum and Order also notes, Plaintiffs contend that defendants' price agreements are voluntary by citing to documents that contain words such as "agreed by voting" or "reached an agreement."[65] As explained above, the "industry coordination" process is a government mandated regulatory process and is not voluntary in the sense that vitamin C manufacturers were free to ignore it. To the extent certain Defendants may have engaged in discussions of vitamin C market prices or production levels with or without the Chamber's presence, such conduct is part and parcel of the government-mandated "industry coordination." The purpose is to find the appropriate regulatory measures, which the Chamber has been authorized and directed to implement.

68.     This Court's November 6, 2008 Memorandum and Order suggests that it is difficult to determine the degree of defendants' independence in making pricing decisions because certain documents seem to indicate that some defendants had

---

[63] Rules on Strengthening the Coordination and Regulation of Export Goods, MOFTEC, effective February 22, 1991.
[64] November 6, 2008 Memorandum and Order, at p. 17.
[65] Id., at pp. 19-20.

21

their own self-interest in participating in the coordination process.[66]  Whether the individual companies' self-interest coincided with the "industry coordination" process does not change the nature of this "industry coordination" – a government mandated regulatory process for the purpose of finding the appropriate industry regulatory measures.   MOFCOM and its delegate – the Chamber – are fully authorized to implement and enforce it to make it effective.  The penalty for non-compliance is severe –the non-compliant company will lose its right to export.[67]

### K.      "Industry Self-Discipline" and Government's Concern with Advancing National Interest and Avoiding "Price Wars"

69.      Also as noted by this Court's November 6, 2008 Memorandum and Order, Plaintiffs contend that defendants' price agreements are voluntary by citing to documents that contains words such as "industry self-discipline" and "voluntary self-restraint."[68]  These words also must be understood within the context of Chinese economic and regulatory policies.  They do not entail voluntary actions by Defendants.

70.      "Industry self-discipline," is a term that has a widespread and well-understood usage in Chinese industrial policy.[69]  As I have noted above, this concept of self-discipline was emphasized by Minister Wu in her speech in 1994. The Import an Export Chambers that were converted from government ministries were assigned important functions to implement the concept, and it was officially sanctioned by the government in 1998.[70] "Self-discipline" means that all industries shall maintain import and export order in accordance with laws, regulations and rules and shall not conduct operation in violation of regulations regardless of national interest.  While the coordination was a top-down regulation system led by MOFTEC and implemented by Import and Export Chambers, the industry self-discipline mechanism was a mutual supervision measure among export enterprises required for the implementation of government policy of acting in unison to achieve overall national profit and to develop successful domestic industries.

71.      Specifically, because vitamin C is a major export industry, the Chinese government has paid close attention to its regulation to prevent Chinese companies from engaging in competition against each other for the purpose of maximizing their own profits at the expense of the national interest, and that is what is meant by "industry self-discipline" and "voluntary self-restraint."[71]  As an example, in a meeting held by Chamber on April 13, 2001, an officer of

---

[66] November 6, 2008 Memorandum and Order, at pp. 22-23.
[67] 2003 No. 36 Public Notice by MOFCOM and China General Administration of Customs.
[68] November 6, 2008 Memorandum and Order, at p. 18.
[69] "Industry self-discipline" is the most common English translation of the Chinese, although "industry self-regulation" could also serve as a literal translation.
[70] See Owen, et al, "Chinese Competition Policy Reforms: The Anti-Monopoly Law and Beyond," 75 Antitrust L.J. 231, 241 (2008) and authority cited.
[71] See 1997 MOFTEC and SDA Notice.

MOFTEC's Department of Foreign Trade admonished the vitamin C manufacturers and exporters: "Even though VC is not a resource product, it has been strictly regulated since 1997... MOFTEC attaches importance to the establishment and development of the Chamber and requires the Subcommittee to act proactively. Enterprises need to obey the industry agreements and industry rules. When enterprises are maximizing their profits, they also need to consider the interest of the State as a whole."[72]

72.     Plaintiffs have relied on website reports to suggest that the Defendants reached "a voluntary agreement on price fixing and production restraints." However, within China's self-discipline context the term "voluntary" refers to the fact that market participants have some limited control over the time, place and manner in which they carry out the regulatory mandate to reach industry-wide agreements to further China's economic policies. In China's regulatory context enterprises are expected to discuss matters among themselves with a view towards reaching a consensus as to how best to go about furthering the required coordination in a manner consistent with "the interest of the State as a whole" and, in doing so, are expected to follow Chinese laws, and regulations under the leadership of the Chambers of Commerce.

73.     Similarly, although there are documents indicating that on occasion there were extended discussions, and occasions where agreements were not reached, this does not demonstrate a lack of compulsion or regulation, but rather is inherent in the idea that the parties were mandated to engage in self-discipline to achieve basic policies, but had freedom in deciding the manner in which coordination was to be achieved consistent with national goals.

74.     Metaphorically speaking, the industry self-discipline mechanism under the coordination and regulation of Import and Export Chambers in China's foreign trade regulatory regime is like a race competition, having strict rule and a reward and penalty system. Participants (export companies) who comply with the rules will have the right to participate in the competition; otherwise, they will be punished or even disqualified for the race. Therefore, the so-called voluntary self-discipline of Defendants is a mechanism that is engaged in pursuant to a mandated regime of coordinated behavior related to price and output that must be implemented in a manner that furthers China's national economic policy.

75.     Properly understood, what the government is compelling is the active participation of the industry in a mandated process which must be obeyed. It is also important to note that in China, having established the broad regulatory framework through regulations, directives and implementing orders are frequently given in an oral fashion. Chinese governmental control is a quite different process from what takes place in other countries, and the fact that directives are oral, or terms such as "self-discipline" or "voluntary self-restraint" are used does not change the forcefulness or compulsion which attaches to such directives when

---

[72] Deposition Exhibit 173, JJPC0043064.

23

given in China – especially when such directives are given to companies which themselves have significant government ownership and whose officials receiving such directives are party members and appointees. Importantly in the Chinese regulatory system where companies still have significant state ownership, the national and regional governments play an ongoing role, and top managers and executives generally owe their business positions to political appointment, it is generally unnecessary actually to use these levers of control. The fact that they exist, and that the enterprises are so closely intertwined with the government, gives force to the regulatory system I describe herein.

76.     As reflected in the regulations set forth above and noted by legal scholars, China's industry export self-discipline measures mean the export self-discipline measures implemented by the Import and Export Chambers authorized or entrusted by the government, including restriction on capacity and export volume or adjustment of export price to reduce and mitigate competition, for the purpose of furthering China's national interest and resolving or avoiding trade frictions with other countries. Chinese legislators contemplated that trade associations would play an important role in enhancing the competitiveness of domestic industries. "In particular, the lawmakers want the trade associations to eliminate 'vicious competition,' or cutthroat price wars."[73]

77.     The concept of industry self-discipline is ingrained in China's economic regulatory framework. The Chinese government requires chambers and trade associations to promote "self-discipline" among competitors to avoid such "price wars" and to promote national interest.   Article 56 of the Foreign Trade Law provides that "[t]he relevant associations and chambers of commerce shall abide by laws and administrative rules, provide the members with services related to production, marketing, information and training in accordance with articles of association, perform the function of coordination and self-discipline…."

78.     The concept of self-discipline most recently was re-iterated and reaffirmed by China's newly-enacted Anti-Monopoly Law. Article 11 of the Anti-monopoly Law adopted in August 2008 explicitly requires trade associations to "strengthen industry self-discipline, guide business operators to lawfully compete, safeguard the competition order in the market…."[74]

79.     As I have noted previously, part of the concern that arose from  the transition to a type of market economy was that companies would price so low that they actually would create a serious risk of anti-dumping actions. In fact, that was the genesis of the November, 2001 meeting. However, as reflected in the documents I have seen and in the MOFCOM website, industry self-discipline was

---

[73] Yong Huang, *Pursuing the Second Best: The History, Momentum, and Remaining Issues of China's Anti-Monopoly Law*, 75 Antitrust L. J. 117, 129 (2008).
[74] Anti-Monopoly Law of the People's Republic of China (promulgated by the Standing Committee of the National People's Congress on August 30, 2007 and effective August 1, 2008), art. 11. *See also*, art. 15 (The Anti-Monopoly Law does not apply to an agreement among business operators "for the purpose of safeguarding the justifiable interests in the foreign trade or foreign economic cooperation")

intended not merely, or even principally, to address antidumping concerns. Rather it was to implement the much broader national export policy that has existed for many years and that requires Chinese companies to refrain from engaging in excessive competition to pursue short term self-interest at the consequence of disrupting trade order, and to act in unity in the international market in order to develop profitable and successful national industries.

**L.    A Verified Government Seal Is Not Required under Chinese Law to Cite to a Law or Regulation**

80.    As a final point, I would like to explain that Professor Feinerman incorrectly concludes in his August 15, 2006 Declaration that the regulations attached to MOFCOM's Amicus Curiae Brief are not properly authenticated under Chinese law because they do not bear a verified official chop.[75] For a document to be authenticated in China, Chinese law does not require a verified seal or chop in addition to a proper notarization. These Chinese government regulations are provided by an authorized representative of MOFCOM, which is either the issuer, designated enforcement agency, or the authorized interpreter of these regulations, and therefore are properly authenticated.


Professor Shen Sibao


Dated: February 19, 2009

---

[75] *See* Exhibit B to Feinerman Decl.

25

## Appendix A.   Professor Shen Sibao's Curriculum Vitae

**Education:**
- LL.B., Peking University, P.R. China, 1970
- LL.M., Peking University, P.R. China, 1983
- Columbia University, Parker School Program in Comparative Law, 1981-1983

**Professional Experience:**
- Teaching at Peking University Law School, 1972-1979
- Teaching at University of International Business and Economics Law School, 1983-present
- Vice General Manager of China Joint Stock Consultation Company, 1992-1994
- Founder and managing partner of Beijing Hua Mao Law Firm (later renamed as Hua Mao & Silicon Valley Law Firm), 1994-present
- Dean of University of International Business and Economics Law School, 1995-present
- Vice Chairman of China International Economic & Trade Arbitration Commission, 1996-2004
- Dean of the Law School of Shanghai University (part-time), Oct. 2008-present

**Academic Activities:**
- Doctoral Adviser of University of International Business and Economics, 1996-present;
- Member of the Law Group of the Degree Commission of the State Council of China, 1996-present;
- Member of the Social Science Commission of the Ministry of Education of China, 2008-present;
- Chairman of China International Economic Law Studies Association, 2004-present;
- Member of the Central Government Senior Officials Lecturer Group, 2002-present;
- Main speaker at the Central Legal System Seminar, 2002-present

1

**Honors and Awards:**

- Excellent Teacher Award by Beijing Municipality, 1998
- Fulbright Scholarship, 1999-2000
- National Famous Teacher Award by the Ministry of Education, 2006,
- China Outstanding Social Scientist, 2007
- Outstanding Achievement Award by the Ministry of Justice, 2007
- Thirty-Year Outstanding Achievement Award by China Law Society, 2008
- National Excellent Textbook Prize, 2006
- Outstanding Achievement Award by Beijing Municipality, 2007

**Legislative Activities and Academic Research on Foreign Trade Law:**

- Participating in drafting and revision of the Foreign Trade Law, Company Law and Arbitration Law
- Participating in drafting and revision of the Foreign Trade Law as a member of the expert panel to the Ministry of Commerce
- Participating in drafting and revision of the Anti-dumping Regulations, Anti-Subsidy Regulations, and Regulations of Safeguard Measures as well as related provisions as a member of the expert panel to the Ministry of Commerce
- Participating in drafting and revision of the Foreign Investment Law as an expert to the Ministry of Foreign Trade and Economic Cooperation
- Participating in drafting and revision of the Company Law as a member of the expert panel to the Bureau of Legislative Affairs of State Council
- Participating in drafting and revision of Arbitration Law as an expert to the Bureau of Legislative Affairs of the State Council
- Undertaking the research project of "Sorting Foreign Trade Laws after China's WTO Accession" sponsored by the National Social Science Fund
- Undertaking the legislative research project of the Regulation of Trade Promotion sponsored by Department of Foreign Trade of Ministry of Commerce
- Undertaking the legislative research project of the Regulation of Promotion of Trade in Service sponsored by Department Trade in Service of Ministry of Commerce
- Undertaking the legislative research project of "The Situation and Countermeasures of Foreign Trade Conflicts" sponsored by Department of Foreign Trade of MOFCOM
- Undertaking the research project of "Determination of Injury for Anti-Dumping measures" sponsored by Industry Injury Investigation Bureau of Ministry of Commerce
- Subject study of application of anti-dumping measures to processing trade for the Bureau of Fair Trade for Import and Export of MOFCOM

2

**International Commercial Arbitration and Mediation:**

- United Nations International Center for Settlement of Investment Disputes
- The International Court of Arbitration of International Chamber of Commerce
- China International Economic & Trade Arbitration Commission, senior arbitrator and Vice Chairman
- Great Britain Court of International Arbitration
- London Grain and Feed Trade Association
- The Commercial Arbitration Chamber of Paris
- Japan Commercial Arbitration Association
- Singapore International Arbitration Center
- Korea International Commercial Arbitration Board
- Arbitration Institute of the Stockholm Chamber of Commerce
- Chamber of Commerce in Lausanne in Switzerland
- Shanghai Arbitration Commission
- Beijing Arbitration Commission
- Shenzhen Arbitration Commission

# Appendix B.  Main Publications and Articles

Books:

- *International Commercial Law Review*, Volumes 1 to 9,  ed., The Law Press, 1990-2008
- *The Truth of Law is Practice*, The Law Press, 2008.
- *Analysis and Selected Cases of U.S. Anti-Trust Law*, The Law Press, 2006
- *Theories of Company Laws of Western Countries*, The Law Press, 2006
- *Piercing the Corporate Veil: Legal Principle and Selected Cases*, University of International Business and Economics Publishing House, 2005
- *The Latest U.S. Model Business Corporation Act*, The Law Press, 2006
- *China's Foreign Trade Law*, The Law Press, 2006
- *Commentaries on WTO Anti-Dumping Agreement*, Hunan Science & Technology Press, 2006
- *World Trade Organization Tutorial*, (Beijing Higher Education Top Quality Textbook), University of International Business and Economics Publishing House, 2006
- *Guide to China's Investment Law*, The Law Press, 2005
- *Securities Arbitration*, Sweet and Maxwell Asia, 2004.
- *Analysis of People's Republic of China Foreign Trade Law*, University of International Business and Economics Publishing House, 2004
- *China Foreign-Related Economic and Trade Laws*, Capitol Economic and Trade University Press, 2004
- *Review of Company Law and Securities Law*, (Beijing Higher Education Top Quality Textbook), China International Business and Trade Publishing House, 2004
- *Company & Securities Law Review*, Volume 1, eds., China International Business and Trade Publishing House, 2004 and 2005
- *International Business Law*, (Beijing Higher Education Top Quality Textbook) University of International Business and Economics Publishing House, 2002
- *International Economic Law*, China International Business and Trade Publishing House, 2000
- *Selected Cases (English) on International Commercial Law*, The Law Press, 1999 (1st ed.), 2007 (2nd ed.)
- *International Economic Law Syllabus*, Higher Education Press, 1998
- *Introduction to International Economic Law*, Higher Education Press, 1998
- *International Business Law*, (Beijing Higher Education Top Quality Textbook) University of International Business and Economics Publishing House, 1994
- *International Investment Law*, China International Business and Trade Publishing House, 1990

1

- *An Introduction to the Corporation Law in the Western Countries*, Peking University Publishing House, 1986 (1ˢᵗ ed.), 1989 (revised ed.)
- *U.S. Model Business Corporation Act*, Peking University Publishing House, 1981
- *International Trade Law*, Peking University Publishing House, forthcoming
- *Company Law*, The Law Press, forthcoming
- *International Commercial Law*, University of International Business and Economics Publishing House, forthcoming

Articles:

- *Legal Countermeasures of Business Risk Prevention in Economic Globalization*, Legal Person Journal, 2008, No.10
- *The 100 Year Old Legal Scholar Mr. Rui Mu's Academic Contribution*, China Law, 2008, No. 10
- *The Basic Experience and Outlook of China's Foreign Trade Legal System after 30 Years of Reform and Opening-up*, Hebei Law Review, 2008, No. 8-No.10
- *A Comparative Study of the Legal Systems of NAFTA and EU*, Journal of Ningbo University, 2008, No.4
- *Economic Globalization and Building Chinese Companies' Social Responsibility System*, Law Journal, 2008, No.3
- *The Global Perspective and Strategic Thoughts of Building the Legal System*, Journal of China National Administration Management Institute, 2008, No. 1
- *The Formation of Regional Trade Arrangement is an Urgent and Inevitable Strategic Choice of China's Foreign Trade Development*, Economic Research Reference, 2007/21
- *A Comparative Study of U.S., Japanese, and EU Trade Friction Countermeasure Mechanisms — And Implications to Our Country*, Economic Research Reference, 2007/16
- *The Conflicts in China's Foreign Trade Agency System and Its Resolution*, Journal of Jinan University, 2007/5
- *A Comparative Study on the Legal Systems of Regional Trade Arrangements— Using EU and NAFTA as Examples*, Zhujiang Economy, 2007/05
- *Building the Legal System in China's Developed Regions in the WTO Context*, Journal of Jiangnan University, 2007/05
- *Promoting Regional Trade Arrangement Is an Important Strategy for the Sustainable Development of China's Trade*, Journal of Xiangtan University (Social Science Section), April 2007
- *Protecting Domestic Industries and Promoting Foreign Trade – Borrowing Experiences from US, Japanese and EU Trade Friction Countermeasure Mechanisms  (Part 2)*, WTO Economic Guide, 2007/04
- The Formation of Regional Trade  Arrangement is an Urgent and Inevitable Strategic Choice of China's Trade Development, Hebei Law, 2007/04

- *Protecting Domestic Industries and Promoting Foreign Trade – Borrowing Experiences from US, Japanese and EU Trade Friction Countermeasure Mechanisms (Part 1)*, WTO Economic Guide, 2007/03
- The Formation of Regional Trade Arrangements and the Development of China Foreign Trade, Law Journal, 2007/03
- *A Comparative Study of U.S., Japanese, and EU Trade Friction Countermeasure Mechanisms — And Implications to Our Country*, International Trade, 2007/02
- *A Rational Read of the "(Interim) Provisions of the Investigation and Punishment of Improper Low-price Export Conduct,"* Hebei Law, 2007/01
- *WTO and the Establishment of New International Economic Order*, Red Flag Essay Collections, 2007/01
- *Three Tasks China Should Perform Well When Facing the Challenge of WTO*, Economic Research Reference, 2006/79
- *Countermeasures and Suggestions for Addressing Trade Frictions*, Economic Research Reference, 2006/61
- *Thoughts on Several Issues in the Legislation of Antitrust Law*, China Law, December 2006
- *Reform and Development of Commercial Arbitration in China*, China Law, February 2006
- *Strategies for Protecting Intellectual Property Rights in Foreign Trade*, China Foreign Trade, 2006/10
- *Sorting and Perfecting China's Foreign Trade Legal System in the Post WTO Transitional Era*, WTO Economic Guides, 2006/10
- *Facing New Challenges of WTO Development – Strategic Thoughts on China's Foreign Trade Development*, International Trade, 2006/09
- *WTO and Establishment of New International Economic Order*, WTO Economic Guides, 2006/08
- *Post WTO Transitional Era: Sorting China's Foreign Trade Legal System*, WTO Economic Guides, 2006/07
- *Discovery is a Value – on the "Provisions of the Investigation and Punishment of Improper Low-price Export Conducts,"* International Trade, 2006/06
- *Thoughts on Legislations for Promoting China's Overseas Investment*, Jurists, 2006/04
- *Positioning and Reforming China's Commercial Arbitration System*, Legal Studies, 2006/04
- *The Important Position and Effect of Articles of Association in the New Company Law*, Law Applications, March 2006
- *Economic Globalization and the New Development of International Economic Law*, China Law, 2006/03
- *Enterprises' Low Price Competition and Legal Rules – Causal Analysis and Legal Rules for Low Price Competition in Foreign Trade form an Anti-Dumping Perspective*, International Trade, 2006/03

3

- *On the Intellectual Property Protection in International Direct Investment*, Journal of Shanxi University (Social Science Section), 2006/03
- *New Characteristics of New Company Law in Economic Globalization*, China Industry and Commerce Administration Research, February 2006
- *The Highlights of the New Company Law*, Regeneration and Utilization of Non-ferrous Metals, 2006/02
- *A Comparative Study of U.S. Partnership Law and Its Implication to China*, Journal of Gansu Institute of Politics and Law, 2006/02
- *The Highlights of the New Company Law*, Legal Person Journal, 2006/02
- *The New Highlights of the New Company Law*, Modern Laws, Jan. 2006
- *On the "Agreement on Dispute Settlement Mechanism of the Framework Agreement on Comprehensive Economic Cooperation between China and ASEAN"*, Journal of Shanghai University of Finance and Economics, 2006/01
- *The Third Type of Weapons —The Intentions of U.S Amendment to Countervailing Law*, China Textiles, 2005/10
- *Commentaries on the U.S and European Restrictions on China's Textiles*, Textile News, 2005/08
- *The Experience of NAFTA and its Implications for China*, Legal Journal, 2005/06
- *The Modern Development of Commercial Trust System*, Journal of Gansu Institute of Politics and Law, 2005/04
- *Will the Independent Director Institution Work in China?* co-authored with Jing Jia, 27 Loy. L.A. Int'l. & Comp. L. Rev. 223 (2005)
- *China's New Corporate Governance Measures after Its Accession to the WTO*, Australian Journal of Corporate Law, Volume 17 (1), October 2004, LexisNexis Butterworths
- *Insisting on Internationalization and Training Legal Professionals for Two Markets*, Modern Laws, 2004/06
- *The New Features of the New Foreign Trade Law*, Journal of the Capitol Normal University (social science section), 2004/05
- *Research on Several Issues Concerning Foreign Trade law*, Journal of Shanxi University (social science section), 2004/03
- *The WTO Transparency Principle and China's Governing by the Law Process*, International Commerce, 2004/01
- *U.S. Securities Arbitration and Its Implications*, Securities Market News, 2003/01
- *Analysis of and Commentaries to Amendments to China's Anti-Dumping Rules after WTO Accession*, International Commerce, 2002/06
- *International Anti-dumping Rules and the Perfection of China's Anti-Dumping Legal System*, Journal of Shanxi University, 2002/03.

4

# 沈四宝教授报告

法学教授及院长

对外经济贸易大学

中国北京


法学教授及院长

上海大学法学院

中国上海

**I.** **简介**

*简要资历*

1.　我是在中国北京的对外经济贸易大学法学院法学教授、博士生导师及院长，该法学院是中国领先的法学院，专注于国际法及经济法。我同时担任在中国上海的上海大学法学院院长。我讲授数门法律课程，特别包括：中国对外贸易法、国际商法及公司投资法。我是国务院学位委员会法学组成员、教育部社会科学委员会委员、中国对外贸易促进会特邀顾问、中国国际经济法研究会会长。

2.　我作为律师被获准在中国执业已经 25 年。我担任中国最高人民法院专家特别咨询员，同时还是中央政府高级官员讲座小组成员和中央法制讲座主讲人。我担任中国国际经济贸易仲裁委员会的副主席和资深仲裁员已经 10 年，同时也在在国内外众多仲裁机构担任仲裁员，其中包括伦敦谷物与饲料贸易协会、巴黎商业仲裁院、以及韩国国际商事仲裁委员会等。我也是联合国解决国际投资争端中心的调解员。

3.　我还曾在国外（包括美国）从事广泛学习：从 1981 年到 1983 年，在哥伦比亚大学帕克学校学习比较法；从 1999 年 2000 年，作为福布莱特计划的访问学者，在布鲁克林法学院教学。我的简历请见附件 A。

4.　我对国际贸易、国际投资、国际经济贸易争议解决等法律问题广泛研究，并有大量著述。我曾应邀参与对外贸易法、公司法和仲裁法与与对外贸易相关的法规和行政条例的起草和修订工作。我曾就诸多问题担任中国商务

1


EXHIBIT
219
4/16/09

部，即原对外贸易经济合作部("外经贸部")（上述两个单位有时会被统称为"商务部"）的特别顾问，我目前仍然主持由商务部条法司、对外贸易司和服务贸易司资助的多个研究项目。我的著述清单请见附件 B。

*任务性质*

5.    作为本案被告聘请的中国法律专家，我提交本报告，以解释经商务部授权在中国医药保健品进出口商会（"商会"）监管下发生于本诉讼相关时期内在中国运作的并适用于被告，即维生素 C 生产企业，的管理制度的性质；并进一步考量商会的某些公开材料或原告提到的和法院参考的文件是否与该监管制度或者与本案被告被中国政府要求建立有关中国出口维生素 C 价格和产量的协调制度之间存在矛盾之处。

6.    在接受此任务的过程中，我阅读了原告第三次补充诉状，双方提交的与被告的驳回联合动议相关的各类文件，其中包括法律意见书及其支持性文件，商务部法庭之友及其附件，商务部的补充宣誓，James V. Feinerman 教授 2008 年 11 月 14 日的宣誓，以及 2008 年 11 月 6 日的法院法律备忘录及裁决。我还阅读了被告提供的文件以及本案证人的证言，相关的中国法律法规和研究资料，并且就中国出口管理体制向知情政府官员了解了情况。我的费率是每小时 600 美元。

*主要观点*

7.    基于上文所述我的经验和专业知识，以及我根据维生素 C 管理的相关事实所作的分析，我的结论总结如下（该结论的根据则将在之后的章节中具体阐述）：

8.    在过去的大约 30 年中，中国处于一个从国家控制所有国内和国际贸易的指令经济（有时亦被称为"计划经济"），向改版的市场经济（亦被称为"社会主义市场经济"）过渡的转型期。在改版的市场经济体制下，允许私有企业存在并盈利，但是它们也受到政府的控制，以便引导某些重要的中国工业在协调的方式下运作，从而保证其稳定性并提高收益，避免受到在中国被认为是不正当的、有害的竞争方式的阻碍；作为世界新兴经济力量，中国认为发展这些行业是关系到其国家利益之所在。

2

9.　　与这条重要的国家经济政策相一致，维生素C多年以来都被当作中国战略性的重要产业受到强制的行业协调以避免中国认为"有害"的竞争，进而帮助促进在该领域发展强大的出口商业。尽管随着情况的改变，用于保证该协调和国家总体利润的机制随着时间的推移有一定变化，但维生素C始终都是为了提高上述国家利益而在价格和/或产出方面受到控制的被监管商品。

10.　　中国已经在许多关键的经济发展领域中实现其管理利益，其主要方式之一就是通过被称之为"中国进出口商会"（"进出口商会"）的建立和运作。对于包括维生素C的战略性行业而言，进出口商会负责对政府关注的行业执行政府的经济政策，从这个意义上说，这些商会代表了中国政府。这个角色在商务部发布的许多法规和指示中都有体现。受到这些进出口商会监督的公司被要求加入相关的商会并受其规则约束。如果拒绝遵守这些规则将会受到制裁，包括完全丧失出口权。

11.　　在维生素C行业的情况中，被告始终都被要求按照协调的方式来行动，与政府的经济政策和国家利益保持一致，避免有害的出口竞争。在就具体的行动达成协议时，当事方都是按照管制程序进行的，也就是在中国广为人知并广泛运用的被称为"自律"的程序。该程序有意地涵盖了在相关方之间进行的沟通，目的是就统一行动达成一致，从而实现我在上文描述的中国政策规定的强制目标。该程序是行之有效的，因为行业内相关公司最能了解如何最好地执行中国国家行业政策的强制目标。

12.　　强制性的政策目标本身是不容讨论亦不容忽视的，理解该点是非常重要的。政府的政策是强制的，同时参与以实现该政策为目的的程序也是强制的。因此，在自律体制下受到管制的公司参加政府的强制程序从而达到中国避免有害和毁灭性的竞争方的目标，这从来都是强制的。此外，监管维生素C的商会以积极的监督方式发挥作用，并被赋予权力以保障该合作的进行。从几乎每次本案被告开会讨论价格或产量的场合都有商会的主持并直接参与来看，这一事实是相当清晰明确的。

13.　　至少在指令经济向社会主义市场经济转型的某些时期，中国政府自身没有制定具体的出口价格或配额作为执行强制政策的手段。正如在上一段中

3

所解释的，政府制定了政策目标，建立了通过商会强制监管的程序，然后要求维生素C出口商为了实现政策目标，在商会监管下通过的相互沟通和自律参与该程序。不论参与这一程序或是拒绝按照符合中国国家经济政策的方式而行动，都绝非"自愿"，因为该程序是不容忽视的。这个政策，如同通过商会参与协调程序，都是强制的。

14.　　我所提到的中国管理监督政策至少从20世纪80年代中期就有了，是政府基本政策的一项功能。它的实施根据是针对中国认为至关重要的某些产业和经济领域而实行的中国国家经济目标，无论那些产业在国外影响的大小以及是否在海外有无市场支配力。要理解2001年之后的管理体系，必须要理解该体系的历史背景和发展和进化的历程。在下面的段落里，我将根据我的个人经验，基于我的专业知识和收到的本案事实和材料，描述这个发展过程。

II.　**分析**

A.　　**中国法律体制**

15.　在对中国的维生素C管制体系展开更为具体的讨论之前，我认为有必要初步地介绍中国法律体制的性质及其在中国特定的社会文化历史及环境下所具有的特色。对中国法律体制本质的理解对此报告的评估很重要。

16.　在中国，"法"，从必须遵守的义务的角度讲，包含很多不同种根源。笼统的说，中国法从宪法开始。宪法是法律责任的最高根源。其次是由人民代表大会常务委员会颁布的法律，国务院（中国的中央政府[1]）制定的行政法规，政府各部委或部门（如商务部）制定的管理文件。上述类型的法律形式通常会以一种笼统地形式得以表现，然后在特定的情况下适用并执行。

17.　那个过程是通过国务院及其所属部委发布的决定、通知、或者官方会议纪要，和其他类似的也都是在其范围内具有约束力的文件进行的。许多官方要求还以部门文件，口头指令，甚至包括电话通知的沟通形式传达的。然而，其法律效力并非源于这些沟通的表现形式，而是源于指令的出处及权

---

[1] "中华人民共和国国务院，即中央人民政府，是最高国家权力机关的执行机关，是最高国家行政机关。"中华人民共和国宪法，第85条。

4

力。不论何种形式，对公司或下级而言，只要这些指令来源于上级权力，他们对下级和公司的约束力或强制性就不比其他形式的"法"小。即便在中国正在进行的想更基于市场的经济系统转变的过程中，这在中国作为思维和行为的系统也是长期存在的。

**B.    商务部的监管责任**

18.    商务部是国务院的组成部门，是中国政府管理对内、对外贸易的最高行政机构。商务部有权起草并实施与贸易相关的法律、规章、政策和命令 2，也可以就贸易问题发布自己的规定、办法，和指示，并且对其具有完全的解释权以及，无论是直接或是通过授权而进行的执行权。

19.    更重要的是，根据中国法律规定，商务部对其自己颁布的规章政策的解释具有决定性的权威。

20.    作为贸易的国家管理者，商务部可以将其一部分管理职能和权力委托给由其监管的单位。如下所述，在本案所涉及的情况下，商务部已经将这样的行政管理职能和权力委托给商会。因此，商会在执行这些授权的职能时，是具有官方身份的。

**C.    中国的出口管理改革及协调出口以增加国家利益的政策**

21.    中国的经济体制经历过两种不同的发展阶段即计划经济时期和向社会主义市场经济体制转变的时期。后者是自 1978 年开始，并由政府在 1993 年正式提出。在计划经济时期（1949年-1978年），中国对外经济贸易实行的是国家专营体制，由外经贸部集中控制对外贸易，只允许指定的专业国有进出口公司根据国家要求的贸易计划经营对外贸易。

22.    当时主要有八大专业进出口公司负责包括化工、粮油、五矿、纺织品、土畜、机械、轻工、成套设备等八大相应的工业块。每个指定专业进出

---

2 这样的命令可能出现在中国政府部门发布的各种形式的公文上，例如"决定"、"通知"、"答复"和"会议纪要"。国家行政机关公文处理办法，第9条。它们在中国法下具有法定效力。同上第2条（行政机关的公文（包括电报，下同），是行政机关在行政管理过程中形成的具有法定效力和规范俗式的文书，是依法行政和进行公务活动的重要工具。）

5

口公司是外经贸部的一部份。指定公司的干部是外经贸部官员－他们由外经贸部选派，有相应的政府干部级别，并且他们的人事档案在政府保存。盈亏在国家层面上计算；没有单独的公司盈亏责任。

23.  正如当时的外经贸部部长李岚清[3]在全国经济体制改革工作会议上所评论的，随着中国自80年代中期开始改革其政治经济系统并对外开放其国内市场，政府逐渐放开其对企业经营活动的统一计划和直接控制，而主要开始依赖经济、法律、政治手段并采取行政手段对对外贸易实行宏观调控和监督，从而实现国家政策目的。[4]

24.  在中央控制权被下放和放松后，许多中国公司在没有进行大量仔细规划、甚至没有考虑到其行为的长远后果的情况下，就已经开始以过度的、激进的方式进行竞争。这些公司在与其他国内企业竞争时忽视了维持中国产业长期稳定性和收益性的重要国家利益，并且违背上述国家政策目的，削价竞销。[5]

25.  正如李部长所观察到的，当时的中国外贸是"一统就死，一放就乱"。[6]在国家政策的层面上，中国不认为上述的过度竞争就国家利益而言是可以接受的，因此要建立行政管理来确保企业在开始私营时不会置更重要的国家利益于不顾。

26.  在实施这些控制措施时，由于政府已经不直接控制单个公司的活动，处理这些问题就必然需要政府将其管理职能指派给能够为了提高国家利益而协调管理市场竞争的单位，保证竞争有序进行并以确保行业不受国外贸易制裁的方式予以引导，并获取与国家在全球范围内成为成功的工业国家的目标相一致的适当经济回报。

---

[3] 李先生在1986年至1990年任对外经济贸易部副部长，1990年至1993年任对外经济贸易部部长，1993年至2003年任主管全国对外贸工作的国务院副总理。

[4] 关于1988年外制改革问题，李岚清，《宏观经济研究》，1987年，第30页。

[5] 同上。

[6] 同上。

6

27.   当时任经贸部部长的吴仪[7]在其1994年的讲话中对中国政府所要应对的局面归纳如下：

> 随着进出口商品的经营继续放开，经营进出口贸易的企业也会越来越多。特别是将来我国"复关"之后，由国家直接管理的进出口商品将进一步减少。但是，目前我国社会主义市场经济体制还处于初创阶段，很多经济活动还不规范，一些企业的经营自主权扩大后，其自负经营、自负盈亏、自我约束、自主发展的机制尚未形成，国内企业间盲目竞争、破坏秩序的现象，在一定时期内仍比较突出。这个问题是多年以来一直迫切需要解决而没能很好解决的，它已严重影响了我国外贸出口的健康发展，给国家造成了直接经济损失。... 因此，要通过改革进出口商会工作，使商会有能力承担起新形势下对外经贸经营活动进行协调、指导、咨询和服务的重担，尽快扭转当前这种不利局面。... 在外贸经营领域中，要大力加强和完善进出口协调服务机制，包括加强和发挥进出口商会等中介机构的作用。政府的一些职能将逐步弱化或移交至商会。[8]

28.   如上所述，自从中国开始转变其计划经济以及外贸放权以来，中国政府始终非常重视维护"市场秩序"，在中国政府看来，市场秩序可以帮助保持和推进其发展成功的、赢利的民族工业的国家利益。中国政府担心国内企业之间的"过度竞争"和"恶性竞争"会威胁到整个国内产业的利润和持续稳定，在外贸领域会导致利润从中国流走。[9]

---

[7]吴女士在1993年至1998年任经贸部部长。1998年至2002任国务委员（相当于国务院副总理）。2003年-2008年任国务院副总理。

[8]*吴仪部长谈进出口商会的改革*，徐国明，《机电产品市场》，1994年第10期。政府官员如李部长、吴部长的讲话在中国立法和管理政策制定的过程中拥有特殊的地位。这些讲话，针对重要政府政策议题，意于给与其他政府官员和公众广泛的指导，经常会就其涉及的内容成为更具体的立法的基础。

[9]例如，Owen, Sun and Zheng, *China's Competition Policy Reforms: The Anti-Monopoly Law and Beyond*, 75 Antitrust L.J. 231, 249 (2008). 又参见，脚注8，*吴仪部长谈进出口商会的改革*，徐国明，《机电产品市场》，1994年第10期。

29.   基于这些考虑，为了提高国家利益发展成功的国内产业、保证国家整体赢利，中国政府制定了一项非常重要的国家政策，要求中国的出口企业"联合统一对外"。[10]这一政策是中国出口贸易改革的重要目标，在一系列的关于官方指令中明确提出，特别是，例如：

（1）   当时任外经贸部部长的李岚清在全国经济体制改革工作会议上的发言[11]中指出"鉴于以上存在的主要问题，改革的目标和方向也是比较清楚的。外贸体制改革，就是要实行自负盈亏，放开经营，加强管理，联合对外，进一步促进对外贸易发展。"[12]李岚清部长在讲话中谈到 1988 年外贸体制改革的一个重要任务就是"改进外贸行政管理，落实联合统一对外"[13]。而在这次讲话中提到，成立进出口商会正是为了落实这项工作的具体措施之一。[14]

（2）   在 1991 年对外经济贸易部发布的《关于加强出口商品协调管理的若干规定》，指出"加强出口商品协调管理的目的是贯彻治理整顿、深化改革方针，充分发挥主营出口渠道作用，调动各类外贸企业的积极性，做到联合统一对外，建立起健康的外贸经营秩序，从而有利于扩大出口、提高经济效益，维护国家整体利益"。[15]该《规定》指出，负责协调管理，实现联合统一对外政策的主要部门就是进出口商会。

---

[10] 国务院关于进一步改革和完善对外贸易体制若干问题的决定，1990，国发【1990】70号。

[11] 参见脚注 4，第 31 页。

[12] 参见脚注 4，第 31 页。

[13] 参见脚注 4，第 36 页。

[14] 见上。

[15] 《关于加强出口商品协调管理的若干规定》，经贸部，1991 年，第一段。

8

（3） 在 1990 年的《国务院关于进一步改革和完善对外贸易体制若干问题的决定》中指出进一步推进改革的主要任务之一就是"改善出口经营，加强协调管理，联合统一对外"。[16]

30.  总而言之，在过去的几十年中，中国始终保持至今的明确政策是，非国有企业应该存在，它们之间也应该有竞争，但是开展这种竞争时必须考虑到更大的国家利益，避免可能扰乱市场秩序、进而影响国内产业可持续发展的"过度的"或"恶性的"竞争。基于这一出发点，为了避免这种威胁，中国企业被要求在外贸中联合统一对外。

31.  正是在这种意义上讲，中国的整体经济体系不仅仅被定为"市场经济"，而是"*社会主义市场经济*"。在这种政治和经济的背景下，为了贯彻该出口政策，进出口商会为了填补空缺作为政府授权的管理外贸的机构而成立。[17] 如下所述，对外经济贸易部将某些政府职能授予了进出口商会，尤其是管理维生素 C 的商会，商会被要求协调管理出口并对出口企业执行强制的行业自律机制。

**D.    进出口商会的成立及其协调功能**

32.  商会是中国政府为从计划经济向"社会主义市场经济"转变而改革外贸体制成立的国家进出口商会之一。享有进出口业务专营权的特别指定的国营全国性进出口公司控制进出口业务的责任和权利就此转给了进出口商会。进出口商会被委托监管和协调国家主要产业块的进出口：医药保健品、食品土

---

[16]《国务院关于进一步改革和完善对外贸易体制若干问题的决定》（国发[1990]70号）（"...经贸部要继续发挥各专业总公司和各进出口商会的作用，加强对进出口商品的协调管理，维护正常的外贸经营秩序，做到联合统一对外。...各类外贸企业必须服从统一的协调管理，对违反者，经贸部及其授权单位有权对其实行必要的处罚。在各专业总公司自主经营、自负盈亏的基础上，经贸部可有领导、有步骤地试行组建行业性的进出口集团公司，联合统一对外。有关出口商品分类的经营、协调管理办法，由经贸部制定"。）这里，"专业总公司"指的是指定进行外贸的专营外贸公司。

[17]参见脚注 4。

9

畜、轻工工艺、五矿化工、机械电子、纺织品。特别需要指出的是，中国政府授权商会协调和管理出口的医药保健品，其中也包括了维生素 C 产品。

33.   这些商会成立时，其工作人员都直接来调自政府部门，并被授权执行某些政府管理职能，针对一些重要的外贸问题，商会还被要求成立分会，并要求其分会"本着…维护共同利益的原则进行协调"。[18]

34.   于是，1994 年国务院在《关于进一步深化对外贸易体制改革的决定》中明确的进出口商会的十项职责，这些职责中的大多数是政府职能性质的，而只有少数是非政府性质的，它们包括：（1）维护进出口经营秩序和会员企业的利益；（2）组织对国外反倾销的应诉；（3）为会员企业提供信息和咨询服务；（4）调解会员之间的贸易纠纷；（5）向政府反映企业的要求和意见，并对政府制定政策提出建议；（6）监督和指导会员企业守法经营；（7）根据政府主管部门的授权，参与组织进出口商品配额招标的实施；（8）参与组织出口交易会、出国展览会；（9）对外开展业务交流与联络，进行市场调研；（10）向政府有关执法部门建议或直接根据同行协议规定，采取措施惩治违反协调规定的企业。其中第（1）、（2）、（6）、（7）、（10）项职责均是商务部原先的管理职能，之后授权给进出口商会带其以官方角色行使。

35.   进出口商会的官方性质以及它们在监管体系中的角色可以从经贸部任命商会领导人和批准商会人员编制及其薪酬结构得到证明。[19]商务部有权"审批出口商会及分会的成立和撤销，并归口管理"。[20]

E.   中国进出口商会的特殊性质

---

[18] 同上，第 36 页。

[19] 经贸部《关于进出口商会人事管理的若干规定》（1994 年 9 月 23 日）。早期商会的人员实际上来自与国家机关和国有外贸公司，后者是政府控制对外贸易的手段。在担任商会领导时，有些政府官员还同时在国家机关或国有外贸公司兼职。比如 1991 年经贸部发布的《进出口商会座谈会会议纪要》提到，"要继续加强商会领导队伍，从外贸公司调任的商会领导要采取轮岗制。这种措施在目前是必要的，轮岗时间的长度可以在 2 到 4 年之间。"

[20] 参见 脚注 4，第 36-37 页。

36. 原告的专家 James V. Feinerman 教授提出原告指控的行为从中国法律上讲并不是被强制的，他说"被告是一个社会团体的成员，该社会团体的成立需要政府批准，但这一点并不意味着中国政府就强制要求了该成员的行为"。[21] 他的结论基于其对 1998 年 10 月国务院发布的《社会团体登记管理条例》[22] 的援引，该条例要求所有社会团体的成立都需要相关政府部门的批准。[23]

37. Feinerman 教授的分析是错误的，因为该分析不承认在中国法律中有不同种类的社会团体。在中国法律中，"社会团体"是一个很宽泛的法律概念，与个人、企业、机构，以及政府部门相区别。Feinerman 教授所引用的《社会团体登记管理条例》规定了成立所有类型社会团体的最基本要求，而并不针对一个组织的性质，即该组织是民间组织还是有官方代理。打个比方，Feinerman 教授的结论就好像是说：你不能证明一个苹果是苹果，因为它是个水果，而水果又存在成千上万的种类。

38. 在中国的经济改革中，成立了很多的自称为"协会"或者"商会"的组织。[24] 中国目前属于《社会团体登记管理条例》规定范围的"协会"、"商会"等社会团体主要分为两类：（1）那些被赋予某些管理或行政职能的团体，例如我自己担任顾问的中国国际贸易促进会以及以上提到的外经贸部领导的几大国家进出口商会，和（2）那些完全自愿成立的，没有政府管理职能的，在组织结构和人员选择方面完全自主的商业协会。后一种是私人的民间组织。由于负责维生素 C 的商会自其建立之日起就承担了政府授予的政府管理职能，归于第一类。

39. 根据 1991 年《对外经济贸易社会团体管理办法》（"1991 年管理办法"），医保商会属于"具有业务协调和部分行业管理职能的社会团体"。贸易协会虽然属于"对外经济贸易社会团体"，但并非所有都具有"业务协调和行

---

[21] Feinerman 宣言，¶12。

[22] Feinerman 宣言，附件 C。

[23] Feinerman 宣言，¶¶6-10。

[24] 但是，"中国进出口商会"的名称仍被少数几个根据政府指令建立的指定商会所专用。

业管理职能"。"具有业务协调和部分行业管理职能的社会团体，其日常管理由对外贸易部直接负责。[25] 与此相反，对那些不具有业务协调和部分行业管理职能的"社会团体"，外经贸部并不直接负责。[26] 作为有权解释1991年管理办法的政府部门，外经贸部有权决定一个组织是否为具有业务协调和部分行业管理职能的对外经济贸易社会团体。[27] 最重要的是，我们需要认识到，进出口商会是在商务部的指令之下建立的，而且被授予特定的政府管理职能。他们是政府授权机构。

40. 就我所知，全国进出口商会也与西方国家典型的商会有很大不同。中国进出口商会是由政府以"自上而下"的方式为了贯彻国家政策的执行而建立的，并自其成立之日起就被政府委派执行行政管理职能。对于关键性行业和出口商品，企业参加商会是强制性的，以保证中国政府政策及规定的贯彻执行。中国进出口商会的领导是由国家指派或在政府监督下被选中的。与此形成鲜明对照的是，西方国家的商会一般都是由私有企业企业自发组织起来，而且是自由加入的会员制，其领导都是由成员企业选举的。这些西方国家的商会一般都是完全独立的非官方组织，不直接承担政府部门职能。他们的商会领导都不受政府的干预或指示影响，由会员企业自由选举。

**F. 进出口商会的协调职权**

41. 如上所述，具有管理权利的进出口商会的职能是保证外贸企业的协调和有序竞争，从而促进国家的基本经济政策的执行以及国家利益的实现。所以，遵循政府政策以及遵循商会为了执行和推动上述政策而提出的要求都是强制性的。

42. 为保证中国国家政策正确执行，外经贸部要求参与外贸的企业服从进出口商会的管理指令。"出口商会及分会，由有外贸出口经营权的企业组成。有外贸经营权的企业，经营粮油、土产、畜产、纺织、服装、轻工、工艺、五金、矿产、化工、机电等产品必须参加有关出口商会及分会，否则不

---

[25]《对外经济贸易社会团体管理办法》，经贸部，1991年2月26日发布，第17条。"外经贸部有权解释此办法。"第25条。

[26] 比较，同上，第18条。

[27] 同上，第25条.

12

能经营该类商品的出口业务。出口商市场、客户、价格等方面有协调权和建议权，并应积极进行市场调研，提供对不服从协调者，可以停止其会籍，经贸部相应地暂停其经营，对情节严重除其会籍，经贸部相应地撤销其经营权。"[28]

43.  "各类外贸企业必须服从统一的协调管理，对违反者，经贸部及其授权单位有权对其实行必要的处罚"[29]。而且，"经贸各有关单位要继续积极支持商会搞好协调服务工作，使商会协助经贸部进行行政宏观管理"[30]。

44.  在 1994 年，当时任经贸部部长的吴仪就进出口商会的协调管理职能作出了下述指示：

> "协调，是指各商会必须树立行业意识，要有"大经贸"思想，从维护广大会员利益和我国对外贸易正常秩序的大局出发，对会员的进出口活动进行协调。有外贸经营权的企业(包括外商投资企业)均应服从进出口商会协调。协调对于商会来讲是个硬任务。对个别违反国家有关规定和同行业协议，给国家和其他单位造成重大损失的企业，除由商会按同行业协议予以处理外，也可建议主管部门给予处罚。今后，为配合商会的协调，外经贸部将严肃处理几个不服从协调的典型"[31]。

45.  海关总署在 1994 年发布了《中华人民共和国海关对出口商品审价暂行办法》。暂行办法明确规定，海关在审核出口报关单上的出口销售价格时，应当首先参照"各中国进出口商会协调的出口商品价格…"[32] 如报关单上的出口价格低于商会的协调价格，"海关将有关情况通报有关中国进出口商会和国家外汇管理部门"。[33]"具体处罚办法由各进出口商会和国家外汇管理

---

[28] 参见脚注 4，第 36 页。

[29] 国务院关于进一步改革和完善对外贸易体制若干问题的决定，国务院，国发 [1990]70 号，1990 年。

[30] 《进出口商会座谈会会议纪要》，经贸部办公室，1991 年。

[31] 参见脚注 8。

[32] 《中华人民共和国海关对出口商品审价实施细则》，海关总署，1994 年，第四条

[33] 同上。

部门制定"。[34] 明确的指出的是，经商会协调的出口价格是各出口商必须遵守的，这是由海关审价和进出口商会对于违反行为的处罚权保障的。

46.    如下述更为详细的阐述和支持引文所示，上述通常性义务同样适用于维生素 C 出口企业。因此，商会在协调管理医药和保健产品行业时的指示，其成员必须要遵守，因为医保商会是中国政府授权的行业管理者。四家中国生产商被告都被要求成为商会会员并必须服从商会指示。[35] 如果被告不遵守商会的管理，会被禁止出口或承受其他严格处罚。

**G.    许可证和配额制度下商会的管理职能**

47.    最迟自 1990 年开始，维生素 C 产品的出口就受到中国政府在配额以及出口许可制度下的积极管理，商会也被赋予管理协调维生素 C 产品出口的权利和责任。[36] 作为关系到某些重点行业经济活动的国家政策，此管理长期以来通过各种形式和机制发挥作用。因而，对于维生素 C 而言，在 1990 年维生素 C 产品被划为"第二类"出口商品，该类商品的出口实行"指导性出口计划"，并经由指定的有出口经营权的外贸公司出口。"第二类"出口商品是"国际市场容量有限、有配额限制和竞争激烈、价格比较敏感的出口商品"。[37]

48.    进出口商会被明确赋予了"协调管理"包括维生素 C 产品在内的"第二类"出口商品出口的职能。对于"第二类"出口商品，"由进出口商会根据商品的不同性质，对市场、客户、价格等方面进行协调管理，尤其要组织商会成员定期或随时制定全国统一的出口价格方案，并负责监督执行。"[38] "有关进出

---

[34] 同上。

[35] 1997 年经贸部和药管局颁布的《关于加强维生素 C 生产、出口管理有关事项的通知》（"1997 年外贸部和药管局通知"）要求所有有资格经营维生素 C 出口的企业必须加入维生素 C 分会。

[36] 见《关于调整出口商品分类目录和加强出口商品经营管理的通知》，对外经济贸易部（1990 年 1 月 23 日）。

[37] 同上。

[38] 同上。

口商会应组织成立相应的进出口商品分会或协调管理小组负责协调管理[第二类出口商品]。"[39]

49.　维生素 C 的出口是一个由行业成员参与的国家强制"协调"的过程。根据 1992 年出口商品管理暂行办法对包括维生素 C 在内的 38 中产品实施计划额额管理。根据 1992 年暂行办法,化为"第一类"出口的 38 种商品是"对关系国计民生的大宗资源性出口商品以及在我国出口中占有重要地位的大宗传统出口商品"。1992 年暂行办法还再次规定了强制性的"协调"过程:"需要协调的出口商品,统一由各进出口商会协调管理。经营实行配额许可证管理出口商品的企业必参加有关进出口商会。具体协调管理办法,由各进出口商会制订,经会员大会讨论通过后严格执行"。[40]

50.　该强制性的"协调"过程还受到配额许可制度的保障。1995 年经贸部发布的《关于出口商品配额分配的若干规定》中规定,出口商品配额分配的必要条件之一是"参加有关进出口商会,并能自觉服从协调"。此外,1996 年的《关于出口许可证管理的若干规定》规定,当出口合同中的价格低于有关进出口商会指定的出口协调价格时,发证机关应拒发出口许可证。

51.　在此期间,中国政府特别关注维生素 C 及其保证国家政策指令实施的需要。在 1995 年末,三位副总理指示外经贸部处理维生素 C 产业中的问题。在此指示之后,外经贸部在 1996 年召集了其地方省级部门,主要出口商和生产商,商会及国家药品监督管理局("药管局")[41]的官员召开紧急会议,以"加强对维生素 C 出口的管理,维护来之不易的世界市场份额,促进[维生素 C]出口的健康发展"。[42] 会议后,外经贸部向国务院递交了报告,披露了几项问题,包括中国维生素 C 对出口的过度依赖,低价出口,及过多

---

[39] 同上。

[40]《出口商品管理暂行办法》,对外经济贸易部部令 1992 年第 4 号（1992 年 12 月 29 日）。

[41] 药管局当时是在国务院下管理食品和药物产品的中国政府最高级别的行政管理权利机构;2008 年 3 月后,药管局变成公共健康部的一部分。

[42] 关于召开维生素 C 出口工作座谈会的紧急通知,对外贸易经济合作部对外经济贸易管理司,1996 年 1 月 31 日。

竞争的出口渠道。[43] 外经贸部注意到，中国维生素 C 生产厂商对应前些年在国际市场的高收益和强需求，建立了生产能力过剩，国外生产商试图通过降低价格重新占有市场份额。[44] 外经贸部总结道："目前维生素 C 出口中出现的价格竞争主要是中国维生素 C 生产企业和国际跨国公司之间的竞争，其次是中国维生素 C 生产企业之间的竞争。"[45] 低价竞争和出口混乱是"[中国]维生素 C 出口进一步健康发展的严重隐患"。[46]

**H.    维生素 C 分会的成立**

52.  贵法院 2008 年 11 月 6 日的备忘录和决定质疑维生素 C 分会是否是基于私人团体或被告的请求而成立的。[47] 答案是否定的。在 1997 年，经贸部、药管局联合颁布一规定并要求商会成立维生素 C 分会。[48] 经贸部、国家医药管理局还指出"[中国]维生素 C 出口面临来自国际市场的激烈的竞争和挑战"。[49] "为整顿维 C 出口经营秩序、优化出口经营队伍、实现出口的规模化经营、提高我维 C 在国际市场的竞争能力，促进维 C 出口的健康发展，维护国家和企业利益"，经贸部和药管局联合颁布了一些措施，其中就包括了要求商会成立维生素 C 分会。[50]

---

[43] 对外贸易经济合作部向国务院关于当前维生素 C 出口情况及对策意见的报告，吴仪签发，【1996】外经贸管发第 185 号。

[44] 同上。

[45] 同上。

[46] 同上第 5 页。因此，外经贸部建议采取严厉的手段，包括禁止在其后的 3 年里上马新的维生素 C 生产企业或生产规模的扩张，对现有维生素 C 生产企业的限产措施，控制出口总量，调节现有出口配额分配方法以提高规模性出口。

[47] 2008 年 11 月 6 日的法院备忘和裁定，第 30 页。

[48] 1997 关于加强维生素 C 生产，出口管理有关事项的通知（1997），外经贸管发第 664 号，1993 年 11 月 27 日发行，第六段。

[49] 同上，引言。

[50] 同上，第六段。

16

53. 经贸部和药管局就维生素 C 分会的协调和管理职能进行了明确的规定："该小组要重点负责对维 C 出口市场、价格、客户的协调。"[51] "凡是具有维 C 出口经营资格的企业均应加入该'协调小组'"。[52]

54. 经贸部和药管局为此"协调"程序搭建了总体框架，其中涉及行业成员的参与，赋予了医保商会执行特定的管理协调办法的责任，由其组织的并在其积极监管指导下的负责某些特定产品（如维 C 产品）的"分会"来具体执行该协调方法："[维 C 分会]要根据国内外市场情况，适时组织维 C 主要出口经营企业召开会议，研究营销策略，及时制定和调整出口协调价格。维 C 出口企业必须严格按照执行。"[53] 外经贸部授权的发证机关要严格审核企业维 C 出口经营资格并按维 C 出口协调价格和配额数量，审核企业的出口合同，核发出口许可证。对违规者要严格处理。[54]

55. 经贸部在批准设立维生素 C 分会时，又再度重申商会及其分会的职能是对"维 C 出口市场、价格、客户的协调"。[55] 该"协调管理市场，价格，客户和维生素 C 出口秩序"的职权随后也被规定在了维生素 C 分会的章程中。[56]

56. 贵法院在 2008 年 11 月 6 日的备忘录和决定中提出："一个可以开始展开取证的地方是被告在 2001 年 12 月之前和之后协调价格的程度。如果在 1999 年（商会成立的时候）或 1997 年（维生素 C 分会成立的时候），制定价格的工具和强制要求已经存在，但是没有串谋价格，直至取得市场控制力后，那么原告关于被告的行为是自愿的说法将更有说服力。"对于这个问题的答案是，正如前文所述，维生素 C 出口自 1990 年起就受到强制性协调管理，而且维生素 C 生产企业协调过程是强制性的，因为他们在维生素 C 分

---

[51] 同上，第六段。

[52] 同上。

[53] 同上，第七段。

[54] 同上，第九段和第十段。对违反本通知有关规定的出口企业，一经查实，将根据情节轻重，处以扣减出口配额、直至取消其维 C 出口经营权的处罚。

[55] 经贸部批准设立中国医药保健品进出口商会维生素 C 分会，1998 年 3 月 23 日.

[56] 中国医药保健品进出口商会维生素 C 分会章程，1997 年 10 月 11 日。

会的会员身份及其对分会指令的服从都是强制性的，如有违背，就会受到丧失出口权的处罚。

57.　本案的起诉书中所指控的事件并非缘于自愿的活动，而仅仅是政府强制管理的延续，正如我前文所述，这种强制过程已经存在了近 10 年。所以，诉状所指控的第一次共谋会议实际上是由商会根据经贸部的指示，针对中国政府警告中国企业应对倾销风险的而召开的。[57] 其后，并在被告被指控共谋的期间，商会及维生素 C 分会适当地召开会议，通过协调价格和产量从而贯彻执行国家的关于维护一个盈利的维生素 C 产业的竞争政策。因此，不论在被告被指控违反美国反垄断法的期间开始之前或者之后，维生素 C 生产企业始终被要求遵循同样的政策，并为此参与商会维生素 C 分会的活动。

**I.　　商会在 2001 年以后出口预核签章制度中的管理角色**

58.　商会的 "协调和行业管理" 的政府指派权利在 2001 年 12 月中国加入 WTO 之后继续延续。在 2002 年，在外贸部和海关总署的联合指派下，商会开始实施一个 "预核签章" 制度以取代原有的出口配额限制、根据中国要求对某些重点产业继续进行监管的基本国家政策继续进行 "协调价格和行业自律"。[58]

59.　维生素 C 产品是 36 种国家重点控制并受出口预核签章管理的产品之一。出口企业必须是维生素 C 分会会员，并遵守商会和维生素 C 分会执行的行业协调。商会和维生素 C 分会组织行业成员开会并讨论维生素 C 市场，价格和生产情况，都是出于商务部所赋予的地位和职权。[59]

60.　有关预核签章的具体程序由 2003 年商务部和海关总署发布的（第 36 号）公告具体规定。[60] 对于纳入出口商品预核签章目录的商品，出口企业

---

[57] 维生素 C 出口企业官员会议纪要，JJPC0043070。

[58] 见商务部、海关总署关于调整出口商品海关审价目录的通知，外经贸贸发 【2002】187 号，（2002 年 3 月 29 日），第 4 条。

[59] 同上。

[60] 2003 年商务部、国家海关总署发布的第 36 号公告，2003 年 11 月 29 日。

应在报关前，将出口合同(正本和影印件)送达相关进出口商会，由进出口商会对出口合同进行审核。相关进出口商会之后应以其监督的同行协议为依据审核批准出口公司的拟议的出口合同。[61] 批准时，进出口商会要在"签章表"的指定位置加盖审核签章防伪印章、在出口合同的成交价格和数量位置加盖预核签章防伪印章后将"签章表"和出口合同提供给出口企业。出口企业按要求需持盖了章的"签章表"原件及出口合同到海关申请出口报关。商会审核并在生产商出口合同上盖上它的批准"签章"的法定权威，是商务部授予商会管理维生素C行业的政府职权的众多体现之一。

61. 另外，重要的是要了解，中国加入世贸后，预核签章机制的实施并没有从任何形式上改变政府对维生素C产业的控制程度。和在实施预核签章机制前一样，维生素C分会始终是在商会的内部的政府授权的协调组织，而商会是根据国家规定和政策设立的、并由政府授权代表政府管理出口。维生素C分会协助下的有关产量减产，出口配额和其他措施的的价格协调会议以及同行协议，继续为了实现我在上文所述的国家利益，保持国家所关注的、适当的出口秩序而服务。

62. 国家经济政策一直要求对重要产业（如维生素C）进行协调，从而避免发生那些被认为是违背国家利益的、有害形式的价格竞争。维生素C生产企业被要求，在医保商会领导下协调价格和产量，贯彻实施上述政策。如上文所述，2001年之后和2001年之前都是如此。采取何种机制以贯彻该政策并非重点。关键是生产商被要求以协调的方式行动以贯彻中国的经济政策。

63. 2001年后所采取的措施（包括预核签章，价格协调，产量或供应的限制），与1990后实施的出口限制措施一样，都具有强制性。企业在商会领导下参与出口协调，讨论市场价格、产量和出口数量，制定并遵守协调措施，这些都是自1990年起被强制性要求进行的行为。如果拒绝参与上述协调或者不遵守协调措施，被告会丧失其出口权。

J.　　所控共谋期间的强制性"协调"机制

---

[61] 同上。

64. 贵法院在 2008 年 11 月 6 日的备忘录和裁决中正确地指出，"协调"二字在中国的政治和经济政策的背景下有特别的含义。[62] 在中国的经济管制和政策背景下，"协调"二字涵盖了一个在商务部指导授权下，为了实现中国国家整体利益、减少外贸争端，由商会进行的、强制行业成员参与讨论从而决定适宜的管制措施的监管过程。

65. 如上文所述分析，商会的协调职能是商务部依据中国法律和政策所授予的。在中国由集中直接的行政管理体系向社会主义市场经济过渡的转型期间，政府预计从政策的层面上通过向下指派管理细节的方式监管具体公司市场行为，在此期间，商会的协调管理是国家外贸系统中重要的管理手段。协调的目的是使调动国内企业以一个整体的方式在国际市场竞争，建立起健康的外贸经营秩序，扩大出口，并提升国家的整体利益。[63] 商会和商务部的管理职权保障上述强制过程的实施。

66. 在贵法院 2008 年 11 月 6 日的备忘录和裁决中提到，原告声称"商务部并未指出任何一个单独的法律或规定，来强制实行涉案价格合同中的价格。"[64] 然而，原告对中国的出口管制体制理解错误。中国法律法规对关系到重要国家利益的出口建立了一个强制性的"行业协调"过程，中国政府授权商会通过该强制性的管制过程找到最适宜的管制措施。该管制过程强制性要求行业成员讨论市场情况，价格和其他相关因素，从而找到适宜的协调措施。一旦适宜的措施（例如，配额，价格或产量限制，或强制性的共同行动）被商会采纳，根据中国法律和管制实践，这些措施就具有了强制性。上述管理过程是中国政府通过中国法律法规强制要求的，并通过由商会根据其政府授予的权威具体实施。

67. 如贵法院 2008 年 11 月 6 日的备忘录和裁决所指出的，通过援引包含"投票同意"或"达成协议"文字的文件，原告辩称被告的价格协议是自愿的。

---

[62] 2008 年 11 月 6 日的法院备忘录和裁定，第 18 页，备注 7。

[63] 关于加强出口商品协调管理的若干规定，对外经济贸易部，于 1991 年 2 月 22 日生效。

[64] 2008 年 11 月 6 日的法院备忘录和裁定，第 17 页。

[65] 如上文所解释的，该"行业协调"过程是政府强制性的管制过程，并非是从维生素 C 生产商能随意忽视它的涵义上的自愿。某些被告可能讨论了维生素 C 市场价格或生产水平，无论商会是否在场，这些行为都是政府强制要求的"行业协调"的不可缺少的组成部分。其目的是为了找到适宜的行业管制措施，这是商会被授权并指示实施的。

68.   贵法院 2008 年 11 月 6 日的备忘录和裁决还提出，由于某些文件似乎显示有些被告是出于自身利益而参与该协调过程的，所以难以决定被告在定价过程中的独立程度。[66] 无论个别公司的自身利益是否与"行业协调"过程巧合，并不能改变该"行业协调"过程的本质——一个为了找到适宜行业管理措施的政府强制管理过程。商务部及其委派人 -- 商会 -- 被全权授权实施并强制执行以使其有效。不遵守会导致严重的处罚 --- 不遵守的公司会丧失其出口权。[67]

**K.   "行业自律"和政府对加强国家利益、避免"价格战"的关注**

69.   贵法院 2008 年 11 月 6 日的备忘录和裁决还表明，原告通过援引包含"行业自律"或"自愿限制"词语的文件来辩称被告的价格协议是自发的。[68] 这些词语必须在中国的经济和管理政策的背景下理解。他们并不包涵被告自愿行为的含义。

70.   "行业自律"是一个在中国产业政策中被充分理解并广泛运用的术语。[69] 如我在上文所述，这个自律的概念在吴部长 1994 年的讲话中就曾被强调提出的。从国家部委转化而来的进出口商会被赋予了执行该概念的重要职能，该概念在 1998 年得到官方认可。[70] "自律"是指所有的行业都必须依据法

---

[65] 同上，第 19-20 页。

[66] 同上，第 22-23 页。

[67] 商务部、国家海关总署的 第 36 号公告。

[68] 2008 年 11 月 6 日的法院备忘和裁定，第 18 页，备注 7。

[69] "Industry self-discipline"虽然是中文字最普遍的英文翻译，但是其直接翻译可以是"industry self-regulation"。

[70] 见 Owen, et al, "Chinese Competition Policy Reforms: The Anti-Monopoly Law and Beyond," 75 Antitrust L.J. 231, 248 (2008) 及其引用资料。

律、法规、规章来维护进出口秩序，不得进行违反规定、不顾国家利益的经营。虽然该协议是由外经贸部领导自上而下的，并经进出口商会实施的管理体制，该行业自律机制也是出口企业间的共同监督措施，是政府联合一致政策以实现国家整体利益、发展成功国内产业要求的。

71.  明确的讲，由于维生素 C 是重要出口行业，为了防止中国公司之间为了自身利益最大化，以损害国家利益为代价展开竞争，中国政府长期以来就一直非常关注该行业的监管，这就是"行业自律"和"自愿限制"的含义。[71] 例如，在 2001 年 4 月 13 日商会召开的会议上，经贸部外贸司的一名官员告诫维生素 C 生产商和出口商说："VC 虽不是资源性产品，但自 1997 年以来管理都很严格 ...部里重视商会建设，要分会积极发挥作用；企业要遵守行约行规；企业利润最大化的同时，也要考虑国家大局利益。"[72]

72.  原告根据网站报道指控被告达成了"定价限产的自愿协议"。然而，在中国的"自律"的背景下，"自愿"一词是指，为贯彻中国经济政策，市场参与者在达成管理强制要求的行业协议的过程中，对时间、地点和方式仅有某些有限的控制权。在中国管制背景下，企业被期望相互间进行讨论，为的是对如何最好的进行其被要求的与"国家整体利益"相一致的协调达成一致；在此过程中，企业被期与在商会的领导下遵守中国法律法规。

73.  同样的，虽然有文件显示有时有个别讨论持续时间长或者并未达成协议的情况，但是这并不能表强制性或管制的匮乏，但这是程序固有的-- 当事人虽然是被强制要求参与为实现基本政策而进行的自律过程的，但有自由决定如何实现与国家利益一致的协调方式。

74.  比喻的说，中国外贸管理体制中在进出口商会协调指导下的行业自律机制好比一套有其严密规则和奖惩系统的赛跑比赛机制。参赛者（出口企业）遵守规则就有权参与竞赛，否则，他们就会受到惩罚，甚至取消比赛资格。因此，所谓的自愿的被告自律，是在以延伸中国国家经济政策的方式而必须执行的协调有关价格和产量的行为的强制性机制。

---

[71] 见商务部、海关总署 1997 年通知。

[72] 证人问询证物 173 号，JJPC0043064。

75.　正确的理解，政府要求的是行业在一个必须遵循的强制过程中的积极参与。更重要的是，在中国，通过法规而建立的广泛的管制框架后，指令和执行命令通常是以口头形式下达的。中国政府的控制是一个非常不同于在其他国家发生的程序，而其指令是口头形式的事实，或者诸如"自律"或"自愿限制"的术语的使用，亦不能改变这些指令在中国下达时的强制度或强迫性——尤其是当这些指令是下达给政府拥有重要所有权的公司本身，而且接收指令的官员都是政党官员或其指派者。重要的是，中国管理体制中，企业仍有显著的国家所有权，国家和地方政府发挥持续作用，高级管理层和主管人员的业务职位通常是政府任命的，因而，这些控制手段通常都不需用到的。它们的存在以及企业和政府之间密切交织的事实，给我所述的管理体制提供了力量。

76.　如上述法规和国内法律学者所反映的，中国的行业出口自律措施指的是由进出口商会根据政府授权或委托而实施的出口自律措施，包括通过对产能和出口量的限制或出口价格的调整而减轻缓和竞争，以达到提高中国的国家利益，化解或避免与他国的贸易摩擦。这种行业自律得到了中国《对外贸易法》和《反垄断法》的支持。中国立法者思忖行业协会在增加国内产业竞争力的过程中发挥重要作用。"特别是，立法者想要行业协会消除'恶性竞争'或割喉式'价格战'"。[73]

77.　行业自律的概念是根深于中国的经济管制框架。中国政府要求商会和行业协会通过提高竞争者的"自律"来避免所谓的"价格战争"并促进国家利益。对外贸易法第 56 条指出："有关协会、商会应当遵守法律、行政法规，按照章程对其成员提供与对外贸易有关的生产、营销、信息、培训等方面的服务，发挥协调和自律作用…"。

---

[73] Yong Huang, *Pursuing the Second Best: The History, Momentum, and Remaining Issues of China's Anti-Monopoly Law*, 75 Antitrust L. J. 117, 129 (2008)。

78.　自律的概念在中国最近通过的反垄断法中得到了再次重申和确认。2008 年 8 月施行的《反垄断法》第 11 条明确要求行业协会应当"加强行业自律，引导本行业的经营者依法竞争，维护市场竞争秩序…"[74]

79.　如我之前所述，向一个类型的市场经济的转变而引发的部分忧虑是企业会把价格标的很低以至于他们会造成严重的反倾销风险。事实上，这也是 2001 年 11 月会议的缘由。然而，如同我所见到的文件及商务部网站所反映的，解决反倾销忧虑并非行业自律的唯一甚至主要的目的。其实，它更是为了执行已经存在多年的、在更广泛层面上的国家出口政策，即避免以扰乱贸易秩序而为代价而追求短期自身利益的过度竞争，并在国际市场上做到联合行动进而发展盈利的、成功的国家产业。

**L.　中国法律不要求用核实的政府印章来援引法律或法规**

80.　我想指出的最后一点是，Feinerman 教授在其 2006 年 8 月 15 日的声明做了不正确的结论，即商务部提交的"法庭之友"报告所附的法规因为没有核实过的官员，在中国法律下没有正确的验证其真实性。[75] 为了证实一个文件的真实性，中国法律在其正确公证之外，并不要求有核实的封印或盖章。这些中国政府的规定是通过商务部所授权的代表提供的，而商务部或者是这些法规的发行者，指定的执行机构，或是授权解释部门，因而他们经过正确认证的。

沈四宝教授

日期：2009 年 2 月 19 日

---

[74] 中华人民共和国反垄断法（全国人大委员会常委会 2007 年 8 月 30 日通过，于 2008 年 8 月 1 日起生效），第 11 条。另见第 15 条（反垄断法不适用于"为保障对外贸易和对外经济合作中的正当利益的"经营者之间的协议）。

[75] Feinerman 宣誓附件 B。

24

## 附件A.　沈四宝教授简历

**教育背景：**

- 学士学位, 北京大学 , 1970

- 法学硕士学位, 北京大学 , 1983

- 哥伦比亚大学, 帕克学院比较法专业 , 1981 - 1983


**工作经历：**

- 1972 年至 1979 年在北京大学法学院任教

- 1983 年至今在对外经济贸易大学任教

- 1992 年至 1994 年在中华股份制咨询公司任副总经理

- 1994 年至今为北京华贸律师事务所( 后更名北京华贸硅谷律师事务所 )创始人 ,

  管理合伙人

- 1995 年至今任对外经济贸易大学法学院院长

- 1996 年至 2004 年为中国国际经济贸易仲裁委员会副主席

- 2008 年 10 月至今任上海大学法学院院长 ( 兼职 )


**学术活动：**

- 对外经济贸易大学博士生导师 , 1996年至今

- 国务院学位委员会法学组成员 , 1996年至今

- 教育部社会科学委员会委员 , 2008年至今

- 中国国际经济法学研究会会长 , 2004年至今

- 中央高级干部讲师团成员，2002年至今

- 中央法制讲座主讲人，2002年至今

**奖励与荣誉：**

- 北京市优秀教师奖，1998年

- 富布赖特（Fulbright）奖学金, 1999年 - 2000年

- 教育部国家级教学名师奖，2006年

- 中国杰出社会科学家奖，2007年

- 司法部优秀成果奖，2007年

- 中国法学会30年优秀成果奖，2008年

- 全国优秀教材奖，2006年

- 北京市优秀成果奖，2007年

对外贸易法方面的立法活动及学术研究：

- 参与《对外贸易法》、《公司法》和《仲裁法》等法律的起草和修订工作

- 作为商务部专家团成员参与《对外贸易法立法》及修订工作

- 作为商务部专家团成员参与《反倾销条例》、《反补贴条例》、《保障措施条例》

   及其一系列细则的立法及修订工作

- 作为对外贸易部专家参与外商投资法立法及修订工作

- 作为国务院法制局专家团成员参与公司法立法及修订工作

- 作为国务院法制局专家参与仲裁立法与修订工作

- 承担国家社科基金《中国入世后对外贸易法律的梳理》课题研究

- 承担商务部对外贸易司《贸易促进条例》立法研究课题

- 承担商务部服务贸易司《服务贸易促进条例》立法研究课题

- 承担商务部对外贸易司《对外贸易摩擦的形势与对策》立法研究课题

- 承担商务部产业损害调查局《反倾销措施中对于损害的认定》课题研究

- 承担商务部公平贸易局《反倾销措施对于加工贸易的适用》课题研究


国际商事仲裁、调解

- 联合国解决国际投资争端中心调解员

- 国际商会仲裁院

- 中国国际经济贸易仲裁委员会

- 英国国际仲裁院

- 伦敦谷物及饲料贸易协会

- 巴黎商事仲裁院

- 日本商事仲裁协会

- 新加坡国际仲裁中心

- 韩国国际商事仲裁委员会

- 瑞典斯德哥尔摩仲裁院

- 瑞士洛桑仲裁院

- 上海仲裁委员会

- 北京仲裁委员会

- 深圳仲裁委员会

## 附件 B.   主要著作及发表文章

**（一）主要出版图书**

- 《国际商法论丛》（第一至第九卷）（总编），法律出版社，1990 年至 2008 年

- 《法律的真谛是实践》，法律出版社，2008 年

- 《美国反垄断法原理与典型案例研究》，法律出版社，2006 年

- 《西方国家公司法原理》，法律出版社，2006 年

- 《揭开公司面纱法律原则与典型案例选评》，对外经济贸易大学出版社 2005 年

- 《最新美国标准公司法》，法律出版社，2006 年

- 《中国对外贸易法》，法律出版社，2006 年

- 《ＷＴＯ反倾销协议解读》，湖南科技技术出版社，2006 年

- 《世界贸易组织法教程》（北京市级精品教材），对外经济贸易大学出版社，2005 年

- 《中国投资法律指南》，法律出版社，2005 年

- Securities Arbitration，Sweet and Maxwell Asia，2004

- 《中国人民共和国对外贸易法解析》，对外经济贸易大学出版社，2004 年

- 《中国涉外经贸法》（北京市高等教育精品教材），首都经济贸易大学出版社，2004 年

- 《公司法与证券法论丛》，对外经济贸易大学出版社，2004 及 2005 年版

- 《国际商法》（北京市高等教育精品教材），对外经济贸易大学出版社，2002 年

- 《国际经济法》，中国对外经济贸易出版社，2000 年

5

- 《国际商法教学案例(英文)选编》，法律出版社，1999 年第一版，2007 年第二版

- 《国际经济法教学大纲》，高等教育出版社，1998 年

- 《国际经济法概论》，高等教育出版社，1998 年

- 《国际商法》( 北京市高等教育精品教材 )，对外经济贸易大学出版社，1994 年

- 《国际投资法》，中国对外经济贸易出版社，1990 年

- 《西方国家公司法概论》，北京大学出版社，1986 年第一版，1989 年修订版

- 《美国标准公司法》，北京大学出版社，1981 年

- 《国际贸易法》，北京大学出版社，即将出版

- 《公司法》，法律出版社，即将出版

- 《国际商法》( 第三版 )，对外经济贸易大学出版社，即将出版

（二）论文

- 经济全球化条件下商业风险防范的法律对策，法人，2008 年第 10 期

- 论百岁法学家芮沐先生学术贡献，中国法律，2008 年第 10 期

- 对外开放三十年来我国外贸法制建设基本经验与展望，河北法学，2008 年第 8 期—第 10 期

- 欧盟与北美自由贸易区法律制度之比较分析，宁波大学学报，2008 年第 4 期

- 经济全球化与我国公司社会责任制度的构建，法学杂志，2008 年第 3 期

- 法制建设的世界眼光与战略思维，国家行政学院学报，2008 年第 1 期

- 发展区域贸易安排是我国当前外贸发展的一项急迫而必然的战略选择，经济研究参考，2007/21

6

- 美国、日本和欧盟贸易摩擦应对机制比较研究——兼论对我国的启示，经济研究参考，2007/16

- 我国外贸代理制度的法律冲突及其消解，暨南学报，2007/6

- 区域贸易安排法律制度之比较研究——以欧盟、北美自由贸易区为例 珠江经济，2007/05

- 论 WTO 环境下我国经济发达地区的法制建设，江南大学学报，2007/05

- 积极推进区域贸易安排是我国外贸持续发展的重要战略，湘潭大学学报(哲学社会科学版)，2007 年 4 月

- 保护国内产业 促进对外贸易——借鉴美、日、欧贸易摩擦应对机制[下] ，WTO 经济导刊，2007/04

- 发展区域贸易安排是我国外贸发展的急迫和必然战略选择，河北法学，2007/04

- 保护国内产业 促进对外贸易——借鉴美、日、欧贸易摩擦应对机制[上]，WTO 经济导刊，2007/03

- 发展区域贸易安排与我国外贸发展，法学杂志，2007/03

- 美国、日本和欧盟贸易摩擦应对机制比较研究——兼论对我国的启示，国际贸易，2007/02

- 对《不正当低价出口行为调查和处罚(暂行)规定》理性评析，河北法学，2007/01

- WTO 与和谐国际经济新秩序的建立，红旗文稿，2007/01

- 面对 WTO 发展的新挑战中国发展对外贸易需做好三件事，经济研究参考，2006/79

- 应对贸易摩擦的对策和建议，经济研究参考，2006/61

- 对反垄断法立法若干问题的思考,中国法律，2006 年 12 月

- Reform and Development of Commercial Arbitration in China，中国法律，2006 年 2 月

- 对外贸易中知识产权保护战略，中国对外贸易，2006/10

- 论 WTO 后过渡期中国对外贸易法律制度的梳理和完善，河北法学，2006/10

- 面对 WTO 发展新挑战——中国发展对外贸易的战略思路，国际贸易，2006/09

- WTO 与国际经济新秩序的建立，WTO 经济导刊，2006/08

- WTO 后过渡期:中国对外贸易法律制度梳理，WTO 经济导刊，2006/07

- 探索就是一种价值——解读《不正当低价出口行为调查和处罚(暂行)规定》，国际贸易，2006/06

- 构建我国境外投资促进立法的若干思考，法学家，2006/04

- 论我国商事仲裁制度的定位及其改革，法学，2006/04

- 公司章程在新《公司法》中的重要地位与作用，法律适用，2006 年 3 月

- 经济全球化与国际经济法的新发展，中国法学，2006/03

- 企业低价竞销与法律规制——反倾销视野下的对外出口低价竞销原因分析和法律规制，国际贸易，2006/03

- 国际直接投资中的知识产权保护法律问题，山西大学学报(哲学社会科学版)，2006/03

- 经济全球化下新公司法的新特点,中国工商管理研究,2006 年 2 月

- 新公司法的亮点，有色金属再生与利用，2006/02

- 英国合伙制企业法比较评析及对中国法的借鉴，甘肃政法学院学报 2006/02

- 新《公司法》的亮点，法人杂志 2006/02

- 新《公司法》的新亮点，时代法学，2006 年 1 月

- 论《中国—东盟全面经济合作框架协议争端解决机制协议》，上海财经大学学报，2006/01

- Reform and Development of Commercial Arbitration in China, China Law, 2006 (2).

- 第三种武器——美国反补贴法的修改意图，中国纺织，2005/10

- 评美欧对我国纺织品设限，纺织导报，2005/08

- 北美自由贸易区的经验及对我国的启示，法学杂志，2005/06

- 商事信托制度的现代发展，甘肃政法学院学报，2005/04

- *Will the Independent Director Institution Work in China?* co-authored with Jing Jia, 27 Loy. L.A. Int'l. & Comp. L. Rev. 223 (2005)

- *China's New Corporate Governance Measures after Its Accession to the WTO*, Australian Journal of Corporate Law, Volume 17 (1), October 2004, LexisNexis Butterworths

- 坚持国际化特色 努力为两个市场培养法律专门人才，时代法学，2004/06

- 新外贸法的新特征——《中华人民共和国对外贸易法》解读，首都师范大学学报(社会科学版)，2004/05

- 对外贸易法若干问题研究，山西大学学报(哲学社会科学版)，2004/03

- 世贸组织透明度原则与中国的法治进程，国际商务，2004/01

- 美国证券仲裁及其启示，证券市场导报，2003/01

- 入世后我国《反倾销条例》对旧条例的修改及其评析，国际商务，2002/06

- 国际反倾销规则与中国反倾销法律制度的完善，山西大学学报(哲学社会科学版)，2002/03

9

# EXHIBIT
# 5

# REPORT OF PROFESSOR JAMES B. SPETA

## Professor of Law, Northwestern University School of Law

### Summary of Qualifications

1.      I am a Professor of Law at the Northwestern University School of Law, where I have been on the faculty since 1999.  I am also Faculty Director of Northwestern Law's Executive Master of Laws Program in Seoul, South Korea, conducted in partnership with the KAIST Graduate Business School in Seoul.  At Northwestern Law, I teach a variety of classes in competition and regulation, including Antitrust Law, Telecommunications and Internet Policy, Administrative Law, Intellectual Property, Business Associations, and Torts.  I have also taught a Corporations class, co-listed with the Kellogg Graduate School of Management, and I teach a "Law of Information Technology" course in a Master of Science Program offered by the Northwestern McCormick School of Engineering.

2.      My research interests focus on telecommunications and Internet policy, including regulation and competition issues.  I have published in a variety of law reviews, including the *Antitrust Law Journal*, the *Federal Communications Law Journal*, and the *Yale Journal on Regulation*.  In particular, I have written on the interface between competition law and regulation, concluding in the *Antitrust Law Journal* that essential facilities claims were not cognizable given the system of regulation governing telecommunications -- the result the Supreme Court reached in the *Trinko* case. *Verizon Commc'ns., Inc. v. Law Offices of Curtis V. Trinko LLP*, 540 U.S. 398 (2004).  More recently, I have written on the institutions (meaning both competition law and traditional, sector-specific regulation) that should govern Internet markets, as those markets increasingly move from monopoly to more competitive markets.

1



3.   I have been invited to testify on telecommunications and Internet competition issues in the United States House of Representatives, Committee on Energy and Commerce, and I have also been invited to submit testimony to the United States Senate Commerce Committee. Additionally, I have been invited to testify at a full Commission hearing of the Federal Communications Commission on the issue of media concentration regulation and media competition, and I have also testified (again on invitation) to the Illinois House Telecommunications Committee on the issue of video competition and regulation. Last, on behalf of AT&T Corp., I submitted a declaration to the FCC in connection with a proceeding concerning the regulation of cable Internet service.

4.   Prior to joining the Northwestern Law faculty, I practiced law for 5 years with the firm of Sidley & Austin (now Sidley Austin LLP), where my practice centered on regulatory and antitrust matters, including litigation and appeals. I worked on matters for AT&T Corp., which was transitioning from supervision by an antitrust consent decree to the Telecommunications Act of 1996 to a deregulated information services environment. I continue to be engaged as a consulting attorney on complex civil litigation matters, including antitrust matters. I am not, of course, engaged as an attorney in this matter for any party.

5.   In addition to my work on U.S. regulation, I have written in a number of comparative veins. I have monitored Korean broadband policy and have written on it in the *Journal of Korean Law*. I have also written on European regulation of communications markets and its relationship to competition law. My complete curriculum vitae is attached as Appendix A.

2

**Scope of Engagement and Summary of Opinions**

6.      I have been retained by Defendants in this case to consider the system governing the Vitamin C export industry in China, to determine whether that system is a system of regulation, as that term has been used in the United States. I have reviewed Plaintiffs' Third Amended Complaint, the briefing on Defendants' Motion to Dismiss, and the Court's decision dated November 6, 2008. I have also reviewed the Declaration of Professor James V. Feinerman dated November 14, 2008, and the Report of Professor Shen Sibao dated February 19, 2009 ("Shen Report"). I have also reviewed certain documents produced by Defendants, deposition testimony, and academic writings. The complete list of documents I have relied upon is attached as Appendix B. I am being compensated at the rate of $450/hour. I retain the right to modify my opinions on the basis of new information that may come to my attention.

7.      As detailed further below, I believe that the system governing the Chinese Vitamin C export industry exhibits the principal characteristics of a "regulated industry." The Chinese government has expressed, in a variety of manners, that the Vitamin C export industry should not be governed by unrestrained competition, but rather is an industry of importance to government policies and one with characteristics that it believes makes it improper for unrestrained competition. Additionally, the Chinese government has created an apparatus to instruct the private companies involved in Vitamin C export to coordinate their production and export activities, in order to serve government goals. Although not as formal as a tariff-filing regime, the Chinese system also provides supervision of the private actors' coordination to further the government policies in favor of that coordination.

3

**Competition Law Contemplates Areas of Regulation**

8.      The starting point for this analysis is the competition law itself.  In the United States, the principal provisions of the Sherman and Clayton Acts seem to speak in unrestricted terms, applying competition law to all markets.  However, as the Antitrust Modernization Commission recognized in its recent final report, United States antitrust law is subject to a wide variety of exemptions, both express and implied.[1]  Express exemptions have ranged from the permission for farmers and other agricultural producers to engage in coordinated pricing, processing, and marketing (*see* Section 6 of the Clayton Act, 15 U.S.C. § 17, and the Capper Volstead Act, 7 U.S.C. §§ 291-92) to express exemptions for regulated industries, such as placing merger review with the sector-specific regulator rather than the antitrust authorities (*see, e.g.*, 47 U.S.C. § 221(a) (repealed 1996)).  Implied exemptions occur when the statutory scheme governing a particular industry demonstrates the competition law has been displaced.  Examples of such implied exemptions include the exemptions for state regulatory schemes under *Parker v. Brown*, 317 U.S. 341 (1943), and its progeny and for federal regulatory regimes under cases such as *Credit Suisse Securities (USA) LLC v. Billing*, 551 U.S. 264 (2007).  The Antitrust Modernization Commission catalogued at least 31 continuing express and implied exemptions.[2]

9.      As is well-known, China continues to transition from a planned, command economy, in which production is either owned or planned by the state, to what it calls a "socialist market economy," which I understand to mean that it now permits some private ownership, markets, and competition, although with more extensive government involvement to further Chinese policy interests.  Although I do not hold myself out as an expert on Chinese competition

---

[1]  Antitrust Modernization Commission, *Report and Recommendations* ch. 4 (April 2007), *available at* http://govinfo.library.unt.edu/amc/report_recommendation/toc.htm.
[2]  *Id.* at 333-77 & Annex A.

policy, the basic nature and goals of the Chinese system have been described in the literature.[3] This description is also consistent with the Report of Professor Shen, which I have reviewed.

10.     Although the transformation in the direction of markets began a number of years ago, China appears to have carried forward important structures to control competition.  Thus, the Chinese competition law, the Anti-Monopoly Law of the People's Republic of China ("AML") (adopted Aug. 30, 2007), demonstrates that exceptions to unregulated competition remain significant and, thus, are to be expected.  In other words, even a simple look at the Chinese competition law would lead one to expect that significant portions of its economy will remain subject to traditional government regulation, and outside of the realm of competitive markets to which antitrust analysis is appropriate.  For example, Article 7 refers to industries "in which exclusive operation and exclusive sales are the norm of business in accordance with the law" and provides that "the State shall protect the lawful business activities of the undertakings in such industries."  The Article further provides that "[t]he State shall regulate and supervise the business activities of such undertakings in accordance with the law so as to protect the interests of the consumers and to promote technological progress."  As discussed more fully below, government regulation of price is the antithesis of a market governed by competition and competition law.

11.     Additionally, Article 11 of the Chinese Anti-Monopoly Law suggests that several areas of the Chinese economy will be subject to government-supervised private coordination, in order to at least partially displace competition.  "The trade associations shall strengthen the self-discipline of industries to lead undertakings within their respective industries to carry out lawful competition and to maintain the order of market competition."  This provision has no parallel in

---

[3] *See, e.g.*, Salil K. Mehra & Meng Yanbei, *Against Antitrust Functionalism: Reconsidering China's Antimonopoly Law*, 49 Va. J. Int'l L. 379, 386-91 (2009); H. Stephen Harris, *The Making of an Antitrust Law: The Pending Anti-Monopoly Law of the People's Republic of China*, 7 Chi. J. Int'l L. 169, 169-77 (2006).

United States antitrust law itself. It is, however, reminiscent of the federal agricultural marketing order scheme, in which the Secretary of Agriculture supervises groups of producers of particular agricultural commodities, in the extreme to set prices that support the producers. Agricultural marketing orders are the paradigmatic example, where the Secretary blesses a price-supporting marketing order proposed by producers and, when blessed, the marketing order is exempt from antitrust law.[4]

**The Chinese Vitamin C Export Industry Is a Regulated Industry**

12.     To determine whether the Vitamin C export industry is a "regulated industry," I considered three aspects of the system. First, I looked for evidence that Chinese government policy had identified reasons that unregulated competition should not prevail in the Vitamin C export industry. Second, I looked for a governmental body that was charged with supervising the industry, according to the foregoing policies, in a manner comprehensive enough to consider the Vitamin C export industry to be a regulated industry. And, third, I looked for evidence of that supervision in fact occurring. Based on my review, I believe that the Vitamin C export industry in China meets each of these three tests.

**The Chinese Government Has Articulated Grounds for Specially Regulating Vitamin C Export**

13.     *First*, while governments need not permit any markets to be competitive, the presumption in the United States is that markets are to be governed by competitive action (and competition law) unless the government displaces competition. As noted above, China is moving some of its markets in that direction, although (as with much of European utilities markets) the presumption is more limited, much newer, and still evolving. But government may, of course, displace competition, and it may do so for any number of reasons.

---

[4] *See generally* 7 U.S.C. §§ 601-24 (setting out agricultural marketing order system).

6

14.     In the United States, many regulated industries are in traditional utility and transportation sectors, and it is sometimes suggested that regulated industries are those in which, structurally, competition is impossible, for example because extreme economies of scale make the markets natural monopolies.  But this is an ahistoric and incorrect view of U.S. regulated industries.  "Although it has now become a commonplace to associate the tariff-filing system with regulation of monopolies, this is an ahistorical view of the matter.  The railroads of the late nineteenth century were a mix of monopoly and competitive transportation lines . . . .  The Interstate Commerce Act -- in its substantive requirements of just, reasonable, and non-discriminatory rates and practices, in its procedural device of publicly filed tariffs setting forth these rates and practices, and in its disallowance of deviations from the tariffs -- was essentially copied by Congress and the states into numerous subsequent regulatory acts . . . .  The reason for this replication had nothing to do with the structure of these industries.  Some were natural monopolies; others were highly competitive.  Rather, it simply was generally accepted that an administrative system based on filed tariffs was the appropriate approach to regulating public utility and common carrier services, and that government oversight of the market was required to ensure the accepted goals of reasonableness, non-discrimination, and reliable service."[5]

15.     Instead, government may choose to superintend a particular industry in a relatively comprehensive manner for any number of reasons.  In other words, an industry may be regulated for any reason that a government considers sufficient.  As two of the leading commentators on regulated industries have summarized:  "Whatever the approach or scope of the regulatory mandate, its application to private businesses involves persons outside the business relationship -- i.e., neither the owner nor managers of the business nor its customers -- in making

---

[5] Joseph D. Kearney & Thomas W. Merrill, *The Great Transformation of Regulated Industries Law*, 98 Colum. L. Rev. 1323, 1332-34 (1998).

the decisions that will rule business operations. This deviation from the principle of private control of economic decision making is generally justified on the ground that the public interest requires public control. The theory is that the market has failed either to protect or to represent consumers or other public interests adequately."[6]

16.    Indeed, the initial stance in the United States was to define the scope of permissible economic regulation with respect to a category of industries that were "affected with a public interest," in the words of the Supreme Court's decision in *Munn v. Illinois* (1876).[7] And, for a time, the Court struggled to delimit a category of such industries, usually by reference to transportation, utility, or other industries typically operated under license or franchise. But this attempt to limit the scope of government's regulatory powers came to an end with *Nebbia v. New York* (1934), when the Court held that "[t]he phrase 'affected with a public interest' can, in the nature of things, mean no more than that an industry, for adequate reason, is subject to control for the public good."[8]    The Court recognized that economic regulation could constitutionally be imposed for any reason. "So far as the requirement of due process is concerned, and in the absence of other constitutional restriction, a state is free to adopt whatever economic policy may reasonably be deemed to promote public welfare, and to enforce that policy by legislation adapted to its purpose."[9]

17.    Nevertheless, while government may pass economic regulation for any reason, the identification of reasons is important in determining whether the government has in fact regulated an industry. At a general level, that is because the title "regulated industry" implies

---

[6] Richard J. Pierce, Jr. & Ernest Gellhorn, *Regulated Industries in a Nutshell* 2-3 (4th ed. 1999); *see also* Richard J. Pierce, Jr., *Economic Regulation: Cases and Materials* 1 (1994) ("We regulate a particular market because we perceive imperfections in that market that cause it to produce socially unacceptable results.").
[7] *Munn v. Illinois*, 94 U.S. 113, 130 (1876).
[8] *Nebbia v. New York*, 291 U.S. 502, 536 (1934).
[9] *Id.* at 537.

8

that the government has consciously established something other than the default market structure. As one commentator has put it: "In order for an industry to be classified as 'regulated' in the special sense in which the term is here employed, it must be subject to government controls which: (1) are distinctive from those applicable to the economy at large, (2) are concerned with the effectuation of broad economic objectives, (3) are applied directly to the behavior of firms in the industry, and (4) are implemented by relatively formalized governmental machinery."[10]

18.     At three levels, the Chinese government has articulated a special interest in the operation of the Vitamin C export industry that suggests that it would subject it to special attention and regulation. First, at the most general level, the Chinese government has expressed concern for ensuring that its relatively nascent industries, particularly those that it considers "strategic" (meaning important to national policy interests), develop in a profitable manner and aid Chinese economic development. Consistent with that view, the government has apparently stated that the Vitamin C export industry is particularly important to national goals of increasing export volumes and raising foreign trade. Professor Shen explains that the Chinese government has considered Vitamin C export to be a strategic export of China and its operation has received separate government attention.[11] Most notably in this regard, Vitamin C has since 1990 been

---

[10] William K. Jones, *Cases and Material on Regulated Industries* ix (1967).

[11] *See* Shen Report ¶ 9; *see also* Interim Regulation of Export Products, MOFTEC, MOFTEC Order No. 4, Dec. 29, 1992 ("1992 Interim Regulation") (providing that Vitamin C is one of 38 goods classified as "resource products of large export amount and concerning the livelihood of the nation and the people, and [are] of great importance to China's export"); 1997 Notice Relating to Strengthening the Administration of Vitamin C Production and Export by Ministry of Foreign Trade and Economic Cooperation and State Drug Administration, MOFTEC Guan Fa No. 664 ("1997 MOFTEC/SDA Notice"), Nov. 27, 1997, Exhibit H to the Declaration of Joel M. Mitnick in Support of the Brief of Amicus Curiae The Ministry of Commerce of the People's Republic of China ("Mitnick Decl.") (providing that the Vitamin C Sub-Committee was needed to "promote the healthy development of Vitamin C export and maintain the interest of our country and enterprises").

designated in a category of export goods that receives specialized treatment.[12]  Below, I discuss in additional detail the nature of this special regulatory regime.

19.     Second, the Chinese government appears to have taken special interest in avoiding antidumping complaints based on Vitamin C export activity.  The website of the National Development and Reform Commission stated that "some Chinese companies introduced the malignant competition means of low price into the international market.  They decrease the price arbitrarily in order to grab the international market shares, as a result, a lot of products swarm into the international market at a low price, which provides excuses for the anti-dumping measures carried out by the import countries."[13]  The document recommends a number of measures including "regulation policies combined by the medical approval system and pricing method to reduce low-level repeating building."[14]  Similarly, an online news article quotes Qiao Haili of the China Chamber of Commerce of Medicines and Health Products Importers and Exporters (the "Chamber") as stating that it took action to raise prices in order to avoid anti-dumping complaints:  "[I]n last September, the Department of [C]ommerce of the United States had sent legal letter to the Chinese VC Industry Association, expressing their intention to take anti-dumping measures . . . 'VC industry is at stake now,' said by Qiao Haili, the President of the [Chamber's] VC Subcommittee, at an interviewing by our reporter, 'antidumping measures posed on sodium saccharin industry is a good lesson!' . . . 'When receiving the legal letter from the United States, everyone was in tension, the Association urgently convened enterprises to hold a meeting, asking enterprises not drop their VC price any more.'"[15]  Other documents produced

---

[12] Shen Report ¶ 47; *see also* Notification of Adjusting Export Good Classification Catalogue and Strengthening Regulation of Export Goods Marketing and Sales, MOFTEC, Jan. 23, 1990 ("1990 Notification").
[13] Information Journal, Sept. 15, 2006, Bates No. NEPG030535.
[14] *Id.*
[15] Shijiazhang Pharmaceutical Co., Ltd., the Target of Critics from Industrial Partners (from www.ehongyuan.com), Aug. 24, 2003, Bates No. NEPG031085.

in this litigation reflect the Chamber's consistent concerns with possible antidumping complaints.[16]

20.     Third, and at the most particular level, a number of sources articulate the Chinese government's concern that unregulated competition among Vitamin C manufacturers would be damaging to the industry as a whole.  As several commentators on Chinese competition policy have explained, China recognizes a concept of "bad" or "harmful" competition which it seeks to prevent through government restrictions.  One put it this way:  "In recent years, while China has been trying to curb the monopolistic abuses of SOEs, China's policy makers have simultaneously become concerned about a new threat -- 'excessive' or 'malignant' competition.  To many outsiders, this contrast is perplexing, but fear of 'excessive competition' is widespread in China. A Google search on the Chinese Internet using the Chinese characters for 'excessive competition' yielded approximately one million hits, most of which were press reports of intense competition in various industries."[17]     While several of these commentators suggest that the notion of harmful competition runs counter to Western notions of markets, that actually over-states the case somewhat.   In fact, these statements are very similar to the "destructive

---

[16] See, e.g., Notice for Distributing Minutes of Meeting by Heads of Vitamin C Manufacturers, Nov. 20, 2001, Bates No. JJPC0043068-73, Pls. Ex. 134 ("[I]t has been concluded that there is a great possibility for the EU to institute an anti-dumping investigation against Chinese Vitamin C products exported to the Europe . . . which may very likely cause the chain-reaction in the US market.  Therefore, the participants of the meeting, through enthusiastic discussions, have reached an agreement aimed at enhancing the self-discipline of the industry."); VC Chapter Meeting Memo, Aug. 8, 2003, Bates No. JJPC0043575, Pls. Ex. 53 (Qiao Haili noting "an increase of anti-dumping cases against China"); Memorandum of VC Chapter Meeting of CCCMHPIE, Apr. 19, 2005, Bates No. JJPC0043578, Pls. Ex. 142 ("The recent antitrust lawsuit is unprecedented, but we shall not suspend the coordination mechanism of the VC industry in our country.  If we fail to coordinate, the price will drop and we will face more fearful consequences:  the falling price will further trigger antidumping lawsuits."); VC Chapter of the Chamber of Commerce Dalian Meeting Memo, May 19, 2005, Pls. Ex. 116 (Qiao Haili stated:  "As the price is gradually decreasing, he hopes that each manufacturer will take the possibility of anti-dumping highly seriously."); Status Report, Sept. 19, 2005, Bates No. NEPG023590, Pls. Ex. 36 ("The Chamber of Commerce leaders still asked all enterprises to prevent the possibility of the occurrence of anti-dumping.").

[17] Bruce Owen, et al., China's Competition Policy Reforms:  The Anti-Monopoly Law and Beyond, 75 Antitrust L.J. 231, 247 (2008); see also Yong Huang, Pursuing the Second Best:  The History, Momentum, and Remaining Issues of China's Anti-Monopoly Law, 75 Antitrust L.J. 117, 129 (2008) ("[T]he lawmakers want the trade association to eliminate 'vicious competition,' or cutthroat price wars.").

11

competition" rationale that was articulated for U.S. regulation of the railroads and several other transportation industries. As Richard Pierce has noted: "From the 1930s until the 1970s, 'destructive' or 'ruinous' competition provided the primary justification for regulation of many transportation markets, *e.g.*, railroads, barges, trucks, and airlines."[18]

21.    The logic of the "destructive competition" concern is that overly-aggressive expansion of output and equally virulent price wars may prevent the development of a stable and successful industry. Particularly, an industry with relatively high fixed costs will, if competition prevails, price at average or marginal cost, meaning that capital replacement costs will not be covered. The classic statement of the reasoning as applied to railroads is from David Philip Locklin:

> Competition in the railway industry is ruinous. By this we do not mean simply that some companies will fail, for that happens as a result of normal competition. What we mean is that competition will force rates below the cost of service for the entire industry. Rates cannot continue at this level without destroying the railroads themselves; for if no return is earned on the capital invested, there is no inducement to restore the plant as it wears out. . . . [W]hen part of the expenses are constant and part variable, it is better to take traffic that pays less than the full cost of the service than to let a rival carry it. The railroad may lose money in carrying it at a low rate, since the overhead expenses are only partially covered; but if the traffic is not carried by it at all, there is no contribution to overhead whatsoever. . . . Competition, then, tends to reduce rates to prime or variable costs. This struggle for traffic, unless checked by some device, will continue as long as there is unused capacity.[19]

In fact, Locklin notes that the same reasoning can be applied to any industry in which fixed costs are high. "The same characteristics which cause railroad competition to be ruinous operate in the industrial field, though to a lesser degree. Industries which, like railroads, have a large investment in fixed and specialized capital, and which therefore have large fixed expenses, find themselves subject to the same danger. If competition is not held in check in some way, prices are forced below cost. These are the industries in which the motive to control prices by means of

---

[18] Pierce, *supra* note 6, at 21-22; *see also* Kearney & Merrill, *supra* note 5, at 1359.
[19] David Philip Locklin, *The Economics of Transportation* 138-39 (6th ed. 1966).

12

combinations, price agreements, and other devices is the strongest."[20]   Or, as another, more modern source has put it:  "If marginal cost lies significantly below average cost and competition leads to marginal cost pricing, then firms will earn below-normal profits when they are unable to coordinate their pricing decisions.  In that case, there is an economic rationale for regulation."[21]

22.     Precisely this concern has been noted with respect to the Chinese Vitamin C industry.  Mr. Qiao Haili of the Chamber stated in an article that Vitamin C is among a number of "oversupplied products" and that government had attempted to forbid expansion by existing manufacturers.[22]  Other documents support this view.[23]  And one company witness testified that the Chamber was attempting to eliminate "malignant or malicious" or "vicious" competition.[24]

**The Vitamin C Export Industry, through the Chamber, Is Regulated**

23.     *Second*, in addition to the Chinese government's articulating a familiar justification for regulation, it appears that the Chinese government has established supervision of the Vitamin C export industry that has many of the same hallmarks of a U.S. regulated industry.  First, the government has established a regulatory body, the Chamber, with a broad mandate to supervise the industry.  That much of the industry action that is approved by the regulator has its

---

[20] *Id.* at 139.

[21] W. Kip Viscusi, *et al.*, *Economics of Regulation and Antitrust* 594 (4th ed. 2005).  To be sure, in the United States, we have substantially deregulated railroads, airlines, trucking, and other industries in which the "destructive competition" rationale was the basis for imposing economic regulation.  *See generally* Kearney & Merrill, *supra* note 5.  As noted, however, the courts do not evaluate the economic rationality of the regulatory system, but defer to the legislative judgment in establishing it.

[22] Bates No. NEPG031085, *supra* note 15.

[23] *See, e.g.*, Export Quota Report on Vitamin C of NEPG, Feb. 26, 1999, Bates No. NEPG028350 (noting that the international Vitamin C market was oversupplied); Bates No. JJPC0043567, Pls. Ex. 144 ("[t]here will have an excessive volume of products of 20,000 - 30,000 tons"); Recognize New Trends, Develop on Both Fronts, and Build a Healthy, Sustainable and Harmonious Jiangshan, Jan. 28, 2005, JJPC037065, Pls. Ex. 141 ("According to reliable information, the current global VC consumption is about 105,000 tons, but China's production capacity alone is about 100,000 tons while, internationally . . . the global VC supply exceeds demand by 30-35%."); *Antitrust Lawsuits in the US Cause Trade Difficulties for China's Vitamin C companies*, The Beijing News, Apr. 20, 2005, Pls. Ex. 143 ("During the period from 2000 to the end of 2001, many domestic pharmaceutical companies were suffering from blind investment made earlier on vitamin C production lines in a race to expand production.  This ultimately resulted in excess vitamin C production capacity . . . . According to incomplete statistics, excess production capacity resulting from blind investment led to China losing at least RMB5 billion.").

[24] Deposition of Ning Hong of NEPG, taken Apr. 17, 2008, at 90:14, 96:10.

beginnings in the private firms is not inconsistent with government regulation of the industry; indeed, it is familiar to U.S. regulatory structure.  Second, the regulatory body controls the key economic dimensions of the industry -- authorizing companies to participate in the industry, and supervising price and output.

24.      According to Professor Shen, the Chamber, and in particular its Vitamin C Sub-Committee (the "Sub-Committee"), is a governmental entity that has the power to act with the force and effect of law, including "participating in the organization of the quota bidding for the import and export commodities," and "recommending to governmental law enforcement authorities to take measures to punish enterprises in violation of coordination regulations or punishing violators directly in accordance with industry-wide agreements."[25]  Professor Shen notes that the Chamber has a different function than other chambers of commerce and voluntary nongovernmental or social organizations, because of these regulatory powers.[26]  The 1997 Charter of the Sub-Committee similarly indicates that it shall "coordinate and administrate market, price, customer, and operation order of Vitamin C export" and "work out coordinated prices for Vitamin C export, to supervise and inspect the implementation of such coordinated export prices set by the Sub-Committee and relevant business activities related to the enterprises."[27]

25.      The relevant ministries have endowed the Chamber with regulatory authority in a broad sense, and the documents indicate that the Chamber has frequently reported to and

---

[25] Shen Report at ¶ 34; *see also* Measures for Administration over Foreign Trade and Economic Social Organizations, MOFTEC, Feb. 26, 1991, Exhibit D to the Mitnick Decl. ("1991 Measures"); China Chamber of Commerce of Medicines & Health Products Importers & Exporters, Publication of Administration and Regulation, 2003, Exhibit C to the Mitnick Decl.; Notice of Ministry of Foreign Trade and Economic Cooperation Regarding Printing and Distribution of Several Regulations for Personnel Management of Chambers of Commerce for Importers and Exporters, Sept. 23, 1994, Exhibit E to the Mitnick Decl.; Decision on Further Deepening the Reform of Foreign Trade System, State Council, Jan. 11, 1994.

[26] Shen Report ¶¶ 36-40; *compare* 1991 Measures, *supra* note 25, Art. 17 *with* Art. 18.

[27] Charter of Vitamin C Sub-Committee of China Chamber of Commerce of Medicines and Health Products Importers and Exporters ("VC Sub-Committee Charter"), Oct. 11, 1997, Pls. Ex. 125 at Art. 7, 10.

14

coordinated with the relevant ministry. The government direction of the Vitamin C industry reaches the highest ranks of the Chinese government: Professor Shen relates three Vice Premiers specifically directing policy on Vitamin C.[28]  Similarly, in 1994, Wu Yi, the Minister of the China Ministry of Foreign Trade and Economic Cooperation ("MOFTEC"), now known as the China Ministry of Commerce (the "Ministry"), stated that export enterprises "shall be subject to the coordination of the Import and Export Chambers of Commerce" and that "the Chambers of Commerce shall punish [noncooperating] enterprises in accordance with the industry-wide agreement."[29]  Ms. Wu also stated that "MOFTEC will set up several examples by seriously punishing enterprises which do not follow the coordination process."[30]  And, in 1997, MOFTEC issued regulations requiring the Chamber to "timely organize meetings for the major vitamin C export enterprises according to the domestic and international market development, to conduct studies on market strategies, timely formulate and adjust export coordination price, which the vitamin C enterprises must strictly implement in accordance with."[31]  More recently, MOFTEC confirmed the Chamber's power under the verification and chop regime to "coordinat[e] prices."[32]

26.     Other documents show the Chamber reporting to MOFTEC or the Ministry on price, quantity, or other industry agreements. One report states that "in 1997 . . . in order to stabilize the price of Vitamin C, and control Vitamin C export production quantity, the Ministry

---

[28] Shen Report ¶ 51.

[29] *Minister Wu Yi's Comments on the Reform of Import and Export Chambers of Commerce*, Xu Guomin, Machinery Electronic Products Market (1994) Issue 10.

[30] *Id.*

[31] 1997 MOFTEC/SDA Notice, *supra* note 11, at ¶ 7.

[32] Notice Issued by the Ministry of Foreign Trade and Economic Cooperation and the General Administration of Customs for the Adjustment of the Catalogues of Export Products Subject to Price Review by the Customs, MAO FA [2002] No. 187, Mar. 29, 2002, Exhibit J to the Mitnick Decl. ("2002 Notice of Adjustment") at Art. 4; *see also* Announcement of Ministry of Commerce of the People's Republic of China, General Administration of Customs of the People's Republic of China, Nov. 29, 2003, Exhibit K to the Mitnick Decl. (describing rigorous verification and chop system).

of Foreign Trade and Economic Cooperation agreed on that the export quota of VC in 1998 is 20,000 tons."[33]  Documents from 2000, 2004, and 2005 all show Ministry officials in attendance at Chamber meetings.[34]  Notes of a May 2000 meeting relate that "[t]he Ministry is very concerned and considers VC coordination as a successful example.  Now the situation has changed."[35]  These notes also indicate that any change from restrictive regulation would depend on whether "the state authorities allow the removal of the restrictions."[36]  The notes of a December 2000 meeting state that the Chamber was required to submit a report to MOFTEC after the meeting regarding the "export restrictive price."[37]

27.    The Chamber also has powers that an industry regulator would typically have in the United States.  The hallmarks of the regulation that makes us think of an industry as "regulated" are government limits on the number of firms and controls on price, output, and quality of service.  "Although economic regulation can encompass restrictions on a wide array of firm decisions, the three key decision variables controlled by regulation are price, quantity, and the number of firms."[38]  For example, under the Interstate Commerce Act of 1887, which was the model for much of U.S. economic regulation, railroads could only offer or discontinue service with regulatory approval.  Similarly, railroads were required to file tariffs setting forth their charges and terms of service.[39]  "Deviation from these tariffs is strictly prohibited under any

---

[33] Bates No. NEPG028350, *supra* note 23.

[34] *See* Notes from the Sixth General Meeting of Members of the Vitamin C Branch, Dec. 4, 2000, Bates No. NEPG042592, Pls. Ex. 167; Bates No. NEPG030344, Dec. 31, 2004, Pls. Ex. 38; Bates No. NEPG023590, Pls. Ex. 36, *supra* note 16.

[35] Report on the Status of the Meeting, June 5, 2000.

[36] *Id.*

[37] Bates No. NEPG042592, Pls. Ex. 167, *supra note* 34.

[38] W. Kip Viscusi, *et al.*, *supra* note 21, at 358; *see also* Pierce & Gellhorn, *supra* note 6, at 8 ("In connection with public utility regulation, for example, the ruling agency will specify who can enter the business, what service they must provide, what prices they may lawfully charge (albeit, usually at the private firm's initiative), and what investments they can include in their rate base.").

[39] *See* Interstate Commerce Act, 49 U.S.C. § 6 (repealed).

16

circumstances . . . [e]ven where a customer has been quoted a lower rate and has relied on that quotation."[40]

28.     The Chinese Vitamin C export industry shares these two characteristics.  First, companies must be licensed by the government in order to export Vitamin C.[41]  Second, the Chamber has historically approved export prices directly, or has controlled export prices through directed output limitations.[42]  For example, Professor Shen notes that, as early as 1990, the Ministry of Foreign Trade and Economic Cooperation adopted a "quota and export licensing system."[43]  He also notes that the "[m]easures adopted after 2001, such as the verification and chop system, price coordination and production and supply restraints retain the same mandatory nature as the export restraint measures implemented since 1990."[44]  That appears clearly to be the case, since there is considerable evidence that in the period beginning in the early part of this century, the companies began to focus particularly on output reduction as a strategy for insuring that the government policy towards Vitamin C pricing was implemented.[45]

29.     The Chamber acting at the recommendation of the VC Sub-Committee has exercised the typical tools of economic regulation, including control of price, both directly and

---

[40] Kearney & Merrill, *supra* note 5, at 1331.  There are, in fact, a notable number of cases in which the Supreme Court has had to reiterate this principle.  For example, in *Maislin Indus., U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116 (1990), the Interstate Commerce Commission, responding to significant competition in trucking markets, authorized carriers to negotiate individualized rates with shippers that deviated from the tariff terms.  The Supreme Court rejected the ICC's policy, holding that it was fundamentally inconsistent with the system of economic regulation established by the statute.  497 U.S. at 130-32; *see also AT&T v. Central Office Tel., Inc.*, 524 U.S. 214, 222-24 (1998) (rejecting customer's attempt to enforce contractual terms of service that differed from company's tariff).

[41] *See* Shen Report ¶¶ 42, 46; *see also* VC Sub-Committee Charter, *supra* note 27, at Art. 12 ("Only the members of the Sub-Committee have the right to export Vitamin C and are simultaneously qualified to have Vitamin C export quota.").

[42] *See* Shen Report ¶¶ 41-46 (discussing pricing coordination), ¶¶ 47-51 (discussing licensing and quota regime); *see also* Decision on Several Matters Concerning Further Reforming and Perfecting the Foreign Trade System, State Council, Guofa [1990] No. 70, 1990 (establishing pricing coordination mechanisms); 1990 Notification, *supra* note 12 (same); 1992 Interim Regulation, *supra* note 11 (revising pricing coordination system); 2002 Notice of Adjustment, *supra* note 32 (establishing verification and chop regime).

[43] Shen Report ¶ 47; *see also* 1990 Notification, *supra* note 12.

[44] Shen Report ¶ 63.

[45] *See, e.g.*, Periodical Summary for December—Import and Export, Jan. 3, 2004, Bates No. JJPC036826, Pls. Ex. 137; September Import & Export Work Summary, Oct. 5, 2003, Bates No. JJPC0043594, Pls. Ex. 79.

indirectly through output quotas and production limits.  There was testimony from a number of witnesses that the Chamber would convene mandatory meetings to set various prices, as well as production quotas and other restrictions, from time to time.[46]  Thus, for example, a Chamber notice from April 2001 established the export price for Vitamin C and stated that "exports in violation of the rules has been reported, once verified through investigations, recommendations shall be made for the Ministry of Foreign Trade and Economic Cooperation to reassign the violating enterprise's quotas to the reporting enterprise."[47]  At various later times, the Chamber conveyed the minimum export price to the manufacturers and to the Ministry of Commerce and the Customs Office.[48]

30.     The documents also reflect the Sub-Committee recommending to the Chamber to limit the production of Vitamin C to control price.  A typical meeting report indicates the setting of an "export chop quota" and a decision that "all of the companies shall suspend production for 30 days."[49]  A report from Northeast Pharmaceutical Group Co., Ltd. ("NEPG") to the Shenyang Branch of State Administration of Foreign Exchange states that "[d]ue to great decrease of VC export price, China Chamber of Commerce for Import &Export of Medicines & Health Products (CCCMHPIE) held VC meeting on 11[th] June in order to stabilize export price, and decided to limit export of VC."[50]  Notes of a meeting from 2000 describe the Chamber as developing

---

[46] *See, e.g.*, Deposition of Huang Pinqi of Hebei Welcome, taken June 19 and 20, 2008 at 27:2-5, 15-17; 33:22-25; 38:17-18; 40:20-41:8; 47:22-25; 48:13-16; 107:4-8, 20-21; Deposition of Zhang Yingren of Hebei Welcome, taken June 18, 2008 at 19:12-14; 19:24-20:2; 20:21-24; 29:25-30:6; 81:25-82:5; 83:5-8, 17-19.

[47] Notice on the Announcement of the Coordinated Export Price for Vitamin C, Apr. 16, 2001, Bates No. NEPG042662, Pls. Ex. 31.

[48] Notice Regarding Publishing the Industry Agreed Export Prices for the Key Commodities for the Spring of 2003, Bates No. JJPC0042489, Pls. Ex. 52; Bates No. JJPC0043567, Pls. Ex. 144, *supra* note 23 (Qiao Haili stating twice that the "controlled price" should not be below 3.35); Chapter Meeting Memorandum, June 23, 2006, Bates No. JJPC0047793, Pls. Ex. 151; VC Subcommittee Meeting Memorandum, June 11, 2003, Bates No. JJPC0043574.

[49] Report of the VC Sub-Committee Meeting on Sept. 15, Sept. 18, 2006, Bates No. NEPG058163, Pls. Ex. 214.

[50] Explanation of Charging Off Price Difference of Export Collection of Ascorbic Acid of Our Factory, Nov. 5, 2003, Bates No. NEPG028100.

information on export markets and setting quotas for the coming year.[51]   Other meeting notes are

to the same effect.[52]

    31.    The documents and deposition testimony that I have reviewed in this case

certainly convey that the companies in the Vitamin C export industry have the key economic

terms of their action dictated by the Chamber.   For example, NEPG reported to the Shenyang

Economic and Trade Commission that the Chamber ordered a shut down and, while granting a

temporary delay, the Chamber would "impose a series of sanctions on us" for failing to shut

down.[53]   Another company noted that it was "penalized by the Chamber" for failing to shutdown

"and what happened was that the two product lines of our old facility or the two old productions

lines were shut down; however, with the new production line, we were not allowed to run it for

trial even without the [products]."[54]   One witness from NEPG (Du Chenxiang) indicated that "it

was the Chamber of Commerce that iterated a new adjusted coordinate price.   Otherwise, as it

said down below very clearly, that they would eliminate or they would cancel your VC export

product and cancel the membership qualifications of the member concerned."[55]   Another witness

from Hebei Welcome Pharmaceutical Co., Ltd. ("Hebei Welcome") (Tang Shuhua) testified that

"[i]f the Chamber of Commerce had a minimum price we all have to follow it."[56]   Similarly:

"This restricted price for export was set down by the MOFTEC and the Chamber of Commerce,

---

[51] Bates No. NEPG042592, Pls. Ex. 167, *supra* note 34.

[52] Bates No. JJPC0047793, Pls. Ex. 151, *supra* note 48 ("The [Chamber] meeting mainly dealt with the production and export of VC, and arrived at important understandings on the quantity of VC export.   For the second half of this year, the Chinese export of VC will be controlled at 6,000 tons per month, and will not exceed 72,000 tons in the whole year."); Shi Jia Zhuang Pharmaceutical Group Co., Ltd., Report Materials on the Overall Management Meeting on July 12, July 11, 2006, Bates No. WSC00010354, Pls. Ex. 67 ("A new turn for the better has emerged on the international market.   Through coordination by the [Chamber], starting in July, the VC manufacturers began to implement the export quota system to control the export volume by limiting production.").

[53] Report re Implementation of NEPG's Suspension and Maintenance of VC Manufacture, June 6, 2006, Bates No. NEPG033313.

[54] Deposition of Feng Zhen Ying of Weisheng, taken June 12, 2008 at 86:24-87:5; *see also* Deposition of Wang Qi of Jiangsu Jiangshan, taken July 3, 2008 at 187:10-12 (noting that when Weisheng failed to suspend production "their quotas were allocated–the allocation of their quotas was delayed").

[55] Deposition of Du Chengxiang of NEPG, taken July 23, 2008 at 41:20-25; *id.* at 43:16-22.

[56] Deposition of Tang Shuhua of Hebei Welcome, taken June 17, 2008 at 105:19-20.

they set down that price."[57]   Another witness said that "[p]recisely because some of the manufacturers did not do very well -- did not do so well in the first half of 2006, that is why the Chamber of Commerce made this mandatory decision for shut downs in the second half of 2006."[58]   "The export volume, as for the export volume it was decided not by the enterprises themselves, but by the Chamber of Commerce."[59]   A simple summary of one witness was that "[i]f you do not follow the allocations, they would not give you verify and chop, and you cannot export any VC, Vitamin C, at all."[60]   Indeed, the availability of the export allocations was the Chamber's ultimate tool to force agreement: "When the Chamber of Commerce has a very clear request for something, the members would definitely reach some kind of a plan or agreement.  If they do not reach agreement, they are not able to get their quotas."[61]

32.    The Chamber apparently had the ability, beyond the initial verification and chop system, to monitor the companies' compliance.  As one example, the Chamber required the Vitamin C manufacturers to file reports concerning production, capacity, and other characteristics.[62]  As a second example, the Chamber instituted a monitoring system among the companies, to ensure that capacity reductions and shutdowns were being followed.[63]  As a third

---

[57] Deposition of Du Chengxiang of NEPG, taken July 23, 2008 at 109:18-20.

[58] Deposition of Wang Qi of Jiangsu Jiangshan, taken July 3, 2008 at 268:14-20.

[59] Deposition of Huang Pinqi of Hebei Welcome, taken June 19, 2008 at 27:15-17.

[60] Deposition of Wang Renzhi of NEPG, taken July 17, 2008 at 33:13-16; *see also* Deposition of Zhang Yigren of Hebei Welcome, taken June 18, 2008 at 79:25-80:5 (stating that a company had a contract rejected by the Chamber: "The president of the Chamber of Commerce said very clearly if you were lower, if you have a price that is lower than my minimum price, don't send it to me, I will not accept it, I will not approve it.").

[61] Deposition of Wang Qi of Jiangsu Jiangshan, taken July 3, 2008 at 188:24-189:5.

[62] Bates No. NEPG042592, Pls. Ex. 167, *supra* note 34; Notice from Chamber of Commerce for Import and Export of Medicines and Health Products, Jan. 21, 2005, Bates No. HEB004475, Pls. Ex. 115.

[63] Chamber Meeting Memorandum, Dec. 23, 2005, Bates No. JJPC0040755; Report on the Investigation on the Shutdown of Production of Weisheng Pharmaceutical Co., Ltd., Apr. 19, 2006, Bates No. NEPG037113, Pls. Ex. 162; *see also* Deposition of Zhang Yingren of Hebei Welcome, taken June 19, 2008 at 141:12-16 ("In accordance with the request of the Chamber of Commerce, other people from Welcome had inspected the shutdown for repairs and maintenance of facilities at other VC manufacturers.").

example, Hebei Welcome witness Zhang Yingren testified that the Chamber "can look at the statistics at customs" to monitor the quantity of product that the manufacturers' shipped.[64]

33.     A number of documents and items of deposition testimony indicate that certain of the Chamber's actions were in response to requests by the members of the Vitamin C industry itself, or followed after active input and occasional disagreement by the companies.   For example, one report of a Chamber meeting states that "[t]he attendees argued vigorously about how the export chop quota should be allocated from September."[65]   A witness testified that manufacturers sometimes argued their opinion as to what policy should be set in Chamber meetings.[66]   But he was also clear that the final Chamber resolution "is mandated so we had to follow it despite our dissatisfaction."[67]   Another witness, from Weisheng Pharmaceutical Co., Ltd. ("Weisheng"), said that "we were not going along with the other manufacturers [to shutdown]; however, we subsequently agree based on the mandatory requirement of the Chamber of Commerce of Medicines and Health Products."[68]   Indeed, from my review of the documents, it seems clear that the Chamber called the meetings of the manufacturers, set the agenda for those meetings, and coordinated the agreements that emerged from the meetings, despite the expressed views of the parties.[69]   One recent meeting noted that, "through the

[64] Deposition of Zhang Yingren of Hebei Welcome, taken June 18, 2008 at 78:13-14.

[65] Bates No. NEPG058163, Pls. Ex. 214, *supra* note 49.

[66] Deposition of Zhang Yingren of Hebei Welcome, taken June 18, 2008 at 22:8-25:16.

[67] *Id.* at 26:9-10.

[68] Deposition of Feng Zhen Ying of Weisheng, taken June 12, 2008 at 84:18-21.

[69] *See* Deposition of Kong Tai of Jiangsu Jiangshan, taken June 17, 2008 at 73:2-3 ("The Chamber of Commerce would organize them [the sales department heads of the manufacturers] to have meetings"); Deposition of Wang Qi of Jiangsu Jiangshan, taken July 3, 2008 at 221:21-222:3 ("At all the meetings called by the Chamber of Commerce, cost, price, supply and demand and quotas might have been–might be discussed.  And it depends on whatever topic that the Chamber of Commerce decides that the meeting would concentrate on."); Deposition of Huang Pinqi of Hebei Welcome, taken June 19, 2008 at 21:12-17 ("In my impression our factory had never called a meeting with the other factory, or we've had any meetings between the two factories.  If we had taken any part in a meeting like that it would be called by the Chamber of Commerce and we all went."); Deposition of Wang Renzhi of NEPG, taken July 17, 2008 at 48:19-25 ("Vitamin C is under the government's extremely strict control.  So under the circumstances, the Chamber of Commerce felt it was necessary to limit the output [in order to limit the export volume], and that is why they called us four manufacturers to have this meeting in Beijing."); Deposition of Feng

coordination by the Chinese Chamber of Commerce of Medicines and Health Products, various domestic VC production enterprises have reached an agreement on the shutdown of production lines in 2007."[70]   Another records Director Qiao Haili noting that a future meeting will "focus on discussions of the importance and necessity of industry coordination and the method of coordination" -- and specifically that "voluntary shutdown shall not substitute [for] centrally managed shutdown."[71]   And Mr. Wang Qi described in detail that, at the meetings, "all the manufacturers permitted to put forth their suppositions, you know, their hypothesis and their plans and so forth.   And discussions would be made.   So differences of opinion are allowed. There will be differences of opinions.   And eventually at the end the Chamber of Commerce will finally approve it or not or make the decision."[72]

34.   However, that some or even most action was initiated by the private companies does not change the conclusion that Vitamin C export is a regulated industry.   Regulatory regimes often depend on private companies to initiate the regulatory process.   Under typical

---

Zhen Ying of Weisheng, taken June 12, 2008 at 75:12-15 ("There was not advanced notice for these agendas. It was always Qiao Haili. He would decide the agendas prior to the meetings was called.").

[70] Situation Report, June 26, 2007, Bates No. WSC00014750, Pls. Ex. 63.

[71] Bates No. JJPC0043567, Pls. Ex. 144, *supra* note 23; *see also generally* Work Summary of Import and Export September, Oct. 8, 2002, Bates No. JJPC036822, Pls. Ex. 76 (noting Sub-Committee calling meeting in Qingdao); Bates No. JJPC0043594, Pls. Ex. 79, *supra* note 45 ("On September 3, CCCMHPIE took the lead to coordinate a summit on coordination among the VC manufacturers in Beijing."); Bates No. JJPC037065, Pls. Ex. 141, *supra* note 23 ("These VC enterprises, mediated by Chamber of Commerce for Pharmaceutical and Health Products, took measures last year to limit production to protect price."); Report on the Situational Analyses and Corresponding Strategies of VC and Its Product Series for the First Half of Next Year, Dec. 29, 2005, Bates No. NEPG058984, Pls. Ex. 161 ("The increasing pressure of stocks and price on all domestic VC companies has prompted Medical Insurance chamber of commerce to organize a conference to discuss corresponding strategies on December 23d. The consensus that has been reached in the conference is comprised of two measures, *i.e.*, increase quotation . . . and halt production for 40 days in all companies").

[72] Deposition of Wang Qi of Jiangsu Jiangshan, taken July 3, 2008 at 224:2-11.   Interestingly, he noted that the Chamber might approve a plan agreed upon by the manufacturers or impose one if it disagreed with even an agreed-upon plan.   *Id.* at 229:16-230:10 ("At these meetings the Chamber of Commerce, they wanted everybody to discuss the topic of how to stabilize the market. And they wanted all the manufacturers to come forth with their own plans. And how to do so.   So whether the Chamber of Commerce agrees with these plans or not, it depends on whether there is a plan that all the manufacturers can agree in common. If there is such a plan, that all manufacturers agree to, then the Chamber of Commerce would give it priority.   It only, on these kinds of meetings when the topic is preset, only when the Chamber of Commerce does not agree with the plan or any programs that are raised by the manufacturers do they set a mandatory plan.").

public utility regulation, new tariffs and new rate cases are initiated by the regulated companies. That is, the private companies file new tariffs or rates, seeking governmental approval for those rates. For example, under statutes modeled on the Interstate Commerce Act, "[c]arriers may initiate rate changes by filing new tariffs with the Commission."[73] Similarly, "[p]roceedings to establish rates for electricity are ordinarily initiated by the filing by the electric company of a schedule of rates with the regulatory commission."[74] The Motor Carrier Act of 1935, and other statutes, also authorized rate-setting through supervised private industry organizations, such as rate bureaus. "Federal regulation of motor carriers was first implemented under the Motor Carrier Act of 1935, which subjected motor common carriers of property to licensing and rate regulation by the Interstate Commerce Commission. Originally, the Commission tightly controlled entry into the trucking industry 'on the premise that the public interest in maintaining a stable transportation industry so required.' Consistent with this limitation on entry, the I.C.C. also strictly regulated motor carrier rates, which were set primarily through collective pricing decisions made by 'rate bureaus.' These were agencies . . . established by carriers to facilitate the negotiation of collective rates. Obviously, these arrangements tended to discourage rate competition."[75] Finally, as previously noted, the Secretary of Agriculture "establishes new AMAA marketing orders after receiving a favorable polling of producers within specified geographic areas. Following the poll, the Secretary and a majority of the handlers of the product usually enter into 'marketing agreements' embodying the proposed order."[76]

---

[73] *American Tel. & Tel. Co. v. F.C.C.*, 487 F.2d 865, 871 (1973) (discussing 47 U.S.C. § 203, applying to communications common carriers); 487 F.2d at 873-75 (discussing similar provisions under the Interstate Commerce Act and other statutes). The U.S. scheme provides that the carrier-initiated rate goes into effect unless it is affirmatively suspended by the regulatory agency and declared illegal within a limited period of time. *Id.*

[74] 29 C.J.S. *Electricity* § 62 (2008).

[75] *American Trucking Ass'n, Inc. v. United States*, 755 F.2d 1292, 1293-94 (7th Cir. 1985) (internal citation omitted).

[76] Ralph H. Folsom, *Antitrust Enforcement under the Secretaries of Agriculture and Commerce*, 80 Colum. L. Rev. 1623, 1635-36 (1980).

35.     The documents also indicate that private action was accomplished as part of the process initiated and superintended by the Chamber.  Thus, one document indicates that the Chamber would "organize[] a coordination meeting" at which "representatives from all four agreed to limit production."[77]  Other documents indicate the Chamber coordinating an industry-wide inventory set-aside and monitoring regime.[78]  And other documents, as noted, record the Chamber actively managing the industry shut down periods.[79]  Testimony that I have reviewed is to a similar effect.  For example, one witness from Hebei Welcome (Huang Pinqi) testified that "at these meetings each manufacturer would report to the Chamber about the market situation and their capacity" . . . "but these were meetings that were organized by the Chamber of Commerce according to the market situation, and the decisions were also made by the Chamber of Commerce."[80]  Another witness from Weisheng (Feng Zhen Ying) testified similarly that manufacturers "follow[ed] the self-discipline required by the" Chamber.[81]

36.     I am aware from my review of the record in this case that the system of regulation of Vitamin C in China was referred to frequently as involving industry "self-discipline" and that the Chamber not only used that term, but publicly congratulated members of the Vitamin C Sub-Committee on carrying out the government's policy through "voluntary" action. Although as I say, I am not an expert on Chinese policy, these statements are consistent with a regulatory structure such as the one I have described. Moreover, my interpretation is further confirmed by

---

[77] Bates No. JJPC036826, Pls. Ex. 137, *supra* note 45.

[78] Import Export Department February 2004 Work Summary, Mar. 2, 2004, Bates No. JJPC036837, Pls. Ex. 81. *See also* Memorandum of CCCMHPIE Meeting, Mar. 19, 2004, Bates No. JJPC0043576, Pls. Ex. 57.

[79] 2006 Work Planning Memo, Nov. 28, 2005, Bates No. JJPC37150, Pls. Ex. 88 ("CCCMPHIE held a national VC producers' meeting in Beijing on Nov. 10 . . . . According to the above-mentioned situation and the technical improvement schedule of our company, we are now making the following monthly arrangement for VC production next year . . . . Apr. production shutdown."); *see also* Status Report on the January 29 Meeting of the Chamber of Commerce VC Branch, Jan. 31, 2007, Bates No. NEPG028603, Pls. Ex. 91.

[80] Deposition of Huang Pinqi of Hebei Welcome, taken June 19, 2008 at 33:21-34:8; *see also* Deposition of Zhang Yingren of Hebei Welcome, taken June 18, 2008 at 19:12-13 ("The Chamber of Commerce has always been controlling the amount of our VC exports and the pricing of our VC exports").

[81] Deposition of Feng Zhen Ying of Weisheng, taken June 12, 2008 at 39:2-4.

the Report of Professor Shen.   The term "self-discipline" appears quite frequently in the literature regarding Chinese competition and trade policy.  In fact, it is used in the new AML.[82] It apparently refers to a concept that members should seek to achieve the goals of national economic policy under the general direction of a supervising agency.[83]  The industry participants do not seem to regard "self-discipline" as a voluntary process.  One document notes that, "to enhance the self-discipline of the VC industry . . . through coordination by the Chinese Chamber of Commerce of Medicines and Health Produces, various domestic VC production enterprises have reached an agreement on the shutdown of production lines in 2007."[84]  A witness from Weisheng said, "[t]he industry self-discipline is mandated by the government.   The price coordination mechanism is authorized by the Ministry of Commerce, the former Ministry of Foreign Trade and Economic Cooperation, to be carried out by the Chamber of Commerce."[85]

37.   From a regulatory perspective, this type of action is entirely consistent with a regulated industry structure, for even though government will set policy goals, government will rely on those in the industry to use their knowledge of the industry and the market to develop specific plans to realize those goals.

**Conclusion**

38.   In conclusion, the Chinese Vitamin C export industry demonstrates the hallmarks of government control as a regulated industry.  First, the Chinese government has articulated several justifications for treating the Vitamin C export industry differently from other industries: its strategic export importance, fear of anti-dumping measures, and the fear of destructive

---

[82] *See* Anti-Monopoly Law of the People's Republic of China, Arts. 7, 11, Aug. 30, 2007.

[83] *See, e.g.*, Owen, *supra* note 17, at 249 ("For instance, in 2003 the government imposed an 'advance approval' requirement for the export of thirty-six goods. Under the requirement, exporters must first submit their export contracts to the respective trade associations for approval prior to export. Policies such as 'industrial self-discipline' and 'advance approval' to a large degree function simply as government-sponsored price cartels.").

[84] Bates No. WSC00014750, Pls. Ex. 63, *supra* note 70.

[85] Deposition of Feng Zhen Ying of Weisheng, taken June 12, 2008 at 38:14-19, as modified by Feng Zhen Ying Errata Sheet, dated July 15, 2008.

competition. The last of these served as a justification for much economic regulation in the United States. Second, the Chinese government has established a government agency to superintend the industry -- the Chamber of Commerce, and particularly its Vitamin C Sub-Committee. Third, the Vitamin C Sub-Committee has the power to limit the number of participants in the industry, to control price directly or indirectly by limiting quantity, and the Chamber has used that power to coordinate and supervise the Vitamin C export industry.

_James B. Speta_

Professor James B. Speta

Dated: February 20, 2009

26

# APPENDIX A

## JAMES B. SPETA
### Northwestern University School of Law
357 East Chicago Avenue
Chicago, Illinois 60611
Phone: (312) 503-8470
E-Mail: j-speta@northwestern.edu

### *EDUCATION*

The University of Michigan, Ann Arbor, Michigan.
    J.D., magna cum laude, 1991.
    Editor-in-Chief, Michigan Law Review (Vol. 89, 1990-1991).
    B.A., with highest distinction, 1988 (major: economics).

### *EXPERIENCE*

*Professor*, Northwestern University School of Law (Aug. 2005-present); *Assistant & Associate Professor* (Aug. 1999-Aug. 2005). Principal research areas: telecommunications law, Internet regulation, antitrust and regulation, and network industry regulation.

    *Director*, Northwestern University School of Law Executive LLM Program – Seoul.

*Visiting Assistant Professor*, Northwestern University School of Law (Aug. 1998-Aug. 1999).

*Associate*, Sidley & Austin, Chicago, Illinois (Aug. 1993-Aug. 1998). Practice concentrated in telecommunications matters, appellate and complex civil litigation, antitrust, and contested corporate transactions.

*Visiting Assistant Professor*, The University of Michigan Law School (Aug. 1992-May 1993). Taught Federal Appellate Practice (issues of federal jurisdiction and administrative law) and Contemporary First Amendment Issues.

*Law Clerk*, The Honorable Harry T. Edwards, United States Court of Appeals for the District of Columbia Circuit (Aug. 1991-Aug. 1992).

### *PUBLICATIONS*

*A Sensible Next Step on Network Neutrality: The Market Power Question*, Review of Network Economics (forthcoming 2009).

*Modeling an Antitrust Regulator for Telecommunications*, in Balancing Antitrust and Regulation in Network Industries (H. Shelanski & F. Leveque eds., forthcoming 2009).

*Spectrum Policy Experiments: What's Next?*, 2008 U. Chi. Legal Forum 389.

*Convergence and the (Near) Death of the Broadcast Model of Regulation in the United States*, in

Studies in Communications Law IV:  New Regulatory Systems Governing the Convergence of Telecommunications and Broadcastings (Dr. Won-Woo Lee, ed., 2008).

*Resale Requirements and the Intersection of Antitrust and Regulated Industries*, 31 J. Corp. L. 307 (2006).

*Making Spectrum Reform "Thinkable,"* 4 J. Telecom. & High Tech. L. 183 (2006).

*Rewriting U.S. Telecommunications Law with an Eye on Europe*, in Connecting Markets & Societies (Jürgen Müller & Brigitte Preissl, eds.) (2006).

*An Overview of Media Concentration in the United States:  Regulation and the Theory of Deregulation*, in Digitale Satellitenplattformen in den USA und Europa und ihre Regulierung (Institutes fur Europaisches Medienrecht 2005).

*Policy Levers in Korean Broadband*, 4 J. Korean Law 1 (2004).

*Deregulating Telecommunications in Internet Time*, 61 Wash. & Lee L. Rev. 1063 (2004).

*Vertical Regulation in Digital Television:  Explaining Why the United States Has No Access Directive*, in Regulating Access to Digital Television Technical Bottlenecks, Vertically-Integrated Markets and New Forms of Media Concentration 53-65 (European Audiovisual Observatory 2004).

*Antitrust and Local Competition under the Telecommunications Act*, 71 Antitrust L.J. 99 (2003).

*FCC Authority To Regulate The Internet:  Creating It and Limiting It*, 35 Loy. U. Chi. L.J. 15 (2003).

*Competitive Neutrality in Right of Way Regulation: The Consequences of Convergence*, 35 Conn. L. Rev. 763 (2003).

*Maintaining Competition in Information Platforms: Thoughts on Vertical Restrictions in Emerging Information Platforms*, 1 J. Tel. & High Tech. L. 185 (2002).

*A Vision of Internet Openness by Government Fiat*, 96 Nw. U. L. Rev. 1553 (2002) (reviewing Lawrence Lessig, The Future of Ideas:  the Fate of the Commons in a Connected World).

*A Common Carrier Approach To Internet Interconnection*, 54 Fed. Comm. L.J. 225 (2002).

*The Vertical Dimension of Cable Open Access*, 71 Colo. L. Rev. 975 (2000).

*Handicapping the Race for the Last Mile?: A Critique of Open Access Rules for Broadband Platforms*, 17 Yale J. on Reg. 39 (2000).

*Tying, Essential Facilities, and Network Externalities: A Comment on Piraino*, 93 Nw. U.L. Rev.

1277 (1999).

*Internet Theology*, 2 Green Bag 2d 227 (1999) (reviewing Mike Godwin, Cyber Rights (1998)).

Hon. Harry T. Edwards and James B. Speta, "Our Federalism": Doctrines of Legislative and Judicial Federalism in the United States (Comparative Lessons for "Subsidiarity" in the European Community?) (Mentor Group Working Paper 1993).

Note, *Narrowing the Scope of Civil Drug Forfeiture: Section 881, Substantial Connection, and the Eighth Amendment*, 89 Mich. L. Rev. 165 (1990).

### WORKING PAPERS

*The Consumer Benefits of Video Franchise Reform in Illinois*, Heartland Policy Study #112 (2007) (with John Skorburg & Steven Titch).

*Network Neutrality Is a Federal Issue*, Free State Foundation Working Paper (2007).

### GRANTS

Measuring the Welfare Loss from the FCC's TV Table of Allocations, Searle Foundation, 2003-2004 (with David Haddock).

### PANEL & PAPER PRESENTATIONS

Assessing the FCC's Internet Jurisdiction in Light of the Comcast Order, University of Colorado Silicon Flatirons Conference, February 2009.

The Future of Intercarrier Compensation, University of Pennsylvania Conference on 25 Years after the Bell Decree, April 2008.

The Year in Telecommunications Regulation, Searle Center on Law and Regulation, April 9, 2008.

Assessing the Progress of "Spectrum Reform," University of Chicago Legal Forum, October 27, 2007.

U.S. Broadcast Deregulation:  Modest Thoughts for Korea, Seoul National University Center on Law and Public Utilities, September 14, 2007.

Getting Past the Network Neutrality Roadblock, SNU-Berkeley Centers for Law and Technology, January 2007.

The Digital Age Communications Act's Approach to Net Neutrality.  March 2006.

Antitrust and Unfair Competition, SNU-Berkeley Centers for Law and Technology, Annual Conference, February 2006.

Antitrust and Regulation in Telecoms, Ecole des Mines, January 2006.

Commentary on the Federal/State Relations Proposal, Digital Age Communications Act Project, September 2005.

The Regulatory Framework Proposal, Digital Age Communications Act, June 2005.

VoIP Blocking and Network Neutrality, Congressional Internet Caucus, on April 19, 2005.

The Political Economy of Spectrum Reform, Silicon Flatirons, University of Colorado, February 2005.

Commentary on Broadcasting Convergence in the U.S. and Korea, SNU-Berkeley Centers for Law and Technology, Annual Conference, January 2005.

Options and Prospects for Voice over Internet Protocol Regulation, Presentation, Federal Communications Bar Association, October 2004.

Comparative Law and Economics of U.S. and European Telecommunications Reform, Telecommunications Policy Research Conference (Washington, D.C.), October 2004.

The FCC's Jurisdiction To Regulate the Internet, Cardozo Law School, September 2004.

Rewriting U.S. Telecommunications Law with an Eye on Europe, International Telecommunications Society, Berlin, Germany, September 2004.

Current U.S. Broadband Policy and Prospects for Deregulation, Presentations to Korean Ministry of Information and Communications and Korean Information Strategy Development Institute, June 2004.

U.S. Approaches To Vertical Media Regulation, Medienforum.nrw, Cologne, Germany, June 2004.

Untangling Copyright and Communications Law:  The FCC's Digital Rights Management Policies, Michigan State University-DCL College of Law, March 2004.

Lessons from Korean Broadband Policy for the United States, SNU-Berkeley Technology Centers, February 2004.

Deregulating Telecommunications in Internet Time, Georgetown Law School Intellectual Property and Technology Law Colloquium, December 2003.

U.S. Vertical Regulation of Digital Television Platforms, European Audiovisual Observatory &

IVIR, University of Amsterdam, September 2003.

The Article I Authority of the FCC, Loyola University of Chicago, February 2003.

Legal Rules To Implement Dynamic Spectrum Sharing, Panel Presentation, Carnegie Mellon University, Insites Program, February 2002.

The Antitrust Regulation of Information Platforms, Panel Presentation and Paper, Silicon Flatirons, University of Colorado, January 2002.

Vertical Exclusivity in Third-Generation Wireless, Paper and Presentation, Pacific Telecommunications Council, Seoul, South Korea, June 2001.

Corporate Control and Industry Structure in Global Communications, London Business School, Paper Discussant, May 2001.

Cable Internet Regulation and Market Incentives for Openness, Stanford Center for Internet and Society, Panel Presentation, December 2000.

A Common Carrier Approach to Internet Interconnection, Paper and Presentation, Telecommunications Policy Research Conference, Washington, D.C., September 23, 2000.

Open Source and Open Access, Panel Presentation, The E-Business Transformation, Brookings Institution and Department of Commerce, September 2000.

Unbundling & Open Access, Telecommunications in the 21st Century, Paper and Presentation, University of Colorado Law Review, February 2000.

Telecommunications Innovation, Moderator, University of Chicago Legal Forum, October 1999.

Mandatory Resale Rules in Long Distance Markets: Regulation Searching for an (Economic) Justification, Working Paper and Presentation, Telecommunications Policy Research Conference, Washington, D.C., September 1999.

## *TESTIMONY AND AGENCY SUBMISSIONS*

Testimony (invited panelist), Federal Communications Commission, Media Concentration Field Hearing, September 20, 2007.

Testimony, "Video Franchising Reform in Illinois," Illinois House Telecommunications Committee, March 15, 2007.

Testimony, "Competition in the Communications Marketplace: How Technology Is Changing the Structure of the Industry," House Energy & Commerce Committee, March 2, 2005.

Comments, Inquiry Concerning High-Speed Access to the Internet over Cable and Other

Facilities, FCC GN Docket 00-185 (Jan. 19, 2001) [filed on behalf of AT&T Corp.].

Comments on Request by Staff of Senate Commerce Committee, Hearings on Internet Access and the Consumer, Senate Commerce Committee (April 13, 1999) (comments available at http://www.senate.gov/~commerce/hearings/0414spe.pdf).

Ex Parte Comments, In the Matter of the Merger of AT&T Corp. and MediaOne, Submitted to the Federal Communications Commission (Dec. 22, 1999) (addressing whether FCC should condition approval of merger on open access conditions).

## *OTHER PROFESSIONAL ACTIVITIES*

Board of Academic Advisors, The Free State Foundation, 2008-present.

Advisory Board (including peer review), I/S: A Journal of Law and Policy for the Information Society.

Co-Chair, Working Group on "New Regulatory Framework," The Digital Age Communications Act Project, Progress & Freedom Foundation, 2004-2006.

Board of Advisors, Institute for Regulatory Law & Economics, 2003-present.

Board of Legal Experts, Carnegie Mellon University Insites Program (Law and Technology), 2002-2006.

Admitted to Illinois, Seventh Circuit, and Northern and Central Districts of Illinois Bars. Active membership.

Expert Declaration for AT&T Corp. in Inquiry Concerning High-Speed Access to the Internet over Cable and Other Facilities, FCC GN Docket 00-185 (Jan. 19, 2001).

United States Court of Appeals for Seventh Circuit. Accepted appointments in civil cases on request of Circuit Executive. One continuing matter (as of 2008).

Occasional appellate and complex litigation consulting. Clients (either directly or indirectly through a law firm) have included Citgo Petroleum Corp., Union Carbide Corp., and PacTiv Corp.

## *TEACHING*

Courses:      Administrative Law, Antitrust Law, Business Associations, Corporations, Intellectual Property, Telecommunications and Internet Policy, and Torts

Teaching Awards:  Best Teacher of a First-Year Class (1999-2000 and 2007-2008) (student-voted award)
Childres Award for Teaching Excellence
(2000-2001 & 2005-2006) (student-voted award for best overall teacher)

James B. Speta
Page 7

Dean's Teaching Award (2002-2003, 2005-2006)
Elected "Last Lecturer" for Graduating Class (2005, 2006).

# APPENDIX B

## Law Review Articles

Ralph H. Folsom, *Antitrust Enforcement under the Secretaries of Agriculture and Commerce*, 80 Colum. L. Rev. 1623 (1980).

H. Stephen Harris, *The Making of an Antitrust Law: The Pending Anti-Monopoly Law of the People's Republic of China*, 7 Chi. J. Int'l L. 169 (2006).

Yong Huang, *Pursuing the Second Best: The History, Momentum, and Remaining Issues of China's Anti-Monopoly Law*, 75 Antitrust L.J. 117 (2008).

Joseph D. Kearney & Thomas W. Merrill, *The Great Transformation of Regulated Industries Law*, 98 Colum. L. Rev. 1323 (1998).

Salil K. Mehra & Meng Yanbei, *Against Antitrust Functionalism: Reconsidering China's Antimonopoly Law*, 49 Va. J. Int'l L. 379 (2009).

Bruce Owen, *et al., China's Competition Policy Reforms: The Anti-Monopoly Law and Beyond*, 75 Antitrust L.J. 231 (2008).

## Books

William K. Jones, *Cases and Material on Regulated Industries* (1967).

David Philip Locklin, *The Economics of Transportation* (6th ed. 1966).

Richard J. Pierce, Jr. & Ernest Gellhorn, *Regulated Industries in a Nutshell* (4th ed. 1999).

Richard J. Pierce, Jr., *Economic Regulation: Cases and Materials* (1994).

W. Kip Viscusi, *et al., Economics of Regulation and Antitrust* (4th ed. 2005).

## Other Materials

Antitrust Modernization Commission, *Report and Recommendations* (April 2007), *available at* http://govinfo.library.unt.edu/amc/report_recommendation/toc.htm.

29 C.J.S. *Electricity* § 62 (2008).

## Deposition Testimony

Deposition of Tang Shuhua of Hebei Welcome, taken June 17, 2008.

Deposition of Ning Hong of NEPG, taken Apr. 17, 2008.

Deposition of Feng Zhen Ying of Weisheng, taken June 12, 2008.

Feng Zhen Ying Errata Sheet, dated July 15, 2008.

Deposition of Kong Tai of Jiangsu Jiangshan, taken June 17, 2008.

Deposition of Zhang Yingren of Hebei Welcome, taken June 18, 2008.

1

Deposition of Zhang Yingren of Hebei Welcome, taken June 19, 2008.

Deposition of Huang Pinqi of Hebei Welcome, taken June 19, 2008.

Deposition of Huang Pinqi of Hebei Welcome, taken June 20, 2008.

Deposition of Wang Qi of Jiangsu Jiangshan, taken July 3, 2008.

Deposition of Wang Renzhi of NEPG, taken July 17, 2008.

Deposition of Du Chengxiang of NEPG, taken July 23, 2008.


**Documents Produced in This Litigation**

Information Journal, Sept. 15, 2006, Bates No. NEPG030535.

Shijiazhang Pharmaceutical Co., Ltd., the Target of Critics from Industrial Partners (from www.ehongyuan.com), Aug. 24, 2003, Bates No. NEPG031085.

Notice for Distributing Minutes of Meeting by Heads of Vitamin C Manufacturers, Nov. 20, 2001, Bates No. JJPC0043068-73, Pls. Ex. 134.

VC Chapter Meeting Memo, Aug. 8, 2003, Bates No. JJPC0043575, Pls. Ex. 53.

Memorandum of VC Chapter Meeting of CCCMHPIE, Apr. 19, 2005, Bates No. JJPC0043578, Pls. Ex. 142.

VC Chapter of the Chamber of Commerce Dalian Meeting Memo, May 19, 2005, Pls. Ex. 116.

Status Report, Sept. 19, 2005, Bates No. NEPG023590, Pls. Ex. 36.

Export Quota Report on Vitamin C of NEPG, Feb. 26, 1999, Bates No. NEPG028350.

Bates No. JJPC0043567, Pls. Ex. 144.

Recognize New Trends, Develop on Both Fronts, and Build a Healthy, Sustainable and Harmonious Jiangshan, Jan. 28, 2005, JJPC037065, Pls. Ex. 141.

*Antitrust Lawsuits in the US Cause Trade Difficulties for China's Vitamin C companies*, The Beijing News, Apr. 20, 2005, Pls. Ex. 143.

Notes from the Sixth General Meeting of Members of the Vitamin C Branch, Dec. 4, 2000, Bates No. NEPG042592, Pls. Ex. 167.

Bates No. NEPG030344, Dec. 31, 2004, Pls. Ex. 38.

Report on the Status of the Meeting, June 5, 2000.

Periodical Summary for December–Import and Export, Jan. 3, 2004, Bates No. JJPC036826, Pls. Ex. 137.

Notice on the Announcement of the Coordinated Export Price for Vitamin C, Apr. 16, 2001, Bates No. NEPG042662, Pls. Ex. 31.

Notice Regarding Publishing the Industry Agreed Export Prices for the Key Commodities for the Spring of 2003, Bates No. JJPC0042489, Pls. Ex. 52.

Chapter Meeting Memorandum, June 23, 2006, Bates No. JJPC0047793, Pls. Ex. 151.

2

Explanation of Charging Off Price Difference of Export Collection of Ascorbic Acid of Our Factory, Nov. 5, 2003, Bates No. NEPG028100.

Shi Jia Zhuang Pharmaceutical Group Co., Ltd., Report Materials on the Overall Management Meeting on July 12, July 11, 2006, Bates No. WSC00010354, Pls. Ex. 67.

Report re Implementation of NEPG's Suspension and Maintenance of VC Manufacture, June 6, 2006, Bates No. NEPG033313.

Notice from Chamber of Commerce for Import and Export of Medicines and Health Products, Jan. 21, 2005, Bates No. HEB004475, Pls. Ex. 115.

Chamber Meeting Memorandum, Dec. 23, 2005, Bates No. JJPC0040755.

Report on the Investigation on the Shutdown of Production of Weisheng Pharmaceutical Co., Ltd., April 19, 2006, Bates No. NEPG037113, Pls. Ex. 162.

Report of the VC Sub-Committee Meeting on Sept. 15, Sept. 18, 2006, Bates No. NEPG058163, Pls. Ex. 214.

Situation Report, June 26, 2007, Bates No. WSC00014750, Pls. Ex. 63.

Work Summary of Import and Export September, Oct. 8, 2002, Bates No. JJPC036822, Pls. Ex. 76.

September Import & Export Work Summary, Oct. 5, 2003, Bates No. JJPC0043594, Pls. Ex. 79.

Report on the Situational Analyses and Corresponding Strategies of VC and Its Product Series for the First Half of Next Year, Dec. 29, 2005, Bates No. NEPG058984, Pls. Ex. 161.

Import Export Department February 2004 Work Summary, Mar. 2, 2004, Bates No. JJPC036837, Pls. Ex. 81.

Memorandum of CCCMHPIE Meeting, Mar. 19, 2004, Bates No. JJPC0043576, Pls. Ex. 57.

2006 Work Planning Memo, Nov. 28, 2005, Bates No. JJPC37150, Pls. Ex. 88.

Status Report on the January 29 Meeting of the Chamber of Commerce VC Branch, Jan. 31, 2007, Bates No. NEPG028603, Pls. Ex. 91.

September Import & Export Work Summary, Oct. 5, 2003, Bates No. JJPC0043594, Pls. Ex. 79.

VC Subcommittee Meeting Memorandum, June 11, 2003, Bates No. JJPC0043574.

## Chinese Laws, Regulations and Interpretations

Decision on Several Matters Concerning Further Reforming and Perfecting the Foreign Trade System, State Council, Guofa [1990] No. 70, 1990.

Notification of Adjusting Export Good Classification Catalogue and Strengthening Regulation of Export Goods Marketing and Sales, MOFTEC, Jan. 23, 1990.

Measures for Administration over Foreign Trade and Economic Social Organizations, MOFTEC, Feb. 26, 1991, Exhibit D to the Declaration of Joel M. Mitnick in Support of the Brief of Amicus Curiae The Ministry of Commerce of the People's Republic of China ("Mitnick Decl.").

Interim Regulation of Export Products, MOFTEC, MOFTEC Order No. 4, Dec. 29, 1992.

3

Notice of Ministry of Foreign Trade and Economic Cooperation Regarding Printing and Distribution of Several Regulations for Personnel Management of Chambers of Commerce for Importers and Exporters, Sept. 23, 1994, Exhibit E to the Mitnick Decl.

Decision on Further Deepening the Reform of Foreign Trade System, State Council, Jan. 11, 1994.

*Minister Wu Yi's Comments on the Reform of Import and Export Chambers of Commerce*, Xu Guomin, Machinery Electronic Products Market (1994) Issue 10.

1997 Notice Relating to Strengthening the Administration of Vitamin C Production and Export by Ministry of Foreign Trade and Economic Cooperation and State Drug Administration, MOFTEC Guan Fa No. 664, Nov. 27, 1997, Exhibit H to the Mitnick Decl.

Charter of Vitamin C Sub-Committee of China Chamber of Commerce of Medicines and Health Products Importers and Exporters, Oct. 11, 1997, Pls. Ex. 125.

China Chamber of Commerce of Medicines & Health Products Importers & Exporters, Publication of Administration and Regulation, 2003, Exhibit C to the Mitnick Decl.

Notice Issued by the Ministry of Foreign Trade and Economic Cooperation and the General Administration of Customs for the Adjustment of the Catalogues of Export Products Subject to Price Review by the Customs, MAO FA [2002] No. 187, Mar. 29, 2002, Exhibit J to the Mitnick Decl.

Announcement of Ministry of Commerce of the People's Republic of China, General Administration of Customs of the People's Republic of China, Nov. 29, 2003, Exhibit K to the Mitnick Decl.

Anti-Monopoly Law of the People's Republic of China, Aug. 30, 2007.

4