UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------- X
                            :

IN RE VITAMIN C ANTITRUST LITIGATION  :    **MEMORANDUM**
                                   :    **DECISION AND ORDER**

This document refers to: ALL ACTIONS    :

                                 :    06-MD-1738 (BMC) (JO)

                                 :

                                 :
---------------------------------------------------------------- X

**Cogan**, District Judge.

Plaintiffs have filed suit against Chinese vitamin C manufacturers, alleging that they engaged in an illegal cartel to fix prices and limit supply for exports, including those to the United States.[1] The four main defendants are Hebei Welcome Pharmaceutical Co. Ltd. ("Hebei Welcome" or "Welcome"), Aland (Jiangsu) Nutraceutical Co., Ltd. ("Jiangsu Jiangshan" or "JJPC"), Northeast Pharmaceutical Co. Ltd. ("NEPG" or "Northeast") and Weisheng Pharmaceutical Co. Ltd. ("Weisheng") (collectively "defendants").[2]

Plaintiffs bring this putative class action under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 4, 16. Plaintiffs seek treble damages and injunctive relief against all defendants except for Northeast, against whom only injunctive relief is sought.

---

[1] Two similar price-fixing suits are currently pending against Chinese producers of magnesite and bauxite. See Animal Science Prods., Inc. v. China Nat. Metals & Minerals Import & Export Corp., 702 F. Supp. 2d 320 (D.N.J. 2010), vacated, --- F.3d ----, 2011 WL 3606995 (3d Cir. Aug. 17, 2011); Resco Prods., Inc. v. Bosai Minerals Group Co., Ltd., No. 06-235, 2010 WL 2331069 (W.D. Pa. June 4, 2010).

[2] There are also other defendants that do not manufacture vitamin C, including JSPC America, Inc. ("JSPCA"), a subsidiary of JJPC, Shijiazhuang Pharmaceutical (USA) ("Shijiazhuang"), Inc., an affiliate of Weisheng, and China Pharmaceutical Group Ltd. ("China Pharmaceutical"), the owner of Weisheng and Shijiazhuang. The complaint also names North China Pharmaceutical Group ("NCPC Group Corp."), North China Pharmaceutical Group Co. Ltd., ("NCPC Ltd.") and North China Pharmaceutical Group Corporation Import and Export Trade Co., Ltd. ("NCPC I&E") (collectively "North China defendants"). Welcome, is a partially-owned subsidiary of NCPC Ltd., which is, in turn, a partially-owned subsidiary of NCPC Group Corp. NCPC I&E is an indirectly owned subsidiary of NCPC Group Corp. that purchases vitamin C from Chinese companies including Welcome.

Defendants do not dispute that the cartel agreements at issue violate the antitrust laws save for one primary defense: that they were compelled by the Chinese government to fix prices. They have filed a motion for summary judgment based upon that defense and the related doctrines of comity and act of state.

The three doctrines upon which defendants rely recognize that a foreign national should not be placed between the rock of its own local law and the hard place of U.S. law. However, that concern is insufficient to protect defendants from their acknowledged violation of the antitrust laws because, here, there is no rock and no hard place. The Chinese law relied upon by defendants did not compel their illegal conduct. Although defendants and the Chinese government argue to the contrary, the provisions of Chinese law before me do not support their position, which is also belied by the factual record. I decline to defer to the Chinese government's statements to the court regarding Chinese law.

Accordingly, defendants' motion for summary judgment is denied.

### (1)

## BACKGROUND

By November 2001, defendants, who faced much lower manufacturing costs than their foreign competitors, had captured over 60% of the worldwide market for vitamin C. China's share of vitamin C imports to the United States rose from 60% in 1997 to over 80% by 2002. Around this time, a number of foreign competitors discontinued or reduced production.

It is not disputed that defendants fixed prices and agreed on output restrictions. Defendants are members of the Chamber of Commerce of Medicines and Health Products Importers and Exporters ("the Chamber"). Many of the agreements at issue were reached at

meetings of the Chamber and appear to have been, at the very least, facilitated by the Chamber. Defendants, however, contend that the Chamber is a government-supervised entity through which the Chinese government exercises its regulatory authority over vitamin C exports and that all of the agreements at issue were compelled by the Chinese government.

After plaintiffs filed suit, defendants moved to dismiss the complaint, invoking the foreign sovereign compulsion defense, the act of state doctrine and the doctrine of international comity. The Ministry of Commerce of the People's Republic of China ("The Ministry"), which is the highest authority in China authorized to regulate foreign trade,[3] filed an amicus brief in support of defendants' motion, explaining the Chinese government's regulation of vitamin C exports. The Ministry "formulates strategies, guidelines and policies concerning domestic and foreign trade and international economic cooperation, drafts and enforces laws and regulations governing domestic and foreign trade, and regulates market operation to achieve an integrated, competitive and orderly market system." The Ministry is equivalent to a cabinet level department in the United States. According to the Ministry, defendants' actions were compelled by the Chinese government.

Judge David G. Trager denied defendants' motion to dismiss, finding the record, at that time, to be "simply too ambiguous to foreclose further inquiry into the voluntariness of defendants' actions."[4] In re Vitamin C Antitrust Litig., 584 F. Supp. 2d 546, 559 (E.D.N.Y. 2008). With the benefit of some discovery, plaintiffs had offered evidence suggesting that defendants' agreements may have been voluntary. In addition, Judge Trager was concerned with the possibility that the cartel and purportedly compulsive governmental regulations at issue had

---

[3] The Ministry was originally known as the Ministry of Foreign Trade and Economic Cooperation (or "MOFTEC"). For ease of reference, "the Ministry" is used to refer to both entities.

[4] This case was reassigned to me in January 2011 following the death of my dear colleague, Judge Trager.

been established at the behest of defendants and the Chinese government had simply given its "imprimatur."

Defendants now move for summary judgment on their three related defenses. Although the initial complaint in this suit was filed in January 2005, the operative complaint for the purposes of the instant motion covers the time period from December 1, 2001 through December 2, 2008.

**(2)**

**CHINESE LAW**

**I.    China's Economic Transition and the Establishment of the Chambers**

In 1978, China began to transition from a planned economy to a "socialist market economy." During the planned economy era, the control of foreign trade was centralized under the Ministry and all foreign trade was conducted through state-owned import and trade companies according to state trade plans. After some reforms in the mid-1980's led to aggressive forms of competition, the government imposed new administrative controls, which involved the establishment of the various China Chambers of Commerce for Import and Export ("Chambers"), including the Chamber. According to defendants' Chinese law expert, Professor Shen Sibao,[5] the formation of the Chambers was part of China's "important national policy which requires Chinese exporting companies to 'unite and act in unison in foreign trade.'"

The authority to regulate import and export commerce was eventually transferred from the state-owned trading companies to these Chambers. When the Chambers were created, they

---

[5] Plaintiffs do not have a Chinese law expert and, instead, attempt to make their case by relying on the plain language of: (1) directives issued by the Ministry; (2) charter documents of the Chamber and its sub-committee that dealt with the vitamin C; and (3) public statements made by the Chinese government and various Chambers to the World Trade Organization ("WTO") and the United States government.

4

were staffed with personnel transferred directly from the government.

The Chambers were given both governmental functions, which had previously been performed by the Ministry, and private functions. The governmental functions included, inter alia, responding to foreign anti-dumping charges and industry "coordination." The private functions of the Chambers included organizing trade fairs, conducting market research and "mediating" trade disputes.

## II. 1996 Interim Regulations

The first governmental directive cited in the Ministry's brief is the Interim Regulations of the Ministry on Punishment for Conduct of Exporting at Lower-than-Normal Price ("1996 Interim Regulations"), which were promulgated on March 20, 1996.[6] The 1996 Interim Regulations, which applied to all export products produced in China, address the Ministry's power to punish enterprises for exporting at "lower-than-normal" prices. Potential punishments include "a notice of criticism" and monetary fines. According to the regulations, a normal price includes the costs for producing the product as well as "reasonable profit." The Ministry could request the Chambers to investigate alleged violations of the regulations. The 1996 Interim Regulations also note that "[a]ll export enterprises shall . . . follow the coordination by various chambers of commerce for import and export trade, and set export prices which are suitable in countries to which the goods are exported."

Although not raised by either party, according to a recent decision by the World Trade Organization ("WTO"), the 1996 Interim Regulations were formally repealed on September 12, 2010. WTO, Panel Report, WT/DS394/R, WT/DS395/R, WT/DS398/R, China – Measures

---

[6] The record includes various regulatory documents issued by the Ministry that have various titles such as "Regulations," "Decision" and "Notice." These types of documents are collectively referred to herein as "governmental directives."

Related to the Exportation of Various Raw Materials (July 5, 2011) ("WTO Panel Report"), ¶ 7.1029 (citing Order No. 2 of 2010 (promulgated by the Ministry on Sept. 12, 2010)). However, in this proceeding before the WTO ("WTO Proceeding"), China asserted that it "ceased to impose . . . penalties [under the 1996 Interim Regulations]" as of May 28, 2008 when "verification and chop," which required export contracts to receive an official seal, was repealed.[7] Id. ¶ 7.1031.

## III.    1996 Conference and Report

In early 1996, the Ministry held a conference and issued a report addressing problems in the vitamin C industry. Although China's vitamin C industry had rapidly expanded, the industry faced a number of problems including: (1) "violations of export administration regulations" and "the lack of strong administration and coordination of exports"; (2) a glut of capacity and Chinese vitamin C producers; (3) "disorderly" and fierce export competition that resulted in companies "blindly cutting prices"; and (4) threats of foreign anti-dumping suits. To combat these problems, the report recommended restricting production in order to "preserve price," barring expansion of production capacity and consolidating the numerous vitamin C producers.

## IV.    1997 Notice and 1997 Charter

In November 1997, the Ministry and the State Drug Administration ("SDA") promulgated the Notice Relating to Strengthening the Administration of Vitamin C Production and Export by [the Ministry] and [SDA] (the "1997 Notice"). The purpose of the 1997 Notice was "to rectify the operational order and optimize the operational team of Vitamin C export, realize the scale-operation on export, improve the competitiveness of our Vitamin C products in the international market, promote the healthy development of Vitamin C export and maintain the

---

[7] In the WTO Proceeding, the United States and other countries challenged Chinese export restrictions on certain raw materials. Although vitamin C is not at issue in the WTO Proceeding, one of the raw materials in dispute was, like vitamin C, also subject to verification and chop.

6

interest of our country and enterprises . . . ."

The regulatory scheme under the 1997 Notice had three primary components. First, the 1997 Notice required export licenses, which were granted by the government based on certain qualifications, including prior production output. Second, the Ministry set export quotas for the total volume of vitamin C that could be exported and export quotas for each individual company. Third, the 1997 Notice generally directed the Chamber to "improve the coordination on Vitamin C export [,]. . . supervise [the implementation of the 1997 Notice], and timely report to [the Ministry] about the relevant issues and problems." To meet these goals, the Chamber was required to establish the Vitamin C Subcommittee (the "Subcommittee"). All exporting enterprises were required to participate in the Subcommittee and to "subject themselves to the coordination of the [the Subcommittee]." The Subcommittee was directed to, inter alia, establish a mandatory minimum export price. Under the 1997 Notice, "the Ministry itself did not decide what specific prices should be," leaving that to the Subcommittee.

Only enterprises that followed the coordinated price and volume quotas would receive export licenses. For violations of the "relevant provisions" of the 1997 Notice, including "competing at low price and reducing price through any disguised means," enterprises could be punished through a reduction of their export quotas and even complete revocation of their export licenses.

In October 1997, the Subcommittee enacted a charter (the "1997 Charter") in accordance with the charter of the Chamber and the 1997 Notice.[8] According to the 1997 Charter, the Subcommittee was organized around certain tenets, including "complying with laws of the country, implementing and executing the state policies and regulations on foreign trade [and]

---

[8] The 1997 Charter was enacted on October 11, 1997, which is prior to the promulgation of the 1997 Notice (November 27, 1997), the effective date of the 1997 Notice (January 1, 1998) and the Ministry's approval of the Subcommittee (March 28, 1998).

maintaining orderly export of Vitamin C products . . . ." The Subcommittee was to perform "coordination, direction, consultation, service and supervision & inspection functions over its members. It bridges and ties the enterprises and the government." Under the 1997 charter, the Subcommittee was supposed to, inter alia, supervise the implementation of export licenses, advise the Ministry on export quotas and "coordinate and administrate market, price, customer and operation order of Vitamin C export."

According to the 1997 Charter, "[o]nly the members of the Sub-Committee have the right to export Vitamin C" and to obtain a "Vitamin C export quota." In return, members of the Subcommittee were obligated to "comply with various directives, policies and regulations with respect to foreign trade, comply with the Charter and regulations of [the Subcommittee] and to implement Sub-Committee's resolution." Specifically, the members were required to "[s]trictly execute export coordinated price set by the Chamber and keep it confidential."

For violations of the 1997 Charter or any resolution issued by the Subcommittee, a member could be punished through a warning, open criticism and even revocation of its membership. In addition, the Sub-Committee would "suggest to the competent governmental department, through the Chamber, to suspend and even cancel the Vitamin C export right of such violating member."

On March 21, 2002, the Ministry abolished the 1997 Notice and other regulations,

> [i]n order to adapt to the new situation of our country's opening-up to the outside world, to further establish and improve the legal system of the socialist market economy, to earnestly perform the promises of our country's entry to the WTO, to accelerate the transformation of the functions of the government and to improve the level of administration . . . .

Only a few months earlier, the Ministry had issued regulations ("the 2002 Regulations"), which repealed, as of January 1, 2002, another directive that had subjected vitamin C and other products to export licensing and export quotas beginning on December 29, 1992 (the "1992

Interim Regulations").

## V.    2002 PVC Notice and the Institution of Verification and Chop

Shortly after abolition of the 1997 Notice, the Ministry and the General Administration of

Customs ("Customs") issued a notice on March 29, 2002 establishing an export regime referred

to as "Price Verification and Chop" (the "2002 PVC Notice").  The 2002 PVC Notice became

effective on May 1, 2002.  Thirty categories of products, including Vitamin C, were now subject

to "Price Verification and Chop . . . by the chambers, and [were] no longer subject to supervision

and review by customs." "Following the adjustment made under [the 2002 PVC Notice], the

relevant chambers" were required to submit to Customs, by April 20, 2002, "information on

industry-wide negotiated prices."  According to the Ministry, under verification and chop,

Customs would only permit export if the relevant contract was reviewed by the Chamber and

received a "chop," which is a special seal that the Chamber would affix to the contract indicating

its legality (and, more importantly, the absence of which would indicate its illegality.)

The 2002 PVC Notice explains that:

> [the Ministry] and [Customs] have made the decision to adjust the catalogue of
> export products subject to price review by customs for year 2002, in order to
> accommodate the new situations since China's entry into WTO, maintain the
> order of market competition, make active efforts to avoid anti-dumping sanctions
> imposed . . ., promote industry self-discipline and facilitate the healthy
> development of exports.

According to the 2002 PVC Notice, "[t]he adoption of PVC procedure shall be convenient for

exporters while it is conducive for the chambers to coordinate export price and industry self-

discipline."

The 2002 PVC Notice also provides that "[g]iven the drastically changing international

market, the customs and chambers may suspend export price review for certain products with the

approvals of the general members' meetings of the sub-chamber (coordination group) and filing

9

with [Customs]" (hereinafter "Suspension Provision").

VI.     **2003 Announcement**

On November 29, 2003, the Ministry issued a new directive, effective January 1, 2004,

that continued the verification and chop system (the "2003 Announcement"). This was done

"[i]n order to maintain the order of foreign trade and create a fair trade environment and in

response to the demands of the industries engaging in export and import, as well as on the basis

of the coordination by relevant industrial associations . . . ."

According to the 2003 Announcement, "[e]ach [Chamber] shall . . . strictly observe the

Procedures for Implementing the Verification and Chop System on Export Commodities" ("2003

Procedures"), which are attached to the 2003 Announcement. The 2003 Procedures, which

explain the verification and chop process in greater detail,[9] state:

> exporters shall deliver . . . the export contracts . . . to the relevant Chambers for
> verification before Customs declaration. If it is verified that the contracts are
> correct, the Chambers shall fill in the Verification and Chop Form of [the relevant
> Chamber] and affix the counter-forgery V&C chop at the designated block of the
> V&C Form and to the export contacts at the blocks where prices and quantities
> are specified, and then deliver them back to the exporters.
>
> * * * *
>
> The Chambers shall verify the submissions by the exporters based on the industry
> agreements and in accordance with the relevant regulations promulgated by [the
> Ministry] and [Customs]. . . . The relevant Chambers shall file the industry
> agreements with [the Ministry] and [Customs] within 10 days after the public
> announcements [for such industry agreements] are made . . . .

(Emphasis added). If a contract did not have a chop, Customs would not accept the contract and

the goods could not be exported. Enterprises that forged the chop were to "be punished by the

[Chambers] according to relevant rules."

---

[9] Although the 2002 PVC Notice indicates that there were similar explanatory regulations related to the 2002 PVC
Notice, those regulations are not part of the record.

The 2003 Procedures also contain a provision addressing non-members, which provides that "[f]or V&C Applications made by non-member exporters, the Chambers shall give them the same treatment as to member exporters."

## VII.  2002 Charter

On June 7, 2002, after the 2002 Notice became effective, the Subcommittee approved a revised charter (the "2002 Charter"). The 2002 Charter describes the Subcommittee as "a self-disciplinary industry organization jointly established on a voluntary basis by those [Chamber] members which conduct import and export of vitamin C." According to the 2002 Charter, the purposes of the Subcommittee are:

> to observe the state laws, regulations and the Articles of Association for [the Chamber], to coordinate and guide the Vitamin C import and export business as well as related activities, to provide consultation and services to its members and relevant governmental departments, to maintain the normal working order of vitamin C import and export operations, to ensure fair competition, to protect the national interest and the legal rights and interests of its members, and to promote the healthy development of the vitamin C import and export trade.

The 2002 Charter also provides that: "The Subcommittee shall coordinate and guide vitamin C import and export business activities, promote self-discipline in the industry, maintain the normal order for vitamin C import and export operations, and protect the interests of the state, the industry and its members" According to the 2002 Charter, "obligations" of members include "[i]mplement[ing] the resolutions and agreements of the Subcommittee" and "[a]ccept[ing] the coordination of the Subcommittee."

Although the 2002 Charter is, in many respects, similar to the 1997 Charter, there are some differences. Most notably, the 1997 Charter never states that the Subcommittee was established on a "voluntary basis." In addition, unlike the 2002 Charter, the 1997 Charter provides that "[o]nly the members of the Sub-Committee have the right to export Vitamin C" and

to obtain a "Vitamin C export quota." These differences between the two charters make sense given that, under the 2002 PVC Notice and 2003 Announcement (collectively the "2002 Regime"), membership in the Subcommittee was no longer required in order to export vitamin C.

The penalty provisions in the two charters also differ. Although the 1997 Charter provided that "[t]he Sub-Committee will suggest to the competent governmental department, through the Chamber, to suspend and even cancel the Vitamin C export right of such violating member," this provision is absent from the 2002 charter. In addition, although the 1997 Charter and the 2002 Charter both provide that the Subcommittee can discipline members through public criticism, a warning or termination of membership, because non-members can export under the 2002 Regime, revocation of membership would not necessarily have the same effect under the 2002 Regime. The 2002 Charter also includes an enforcement provision that is not included in the 1997 Charter. The 2002 Charter provides that "[i]n order to monitor the implementation of industry self-disciplinary agreements, coordination plans, or industry resolutions, upon approval by relevant members, the Subcommittee can collect a security deposit in the specified amount for breach of agreement."

Finally, although the Subcommittee includes both representatives from the Chamber and representatives from the members, the 2002 Charter appears to require majority voting by the members alone to take any action.

## VIII. May 2002 Agreement

On May 25, 2002, less than two weeks before the 2002 Charter was passed, the Subcommittee met to discuss revising the 1997 Charter. At this meeting, the Subcommittee agreed that that "[a] company, without being a member of the VC Chapter, can export VC (but the export quantity needs to be confirmed by other companies)" (hereinafter the "May 2002

12

agreement"). The May 2002 agreement, however, is not reflected, in any way, in the 2002 Charter.

## IX.   Repeal of Verification and Chop

Although not raised by either party, according to the WTO Panel Report, it appears that the 2003 Announcement was formally repealed on May 26, 2008. WTO Panel Report, ¶¶ 7.1013, 7.1056-1057 (citing Communication ([Ministry] and [Customs] (2008) No. 33, May 26, 2008)).

## X.   Charter of the Chamber

The Chamber's own charter (the "2003 Chamber Charter") contains language similar to that found in the Subcommittee's 2002 Charter. The Chamber describes itself as "a nation-wide and self-disciplined social entity voluntarily organized by [importers and exporters of] medicines and health products." According to the 2003 Chamber Charter, the objectives of the Chamber are [inter alia] to "coordinate and guide the import and export of medicines and health products . . . maintain the order of foreign trade, defend fair competition, secure interests of the state and the trade [and] safeguard lawful rights and interests of member organizations." Potential penalties for violations of the 2003 Chamber Charter, "coordination regulations or the Chamber's directives" mirror those found in the 2002 Charter.

With regard to vitamin C, other literature issued by the Chamber along with the 2003 Chamber Charter indicates that the Chamber's Pharmaceutical Department has a number of responsibilities, including "help[ing] the government to manage the import and export of some products, such as Vitamin C . . . ." and "coordinat[ing] and manag[ing]" various sub-chambers, including the Vitamin C sub-chamber.

13

## XI.   Relationship between the Ministry and the Chamber

Three sources address the relationship between the Ministry and the Chamber: (1) "[The Ministry] Measures for Social Organizations, Measure for Administration over Foreign Trade and Economic Social Organizations," dated Feb. 26, 1991 ("1991 Measures"); (2) the "Notice of [the Ministry] regarding Printing and Distribution of Several Regulations for Personnel Management of Chambers of Commerce for Importers and Exporters," dated September 23, 1994 ("1994 Notice"); and (3) the 2003 Chamber Charter.

Pursuant to the 1991 Measures, the Ministry has a supervisory role over organizations "established with coordination and industry regulation functions." This supervisory role includes responsibility for the "daily management" of the organizations, which the 1991 Measures define to include examining the structure, personnel and budget of the organizations and formulating the salaries and benefit plans for the organizations. The 1991 Measures also state that "[s]ocial organizations established with coordination and industry regulation functions as authorized by the [the Ministry] must implement the administrative rules and regulations relating to foreign trade and the economy."

The 1994 Notice, and the regulations annexed thereto, specify that: (1) "[t]he candidates for the senior positions of the chamber are recommended by [the Ministry] (or recommended by over 1/3 of the chamber's member companies and approved by [the Ministry]) and then elected or dismissed by the general meeting of members"; (2) the Chamber's employees are to be chosen primarily from member organizations or the competent authorities in charge of foreign trade; (3) the Chamber's headcount of employees must be verified and approved by the Ministry and then by the Ministry of Civil Affairs; and (4) the Ministry must verify and approve the Chamber's budget for total employee salaries.

14

The 2003 Chamber Charter and accompanying literature also address this relationship, stating that the Chamber implements the government's policies, regulations and "authorization," and "accepts the guidance and supervision of the responsible departments under the State Council." In addition, mirroring the requirements set out in the 1994 Notice, the 2003 Chamber Charter provides that "the candidates for the president, vice-presidents and secretary-general [of the Chamber] may be recommended by the competent authorities, or be recommended jointly by more than one third of members and approved by the competent authorities."

## XII.    WTO and Public Trade Documents

In public statements to the WTO and the United States government, the Chinese government has made representations regarding its regulation of exports generally as well as its specific regulation of vitamin C exports. See Report of Dr. Paula Stern ("Stern Report") (identifying such statements).

In certain documents, China represented that, as of January 1, 2002, it gave up "export administration . . . of vitamin C." In one document, under the heading "any restrictions on exports through non-automatic licensing or other means justified by specific product under the WTO Agreement or the Protocol," China represented that "[f]rom 1 January 2002, China gave up export administration of . . . vitamin C." WTO, Transitional Review under Art. 18 of the Protocol of Accession of the People's Republic of China, G/C/W/438 (2002)[10]; see also Stern Report at 7 (citing WTO, Statement by the Head of the Chinese Delegation on the Transitional Review of China by the Council for Trade and Goods, G/C/W/441 (2002), which states, under

---

[10] This document is not directly cited in the Stern Report, on which plaintiff rely. The Stern Report cites to a "Trade Policy Review" conducted by the WTO, which states that "[o]n January 1, 2002, China abolished export quotas and licenses for, inter alia, . . . Vitamin C." Stern Report at 8 (citing WTO, Trade Policy Review, WT/TPR/S/161Rev.1 (2006)). In support of this proposition, the "Trade Policy Review" cites to WTO, Transitional Review under Art. 18 of the Protocol of Accession of the People's Republic of China, G/C/W/438 (2002).

the heading "[n]on-automatic export licensing requirements under WTO agreement and accession commitments," that "[f]rom January 1, 2002, China gave up export administration of . . . vitamin C."). These WTO documents were not before Judge Trager at the motion to dismiss stage.

## XIII.   The Ministry's Statements in the Instant Litigation Concerning "Self-Discipline"

In an additional statement submitted on summary judgment (the "2009 Statement"), the Ministry describes the Chinese "system of self-discipline." According to the 2009 Statement:

> [The system of 'self-discipline'] has a long history in China and has been well known to, and complied with by, Chinese companies. Self-discipline does not mean complete voluntariness or self-conduct. In effect, self-discipline refers to a system of regulation under the supervision of a designated agency acting on behalf of the Chinese government. Under this regulatory system, the parties involved consult with each other to reach consensus on coordinated activities for the purpose of reaching the objectives and serving the interest as set forth under Chinese laws and policies. Persons engaged in such required self-discipline are well aware that they are subject to penalties for failure to participate in such coordination, or for non-compliance with self-discipline, including forfeiting their export right.

According to the Ministry, vitamin C exporters were governed by self-discipline regulation, the objectives of which were "to maintain orderly export, safeguard the interests of the country as a whole and avoid self-destructive competition." The 2009 Statement also discusses the Ministry's delegation of authority to the Chamber regarding self-discipline.

## XIV.   1998 Opinions

In discussing the notion of "self-discipline prices", Professor Shen and a number of commentators cite to an August 1998 directive issued by the State Economic and Trade Commission ("SETC") entitled "Opinions On Self-Discipline Pricing For Certain Industrial Products" ("1998 Opinions"). Wang Xiaoye, The Prospect of Anti-Monopoly Legislation in China, 2002 Wash. U. Glob. Stud. L. Rev. 201, 208-09; Shen Report ¶ 70. The 1998 Opinions,

which only involved domestic prices, "demanded that the producers of certain industrial products observe the minimum price limits set by their respective trade associations." Wang Xiaoye, 2002 Wash. U. Glob. Stud. L. Rev. at 208; see also Scott Kennedy, The Price of Competition: Pricing Policies and the Struggle to Define China's Economic System, The China Journal No. 49, 19 (Jan. 2003). The minimum prices were based on a product's average costs in the industry. Kennedy, The China Journal No. 49, 19; see also Wang Xiaoye, 2002 Wash. U. Glob. Stud. L. Rev. at 209.

**(3)**

**ACTIONS OF CHINESE MARKET PARTICIPANTS**

**I.     The 1997 Regime**

Between the promulgation of the 1997 Regime and April 2001, the Subcommittee held a number of meetings where defendants reached agreements on price and export quotas. These meetings were attended by officials from both the Chamber and the Ministry.

In 1997, the price of vitamin C was $4.4/kg. At some point, defendants set the minimum price at $5.3/kg and the price rose to at least $5/kg. However, between May 2000 and December 2001, there was a "price war," which resulted in export prices dropping to less than $2.8/kg. This appears to have been caused by an expansion in China's production capacity that stemmed from an apparent "misunderstanding" at a 1999 Subcommittee meeting.

In December 2000, the minimum export price was $5.1/kg. However, as it appears that none of the defendants were following that price, defendants agreed to "nullify" that price and submitted this agreement to the Ministry "for approval."[11]

---

[11] Although the Ministry's counsel suggested at oral argument that, under both the 1997 Regime and the 2002 Regime, the Ministry had "plenary authority" over prices and the power to accept or reject a price, there is no

17

At a Subcommittee meeting in April 2001, the attendees discussed a drop in the price and the recent expansion in China's production capacity. At one point during the meeting, the representative from the Ministry informed the members that:

> Even though VC is not a resource product, it has been strictly regulated since 1997. Regarding the effects of current regulations, generally speaking, the regulation has not been very successful. [The Ministry] attaches importance to the establishment and development of the Chamber, and requires sub-committees to act proactively. Enterprises need to obey the industry agreements and industry rules. When enterprises are maximizing their profits, they also need to consider the interest of the state as a whole.

At the meeting, the manufacturers agreed to reduce the minimum export price from $5.10/kg to $3.20/kg, presumably in accordance with the agreement at the December 2000 meeting. The minutes go on to state that: "However, because the manufacturers have not agreed on the enforcement mechanisms of the verification and chop system, it remains a major question whether this price limit can be enforced effectively."

## II.     Transition to the 2002 Regime

In September and November 2001, the Ministry learned that the European Union was considering bringing an anti-dumping suit against the Chinese vitamin C manufacturers. This information was forwarded to the Chamber. On one document, handwritten notes, apparently from Ministry officials, state: (1) "[p]lease review and get prepared"; (2) "please review and address it"; and (3) "[p]lease investigate this matter."[12]

---

evidence of any industry agreements reached under the 2002 Regime being submitted to the Ministry "for approval." The 2002 PVC Notice, however, does require the Chamber to file an "annual price review report" with the Ministry and Customs.

[12] Defendants' 56.1 Statement does not discuss any of the events that occurred after this information was forwarded to the Chamber. Although defendants' briefs discuss a few of those events in a handful of scattered passages, defendants contend that all of the facts relied on by plaintiffs are "either irrelevant or, in any event, do not prevent entry of judgment in Defendants' favor" because the instant motion should be decided strictly as a matter of a law.

On November 16, 2001, the Chamber held a meeting with defendants.[13]  At the meeting, defendants, "by way of hand voting," agreed to raise the "coordinated export price" to $3/kg starting on January 1, 2002.  Defendants also agreed to limit the total export volume for 2002 to 35,500 tons (with each company receiving individual export volume allocations) and to not expand their production capacity.  Defendants' agreement was "aimed at enhancing the self-discipline of the industry."  In December 2001, the Chamber convened another meeting amongst defendants to discuss implementing this agreement.

Not only is there no affirmative evidence of compulsion in the documents discussing this agreement, but these documents also suggest, on their face, that this agreement was voluntary.[14]  One states, for example, that the participants "concluded that Chinese Vitamin C manufacturers are absolutely capable of realizing the self-discipline of the industry" because (1) China has lower gross costs; (2) "production of Vitamin C in China is highly centralized in four manufacturers and thus, it is relatively easy to reach unison within the industry"; (3) supply is in balance with demand and price declines are psychological; and (4) there is strong growth in demand for Vitamin C as an "irreplaceable product."  Another states:

> [a]nalysis from persons within the industry was that the enterprises were able to sit down together at this particular time because VC prices had reached rock bottom, and no one could sustain a further slide; the next reason was, because the country had opened up the commercial products business from a free competition aspect the enterprises were impelled and had no choice but to seek industry self-regulation.

Similarly, a summary of the December 2001 meeting from Chamber's website notes that:

---

[13]  The meeting was presided over by Qiao Haili, a Chamber official and Secretary-General of the Subcommittee, who appears to have attended all of the formal Subcommittee meetings held under the 2002 Regime.  Although no representative from the Ministry was present at the November 16, 2001 meeting, minutes of the meeting and a copy of the agreement reached at the meeting were forwarded to the Ministry.

[14]  Defendants do not contest the admissibility of any of the documents relied on by plaintiffs.  In addition, not only have plaintiffs offered evidence establishing the admissibility of many of the documents, but, in some instances, witnesses explicitly confirmed at their depositions that the documents accurately reflected what occurred.

through efforts by the Vitamin C Sub-Committee of [the Chamber] . . . domestic manufacturers were able to reach a self-regulated agreement successfully, whereby they would voluntarily control the quantity and pace of exports to achieve the goal of stabilization while raising export prices. Such self-restraint measures, mainly based on 'restricting quantity to safeguard prices, export in a balanced and orderly manner and adjust dynamically' have been completely implemented by each enterprises' own decisions and self-restraint, without any government intervention. Beginning on May 1, 2002, vitamin C was listed as a product requiring price reviews by China's Customs and a seal of pre-approval by the [Chamber], which has provided powerful oversight and safeguards for the implementation of self-restraint agreements among domestic manufacturers.

(Emphasis added).[15]

Some documents discussing the November and December 2001 meetings imply that verification and chop was used to enforce the parties' agreement. However, none of these documents clearly state that defendants' agreements restricting output were enforced through verification and chop. In fact, the document quoted above explicitly refers to "price reviews."

## III.    The 2002 Regime

### A. Meetings and Agreements

Between the beginning of 2002 and the filing of the initial complaint on January 26, 2005, the Subcommittee held numerous "coordination" meetings where defendants reached agreements regarding price and output. There were also a number of Subcommittee meetings where no agreements were reached.[16]

---

[15]  This is the only factual evidence in the record that the Ministry's submissions explicitly address. In its amicus brief, the Ministry asserted that:

in the context of the Ministry's regulation of the vitamin C industry through the Chamber[,] . . . the characterizations by the Chamber of the conduct as 'self-restraint' and 'voluntary' are unremarkable. The vitamin C industry was under a direct Ministry order to reach a 'coordinated' agreement in order to stabilize export pricing. Thus, it is understandable that the Chamber would express its pleasure publicly that the parties were able to comply with the Ministry' order to coordinate pricing and quantities on their own (i.e., 'voluntarily' and in 'self-restraint') as opposed to requiring more direct Ministerial intervention.

[16]  During the pre-filing period, a representative of the Ministry only attended one Subcommittee meeting, which

20

## B. Evidence of Voluntariness

Similar to the record regarding the November 2001 agreement, the relevant documents contain no affirmative evidence of compulsion and, a number of these documents, on their face, suggest voluntariness.[17] For example, one documents notes:

> In 2003, it is expected that the export quota management system will be kept and continue to play a positive role. But, because the international market has turned for the better considerably when compared with the situation in early 2002, the willingness and actual effectiveness of various manufacturers to cooperate will be lower than the days when the market had a difficult time.

(Emphasis added). Similarly, a speech made two days after the instant suit was filed states:

> These VC enterprises, mediated by the [Chamber], took measures [in 2004] to limit production to protect price and to ensure a 'soft-landing' of the price plunge, but in the long run, such allegiance is vulnerable and will easily succumb to the temptation of profit and before the test of time.

## C. Minimum Price

According to defendants' interrogatory answers and the deposition testimony of Wang Qi, a JJPC executive, beginning in May 2002, the minimum price was $3.35/kg throughout the relevant period. However, there is other evidence indicating that, at certain times, higher minimum prices were in effect or no minimum price was in place. An official notice issued by

---

addressed dumping concerns.

[17] The relevant documents make numerous references to "coordination" and "self-discipline." According to the Ministry and Professor Shen, terms such as "coordination," "industry self-discipline" and "voluntary self-restraint" have particular meanings in the context of China's regulatory regime. Thus, the use of such terms may not, in and of themselves, necessarily indicate voluntariness. However, beyond the use of such terms, there is independent factual evidence in the record indicating voluntariness. For example, irrespective of what "industry self-discipline" may mean, there is evidence in the factual record, discussed infra, indicating that, in June 2004, Weisheng violated a shutdown agreement without penalty and that its decision to agree to a new shutdown agreement stemmed solely from problems that Weisheng had with its production line (and not, as defendants' employees now claim, from any compulsion by the Chamber). Furthermore, there does not appear to be any compulsion inherent in "self-discipline" and related terms. Rather, any compulsion is dependent on the specifics of the governmental directives in effect at the time. According to the 2009 Statement, self-discipline regulation required vitamin C exporters to "to coordinate among themselves on export price and production volume in compliance with China's relevant rules and regulations." Therefore, references to "self-discipline" would appear to imply compulsion only if the specific governmental directives underlying the 2002 Regime involved compulsion.

the Chamber in early 2003 indicates that, at the time, there was no minimum price in effect for Vitamin C (or, possibly, that verification and chop had been suspended). Although the notice lists minimum prices for two other products subject to verification and chop, the minimum price field for vitamin C is blank.

Later in the spring of 2003, defendants set a minimum price above $3.35/kg and violated it without punishment. After the price of vitamin C rose in the spring of 2003 to around $15/kg, the price began to rapidly drop. Although defendants agreed at a June 2003 Subcommittee meeting to set a "floor price" of $9.20/kg, this price was not followed; within a few weeks, every manufacturer was quoting prices below this "floor" price. At a meeting in July 2003, the $9.20/kg price was cancelled and the verification and chop price was restored to $3/kg.

It should also be noted that Ning Hong, the primary person at NEPG responsible for negotiating vitamin C prices with American customers, made a number of statements at his deposition suggesting that defendants were rarely, if ever, required to follow the minimum price under verification and chop. Additionally, there is other evidence indicating that NEPG made sales below the minimum price in May and June 2002 and that defendants consistently sold below the minimum price during substantial portions of 2005 and 2006.

### D. Weisheng's Violation of June 2004 Shutdown Agreement

On May 12, 2004, the Subcommittee held a meeting to coordinate an upcoming June production stoppage that defendants had previously agreed to undertake. However, at the meeting, Weisheng announced that it would not participate in the production stoppage. According to Kong Tai, the general manager of JJPC, Weisheng "unilaterally tore up the agreement" for the planned June shutdown. "[U]sing the pretext of conducting a trial run," Weisheng announced it would stop production on an old production line, but not on its "new

15,000-ton production line, where . . . a trial run had been formally launched" four days earlier. "As a result, the agreement fell apart and plans for ceasing production in June were canceled."

On May 24, 2004, Welcome, Northeast and JJPC met and decided on a new shutdown agreement, which appears to have hinged on whether Weisheng would also participate. At a May 28, 2004 internal JJPC meeting, Kong Tai suggested that the possibility of Weisheng participating "was not great." Similarly, an undated NEPG document doubted whether defendants could execute the agreed June shutdown as planned and noted that if the agreement were not followed "the impact on the market will be very serious."[18]

On June 15, 2004, defendants attended a "VC regulation meeting." According to a monthly report prepared by Wang Qi, "[a]t this meeting, Weisheng . . . re-proposed the agenda for quoting while stopping production, because their production line had problems." (Emphasis added).

Defendants' employees asserted, at their depositions, that the Chamber called this meeting, penalized Weisheng for its actions and required Weisheng to agree to the shutdown plan reached at the June 15 meeting. According to Feng Zhen Ying, an employee of Weisheng, when Weisheng initially refused to participate in the shutdown, Weisheng was "penalized by the [Chamber]," which did not allow Weisheng to run its new production lines, even for dry trial runs. According to Wang Qi, when Weisheng failed to follow the original agreement, "the allocation of their quotas were delayed." Feng Zhen Ying also testified that although "Weisheng had a different opinion about the proposed production shutdown" "under the mandatory requirement of the [Chamber, Weisheng] eventually went along" and shut down production. He

---

[18] This document's additional prediction that if the shutdown agreement could be "executed as scheduled . . . . it will have a profound significance for the confidence in forming a continuous mechanism similar to the 'price control mechanism' in the future," is further evidence of the voluntariness of defendants' agreements, particularly regarding output restrictions. Moreover, this document indicates that defendants viewed the mechanism for controlling prices as distinct from the mechanism for restricting output.

asserted that "it was mandated by the government that all manufacturers have to shut down together." Similarly, Wang Qi testified that, "the [Chamber] forced Weisheng to come up with a new plan, with a plan for stoppage . . . . [a]nd forced Weisheng to express . . . consent to this stoppage of production." None of the documentary evidence, however, supports this testimony.

It should also be noted that, at his deposition, Wang Qi admitted that the original shutdown agreement that Weisheng breached did not contain "any clear provisions for penalty." This apparently led someone (perhaps Wang Qi himself) to conclude that subsequent production shutdown agreements should include "very clear cut [penalty] conditions." Relatedly, Wang Qi also testified that, at the time of Weisheng's breach, the Chamber had never considered how to address violations of its "mandatory instructions."

Even after defendants agreed to the new shutdown agreement following Weisheng's breach, defendants were still predicting fierce price competition and even thought that it was possible that prices would fall below costs.

## IV.    Post-Filing Evidence

There are numerous documents in the record created by defendants after the initial complaint in this case was filed on January 26, 2005. These documents indicate that defendants continued to reach agreements in the post-filing period. According to minutes from an April 19, 2005 meeting, at the meeting, Qiao Haili stated that: "[t]he recent antitrust lawsuit is unprecedented, but we shall not suspend the coordination mechanism of the VC industry in our country. If we fail to coordinate, the price will drop and we will face more fearful consequences: the falling price will further trigger antidumping lawsuits . . . ."

Plaintiffs suggest that a fact-finder could conclude that the post-filing documents were crafted (or, at the very least, that the actions described in the documents were taken) to support

defendants' litigation position. Both the timing of these documents and the substance of certain documents could support such an inference.[19] The above notwithstanding, some evidence from this period still warrants brief discussion.

### A. Potential Change in Chinese Law

Although the record does not contain any governmental directives issued after the 2003 Announcement, one post-filing document suggests that the Chinese law governing vitamin C exports changed after the filing of the instant suit. According to the minutes of a November 16, 2005 Subcommittee meeting, at the meeting, Qiao Haili stated that: "Recently Premier Wen Jiabao had an instruction on the enhancement of industrial self-regulation. The Secretary 2d Bureau under the State Council had conducted an analysis aiming at VC, which also asked for resolving the legal status issue of the industrial self-regulation."[20] Neither Premier Wen Jiabao's "instruction" nor the Secretary's analysis is part of the record.

### B. Evidence of Voluntariness

Despite the credibility questions surrounding all of the post-filing documents, it should be noted that certain post-filing documents continue to suggest voluntariness. For example, after defendants set a minimum price and agreed to a production shutdown at a May 2005 meeting, Wang Qi's notes remark that, "due to the damage caused by Weisheng last year, it is still an open

---

[19] In a November 2005 e-mail, Wang Qi's writes:

> This act of deciding production or prices based on coordination is a kind of monopoly whatever the reasons. However, I believe we should not have any worry since the [Ministry] is a friend of the court in the lawsuit. If we won the lawsuit, it would be hard for foreigners to make more trouble. Even if we lost the case, the government would take the foremost part of responsibility. After all, we need to do many things a more hidden and smart way.

(Emphasis added). Also, a December 2005 NEPG report states "must avoid strategies that would appear counter to sales growth and thus speak not further about the antitrust lawsuit. (Emphasis added).

[20] The copy of these minutes in the record includes redacted content both directly before and directly after this quotation.

question as to what extent the consensus made at the meeting will be implemented. We should have a sober estimate of the situation." Also, a December 2005 NEPG report concerning marketing and sales strategy states: "Strengthen self-regulation in the VC industry, but don't rely completely on the 'gentlemen's agreements' of the [Chamber]."

## C. **Evidence Regarding the Chamber Compelling Agreements in the First Instance**

Defendants contend that two post-filing documents evidence the Chamber directing the parties to agree on coordinated production shutdowns. Neither document, however, clearly supports that proposition.

First, defendants point to the minutes of a November 16, 2005 meeting, which defendants assert indicate that "that Qiao Haili of the Chamber was to follow up and determine with the 'Chairman of the Chamber' '[w]hether we should have a production shutdown.'" Although the minutes note that, at the meeting, Qiao Haili stated that the question of whether to conduct a shutdown should be discussed at a follow-up meeting, the minutes do not clearly state that the Chairman of the Chamber would decide this question. Moreover, a November 16, 2005 document authored by Wang Qi discussing the meeting casts doubt on defendants' interpretation of the minutes. This document suggests that JJPC had the ability not to join proposed shutdown if it so desired and explicitly states that the Chamber "once again put forward the suggestion of coordinated termination of production."[21] (Emphasis added).

---

[21] This document also includes the following cryptic passage, discussing "government relations":

> We are reluctant to admit the fact that the [Chamber] will continue to be a major force in coordinating companies of this industry, particularly in a difficult situation. The role of the [Chamber] as the industrial association will be intensified rather than weakened in the future. Therefore, there is no need for us to go beyond [the] coordination of the [Chamber], which will do no good to our current or future work. The work of the [Chamber] will be supported by the Ministry of Commerce. We should not regard the coordination simply as authoritarianism of the [Chamber].

Second, defendants cite to a September 2006 internal NEPG report, which states that "various VC manufacturers in China will successively suspend production." This document, however, does not address what, if any, role the Chamber played in the formation of this shutdown agreement.

### D. **Minimum Price**

As noted earlier, there is evidence of defendants making substantial sales below the minimum price during 2005 and 2006.

### E. **Use of Verification and Chop to Enforce Output Restrictions**

Defendants cite to minutes from a December 2005 meeting indicating that defendants would inspect each other to ensure compliance with a production shutdown agreement and that "[i]f production is not suspended in accordance with the schedule, the Chamber of Commerce will stop issuing export verification and approval seals until the enterprise suspends its production."

There is also other post-filing evidence indicating that verification and chop was used to enforce output restrictions. Ning Hong testified that the Chamber would allocate a certain number of chops to each company and that the company could not exceed that amount. There are also post-filing documents that discuss using "the method of issuing export pre-authorization stamps in order to restrict the export volume."

### V.    **Export Quotas**

According to their interrogatory answers, defendants were subject to export quotas at

---

Not only does this passage raise questions about the voluntariness of defendants' post-filing agreements, but it also suggests, consistent with Qiao Haili's statement, that Chinese law governing vitamin C exports was in flux after the filing of the initial complaint in this case.

various times since 1997.[22]  However, defendants' answers are not entirely consistent as to when

such quotas were imposed.  Although no export quotas appear to have been in place in 2003,

2004 or 2005, export quotas were apparently re-instituted in June 2006.

**(4)**

## INTERPRETING FOREIGN LAW AND DEFERENCE TO STATEMENTS BY FOREIGN GOVERNMENTS

Under Federal Rule of Civil Procedure 44.1, "[d]etermination of a foreign country's law

is an issue of law." Itar-Tass Russian News Agency v. Russian Kurier, Inc., 153 F.3d 82, 92 (2d

Cir. 1998); see also Kim v. Co-op. Centrale Raiffeisen-Boerenleebank B.A., 364 F. Supp. 2d

346, 349 (S.D.N.Y. 2005).  In determining foreign law, courts "may consider any relevant

material or source, including testimony, whether or not submitted by a party or admissible under

the Federal Rules of Evidence." Fed. R. Civ. P. 44.1.  Disputes among experts regarding foreign

law do not create issues of fact. Rutgerswerke AG and Frendo S.p.A. v. Abex Corp., No. 93-cv-

2914, 2002 WL 1203836, at *16 (S.D.N.Y. June 4, 2002).

When a foreign government submits a statement regarding its law, courts have taken

different approaches as to the weight that should be afforded to such statements.

Prior to the enactment of Rule 44.1, the Supreme Court held that such statements should

be considered "conclusive." United States v. Pink, 315 U.S. 203, 220 (1941) (accepting as

conclusive declaration from Russian government that nationalization decree was intended to

have extraterritorial effect); see also Agency of Canadian Car & Foundry Co. v. American Can

Co., 258 F. 363, 368-69 (2d Cir. 1919) (finding statement from Russian government that

---

[22]  Although the time period covered by defendants' answers regarding export quotas includes the 1997 Regime, the pre-filing period under the 2002 Regime and the post-filing period under that regime, defendants make no effort to explain, for example, the difference between quotas set under the 1997 Regime and those set during the post-filing period under the 2002 Regime.

individual was authorized to act on behalf of government in entering assignment and release was "binding and conclusive in the courts of the United States against that government").

However, more recent authorities, including the Second Circuit and the Justice Department, have moved away from the view that a foreign government's position on its own law is conclusive and precludes any further inquiry.

The Justice Department's current position on this issue is that:

As a general matter, the Agencies regard the foreign government's formal representation that refusal to comply with its command would [give rise to the imposition of penal or other severe sanctions] as being sufficient to establish that the conduct in question has been compelled, as long as that representation contains sufficient detail to enable the Agencies to see precisely how the compulsion would be accomplished under local law.

* * * *

The Agencies may inquire into the circumstances underlying the statement and they may also request further information if the source of the power to compel is unclear.

1995 Antitrust Enforcement Guidelines for International Operations (promulgated by the Dept. of Justice, April 5, 1995) ("Antitrust Guidelines"), at § 3.32 & n. 94, available at http://www.justice.gov/atr/public/guidelines/internat.htm (last visited Sept. 1, 2011).

More importantly, in a recent decision, the Second Circuit held "that a foreign sovereign's views regarding its own laws merit - although they do not command - some degree of deference." Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara ("Pertamina"), 313 F.3d 70, 92 (2d Cir. 2002) (adopting the Indonesian's government's position regarding the ownership, under Indonesian law, of majority of funds in dispute, but reaching a contrary position regarding a portion of the funds). In denying defendants' motion to dismiss, Judge Trager, relying on Karaha Bodas, concluded that the Ministry's amicus brief was "entitled to substantial deference, but would not be taken as conclusive evidence of compulsion,"

particularly given that the plain language of the documentary evidence submitted by plaintiffs directly contradicted the Ministry's position. Judge Trager also noted that, unlike <u>Karaha Bodas</u>, both <u>Pink</u> and <u>American Can</u> were decided prior to the promulgation of Rule 44.1.

Defendants contend that I should not follow <u>Karaha Bodas</u> because it did not discuss <u>Pink</u> or <u>American Can</u>. Defendants also point out that the defendant's brief in <u>Karaha Bodas</u> did not cite to either case and never even argued that "conclusive" deference was required. I disagree.

<u>Karaha Bodas</u> is the law of the Circuit, particularly given that, as Judge Trager noted, one subsequent panel has explicitly relied on <u>Karaha Bodas</u> on this issue. <u>See</u> <u>Villegas Duran v. Arribada Beaumont</u>, 534 F.3d 142, 148 (2d Cir. 2008), <u>vacated on other grounds</u>, 130 S. Ct. 3318 (2010). Also, as Judge Trager noted, <u>Karaha Bodas</u> was decided after the promulgation of Rule 44.1. <u>Cf.</u> <u>Riggs Nat. Corp. & Subsidiaries v. C.I.R.</u>, 163 F.3d 1363, 1368 (D.C. Cir. 1999) (citing Rule 44.1 and analogous Tax Court rule and noting the court's "hesitant[ance] to treat an interpretation of law as an act of state [under the act of state doctrine], for such a view might be in tension with rules of procedure directing U.S. courts to conduct a de novo review of foreign law when an issue of foreign law is raised").[23] Furthermore, although <u>Karaha Bodas</u> may accord less deference to a foreign government's statement than the Justice Department's position, this is merely a question of degree. <u>Karaha Bodas</u> and the Justice Department's position, which explicitly takes <u>Pink</u> into account, <u>see</u> Brief for the United States as Amicus Curiae Supporting Petitioners, <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, (No. 83-2004), 1985 WL 669667, at *23 ("<u>Matsushita</u> Amicus Br.") ("the [foreign] government's assertions concerning the existence and meaning of its domestic law <u>generally</u> should be deemed 'conclusive.' <u>United</u>

---

[23] One district court decision post-dating Rule 44.1 continued to apply <u>Pink</u>'s conclusive deference standard. <u>D'Angelo v. Petroleos Mexicanos</u>, 422 F. Supp. 1280, 1285-86 (D. Del. 1976), <u>aff'd</u>, 564 F.2d 89 (3d Cir. 1977 (table case). However, that decision, which viewed the relevant inquiry as an "act of state" question, <u>id.</u> at 1281, did not discuss the potential impact of the Rule 44.1. <u>Compare</u> <u>Riggs</u>, 163 F.3d at 1368.

States v. Pink, 315 U.S. 203, 220 (1942)") (emphasis added), both acknowledge that a foreign government's statement is not entitled to absolute and conclusive deference in all circumstances and that further inquiry behind that statement is permissible.

It must be noted that, for certain issues, the governmental directives contain language that contradicts the position taken by the Ministry and neither the Ministry nor Professor Shen address the problematic language. In such circumstances, I must consider the plain language of the governmental directives. Although I would consider the notion that an interpretation suggested by the plain language of a governmental directive may not accurately reflect Chinese law, I cannot ignore such plain language without some explanation as to why it should be disregarded.[24]

**(5)**

**DEFENDANTS' DEFENSES**

**I.      Comity**

> 'Comity,' in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws.

Hilton v. Guyot, 159 U.S. 113, 163-64 (1895).

As Judge Trager's opinion noted, often-cited decisions by the Ninth and the Third Circuits adopted various factors for courts to consider in determining whether to assert

---

[24] In different circumstances, I may have requested that the parties and the Ministry further address these provisions. However, defendants and the Ministry have had more than ample opportunity to explain the relevant Chinese law. Notably, in the 2009 Statement, the Ministry's most recent submission, the Ministry elected not to discuss, or cite to, any specific governmental directives or Chamber documents.

extraterritorial jurisdiction in an antitrust suit.[25]  Timberlane Lumber Co. v. Bank of America,

N.T. and S.A., 549 F.2d 597, 614 (9th Cir. 1976); Mannington Mills, Inc. v. Congoleum Corp.,

595 F.2d 1287, 1297-98 (3d Cir. 1979).

However, the Supreme Court has not adopted these tests and their continuing validity (or

at the very least their proper application) is unclear after the Supreme Court's decision addressing

comity in Hartford Fire Ins. Co. v. California, 509 U.S. 764 (1993), an antitrust suit against

British reinsurers.  "The only substantial question in [Hartford Fire was] whether 'there [was] in

fact a true conflict between domestic and foreign law.'"  Id. at 798 (citation omitted).  The Court

concluded that no such conflict exists when a defendant can comply with both United States and

foreign law, "even where the foreign state has a strong policy to permit or encourage [the

conduct that violates American law]."  Id. at 799.  The Court found no such conflict with British

law as the defendants were not "required . . . to act in some fashion prohibited by the law of the

---

[25]  The Timberlane factors are:

(1)    Degree of conflict with foreign law or policy,
(2)    Nationality or allegiance of the parties and the locations or principal places of businesses or corporations
(3)    Extent to which enforcement by either state can be expected to achieve compliance,
(4)    Relative significance of effects on the United States as compared with those elsewhere,
(5)    Extent to which there is explicit purpose to harm or affect American commerce,
(6)    Foreseeability of such effect, and
(7)    Relative importance to the violations charged of conduct within the United States as compared with
       conduct abroad.

The Mannington Mills factors are:

(1)    Degree of conflict with foreign law or policy;
(2)    Nationality of the parties;
(3)    Relative importance of the alleged violation of conduct here compared to that abroad;
(4)    Availability of a remedy abroad and the pendency of litigation there;
(5)    Existence of intent to harm or affect American commerce and its foreseeability;
(6)    Possible effect upon foreign relations if the court exercises jurisdiction and grants relief;
(7)    If relief is granted, whether a party will be placed in the position of being forced to perform an act illegal in
       either country or be under conflicting requirements by both countries;
(8)    Whether the court can make its order effective;
(9)    Whether an order for relief would be acceptable in this country if made by the foreign nation under similar
       circumstances;
(10)   Whether a treaty with the affected nations has addressed the issue.

United States" and there was no claim "that their compliance with the laws of both countries is otherwise impossible." Id. The Court declined "to address other considerations that might inform a decision to refrain from the exercise of jurisdiction on grounds of international comity." Id.

It is thus not clear that a comity analysis is still permitted in the absence of the type of true conflict envisioned by Hartford Fire. See Filetech S.A.R.L. v. France Telecom, 978 F. Supp. 464, 478 (S.D.N.Y. 1997) (holding, in antitrust suit, that a true conflict under Hartford Fire is a threshold requirement for any comity analysis), vacated on other grounds, 157 F.3d 922 (2d Cir. 1998). However, even assuming that it were, any such analysis would focus exclusively on Timberlane's other factors and would not consider China's encouragement and approval of defendants' price-fixing. As one commenter who strongly supports Timberlane's expansive comity analysis has conceded, after Hartford Fire, "litigants are free to make comity arguments relying on the other factors outlined in the cases and the Restatements, but may not rely upon the conflict between national policies, unless the conflict rises to the level of outright compulsion."[26] Spencer Weber Waller, Antitrust and American Business Abroad (2009) § 6:21; see also Metro Indus., Inc. v. Sammi Corp., 82 F.3d 839 (9th Cir. 1996) (limiting comity analysis to remaining Timberlane factors after finding no conflict with foreign law or policy because the Korean design registration system at issue was not compelled by the Korean government).

Unless defendants' price-fixing was compelled by the Chinese government, dismissal on comity grounds would not be justified. Once Timberlane's first factor is excluded from

---

[26] Defendants' only response to Hartford Fire is a citation to the Justice Department's antitrust enforcement guidelines, which state that "[i]n deciding whether or not to challenge an alleged antitrust violation, the Agencies would, as part of a comity analysis, consider whether one country encourages a certain course of conduct, leaves parties free to choose among different strategies, or prohibits some of those strategies." Antitrust Guidelines § 3.2. The unsurprising fact that the Justice Department still considers these factors in exercising its prosecutorial discretion does not indicate that courts may, in direct contradiction to Hartford Fire, consider a foreign government's encouragement of conduct in a comity analysis.

consideration, the instant case essentially becomes no different than any other worldwide price-fixing conspiracy by foreign defendants that includes the United States as one of its primary targets. Although this case could affect foreign relations, these foreign policy concerns stem directly from the degree of conflict between Chinese and American laws and policies.

## II.   Foreign Sovereign Compulsion

### A. Overview

> The defense of foreign sovereign compulsion . . . focuses on the plight of a defendant who is subject to conflicting legal obligations under two sovereign states . . . [and] recognizes that a defendant trying to do business under conflicting legal regimes may be caught between the proverbial rock and a hard place where compliance with one country's laws results in violation of another's.

584 F. Supp. 2d at 551. Although the Supreme Court in Hartford Fire did not explicitly discuss the foreign sovereign compulsion defense ("FSC defense") as a distinct doctrine or absolute bar to antitrust liability, the Court recognized that abstention on comity grounds may be warranted where compulsion creates a true conflict. Other courts have recognized compulsion as a distinct defense or as a "[a] corollary to the act of state doctrine," Timberlane, 549 F.2d at 606 (reasoning that "corporate conduct which is compelled by a foreign sovereign" is treated as "if it were an act of the state itself.").

In addition to fairness concerns, the FSC defense also acknowledges comity principles by accommodating the interests of equal sovereigns and giving due deference to the official acts of foreign governments. Antitrust Guidelines § 3.32. The fact that a foreign government compels certain activity ordinarily indicates that the activity implicates its "most significant interests." Matsushita Amicus Br. at *21. Relatedly, the FSC defense also recognizes "that compelled conduct often raises foreign policy concerns that are primarily the province for the Executive Branch." Brief for the United States as Amicus Curiae Supporting Appellants, Matsushita, 1985

34

WL 669663, at *14-15; see also Matsushita Amicus Br. at *19.

The burden of proof for the FSC defense is on defendants. Matsushita Amicus Br. at 22; cf. Bigio v. Coca-Cola Co., 239 F.3d 440, 453 (2d Cir. 2000) (addressing act of state doctrine).

According to the Justice Department, for the FSC defense to apply, the defendant must face "the imposition of penal or other severe sanctions" for refusing to comply with the foreign government's command. Antitrust Guidelines § 3.32. The Justice Department has also recognized the FSC defense to be applicable where refusal to comply with the command of a foreign sovereign would be futile.[27]

"Of course, the [FSC] defense is not available for conduct going beyond what the foreign sovereign compelled." Weber Waller, Antitrust and American Business Abroad § 8:23 n.6; see also Mannington Mills, 595 F.2d at 1293 ("One asserting the defense must establish that the foreign decree was basic and fundamental to the alleged antitrust behavior and more than merely peripheral to the overall illegal course of conduct"); cf. United Nuclear Corp. v. General Atomic Co., 629 P.2d 231, 259 (N.M. 1980) (explaining that even if defendant was compelled to participate in cartel by the Canadian government, the act of state doctrine would not bar inquiry into whether defendant "went beyond the scope of the cartel as the Canadian Government defined it").

## B. Animal Science and the FSC Defense

In Animal Science, the court addressed the FSC defense, concluding that the only pertinent question in determining the applicability of the FSC defense was whether the

---

[27] In Matsushita, a predatory pricing case that went up to the Supreme Court, the Japanese government represented that if the defendants had failed to follow the government's direction to enter into minimum price agreements and a customer division regulation, the government would have invoked its power to unilaterally impose those export restrictions. Brief for the Government of Japan as Amicus Curiae in Support of Petitioners, Matsushita, 1985 WL 669665, at 13a-14a. The United States' amicus brief found this sufficient to establish the FSC defense. Matsushita Brief at *24-25. The Supreme Court, however, did not reach the FSC defense. 475 U.S. 574 (1986).

defendants were compelled to abide by the minimum prices set through the relevant Chamber.[28] 702 F. Supp. 2d 320, vacated on other grounds, --- F.3d ----, 2011 WL 3606995 (3d Cir. Aug. 17, 2011. The court considered the question of "how the minimum prices came about" to be irrelevant. Id. at 438 & n. 119. According to the court, the plaintiffs were challenging the defendants' decision to follow the minimum price and the defendants' "coining" of that minimum price was "a ministerial task entirely different from the challenged conduct." Id. at 438. The court also reasoned that a person (be they a legislator, agency official or company in a regulated industry) who participates in "coining" a law or regulation is not exempted from the compulsion of the resulting law or regulation. Id. at 424-25, 438.

I disagree with the approach taken in Animal Science. If the defendants in Animal Science were not compelled to reach minimum price agreements in the first instance, the fact that such agreements were enforced would not appear sufficient to establish the FSC defense. It should be noted that, in a footnote, the court in Animal Science went on to explain that even if the question of "how the minimum price came about" was relevant, based on the Ministry's statements in the instant case, the defendants in Animal Science had a mandatory obligation to engage in deliberations about the minimum price and that "an attempt to filibuster would cause a substantial punishment." Id. at 438 n. 119. However, as explained below, I disagree with the Ministry's position. Furthermore, the court in Animal Science did not address whether, given the discretion that the defendants had to set the level of the price, prices set above the minimum level necessary to avoid anti-dumping suits and below-cost pricing would be beyond the scope of any potential compulsion.

---

[28] The defendants in Animal Science, Chinese magnesite producers, were not governed by verification and chop. However, they were still subject to export quotas, which were set by the Ministry, and a minimum price. The court's compulsion analysis focused on the minimum price, which was determined through meetings of the producers convened by the relevant Chamber and then registered with, and enforced by, the Ministry. Selling below the minimum price could result in penalties, including fines, loss of quota allotment and revocation of export license.

## III. The State Action Doctrine

Where a state enacts programs regulating domestic commerce, the state action doctrine

provides antitrust immunity for the regulated private parties who participate in such programs.

S. Motor Carriers Rate Conference, Inc. v. United States, 105 S.Ct. 1721, 1726 (1985). To

qualify for immunity under the state action doctrine, the anticompetitive restraint must be

"clearly articulated and affirmatively expressed as state policy" and "the State must actively

supervise any private anticompetitive conduct." Id. at 1727. The state action defense applies to

state policies that "permit, but do not compel, anticompetitive conduct by regulated parties." Id.

at 1728; see also Parker v. Brown, 317 U.S. 341 (1943).

Defendants argue that even if they fail to qualify for the FSC defense, the state action

doctrine should be applied to regulatory programs enacted by foreign governments. One recent

decision has rejected this argument. In re Transpacific Passenger Air Transp. Antitrust Litig.,

No. C 07-5634, 2011 WL 1753738, at *16 (N.D. Cal. May 9, 2011). Also, in its amicus brief to

the Supreme Court in Matsushita, the Solicitor General distinguished the FSC defense from the

state action defense and suggested that the state action defense should not apply in the foreign

context. Matsushita Amicus Br. at 20-22.

It is unnecessary to determine whether the state action doctrine should be available to

defendants because they have not even attempted to establish the active supervision prong. After

plaintiffs raised this issue in their opposition brief, defendants responded that, as matter of

comity, they should not have to meet the strict requirements of the state action doctrine. As

discussed previously, absent compulsion, dismissal on comity grounds is not warranted.[29]

---

[29] One commentator has suggested that a defendant exercising authority delegated by a foreign government should be entitled to an even broader defense than is available under the state action doctrine. Weber Waller, Antitrust and American Business Abroad § 8:20. In Continental Ore Co. v. Union Carbide & Carbon Corp., a subsidiary of the defendant was delegated authority by the Canadian government to act as the exclusive purchasing agent for the

## IV.    Act of State Doctrine

### A. Overview

The act of state doctrine is a judge-made rule of federal common law. Antitrust Guidelines § 3.33. The "doctrine directs United States courts to refrain from deciding a case when the outcome turns upon the legality or illegality (whether as a matter of U.S., foreign, or international law) of official action by a foreign sovereign performed within its own territory." Riggs Nat. Corp. & Subsidiaries v. C.I.R., 163 F.3d 1363, 1367 (D.C. Cir. 1999). Although the doctrine was originally based on considerations of international comity, more recent decisions have focused on the doctrine "as a consequence of domestic separation of powers, reflecting 'the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder' the conduct of foreign affairs." W.S. Kirkpatrick & Co., Inc. v. Envtl. Tectonics Corp., Int'l, 493 U.S. 400 (1990) (quoting Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 423 (1964)). "The act of state doctrine is not some vague doctrine of abstention but a 'principle of decision binding on federal and state courts alike.'" Id. at 406 (quoting Sabbatino, 376 U.S. at 427). Defendants bear the burden of proof to justify application of the act of state doctrine. Bigio, 239 F.3d at 453.

The factual predicate for application of the act of state doctrine only exists where the suit "requires the Court to declare invalid, and thus ineffective as a rule of decision for the courts of this country, the official act of a foreign sovereign." W.S. Kirkpatrick, 493 U.S. at 405 (citation and internal marks omitted). Thus, "[a]ct of state issues only arise when a court must decide -

---

Canadian vanadium market. 370 U.S. 690, 706-07 (1962). The subsidiary used that authority to exclude a seller, which competed with the defendant, from the Canadian market. In refusing to apply the act of state doctrine, the Supreme Court explained that the subsidiary's exclusion of the competing seller was neither compelled nor approved by the Canadian government. Continental Ore "leaves open the possibility that delegated conduct shown to have been consistent with the standards and purposes of the foreign regulatory program will not be treated as harshly as purely private conduct." Antitrust and American Business Abroad § 8:20. However, the Supreme Court and the Second Circuit have yet to recognize such a far-reaching defense and I decline to do so here.

that is, when the outcome of the case turns upon the effect of official action by a foreign sovereign." Id. at 406. However, even where the factual predicate for the act of state doctrine is met, courts, applying a balancing approach, can refuse to apply the doctrine if the policies underlying the doctrine do not justify its application. Id. at 409.

## B. Act of State Doctrine and Compulsion

Defendants argue that the act of state doctrine is applicable to the instant case based on the following logic: because defendants' actions were compelled by the Ministry, defendants' acts are "effectively" the acts of the Ministry – thus, any challenge to defendants' conduct is, in essence, a challenge to official actions taken by the Ministry. Although this makes sense – assuming defendants' conduct was compelled – it is not clear how proceeding under the act of state doctrine, as opposed to the related FSC defense, adds anything to defendants' case.

There are, however, two other ways in which the act of state doctrine may be applicable to instant suit.

## C. Inquiry into the Motivation of Foreign Governments and Officials

Defendants argue that the act of state doctrine does not require compulsion, citing the Antitrust Guidelines. Antitrust Guidelines § 3.33 ("[a]lthough in some cases the sovereign act in question may compel private behavior, such compulsion is not required by the doctrine"). This section of the Antitrust Guidelines suggests that the relevant agencies consider the act of state doctrine to be applicable to certain suits where a court would be required to inquire into the motivation of the foreign state for taking an action.[30]

---

[30] In asserting that the act of state doctrine does not require compulsion, the Antitrust Guidelines cite to Timberlane, 549 F.2d at 606-08. In Timberlane, the plaintiff alleged that, as part of a scheme to put the plaintiff out of business, the defendants filed suit in Honduran courts and foreclosed on security interests that they held on the plaintiffs' assets. Invoking the act of state doctrine, the defendants relied on an earlier decision that had applied the doctrine to bar a suit alleging that the defendants induced a foreign government to assert fraudulent claims over the scope of its territorial waters in order to interfere with the plaintiff's oil concession. Timberlane, 549 F.2d at 608 (discussing

The Second Circuit has held that the act-of-state doctrine bars inquiry into a foreign government's motivations for taking a specific action. See Hunt v. Mobil Oil Corp., 550 F.2d 68 (2d Cir. 1977) (dismissing suit that could not be resolved without determining that, but for defendants' actions, the Libyan government would not have seized and nationalized plaintiff's assets); O.N.E. Shipping Ltd. v. Flota Mercante Grancolombiana, S.A., 830 F.2d 449, 452 (2d Cir.1987) (citing Hunt and dismissing suit where defendants allegedly manipulated the Colombian government into implementing discriminatory cargo laws that injured plaintiff).

However, I believe that these decisions have been overruled by W.S. Kirkpatrick. See Antitrust and American Business Abroad § 8:11 ("The reasoning of [Buttes] and Hunt regarding the motivations of the foreign states has not survived [W.S. Kirkpatrick]."); Lamb v. Phillip Morris, Inc., 915 F.2d 1024 (6th Cir. 1990) (post-W.S. Kirkpatrick decision refusing to apply act of state doctrine where defendants allegedly agreed to make payments in exchange for price controls on Venezuelan tobacco that injured domestic tobacco growers).[31]

In any event, in the instant case, no inquiry into the motivation of the Ministry in promulgating the relevant governmental directives is necessary. This is because plaintiffs have not pursued the potential argument that the FSC defense is inapplicable because defendants procured those directives.[32] Rather than contending that Hunt and O.N.E. Shipping were

---

Occidental Petroleum Corp. v. Buttes Gas & Oil Co., 331 F. Supp. 92 (C.D. Cal. 1971), aff'd, 461 F.2d 1261 (9th Cir. 1972)). These appear to be the type of non-compelled scenarios envisioned by the Antitrust Guidelines, which indicate that "Agencies may refrain from bringing an enforcement action based on the act of state doctrine" where the "restraint on competition arises directly from the act of a foreign sovereign, such as the grant of a license, award of a contract, expropriation of property, or the like." Antitrust Guidelines § 3.33.

[31] Given W.S. Kirkpatrick, it is not clear why the Antitrust Guidelines take the position that inquiries into the motivations of a foreign state are still barred by the act of state doctrine. The explanation may be that, for purposes of making enforcement decisions, the Antitrust Guidelines take a more expansive view of the act-of-state doctrine than the one adopted by the Court in W.S. Kirkpatrick. Notably, in W.S. Kirkpatrick, the Justice Department, as an amicus, advocated such a position, which was ultimately rejected by the Court. 493 U.S. at 408-09.

[32] Although plaintiffs do not pursue this argument, in their 56.1 statement and the facts section of their brief,

overruled by W.S. Kirkpatrick, plaintiffs simply distinguish those decisions on the ground that they both involved situations where the foreign government took an action that harmed the plaintiff. Because plaintiffs argue that verification and chop did not involve any compulsion, they reason that it was defendants' voluntary actions, rather than the sovereign acts of the Chinese government, that harmed them.[33]

### D. Inquiry into Foreign Officials' Compliance with and Enforcement of Foreign Law

Courts have invoked the act of state doctrine to preclude inquiry "behind" sovereign acts. This can occur where a party contends that a sovereign act is in derogation of the sovereign's own laws. The doctrine has also been applied where a party seeks to establish that a foreign government has failed to comply with and enforce its own laws.

Defendants rely on Interamerican Refining Corp. v. Texaco Maracaibo, Inc., 307 F. Supp. 1291 (D. Del. 1970), where the plaintiff, in an attempt to rebut an assertion of the FSC defense, sought to establish that an oral order given by a Venezuelan official was not binding and compulsive because, under Venezuelan law, the official had no authority to issue the order and such oral orders were not binding. Through the affidavit of a Venezuelan attorney, the plaintiff

---

plaintiffs contend that the verification and chop system "was adopted by agreement among [d]efendants," citing to the statement from the April 2001 Subcommittee meeting that "because the manufacturers have not agreed on the enforcement mechanisms of the verification and chop system, it remains a major question whether this price limit can be enforced effectively." This and other evidence in the record suggests that defendants and Chinese officials were co-equal players in the regime governing vitamin C, and indeed, it may be that defendants were the leaders, in designing that regime.

[33] The act of state doctrine would not have prevented plaintiffs from arguing that the FSC defense should be inapplicable because defendants procured the alleged compulsion. The court in Interamerican Refining Corp. v. Texaco Maracaibo, Inc., 307 F. Supp. 1291, 1297 (D. Del. 1970), suggested that the FSC defense should not be recognized in such circumstances. I am sympathetic to this view. Certainly, the fairness concerns behind the FSC defense would no longer be applicable where the compulsion was procured by the defendant. Moreover, where, as in the instant case, defendants enthusiastically embrace a legal regime that encourages, or even "compels," a lucrative cartel that is in their self-interest, any inquiry into the applicability of the FSC defense is artificial. In such circumstances, the presence or absence of compulsory measures is seemingly irrelevant, for they are never going to be needed. To borrow a metaphor used by Mao Tse-Tung, the concept of "coercion" in this context is a paper tiger. Ultimately, it is unnecessary to rely on the above points to resolve this motion because I conclude that the 2002 Regime did not involve any compulsion.

sought to establish this both, as a legal matter, and, somewhat confusingly, as a factual matter at trial, id. at 1301 ("[the plaintiff] urges that it be permitted to show at trial that the order was not binding because oral and without legal authority"). Although the court explained that "whether or not [the Venezuelan] official 'ordered' certain conduct is an evidentiary question," the court rejected plaintiff's arguments based on the act of state doctrine, which precluded the court from examining the validity of the order under Venezuelan law.[34] Id. The court added that whether the act was legal or "compulsive" under the laws of Venezuela is not a proper inquiry for either a court or a jury and that "[o]nce governmental action is shown, further examination is neither necessary nor proper. Id. Because plaintiffs here do not argue that the governmental directives establishing the 2002 Regime are invalid under Chinese law, Interamerican is largely irrelevant to the instant motion.

West v. Multibank Comerex, S.A., 807 F.2d 820 (9th Cir. 1987), is arguably more relevant to the instant motion. In West, the Ninth Circuit held that the act of state doctrine bars inquiry into whether foreign officials are failing to enforce their own laws. In order to resolve a securities suit involving certificates of deposit issued by a Mexican bank, the court had to determine whether the Mexican banking regulatory scheme (which included supervision by the government, capital and reserve requirements, and other safeguards) "virtually guaranteed repayment in full." Id. at 827. The plaintiffs argued the regulatory regime only met this standard "on paper" because, in practice, Mexican officials neither complied with nor enforced these laws. Id. Invoking the act of state doctrine, the Ninth Circuit rejected this argument, holding that

---

[34] The plaintiff in Interamerican argued that its evidence of Venezuelan law, as well as other facts, "refute[d] the existence of [the alleged] order." Pl.'s Br. in Opp. to Def.'s Motions for Summ. Judg., Interamerican, No. 2808 (May 28, 1969). However, the plaintiff addressed this argument in a single, brief, paragraph and made no effort to explicitly explain how its evidence of Venezuelan law should have been considered in making this factual determination.

courts "may not examine the actual operations of the regulatory system to the extent that such inquiry would directly implicate the failure (whether willful or negligent) of officers of the foreign state to enforce their own laws." Id. at 828. The court went on to note that "[a]s a matter of comity, we presume that Mexican officials are acting in a manner consistent with the requirements of Mexican law."[35] Id.

(6)

ANALYSIS

To resolve defendants' motion for summary judgment, I must: (1) determine what deference, if any, should ultimately be accorded to the Ministry's interpretation of Chinese law; (2) determine what, if any, consideration should be given to the factual record, which defendants contend is irrelevant to the instant motion; (3) interpret Chinese law. These three inquiries are, to a certain degree, interrelated.

At the outset, I am compelled to note that the Chinese law and regulatory regime that defendants rely on is something of a departure from the concept of "law" as we know it in this country – that is, a published series of specific conduct-dictating prohibitions or compulsions with an identified sanctions system. To give but one example, the regulatory system governing

---

[35] The viability of West after W.S. Kirkpatrick is questionable. Although West's rationale for invoking the act of state doctrine is not entirely clear, its primary justification appears to have been that a challenge to the effectiveness of Mexican officials would embarrass the Mexican government and "intrude upon [Mexico's] coequal status." Id. at 827-828. However, W.S. Kirkpatrick made clear that "[t]he act of state doctrine does not establish an exception for cases and controversies that may embarrass foreign governments, but merely requires that, in the process of deciding [a case], the acts of foreign sovereigns taken within their own jurisdictions shall be deemed valid." 493 U.S. at 409. The court in West also relied on Clayco Petroleum Corp. v. Occidental Petroleum Corp., 712 F.2d 404, 406-07 (9th Cir.1983). However, as noted earlier, "motivation" decisions such as Clayco, which invoked Buttes to bar inquiry into whether bribes paid to a foreign government resulted in the plaintiff losing an oil concession, appear to no longer be viable after W.S. Kirkpatrick. Given the above concerns about West, I also question the continuing viability of the Second Circuit's broad dicta in O.N.E. Shipping, asserting that "[i]n essence, the act of state doctrine is a principle of law designed primarily to avoid judicial inquiry into the acts and conduct of the officials of the foreign state, its affairs and its policies and the underlying reasons and motivations for the actions of the foreign government." 830 F.2d at 452 (emphasis added).

43

vitamin C not only relies on consensus-based decision making, but also accords defendants wide, and possibly unbounded, discretion in setting the price and output levels for vitamin C. In addition, defendants' own expert asserts that oral directives are an important component of Chinese regulatory law and admits that "Chinese governmental control is a quite different process from what takes place in other countries." Of course, foreign legal regimes that are markedly different from our own can still, in their own unique ways, compel a defendant's conduct. However, in some circumstances, asserting a claim of compulsion under a foreign regime that so differs from our own concept of law can be akin to trying to fit a round peg into a square hole. Close ties and cooperation between government and industry does necessarily equal compulsion, particularly in situations where compulsion appears unnecessary.

For the reasons explained below, I respectfully decline to defer to the Ministry' interpretation of Chinese law and conclude, based on what may be considered the more traditional sources of foreign law – primarily the governmental directives themselves as well as the charter documents of the Subcommittee and the Chamber – that the 2002 Regime did not compel defendants' conduct. This interpretation is further supported by the factual record. In interpreting Chinese law, I find it appropriate to consider the factual record concerning how Chinese law was enforced and applied.[36] In addition, as explained below, to the extent that the factual record contains any disputed issues of fact that are relevant to the task of interpreting

---

[36] I have concluded that it is appropriate to look to the factual record to help interpret the governmental directives at issue. There is also a strong argument that consideration of the factual record is necessary because any oral directives by officials of the Ministry and the Chamber appear to be an essential part of the Chinese law governing vitamin C. According to Professor Shen, "it is normal for [regulatory documents promulgated by the Ministry] to be expressed at a level of generality that then must be applied and implemented in specific contexts." This application and implementation "frequently" occurs through "oral directions, even including telephone calls." I also note that defendants themselves suggest that coordination was only required when the Chamber "direct[ed] the manufacturers to cooperate as to prices or output." If that were the case, an inquiry into what the representatives of the Chamber communicated to the defendants would be necessary to resolve the FSC defense. Of course, the above discussion assumes that the act of the state doctrine would be equally applicable to both oral directives and written law, a conclusion as to which I harbor some doubt.

Chinese law, such disputes are for the Court to resolve.

I.    **Deference to the Ministry's Statements**

Except for the Ministry's explanation of the relationship between the Ministry and the Chamber,[37] I respectfully decline to defer to the Ministry's interpretation of Chinese law.  As explained below, the Ministry fails to address critical provisions of the 2002 Regime that, on their face, undermine its interpretation of Chinese law.  "[T]he support of a foreign sovereign for one interpretation furnishes legitimate assistance in the resolution of interpretive dilemmas" "[w]here a choice between two interpretations of ambiguous foreign law rests finely balanced."  Karaha Bodas, 313 F.3d at 90.  However, that is not the case here, particularly given the Ministry's failure to address key provisions of the 2002 Regime.[38]

I note that three significant flaws in the Ministry's 2009 Statement render it particularly undeserving of deference.  First, in contrast to the Ministry's amicus brief, which at least attempted to explain the regulatory system governing vitamin C exports by citing to, and discussing, specific governmental directives and Chamber documents, the 2009 Statement does

---

[37]  According to the Ministry, "specific chambers of commerce, when authorized by the Ministry to regulate, act in the name, with the authority, and under the active supervision, of the Ministry."  In sum, the Ministry asserts that the Chamber is "the instrumentality through which the Ministry oversees and regulates the business of importing and exporting medicinal products in China," including vitamin C.

Plaintiffs challenge the Ministry's position arguing that: (1) the 1991 Measures granting the Ministry supervisory authority over the Chamber were abolished and, under subsequent laws, the Chamber was treated no differently than other social organizations in China; and (2) representations made by other Chambers indicate that the Chamber is a non-governmental organization that is independent of the government.  Neither of these arguments is persuasive.  At the very least, the Chamber was delegated authority, under the 2002 Regime, to grant and deny chops, which, in some circumstances, were required for export.  In addition, the 1991 Measures and 1994 Notice (both of which were still in force during the relevant period), as well as the 2003 Chamber Charter, all establish that the Ministry held a special supervisory role over the Chamber.  However, none of these points, standing alone, establish compulsion or require dismissal under the act of state doctrine.

[38]  The United States' submissions in the WTO proceeding relied on the amicus brief and statements submitted by the Ministry in the instant litigation.  The Executive Branch, however, has not communicated to this Court that the Ministry's statements should be accorded heightened deference based on the Executive Branch's reliance on those statements in the WTO proceeding.

not cite to any of those sources to support its broad assertions about the regulatory system governing vitamin C exports. This omission is compounded by the 2009 Statement's declaration that self-discipline regulation required vitamin C exporters "to coordinate among themselves on export price and production volume in compliance with China's relevant rules and regulations." Of course, this simply begs the question of what did the relevant rules and regulations require – an issue that the 2009 Statement conspicuously avoids by not citing to any governmental directives or Chamber documents.[39] Second, as discussed infra, the 2009 Statement contains numerous ambiguous terms and phrases, particularly with regard to the penalties under self-discipline. Third, although there are clearly some differences between the 1997 Regime and 2002 Regime, the 2009 Statement makes no attempt to distinguish between the two regimes. The 2009 Statement does not read like a frank and straightforward explanation of Chinese law. Rather, it reads like a carefully crafted and phrased litigation position.

China's representation to the WTO that it gave up "export administration . . . of vitamin C" as of January 1, 2002 is further reason not to defer to the Ministry's position. Although many of the public statements cited by the Stern Report are, as the Ministry asserts, simply general descriptions of the current status of China's economy and China's transition toward a market economy, the Ministry makes no attempt to explain China's representations that it gave up export administration of vitamin C, which appear to contradict the Ministry's position in the instant litigation.

Moreover, although not dispositive on the question of the appropriate deference to be afforded to statements by foreign governments, when the alleged compulsion is in the

---

[39] Professor Shen's attempt to define "self-discipline" is also circular and unhelpful. He asserts that "'[s]elf-discipline' means that all industries shall maintain import and export order in accordance with laws, regulations and rules and shall not conduct operation in violation of regulations regardless of national interest."

defendants' own self-interest, a more careful scrutiny of a foreign government's statement is warranted. Similarly, in interpreting Chinese law, I cannot ignore the obvious fact that a compulsory regime is unlikely to be present where the defendants' economic interest is in accordance with the allegedly compelled conduct.

Finally, the factual record contradicts the Ministry's position.[40]  In sum, all of the points above suggest that the Ministry's assertion of compulsion is a post-hoc attempt to shield defendants' conduct from antitrust scrutiny rather than a complete and straightforward explanation of Chinese law during the relevant time period in question. Although the Ministry encouraged defendants' cartel and now fervently desires that defendants be dismissed from this suit, those policy preferences do not establish that Chinese law "required" defendants to follow their anti-competitive predilections.

Like the Ministry, Professor Shen also fails to address important provisions of the 2002 Regime that contradict his interpretation of Chinese law.  I therefore cannot accept his conclusion that "the implementation of the verification and chop mechanism . . . did not in any way change the level of control that the government maintained over the vitamin C industry." Not only does Professor Shen fail to address key provisions of the 2002 Regime, he maintains that "[t]he mechanism through which [China's policy requiring coordination] was to be accomplished was not the key point," which suggests that he views the details of the 2002 Regime as essentially irrelevant.

---

[40]  As defendants correctly point out, some of the documentary evidence in the record is consistent with the Ministry's interpretation of Chinese law and explanation of compulsion.  This includes evidence documenting that: (1) defendants voted on proposals and reached agreements through consensus; (2) such agreements were reached at meetings with the Chamber and "under the coordination of [the Chamber],"; and (3) defendants failed to reach consensus on certain occasions.  However, not only is the above evidence also consistent with an absence of compulsion, but, as explained infra, there are other facts in the record, such as those surrounding Weisheng's violation of the shutdown agreement in 2004, that directly contradict the Ministry's position.

## II. Interpretation of Chinese Law Based on the Traditional Sources of Foreign Law

### A. <u>Applicability of the 1997 Regime to Defendants' November 2001 Agreement</u>

Once the 2002 PVC Notice took effect on May 1, 2001, all of defendants' subsequent

conduct (including their continuing compliance with the agreement reached in November 2001)

was governed by the 2002 Regime. Moreover, although the 2002 PVC Notice did not formally

take effect until May 1, 2002, I will assume that the 2002 PVC Notice governed defendants'

conduct in the interim period between the abolishment of the 1997 Regime on March 21, 2002

and the formal institution of the 2002 PVC Notice.

There is, however, a question as to what directives governed the remainder of defendants'

conduct regarding the agreement they reached in November 2001.  That agreement concerned

the coordinated export price that was to take effect on January 1, 2002 and total export volumes

for 2002.  The 1997 Notice was still formally in effect from January 1, 2002 through March 21,

2002.  However, China represented to the WTO that as of January 1, 2002, it gave up "export

administration . . . of vitamin C."  This representation coincides with the repeal, on January 1,

2002, of the 1992 Interim Regulations, which appear to have established the foundation of the

export licensing and quota regime in place at the time.  Notably, like the 1997 Regime, the 1992

Interim Regulations also subjected vitamin C to export licensing and quotas.  Given the above, I

conclude that the 1997 Regime did not govern defendants' compliance with the November 2001

agreement.  Thus, the 1997 Regime is irrelevant to the instant motion, except to give context to

the 2002 Regime.

### B. <u>Suspension Provision</u>

The Suspension Provision in the 2002 PVC Notice provides that "[g]iven the drastically

changing international market, the customs and chambers may suspend export price review for

48

certain products with the approvals of the general members' meetings of the sub-chamber (coordination group) and filing with [Customs]." Neither the Ministry nor Professor Shen address this provision, which I interpret as granting defendants the unilateral authority to suspend verification and chop.[41]

The Suspension Provision is open to two potential interpretations. Under either interpretation, it is clear that the Chamber and Customs could not suspend verification and chop without the approval of the members of the Subcommittee (i.e., the defendants). However, this provision is ambiguous as to whether defendants had the unilateral power to suspend verification and chop. The term "may" could be read to indicate that even if the members agreed to suspend verification and chop, the Chambers and Customs could, but were not required to, suspend it. The most plausible interpretation of this provision is that the Subcommittee had the unilateral power to suspend verification and chop. It would make little sense if the Subcommittee was granted the power to veto a decision of the Chamber and Customs regarding the suspension of verification and chop, but did not have the unilateral power to decide whether to suspend verification and chop in the first instance.

Although the 2003 Announcement does not contain a similar explicit suspension provision, I construe the 2003 Announcement as granting defendants the same power under the 2003 Announcement. Nothing in the record indicates that the 2003 Announcement's extension of verification and chop was intended to alter the substance of the regime in any way. In fact, both the Ministry and Professor Shen appear to view the 2002 PVC Notice and the 2003 Announcement as essentially interchangeable.

Moreover, even if the absence of an explicit suspension provision in the 2003

---

[41] There is no evidence that the 1998 Opinions, the text of which is not in the record, contained a similar suspension provision.

Announcement were material, under the 2003 Announcement defendants had the power to effectively suspend verification and chop simply by not reaching any agreements in the first instance. Although the 2003 Procedure's requirement that the Chambers "verify the submissions based on the industry agreements [and relevant regulations]" indicates that the contracts must comply with the relevant industry agreements, neither the 2003 Announcement nor the 2003 Procedures explicitly direct defendants to reach any agreements in the first instance. During any period in which no industry agreements were in effect, it can be assumed that either a chop would be granted to any contract submitted to the Chamber irrespective of the contract price or that the requirement for chops would simply be abandoned.

The interpretation above is, standing alone, sufficient reason to deny summary judgment.[42] Moreover, this interpretation renders moot any potential act of state concerns because, under this interpretation, inquiries into the enforcement of the 2002 Regime and defendants' role in promulgating the 2002 Regime are unnecessary to resolve the instant motion.

Although I could end my analysis here, there are further reasons why denial of summary judgment is warranted. For one thing, as certain points below illustrate, even if Chinese law did involve some compulsion, summary judgment would still be denied because Chinese law assuredly did not compel all of defendant's illegal conduct.

## C. Applicability of Verification and Chop to Industry-Agreed Output Restrictions

I conclude that, as a matter of Chinese law, in order to receive a chop under the 2002 PVC Notice and 2003 Announcement, an export contract was only required to comply with the industry-agreed minimum price ("Price Interpretation"). Compliance with industry-agreed output restrictions was not required to receive a chop. Because verification and chop did not

---

[42] Given this interpretation, it is not clear what would be left for the jury to determine at trial, particularly in regards to the pre-filing period.

require compliance with industry agreements regarding output, it can also be assumed that the 2002 Regime did not compel such agreements in the first instance.

Nothing on the face of the governmental directives indicates that compliance with output restrictions was required to receive a chop. The 2002 PVC Notice explicitly focuses on price and the 2003 Announcement is ambiguous regarding the applicability of verification and chop to output restrictions.

The 2002 PVC Notice explicitly states that "the relevant chambers" were required to submit to Customs "information on industry-wide negotiated prices" and repeatedly refers to "price review." By contrast, the 2002 PVC Notice makes no mention of industry-agreed output restrictions.[43] Moreover, if all agreements, including agreements regarding output restrictions, were to be enforced through verification and chop, it is not clear why the 2002 Charter includes a provision for "security deposit[s]" to ensure compliance with industry agreements. Furthermore, because the apparent purpose of the 2002 Regime was to avoid dumping suits and below cost-pricing, see discussion infra, it is not surprising that the 2002 Regime was limited to compliance with a minimum price.

Although the term "industry agreements" in the 2003 Procedures is broad enough to also include agreements on output restrictions, this ambiguity does not favor either potential interpretation. In addition, as noted earlier, nothing in the record indicates that the substance of verification and chop differed between the 2002 PVC Notice and the 2003 Announcement. The only provision in the 2003 Announcement that could be read to suggest that compliance with output restrictions was also required to receive chops is the 2003 Procedures' direction that chops be affixed on the contract "where the prices and quantities are specified." However, in light of

---

[43] Similarly, the 1998 Opinions cited by Professor Shen only appear to have required compliance with a minimum price.

the plain language of the 2002 PVC Notice, this ambiguous provision is insufficient to establish that verification and chop required compliance with output restrictions.

Moreover, some of the Ministry's own statements support the Price Interpretation. According to the Ministry, under the 2002 PVC Notice, "[i]f the [contract] price was at or above the minimum acceptable price set by coordination through the Chamber, the Chamber affixed . . . a 'chop.'" The Ministry similarly has acknowledged that the "basis" of the verification and chop system "was a process of 'industry-wide negotiated prices.'"

Neither the Ministry nor Professor Shen offers any compelling explanation undermining the Price Interpretation. First, I recognize that, in addition to stating that the Chamber would affix a chop "[i]f the [contract] price was at or above the minimum acceptable price set by coordination through the Chamber," the Ministry's amicus brief also states that, under the 2002 PVC Notice, the Chamber "'verified,' i.e., approved, the contract price and volume." The Ministry, however, provides no citation to support this assertion. Perhaps the Ministry is referring to the 2003 Procedures' requirement that chops be affixed on the contract "where the prices and quantities are specified." Yet, even if the Ministry had explicitly cited to the 2003 Procedures as support, that ambiguous provision is insufficient in light of the other evidence in the record outlined above.

Second, the 2009 Statement, which does not discuss any of the specific governmental directives, fails to address any of the issues raised above. Third, although Professor Shen suggests that the 2003 Procedures require compliance with both a minimum price and output restrictions in order to receive a chop, Professor Shen never addresses the limited language of the 2002 PVC Notice that refers only to "industry-wide negotiated prices" and "price review." Moreover, as discussed infra, both Professor Shen and the Ministry completely ignore the 2002

Charter

## D. **Potential Penalties for Non-Compliance with Self-Discipline**

In arguing that the FSC defense is applicable, the Ministry's amicus brief, citing to the 1997 Notice and 1997 Charter, relies, inter alia, on the fact that defendants: (1) were required to be members of the Subcommittee; and (2) would not have been able to export vitamin C if they failed to participate in "price-setting" activities. The Ministry, however, does not explain how Subcommittee membership was required under the 2002 Regime and 2002 Charter or how defendants' export right would be affected if they failed to participate in price-setting and output-setting activities under the 2002 Regime. Thus, even assuming that, under "self-discipline," defendants were supposed to "consult with each other to reach consensus on coordinated activities for the purpose of reaching the objectives and serving the interest as set forth under Chinese laws and policies," there was no penalty for failing to do so.

Preliminarily, I note that the absence of potential penalties or other mechanisms to compel defendants to reach price and output agreements is not surprising. As I mentioned earlier, there is no need to compel defendants to do what makes them the most money.[44] It would actually be somewhat surprising to see a compulsory regime where the defendants' interests and the government's goals are aligned. Although the FSC defense would presumably still be applicable in such circumstances provided that a compulsory framework were, in fact, present, as a matter of common sense, such a regime is simply much less likely when the alleged compulsion is in the defendants' economic self-interest. Cf. Mitsuo Matshushita & Lawrence Repeta, Restricting the Supply of Japanese Automobiles, Sovereign Compulsion or Sovereign

---

[44] Although it may have been unnecessary to compel defendants to reach price and output restriction agreements, a government-backed mechanism for ensuring compliance with those agreements would not be superfluous. Such an enforcement mechanism would attempt to counteract each defendant's individual incentive to cheat, which is a problem in almost any cartel. However, the presence of a compulsory enforcement mechanism would not establish that defendants' agreements were compelled in the first instance.

Collusion?, 14 Case W. Res. J. Int'l L. 47, 63 (1982) ("[T]he defendant's decision to act in a manner contrary to its monetary interests should be accorded great weight in determination whether that act was compelled." ).

Turning to the instant record, certain governmental directives and Chamber documents state, on their face, that membership was no longer required under the 2002 Regime. The 2003 Procedures provide that "[f]or V&C Applications made by non-member exporters, the Chambers shall give them the same treatment as to member exporters." Similarly, the May 2002 Agreement indicates that "[a] company, without being a member of the VC Chapter, can export VC (but the export quantity needs to be confirmed by other companies)." Moreover, none of the governmental directives and Chamber documents requiring membership remained in force under the 2002 Regime. The 1997 Notice was abolished and the 1997 Charter was replaced by the 2002 Charter, which describes the Subcommittee as a "a self-disciplinary industry organization jointly established on a voluntary basis by those Chamber of Commerce members which conduct import and export of vitamin C." (Emphasis added). In addition, the 2002 Charter does not include the provision in the 1997 Charter providing that "[t]he Sub-Committee will suggest to the competent governmental department, through the Chamber, to suspend and even cancel the Vitamin C export right of such violating member."

The Ministry ignores the above provisions, which, on their face, contradict the Ministry's position and the Ministry's argument as to why the FSC defense is applicable.

The Ministry's submissions only briefly address the specific governmental directives underlying the 2002 Regime. In discussing the applicability of the FSC defense, the amicus brief's only reference to the 2002 Regime is in relationship to the enforcement of industry agreements. Similarly, the amicus brief's discussion of the 2002 Regime indicates that the 2002

Regime "changed the way in which <u>compliance</u> with the Chamber's 'coordination' was <u>confirmed</u> by abolishing [export licenses] and establishing [verification and chop]." (Emphasis added).

The Ministry does not address the fact that membership in the Subcommittee was no longer required and never discusses the 2002 Charter.[45] The 2009 Statement, which does not cite to any specific governmental directives, does not address these issues. Although Professor Shen asserts that membership was required under the 2002 Regime, he does not provide any citation to support that proposition and never addresses the contrary provisions in the governmental directives and Chamber documents. Similar to the Ministry's amicus brief, Professor Shen cites only to the 1997 Charter and never discusses the 2002 Charter.

Given the above, it is clear that even if a company's membership in the Subcommittee was revoked (or the company was never a member), that company could still export vitamin C.

Neither the Ministry nor defendants make any effort to explain how defendants' participation in price-setting and output-setting is compelled given that membership in the Subcommittee is no longer required. Although the 2009 Statement conclusorily asserts that persons engaged in self-discipline are "well aware that they are subject to penalties" for "non-compliance with self-discipline," including "forfeiting their export right," the Ministry never explains: (1) why such persons are "well aware" of this fact; (2) what "forfeiting their export right" means in the context of the 2002 Regime; (3) how a forfeiture of export rights would be accomplished under the 2002 Regime; or (4) what the other potential penalties are.[46] The 2009

---

[45] The Ministry's amicus brief was less than straightforward in its presentation of the 1997 Charter. The amicus brief did not mention the 2002 Charter and implied that the 1997 Charter was still controlling under the 2002 Regime. Notably, Judge Trager's decision appears to have assumed that the 1997 Charter was still operative throughout the relevant period. At oral argument on the motion to dismiss, the Ministry's counsel conceded that the "whole regulatory regime" under the 1997 Notice was superseded by the 2002 PVC Notice, but never mentioned the 2002 Charter.

[46] On its face, the 2002 Regime would only appear to deny a defendant its "right" to export if the defendant submitted a contract that failed to abide by the relevant industry agreements and was, thus, ineligible to receive a

Statement also indicates that the Chamber was delegated "necessary enforcement measures" and that the Chamber had the power to "penalize," but the Ministry never identifies those "enforcement measures" or explains the Chamber's power to "penalize" under the 2002 Regime. Similarly, Professor Shen also maintains, without any explanation, that under the 2002 Regime, "[d]efendants' right to export will be forfeited if they refuse to participate in . . . coordination."[47] All of the above assertions are insufficient to establish the FSC defense.  See Antitrust Guidelines § 3.32 (explaining that the FSC defense requires "penal or other severe sanctions" and that the Agencies will regard a foreign government's statement regarding compulsion to be conclusive if "that representation contains sufficient detail to enable the Agencies to see precisely how the compulsion would be accomplished under local law").

The only provision in the 2002 Regime that could potentially establish compulsion is the 2003 Procedures' "same treatment" provision, which states that "[f]or V&C Applications made by non-member exporters, the Chambers shall give them the same treatment as to member exporters."  (Emphasis added).  This provision suggests that although non-members could export under the 2002 Regime, non-members may have still been required to abide by the minimum price (and possibly also the output restrictions) set by the Subcommittee.  Moreover, non-members would not appear to have any input into the restrictions that they would be required to

---

chop.  However, nothing in the governmental directives indicates that chops were to be denied if defendants failed to reach agreements in the first instance.

[47] At one point, Professor Shen suggests that compulsion arises from the fact that regulated companies "still have significant state ownership, the national and regional governments play an ongoing role, and top managers and executives generally owe their business positions to political appointment."  However, defendants do not rely on this specific assertion and the Ministry does not advance a similar argument.  Moreover, not only do I doubt, as a general matter, that this would be sufficient to trigger the FSC defense, but Professor Shen's sweeping assertion is clearly insufficient to establish that these specific defendants faced the possibility of coercion through these informal channels.  Not only would this require a fact-intensive inquiry, but the factual record indicates that the type of compulsion suggested by Professor Shen was utterly absent here.  As discussed infra, with regard to Weisheng's breach of a June 2004 shutdown agreement, there is no documentary evidence suggesting even the possibility that the informal levers of control noted by Professor Shen would be employed.

follow – no defendant would want the amount of vitamin C it could export to be determined, unilaterally, by its competitors.

However, neither the Ministry nor Professor Shen nor defendants rely on the "same treatment" provision to establish compulsion. In any event, the above concerns notwithstanding, this provision is insufficient to establish compulsion.

First, non-members did not have to abide by output restrictions imposed by the Subcommittee. As discussed earlier, the 2002 Regime only requires compliance with the minimum price in order to receive a chop. As such, the "same treatment" provision would not have compelled defendants to reach agreements regarding output restrictions. In addition, although the May 2002 Agreement states that the "export quantity [of non-members] needs to be confirmed by other companies," this provision was never incorporated into the final 2002 Charter.

Second, even if non-members were required to abide by both price and output restrictions imposed by the Subcommittee, the absence of a membership requirement still leaves open the question of what would happen if all the members simply resigned from the Subcommittee. If this occurred, the non-members could still export and there would be no price or output restrictions that they would be required to follow. The only way the FSC defense would still be applicable in such circumstances is if I were to simply assume that the Ministry would directly impose restrictions that the non-members would be required to follow. However, the notion that the threat of the Ministry's direct intervention was hanging over the 2002 Regime appears to conflict with China's representations to the WTO that it gave up "export administration . . . of vitamin C." Moreover, neither defendants nor the Ministry focus their compulsion argument on the possibility of the Ministry intervening and directly imposing price and output restrictions.

Instead, the Ministry and defendants focus on the Chamber's power to penalize.

Given the above, I conclude that none of the provisions in the 2002 Regime, including the "same treatment" clause, would compel defendants to reach agreements in the first instance.

## E. Relevance of the WTO Proceeding and the 1996 Interim Regulations

In the WTO Proceeding, the WTO panel concluded that China imposed minimum export price requirements on all of the raw materials at issue. Those raw materials were under the auspices of the China Chamber of Commerce of Metals, Minerals and Chemicals Importers and Exporters ("CCCMC"). The WTO panel found that the CCCMC's charter "authorized" and "directed the CCCMC to set and coordinate export prices" for those raw materials and that the resulting minimum prices were enforced through two governmental directives: (1) a licensing provision that is irrelevant to the instant suit; and (2) the 1996 Interim Regulations, which "imposed penalties on exporters that fail to set prices in accordance with the coordinated export prices."[48] WTO Panel Report ¶¶ 7.1026, 7.1063. The WTO panel concluded that these provisions "amount[] to a requirement to coordinate export prices for the raw materials at issue." Id. ¶ 7.1064. The WTO panel also determined that "actions undertaken by the CCCMC with respect to minimum export price requirements . . . are attributable to China." Id. ¶ 7.1096.

The WTO panel's conclusions do not alter my interpretation of Chinese law. Notably, none of the parties in the WTO Proceeding ever argued that the measures in dispute did not impose a minimum price. Rather, China, the only party that had an incentive to take such a position, argued that: (1) all of the measures at issue relevant to a minimum price requirement were repealed prior to the panel's establishment on December 21, 2009; and (2) even if it did

---

[48] Although the complainants in the WTO Proceeding also argued that verification and chop was used to enforce the minimum price for one of the raw materials at issue, the WTO panel declined to address verification and chop because its repeal in May 2008 put it beyond the scope of the WTO panel's inquiry. WTO Panel Report ¶ 7.1054.

impose minimum prices, that would not constitute a violation for the purposes of the WTO.

In addition, the WTO panel did not discuss whether any of the CCCMC documents that it cited included provisions stating that membership in the CCCMC or its product-specific subcommittees were voluntary and that companies could export without holding such membership. As explained earlier, those provisions in the governmental directives and Chamber documents at issue here are critical to the question of whether defendants' agreements were compelled in the first instance.

Also, although the 1996 Interim Regulations appear to have been in effect during both the 1997 Regime and the 2002 Regime, neither the Ministry nor Professor Shen rely on those regulations to establish compulsion.[49] Professor Shen's report never even mentions the 1996 Interim Regulations.[50] In its amicus brief, the Ministry cites to the 1996 Interim Regulations merely as background in attempting to explain the goals of the 1997 Regime. In fact, the Ministry's counsel asserted at oral argument that there was no compulsion under the 1996 Interim Regulations: "[The 1997 Notice] is what establishes the license. So what you have in [the 1996 Interim Regulations] is the beginning of a, 'you shall,' but there is no mechanism yet. There is no hammer. There is no compulsion yet really."

Furthermore, because the 1996 Interim Regulations cover all export products and the

---

[49] The complainants in the WTO Proceeding also relied on the Ministry's 2009 statement discussing self-discipline as well as two CCCMC "coordination measures," which are irrelevant to the instant suit. The WTO panel did not base its decision on these additional documents, finding them outside of "the Panel's terms of reference." WTO Panel Report ¶ 7.1028. The panel, however, still considered these documents in "assessing the operation of China's alleged [minimum price] requirement" and interpreting the 1996 Interim Regulations. Id. ¶ 7.1032. According to the panel, the 2009 Statement "reveal[s] that . . . parties would be subject to penalties for failure to participate in price coordination." Id. ¶ 7.1035. The panel, however, did not address the various deficiencies in the 2009 Statement that I identified earlier.

[50] The fact that Professor Shen does not rely on the 1996 Interim Regulations is particularly noteworthy given that he wrote an article entitled "A Rational Read of the '(Interim) Provisions of the Investigation and Punishment of Improper Low-price Export Conduct," which appears to be about the 1996 Interim Regulations.

2002 PVC Notice and 2003 Announcement address a limited number of specific products, one can assume in the event of any conflict the more specific directives would govern. For example, if defendants invoked the Suspension Provision in the 2002 PVC Notice, it is doubtful that they would have still been subject to potential penalties under the 1996 Interim Regulations. Moreover, China's assertion to the WTO panel that it ceased enforcing the 1996 Interim Regulations at the same time that it repealed verification and chop indicates that these directives should all be interpreted in light of each other.

Even if I were to conclude that the 1996 Interim Regulations involved compulsion and required defendants to set, and abide by, a minimum price, summary judgment would still be denied. The 1996 Interim Regulations only concern a minimum price and are irrelevant to the defendants' agreements regarding output restrictions. Moreover, as discussed below, the 1996 Interim Regulations only address concerns of below-cost pricing and anti-dumping.

### F. Any Potential Compulsion was Limited to Avoiding Anti-dumping and Below-Cost Pricing

Even assuming that the 2002 Regime and the 1996 Interim Regulations provided potential sanctions and required defendants to agree on and abide by a minimum price (and possibly also output restrictions), I am not convinced that the Chamber or the Ministry would have intervened through compulsory measures if defendants, in exercising their discretion, had simply set the minimum price and output levels at a point that would have avoided anti-dumping suits and below-cost pricing. Setting prices above that level exceeded the scope of any compulsion and, therefore, would not be immunized by the FSC defense.

On their face, the relevant directives do not indicate that defendants were required to set prices above a level that would have avoided anti-dumping suits and below-cost pricing. The 1996 Interim Regulations explicitly discuss below-cost pricing and appear to have been intended

to avoid anti-dumping suits. Moreover, the directives underlying the 2002 Regime are vague regarding objectives other than avoiding dumping suits.

In addition, the "self-destructive competition" that the Ministry and Professor Shen claim concerned the government also appears to refer to below-cost pricing and avoiding anti-dumping. The 1998 Opinions cited by Professor Shen addressed below-cost pricing by instituting prices for certain domestic products based on average costs in the industry. Similarly, a law review article cited in Professor Shen's discussion of self-discipline indicates that the notion of "vicious competition" in the export context also refers to below-cost pricing. In discussing China's Anti-Monopoly Law, which directs trade associations to "strengthen the self-discipline of industries . . . [and] protect[] the order of market competition," the article explains that:

> In the legislators' eyes, there are two kinds of competition: the good and the bad. 'Good competition' refers to competing on quality and variety of product/services; 'bad competition' ('vicious competition') refers to below-cost pricing. The legislators believe the latter type is a race to the bottom and harms Chinese enterprises, especially those in the business of exporting raw materials; and they further believe trade associations ought to promote 'self-discipline' among competitors and avoid such price wars.

Yong Huan, Pursuing the Second Best: The History, Momentum, and Remaining Issues of China's Anti-Monopoly Law, 75 Antitrust L.J. 117, 129-30 (2008-2009) (emphasis added). In addition, before the WTO panel, China asserted that "it designated [the Ministry] to coordinate export prices [for the raw materials at issue] to minimize the possibility of injurious dumping of Chinese exports by individual exporters." Panel Report ¶ 7.998.

Finally, neither the Ministry nor Professor Shen explicitly state that the Chamber or the Ministry would have intervened if defendants had set restrictions at the minimum levels

necessary to avoid anti-dumping suits and below-cost pricing. In fact, the Ministry's counsel represented that, although the Ministry was concerned with dumping and wanted the companies to achieve "sufficient profit margins" in order to ensure the "stable development of the industry" and "full employment," the relevant profit margins were determined by the companies themselves and the Ministry "really didn't care" what those margins were.

## III.    The Factual Record and Interpreting Chinese Law

### A. Legal Standard

Under Rule 44.1, courts have substantial discretion to consider different types of evidence in determining foreign law. Fed. R. Civ. P. 44.1 ("In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence."). Although courts often rely on sources such as expert testimony and treatises in determining foreign law, Rule 44.1 does not limit courts to such evidence. See United States v. First National Bank of Chicago, 699 F.2d 341, 344 (7th Cir. 1983) (holding that there was "no doubt" that it was appropriate for district court to consider, inter alia, affidavit of bank manager in determining that Greek statute at issue was in effect during the relevant period and applied to foreign banks). In one recent decision, a court, in interpreting an ambiguous Brazilian regulation, relied on the fact that the plaintiff "offered no evidence that . . . Brazilian authorities ever prosecuted, or expressed an intent to prosecute, civilly or criminally, any person or institution for the conduct [the plaintiff asserted] was illegal in Brazil."[51] Gusmao v. GMT Group, Inc., No. 06-cv-5113, 2009 WL 1174741, at

---

[51] Even if West were still good law and barred inquiry into whether foreign officials failed to enforce their own laws, West would not prevent consideration of the type of evidence considered in Gusmao. A court can presume that foreign officials were acting in a manner consistent with the requirements of foreign law and construe ambiguous foreign law accordingly. In such circumstances, the type of evidence considered in Gusmao would not directly implicate a failure by foreign officials to enforce their own law.

*23 (S.D.N.Y. May 1, 2009).

A difficult question, however, arises when this type of evidence involves disputed facts. This was not an issue in Gusamo and no decisions appear to have addressed this question. Because courts are tasked with determining foreign law as a question of law,[52] courts, rather than juries, should resolve any disputed facts relevant to interpreting foreign law.

A determination of foreign law is, like choice of law analysis, a preliminary matter to be resolved by the court. Therefore, any disputed facts underlying that determination must also be resolved by the court. See Nautilus Ins. Co. v. Reuter, 537 F.3d 733, 742-43 (7th Cir. 2008) (holding, in the context of choice of law analysis, that district court should resolve the factual issue of whether defendant was a legitimate corporation operating out of Illinois); Cf. Fed. R. Evid. 104 advisory committee's note, 1972 Proposed Rule ("To the extent that [inquiries into admissibility] are factual, the judge acts as a trier of fact."). Courts first determine the applicable law before cases can be given to the jury.[53]

Admittedly, in contrast to the Seventh Circuit, the Second Circuit held forty years ago that the jury, rather than the court, should make factual findings necessary to resolve choice of law questions. See Marra v. Bushee, 447 F.2d 1282 (2d Cir. 1971). However, that decision has been criticized, see Chance v. E. I. Du Pont De Nemours & Co., Inc., 57 F.R.D. 165, 168-69

---

[52] Although no courts appear to have directly addressed the issue, determination of foreign law by judges does not appear to violate the Seventh Amendment. See Arthur R. Miller, Federal Rule 44.1 and the "Fact" Approach to Determining Foreign Law: Death Knell for a Die–Hard Doctrine, 65 Mich. L. Rev. 613, 684 (1967) ("When the federal experience is examined against the backdrop of the early English and state court decisions, the irresistible conclusion is that there is no historic tradition of submitting foreign-law issues to the jury that is of sufficient clarity to warrant a present-day federal judge to hold that he is bound to do so as a constitutional matter.").

[53] The fact that, in the instant case, it may ultimately be unnecessary to instruct the jury regarding foreign law does not alter the analysis. As a general matter, the resolution of foreign law is a preliminary determination that must first be decided by the court before the case can go to trial before a jury. Notably, in the choice of law context, there can be situations where resolution of the critical facts underlying the choice of law analysis would be outcome determinative and, irrespective of how those facts are resolved, a grant of summary judgment would necessarily follow. Yet, the appropriate fact-finder for choice of law issues would surely not vary depending on the specifics of individual cases.

(E.D.N.Y.1972), and I do not believe that the Second Circuit would extend it beyond its facts. As Judge Weinstein explained in <u>Chance</u>, because judges determine what the substantive law is, "[t]heory suggests that the facts predicate to a choice of law decision are generally for the judge rather than the jury." <u>Id.</u> at 168. That rationale is equally applicable to determinations of foreign law. Even assuming that the Second Circuit would continue to adhere to the holding of <u>Marra</u> in the choice of law context, for the reasons persuasively outlined by Judge Weinstein in <u>Chance</u>, it is doubtful that the Second Circuit would extend the rationale of <u>Marra</u> beyond that case.

Finally, it cannot be overlooked that in this case I am not merely tasked with interpreting Chinese law, but also with determining the appropriate deference to be accorded to the statements of the Ministry. I do not think that the two can be separated as a practical matter, and the latter is clearly inappropriate for resolution by a jury. The resolution of factual disputes relevant to that inquiry is assuredly a function of the court and not the jury.

## B. Preliminary Issues

### 1. Change in Chinese Law

I conclude, as a question of foreign law under Rule 44.1, that all evidence regarding post-filing conduct must, given the current record, be deemed irrelevant to the task of interpreting the Chinese law that was applicable during the pre-filing period. At a November 16, 2005 meeting, Qiao Haili referenced an instruction by "Premier Wen Jiabao" regarding "the enhancement of industrial self-regulation" as well as "an analysis" conducted by the "Secretary 2d Bureau under the State Council" that focused on vitamin C and "asked for resolving the legal status issue of the industrial self-regulation."[54] Because neither the Ministry nor defendants have offered this

---

[54] Qiao Haili's statement is arguably hearsay. However, in making a determination of foreign law under Rule 44.1,

"instruction" or "analysis" into the record, I am unable to determine the specific impact this "instruction" or "analysis" had on Chinese law. However, I infer that that these changes were made in response to the instant suit – such an inference is particularly appropriate in light of the redactions surrounding these statements in the meeting minutes. Given this gap in the record, which defendants and the Ministry have failed to fill, I decline to rely on any post-filing conduct in interpreting the Chinese law that governed during the pre-filing period. In addition, the fact that, in November 2005, the Chinese government was attempting to "resolv[e] the legal status . . . of the industrial self-regulation," a concept upon which defendants and the Ministry place great reliance, further suggests that Chinese law did not compel defendants' conduct, particularly in the pre-filing period.

In addition to the minutes of the November 2005 meeting, there is also other evidence in the record indicating that Chinese law fluctuated during the post-filing period. An e-mail authored by Wang Qi that discusses the November 2005 meeting indicates an evolving role for the Chamber. Also, the re-institution of export quotas in 2006 indicates a further potential change in Chinese law.

### 2. Miscellaneous Factual Findings

As an initial matter, I find it appropriate to address three statements in the pre-filing documentary record that could potentially be construed as affirmative evidence of compulsion. First, I find that the Ministry's statements in the fall of 2001 to the Chamber regarding the threatened anti-dumping suits do not indicate that defendants were compelled to reach agreement in November 2001 and to abide by that agreement. Second, I find that the summary of the

---

I am not bound by the Rules of Evidence. Fed. R. Civ. P. 44.1; see also Exxon Corp. and Affiliated Companies v. C.I.R., 63 T.C.M. (CCH) 2067 (T.C. 1992) (finding witness' testimony regarding telephone conversation in which Saudi Arabian Minister clarified scope of government price restriction to be "admissible under [tax court analogue to Rule 44.1] in ascertaining the scope of the restriction, for which its contents may be used in support of the truth thereof").

December 2001 meeting from the Chamber's website does not constitute evidence of compulsion. Although this document may be susceptible to multiple interpretations, I interpret it to mean that the Chamber was announcing that defendants were able to reach, and implement, an agreement without the government's intervention because the government was no longer involved under the 2002 Regime and the Chamber was expressing its pleasure that defendants, freed from any constraints imposed by the 1997 regime (including the government imposed licenses and export quotas), were able to reach, and abide by, this agreement on their own. In making this finding, I note the absence of any testimony from the Chamber employee who drafted the summary at issue explaining its meaning. Third, I find that the statement by the representative of the Ministry at the April 2001 Subcommittee was not a compulsory order and, more importantly, even if it was, it is insufficient to indicate compulsion under the 2002 Regime given that the Ministry was clearly playing a different role under the 2002 regime. Moreover, even if this statement did indicate compulsion under the 2002 Regime, it does not speak to the question of whether restrictions limited to combating below-cost pricing and anti-dumping would have been sufficient to satisfy the Ministry.

Although these factual findings and the additional findings below support my interpretation of Chinese law, I note that, based solely on the more traditional evidence of foreign law discussed earlier, I would reach the same conclusions even if I did not consider the factual record.[55]

---

[55] Plaintiffs cite to a decision from the European Court of First Instance addressing anti-dumping duties imposed by the European Union ("EU") against an exporter of Chinese glyphosate. Case T-498/04, Zhejiang Xinan Chemical Industrial Group Co. Ltd v. Council of the European Union ("Zhejiang Xinan"), 2009 ECJ EUR-Lex LEXIS 529 (June 17, 2009). Glyphosate is also subject to verification and chop under the 2002 PVC Notice and 2003 Announcement. In order to decide whether China should be treated as a market economy under the relevant dumping laws, the court in Zhejiang Xinan had to determine whether there was significant state interference in export prices. In arguing that no such interference existed, the Chinese exporter offered evidence showing, inter alia, that: (1) the "floor price" under verification and chop was merely a non-binding "guide" price established on the initiative of the exporters to combat anti-dumping concerns; and (2) after the guide price system was abandoned

## C. Factual Findings and Specific Interpretations of Chinese Law

### 1. Applicability of Verification and Chop to Industry-Agreed Output Restrictions

The Price Interpretation outlined earlier is strongly supported by the factual record. First, it is undisputed that, in early 2003, the Chamber distributed an official notice listing the "export prices of commodities reviewed by Customs and agreed by the industry for obtaining an export pre-authorization stamp from the Chamber." (Emphasis added). The notice does not refer to (and includes no field for) any type of output or quantity restrictions for vitamin C or any of the other commodities subject to verification and chop. Notably, Professor Shen makes no attempt to explain this notice.

Second, the circumstances surrounding Weisheng's violation of a shutdown agreement in 2004 also indicate that verification and chop was not intended to enforce production shutdown agreements. This incident is highly probative as it is the only breach of output restrictions during the pre-filing period. I find, as a factual matter, that: (1) this shutdown agreement was not enforced through verification and chop; (2) Weisheng was not punished, in any way, for its breach; and (3) the only reason Weisheng proposed a new shutdown agreement was, as Wang Qi's report explicitly states, "because their production line had problems." Not only is there a complete absence of any statements in the documentary evidence suggesting that the shutdown agreement would be enforced through verification and chop, but, after Weisheng's violation, Kong Tai stated that he believed that the possibly of Weisheng participating in the new shutdown

---

at a meeting in 2003, contracts were still subject to the "stamping procedure" by the relevant chamber so that it "could collect annual statistical information." The EU did not challenge the exporter's evidence on these points and based its case almost exclusively on the fact that, under verification and chop, the Chinese government granted the relevant chamber the power to refuse to grant a chop for contracts that were lower than the floor price. Although I do not rely on Zhejiang Xinan in interpreting Chinese law, I note that the position taken by the Chinese exporter and the evidence it apparently offered in support of its position are generally consistent with my interpretation of Chinese law and similar to the factual record here.

agreement "was not great." Wang Qi's deposition testimony regarding the absence of any penalty provisions for breaches in the shutdown agreement also indicates that the production shutdown was not enforced through verification and chop – if it had been, specific penalty provisions in the shutdown agreement would not have been necessary. The Price Interpretation is further supported by an NEPG document that discusses the June 2004 shutdown agreement and indicates that defendants viewed the mechanism for controlling prices as distinct from the mechanism for restricting output.

Weisheng's breach also indicates that production shutdown agreements were not compelled in the first instance. Even if there were some explanation as to why the shutdown agreement was not enforced, Kong Tai's statement that the possibility of Weisheng agreeing to participate in the new shutdown agreement "was not great" indicates that neither the Chamber nor the Ministry would have intervened if Weisheng had simply refused to agree to the revised shutdown agreement.

In light of the evidence above, I reject, as incredible and conclusory, the deposition testimony of defendants' employees asserting that Weisheng was penalized by the Chamber and that the Chamber required Weisheng to agree to the revised shutdown agreement.[56]

The evidence discussing the use of verification and chop to enforce defendants' November 2001 agreement does not alter my conclusion that verification and chop was not used to enforce output restrictions. This evidence refers to "price reviews" and never explicitly states

---

[56] Although defendants cite to only limited portions of the factual record, even if defendants had relied on all of the deposition testimony of their employees, I would reject that testimony. For example, I would reject the deposition testimony of defendants' employees to the extent that they suggest that verification and chop was used to enforce any output restrictions in the pre-filing period. Moreover, based on the evidence concerning Weisheng's breach, the other evidence of voluntariness in the pre-filing documentary evidence and the absence of any affirmative evidence of compulsion in those documents, I would also reject the deposition testimony of defendants' employees asserting that the agreements they reached during the pre-filing period stemmed from compulsory orders from the Chamber. In addition, much, if not all, of this testimony is conclusory.

that the industry-agreed output restrictions would be enforced through verification and chop.

Finally, I note that the post-filing re-institution of export quotas in 2006 further supports the Price Interpretation. The re-institution of export quotas makes little sense if verification and chop was supposed to enforce output restrictions.

## 2. Potential Penalties for Non-Compliance with Self-Discipline

The factual record also confirms that there were no material penalties under the 2002 Regime for failing to reach agreements in the first instance. If the threat of membership revocation under the 2002 Regime was sufficient to compel defendants' conduct, then Kong Tai would not have stated that it was unlikely that Weisheng would agree to participate in the new shutdown agreement. This incident also indicates that, even when a majority of the members of the Subcommittee wanted to compel one holdout member to reach agreement, they were powerless to do so.

Additionally, it is notable that none of defendants' employees have asserted that the Chamber threatened to revoke Subcommittee membership in order to compel defendants to reach agreements. Rather, defendants' employees claim, in unconvincing testimony, that the Chamber would compel defendants to reach agreement by threatening to withhold chops or export quotas.

In short, "self-discipline" does not involve coercion – as the term "self-discipline" suggests on its face, defendants were engaged in consensual cartelization.

## 3. Applicability of the 1997 Regime to Defendants' November 2001 Agreement

The factual record supports the conclusion that defendants' compliance with the agreement reached in November 2001 was not governed by the 1997 Regime. One document indicates that when defendants reached agreement in November 2001, they did so under the new legal framework established by the 2002 Regime:

69

Analysis from persons within the industry was that the enterprises were able to sit down together at this particular time because VC prices had reached rock bottom, and no one could sustain a further slide; the next reason was, because the country had opened up the commercial products business from a free competition aspect the enterprises were impelled and had no choice but to seek industry self-regulation.

(Emphasis added). Moreover, the factual record also suggests that the November 2001 agreement was only enforced under the 2002 Regime. As one documents notes, "[t]he [Ministry] and [Customs] actively supported this effort to pre-verify and sign VC product types, requiring the companies to file with [the Chamber] prior to export."

### 4. Suspension Provision

None of the underlying facts are directly relevant to interpreting the Suspension Provision. There is no evidence that defendants invoked the Suspension Provision over the objections of the Chamber or that the Chamber prevented defendants from suspending verification and chop when defendants so desired. However, the general evidence of voluntariness in the record is, at the very least, consistent with my interpretation of the Suspension Provision.

### 5. Potential Compulsion and Avoidance of Anti-dumping and Below-Cost Pricing

There is evidence in the record suggesting that, even if the 2002 Regime involved some compulsion, the Chamber and the Ministry would have only compelled defendants' conduct if anti-dumping suits and below-cost pricing were threatened. One Weisheng document notes that "because the international market has turned for the better considerably when compared with the situation in early 2002, the willingness and actual effectiveness of various manufacturers to cooperate will be lower than the days when the market had a difficult time." (Emphasis added). Although I interpret this document as indicating that all of defendants' agreements were

voluntary, if the 2002 Regime did, as a matter of Chinese law, involve some compulsion, I would interpret this document to mean that when the market was not "ha[ving] a difficult time" defendants could reach agreements, but were not required to do so.

It is also notable that, during the pre-filing period, the only Subcommittee meeting attended by a representative of the Ministry addressed dumping concerns.

## IV.   The Post-Filing Period

Although there appear to have been changes to Chinese law during the post-filing period – changes that are a sufficient reason to distinguish it from the pre-filing period – defendants have still failed to establish compulsion, as matter of Chinese law, during this time.  Defendants have not provided me with the "instruction" and "analysis" referenced by Qiao Haili at the November 2005 meeting.  Defendants have also not provided any explanation for the re-institution of export quotas in 2006.

In addition, the factual record does not indicate that Chinese law compelled defendants' conduct during the post-filing period.  Although I question the credibility of much of defendants' post-filing evidence, the November 16, 2005 document authored by Wang Qi, which suggests that the Chamber's role was evolving along with the changes in Chinese law, does not appear to have been crafted to serve defendants' litigation position.  However, my interpretation of the ambiguous phrases in this document lead me to conclude that, even in November 2005, defendants were still not compelled to reach agreement, particularly regarding output restrictions.  Much of this document suggests voluntariness, not compulsion.  Even Wang Qi's discussion of "government relations" does not indicate the compulsion necessary to trigger the FSC defense.  Rather, this discussion suggests a complex relationship between defendants, the Chamber and the Ministry that, given the evolving changes in Chinese law, was still being sorted

71

out.  Although Wang Qi notes that the Chamber "will continue to be a major force in coordinating companies" and that "go[ing] beyond [the] coordination of the [Chamber]" could have some negative consequences, his e-mail suggests that the latter action was, nonetheless, still a potential option.  Moreover, it is not clear that the potential negative repercussions of such action would rise to the level necessary to constitute compulsion.

I conclude that Chinese law did not compel defendants' conduct in the post-filing period. Therefore, summary judgment must also be denied as to the post-filing period.

## CONCLUSION

For the reasons explained above, defendants' motion for summary judgment is denied.

**SO ORDERED.**

BRIAN M. COGAN

_____
                        U.S.D.J.

Dated: Brooklyn, New York
         September 1, 2011