```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------- X
                                                            :
                                                            :
                                                            :
IN RE VITAMIN C ANTITRUST LITIGATION                        :   **MEMORANDUM**
                                                            :   **DECISION AND ORDER**
                                                            :
                                                            :   06-MD-1738 (BMC) (JO)
                                                            :
This document relates to:                                   :
                                                            :
----------------------------------------------------------- X
                                                            :
ANIMAL SCIENCE PRODUCTS, INC., *et al.*,                    :
                                                            :
                           Plaintiffs,                      :
                                                            :   05-CV-453 (BMC) (JO)
              vs.                                           :
                                                            :
HEBEI WELCOME PHARMACEUTICAL CO.,                           :
LTD., *et al.*,                                             :
                                                            :
                           Defendants.                      :
----------------------------------------------------------- X
```

**COGAN,** District Judge.

In this putative class action, plaintiffs allege that defendants violated § 1 of the Sherman Act, 15 U.S.C. § 1, by fixing the prices and limiting the output of vitamin C exported to the United States from China. The main defendants are four Chinese vitamin C manufactures: Jiangshan Pharmaceutical Co., Ltd., Hebei Welcome Pharmaceutical Co. Ltd., Northeast Pharmaceutical Co. Ltd., and Weisheng Pharmaceutical Co. Ltd (collectively the "Chinese vitamin C manufacturers"). Plaintiffs also name JSPC America, Inc. as a defendant. JSPC America (the "subsidiary") was a wholly-owned subsidiary of Jiangshan Pharmaceutical (the "parent").

The case is before me on the subsidiary's motion for summary judgment.[1] For purposes of this motion, it is undisputed that the parent's general manager entered into conspiratorial agreements to fix prices and limit exports with the other Chinese vitamin C manufacturers. Plaintiffs seek to hold the subsidiary liable for these antitrust violations because, at the time the agreements were made, the parent's general manager also served as the subsidiary's chief executive officer. Thus, because this dual officer reached agreements that "inured to the benefit of [both the parent and the subsidiary]," plaintiffs contend that a reasonable jury could infer that the subsidiary was a party to the conspiracy. The undisputed evidence, however, shows that the subsidiary never became a party to the conspiratorial agreements at issue. Accordingly, the subsidiary's motion for summary judgment is granted.

## BACKGROUND

I have taken the facts set forth herein from the parties' affidavits, exhibits, and Rule 56.1 statements, and viewed them in the light most favorable to the plaintiff as the nonmoving party. See Capobianco v. City of New York, 422 F.3d 47, 50 n.1 (2d Cir. 2005). The facts are undisputed unless otherwise noted.

The parent incorporated the subsidiary on December 22, 1994; it was incorporated and headquartered in California. The subsidiary distributed vitamin C and other vitamins in the United States. It did not manufacture vitamin C or any other products. During all relevant periods, Kong Tai served as the parent's general manager and the subsidiary's CEO. Mr. Kong's role at the subsidiary "was to coordinate the relationship between [the subsidiary] and [the parent]."

---

[1] I previously denied a motion for summary judgment filed by defendants Jiangshan Pharmaceutical Co., Ltd., Hebei Welcome Pharmaceutical Co. Ltd., Northeast Pharmaceutical Co. Ltd., and Weisheng Pharmaceutical Co. Ltd. See In re Vitamin C Antitrust Litig., No. 06-MD-1738, 2011 U.S. Dist. LEXIS 99621 (E.D.N.Y. Sept. 6, 2011). Familiarity with that Decision and Order is assumed.

Mr. Kong attended various conspiratorial meetings in China where the Chinese vitamin C manufacturers agreed to fix prices and limit the output of vitamin C exports. The parties dispute whether Mr. Kong attended these meetings on behalf of the subsidiary. Plaintiffs argue that, "[a]s [the subsidiary's] chief executive officer, Mr. Kong attended these meetings on behalf of both [the subsidiary] and [the parent]." According to the subsidiary, however, Kong attended the meetings pursuant to his role as the parent's general manager; he did not attend any of them on behalf of the subsidiary.

Finally, the parties dispute the process by which the subsidiary would obtain vitamin C from the parent for sale in the United States. Plaintiffs contend that "[the parent] set both the prices [the subsidiary] paid for vitamin C and the price markup [the subsidiary] could charge to customers." The subsidiary asserts that it alone determined how much to charge its customers; "[the parent] did not exercise control over the prices [it] charged its customers."

## DISCUSSION

### I.  Standard on Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment is warranted where the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." Id.

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." Caldarola

v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S. Ct. 1348 (1986)). "Bald assertions or conjecture unsupported by evidence are insufficient to overcome a motion for summary judgment." Zdziebloski v. Town of E. Greenbush, 336 F. Supp. 2d 194, 201 (N.D.N.Y. 2004) (citing Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir. 1991)). In determining whether genuine issues of material fact exist, I am required to "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." Patterson v. Cnty. of Oneida, 375 F.3d 206, 219 (2d Cir. 2004).

## II.     The Subsidiary's Participation in the Conspiracy

Section 1 of the Sherman Act prohibits "contract[s], combination[s] . . . , or conspirac[ies ]in restraint of trade or commerce." 15 U.S.C § 1. As the Second Circuit has explained, "[o]ther elements aside, it is clear that the essence of a § 1 violation is a combination or agreement between two or more persons." Schwimmer v. Sony Corp. of Am., 677 F.2d 946, 952 (2d Cir. 1982). It is the subsidiary's participation in the conspiracy (or lack thereof) that forms the basis for the current motion.

Plaintiffs advance two main theories that, they claim, create a jury issue as to the subsidiary's participation in the conspiracy. First, because Mr. Kong attended the conspiratorial meetings in China and because the agreements reached at those meetings benefitted the subsidiary, plaintiffs claim that a jury could reasonably infer that Mr. Kong attended those meetings on behalf of the subsidiary and that, as a result, the subsidiary became a party to the agreements reached at those meetings. Second, plaintiffs claim that, even assuming the subsidiary did not become a direct party to the agreements, it is still liable for the antitrust violations because it is charged with knowledge of the agreements and it took steps in

furtherance of the conspiracy (it sold vitamin C at artificially inflated prices in the United States). Neither of plaintiffs' theories has merit.

The parties expend a great deal of effort arguing over which "hat" Mr. Kong was wearing when he attended the conspiratorial meetings in China – i.e., whether he was wearing just his parent "hat" or whether a jury could reasonably conclude that he was wearing his parent "hat" and his subsidiary "hat." Even assuming a jury could reasonably infer that Mr. Kong attended the vitamin C meetings in China on behalf of both the parent and the subsidiary, no reasonable juror could conclude that Mr. Kong entered into the agreements on the subsidiary's behalf. In fact, there is nothing in the record that suggests the subsidiary was a party to the agreements and logic dictates that it could not have been.

At the meetings, Chinese vitamin C manufacturers agreed to fix the prices and limit the output of vitamin C exported from China to the United States. The subsidiary did not manufacturer vitamin C in China, nor did it export vitamin C from China to the United States. It purchased vitamin C from its parent, who manufactured vitamin C in China and exported vitamin C from China to the United States. In other words, at the meetings, the Chinese vitamin C manufacturers reached agreements that the subsidiary was incapable of participating in. Thus, although a jury could reasonably conclude that Mr. Kong attended the meetings (in part) as the subsidiary's CEO, it could not likewise conclude that Mr. Kong entered into the agreements on the subsidiary's behalf.

Moreover, as plaintiffs themselves point out, the undisputed evidence shows that the parent determined the price the subsidiary would pay for vitamin C the parent sold to the subsidiary. For the subsidiary to have become a party to the agreements reached at the China meetings, it had to have been able to play some role in carrying out the goals of the agreements.

5

But these agreements were entirely focused on the Chinese vitamin C manufacturers selling and exporting vitamin C from China to the United States. By time the subsidiary became involved in the process – when it purchased vitamin C at a price determined by the parent – the aims of the conspiracy had been reached – the parent sold the vitamin C to the subsidiary at an artificially inflated price within the confines of the agreements it entered into with the other Chinese vitamin C manufacturers.[2] To hold that a jury could reasonably conclude that the subsidiary became a party to the agreements merely because Mr. Kong attended the conspiratorial meetings would ignore the realities of how this scheme played out.

In this regard, I find it telling that plaintiffs have not offered a theory as to why the other Chinese vitamin C manufacturers would need (or even want) the subsidiary to be a party to the agreements. Rather, in an attempt to show that a jury could reasonably conclude that the subsidiary agreed with the Chinese vitamin C manufacturers at the meetings, they rely entirely on their claim that the agreements reached at the meetings benefited the subsidiary. This claim is misplaced. Mr. Kong testified at deposition that, because the parent determined how much the subsidiary would pay for vitamin C and because the vitamin C market in the United States was transparent, the parent was able to determine how much profit the subsidiary realized upon re-sale in the United States. Although this tends to show that the subsidiary benefitted in the sense that it was able to earn a profit when it sold vitamin C in the United States, that alone does not mean that it benefitted from the agreements reached at the China meetings. It only benefited

---

[2] There is no evidence in the record to suggest that the parent sold vitamin C to the subsidiary at a price below the agreed upon floor. Thus, the only inference I can reasonably draw is that the subsidiary purchased vitamin C at a price consistent with the charged price-fixing scheme.

6

because the parent chose to protect it. It benefitted in spite of the agreements, not because of them.[3]

In addition, plaintiffs' request for an adverse inference is insufficient to compel a denial of the subsidiary's motion for summary judgment. It is undisputed that, after being advised by counsel to preserve documents and emails, Mr. Kong deleted emails from his account. And, when Mr. Kong retired from the parent, he returned his company-issued laptop to its IT department and the IT department installed a new operating system on the laptop. Because of these acts, plaintiffs claim that they are entitled to an adverse inference that the emails and laptop contained information showing that Mr. Kong was representing the subsidiary at the China meetings. Mr. Kong's actions, against advice of counsel, are troublesome and, I suspect, will be taken up again during the course of this litigation. But an adverse inference, if granted, has no bearing on the disposition of this motion. To the contrary, I have assumed that a jury could reasonably conclude that Mr. Kong appeared at the meeting on the subsidiary's behalf. And plaintiffs have failed to produce any evidence showing that Mr. Kong did (or even could have) entered into the conspiratorial agreements on the subsidiary's behalf. Under these circumstances, the adverse inference alone would be insufficient to defeat summary judgment. See Kronisch v. United States, 150 F.3d 112, 128 (2d Cir. 1998).

As for plaintiffs' second point, again, even assuming a jury could reasonably conclude that the subsidiary had knowledge of the agreements reached at the China meetings, it does not necessarily follow that there was one large, two-tier conspiracy between the Chinese vitamin C

---

[3] Plaintiffs' reliance on Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 104 S. Ct. 2731 (1984), for the proposition that anything in the parent's interest is by definition in the subsidiary's interest is misplaced. In Copperweld, the Supreme Court held that a parent and its wholly owned subsidiary are legally incapable of conspiring to violate § 1 of the Sherman Act because they "have a complete unity of interest." Id. at 771. It did not hold that a wholly owned subsidiary is automatically liable for a parent's § 1 violations. See In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 341 n.44 (3d Cir. 2010).

7

manufacturers on the first tier and the manufacturers' United States customers on the second tier. Rather, as set forth above, the only evidence in the record points to the existence of a one-tier conspiracy between the Chinese vitamin C manufacturers. They agreed to fix prices and limit exports to the United States. The subsidiary's subsequent act of re-selling vitamin C to customers in the United States was a by-product of the conspiracy; it was not in furtherance of the conspiracy.[4]

On this record, the only reasonable inferences to be drawn are that the parent participated in a conspiracy with the other Chinese vitamin C manufacturers and that, incident to that conspiracy, it employed the subsidiary to sell vitamin C on its behalf in the United States. There is no evidence in the record suggesting that the conspiracy between the Chinese vitamin C manufacturers extended passed the initial price fixing and export limits. In other words, how the parent chose to allocate its portion of vitamin C exports was of no concern to the other Chinese vitamin C manufacturers. The parent was free to sell to third-parties and it was free to sell to the subsidiary (who, in turn, would sell to third-parties) so long as it stayed within the terms of the agreements. Any agreements between the parent and the subsidiary to sell vitamin C in the United States occurred separate and apart from the agreements reached by the Chinese vitamin C manufacturers. And, because parents are legally incapable of conspiring with their wholly owned subsidiaries for purposes of § 1 of the Sherman Act, the mere fact that the subsidiary sold vitamin C at artificially inflated prices on behalf of the parent cannot give rise to § 1 liability. See Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 777, 104 S. Ct. 2731 (1984).

---

[4] I find it telling that plaintiffs have failed to name one other entity on the second tier of this alleged conspiracy, nor has it even undertaken to show that any such entity exists. It is certainly plausible that vitamin manufacturers could conspire with their wholly owned subsidiaries and other sales agents to the detriment of the subsequent purchasers. But that is clearly not what happened here. And if a jury reached a contrary conclusion, I would be compelled to set aside its verdict.

### III. The Subsidiary's Answer

Plaintiffs argue that summary judgment is inappropriate because the subsidiary admitted to participating in the conspiracy in its Answer. In Paragraph 69 of their Third Amended Complaint, plaintiffs allege:

> To address the price cutting, the Association called an "emergency meeting" in late November or December 2003, which was attended by representatives of each of the defendants. The Association discussed with defendants at the meeting how they would rationalize the market and restrain and limit the production levels of vitamin C to increase prices.

In its Answer, the subsidiary replied:

> JSPCA denies the allegations in Paragraph 69, except admits and avers that on or about November or December 2003, representatives of Defendants met in China pursuant to the vitamin C regulatory regime in which the Chinese government compelled Defendants to participate. [The subsidiary] further admits that, as part of the conduct in which the Chinese government compelled Defendants to engage, they discussed the vitamin C market and pricing. Except as expressly admitted, [the subsidiary] denies the allegations of Paragraph 69.

Because the subsidiary did not qualify its use of the term "Defendants" to exclude itself, plaintiffs claim that it effectively admitted its own participation in the conspiratorial meetings.

The subsidiary contends that it erroneously omitted the qualifier "the other" before "Defendants." It argues that I should not decide its motion on the basis of a mere technicality. Moreover, it asserts that its motion to dismiss plaintiffs' Second Amended Complaint obviously showed that it "denie[d] that it had any part in the conspiracy." Alternatively, the subsidiary requests leave to file an amended Answer pursuant to Rule 15 of the Federal Rules of Civil Procedure. Because I find that the subsidiary should be granted leave to amend its Answer, I do not need to determine whether the admission, as stated, would preclude summary judgment.

"[L]eave to amend an answer shall be freely given when justice so requires." Justin R. v. Bloise, No. 06 Civ. 6228, 2009 U.S. Dist. LEXIS 17274, at *3 (S.D.N.Y. Mar. 6, 2009); see also

9

Fed. R. Civ. P. 15(a)(2). But "the Court has broad discretion to deny such leave where the motion is made after inordinate delay, without satisfactory explanation, and where the amendment would prejudice opposing parties." Justin R., 2009 U.S. Dist. LEXIS 17274, at *3 see also Rachman Bag Co. v. Liberty Mut. Ins. Co., 46 F.3d 230, 235 (2d Cir. 1995). Here, the subsidiary requested leave to amend on November 23, 2009, only ten months after it filed its Answer. Given the posture of this case, I find that the subsidiary did not unduly delay in seeking leave to amend. Moreover, the subsidiary has represented that the amendment is necessary to correct an inadvertent omission and plaintiffs have not attempted to make any showing of prejudice.

Under these circumstances, I find that justice requires granting the subsidiary leave to amend its Answer. I hereby deem Paragraph 69 in the subsidiary's [367] Answer to be amended as follows (amendments underlined):

> JSPCA denies the allegations in Paragraph 69, except admits and avers that on or about November or December 2003, representatives of <u>the other</u> Defendants met in China pursuant to the vitamin C regulatory regime in which the Chinese government compelled <u>the other</u> Defendants to participate. JSPCA further admits that, as part of the conduct in which the Chinese government compelled <u>the other</u> Defendants to engage, they discussed the vitamin C market and pricing. Except as expressly admitted, JSPCA denies the allegations of Paragraph 69.

Accordingly, the subsidiary has not admitted its participation in the conspiracy.

## **CONCLUSION**

Defendant JSPC America, Inc.'s [401] motion for summary judgment is GRANTED.

**SO ORDERED.**

s/ BMC
_____
U.S.D.J.

Dated: Brooklyn, New York
      December 27 , 2011