UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------

                                                :
IN RE VITAMIN C ANTITRUST LITIGATION            :        06-MD-1738 (BMC) (JO)
                                                :
------------------------------------------------------------  :
                                                :
This document relates to:                       :
                                                :        **MEMORANDUM**
ANIMAL SCIENCE PRODUCTS, INC., et al.,          :        **DECISION AND ORDER**
                                                :
              Plaintiffs,                       :        05-CV-0453
                                                :
   v.                                           :
                                                :
HEBEI WELCOME PHARMACEUTICAL CO.                :
LTD., et al.,                                   :
                                                :
              Defendants.                       :
------------------------------------------------------------

**Cogan**, District Judge.

Plaintiffs are suing Chinese vitamin C manufacturers for allegedly violating Section 1 of

the Sherman Act, 15 U.S.C. § 1, by engaging in a cartel to fix prices and limit the output of

vitamin C exported to the United States. The four main defendants are Hebei Welcome

Pharmaceutical Co. Ltd.; Jiangsu Jiangshan Pharmaceutical Co. Ltd.; Northeast Pharmaceutical

Co. Ltd.; and Weisheng Pharmaceutical Co. Ltd. (collectively "defendants"). Plaintiffs The

Ranis Company ("Ranis") and Magno-Humphries Laboratories, Inc. ("MHL") move for class

certification on behalf of a group of direct purchasers seeking treble damages against all

defendants except Northeast Pharmaceutical Co. Ltd. ("Northeast"). Plaintiff Animal Science

Products, Inc., ("Animal Science") has moved separately for certification of a class of direct and

indirect purchasers seeking injunctive relief against all defendants, including Northeast.

Defendants opposed both motions for class certification. For the reasons stated below, I grant

class certification on behalf of a damages class represented by Ranis, but I determine that MHL

cannot serve as class representative because it is not a member of the class it seeks to represent.

I also grant certification of an injunction class represented by Animal Science.

## BACKGROUND

Ranis and Animal Science commenced this action on January 26, 2005. Related actions

were subsequently filed in other districts, and all of these cases were eventually coordinated by

the Judicial Panel for Multidistrict Litigation and transferred to this Court for pretrial

proceedings. In April, 2007, Ranis and Animal Science moved separately for class certification

under Rule 23 of the Federal Rules of Civil Procedure. Both putative classes are represented by

the same counsel.

Ranis seeks to represent a class composed of purchasers who bought vitamin C directly

from the defendants during the class period (the "Damages Class"). The only relief sought by

this putative class is damages. The exact class definition is as follows:

> All persons or entities, or assignees of such persons or entities, who directly
> purchased vitamin C for delivery in the United States, other than pursuant to
> a contract containing an arbitration clause, from any of Defendants or their
> co-conspirators, other than Northeast Pharmaceutical (Group) Co. Ltd.,
> from December 1, 2001 to the present. Excluded from the proposed class
> are all governmental entities, Defendants, their co-conspirators, and their
> respective subsidiaries or affiliates.

Animal Science seeks to represent a class composed of purchasers who bought vitamin C

manufactured by the defendants, regardless of whether the vitamin C was purchased directly

from the defendant or through an intermediary (the "Injunction Class"). This putative class

seeks only injunctive relief. The exact class definition is as follows:

> All persons or entities, or assignees of such persons or entities, who
> purchased vitamin C manufactured by Defendants for delivery in the United
> States, other than pursuant to a contract with a Defendant containing an

arbitration clause, requiring injunctive relief against Defendants to end Defendants' antitrust violations.

Defendants opposed Ranis's motion for class certification primarily on the basis of Ranis's adequacy to serve as class representative. Defendants' chief concern is that Ranis is not presently, and has never been, involved in the vitamin C business. Instead, Ranis purchased this antitrust claim from The Graymor Chemical Company ("Graymor") for $100 and is not currently engaged in any business aside from prosecuting Graymor's claim. Defendants question the motives behind the assignment of Graymor's claim and argue that assignees may not serve as class representatives. Defendants further argue that Ranis and putative class counsel have conflicts of interest with other class members; have made decisions that are contrary to the class's interests; and lack the requisite integrity and candor to represent absent class members.

Before briefing was complete on Ranis's motion to certify the Damages Class, however, counsel for Ranis informed defendants of counsel's intention to add a second plaintiff as putative class representative in this action. On September 27, 2007, plaintiffs amended the complaint to add MHL as a plaintiff and the company from which MHL bought vitamin C – JSPC America, Inc. ("JSPCA") – as a defendant.[1] The parties were then permitted to supplement their class certification briefing to address this new putative class representative. Defendants' supplemental opposition to class certification again focused on the adequacy of Ranis and MHL to represent the class.

In their supplemental opposition to certification of the Damages Class, defendants argued that JSPCA, a subsidiary of defendant Jiangsu Jiangshan Pharmaceutical Co., Ltd. ("Jiangsu"), was not part of the price-fixing conspiracy and should therefore be dismissed from the case.

---

[1] Legend Ingredients Group, Inc., was also added as a defendant, but the claims against this defendant were voluntarily withdrawn on June 20, 2008, allegedly because this defendant began "providing cooperation to Plaintiffs."

Moreover, defendants argued that MHL – who did not purchase from any defendant other than JSPCA – should be deemed an indirect purchaser and prohibited from joining a class of direct purchasers.[2] After briefing was complete on the issue of class certification, JSPCA moved for summary judgment. On December 27, 2011, I granted JSPCA's motion and dismissed it from the case, finding that JSPCA was legally incapable of having conspired with Jiangsu or the other defendants in this action.

Defendants also opposed Animal Science's motion to certify the Injunction Class. Once again, defendants' attacks focus on the adequacy of Animal Science to serve as class representative. Defendants' primary arguments are that that Animal Science and class counsel suffer from various conflicts of interest and have demonstrated a willingness to sacrifice important class interests.

Although briefing related to class certification was complete in early 2008, a decision on this motion was reserved pending defendants' omnibus motion for summary judgment. On September 6, 2011, I rejected defendants' contention that the Chinese government had compelled the price-fixing conspiracy and accordingly denied defendants' motion for summary judgment.

## DISCUSSION

Rule 23(a) of the Federal Rules of Civil Procedure requires that any proposed class action: "(1) be sufficiently numerous, (2) involve questions of law or fact common to the class, (3) involve class plaintiffs whose claims are typical of those of the class, and (4) involve a class representative or representatives who adequately represent the interests of the class." Myers v. Hertz Corp., 624 F.3d 537, 547 (2d Cir. 2010). Courts commonly use a shorthand summary to describe these requirements, referring to the four prongs simply as "numerosity,"

---

[2] Defendants have other reasons for arguing that MHL is inadequate; since I find this ground to be dispositive on the issue of MHL's adequacy, however, I will not address defendants' other arguments.

"commonality," "typicality," and "adequacy." <u>See, e.g.</u>, <u>Gen. Tel. Co. of the Sw v. Falcon</u>, 457 U.S. 147, 161, 102 S. Ct. 2364 (1982).

In addition to satisfying each of the four prerequisites listed in Rule 23(a), a party seeking class certification must satisfy one of the subsections of Rule 23(b). Plaintiffs seek to certify the Damages Class pursuant to subsection 23(b)(3) and must therefore show that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods" for adjudicating the controversy. Fed. R. Civ. P. 23(b)(3). Plaintiffs seek to certify the Injunction Class pursuant to subsection 23(b)(2) and must therefore show that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

Regardless of whether class certification is contested, a court may not certify a putative class unless it has performed a "rigorous analysis" and determined that each of Rule 23's requirements has been met. <u>Falcon</u>, 457 U.S. at 161. As part of this analysis, the court must assess all relevant evidence admitted at the class certification stage and resolve any relevant factual disputes, even if this requires a determination of issues that go to the merits of the case. <u>See</u> <u>In re Initial Pub. Offering Sec. Litig.</u>, 471 F.3d 24, 41-42 (2d Cir. 2006).

The party moving for class certification "bears the burden of establishing by a preponderance of the evidence that each of Rule 23's requirements has been met." <u>Myers</u>, 624 F.3d at 547; <u>accord</u> <u>Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.</u>, 546 F.3d 196, 202 (2d Cir. 2008). Despite this Court's obligation to carefully analyze each prong of Rule 23 before granting class certification, "the Second Circuit has emphasized that Rule 23

should be 'given liberal rather than restrictive construction'" and has shown a "general preference" for granting rather than denying class certification.  Gortat v. Capala Bros., 257 F.R.D. 353, 361 (E.D.N.Y. 2009) (quoting Marisol A. v. Giuliani, 126 F.3d 372, 377 (2d Cir. 1997)).

## 1.  THE DAMAGES CLASS

I.      **Rule 23(a)'s Requirements – Numerosity, Commonality, Adequacy, and Typicality**

      **A.      Numerosity**

      To satisfy the numerosity requirement, Ranis and MHL must show that the putative class is so numerous that joinder of all members would be "impracticable."  Fed R. Civ. P. 23(a)(1).  Although the numerosity requirement "imposes no absolute limitations" and requires a case-by-case analysis of the facts, see Gen. Tel. Co. of the Nw v. EEOC, 446 U.S. 318, 330, 100 S. Ct. 1698 (1980), courts within the Second Circuit generally presume that joinder of all putative class members is impracticable if the class has more than forty members.  See, e.g., Ramos v. SimplexGrinnell LP, 796 F. Supp. 2d 346, 353 (E.D.N.Y. 2011) (citing Consol. Rail Corp. v. Town of Hyde Park, 47 F.3d 473, 483 (2d Cir. 1995)).

      Transaction records produced by defendants indicate that there are at least 139 discrete entities that directly purchased vitamin C during the relevant time period.  Defendants do not contest numerosity in any way, and this Court finds by a preponderance of the evidence that joinder of 139 members would be difficult and inconvenient, if not impossible.  Rule 23(a)(1) is therefore satisfied.  See Gortat, 257 F.R.D. at 362 (impracticability within the meaning of Rule 23 "does not mean impossibility of joinder, but rather difficulty or inconvenience of joinder").

### B.   Commonality

Although some courts tend to merge Rule 23's commonality prong with the typicality prong, see Marisol A., 126 F.3d at 376, the commonality requirement is distinct from typicality in that it "tests the definition of the class itself" rather than focusing on the relationship between the putative class representative and the other class members. See 5-23 James W. Moore et al., Moore's Federal Practice § 23.23[6] (3d ed. 2011). Under commonality, the class definition is tested to ensure that the class members' claims "depend on a common contention [which is] of such a nature that it is capable of classwide resolution." Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2551 (2011).

Rule 23(a)(2), read literally, requires only that a class share common "questions of law or fact." As the Supreme Court recently declared, however, what matters under the commonality requirement "'is not the raising of common questions – even in droves – but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation.'" Id. (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. REV. 97, 132 (2009)). A single common question of law or fact may suffice to satisfy this requirement if the question is capable of giving rise to a common answer through a class action. Id. at 2556.

In an effort to limit the scope of discovery in this case, defendants agreed not to oppose class certification on the grounds of commonality or predominance under Rule 23(b)(3). Defendants' opposition papers therefore contain no argument regarding commonality. Having analyzed plaintiffs' claims, I find that the commonality requirement is satisfied. The most significant question posed by this lawsuit will generate common answers among all class members: did the defendants' price-fixing agreement cause an artificial increase in the market

price of vitamin C?  Because the answer to this question could not logically vary between class members, the answer will be applicable to all members of this proposed class.

### C.   Adequacy

The adequacy requirement focuses on the fitness of purported class representatives to competently discharge the responsibility of litigating the case on behalf of absent class members. Under this prong of Rule 23(a), a court must ensure that the putative representatives "'possess the same interests and suffer the same injuries as the class members.'"  In re Literary Works in Elec. Databases Copyright Litig., 654 F.3d 242, 249 (2d Cir. 2011) (quoting Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 625-26, 117 S. Ct. 2231 (1997)).  Although it is important for a court to thoroughly vet any putative class representative, a court must be "wary of a defendant's efforts to defeat representation of a class on grounds of inadequacy" where, as here, the effect of an inadequacy finding would be to "eliminate any class representation."  Kline v. Wolf, 702 F.2d 400, 402 (2d Cir. 1983).

As a threshold matter, a class representative is not "adequate" unless it is a member of the class it purports to represent.  This requirement is evident from the opening sentence of Rule 23, which explains that "one or more members of a class may sue or be sued as representative parties on behalf of all members."  Once it is determined that a putative representative is indeed a class member, courts generally focus the adequacy analysis on three primary areas of concern.

First, the named plaintiff must "demonstrate that class counsel is qualified, experienced, and generally able to conduct the litigation."  Marisol A., 126 F.3d at 378.  This factor is undisputed in this case, as defendants concede that plaintiffs' lawyers are "experienced class action attorneys" and this Court is familiar with their reputation.  Second, the named plaintiff must show that "there is no conflict of interest between the named plaintiffs and other members

of the plaintiff class." Id. Finally, a named plaintiff must exhibit enough integrity and credibility to convince the court that the named plaintiff will diligently perform its fiduciary duties to the class. See Savino v. Computer Credit, Inc., 164 F.3d 81 (2d Cir. 1998); Shakhnes ex rel. Shakhnes v. Eggleston, 740 F. Supp. 2d 602, 627 (S.D.N.Y. 2010). These final two factors – as well as the class membership of both MHL and Ranis – are hotly disputed by the parties. For the reasons stated below, I find that Ranis is adequate to represent the class and MHL is inadequate.

     *1.    Class Membership of MHL and Ranis*

Defendants claim that MHL is not a member of the class because MHL only purchased vitamin C from JSPCA, which is a subsidiary of defendant Jiangsu rather than a defendant itself. This fact technically brings MHL outside the definition of the class, which includes only those entities that "directly purchased vitamin C" from one of the defendants in this action. Of equal importance, defendants argue that allowing MHL to join the class would run afoul of the general rule that indirect purchasers may not recover damages for monopolistic overcharges under federal antitrust law. See Illinois Brick Co., et al., v. Illinois, et al., 431 U.S. 720, 97 S.Ct. 2061 (1977).

Plaintiffs assert that MHL is in fact a direct purchaser because the parent-subsidiary relationship between Jiangsu and JSPCA means that "direct purchases from JSPCA are the same as direct purchases from Jiangsu itself." Some history of the rule set forth in Illinois Brick is necessary to address this argument.

The Supreme Court laid the framework for the Illinois Brick rule in Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481, 88 S.Ct. 2224 (1968). The defendant in Hanover Shoe was a manufacturer of shoe-making machinery which was accused of driving up the price

of this machinery by monopolizing the industry. The defendant argued that the plaintiff – a shoe seller which leased the defendant's machines – had not suffered any injury from these artificially increased prices because the plaintiff had passed the overcharge on to its own customers through higher shoe prices. The Supreme Court described this defense as a "pass-on" theory, and rejected it. The Court reasoned that, if such a defense were permitted, courts would be charged with the "insurmountable" task of weighing the "wide range" of market-based factors that can influence a company's decision to raise prices. Hanover Shoe, 392 U.S. at 493.

According to Hanover Shoe, if antitrust damages were measured by the plaintiff's net loss – taking into consideration any profit recouped through a price-hike in downstream sales – antitrust cases would "require additional long and complicated proceedings involving massive evidence and complicated theories." Id. The Court therefore held that the relevant injury in an antitrust lawsuit is simply the overcharge that a defendant inflicted on its direct purchasers; any attempts by the direct purchasers to recoup this overcharge by passing it on to more remote purchasers is irrelevant to the damages calculation.

The Court's decision in Illinois Brick was the inverse of Hanover Shoe; since defendants could not use the "pass-on" theory to claim that a direct purchaser suffered no net injury, plaintiffs could not use the "pass-on" theory to claim damages for an overcharge that was allegedly passed on from the defendant, through a middleman, to the indirect-purchaser plaintiff. The Court reasoned that the "evidentiary complexities and uncertainties" feared by the Hanover Shoe Court would be multiplied if a plaintiff who is "several steps removed from the defendant in the chain of distribution" could claim monetary damages for an overcharge allegedly caused by the defendant. Illinois Brick, 431 U.S. at 732. This case therefore established a mostly

bright-line rule barring indirect purchasers from seeking damages for antitrust violations in federal court.

Although the Illinois Brick Court explained that any exception to its holding would be "narrow in scope," the Court gave examples of specific situations in which the "pass-on" theory would not require a court to consider "complex market interactions." In such situations, since a court would conceivably be capable of calculating the damages a defendant caused its remote purchasers to suffer, indirect purchasers would be permitted to sue for damages. Id. at 736. For example, the Court suggested in a footnote that indirect purchasers who "owned or controlled" the direct purchaser would be permitted to sue. Id. at 736 n.16.

The "ownership or control" exception is now firmly established and has been expanded to include instances where the defendant owns or controls the intermediary that sold the goods to the indirect-purchaser plaintiff. See, e.g., In re Indus. Diamonds Antitrust Litig., 119 F. Supp. 2d 418, 421 (S.D.N.Y. 2000). Despite this minor expansion, however, courts remain conscious that the Supreme Court "intended exceptions to the Illinois Brick rule to be few and far between." Drug Mart Pharmacy Corp. v. Am. Home Prods. Corp., No. 93-CV-5148, 2002 WL 31528625, at *10 (E.D.N.Y. Aug. 21, 2002) (citing Kansas v. UtiliCorp United, Inc., 497 U.S. 199, 110 S. Ct. 2807 (1990)). Any existing exception, moreover, should be narrowly construed to apply only to those situations in which the court is sure that a calculation of damages would not require consideration of complex market interactions. See Illinois Brick, 431 U.S. at 745; accord Del. Valley Surgical Supply Inc. v. Johnson & Johnson, 523 F.3d 1116, 1125 (9th Cir. 2008) ("'[A]ny exception to the Illinois Brick direct purchaser rule must be narrowly restricted to a situation in which complex market forces are stripped of their effect due to preexisting conditions . . . so that

the pass-on is clearly discernible.'" (quoting In re Lorazepam & Clorazepate Antitrust Litig., 202 F.R.D. 12, 20 (D.D.C. 2001))).

A narrow construction of the "ownership or control" exception has led courts to apply it only when the relationship between the defendant and the middleman "involve[s] such functional economic or other unity that there effectively has been only one sale" between the defendant and the indirect purchaser. Leider v. Ralfe, No. 01-CV-3137, 2003 WL 22339305, at *4 (S.D.N.Y. Oct. 10, 2003). A plaintiff seeking to gain the benefit of this exception must therefore present facts demonstrating that such unity exists and may not rely simply on the existence of a parent-subsidiary relationship. See id.; Mid-West Paper Prods. Co. v. Cont'l Grp., Inc., 596 F.2d 573, 589 (3d Cir. 1979). Crucially, this exception is available only if the plaintiff shows that the defendant has such control over the subsidiary that the defendant can be said to have "set prices along the chain of distribution." Kloth v. Microsoft Corp., 444 F.3d 312, 321 (4th Cir. 2006).

Here, plaintiffs seek to invoke the "ownership or control" exception by proffering the simple fact that JSPCA is a wholly-owned subsidiary of Jiangsu. This evidentiary showing is singularly insufficient to convince me that Jiangsu was responsible for any overcharge inflicted on MHL by JSPCA.[3] In fact, defendants submitted the declaration of Jeffery Fang, a former JSPCA employee, who explained that he and JSPCA's sales manager determined the price of all vitamin C sold by JSPCA. Fang stated that Jiangsu "did not exercise control over the prices that JSPCA charged JSPCA's customers" and explained that JSPCA's pricing determinations were influenced by market factors such as competition with other vitamin C distributors. The concerns that drove the Supreme Court's decisions in Hanover Shoe and Illinois Brick are

---

[3] As noted in my decision granting summary judgment on behalf of JSPCA, JSPCA's former chief executive officer failed to preserve documents and e-mails relevant to this case. However, this possible spoliation did not prevent plaintiffs from seeking other evidence of Jiangsu's domination of JSPCA.

therefore present with full force in this case, and an exception to the direct purchaser rule is unwarranted.

Because MHL is an indirect purchaser and no exception to the Illinois Brick rule applies here, MHL lacks standing to sue for damages under federal law and cannot join the putative Damages Class. MHL therefore has no interest in vigorously pursuing the class claims and is inadequate to serve as class representative.

Defendants argue that, like MHL, Ranis is inadequate to represent the class because it is not even a class member. It is undisputed that Ranis never bought any vitamin C and is therefore eligible for class membership only by dint of being an assignee of Graymor's claims. While conceding that the assignment of Graymor's claim technically brought Ranis within the class definition – which explicitly accounts for assignees of direct purchasers – defendants argue that assignees were included in the class definition in order for Ranis to make a specious end-run around the rule prohibiting assignment of class membership.

Contrary to defendants' assertion, however, there is no rule prohibiting the assignment of class membership. Defendants found support for this rule in a 2006 case from the Southern District of New York in which Judge McKenna refused to allow an assignee to represent a class and warned that "very serious problems" would arise if class membership were treated as a "transferable asset." In re Pub. Offering Fee Antitrust Litig., No. 98-CV- 7890, 2006 WL 1026653, at *4 (S.D.N.Y. Apr. 18, 2006), vacated sub nom. Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc., 502 F.3d 91 (2d Cir. 2007). After defendants filed their brief in opposition to class certification, however, the Second Circuit vacated and remanded Judge McKenna's decision, holding that there are no particular dangers inherent in the practice of transferring class membership that do not arise in the context of claim assignment generally. See

Cordes, 502 F.3d at 103. Since antitrust claims are generally assignable, the Cordes Court held

that an assignment of class representative status in an antitrust case is likewise permissible and

does not amount to champerty. Id. Ranis's status as an assignee therefore does not prevent it

from joining or representing the class.

### 2. Conflicts of Interest

"It is axiomatic that a putative representative cannot adequately protect the class if his

interests are antagonistic to or in conflict with the objectives of those he purports to represent."

7A Charles Alan Wright et al., Federal Practice and Procedure § 1768 (3d ed. 2011). However, a

conflict of interest will not destroy adequacy under Rule 23 unless the conflict is "fundamental"

and concrete; conflicts which are merely "speculative . . . should be disregarded at the class

certification stage." In re Visa Check/MasterMoney Antitrust Litig., 280 F.3d 124, 145 (2d Cir.

2001) (overruled on other grounds by In re IPO, 471 F.3d at 24) (internal quotation marks

omitted); accord Denney v. Deutsche Bank AG, 443 F.3d 253, 268 (2d Cir. 2006).

Defendants argue that Ranis has an inherent conflict of interest with the rest of the class

because Ranis's assignor, Graymor, "wanted to see higher market prices for vitamin C" in order

to "increase its opportunities to profit as a distributor." Since the other class members all sought

lower vitamin C prices, defendants argue, Ranis is more closely aligned with the defendants in

this action and is therefore unlikely to vigorously pursue the class claims.

Defendants do not allege, and the facts would not support a finding, that Graymor

actually took part in defendants' price-fixing conspiracy. Instead, defendants offer evidence

tending to show that, at certain points in time, it was in Graymor's self-interest to see the market

price of vitamin C rise. For example, Graymor's sales director wrote an e-mail in which he

appeared to express satisfaction over the prospect of "dramatic price increases" in the vitamin C

market. But defendants do not dispute that Graymor, like the rest of the class members, sought to *purchase* vitamin C at the lowest price possible. Presumably, any distributor of vitamin C aims to maximize profits by buying low and selling high. This is consistent with the e-mails cited by defendants, in which Graymor's sales director explained his intention to hold vitamin C inventory until the market price rose again, at which time Graymor could sell the inventory at a larger profit margin.

Defendants' conflict-of-interest argument must logically be based on an assumption that the entire class, save Graymor, consists of end-users who never resell vitamin C and therefore oppose price increases at all points in time. But the class is defined solely by whether or not a business purchased directly from a defendant – in other words, the class is defined by purchasing practices, not by downstream sales. There is thus no reason to believe that the entire class is homogenously end-users; in fact it is equally likely that the class consists entirely of distributors whose business habits dovetail perfectly with Graymor's.

Moreover, even if Graymor were the only distributor in the entire class, its occasional interest in high market prices would not create a conflict of interest. Plaintiffs seek to represent a class of direct purchasers in a damages-only suit. When antitrust plaintiffs seek only damages, Hanover Shoe requires a court to disregard the downstream sales of these direct purchasers. Graymor's interest in seeing market prices rise, which appears to have been an attempt to "pass-on" any overcharges suffered by Graymor, is therefore irrelevant to this case. Since Graymor's downstream-sales practices will not come into play in this case, they are incapable of causing a conflict of interest between Ranis and the class. Ranis and the rest of the class, including the end-users, have precisely the same goal in this case: to demonstrate that the defendants' alleged

antitrust violations caused each plaintiff to purchase vitamin C at an artificially inflated price. This Court will look no further down the stream.

Although defendants did not cite to it, there is one important case that lends support to their conflict-of-interest argument. In Valley Drug Company v. Geneva Pharmaceuticals, Inc., 350 F.3d 1181 (11th Cir. 2003), the Eleventh Circuit held that a conflict of interest could arise between a named plaintiff and absent class members if the named plaintiff had benefitted from the defendant's antitrust violation by passing on the overcharge to remote purchasers. Although the Court acknowledged that Hanover Shoe requires a court to disregard downstream sales when calculating damages in an antitrust case, the Court believed that the question addressed in Hanover Shoe was distinct from the question of whether "the economic reality of the situation leads some class members to have economic interests that are significantly different from – and potentially antagonistic to – the named representatives purporting to represent them." Id. at 1195.

I disagree with the Valley Drug Court's holding in the context of a damages-only class. Although the Court was correct to note that Hanover Shoe dealt with the calculation of damages in an antitrust case, rather than the existence of a conflict of interest under a Rule 23(a) analysis, the Valley Drug Court failed to recognize that Hanover Shoe's holding eradicates any possibility that a named plaintiff's downstream sales could create a conflict of interest with other class members. Conceivably, if Ranis were seeking to enjoin defendants' alleged price-fixing conspiracy, evidence that it benefitted economically from the conspiracy could weigh into my consideration of whether Ranis would "vigorously prosecute the interests of the class." Id. at 1196 (internal quotation marks omitted). But the same is not true when all class members seek simply to collect damages.

Other courts that have considered this issue have also declined to follow Valley Drug, finding it irreconcilable with Hanover Shoe.  See, e.g., Meijer, Inc. v. Warner Chilcott Holdings Co. III, Ltd., 246 F.R.D. 293 (D.D.C. 2007) ("[T]he Eleventh Circuit's holding fails to appreciate the true import of the Hanover Shoe rule that a direct purchaser may recover the full amount of the overcharge, even if he is otherwise benefitted . . . ."); In re Hypodermic Prods. Direct Purchaser Antitrust Litig., No. 05-CV-1602, 2006 U.S. Dist. Lexis 89353, at *16 (D.N.J. Sept. 7, 2006) (citing with approval a magistrate judge's ruling that Valley Drug's "narrow reading of Hanover Shoe is neither shared by this Court nor this circuit"); In re Wellbutrin Sr Direct Purchaser Antitrust Litig., Civil Action No. 04-5525, 2008 WL 1946848, at *6 (E.D. Pa. May 2, 2008) ("[T]he Court declines to follow Valley Drug and will adhere instead to the principles announced in Hanover Shoe and Illinois Brick.").

In any event, the Valley Drug decision is distinguishable from this case because it was limited to the particular characteristics of the pharmaceutical industry.  Specifically, the Valley Drug Court relied on an assumption that the demand for pharmaceuticals is less elastic than the demand for most consumer goods.  If a court need not consider fluctuations in demand levels, according to the Valley Drug Court, the process of determining whether an overcharge was passed on to a remote purchaser would be simplified.  Valley Drug, 350 F.3d at 1195.  The defendants do not make such an argument in this case, and this Court therefore has no reason to shrug off the Hanover Shoe Court's concerns over the "evidentiary complexities and uncertainties" associated with the "pass-on" theory.  See In re Air Cargo Shipping Servs. Antitrust Litig., No. 06-MD-1775, 2010 WL 4916723, at *3 (E.D.N.Y. Nov. 24, 2010) (distinguishing Valley Drug on these grounds).

Defendants also argue that Ranis's lawyers have a conflict of interest. This conflict is supposedly caused by the lawyers' representation of Animal Science, an indirect purchaser that has moved for certification of the Injunction Class. Defendants surmise that the Injunction Class may include indirect purchasers that are also members of putative classes seeking damages under state-law provisions. Because these various class actions all seek relief against the same defendants, it is argued that both direct and indirect purchasers are "seeking to recover from the same pool of money." Defendants are apparently concerned that, by representing both direct and indirect purchasers, Ranis's lawyers will be forced to prioritize one class over another.

This argument does not make sense. The indirect purchasers who seek damages from the defendants under state law are not represented by Ranis's lawyers. Ranis's lawyers represent only two classes: the instant class, which seeks damages on behalf of direct purchasers under federal law, and a class of direct and indirect purchasers seeking only injunctive relief under federal law. The interests of these two classes do not conflict, and counsel therefore will not have to choose between them. Ranis's counsel is free to litigate the instant case vigorously without fear of prejudicing the Injunction Class in any way.

### 3. *Ranis's Credibility and Integrity*

Because class representatives have a duty to guard the interests of the class, a court should deny class certification if the putative representative is not honest or ethical enough to adequately discharge this fiduciary duty. See Savino, 164 F.3d at 87. However, this inquiry into the representative's integrity "is not an examination into their moral righteousness, but rather an inquiry directed at improper or questionable conduct arising out of or touching upon the very prosecution of the lawsuit." Friedman-Katz v. Lindt & Sprungli (USA), Inc., 270 F.R.D. 150, 159 (S.D.N.Y. 2010) (internal quotation marks omitted). Because integrity considerations are

"restricted to their relevance to issues in the litigation," Rocco v. Nam Tai Elecs., Inc., 245

F.R.D. 131, 137 (S.D.N.Y. 2007), courts in this Circuit have disregarded ad hominem attacks

that call the putative representative's character into question over incidents unrelated to the case

before the court. See, e.g., Jones v. Ford Motor Credit Co., No. 00-CV-8330, 2005 WL 743213,

at *18-19 (S.D.N.Y. Mar. 31, 2005) (class representative's prior convictions for burglary and

rape "by no means touch upon the class claims").

Defendants' attacks on Ranis's credibility fall into the category of criticisms that courts

in this Circuit tend to disregard. Defendants argue that Ranis and class counsel have engaged in

a dishonorable plot to conceal Graymor's "questionable business practices" from this Court.

These business practices involve attempts by Robert Conway, Graymor's sales manager, to

obtain tips from the defendants regarding future price trends. In various e-mails, Conway refers

to these tips as "inside pricing information"; offers to pay "a reasonable fee" for the information;

and vaguely asserts that Graymor was willing to "work quietly behind the scenes" to obtain such

information. Defendants argue that Ranis's lawyers attempted to hide these practices from the

Court by assigning Graymor's claims to Ranis and refusing to disclose Graymor's identity for

more than a year.

In response to this charge, plaintiffs argue that Graymor's business practices were

legitimate and that its claims were assigned to Ranis in order to protect Graymor from any

potential retaliation by Chinese manufacturers. Defendants counter that Graymor could not

reasonably fear retaliation, as it had left the vitamin C business two years prior to filing this

lawsuit. However, it is uncontested that Graymor continued to purchase other products from

Chinese manufacturers. Alfred J. Gordon, the president of Ranis and Graymor, submitted an

affidavit stating that Graymor's identity was concealed during the early stages of this litigation

because he "was concerned that publicity about [Graymor's] name could be used against [Graymor] in China and subject [Graymor] to possible retaliation." Gordon testified at deposition that he believed that "there was a shared basis of information among Chinese manufacturers" and that he was worried that Graymor could be frozen out of the market in retaliation for suing the Chinese vitamin C manufacturers.

I find that defendants have failed to rebut Gordon's explanation for keeping Graymor's identity private. Moreover, despite their sinister characterization of Graymor's business practices, defendants' exact grievance is not apparent to me. Defendants do not allege that Graymor took part in any alleged antitrust violations, nor do defendants allege that Graymor misappropriated trade secrets or violated any laws against inside trading. To the extent that Graymor's quest for "inside information" was otherwise illegal or immoral, for reasons I am unable to envision, I find that this conduct bears no meaningful connection to the litigation at hand.

### D.    Typicality

The typicality analysis focuses on whether the named plaintiff's interests align with the interests of the rest of the class. See Moore et al., supra, § 23.24[1]. The purpose of this analysis is to ensure that, by prosecuting its own case, the named plaintiff "simultaneously advances the interests of the absent class members." 1 Joseph M. McLaughlin, McLaughlin on Class Actions § 4:16 (8th ed. 2011).

The typicality criterion does not require complete symmetry between the class representative's claims and those of the absent class members. See Shakhnes ex rel. Shakhnes v. Eggleston, 740 F. Supp. 2d 602, 625 (S.D.N.Y. 2010). Rather, the named plaintiff must simply raise claims that "arise from the same course of events" as the class claims and make "similar

legal arguments to prove the defendant's liability." Robidoux v. Celani, 987 F.2d 931, 936 (2d Cir. 1993).

Defendants do not dispute that Graymor directly purchased vitamin C from one of the defendants at a price that was allegedly inflated due to an illegal conspiracy to impose price floors and limit exports to the United States. The claims and legal arguments brought by Ranis, as assignee of Graymor, thus appear completely parallel to the claims brought by other class members, and the typicality requirement is therefore satisfied.

However, defendants argue that Ranis will be subject to unique defenses not applicable to other class members. In general, typicality is lacking when a putative class representative would be "subject to unique defenses which threaten to become the focus of the litigation." Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp., 222 F.3d 52, 59 (2d Cir. 2000). Specifically, defendants allege that Ranis is an ignorant class representative and is being propped up by lawyers who are driving this case in pursuit of their own interests.[4]

Defendants proclaim that Ranis has no "meaningful commitment to this litigation" and "virtually no knowledge or understanding" of the key litigation issues in this case. Class representative status may properly be denied on this basis, but the Second Circuit has expressed a "general disfavor of attacks on the adequacy of a class representative based on the representative's ignorance." In re Flag Telecom Holdings, Ltd. Sec. Litig., 574 F.3d 29, 42 (2d Cir. 2009) (internal quotation marks omitted). Courts in this Circuit therefore deny class certification due to the putative representative's ignorance only when the ignorance is so

---

[4] Defendants do not identify this argument as addressing any particular subsection of Rule 23(a). Although the argument seems to call Ranis's adequacy into question, the Second Circuit has held that such attacks on the putative class representative should be addressed under the typicality prong because an ignorant representative may give "misleading and contradictory testimony with regard to basic issues in the case that might make their claims subject to unique defenses." Baffa, 222 F.3d at 61. I would note, however, that the Second Circuit has addressed this issue under the adequacy prong in the past, and despite this technical change the analysis remains the same. See Maywalt v. Parker & Parsley Petrol. Co., 67 F.3d 1072, 1077-78 (2d Cir. 1995).

profound that the class representative "would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys." Maywalt v. Parker & Parsley Petrol. Co., 67 F.3d 1072, 1077-78 (2d Cir. 1995). A proposed representative can avoid such a fate simply by showing a willingness and ability to pursue the litigation on behalf of the class and a basic understanding of the litigation. See Baffa, 222 F.3d at 62.

Ranis clears this low hurdle easily. Gordon's deposition testimony shows that he fully understands the nature of the claims and is generally apprised of the procedural and technical aspects of the litigation. In an affidavit, he affirmed that he is dedicated to pursuing the class claims and is prepared to cooperate with discovery and trial. In fact, defendants' allegations regarding Ranis's ignorance are supported by almost nothing. The only fact offered in support of this charge is deposition testimony in which Gordon admitted that he did not completely understand why class counsel decided to dismiss the damages claims against defendant Northeast.

Class counsel explains that Northeast was dismissed because Ranis, and presumably other class members, had signed contracts with Northeast that included arbitration clauses. Pursuant to these clauses, defendants sought to compel arbitration of this entire case in Beijing.[5] Plaintiffs' decision to dismiss Northeast, and keep this case in American courts, was tactical and undoubtedly required a sophisticated analysis that could be difficult to explain to a layperson. As Gordon explained at deposition, he was aware that the decision to dismiss Northeast "involve[d] this arbitration in some way," but he did not understand "how that affected the rest of the situation." This is a sufficient level of knowledge and understanding for a named plaintiff,

---

[5] Defendants also argue that Ranis's decision to dismiss Northeast advanced Ranis's interests at the expense of other class members who may not have signed arbitration clauses with Northeast. This argument is puzzling, as defendants fail to explain how the absent class members' interests would be served by moving this case to an arbitration panel in a country that has expressly condoned the defendants' agreements to fix the price of vitamin C.

as these individuals are not expected to understand every intricacy of the litigation or possess a professional-level understanding of the law. See, e.g., Baffa, 222 F.3d at 52; Gunnells v. Healthplan Servs., Inc., 348 F.3d 417, 430 (4th Cir. 2003) ("It is hornbook law . . . that in a complex lawsuit . . . the representative need not have extensive knowledge of the facts of the case in order to be an adequate representative.").

Defendants also argue that Ranis is atypical of the class because it never purchased any vitamin C and because Graymor has been out of the vitamin C business for years. Of course, it is irrelevant that Ranis never purchased any vitamin C, as Ranis is litigating Graymor's claim. It is also irrelevant that Graymor left the business and, according to defendants, has "no stake in what happens to prices going forward." Ranis purports to represent a class seeking damages for antitrust violations that occurred in the past; Graymor's plans regarding prospective business with the defendants therefore do not matter and will not differentiate Ranis from the rest of the class in any meaningful way. This factor does not have any impact on my adequacy analysis either, as Ranis remains incentivized to collect damages for prior antitrust violations. See In re Playmobil Antitrust Litig., 35 F. Supp. 2d 231, 243 (E.D.N.Y. 1998) ("Where the plaintiffs have alleged a single conspiracy to artificially inflate prices, a representative plaintiff may satisfy the adequacy requirement without having . . . made purchases throughout the entire class period." (internal quotation marks omitted)).

Another argument raised by defendants is that this lawsuit is "lawyer-driven" and would never have been filed if Ranis had not been solicited by "lawyers looking for someone to 'front' a case that they had created." Defendants believe that class counsel is interested in this case solely for the "perceived financial rewards they anticipate," rather than any sincere desire to

enforce antitrust laws. Defendants opine that I "should not allow the class action mechanism to be used to create litigation that would not otherwise exist."

Either defendants are naïve for making this argument, or, more likely, they hope that I am naïve enough to accept it. Of course this lawsuit is driven by lawyers who perceive financial rewards. It would make little sense for a law firm like plaintiffs' to bring a massive antitrust class-action on a pro-bono basis. By the same token, individual class members are unlikely to have sufficient resources – let alone fluency with federal antitrust law – to institute a lawsuit such as this. A primary objective of Rule 23 is to allow lawsuits to be brought that would not have otherwise been brought; whether the idea for a class action first arose in the mind of a lawyer, rather than a class member, is of no moment in a class certification analysis.

The case law and Senate Report to which defendants cite, which discuss Congress's rationale in passing the Private Securities Litigation Reform Act of 1995 ("PSLRA"), do not support defendants' argument. Defendants are correct that Congress passed this law in response to concerns that securities litigators were driving class-action lawsuits that would never have been filed by any of the class members. See S. REP. NO. 104-98, at 5 (1995) *reprinted in* 1995 U.S.C.C.A.N. 679, 685. Courts in this Circuit often cite this law with approval, noting that its provisions "were intended to curtail the vice of 'lawyer-driven' litigation . . . in contingent securities fraud class actions." Iron Workers Local No. 25 Pension Fund v. Credit-Based Asset Servicing & Securitization, LLC, 616 F. Supp. 2d 461, 463 (S.D.N.Y. 2009).

However, these courts' concerns are particular to the nature of large securities litigations. The PSLRA was passed because Congress was concerned about harm to the marketplace caused by the prevalence of "frivolous 'strike' suits . . . [which] are often based on nothing more than a company's announcement of bad news" and which extort companies into paying large

settlements simply to avoid the costs of fighting a meritless lawsuit. S. REP. NO. 104-98, at 5

(1995) *reprinted in* 1995 U.S.C.C.A.N. 679, 685. In contrast, defendants in this case have never

disputed that there was a widespread conspiracy among Chinese vitamin C manufacturers to fix

the price of vitamin C at an artificially high level in violation of American antitrust laws.

Congress's disapproval of lawyers who drive frivolous lawsuits is therefore inapplicable

to a case such as this. Moreover, the provisions of the PSLRA do not apply to antitrust cases; if

Congress saw the need to curtail lawyer-driven antitrust class actions, it could have passed an

analogous statute.

Defendants' misgivings over the potential for abuse in a lawyer-driven class action find

good company among judges and scholars. See, e.g., Thorogood v. Sears, Roebuck & Co., 627

F.3d 289, 293-294 (7th Cir. 2010) (Posner, J.) (collecting cases and scholarship). In Thorogood,

the Seventh Circuit listed some abuses that can arise in a lawyer-driven class action, such as

settlement extortion; collusion between defense lawyers and class counsel; and intentional

maximization of attorneys' fees. Conceivably, if these abuses were shown to exist here, this

could factor into my determination of whether class counsel is an adequate guardian of class

interests. But this case presents no evidence of these abuses. To the contrary, although

defendants' briefs are laden with hysterical warnings about the dangers of a "lawyer-driven"

class action, defendants support this argument only by two undisputed facts: 1.) Ranis is not

footing the bill for this lawsuit; and 2.) Ranis had not considered bringing this lawsuit until

Gordon was contacted by class counsel.

Counsel's decision to advance litigation costs in this case is typical and proper. In fact,

courts have explicitly recognized that this common practice facilitates Rule 23's goals by

allowing individuals to initiate important lawsuits that may otherwise have been prohibitively

costly.  See, e.g., Suffolk County v. Long Island Lighting Co., 710 F. Supp. 1407, 1414

(E.D.N.Y. 1989) ("Rule 23 requires, as a practical matter, that attorneys advance costs on a scale

not reimbursable by any normal client."); Rand v. Monsanto Co., 926 F.2d 596, 600-601 (7th

Cir. 1991) (Easterbrook, J.) (remarking that a rule requiring a class representative, rather than

class counsel, to bear the cost of litigating a class action would "cripple the class action device,"

would "serve no good purpose," and is "inconsistent with Rule 23").  This is even true in the

context of securities litigation.  See  In re Worldcom, Inc., Sec. Litig., 219 F.R.D. 267, 284

(S.D.N.Y. 2003) ("[R]equiring named plaintiffs to pay litigation expenses, even their pro rata

share of litigation expenses, can have deleterious effects on the federal class action device.").

I am similarly unmoved by the fact that Ranis did not consider suing until solicited by

class counsel.  In the past, the fact that class counsel had solicited a representative party to bring

a class action was taken into consideration by courts making class certification determinations.

See William B. Rubenstein et al., Newberg on Class Actions § 15:4 (4th ed. 2011).  However,

this concern has waned in recent years and courts are now reluctant to give much weight to this

factor in a class certification analysis.  See id.; Busby v. JRHBW Realty, Inc., 513 F.3d 1314,

1324 (11th Cir. 2008) (holding that, if class counsel had improperly solicited the class

representative, "'the ordinary remedy is disciplinary action . . .' not denial of class certification"

(quoting Halverson v. Convenient Food Mart, Inc., 458 F.2d 927, 932 (7th Cir. 1972))); Jim Ball

Pontiac-Buick-GMC, Inc. v. DHL Express (USA), Inc., No. 08-CV-761C, 2011 WL 815209, at

*5 (W.D.N.Y. Mar. 2, 2011) (noting that defendants had argued "that counsel solicited plaintiff

to be the class representative," but holding that "the class is [nonetheless] adequately represented

by plaintiff's counsel"); Ballan v. Upjohn Co., 159 F.R.D. 473, 488 (W.D. Mich. 1994) ("open

solicitation is no longer frowned upon as in the past").

I share these courts' doubts over the relevance of this factor in a class certification analysis. If the solicitation of a named plaintiff violated a state's ethical rules, it is conceivable that this violation, in conjunction with other evidence of ethical misconduct, could be relevant to a determination of whether class counsel is generally trustworthy and ethical enough to represent the class. Here, however, defendants do not allege that the solicitation at issue violated any state's ethical rules and make no other accusations of professional misconduct against class counsel. Denial of class certification on this basis is therefore unwarranted.

## II.    Rule 23(b)(3)'s Requirements – Predominance and Superiority

Under Rule 23(b)(3), plaintiffs must show that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods" for adjudicating the controversy. As the Advisory Committee explains, Rule 23(b)(3) permits class certification for cases "in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated . . . ." The Supreme Court has recognized that the goal of Rule 23(b)(3) is to provide "vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court at all." Amchem, 521 U.S. at 617 (citation and quotation marks omitted).

The "predominance" requirement of Rule 23(b)(3) "tests whether the proposed [class is] sufficiently cohesive to warrant adjudication by representation." Id. at 623. This criterion is satisfied if "resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." Myers, 624

F.3d at 547 (internal quotation marks omitted). Here, plaintiffs allege that defendants engaged in a horizontal price-fixing conspiracy that caused the market price of vitamin C to rise. In cases such as this, courts have frequently held that the predominance requirement is satisfied because the existence and effect of the conspiracy are the prime issues in the case and are common across the class. See Arden Architectural Specialties, Inc. v. Wash. Mills Electro Minerals Corp., No. 95-CV-7574, 2002 WL 31421915, at *7 (W.D.N.Y. Sept. 17, 2002); In Re Med. X-Ray Film Antitrust Litig., No. 93-CV-5904, 1997 WL 33320580, at *5 (E.D.N.Y. Dec. 26, 1997) ("As a general rule in anti-trust price-fixing cases, questions common to the members of the class will predominate over questions affecting only individual members." (internal quotation marks omitted)); In re NASDAQ Market-Makers Antitrust Litig., 169 F.R.D. 493, 518 (S.D.N.Y. 1996) (collecting cases).

Defendants do not deny that the alleged conspiracy's existence and effect are the chief issues in this case and can be demonstrated through generalized proof. Instead, defendants simply argue that common issues do not predominate because Ranis "has many individual issues not shared with other members of the class." As discussed above, however, the "individual issues" of which defendants complain – for example, Ranis's status as an assignee; Graymor's "questionable" business practices; and Graymor's interest in high vitamin C prices – are insubstantial. None of these "individual issues" presents a meritorious defense that could distinguish Ranis from any other class member. Moreover, the existence of individual defenses will not defeat predominance if "a sufficient constellation of common issues binds class members together." Brown v. Kelly, 609 F.3d 467, 483 (2d Cir. 2010). This class is united by common issues of law and fact that are determinative of liability and causation; this is more than sufficient to satisfy predominance. See In re Visa Check, 280 F.3d at 140.

Rule 23(b)(3)'s "superiority" requirement is frequently satisfied when it would be prohibitively expensive for class members with small claims to proceed individually.  Seijas v. Republic of Argentina, 606 F.3d 53, 58 (2d Cir. 2010).  In this case, plaintiffs seek to prove the existence and effect of a large conspiracy among Chinese vitamin C manufacturers.  It has required and will continue to require a vast outpouring of resources to conduct even the minimum number of depositions abroad or to procure the necessary translation services required to interpret the documentary evidence.  Moreover, proving that the alleged conspiracy affected the market price of vitamin C will require significant fees toward expert analyses and testimony.  Direct purchasers are permitted to join the class regardless of the quantity of vitamin C purchased from the defendants; many of the class members' claims will therefore be small relative to the costs of maintaining this litigation.  A class action is thus superior to requiring each class member to bring an individual claim.

Other factors relevant to a finding of superiority include the manageability of a class action and the desirability of litigating the claims in a particular forum.  See In re Visa Check, 280 F.3d at 133.  In a case such as this, a single proceeding is far more manageable than a series of disjointed proceedings, as adjudicating the claims in a single class action will promote uniformity of decisions and will protect courts from wasting resources on duplicative litigation.  See In re Currency Conversion Fee Antitrust Litig., 264 F.R.D. 100, 117 (S.D.N.Y. 2010).  Furthermore, this Court is highly familiar with the class claims as a consequence of the coordination of many similar cases by the Judicial Panel for Multidistrict Litigation.  The class members will therefore benefit from streamlined pre-trial proceedings in this forum.  See id.

**III.    Defendants' Motion to Dismiss Ranis's Claim for Damages or Strike Ranis's Class Allegations**

On September 22, 2006, defendants moved to dismiss Ranis's claim for damages on two grounds.  First, defendants argued that the complaint failed to allege that Ranis had been harmed by the conspiracy, as there was no allegation that Ranis purchased any vitamin C or was assigned a valid claim by an entity that purchased vitamin C.  Second, defendants argued that even if Ranis amended the complaint to allege that it had been assigned a valid claim, "its allegations would not be sufficient as a matter of law to satisfy the direct purchaser requirement set forth by the Supreme Court in Illinois Brick."  In the alternative, defendants argued that Ranis's class allegations should be stricken under Rule 12(f) of the Federal Rules of Civil Procedure based on Judge McKenna's holding that class representative status may not be assigned.  See In re Pub. Offering Fee, 2006 WL 1026653, at *4.

Defendants' first argument was mooted when plaintiffs amended the complaint, on January 31, 2007, to include the allegation that Graymor directly purchased vitamin C from defendants and assigned its claim to Ranis.  Defendants' second argument is foreclosed by the Second Circuit's decision in Cordes, which held that an assignee of an antitrust claim stands before the court "in the shoes of" its assignor.  502 F.3d at 101.  Since Ranis stands in the shoes of Graymor, and defendants concede that Graymor is a direct purchaser of vitamin C, there is no violation of the Illinois Brick rule.  Defendants' motion to dismiss Ranis's claim for damages is accordingly denied.

The Second Circuit has also foreclosed defendants' motion to strike Ranis's class allegations.  As discussed above, the Cordes Court reversed Judge McKenna's decision and found that the assignment of class representative status is permissible in an antitrust case.  Id. at 103.  Defendants' motion to strike Ranis's class allegations is therefore denied.

## 2.   THE INJUNCTION CLASS

**I.**   **Rule 23(a)'s Requirements – Numerosity, Commonality, Typicality, and Adequacy**

### A.   Numerosity

The Injunction Class includes both direct purchasers of vitamin C and indirect purchasers of vitamin C. As discussed above, there are at least 139 entities that directly purchased vitamin C from the defendants. Defendants do not contest numerosity in any way, and this Court finds by a preponderance of the evidence that the Injunction Class is sufficiently numerous because joinder of more than 139 members would be difficult and inconvenient, if not impossible. See Gortat, 257 F.R.D. at 362.

### B.   Commonality

Again, defendants do not contest commonality in this case. Having analyzed the Injunction Class's claims, I find that this class has satisfied the commonality requirement for the same reason that the Damages Class satisfied this requirement. The most significant question posed by the Injunction Class is the same question posed by the Damages Class:  did the defendants' price-fixing agreement cause an artificial increase in the market price of vitamin C? The answer to this question will be generally applicable to all members of the Injunction Class.

### C.   Typicality

Animal Science is a manufacturer and distributor of animal feed additives and has purchased vitamin C manufactured by defendants for use in these products. Defendants do not dispute that Animal Science's claims and the class claims "arise from the same course of events" and rely on the same "legal arguments to prove the defendant's liability." Robidoux, 987 F.2d at 936. Defendants nevertheless argue that Animal Science is not a typical member of the

Injunction Class, as it spent only $127,388.11 on vitamin C during the year 2005. Defendants explain that Animal Science's vitamin C expenditures represented a small percentage of Animal Science's total purchases for that year and thus characterize Animal Science's stake in this litigation as "de minimus."

In a price-fixing case such as this, the fact that a putative class representative purchased "only a small portion of the products whose prices were anti-competitively established" does not itself destroy typicality. In re Playmobil, 35 F. Supp. 2d at 243. A putative class representative need not be a heavy-weight in its industry to satisfy the typicality prong; the relevant inquiry is simply whether absent class members' interests are advanced by the prosecution of the representative's claim. Defendants have presented no evidence by which this Court could compare Animal Science's vitamin C expenditure with the expenditures of absent class members; there is thus no reason to accept defendants' "de minimus" characterization. Moreover, even if this expenditure is modest in comparison to the regular buying practices of absent class members, this fact does not subject Animal Science to any unique defenses or otherwise differentiate Animal Science's claim in any meaningful way. Typicality is therefore satisfied.

**D.      Adequacy**

As discussed above, class counsel are seasoned class action litigators. Furthermore, defendants do not challenge Animal Science's assertion that it is a vigorous and well-informed class representative. Instead, defendants argue that Animal Science is inadequate to represent the Injunction Class because it is not a member of the class; suffers from various conflicts of interest; and has already demonstrated a willingness to sacrifice important class interests. I will address these arguments in turn.

### 1. *Animal Science's Class Membership*

Defendants argue that Animal Science is not a "proper class member of an injunctive class" because Animal Science has not satisfied the four-factor test that a plaintiff must satisfy in order to qualify for permanent injunctive relief. According to the Supreme Court, a plaintiff seeking a permanent injunction must ordinarily demonstrate that: 1.) the plaintiff has suffered an "irreparable injury"; 2.) remedies available at law are inadequate to compensate for that injury; 3.) an equitable remedy is warranted after consideration of the balance of hardships; and 4.) the public interest would not be disserved by a permanent injunction. EBay, Inc. v. MercExchange, LLC, 547 U.S. 388, 391, 126 S. Ct. 1837 (2006). Defendants home in on the first factor of this test, arguing that Animal Science has suffered no "irreparable injury" because it has managed to pass any overcharge on to its customers and ultimately realize a profit on each of its vitamin C transactions.

This argument is flawed in three fundamental ways. First, defendants have lifted the standard for granting a permanent injunction and grafted it onto Rule 23's standard for class certification. This is clearly improper, and defendants have not pointed me to any case that holds a plaintiff to this standard at the class certification stage. Defendants' citation to Hnot v. Willis Group Holdings Limited, 241 F.R.D. 204, 212 (S.D.N.Y. 2007), does not support their argument; the Hnot court simply held that a Rule 23(b)(2) analysis requires a court to determine whether an injunction will be appropriate if plaintiffs succeed on the merits. This determination is different from the four-factor test cited by defendants, which is essentially a merits determination that does not overlap with any Rule 23 considerations.

Second, Animal Science need not show that it has suffered "irreparable injury" in order to enjoin an antitrust violation. Animal Science derives its standing to sue for injunctive relief from section 16 of the Clayton Act, which provides that a plaintiff may sue to enjoin any "threatened loss or damage by a violation of the antitrust laws." 15 U.S.C. § 26. The Supreme Court has accordingly held that a section 16 plaintiff need not demonstrate actual loss; "he need only demonstrate a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur." Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 130, 89 S. Ct. 1562 (1969); accord Cargill, Inc. v. Monfort of Colo., Inc., 479 U.S. 104, 111, 107 S. Ct. 484 (1986); Kruman v. Christie's Int'l, PLC, 284 F.3d 384, 397 (2d Cir. 2002) (abrogated on other grounds).

Finally, defendants misconstrue the term "injury" in the context of the Clayton Act. It is true that a plaintiff seeking injunctive relief for an alleged antitrust violation must demonstrate a threat of injury, see Zenith, 395 U.S. at 130, and defendants correctly note that this is a threshold requirement which is appropriately addressed at the class certification stage. See, e.g., Sullivan v. DB Invs., Inc., No. 08-CV-2785, 2011 WL 6367740, at *26 (3d Cir. Dec. 20, 2011) (en banc). But this "injury" need not be demonstrable as an accrued – or even prospective – loss of profits. Instead, Animal Science must simply show a threat of injury "of the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful." Consol. Gold Fields PLC v. Minorco, SA, 871 F.2d 252, 257 (2d Cir. 1989) (citing Cargill, 479 U.S. at 111).

Defendants insist that Animal Science has suffered no actual or prospective injury because Animal Science "makes money off each of its purchases and resales of vitamin C" and has continued to make rosy predictions about the company's future growth. In essence,

defendants are again waging a pass-on defense: because Animal Science has passed on any overcharge that it suffered as a result of the defendants' conspiracy, Animal Science has suffered no net economic injury and has no right to enjoin the conspiracy.

This theory misconstrues the purpose of the Clayton Act and, if adopted, would foreclose an unacceptable number of antitrust suits seeking injunctive relief. The antitrust laws were enacted "for the protection of competition," Cargill, 479 U.S. at 115, and a lessening of competition is "precisely the kind of irreparable injury that injunctive relief under section 16 of the Clayton Act was intended to prevent." California v. Am. Stores Co., 492 U.S. 1301, 1304, 110 S.Ct. 1 (1989) (internal quotation marks omitted). When a purchase is made "after a simulated competition, at a price fixed by [a] trust" in excess of the natural market price, the buyer has suffered an antitrust injury. Chattanoonga Foundry & Pipe Works v. City of Atlanta, 203 U.S. 390, 356-96, 27 S. Ct. 65 (1906); accord In re New Motor Vehicles Canadian Export Antitrust Litig., 522 F.3d 6, 13 (1st Cir. 2008) ("There is no doubt that the types of injuries alleged here – consumers paying artificially inflated prices due to antitrust violations – are antitrust injuries.").

I therefore find that Animal Science's past and prospective purchases of vitamin C at artificially inflated prices constitutes antitrust injury regardless of whether Animal Science recoups this overcharge by passing it along to remote purchasers. This finding is consistent with the purpose of section 16 of the Clayton Act, which is to provide courts a "flexible" mechanism with which to serve "the high purpose of enforcing the antitrust laws." Zenith, 395 U.S. at 131. Since courts need not precisely calculate the economic injury inflicted by an artificial price when granting injunctive relief, there is certainly no reason to do so at the class certification stage. The standard for demonstrating antitrust injury under section 16 is accordingly less stringent than the

standard for demonstrating antitrust injury in a suit seeking damages, see In re New Motor Vehicles, 522 F.3d at 12-13, and it is easily met here.

### 2. *Conflicts of Interest*

Defendants argue that class counsel has a debilitating conflict of interest caused by their dual representation of the Damages Class and the Injunction Class. This argument is not well-articulated, but defendants quote at length from a District of Maryland case which involved an antitrust class action that was similarly divided between a damages class and an injunction class. See In re Microsoft Corp. Antitrust Litig., 214 F.R.D. 371 (D. Md. 2003). The Microsoft court held that a putative class representative could not adequately protect the interests of both an injunction class and a damages class because the interests of these two classes had the potential to collide. The court explained that the members of the damages class were likely to be interested in a monetary settlement, whereas the members of the injunction class may be compelled to settle for nothing short of a complete injunction on all disputed behavior. This contradiction, the court explained, could force the class representative to choose between rejecting a settlement that would be in the interest of the damages class or "appearing to use the leverage provided by the nationwide injunctive class to achieve a monetary settlement that leaves some members of the injunctive class disgruntled." Id. at 379.

I disagree with the Microsoft court's holding for two reasons. First, by characterizing this problem as "at least an apparent conflict of interest," the Microsoft court implicitly acknowledged that the conflict presented was speculative rather than concrete. Defendants correspondingly insist that "potential conflicts" destroy adequacy in a Rule 23 analysis. This is incorrect; a conflict of interest will not destroy adequacy if it is "merely speculative or hypothetical." Moore et al., supra, § 23.25[2][b][ii]; accord Hnot v. Willis Grp. Holdings Ltd.,

228 F.R.D. 476, 486 (S.D.N.Y. 2005) ("A potential for conflict need not defeat class certification."). In fact, the Second Circuit recently held that a conflict posed by dual representation did not justify refusing to certify a class because the conflict was "potential," rather than actual, and because the district court could revisit the issue and de-certify the class if a true conflict ever manifested. Seijas v. Republic of Argentina, 606 F.3d 53, 57 (2d Cir. 2010); accord Ingles v. City of New York, No. 01-CV-8279, 2003 WL 402565, at *6 (S.D.N.Y. Feb. 20, 2003) (Chin, J.) ("to the extent any conflicts do arise, I can adjust the definition of the class at that time"). Under my continuing obligation to amend class certification as necessary to ensure that Rule 23's requirements remain satisfied, see Fed. R. Civ. P. 23(c)(1)(C), I can revisit this conflict if it ripens.

Second, a conflict of interest will not defeat class certification unless it is "fundamental." In re Flag, 574 F.3d at 35. In other words, a conflict undermines adequacy only if it presents antagonistic interests which "go to the heart of the litigation, relating to the subject matter of the suit." Rubenstein et al, supra, § 18:14; accord Dziennik v. Sealift, Inc., No. 05-CV-4659, 2007 WL 1580080, at *8 (E.D.N.Y. May 29, 2007). The conflict presented here is merely the prospect that class counsel will use manipulative litigation tactics to leverage one class for the benefit of another. This does not touch upon the subject matter of the litigation and is not particular to the facts before me; it is an accusation that could be waged in any case of dual representation. Even if this conflict ripens, therefore, it is unlikely to create a "fundamental" conflict capable of destroying class certification.

Defendants also assert that there is a conflict of interest between two categories of Injunction Class members. Specifically, defendants argue that "direct purchasers are seeking the full amount of any overcharge while indirect purchasers will likely argue that any damages have

been passed on to them." This argument is illogical. First, direct purchasers are not seeking to be compensated for an overcharge through the Injunction Class; they are seeking an injunction. Second, to the extent defendants are arguing that there is a conflict of interest between the indirect purchasers of the Injunction Class and the direct purchasers of the Damages Class, this conflict is foreclosed by Hanover Shoe. Since downstream sales are irrelevant to a damages action under Hanover Shoe, the Damages Class will take no position on whether the overcharge was ultimately passed on to indirect purchasers. The Injunction Class is thus free to litigate this issue without encountering any disagreement between the direct and indirect purchasers.

### 3. *Willingness to Sacrifice Class Interests*

Defendants argue that Animal Science and class counsel have structured this lawsuit in a way that splits certain class members' claims. Although all direct purchasers of vitamin C are members of both the Injunction Class and the Damages Class, neither class seeks damages on behalf of indirect purchasers. Since the Injunction Class seeks injunctive relief on behalf of indirect purchasers but fails to pursue damages – to which indirect purchasers may be entitled under state law – defendants argue that the Injunction Class has split the indirect purchasers' claims. The crux of this argument is that principles of res judicata will bar the indirect purchasers from bringing these claims in the future. By forfeiting the indirect purchasers' damages claims, defendants argue, Animal Science and class counsel have exhibited their disregard for the indirect purchasers' interests and have demonstrated their inadequacy to represent the indirect purchasers.

Defendants' basic understanding of claim splitting is correct: a final judgment on the merits generally precludes a plaintiff from bringing a new lawsuit raising issues that could have been litigated in the first suit, but were not. See, e.g., Schwab v. Philip Morris USA, Inc., 449 F.

Supp. 2d 992, 1076 (E.D.N.Y. 2006) (reversed on other grounds) (citing Federated Dep't Stores, Inc. v. Moitie, 452 U.S. 394, 398, 101 S. Ct. 2424 (1981)). Furthermore, some courts have held that a class representative who splits the claims of absent class members – thereby exposing their non-litigated claims to foreclosure through claim preclusion – is inadequate to represent the class. See, e.g., Feinstein v. Firestone Tire & Rubber Co., 535 F. Supp. 595, 606 (S.D.N.Y. 1982); In re Universal Serv. Fund Tel. Billing Practices Litig., 219 F.R.D. 661, 668 (D.Kan. 2004).

      Contrary to defendants' assertion, however, participation in a Rule 23(b)(2) class seeking injunctive relief does not ordinarily preclude absent class members from bringing their non-litigated claims in subsequent lawsuits. This exception to the general claim-splitting rule has its origin in a puzzling Supreme Court decision from 1984. In Cooper v. Federal Reserve Bank of Richmond, 467 U.S. 867, 880, 104 S. Ct. 2794 (1984), the Court held that a plaintiff's claim for individual discrimination under Title VII was not precluded by the plaintiff's earlier participation in a class action alleging a "pattern and practice" of discrimination against the same defendant for the same underlying conduct. The Cooper Court recited the principle that a judgment in a class action would extinguish absent class members' claims "on any issue actually litigated and determined," id. at 874, but did not directly address the claim-splitting rule. In fact, the Court's analysis revolved entirely around Title VII principles and never acknowledged that the ordinary rule against claim-splitting would have mandated a different result. See Tobias Barrington Wolff, *Preclusion in Class Action Litigation*, 105 COLUM. L. REV. 717, 730 (2005) ("The [Cooper] Court confronted a limited question . . . and it offered an answer informed primarily by Title VII policy, making no attempt to explain its result with reference to general preclusion principles.").

Although Cooper did not announce any bright-line rules, some courts have cited this case for the sweeping proposition that "a class action judgment . . . binds the class members as to matters actually litigated but does not resolve any claim based on individual circumstances that was not addressed in the class action." Cameron v. Tomes, 990 F.2d 14, 17 (1st Cir. 1993). Moreover, "every federal court of appeals that has considered the question has held that a class action seeking *only declaratory or injunctive relief* does not bar subsequent individual suits for damages." Hiser v. Franklin, 94 F.3d 1287, 1291 (9th Cir. 1996) (emphasis added); accord Fortner v. Thomas, 983 F.2d 1024, 1031 (11th Cir. 1993); Norris v. Slothouber, 718 F.2d 1116, 1117 (D.C. Cir. 1983) (per curiam); Crowder v. Lash 687 F.2d 996, 1009 (7th Cir 1982). Although some of these courts have appeared to limit their holdings to particular contexts – such as prisoners' conditions of confinement, see, e.g., Crowder, 687 F.2d at 1009 – the Ninth Circuit has gone so far as to hold that it would offend due process to preclude any suit for damages as a result of prior membership in a Rule 23(b)(2) class seeking only injunctive relief. See Frank v. United Airlines, Inc., 216 F.3d 845, 851 (9th Cir. 2000); Brown v. Ticor Title Ins. Co., 982 F.2d 386, 392 (9th Cir. 1992).

Although the Second Circuit has not provided any guidance, I agree with the rationale of the other Circuits that have considered this issue and hold that membership in this Rule 23(b)(2) class does not bar the indirect purchasers' subsequent claims for damages. Rule 23(b)(2) does not provide an opportunity for class members to opt out and does not even oblige a district court to afford class members notice of the action; due process therefore requires that class certification under Rule 23(b)(2) be granted only if "broad, class-wide injunctive or declaratory relief is necessary to redress a group-wide injury." Robinson v. Metro-North Commuter R.R. Co., 267 F.3d 147, 162 (2d Cir. 2001). Damages claims usually require individualized analyses

Page 40 of 46

of class members' circumstances and thus tend to destroy class certification under Rule 23(b)(2). See id. at 165 (damages may not be recovered by a Rule 23(b)(2) class unless the damages calculation "flows directly from a finding of liability on the claims for class-wide injunctive and declaratory relief" (internal quotation marks omitted)).

In the instant case, the indirect purchasers' damages claims vary between states and vary between class members based on the extent to which any overcharge was passed on through each class members' seller. See In re Flash Memory Antitrust Litig., No. C 07-0086, 2010 WL 2332081, at *10 (N.D.Cal. June 9, 2010) ("Recovery in an Indirect-Purchaser case under state law requires a demonstration that a defendant overcharged its Direct-Purchasers for the product at issue, and that those Direct-Purchasers then passed on the overcharges to indirect purchasers."). Such individualized claims would defeat class certification under Rule 23(b)(2), and the class members should therefore be permitted to bring these claims separately.[6]

Although I find that the indirect purchasers' damages claims should not be barred in subsequent suits, it is necessary to discuss the oft-cited notion that "the court conducting the action cannot predetermine the res judicata effect of the judgment." See 18A Charles Alan Wright et al., Federal Practice and Procedure § 4455 (2d ed. 2011). Reliance on this principle has caused at least one district court in this Circuit to refuse to certify a class which sought injunctive relief but excluded some class members' damages claims. See In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liability Litig., 209 F.R.D. 323 (S.D.N.Y. 2002). Although the In re MTBE court recognized that "courts generally allow plaintiffs in class actions to sue for injunctive relief on behalf of the class and then bring damages claims in subsequent individual

---

[6] I do not think that allowing class members to opt out of the Injunction Class would solve this problem. Like the Seventh Circuit, I find it "unacceptable" to require an indirect purchaser to "elect between joining an ongoing class suit and thereby forfeiting his right to seek individual damages, on the one hand, and removing himself from the class (and hence risking exclusion from any equitable relief granted) in order to preserve the possibility of bringing a subsequent damage action, on the other." Crowder, 687 F.2d at 1009.

actions," the court nevertheless held that it had no way to "ensure" that the court considering

such subsequent actions would reach the same result on the issue of claim preclusion. Id. at 340.

The court therefore refused to certify the class and declined to make its own ruling regarding the

preclusive effect of a suit seeking injunctive relief.

I disagree with the In re MTBE court's approach. The Restatement of Judgments lists

several exceptions to the claim-splitting principle, one of which arises when "[t]he court in the

first action has expressly reserved the plaintiff's right to maintain the second action."

Restatement (Second) of Judgments § 26(1)(b) (1982). Several Circuits have endorsed this

exception. See Mountain Pure, LLC v. Turner Holdings, LLC, 439 F.3d 920, 925 (8th Cir.

2006); Vines v. Univ. of La. at Monroe, 398 F.3d 700, 712 (5th Cir. 2005); Yapp v. Excel Corp.,

186 F.3d 1222, 1234 (10th Cir. 1999); Venuto v. Witco Corp., 117 F.3d 754, 758-59 (3rd Cir.

1997). Furthermore, the In re MTBE court's approach has been criticized as saying, in effect, "'I

know that you have proposed a class action that may be properly maintainable, but I won't allow

you to proceed because I must protect the absentees from the possibility that a subsequent court

might misapply my judgment.'" Wolff, supra, at 745. This is an unacceptable result. I hereby

expressly reserve the right of the indirect purchasers to maintain their damages claims in

subsequent proceedings notwithstanding their participation in the Injunction Class. This, of

course, is not a guarantee of what subsequent courts will actually do, but it is sufficient to

extinguish defendants' claim-splitting concerns for the purpose of class certification. See

Schwab, 449 F. Supp. 2d at 1077.

Animal Science's brief in support of class certification persuasively demonstrates class

counsel's belief that their method of structuring this litigation would not result in preclusion of

the indirect purchasers' damages claims. The claim-splitting at issue here therefore does not

raise any adequacy-related red flags on the part of Animal Science or class counsel. See Wu v. Pearson Educ., Inc., No. 09-CV-6557, 2011 WL 4526078, at *13, (S.D.N.Y. Sept. 30, 2011) ("Claim-splitting is [an adequacy] concern only where the class representatives had left aside the far stronger claims for monetary damages and sought to have the weaker claims certified, for dubious strategic purposes." (internal quotation marks omitted)).

**E.    Ascertainability**

Although Rule 23(a) contains no express requirement regarding ascertainability, courts within the Second Circuit have held that the rule impliedly prohibits certification of a class that is not identifiable by reference to objective criteria. See, e.g., Friedman-Katz, 270 F.R.D. 150, 154 (S.D.N.Y. 2010). When a class definition includes a subjective criterion, such as state of mind, the class is not ascertainable and should not be certified. See Spagnola v. Chubb Corp., 264 F.R.D. 76, 97 (S.D.N.Y. 2010). When the class definition consists entirely of objective criteria, a court need only determine whether it would be "administratively feasible" to determine whether or not any given entity belongs to the class. Charron v. Pinnacle Grp. N.Y. LLC, 269 F.R.D. 221, 229 (S.D.N.Y. 2010).

Although a class is not ascertainable if determining class membership would "require a mini-hearing on the merits of each case," see id., a class is not rendered unascertainable merely because an analysis of data is necessary to determine class membership. See Dunnigan v. Metro. Life Ins. Co., 214 F.R.D. 125 (S.D.N.Y. 2003) ("[T]he class can be identified through an examination of the individual files of each of the participants. The fact that this manual process may be slow and burdensome cannot defeat the ascertainability requirement."); In re TFT-LCD (Flat Panel) Antitrust Litig., 267 F.R.D. 583, 592 (N.D.Cal. 2010).

Defendants argue that the Injunction Class is unascertainable because it "contains indefinite multiple levels of indirect vitamin C purchasers, and appears on its face to reach many levels of the business, from direct purchasers to wholesalers, manufacturers, distributors, retailers and consumers." Defendants are correct that the class definition is broad and spans many levels along the distribution chain. However, the criteria used to define the class – whether an entity purchased vitamin C and whether that vitamin C was manufactured by a defendant in this action – are decidedly objective. The fact that these criteria may require an entity to trace the chain of sales via invoices or other company records does not render the class unascertainable, as this process seems administratively feasible. Moreover, the ascertainability requirement is less important in a Rule 23(b)(2) class, since a chief objective of this rule is to provide broad injunctive relief to "large and amorphous" classes not capable of certification under Rule 23(b)(3). Marisol A., 126 F.3d at 378; accord Rule 23(b)(2) advisory committee's note (explaining that an "illustrative" example of a Rule 23(b)(2) class is a civil rights class "whose members are incapable of specific enumeration").

## II. Rule 23(b)(2)

Class certification pursuant to Rule 23(b)(2) is appropriate when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). The justification for allowing certification of such claims is that "the relief sought must perforce affect the entire class at once." Wal-Mart, 131 S. Ct. at 2558. Differences between the extent of harm suffered by each class member do not make Rule 23(b)(2) certification inappropriate. See Marisol A., 126 F.3d at 378.

Page 44 of 46

Defendants argue that certification pursuant to Rule 23(b)(2) is not appropriate because plaintiffs have not established that defendants' conduct had a "common impact" on all class members. Although defendants do not explain this argument clearly, it appears to be a reiteration of their "no irreparable injury" argument. Defendants assert that plaintiffs have failed to show that injunctive relief is appropriate with respect to the class as a whole because plaintiffs have not demonstrated that all class members suffered a net economic harm. I have already explained that this argument has no merit. Defendants' price-fixing conduct is alleged to have caused every class member to purchase vitamin C at an artificially increased price; this is a sufficient "common impact" to warrant certification under Rule 23(b)(2).

Finally, defendants argue that certification under Rule 23(b)(2) is inappropriate because Animal Science's request for an injunction "does not . . . adequately delineate what behavior is lawful and what behavior is unlawful," and is therefore too vague. This argument has no place in a class certification analysis. Of course, the Court will fashion any ultimate injunctive relief in a way that provides reasonable notice to the defendants of what behavior is unlawful.

## CONCLUSION

Ranis's [247] motion for certification of the Damages Class is granted. Defendants' [63] motion to dismiss Ranis's claim for damages or strike Ranis's class allegations is denied in its entirety. Animal Science's [242] motion for certification of the Injunction Class is granted. The Court hereby certifies the following classes:

1.  All persons or entities, or assignees of such persons or entities, who directly purchased vitamin C for delivery in the United States, other than pursuant to a contract containing an arbitration clause, from any of Defendants or their co-conspirators, other than Northeast Pharmaceutical (Group) Co. Ltd., from December 1, 2001 to the present. Excluded from the proposed class are all governmental entities, Defendants, their co-conspirators, and their respective subsidiaries or affiliates.

2. All persons or entities, or assignees of such persons or entities, who purchased vitamin C manufactured by Defendants for delivery in the United States, other than pursuant to a contract with a Defendant containing an arbitration clause, requiring injunctive relief against Defendants to end Defendants' antitrust violations.

**SO ORDERED.**

s/ BMC

U.S.D.J.

Dated: Brooklyn, New York
      January 25, 2012

Page 46 of 46