UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------ X
                                                             :
                                                             :
                                                             :
IN RE VITAMIN C ANTITRUST LITIGATION          **MEMORANDUM**
                                                             :  **DECISION AND ORDER**
                                                             :
                                                             :  06-MD-1738 (BMC) (JO)
                                                             :
This document relates to:                                    :
                                                             :
------------------------------------------------------------ X
                                                             :
                                                             :
ANIMAL SCIENCE PRODUCTS, INC., *et al.*,                     :
                                                             :
                           Plaintiffs,                       :
                                                             :  05-CV-453 (BMC) (JO)
              vs.                                            :
                                                             :
HEBEI WELCOME PHARMACEUTICAL CO.,                            :
LTD., *et al.*,                                              :
                                                             :
                           Defendants.                       :
------------------------------------------------------------ X
                                                             :
                                                             :
DENNIS AUDETTE, on behalf of himself and all                :
others similarly situated,                                   :
                                                             :
                           Plaintiff,                        :  06-CV-988 (BMC) (JO)
                                                             :
              vs.                                            :
                                                             :
HEBEI WELCOME PHARMACEUTICAL CO.,                            :
LTD., et al.,                                               :
                                                             :
                           Defendants.         X
------------------------------------------------------------
                                                             :
LINDA PHILION, et al.,                                       :
                                                             :
                           Plaintiffs,                       :
                                                             :  06-CV-987 (BMC) (JO)
              vs.                                            :
                                                             :



HEBEI WELCOME PHARMACEUTICAL CO.,
LTD., et al.,

                         Defendants.

-------------------------------------------------------- X

RICHARD KEANE, et al.,

                         Plaintiffs,

            vs.

HEBEI WELCOME PHARMACEUTICAL CO.,
LTD., et al.,

                         Defendants.

-------------------------------------------------------- X

06-CV-149 (BMC) (JO)

**COGAN,** District Judge.

This case is presently before me on two outstanding motions filed by defendant China Pharmaceutical Group Ltd. ("CPG"). In the first motion, CPG challenges this Court's jurisdiction under Rule 12(b)(2) of the Federal Rules of Civil Procedure. In the second motion, CPG seeks summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons stated below, both motions are denied.

## BACKGROUND

The plaintiffs in this action accuse multiple Chinese companies of fixing the prices and limiting the supply of vitamin C exported to the United States from China. This action was originally commenced on January 26, 2005. Related actions were subsequently filed in other districts, and all of these cases were eventually coordinated by the Judicial Panel for Multidistrict Litigation and transferred to this Court for pretrial proceedings. Various cases were consolidated or voluntarily dismissed; only the four above-captioned actions remain.

2

In Animal Science Products, Inc., *et al.* v. Hebei Welcome Pharmaceutical Co. Ltd., *et al.*, 05-CV-453, the plaintiffs brought strictly federal claims and originally filed the complaint with this Court. In Audette v. Hebei Welcome Pharmaceutical Co. Ltd., *et al.*, 06-CV-988, the plaintiffs brought strictly state-law claims under Massachusetts's consumer protection statute. The Audette plaintiffs filed their complaint in Massachusetts state court and the defendants removed the case to federal court in the District of Massachusetts. In Philion v. Hebei Welcome Pharmaceutical Co. Ltd., *et al.*, 06-CV-987, the plaintiffs brought federal claims as well as state-law claims under California law. Philion was brought in California state court and removed to federal court in the Northern District of California. Finally, in Keane v. Hebei Welcome Pharmaceutical Co. Ltd., *et al.*, 06-CV-988, the plaintiffs brought claims under federal law and various state laws. The Keane complaint was originally filed in this Court.

In all of these cases, the main defendants are four vitamin C manufactures: Jiangshan Pharmaceutical Co. Ltd.; Hebei Welcome Pharmaceutical Co. Ltd.; Northeast Pharmaceutical Co. Ltd.; and Weisheng Pharmaceutical Co. Ltd ("Weisheng"). Plaintiffs also name CPG as a defendant. CPG is a holding company organized under the laws of Hong Kong. Defendant Weisheng is a wholly-owned subsidiary of CPG. It is undisputed that Weisheng manufactures vitamin C and sells it to clients in the United States, including in New York, California, and Massachusetts. Sales contracts between Weisheng and various American buyers indicate that Weisheng sold over $100,000 worth of vitamin C products to a buyer located in the Eastern District of New York; more than $400,000 worth of vitamin C to buyers located in the Southern District of California; and more than $600,000 worth of vitamin C to a buyer located in the District of Massachusetts.

CPG's jurisdictional motion is based primarily on the declaration of Jin Yue, who sits on Weisheng's board of directors and has served as an Executive Director of CPG since 2001. Yue explains that CPG does not have any offices, employees, agents, products for sale, bank accounts, or property in the United States. According to Yue, CPG "has never been engaged in the production, sale, or marketing of vitamin C" and its sole business is to invest in other companies. According to Yue, CPG does not control "the business practices or the daily operations of Weisheng, including with respect to Weisheng's decisions related to production, pricing, marketing and sale of Weisheng's vitamin C products." Yue also explains that CPG's financial books are separate from Weisheng and that the two companies have never held a joint board meeting or shareholder meeting.

Yue also states that CPG has had virtually no contacts with New York, Massachusetts, California, or the United States as a whole. According to Yue, two CPG employees have travelled briefly to Boston, New York, Los Angeles, and San Francisco, but these business meetings were unrelated to vitamin C marketing or sales.

Plaintiffs' version of the facts, however, paints an entirely different picture of CPG and its relationship to Weisheng. According to plaintiffs, CPG is chiefly in the business of manufacturing vitamin C and selling it to the United States and other countries, albeit through its subsidiaries such as Weisheng. Between 2001 and 2008, nine of Weisheng's eleven directors had also served on CPG's board at one time or another. As Weisheng's sole owner, CPG selects all of Weisheng's directors, none of whom are independent. Weisheng conducts very few board meetings: it held no board meetings in 2001, 2004, 2006, or 2007, and held only one board meeting in 2005.

4

In public statements, CPG presents itself as a major player in the global vitamin C economy and makes no distinction between CPG and its manufacturer subsidiaries. For example, CPG's press releases state that it "is principally engaged in the manufacture and sale of pharmaceutical products . . . [including] vitamin C," and that the United States is one of its "major markets." The press releases also state that CPG has "increased its market share" in the pharmaceutical industry. To this day, CPG's website advertises that CPG manufactures "drug products include vitamin C" and states that CPG is "one of the largest manufacturers in the world for all of its bulk drug products." CHINA PHARMACEUTICAL GROUP LIMITED, http://www.cpg.hk/eng/about_cpeic_e.htm (last visited July 11, 2012). The website also mentions CPG's "production facilities" and lists vitamin C as one of CPG's "major products."

CPG's "Annual Report" from 2003 announced that the company was "building a new production line of vitamin C with an annual capacity of 15,000 tonnes" and predicted that operation of the new production line would commence by the middle of 2003. "By then," according to the Annual Report, "[CPG] will become one of the few largest manufacturers of vitamin C in the world." A March, 2003, press release announced that, "to target sales in overseas high-end pharmaceutical market, the Group will put more effort in seeking US Food and Drug Administration accreditation for the production likes of both bulk and finished drug products."

Aside from these public statements, the facts also demonstrate that CPG has funded the expansion of Weisheng's vitamin C production capacities. At one point, according to Yue, CPG obtained a $500,000,000 loan partially for the purpose of investing in "vitamin C projects." Yue also conceded that CPG paid for a "10,000 ton [vitamin C] expansion project." This project was submitted to CPG's board for Weisheng to gain CPG's approval to use CPG's funds, and Yue

5

testified at deposition that CPG's board discussed the "specific implementation plan" for this expansion project. Finally, in 2003, a "feasibility study report" for a 20,000 ton "vitamin C transformation project" was required to be submitted to CPG's board for approval and CPG's chairman announced, in a press release, CPG's "construction of a new Vitamin C production line."

The facts also suggest that CPG gives general financial support to Weisheng. CPG has taken out several large loans since 2001. According to one of CPG's press releases, at least one large loan was expressly for the purpose of allowing its subsidiaries to "meet their capital expenditure." In 2001, CPG pledged all of Weisheng's equity interest as collateral to secure a $150 million loan facility.

Weisheng's meeting minutes reveal that CPG made an additional trip to the United States that Yue did not mention in his declaration. According to a document entitled "Situation Report on How To Handle the Accounts Receivable Problems Left Over From History," a client in the United States (the "U.S. Pacific Company") owed Weisheng $70,000 for the receipt of partially defective vitamin C products. The document further states that the "leadership concerned at [CPG] repeatedly coordinated this matter, made a special trip to work in the United States, and transferred the whole remaining $70,000 in the US Pacific Company account back to Weisheng."

Although Yue's declaration states that CPG does not interfere with Weisheng's "hiring or compensation" of its employees, Yue admitted at deposition that the compensation of Weisheng's employees is tied to the overall performance of the group of companies owned by CPG, and CPG makes "suggestions" for Weisheng's total payroll. Furthermore, minutes from a 2003 Weisheng board meeting stated that Weisheng's profit distribution plan would be reviewed by CPG.

6

Plaintiffs argue that CPG subjected itself to jurisdiction in this Court by conspiring to fix the price and control the supply of vitamin C in the United States and by transacting vitamin C-related business in New York, Massachusetts, and California. In the alternative, plaintiffs argue that the activities of Weisheng – which indisputably sells vitamin C in the United States – may be imputed to CPG due to the close relationship between Weisheng and CPG.

## DISCUSSION

### I. Personal Jurisdiction

On a Rule 12(b)(2) motion to dismiss, the plaintiff bears the burden of establishing that the court has personal jurisdiction over the defendant. See Grand River Enters. Six Nations, Ltd. v. Pryor, 425 F.3d 158, 165 (2d Cir. 2005). This burden varies in degree depending on the case's procedural posture. Where, as here, the parties have conducted jurisdictional discovery but an evidentiary hearing has not been held, the plaintiff must make a *prima facie* showing that jurisdiction is proper, and this showing "must include an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant." Metro. Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 567 (2d Cir. 1996) (internal quotation marks omitted). Accordingly, on a Rule 12(b)(2) motion, this Court construes "all pleadings and affidavits in the light most favorable to the plaintiff" and resolves "all doubts in the plaintiff's favor." Penguin Group (USA) Inc. v. American Buddha, 609 F.3d 30, 34 (2d Cir. 2010). On the other hand, this Court will not accept either party's legal conclusions as true and will not draw "argumentative inferences" in favor of either party. See Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, 673 F.3d 50, 59 (2d Cir. 2012).

To exercise personal jurisdiction over CPG, this Court must find that three requirements are met. First, plaintiffs' service of process on CPG must have been procedurally proper. See id.

7

Second, the Court must find statutory authority to exercise jurisdiction over CPG.  See id. Finally, the Court must decide whether the exercise of jurisdiction comports with the requirements of the Due Process Clause of the Constitution.  See id.

### A.  Service of Process

In CPG's moving papers, it asserts that "CPG moves to dismiss the three above-captioned actions against it which are the only actions in [this multidistrict litigation] in which it has been served with process."  The only cases in the caption are Animal Science, Audette, and Philion; CPG thus implies that it was not served with process in Keane.  However, CPG never explicitly denies that it was served with the Keane complaint and does not discuss service of process at any point in its moving or reply papers.  In their opposition papers, plaintiffs do not address any service issues and discuss personal jurisdiction in Keane as though service is presumed to have been proper.  CPG did not correct this assumption in its reply brief, which includes Keane in the caption and discusses Keane without arguing that service was inadequate in that case.  This Court will therefore assume that the implication contained in CPG's moving papers was an error and that CPG is not contesting service of process.[1]

CPG does not dispute that plaintiffs' service of process was procedurally proper in Animal Science, Audette, and Philion.  This requirement is thus satisfied for all four cases.

### B.  Statutory Jurisdiction

For the purposes of Animal Science and Keane, plaintiffs assert that this Court's jurisdiction over CPG may be predicated on either the Clayton Act, 15 U.S.C. § 22, or New

---

[1] At oral argument on July 10, 2012, counsel for Weisheng confirmed the Court's understanding in the following exchange:

> THE COURT:  The only thing I didn't understand is whether you are contending that the summons was not properly served.

> MR. MASON:  No.

York's long-arm statute.  Plaintiffs argue that this Court's jurisdiction over CPG may be predicated on Massachusetts's long-arm statute for the purposes of Audette.  In Philion, plaintiffs assert that this Court's jurisdiction over CPG may be predicated on either the Clayton Act or California's long-arm statute.

         i.     Animal Science and Keane

Although the Animal Science and Keane plaintiffs alleged violations of the Sherman Act, the private right of action to pursue antitrust claims is provided by the Clayton Act.  See Port Dock & Stone Corp. v. Oldcastle Northeast, Inc., 507 F.3d 117, 121 (2d Cir. 2007).  Section 12 of the Clayton Act ("Section 12") states:

> Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found.

15 U.S.C. § 22.  Courts within the Second Circuit analyze this provision as two separate but interrelated clauses:  the words preceding the semicolon provide a basis for venue, and the words following the semicolon provide that if venue is proper pursuant to the venue clause, personal jurisdiction may be established through worldwide service of process.  See Daniel v. Am. Bd. of Emergency Med., 428 F.3d 408, 423 (2d Cir. 2005).  CPG does not dispute that it was properly served with process.  This Court may therefore assert personal jurisdiction over CPG in the Animal Science and Keane cases if venue was proper under the Clayton Act in the district where these cases were filed – the Eastern District of New York.

According to Section 12, venue is proper wherever the defendant "is an inhabitant," "may be found," or "transacts business."  The Animal Science and Keane

plaintiffs assert that venue was proper in this district because CPG "transacts business" here through CPG's subsidiary, Weisheng. It is undisputed that Weisheng transacted business in this district by selling vitamin C to MTC Industries, a client located on Long Island. Sales contracts between Weisheng and MTC Industries indicate that Weisheng sold 23,000 kilograms (approximately 25 tons) of vitamin C to MTC Industries in four shipments from Tianjin, China, to New York. However, CPG argues that Weisheng's business activities may not be imputed to CPG for the purpose of establishing personal jurisdiction. I disagree.

In the seminal case United States v. Scophony Corp. of Am., 333 U.S. 795, 68 S. Ct. 855 (1948), the Supreme Court explored the meaning of Section 12's phrase "transacts business." The Scophony Court determined that the phrase supplied a "nontechnical" standard for determining whether an entity transacts business; a "practical and broader business conception of engaging in any substantial business operations." Id. at 807 & 810. Applying this standard, the Scophony Court held that a British parent company had transacted business in America because its American subsidiary conducted business here which required the parent company's "constant supervision and intervention." Id. at 815. The British parent company argued that it was a separate entity from its subsidiary, but the Court explained that the practice of using an "artful arrangement of agents' authority" to avoid personal jurisdiction in antitrust cases was an "artifice [that] saw its day end . . . with the advent of § 12." Id. at 808 n.19. The Second Circuit has likewise described the phrase "transacts business" in Section 12 as requiring courts to make a "realistic assessment of the nature of the defendant's business and of whether its contacts with the venue district could fairly be said to evidence the 'practical, everyday business or

10

commercial concept of doing business or carrying on business of any substantial character.'"
Daniel, 428 F.3d at 429 (quoting Scophony, 333 U.S. at 807).

Under this broad standard outlined by the Supreme Court and the Second Circuit, there is
no question that CPG has transacted business in New York within the meaning of Section 12. In
determining whether a parent company has transacted business through its subsidiaries for the
purposes of Section 12, district courts in the Second Circuit often focus on whether the
subsidiary's business transactions are ones that the parent "would have to undertake directly if
the subsidiary did not exist to perform them." In re Tamoxifen Citrate Antitrust Litig., 262 F.
Supp. 2d 17, 23 (E.D.N.Y. 2003); accord Waldron v. British Petroleum Co., 149 F. Supp. 830,
835 (S.D.N.Y. 1957) ("A corporation may be a fiction of the law but there is no reason to carry
the fiction to the extreme of saying that a corporation which has wholly owned subsidiaries . . .
making sales which ordinarily would be made by a sales department, is in fact not transacting
business in that jurisdiction . . . .").

As CPG's website and press releases advertise, CPG is in the business of manufacturing
and selling vitamin C through subsidiaries such as Weisheng. The website and press releases do
not describe CPG as an investment company or a holding company; instead, these public
statements state plainly that CPG itself manufactures and sells vitamin C. CPG notes that some
courts have disregarded similar evidence in a jurisdictional challenge, reasoning that an
"advertising strategy deciding not to present to its consumers the existence of a parent-subsidiary
relationship is not equivalent to a showing that the parent corporation exercises any control over
its subsidiary's operational or marketing activities." J.L.B. Equities, Inc. v. Ocwen Fin. Corp.,
131 F. Supp. 2d 544, 550 (S.D.N.Y. 2001). This is true. However, the facts in this case indicate

11

that the borders between CPG and Weisheng are as permeable as CPG's promotional materials depict.

For example, CPG and Weisheng have a high rate of crossover of directors; for many years, nine out of eleven Weisheng directors were current or former CPG directors. CPG also selects all of Weisheng's directors and has input into Weisheng's payroll. Corporate formalities at Weisheng also seem scarce; even accepting defendants' representation that "Weisheng is not required to have board meetings annually under Chinese law," it is telling that Weisheng held only one board meeting over a four-year span, and minutes from this sole board meeting show that the only agenda was to change Weisheng's official name. Moreover, accepting the facts in a light most favorable to plaintiffs, as this Court is required to do on a Rule 12 motion, it appears that CPG has directly funded Weisheng's day-to-day activities; built vitamin C production facilities from its own pocket; and has even made a special trip to the United States to collect a debt on behalf of Weisheng. In light of these facts, CPG's conclusory assertion that it "merely holds equity in Weisheng, its investment," cannot be taken at face value.

CPG refers this Court to various cases holding that each of the factors just described – overlapping directors, 100% ownership, and extensive financial support, for example – do not necessarily establish that a parent controls a subsidiary. None of these cases change the outcome in this case, however, because the Supreme Court and the Second Circuit have made clear that none of these individual factors should control the analysis. Instead, the determination of whether CPG may be subjected to jurisdiction in New York based on Weisheng's actions involves a non-technical, comprehensive analysis that focuses on the practical reality of their business relationship. Viewing the facts in a light most favorable to plaintiffs, the practical

12

reality of CPG and Weisheng seems to be that CPG, as advertised on its website, manufactures and sells vitamin C through Weisheng, which acts like a sales department of CPG.

CPG devotes most of its brief to arguing that CPG's control over Weisheng is not great enough to justify treating Weisheng as an "agent" or "mere department" of CPG for the purposes of New York's long-arm statute. It is not necessary to reach this issue, since jurisdiction may be premised on the Clayton Act. But it bears noting that all of the cases CPG cites to support its contention that New York "narrowly" construes agency theories of jurisdiction are irrelevant to the question of whether CPG "transacts business" in New York within the meaning of the Clayton Act's jurisdictional provision. The nature of antitrust law is not local, and the Clayton Act's jurisdictional grant is correspondingly broad. Since jurisdiction is proper under the Clayton Act in Keane and Animal Science, it would not be appropriate for this Court to narrow its jurisdictional inquiry based on New York's long-arm statute. See, e.g., In re Auto. Refinishing Paint Antitrust Litig., No. 1462, 2002 WL 31261330, at *7 (E.D.Pa. July 31, 2002) ("[A]ntitrust cases, especially those involving aliens, may pose problems for any one district court to obtain jurisdiction over all the defendants, if left to state long arm statutes." (internal quotation marks omitted)); Paper Sys. Inc. v. Mitsubishi Corp., 967 F. Supp. 364, 368 (E.D. Wisc. 1997) ("If the antitrust laws are to be effective, district courts' jurisdiction must reach the limits of the power of the United States of America. In the case of antitrust laws, it makes no sense to tie a district court's jurisdiction to the state in which it sits; it neither promotes the enforcement of antitrust law nor the management of litigation.").

Moreover, CPG's reliance on New York cases that require "[p]ervasive control over the subsidiary" to pierce the corporate veil for the purpose of liability are particularly misplaced, since the exercise of jurisdiction is different from reaching a parent for the purpose of liability.

13

See, e.g., All Star Carts & Vehicles, Inc. v. BFI Canada Income Fund, 596 F. Supp. 2d 630, 637 (E.D.N.Y. 2009) ("The exercise of [Clayton Act] jurisdiction is simply that, and is not equivalent to piercing the corporate veil for the purpose of imposing liability on the parent entity."). Drawing all inferences in plaintiffs' favor, it appears that the relationship between CPG and Weisheng is such that, if Weisheng did not exist to sell vitamin C directly to American clients, CPG would have to sell the vitamin itself. This is sufficient to establish a statutory basis for jurisdiction under Section 12. See In re Tamoxifen, 262 F. Supp. 2d at 23.

        ii.    *Philion*

The Philion plaintiffs argue that this Court may assert personal jurisdiction over CPG under the Clayton Act or California's long-arm statute. Plaintiffs note that Weisheng has sold vitamin C in California, and sales contracts indicate that Weisheng has made vitamin C sales to clients based near Los Angeles. When considering whether a defendant "transacts business" within a district for the purpose of establishing venue under Section 12, however, sales within a state are not relevant unless the sale took place within the judicial district where the action was filed. See Daniel, 428 F.3d at 403; 15 U.S.C. § 22. Because Philion was filed in a California state court in San Francisco and removed to federal court in the Northern District of California, Weisheng's sales to clients in Southern California are not relevant to the venue analysis under Section 12. Plaintiffs have alleged no facts showing that Weisheng or CPG made vitamin C sales in Northern California. There is thus no basis for this Court to find that venue was proper under Section 12 when Philion was removed to federal court.

Although this conclusion would end the Section 12 inquiry if Second Circuit law controlled the issue, the Philion plaintiffs are saved by a significant circuit split over Section 12's jurisdictional grant. Although the Second Circuit holds that Section 12's venue clause must be

satisfied for personal jurisdiction to be established by worldwide service of process, see Daniel, 428 F.3d at 423, the Ninth Circuit disagrees. Philion was filed in the Northern District of California, and this Court's jurisdiction over CPG in that case is therefore dependent on whether the Northern District of California could assert jurisdiction over CPG when Philion was filed. See Goldlawr, Inc v. Shubert, 175 F. Supp. 793, 795-96 (S.D.N.Y. 1959) ("If the service purported to be made under [Section 12] was effective to give the [transferor court] personal jurisdiction, such jurisdiction would continue after transfer.") (reversed on other grounds). The parties thus agree that the Ninth Circuit's interpretation of Section 12 governs this Court's jurisdiction over CPG in Philion.

In Action Embroidery Corp. v. Atlantic Embroidery, Inc., 368 F.3d 1174 (9th Cir. 2004), the Ninth Circuit held that Section 12's two clauses – the venue clause and the worldwide service of process clause – are independent and unrelated. Seeing no reason to "blur the basic, historic difference" between venue and personal jurisdiction, the Court concluded that the existence of personal jurisdiction under the Clayton Act does not depend on venue being proper in the court where the action was filed. Action Embroidery, 368 F.3d at 1179-1180. Since Section 12 allows nationwide service of process, and "a federal court obtains personal jurisdiction over a defendant if it is able to serve process on him," the Ninth Circuit holds that Section 12 confers a statutory basis for personal jurisdiction over any properly-served defendant. Id. at 1177. The reach of this Court's jurisdiction over CPG, for the purpose of the Philion case, is thus limited only by the boundaries of the Due Process Clause.

### iii. *Audette*

Because the Audette plaintiffs do not bring federal antitrust claims, the Clayton Act cannot serve as a basis for this Court's jurisdiction over CPG in that action. The Audette

plaintiffs thus rely on Massachusetts's long-arm statute.  This statute provides that a court may exercise personal jurisdiction over:

> a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person's
>
> (a) transacting any business in [Massachusetts];
> (b) contracting to supply services or things in [Massachusetts];
> (c) causing tortious injury by an act or omission in [Massachusetts];
> (d) causing tortious injury in [Massachusetts] by an act or omission outside [Massachusetts] if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this commonwealth; . . . .

MASS. GEN. LAWS ch. 223A, §3.  The Audette plaintiffs argue that this statute reaches CPG because CPG has "by an agent" transacted business in Massachusetts; contracted to supply vitamin C in Massachusetts; and caused tortious injury through the sale of vitamin C at inflated prices.

It is undisputed that Weisheng is subject to personal jurisdiction in Massachusetts because Weisheng contracted to supply vitamin C in Massachusetts.  For example, a February, 2005, sales contract between Weisheng and Suzhou-Chem, Inc., indicates that Weisheng sold nearly 200 tons of vitamin C to Suzhou-Chem, which is located in Wellesley, Massachusetts.  Suzhou-Chem paid more than $600,000 for this vitamin C, which was shipped from China to the United States.

The First Circuit has made clear that Massachusetts's long-arm statute should be "broadly construed."  Hannon v. Beard, 524 F.3d 275, 280 (1st Cir. 2008).  In fact, the only limitation on the reach of Massachusetts's long-arm statute is the Constitution.  See Adelson v. Hananel, 652 F.3d 75, 80 (1st Cir. 2011).  Given this broad reach, Weisheng's massive shipment of vitamin C to a buyer in Massachusetts unquestionably subjected Weisheng to personal jurisdiction in that state.  See Cambridge Literary Props., Ltd. v.

16

W. Goebel Porzellanfabrik G.m.b.H. & Co., 295 F.3d 59, 64 (1st Cir. 2002) ("The

shipment of large quantities of goods into a state . . . can satisfy the minimum contacts

prong of the due process inquiry."); Hewlett-Packard Co. v. ICL Network Solutions

(HK), Ltd., Civil Action No. 05-40153, 2005 WL 3728713, at *4 (D. Mass. Nov. 29,

2005) ("[E]ven a single business transaction by a defendant, if it creates a substantial

connection with the forum, can give rise to personal jurisdiction." (internal quotation

marks omitted)).

Although CPG does not dispute that Weisheng is subject to personal jurisdiction

under Massachusetts's long-arm statute, CPG asserts that Weisheng's contacts with the

state may not be imputed to CPG for the purpose of establishing jurisdiction over CPG.

Since Massachusetts's long-arm statute is considered to be "coextensive with the limits

allowed by the Constitution," Adelson, 510 F.3d at 49, courts frame the analysis of

whether a parent may be subjected to personal jurisdiction based on the conduct of its

subsidiary as a "minimum contacts" question. See Donatelli v. Nat'l Hockey League,

893 F.2d 459 (1st Cir. 1990). In Donatelli, the First Circuit explained that a subsidiary's

contacts with a forum state can be attributed to its parent when the parent "is actually

responsible for its subsidiary's decision to undertake instate activities." Id. at 466.

Although the Court warned that "substance is not to be sacrificed on the altar of form"

when analyzing the relationship between a parent and its subsidiary, the Court also held

that there is a "presumption of corporate separateness" between a parent and its wholly-

owned subsidiary which can only be overridden by "clear evidence" of a "plus factor"

which demonstrates the parent's "choice to avail itself of the forum's benefices." Id. at

466.

The Donatelli Court listed a few examples of the kind of "plus factor" that could cause a court to attribute a subsidiary's contacts to its parent for jurisdictional purposes: 1.) "when a subsidiary enters the forum state as an agent for the parent"; 2.) "where the parent is exercising unusual hegemony over the subsidiary's operations"; or 3.) "where the subsidiary is a separate entity in name alone." Id.; accord Ruiz v. Bally Total Fitness Holding Corp., 447 F. Supp. 2d 23, 27 (D. Mass. 2006). Some of the factors that district courts have found relevant to this analysis include: 1.) whether the parent is the subsidiary's sole stockholder; 2.) whether there is significant intermingling of corporate officers and directors; 3.) whether the parent appoints officers of the subsidiary independently; 4.) whether the parent has assumed responsibility for the subsidiary's liabilities; 5.) whether the parent was directly involved in development projects on behalf of the subsidiary; 6.) whether the parent publicly held itself out as a company that performed the particular tasks that the subsidiary actually performed; and 7.) whether the subsidiary failed to hold board meetings.[2] See Ruiz, 447 F. Supp. 2d at 27; In re Lernout & Hauspie Sec. Litig., 337 F. Supp. 2d 298, 315 (D. Mass. 2004); Willis v. Am. Permac, Inc., 541 F. Supp. 118, 122 (D. Mass. 1982).

For the reasons already discussed, I find that CPG's control over Weisheng amounted to "unusual hegemony" within the meaning of Donatelli and was such that Weisheng could be considered CPG's agent. The cases cited by defendants do not alter my conclusion. First, Andresen v. Diorio, 349 F.3d 8 (1st Cir. 2003), is factually distinguishable because the plaintiff in that case made a much weaker factual showing than the Audette plaintiffs have made here. The Andresen plaintiff relied solely on the fact that the parent had a controlling stock interest in

---

[2] Although defendants do not cite this case, United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp., 960 F.2d 1080 (1st Cir. 1992), suggests that the corporate form may not be disregarded, for the purposes of a "minimum contacts" analysis, absent a finding of fraudulent intent on the parent's behalf. But this case involved an ERISA plan, and the Court carefully and repeatedly noted that its analysis was tied to the particularities of this statute. Courts within the First Circuit therefore have not adhered to this requirement outside the context of ERISA.

the subsidiary; the plaintiff's vague allegation that the parent had "overall financial and policy control"; and "a few news articles" which, according to the Andresen Court, showed "only that [the parent] had employed an interim president who formerly worked for [the subsidiary] and that the parent was generally aware of its subsidiary's business plans." Id. at 12-13. The facts put forth by the Audette plaintiffs go much farther to demonstrate the interrelatedness of Weisheng and CPG. Among other factors, the Audette plaintiffs have shown a higher level of interlocking executives and have supported their claims of financial dependence with concrete facts.

Second, My Bread Baking Co. v. Cumberland Farms, Inc., 353 Mass. 614, 233 N.E.2d 748 (1968), discusses piercing the corporate veil for the purpose of establishing liability rather than jurisdiction. Although similar factors are considered by courts in either analysis, the level of rigor to be applied to a jurisdictional motion must be lower. This is especially true because plaintiffs in this case seek to assert specific jurisdiction over CPG, rather than general jurisdiction. Specific jurisdiction requires a lesser showing than general jurisdiction. See Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 290 F.3d 42, 54 (1st Cir. 2002) ("[A]s Donatelli states clearly, the standard for general jurisdiction is more strict than the standard for specific jurisdiction."). When considering motions to dismiss for lack of personal jurisdiction, the First Circuit and other courts of appeals consistently eschew formulaic and overly exacting analyses in favor of practical, fairness-based determinations. "Since the essence of personal jurisdiction is to bring responsible parties before the court, a corporation which is actually responsible for its subsidiary's decision to undertake instate activities should, in all fairness, be within the . . . courts' jurisdictional reach." Donatelli, 893 F.2d at 466.

**C. Due Process**

19

Having found a statutory basis to exert jurisdiction over CPG in all four cases at issue, this Court's next task is to determine whether this exercise of jurisdiction comports with the Due Process Clause of the Fourteenth Amendment. The Due Process analysis begins by asking whether the defendant has had enough "minimum contacts" with the forum state to satisfy the Supreme Court's concern, articulated in International Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S. Ct. 154 (1945), that the exercise of personal jurisdiction not offend "traditional notions of fair play and substantial justice." See, e.g., Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 305 F.3d 120, 127 (2d Cir. 2002); Fiore v. Walden, 657 F.3d 838, 845 (9th Cir. 2011); Adelson, 510 F.3d at 80-81. There are three central factors that guide the minimum contacts analysis: 1.) whether the defendant purposefully availed itself of the privilege of doing business in the forum and could thus foresee being haled into court there; 2.) whether the plaintiff's claim arises out of the defendant's contacts with the forum; and 3.) whether asserting jurisdiction over the defendant would be fair and reasonable. See Bank Brussels Lambert, 305 F.3d at 127; Fiore, 657 F.3d at 845; Adelson, 510 F.3d at 80-81.

Defendants do not dispute that jurisdiction over CPG comports with the Due Process Clause if Weisheng's contacts with New York, Massachusetts, and California can be imputed to CPG. Through Weisheng, CPG purposefully availed itself of the privilege of doing business in New York, California, and Massachusetts by selling tons of vitamin C in these states. Plaintiffs' claims arise directly from these shipments of vitamins, and this Court concludes that it would be fair and reasonable for CPG to come to these states to defend this lawsuit. The Due Process Clause thus does not shield CPG from being subject to jurisdiction in this Court.

## II.   Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment is warranted where the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." Id.

Once the moving party has met its burden, the opposing party "'must do more than simply show that there is some metaphysical doubt as to the material facts. The nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*.'" Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002) (emphasis in original) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S. Ct. 1348 (1986)). In determining whether genuine issues of material fact exist, I am required to "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." Patterson v. Cnty. of Oneida, 375 F.3d 206, 219 (2d Cir. 2004).

CPG's summary judgment motion is based on the dearth of evidence showing that CPG attended price-fixing meetings on its own behalf. In this respect, CPG's motion is similar to the motion for summary judgment that this Court granted on behalf of former defendant JSPC America, Inc. ("JSPCA"). See In re Vitamin C Antitrust Litig., No. 06-MD-1738, 2011 U.S. Dist. LEXIS 153453 (E.D.N.Y. Dec. 27, 2011). However, the facts before the Court on JSPCA's motion were significantly different. In the case of JSPCA, which is a subsidiary of defendant Jiangshan Pharmaceutical Co., Ltd., plaintiffs did not argue that a reasonable jury could hold the parent company derivatively liable for the actions of the subsidiary. To this end, plaintiffs did not put forth evidence that the parent had excessive control over the subsidiary. Instead,

21

plaintiffs' opposition to JSPCA's motion focused on whether the subsidiary's chief executive officer, who attended price-fixing meetings, was acting on behalf of the subsidiary or the parent.

In contrast, plaintiffs argue that CPG can be held liable for the price-fixing activities of Weisheng regardless of whether Weisheng's executives attended price-fixing meetings on behalf of CPG. Under federal law, a parent corporation may be held liable for the antitrust violations of its subsidiary under alter ego principles, see, e.g., Southern New England Tel. Co. v. Global NAPs Inc., 624 F.3d 123, 139 (2d Cir. 2010), or under agency principles. See, e.g., United States v. Bestfoods, 524 U.S. 51, 62-63, 118 S. Ct. 1876 (1998). The factors relevant to veil-piercing analyses for liability purposes – such as the absence of corporate formalities, overlap between officers and directors, and the subsidiary's financial reliance on the parent – are the same as those that the Court has considered with respect to personal jurisdiction. See In re Vebeliunas, 332 F.3d 85, 91 n.3 (2d Cir. 2003) (listing the factors relevant to a veil-piercing analysis in the Second Circuit). For the same reasons that this Court has denied CPG's jurisdictional motion, the Court also finds that the question of whether CPG may be held liable for the price-fixing activities of Weisheng presents a "genuine issue for trial." Matsushita, 475 U.S. at 586. CPG's motion for summary judgment must therefore be denied.

## CONCLUSION

CPG's [286] motion to dismiss for lack of personal jurisdiction and its motion [387] for summary judgment are denied.

**SO ORDERED.**

s/ BMC

_____
U.S.D.J.

Dated: Brooklyn, New York
July 17, 2012

22