UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------- X
                                                               :
                                                               :
IN RE VITAMIN C ANTITRUST LITIGATION   :   **MEMORANDUM**
                                                               :   **DECISION AND ORDER**
                                                               :
                                                               :   06-MD-1738 (BMC) (JO)
                                                               :
This document relates to:                       :
                                                               :
-------------------------------------------------------------- X
                                                               :
ANIMAL SCIENCE PRODUCTS, INC., *et al.*,   :
                                                               :
                              Plaintiffs,       :
                                                               :   05-CV-453 (BMC) (JO)
           vs.                                          :
                                                               :
HEBEI WELCOME PHARMACEUTICAL CO.,   :
LTD., *et al.*,                                      :
                                                               :
                              Defendants.     :
-------------------------------------------------------------- X

**COGAN,** District Judge.

Defendants North China Pharmaceutical Group Corp. ("NCP Group Corp"), North China

Pharmaceutical Co. Limited ("NCPC Limited"), and North China Pharmaceutical Group

International Trade Co., Ltd. ("NCPC I&E") (collectively, the "NCPC defendants"), have filed a

motion to dismiss for lack of personal jurisdiction, lack of subject matter jurisdiction, and failure

to state a claim upon which relief may be granted under Rules 12(b)(1), 12(b)(2), and 12(b)(6) of

the Federal Rules of Civil Procedure. For the reasons set forth below, the NCPC defendants'

motion is granted in part and denied in part.

## BACKGROUND

Plaintiffs in this multi-district litigation accuse multiple Chinese companies of fixing the prices and limiting the supply of vitamin C exported to the United States from China. The NCPC Defendants are parties to only one of the four consolidated cases that comprise this litigation: Animal Science Products, Inc., et al. v. Hebei Welcome Pharmaceutical Co. Ltd., et al., 05-CV-453. The instant motion therefore concerns only the Animal Science case, which was originally filed with this Court in January, 2005. The Animal Science plaintiffs brought antitrust claims arising under section 1 of the Sherman Act, 15 U.S.C. § 1.

The primary defendants in this case are four Chinese vitamin C manufactures: Jiangshan Pharmaceutical Co. Ltd.; Hebei Welcome Pharmaceutical Co. Ltd. ("Welcome"); Northeast Pharmaceutical Co. Ltd.; and Weisheng Pharmaceutical Co. Ltd. Although the NCPC defendants were not initially part of this case, they were added as defendants in plaintiffs' First Amended Complaint, filed in January, 2007. The NCPC defendants accepted service of the complaint in February, 2008.

The NCPC defendants are interrelated corporations that were organized under Chinese law and maintain offices in Shijiazhuang, Hebei Province. These corporations are each affiliated with defendant Welcome in varying ways. Specifically, NCP Group Corp owns approximately 28 percent of NCPC Limited, which in turn owns approximately 65 percent of Welcome. NCP Group Corp also owns approximately 70 percent of NCPC I&E, which is a sister corporation of Welcome.

According to declarations submitted by representatives of each NCPC defendant, the companies each maintain a separate corporate existence; observe "all applicable corporate formalities"; and do not interfere in the day-to-day operations of Welcome or commingle any

2

funds with Welcome.  Plaintiffs do not see things this way; they argue that NCP Group Corp and

NCPC Limited exert unusual control over Welcome and that NCPC I&E – Welcome's sister

company – shares particularly fluid boundaries with Welcome.  For support, plaintiffs note that

all but two members of Welcome's board of directors – which is comprised of an unspecified

number of people – are appointed by, and receive their entire salary from, NCP Group Corp.

Plaintiffs also note that Welcome's Deputy General Manager, Zhang Yingren, testified at

deposition that NCP Group Corp "has the right to make any request of Welcome in relation to

production and its business," since NCP Group Corp is "the parent company of Welcome."  Mr.

Zhang further stated, "I feel that [NCP Group Corp] has that right."

   Plaintiffs also believe that NCP Group Corp had "influence over significant decisions by

Welcome," as evidenced by certain reports and proposals that NCP Group Corp prepared on

behalf of Welcome.  For example, NCP Group Corp prepared a "Project Proposal" for Welcome

which outlined a technology improvement plan designed to reform Welcome's vitamin C

manufacturing process.  Furthermore, in a document titled "Work Summary," Welcome

requested that an "Expert Panel" at NCP Group Corp "approve" Welcome's "technical

renovation and expansion project as soon as possible, so that construction of the project can be

started earlier."  Welcome stated that, "[i]n this way, NCPC Group can enjoy absolute advantage

in vitamin area in future."  Finally, in a separate Work Summary, Welcome referenced

employment policies and product development plans that were apparently created by NCP Group

Corp.  In this document, Welcome outlined its plan to "[i]mplement reform of remuneration

systems approved on Employee Representative Conference according to the requirements of

NCPC Group."  This document also memorialized Welcome's plan to "[c]ontinue to implement

requirements of Four Transformations proposed by NCPC Group, adjust product structure,

strengthen new product development and launch new products to make a great leap in new product offerings." Welcome then enumerated these four "transformations," which included increasing the production capacity and output of vitamin C to specified levels.

The remaining facts that plaintiffs allege in support of their argument that the NCPC defendants control Welcome pertain to one individual – Huang Pinqi – who held positions at NCP Group Corp; NCPC Limited; and Welcome. During a period when Welcome was actively participating in efforts to coordinate the export price of vitamin C with other Chinese vitamin C manufacturers, Mr. Huang was Deputy General Manager of NCP Group Corp; sat on the board of directors at NCPC Limited; and was General Manager of Welcome. During this time, Welcome's Deputy General Manager, Mr. Zhang, attended price-fixing meetings with other vitamin C manufacturers and reported directly to Mr. Huang. Although Mr. Zhang implied, at deposition, that he reported to Mr. Huang in his capacity as General Manager of Welcome, rather than as an employee of NCP Group Corp or NCPC Limited, the testimony is not entirely clear on this point. Welcome also prepared Work Summaries, which appear to have been directed toward NCP Group Corp, explaining some of the agreements Welcome reached at these meetings with other vitamin C manufacturers. For example, Welcome stated, "[i]n July [2003], the manufacturers were hoping that the suspension of production will buoy up the price, but so far the measure has not received the expected effect."

Mr. Huang also personally attended a number of meetings with other vitamin C manufacturers where the manufacturers made agreements to set floor-level prices of vitamin C and limit the supply levels of vitamin C. Although the minutes of these meetings consistently identify Mr. Huang as a representative of Welcome, plaintiffs assert that he actually attended these meetings on behalf of NCP Group Corp and NCPC Limited. Besides Mr. Huang's multi-

4

faceted role as employee of all three companies, one pertinent fact supports plaintiff's assertion: in November, 2004, China's Chamber of Commerce of Medicines and Health Products Importers and Exporters (the "Chamber") publicly announced that the vitamin C sub-committee "decided during [a November 24th] meeting to elect the Deputy General Manager of North China Pharmaceutical Group, Mr. Huang Pinqi as the next president of the committee for the year 2005." Despite this announcement, the NCPC defendants aver that no one from any NCPC company, including Mr. Huang, has ever been elected or served as president of a vitamin C sub-committee of the Chamber.

In August of 2007, Liu Jie drafted a summary of two symposiums he had attended on behalf of Jiangshan Pharmaceutical Co. Ltd. One of these two symposiums was "about the coalition of vitamin technology innovation organized by North China Pharmaceutical Group Corporation." The symposium, according to Mr. Liu, was "hosted by Chang Xing, the Chairman of North China Pharmaceutical Group Corporation (NCPC) and attended by [various vitamin C manufacturers including] Welcome (Huang Pinqi, Mi Zaoji, Zhang Yingren)." Mr. Liu further reported that the host, Mr. Chang, said that "for the Vitamin C industry to gain more and better support from the State, it must form a coalition to share research results." Participants at this symposium also discussed price control options for vitamin C, indicating that "VC price is extraordinarily high right now, problems probably will arise, and the parties should hold a meeting to coordinate an attempt to reign in the price."

NCP Group Corp's website represented, in 2009, that the company is "a leading pharmaceutical company in China." The website also included a list of NCP Group Corp's products, which included vitamin C in two different forms. However, declarations submitted by representatives of each NCPC defendant state that none of the companies engage in the

5

production or manufacture of vitamin C.  These declarations also assert that none of the NCPC

defendants own or lease any real property in the United States, nor do they have any offices,

manufacturing plants, distribution centers, facilities, or any other place of business anywhere in

the United States.  Specifically, the declaration of NCPC I&E's representative states that NCPC

I&E's "one and only office" is located in Shijiazhuang, Hebei Province, China.  Although the

declaration explains that NCPC I&E is a trading company which imports and exports various

pharmaceutical products, including vitamin C, NCPC I&E also asserts that only a "small

portion" of NCPC I&E's trading activities involve vitamin C.  But plaintiffs note that in 2009,

NCP Group Corp's website stated that, as the "gate way" for NCP Group Corp "to enter

international market, [NCPC I&E] has been playing an important role in the export of NCPC's

products" and has "established its branches in [the] USA."  Invoices demonstrate that NCPC

I&E sold more than 18,000 kilograms – worth over $80,000 – of vitamin C products to an

unspecified customer in the United States; NCPC I&E claims that this sale was to a "non-New

York customer."  NCPC I&E's declaration also concedes that NCPC I&E "may have made one

[vitamin C] shipment of 25 kg for USD 160 to New York in 2004, but it is unable to verify such

shipment in its records."

The NCPC defendants have moved to dismiss the complaint under Rules 12(b)(6) and

12(b)(1), arguing that the complaint's allegations are barred by the related doctrines of foreign

sovereign compulsion; act of state; and comity.  Because a number of other defendants moved to

dismiss on identical grounds, the NCPC defendants simply "join[ed] in and incorporate[d] by

reference the papers and arguments submitted by the other defendants."  After the NCPC

defendants filed this motion, but before the plaintiffs filed their opposition papers, this Court

denied the other defendants' motion, finding that the complaint could not be dismissed on the

6

grounds of foreign sovereign compulsion, act of state, or comity without a clear showing that the Chinese Government had required the defendants to fix prices. The Court denied the motion because "the record as it stands [was] simply too ambiguous to foreclose further inquiry into the voluntariness of defendants' actions." In re Vitamin C Antitrust Litig., 584 F. Supp. 2d 546, 560 (E.D.N.Y. 2008).[1]

The NCPC defendants have also moved to dismiss the complaint under Rule 12(b)(6) for failure to state a claim, arguing that the Second Amended Complaint lumps all of the NCPC defendants together and fails to allege that any particular NCPC company participated in the conspiracy. After the NCPC defendants filed their moving papers, but before the NCPC defendants filed their reply papers in support of the motion, this Court allowed plaintiffs to amend their complaint. The amended complaint distinguishes between each of the NCPC defendants.

Finally, the NCPC defendants moved to dismiss the complaint under Rule 12(b)(2) for lack of personal jurisdiction. The NCPC defendants argue that this Court lacks a statutory grant of jurisdiction and that exercising jurisdiction would violate the Due Process Clause of the Constitution. Plaintiffs counter that exercising jurisdiction over the NCPC defendants would be consistent with the Constitution and that this Court can derive statutory authority for such jurisdiction from the Clayton Act and New York's long-arm statute.

## DISCUSSION

### I.   Personal Jurisdiction

On a Rule 12(b)(2) motion to dismiss, the plaintiff bears the burden of establishing that the court has personal jurisdiction over the defendant. See Grand River Enters. Six Nations, Ltd.

---

[1] After the record in this case was developed more fully, a number of defendants moved for summary judgment on the same grounds. This Court denied that motion as well, finding that "Chinese law assuredly did not compel all of defendants' illegal conduct." In re Vitamin C Antitrust Litig., 810 F. Supp. 2d 522, 554 (E.D.N.Y. 2011).

v. Pryor, 425 F.3d 158, 165 (2d Cir. 2005). This burden varies in degree depending on the case's procedural posture. Where, as here, the parties have conducted jurisdictional discovery but an evidentiary hearing has not been held, the plaintiff must make a *prima facie* showing that jurisdiction is proper and this showing "must include an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant." Metro. Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 567 (2d Cir. 1996) (internal quotation marks omitted). Accordingly, on a Rule 12(b)(2) motion, this Court construes "all pleadings and affidavits in the light most favorable to the plaintiff" and resolves "all doubts in the plaintiff's favor." Penguin Group (USA) Inc. v. American Buddha, 609 F.3d 30, 34 (2d Cir. 2010). On the other hand, this Court will not accept either party's legal conclusions as true and will not draw "argumentative inferences" in favor of either party. See Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, 673 F.3d 50, 59 (2d Cir. 2012).

To exercise personal jurisdiction over the NCPC defendants, this Court must find that three requirements are met. First, plaintiffs' service of process on the NCPC defendants must have been procedurally proper. See id. Second, the Court must find statutory authority to exercise jurisdiction over the NCPC defendants. See id. Finally, the Court must decide whether the exercise of jurisdiction comports with the requirements of the Due Process Clause of the Constitution. See id. Although the NCPC defendants do not dispute that the first requirement is satisfied because the NCPC defendants accepted service of the complaint, the second two requirements are in dispute.

### A. Statutory Jurisdiction

Plaintiffs assert that this Court's jurisdiction over each NCPC defendant may be predicated on the Clayton Act, 15 U.S.C. § 22. Although plaintiffs allege violations of the

8

Sherman Act, the private right of action to pursue antitrust claims is provided by the Clayton Act. See Port Dock & Stone Corp. v. Oldcastle Northeast, Inc., 507 F.3d 117, 121 (2d Cir. 2007). Section 12 of the Clayton Act, which provides a unique jurisdictional grant to courts adjudicating Sherman Act claims, states:

> Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found.

15 U.S.C. § 22. In the alternative, plaintiffs argue that this Court's jurisdiction over the NCPC defendants may be premised on New York's long-arm statute. Plaintiffs rely on two provisions of New York's long-arm statute that provide for jurisdiction under different circumstances. Section 302(a)(3)(ii) permits a court to exercise specific jurisdiction over a defendants who, in person or through an agent:

> commits a tortious act without the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if he . . . expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce . . . .

N.Y. C.P.L.R. § 302(a)(3)(ii). Plaintiffs also rely on sub-section 302(a)(1), which permits jurisdiction over a defendant who, in person or through an agent, "transacts any business within the state or contracts anywhere to supply goods or services in the state." N.Y. C.P.L.R. § 302(a)(1).

### 1. NCP Group Corp

NCP Group Corp is subject to jurisdiction in this Court pursuant to section 302(a)(3)(ii) of New York's long-arm statute ("Section 302(a)(3)") because plaintiffs have presented enough facts to create an inference that NCP Group Corp participated in a price-fixing conspiracy in China which the company should reasonably have expected to have consequences in New York.

9

Specifically, plaintiffs have averred facts which, construed in a light most favorable to plaintiffs, show that Mr. Huang – in his role as NCP Group Corp's Deputy General Manager – conspired with various vitamin C manufacturers to fix the price and limit the supply of vitamin C exported to the United States.

In reaching this conclusion, the Court is mindful of the similarities between the facts at issue here and those that were at issue when this Court granted summary judgment on behalf of former defendant JSPC America, Inc. ("JSPCA"). See In re Vitamin C Antitrust Litig., No. 06-MD-1738, 2011 U.S. Dist. LEXIS 153453 (E.D.N.Y. Dec. 27, 2011). JSPCA was entitled to summary judgment because plaintiffs had put forth no evidence to show that Kong Tai – who served both as CEO of JSPCA and General Manager of JSPCA's parent company – had participated in cartel meetings on behalf of JSPCA. Although Mr. Kong participated in many cartel meetings, the minutes of these meetings consistently noted his attendance as being on behalf of JSPCA's parent company. Reasoning that it would not even make economic sense for JSPCA – a vitamin C distributor based in the United States – to conspire to inflate the price of vitamin C imports, I found that "no reasonable juror could conclude that Mr. Kong entered into the agreements on [JSPCA]'s behalf." Id. at *13. These facts are similar to those at issue here because Mr. Huang serves a dual role, on behalf of Welcome and NCP Group Corp, that is similar to Mr. Kong's dual role. Like Mr. Kong, Mr. Huang's attendance at cartel meetings was also consistently noted as being on behalf of only one of the companies he served – Welcome.

But there are several factual distinctions between the instant motion and JSPCA's motion. Unlike JSPCA, NCP Group Corp's economic interests are aligned with those of Welcome and the other vitamin C manufacturers who conspired to fix the price and limit the supply of vitamin C exports. In granting JSPCA's motion, I found that it would not have been

logical for Mr. Kong to have joined the conspiracy on behalf of JSPCA; in contrast, it would

make perfect sense for Mr. Huang to have been speaking for both NCP Group Corp and

Welcome at these meetings. Moreover, unlike the record before me on JSPCA's motion, this

record includes facts that strongly suggest that Mr. Huang was acting on behalf of both NCP

Group Corp and Welcome when he attended these meetings. For example, when the Chamber

publicly announced that Mr. Huang was elected as president of the vitamin C subcommittee for

the year 2005, the Chamber referred to him as "the Deputy General Manager of North China

Pharmaceutical Group." During that year, Mr. Huang attended a meeting with other vitamin C

manufacturers where he proposed specific floor prices and suggested that the manufacturers

"stop fermentation for about 20 days so as to reduce the production volume appropriately and

ultimately relieve the situation that supply surpasses demand." Furthermore, putting aside Mr.

Huang, there is evidence that NCP Group Corp participated in the vitamin C conspiracy on the

company's own behalf rather than on behalf of its subsidiaries. NCP Group Corp hosted a

symposium for vitamin manufacturers, including Welcome, where participants discussed price

control options for vitamin C and indicated that "VC price is extraordinarily high right now,

problems probably will arise, and the parties should hold a meeting to coordinate an attempt to

reign in the price." These facts, which create an inference that Mr. Huang attended cartel

meetings on behalf of both NCP Group Corp and Welcome, distinguish the instant motion from

JSPCA's motion for summary judgment.

Antitrust violations are the sort of "tortious act" that can give rise to personal jurisdiction

under Section 302(a)(3) if the violations caused injury in New York that the defendant should

reasonably have expected. See Yellow Page Solutions, Inc. v. Bell Atl. Yellow Pages Co., No.

00-CV-5663, 2001 WL 1468168, at *8 (S.D.N.Y. Nov. 19, 2001) ("Antitrust violations are

11

tortious acts for jurisdictional purposes."); Daniel v. Am. Bd. of Emergency Med., 988 F. Supp. 127, 233 (W.D.N.Y. 1997) ("Plaintiffs have made a sufficient showing that [defendant] committed a tortious act, based upon the infliction of antitrust injuries in this state, to support personal jurisdiction . . . ."); Fashion Two Twenty, Inc. v. Steinberg, 339 F. Supp. 836, 841 (E.D.N.Y. 1970).  The NCPC defendants concede that antitrust injuries are "tortious act[s]" within the meaning of Section 302(a)(3), but argue that the "situs of the injury" caused by their antitrust conspiracy was in China rather than New York.

When determining whether a defendant has caused injury within the state for the purposes of Section 302(a)(3), New York courts apply a "situs of injury" test which requires the court to identify the "original event which caused the injury"; if this event did not occur in New York, jurisdiction under Section 302(a)(3) is not proper.  Whitaker v. Am. Telecasting, Inc., 261 F.3d 196, 209 (2d Cir. 2001).  The NCPC defendants' argument relies on a distinction that New York courts have drawn between the "'original event which caused the injury'" on the one hand, and the "'location where the resultant damages are felt by the plaintiff'" on the other.  Id. (quoting Mareno v. Rowe, 910 F.2d 1043, 1046 (2d Cir. 1990)).  In discussing the "situs of injury" test, New York courts have warned that the "occurrence of financial consequences in New York due to the fortuitous location of plaintiffs in New York is not a sufficient basis for jurisdiction under § 302(a)(3) where the underlying events took place outside New York."  Id. (quoting Kuwait v. James M. Bridges, Ltd., 766 F. Supp. 113, 116 (S.D.N.Y. 1991)).  The NCPC defendants argue that these precedents lead unavoidably to the conclusion that "where the decisions or agreements of an alleged conspiracy took place outside of New York," this Court cannot exert jurisdiction under Section 302(a)(3).

This argument depends on a circumscribed vision of the "situs of injury" test. Although the NCPC defendants accurately describe a distinction that New York courts draw between the "original event which caused the injury" and the location where resulting economic damages are subsequently felt, the NCPC defendants overlook a corresponding distinction that New York courts make between this "original event" and the "initial tort." See DiStefano v. Carozzi N. Am., Inc., 286 F.3d 81, 84 (2d Cir. 2001). In other words, when identifying the "original event" in order to place the "situs of injury" for the purposes of Section 302(a)(3), courts must disregard the location of the "initial tort" and focus on the place where "the first *effect* of the tort . . . that ultimately produced the final economic injury" is located. Id. at 84-85 (emphasis added). Put much more simply, the "situs of injury" is the place where the plaintiff was first injured.

For example, defendants who decided to terminate a plaintiff in a conference room in New Jersey were subject to jurisdiction in New York under Section 302(a)(3) because the plaintiff worked in New York, and the "original event" under the "situs of injury" test was the plaintiff's "experience of being removed from his job," which occurred in New York "even though he was fired in New Jersey." Id. at 85. Conversely, the Second Circuit has held that defendants were not subject to jurisdiction in New York under Section 302(a)(3) when they fired a plaintiff who worked in New Jersey but resided in New York and therefore "suffer[ed] the economic consequences of his firing in New York." Mareno, 910 F.2d at 1046. In these two fact patterns, the "initial tort" was the decision to terminate the plaintiff; the "first effect" of the tort was the plaintiff's experience of losing his job; and the subsequent "financial consequences" were the plaintiff's resultant economic hardships. The "situs of injury" test led the Mareno and DiStefano Courts to home in on the place where the plaintiff experienced termination.

In this case, there can be no question that the "situs of injury," or the place where the "first effects" of NCP Group Corp's tortious conduct were felt by plaintiffs, is New York. That the conspiracy to inflate the price of vitamin C occurred in China is of no consequence under Section 302(a)(3), since the plaintiffs felt no effects of this conspiracy until they purchased vitamin C at a supracompetitive price in New York. The economic injury caused by these vitamin C sales is not an attenuated result of the injury – as the plaintiff's economic hardships were a distant result of his termination in Moreno – instead, this economic injury is first and primary. See In re Sumitomo Copper Litig., 120 F. Supp. 2d 328, 341 (S.D.N.Y. 2000) (defendants who committed fraud in the United Kingdom which "had the effect of manipulating copper prices [in] New York" were subject to personal jurisdiction because plaintiff's "injury occurred in New York for [Section 302(a)(3)] purposes").

NCP Group Corp also argues that it could not have reasonably foreseen that the price-fixing conspiracy would cause injury in New York. I disagree. In fact, the purpose of the alleged conspiracy between NCP Group Corp and other vitamin C manufacturers was to cause buyers outside China to purchase vitamin C at inflated prices. "'The test of whether a defendant expects or should reasonably expect his act to have consequences within the State is an objective rather than subjective one.'" Kernan v. Kurz-Hastings, Inc., 175 F.3d 236, 241 (2d Cir. 1999) (quoting Allen v. Auto Specialties Mfg. Co., 45 A.D.2d 331, 357 N.Y.S.2d 547 (3d Dep't 1974)); accord UTC Fire & Sec. Americas Corp., Inc. v. NCS Power, Inc., 844 F. Supp. 2d 366 (S.D.N.Y. 2012). NCP Group Corp's website announces that it is a "leading pharmaceutical manufacturer in China" and that it exports vitamin C to the United States. Given the size of the New York market within the United States, and the fact that New York City is a major United States port, no reasonable person who engaged in a price-fixing conspiracy aimed in part at

14

exports to the United States could fail to anticipate that New York customers might purchase the product at an inflated price.

However, as NCP Group Corp notes, mere foreseeability or likelihood that a product will find its way to New York is insufficient to satisfy Section 302(a)(3)'s requirement that a defendant "expects or should reasonably expect" its tort to cause injury in New York. See Kernan, 175 F.3d at 241. Instead, there must be evidence that the defendant made "'a discernible effort to directly or indirectly serve the New York market,'" such that the defendant can be said to have purposefully availed itself of the benefits of New York laws. Id. (quoting Schaadt v. T.W. Kutter, Inc., 169 A.D.2d 969, 564 N.Y.S.2d 865, 866 (3d Dep't 1991)). This test is satisfied here because plaintiffs have presented evidence tending to show that NCP Group Corp conspired to fix prices with many vitamin C manufacturers who indisputably sold massive amounts of vitamin C to multiple New York clients. In particular, at least one of NCP Group Corp's subsidiaries – Welcome – sold vitamin C to buyers in New York. As demonstrated by the Work Summaries passed between Welcome and NCP Group Corp, the parent company was highly apprised of – if not involved in – Welcome's vitamin C exporting activities. Since NCP Group Corp was doubtlessly aware that Welcome had significant vitamin C customers based in New York, NCP Group Corp's apparent conspiracy with Welcome and other vitamin C manufacturers amounts to a "discernible effort" to reach the New York market indirectly. See id. This is especially true because NCP Group Corp's ownership of Welcome means that the profits Welcome derived from New York customers are realized, albeit indirectly, by NCP Group Corp. NCP Group Corp therefore should reasonably have expected that the effects of its price-fixing conspiracy would reach the shores of New York.

Since plaintiffs have presented sufficient facts to demonstrate, at least at this preliminary stage, that NCP Group Corp committed a tortious act outside New York which caused injury to New Yorkers which NCP Group Corp should reasonably have expected, jurisdiction over NCP Group Corp under Section 302(a)(3) is proper provided that NCP Group Corp "derived substantial revenue from interstate or international commerce." Penguin Grp. (USA) Inc. v. Am. Buddha, 16 N.Y.3d 295, 302, 946 N.E.2d 159 (2011). Although the NCPC defendants argue that they "did not regularly solicit or do business in New York," they do not deny that they derive substantial revenue from international commerce. Nor can they, since these companies are in the business of exporting vitamins. Jurisdiction over NCP Group Corp is therefore proper under Section 302(a)(3).

### 2. NCPC I&E

Although plaintiffs generally assert that all three NCPC defendants are subject to jurisdiction under the Clayton Act and various sub-sections of New York's long-arm statute, plaintiffs' memorandum of law refers to the NCPC defendants collectively and tends not to make particularized arguments with respect to NCPC I&E. It is therefore difficult to determine which statutory basis of jurisdiction plaintiffs believe confers jurisdiction over this company.

I see no basis for jurisdiction over NCPC I&E pursuant to Section 302(a)(3). Plaintiffs have presented no evidence whatsoever that any NCPC I&E employee attended any price-fixing meetings or otherwise engaged in the vitamin C conspiracy. Although plaintiffs vaguely imply that NCP Group Corp's participation in the conspiracy can be imputed to NCPC I&E because NCPC I&E is "controlled by" NCP Group Corp, the evidence for such control is scarce. Plaintiffs have presented facts demonstrating only that NCP Group Corp owns 70 percent of NCPC I&E and that NCP Group Corp's website states that NCPC I&E has established branches

16

in the United States as a "gate way" for NCP Group Corp "to enter international market." These facts are decidedly insufficient to warrant holding NCPC I&E accountable for NCP Group Corp's jurisdictional actions; this is true whether the analysis falls under the Clayton Act or New York's long-arm statute. See generally In re Tamoxifen Citrate Antitrust Litig., 262 F. Supp. 2d 17 (E.D.N.Y. 2003); Bulova Watch Co., Inc. v. K. Hattori & Co., Ltd., 508 F. Supp. 1322 (S.D.N.Y. 1981).

Although invoices demonstrate that NCPC I&E sold more than $80,000 worth of vitamin C products to an unspecified customer in the United States, NCPC I&E's contacts with the United States in general – as opposed to New York in particular – cannot give rise to jurisdiction in New York under the Clayton Act or New York's long-arm statute. See Daniel v. Am. Bd. of Emergency Med., 428 F.3d 408, 423 (2d Cir. 2005); N.Y. C.P.L.R. § 302. The only conceivable basis for haling NCPC I&E into court in New York is NCPC I&E's statement, in its declaration, that the company "may have made one [vitamin C] shipment of 25 kg for USD 160 to New York in 2004, but it is unable to verify such shipment in its records." Plaintiffs have presented no evidence of this sale, and this Court therefore has no way of knowing who the customer was; what the sale price was; or whether a sale even occurred.

Section 12 of the Clayton Act and section 302(a)(1) of New York's long-arm statute ("Section 302(a)(1)") each provide for jurisdiction over a defendant who transacts business in New York. As plaintiffs note, courts constantly describe Section 302(a)(1) as a "'single act statute.'" Chloe v. Queen Bee of Beverly Hills, LLC, 616 F.3d 158, 170 (2d Cir. 2010) (quoting Kreutter v. McFadden Oil Corp., 71 N.Y.2d 460, 467, 527 N.Y.S.2d 195 (1988)). Jurisdiction under this section can thus be premised on a single transaction in the state, even if the defendant has never set foot in New York. See id.

17

But this "single act" rule is not limitless. A single transaction can give rise to personal jurisdiction only if the transaction was intentional and there is a strong relationship between the claim asserted and the transaction. See, e.g., id.; Kreutter, 527 N.Y.S.2d at 198. In fact, the text of New York's long-arm statute specifies that a defendant who transacts business in the state may be subject to jurisdiction only "[a]s to a cause of action *arising from*" that transaction. N.Y. C.P.L.R. § 302(a)(1) (emphasis added). Although this "arising from" rule overlaps with the due process aspects of the personal jurisdiction inquiry, New York courts treat it as a separate requirement under Section 302(a)(1) and hold that this statute may not be invoked unless "there is an articulable nexus, or a substantial relationship, between the claim asserted and the actions that occurred in New York." Best Van Lines, Inc. v. Walker, 490 F.3d 239, 246 (2d Cir. 2007) (internal quotation marks omitted); accord Deutsche Bank Sec., Inc. v. Mont. Bd. of Investors, 7 N.Y.3d 65, 71, 818 N.Y.S.2d 1140 (2006).

The Second Circuit has warned district courts not to construe Section 302(a)(1)'s nexus requirement too narrowly, explaining that the requirement is satisfied any time the cause of action "relate[s] to" the defendant's in-state transaction. Chloe, 616 F.3d at 167. But the events giving rise to the plaintiff's injury must bear more than merely a "tangential relationship" to the defendant's New York contacts. Solé Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC, 450 F.3d 100, 104 (2d Cir. 2006). More importantly, a finding of personal jurisdiction must always be based upon "the totality of the circumstances." A.W.L.I. Group, Inc. v. Amber Freight Shipping Lines, 828 F. Supp. 2d 557, 565 (E.D.N.Y. 2011) (citing Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp., 98 F.3d 25, 29 (2d Cir. 1996)).

Here, the totality of the circumstances leads me to conclude that jurisdiction under Section 302(a)(1) cannot be premised on NCPC I&E's fleeting suggestion that the company

18

"may have" made one exceedingly small shipment of vitamin C to an unknown recipient in New York. It was plaintiffs' burden to present this Court with "an averment of facts" from which I could reasonably infer that jurisdiction over NCPC I&E is statutorily warranted and harmonious with the Due Process Clause of the Constitution. Metro. Life Ins., 84 F.3d at 567. Despite their burden, plaintiffs have offered almost no facts to support this Court's jurisdiction over NCPC I&E.

Even construing NCPC I&E's declaration in a light most favorable to plaintiffs, there is no way to know whether this small shipment of vitamin C was even purchased by a New York customer. Although they present no facts in support of this conclusion, plaintiffs suggest that NCPC I&E could have had a New York office. It is therefore possible that this vitamin C was simply mailed from one office of NCPC I&E to another, for any number of reasons. Furthermore, despite NCPC I&E's estimation that the amount of vitamin C that was shipped was worth approximately $160, this Court has no way to know the price of this vitamin C and thus has no way to determine whether it was sold at an inflated price. Indeed, since there are no facts in the record to suggest that NCPC I&E participated in the price-fixing conspiracy, it seems entirely possible that defendants are being forthright in claiming that any vitamin C sale by NCPC I&E would have carried a fair and legal price. Plaintiffs' claims therefore cannot be described as "arising from" this sale, since their claims arise from vitamin C transactions in which purchasers were charged an inflated price by cartel members. There is no evidence that NCPC I&E's shipment to New York was this kind of transaction.

Jurisdiction is also lacking under Section 12 of the Clayton Act, which allows for jurisdiction to be based on an in-state business transaction only when the defendant's "contacts with the venue district could fairly be said to evidence the 'practical, everyday business or

commercial concept of doing business or carrying on business of any substantial character.'"

Daniel, 428 F.3d at 429 (quoting United States v. Scophony Corp. of Am., 333 U.S. 795, 807, 68

S. Ct. 855 (1948)).  NCPC I&E's single, insubstantial shipment of vitamin C to an unspecified

district in New York does not come close to satisfying this standard.

Because there is no statutory basis for exerting jurisdiction over NCPC I&E, the NCPC

defendants' motion to dismiss under Rule 12(b)(2) is granted with respect to this defendant.

### 3. NCPC Limited

Plaintiffs have averred no facts in support of exercising jurisdiction over NCPC Limited.

They have likewise made no jurisdictional argument directed specifically toward NCPC Limited,

and this Court is again at a loss to determine which statutory provision plaintiffs deem capable of

invoking this Court's jurisdiction over NCPC Limited.

It cannot be Section 302(a)(3), since plaintiffs have presented no evidence that NCPC

Limited participated in the vitamin C conspiracy.  Although Mr. Huang sat on the board of

directors at NCPC Limited during the time he was attending price-fixing meetings on behalf of

Welcome and NCP Group Corp, there is nothing in the record to indicate that he was also

representing NCPC Limited.  In this way, Mr. Huang's dual role as manager of NCP Group Corp

and director of NCPC Limited is akin to the dual role of Mr. Kong, whose participation in price-

fixing meetings could not be attributed to JSPCA.  See generally In re Vitamin C, 2011 U.S.

Dist. LEXIS 153453.

Nor can it be Section 302(a)(1) or Section 12 of the Clayton Act, since there no facts to

demonstrate – and plaintiffs do not contend – that NCPC Limited transacted business in New

York.  Although plaintiffs assert, in conclusory fashion, that NCPC Limited "own[s] and

control[s]" Welcome, there is nothing in the record to contradict NCPC Limited's assertions that

it "simply relates to Hebei Welcome as any majority owner would do, as a legal entity separate and apart from Hebei Welcome." Indeed, plaintiffs have offered no facts to support their claims of undue control aside from the corporate structure of the NCPC defendants: NCP Group Corp owns 28 percent of NCPC Limited, which in turn owns 65 percent of Welcome. This fact, standing alone, does not warrant holding NCPC Limited accountable for the jurisdictional actions of either NCP Group Corp or Welcome.

Because there is no conceivable statutory basis for exerting jurisdiction over NCPC Limited, the NCPC defendants' motion to dismiss under Rule 12(b)(2) is granted with respect to this defendant.

### B. Due Process

Having found a statutory basis to exert jurisdiction over NCP Group Corp, this Court's next task is to determine whether this exercise of jurisdiction comports with the Due Process Clause of the Fourteenth Amendment. To determine whether the exercise of personal jurisdiction is consistent with "'traditional notions of fair play and substantial justice,'" courts must ask whether there exist "'minimum contacts' between the defendant and the forum state." World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 291-92, 100 S. Ct. 559 (1980) (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S. Ct. 154 (1945)). Plaintiffs have not presented any facts to demonstrate that NCP Group Corp has any direct contacts with New York. Instead, plaintiffs argue that NCP Group Corp's control over Welcome is such that Welcome's contacts with New York may be imputed to NCP Group Corp to establish the requisite minimum contacts. In the alternative, plaintiffs argue that NCP Group Corp's participation in the price-fixing conspiracy satisfies the so-called "effects test" set forth in the Supreme Court's decision in Calder v. Jones, 465 U.S. 783, 104 S. Ct. 1482 (1984).

21

Because this Court finds that NCP Group Corp's attendance at cartel meetings satisfies Calder's "effects test," it is not necessary to determine whether NCP Group Corp's control over Welcome is sufficient to warrant holding NCP Group Corp accountable for all of Welcome's jurisdictional contacts. However, since the foreseeability of injury in New York is critical to the Calder test, this Court finds it meaningful that NCP Group Corp's subsidiary and co-conspirator Welcome – over which NCP Group Corp had significant, if not overwhelming, control – shipped hundreds of tons of vitamin C to New York purchasers and realized hundreds of thousands of dollars in profits from these sales.

In Calder, the Supreme Court explained that there are instances where personal jurisdiction over a defendant can be consistent with the Due Process Clause even when that defendant has never directly contacted the forum state. Specifically, a defendant whose "intentional, and allegedly tortious, actions were expressly aimed at" the forum state is subject to jurisdiction in that state if the defendant knew that substantial injury would be felt there. Id. at 790-91; accord Best Van Lines, 490 F.3d at 243 ("In the language of minimum contacts, when the defendants committed 'their intentional, and allegedly tortious, actions expressly aimed at California,' they 'must have reasonably anticipated being haled into court there.'") (quoting Calder, 465 U.S. at 789-90). As this Court has already determined, plaintiffs have presented facts tending to show that NCP Group Corp contributed to a cartel with the express purpose of inflicting supracompetitive prices on foreign countries such as the United States. This is sufficient to satisfy the Calder test. See In re Magnetic Audiotape Antitrust Litig., 334 F.3d 204, 208 (2d Cir. 2003) (suggesting, in dicta, that a Korean defendant's attendance at one meeting where export prices were fixed "arguably would satisfy the 'effects' test frequently used in the analysis of specific personal jurisdiction"). Welcome had a robust economic relationship with

22

New York vitamin C purchasers, and the relationship between NCP Group Corp and Welcome is such that NCP Group Corp simply could not have failed to appreciate the likelihood of injury to New York customers. Furthermore, the sizeable profits realized by Welcome from New York clients enriched NCP Group Corp through NCP Group Corp's interest in Welcome. NCP Group Corp therefore should have anticipated being haled into court in New York.

Finally, this Court finds that the exercise of jurisdiction over NCP Group Corp is "reasonable." Courts are to consider five factors in evaluating the reasonableness of exercising personal jurisdiction:

> (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies.

Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 305 F.3d 120, 129 (2d Cir. 2002) (internal quotation marks omitted) (citing Asahi Metal Indus. Co. v. Superior Court of Cal., 480 U.S. 102, 107 S. Ct. 1026 (1987)). The NCPC defendants do not dispute that factors 2, 3, 4, and 5 are either neutral or weigh in favor of plaintiffs. The NCPC defendants solely contend that exercising jurisdiction will impose a burden on NCP Group Corp, which is located solely in China. This Court agrees that this litigation will be a burden on NCP Group Corp and its employees. However, the burden on NCP Group Corp is far outweighed by the interests of the plaintiffs in obtaining relief and the interests of New York in policing antitrust violations. Furthermore, "'the conveniences of modern communication and transportation ease what would have been a serious burden only a few decades ago.'" Id. at 129-130 (quoting Metro. Life Ins., 84 F.3d at 574).

## II.   The Doctrines of Foreign Sovereign Compulsion, Comity, and Act of State

The NCPC defendants' motion to dismiss based on the doctrines of foreign sovereign compulsion; comity; and act of state is denied for the reasons set forth in this Court's Memorandum Decision and Order dated November 6, 2008, see In re Vitamin C, 584 F. Supp. 2d at 560, as well as this Court's Memorandum Decision and Order dated September 6, 2011, see In re Vitamin C, 810 F. Supp. 2d at 554.

## III.   Failure to State a Claim

The NCPC defendants' motion to dismiss under Rule 12(b)(6) became moot when plaintiffs filed an intervening Third Amendment Complaint (the "TAC").  The TAC describes the alleged conspiracy in great detail and provides the date, location, and agenda of at least seven cartel meetings.  The TAC specifically alleges that executives of NCP Group Corp were present at these meetings and that Mr. Huang was elected "President of a vitamin C sub-committee that reached agreements on fixing prices and limiting the supply of vitamin C for export."  These changes resolve all of the NCPC defendants' Rule 12(b)(6) concerns with respect to NCP Group Corp.  The motion to dismiss for failure to state a claim is therefore denied. [2]

## CONCLUSION

The NCPC defendants' [371] motion to dismiss is granted in part and denied in part. Defendants North China Pharmaceutical Co. Limited and North China Pharmaceutical Group International Trade Co., Ltd. are dismissed from this case for lack of personal jurisdiction.  The

---

[2] In the NCPC defendants' reply brief in support of their motion to dismiss, they argued for the first time that this motion should be converted into a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.  This Court disagrees, since the NCPC defendants have yet to submit to discovery on the merits of plaintiffs' claims.  In any event, for the reasons stated in this Memorandum Decision and Order, I find that there is a "'genuine issue for trial'" regarding whether Mr. Huang engaged in a price-fixing conspiracy on behalf of NCP Group Corp.  Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S. Ct. 1348 (1986)).

motion to dismiss is denied insofar as it seeks dismissal of defendant North China

Pharmaceutical Group Corp.

**SO ORDERED.**

s/ BMC

U.S.D.J.

Dated: Brooklyn, New York
        August 7, 2012