**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **IN RE**<br>**VITAMIN C ANTITRUST LITIGATION**<br><br>This Document Relates To:<br><br>    *Animal Science Products, Inc., et al. v.*<br>    *Hebei Welcome Pharmaceutical Co., Ltd., et*<br>    *al.*, Case No. 1:05-CV-00453(BMC)(JO)<br>    (E.D.N.Y.) | **MASTER FILE 1:06-MDL-1738**<br>**(BMC)(JO)**<br><br><br>**PROFFER OF TESTIMONY OF**<br>**QIAO HAILI PURSUANT TO THE**<br>**COURT ORDER OF OCTOBER 12,**<br>**2012** |

Pursuant to the Court's direction in the October 12, 2012 Pretrial Conference, Non-Settling Defendants present the following proffer of the testimony of Mr. Qiao Haili, who formerly was the highest level of government official at the China Chamber of Commerce of Medicines and Health Products Importers & Exporters ("Chamber") administering vitamin C export regulation.  Mr. Qiao's responsibilities at the Chamber include implementing regulations and government directives concerning the vitamin C industry coordination and industry self-discipline and supervising defendants' compliance with these government directives.  Non-Settling Defendants respectfully request that Mr. Qiao be permitted to present all of his proffered testimony at trial.

**Introductory Statement**

In the October 12, 2012 Pretrial Conference, Plaintiffs asserted an unspecified part of Mr. Qiao's testimony constitutes "legal opinion."  Pretrial Conf. Tr. 19:13.  The Court discussed at length with parties of about what Mr. Qiao can testify and concluded it testimony providing factual details are admissible (*Id.*, 25:22-25) but conclusory statements are not (*Id.*, 24:7-11).  The

Court stated it would like to see factual details which indicate "the state of mind and explain why a particular witness did what he did." *Id.,* 26:5-10-11.  Furthermore, with respect to the laws and regulations Mr. Qiao was involved with while working at the Chamber, the Court held:

> [Mr. Qiao] can describe that he was the person involved in a process that led to the development of certain regulations and directives and he can generally state what those regulations or directives pertained to.  He can then say he had communications with the defendants in which he sought to implement those regulations and he can describe those conversations…

*Id.* 36: 4-10.

As an aid to determining the validity or not of plaintiffs' objections, the Court directed that Non-Settling Defendants set forth Mr. Qiao's proffered testimony, and they do so below, reserving in full the right to add such further testimony and to introduce such documents as may be appropriate in light of whatever rulings the Cout may make.

As stated below, Mr. Qiao will testify about the scope of the responsibilities and authority of the Chamber delegated by the China's Ministry of Commerce as well as the process of determining and implementing industry coordination and self-discipline measures, including Mr. Qiao's specific instructions to the Defendants.  Non-Settling Defendants respectfully submit Mr. Qiao's proffered testimony are statements of factual nature, only serving only explain the Chamber's scope of authority and responsibility, to illustrate what he was told and directed to do, and to set forth the framework within which Mr. Qiao conducted and mandated Chamber and Vitamin C Subcommittee Operations,[1]  and therefore should be admitted in its entirety.

---

[1] Non-Settling Defendants respectfully submit Mr. Qiao's prior affidavit and the testimony proffered herein contain no legal conclusions because these references do not contain "terms [that] have a separate, distinct and specialized meaning in the law different from that present in the vernacular." *See Torres v. County of Oakland*, 758 F.2d 147, 150-51 (6th Cir. 1985), citing *United States v. Hearst*, 563 F.2d 1331, 1351 (9th Cir.1977), *cert. denied*, 435 U.S. 1000 (1978) (testimony is not objectionable as containing a legal conclusion where the "average layman would understand those terms and ascribe to them essentially the same meaning intended").

**Proffered Testimony**

Mr. Qiao's testimony will cover the following facts:[2]

Mr. Qiao was the highest level of official at the Chamber from 1993 through his retirement in 2011 in charge of the coordination of exports of certain pharmaceutical products manufactured in China, including vitamin C.

Since the inception of the Chamber's Vitamin C Sub-Committee in October 1997 through his retirement 2011, Mr. Qiao also served as Secretary General of the Sub-Committee, which, as Mr. Qiao describes in details in his Affidavit, was created under his direct supervision and pursuant to directions given to him and his colleagues at the Chamber by Chinese government officials in order to regulate and coordinate the export of vitamin C.  *See* Affidavit of Qiao Haili Pursuant to the Court Order of July 11, 2012 ("Affidavit"), D.E. 497-2, ¶¶12-24.

Mr. Qiao joined People's Liberation Army in 1970 and spent twenty-one years in the army.   Prior to his retirement from the army services in 1992, Mr. Qiao was a mid-level officer and held the rank of Vice Regimental Commander.   Affidavit, ¶2.

In July 1983, while still serving in the army, Mr. Qiao studied part-time and received a three-year college degree in Chinese Literature from The Open University of China (formerly the China Central Radio and TV University).  *Id.* Mr. Qiao has no training in economics.

In 1992, Mr. Qiao reported to China's Ministry of Foreign Trade and Economic Cooperation ("the Ministry") for a position with the Government.  *Id.* at ¶3.  When Mr. Qiao joined the Chamber in 1992, the Ministry was refereed to as MOFTEC.  After 2003, the Ministry was referred to as MOFCOM.

---

[2] Non-Settling Defendants hereby incorporate in full Mr. Qiao's Affidavit, filed July 11, 2012, D.E. 497-2.

The Ministry is a component of the State Council (the Central Chinese Government) and is the highest government authority in China authorized to regulate foreign trade, including export commerce.

At the time, it was a routine practice for retired army officers to be assigned to work in government departments and state-owned companies.   Ministry officials assigned Mr. Qiao to work for the Chamber and appointed him as the Vice Director of the Chamber's Second Coordination Department, which was in charge of administering and implementing export regulation of pharmaceutical products, including vitamin C.  *Id.* In 1993, Mr. Qiao became the highest level officer at the Chamber responsible for industry coordination of pharmaceutical products, including vitamin C.  *Id.*

Until his retirement in 2011, Mr. Qiao was the highest level official at the Chamber responsible for administering export regulation of vitamin C. *Id.* at ¶4.  He reported to the Chairman of the Chamber, who was also appointed by the Ministry and who in turn reported to the Ministry.  *Id.*

As a government official at the Chamber, it was part of Mr. Qiao's responsibilities to have a good understanding of the history and mission of the Chamber and the Chamber's relationship with the Ministry.  He will provide certain background in this regard based on his knowledge and experience.

The Chamber was established in May 1989 by the Ministry as part of Chinese Government's effort to reform its foreign trade regime.  *Id.* at ¶5.  Prior to that time, only a few designated state-owned import and export trading companies were allowed to conduct export trading in accordance with mandatory State trading plans designed to achieve economic objectives set by the Central Government.  *Id.*

Subsequently, the Chinese government allowed the creation of corporations with varying degrees of private ownership.  Among these, were the defendants in this case, each of whom still had significant -- sometimes total -- government ownership, and all of whom were supervised by Mr. Qiao in the performance of his duties.

With the creation of these other types of companies, who were allowed to obtain export licenses, the Ministry created several national Chambers of Commerce of Imports & Exports as the extensions of the Ministry instructed by Ministry officials to regulate these companies' activities.  *Id.* at ¶6.  The Ministry transferred some former government officials to the chambers' staffs and vested the chambers with regulatory authority.  *Id.*

Different chambers had different scopes of authority and Mr. Qiao will testify only as to his experience at the China Chamber of Commerce of Medicines and Health Products Importers & Exporters (the "Chamber").

The Chamber is under the direct supervision of the Ministry.  When Mr. Qiao joined the Chamber in 1992, he worked under a directive given by the Ministry to him and his colleagues at the Chamber ordering that they had to accept the "daily supervision and inspection of MOFTEC" and to implement MOFTEC' s rules.  MOFTEC's 1991 Measures for Administration over Foreign Trade and Economic Social Organizations. Ex. 1 to Affidavit.

Ministry officials dictated all major personnel the appointments and salaries at the Chamber, including those pertaining to Mr. Qiao.  Ministry officials "recommended" senior officials of the Chamber (including their Chairmen, Vice Chairmen, Secretary-General and Vice Secretary-General) (Ex. 2 to Affidavit, arts, 6&13); and these Ministry recommendations were always adopted by the Chamber.  Officials in the Ministry's Personnel Department verified and approved the total amount of salary of the Chamber.  *Id.*, art. 17.   All of this was done pursuant

to a 1994 Regulation Mr. Qiao and his colleagues had frequent occasion to consult and follow during the course of their duties at the Chamber. *Id*.

Mr. Qiao was instructed and understood that one of his key responsibilities at the Chamber was to supervise Chamber member companies by coordinating markets, prices and customers. He understood his responsibility was to regulate companies to act in unison in order to prevent "malicious" or "disorderly" competition and assure the profitability and sustainability of key industries in which the Chinese government had significant financial and economic interest. He understood that he was authorized to discharge this responsibility under a number of Ministry directives which it was his responsibility to understand and to implement.

Among these regulations, and in place when Mr Qiao joined the Chamber in 1992, was a 1991 Ministry Regulation Regarding the Strengthening of the Coordination Administration of Export Commodities. Under that regulation, Mr. Qiao and his colleagues at the Chamber were responsible to implement export plans and quotas, and to coordinate export prices. *Id.*, section II. They were instructed and understood that failure to follow the coordination would subject a company to a range of sanctions including public criticism, delay or suspension of export license issuance, export quota reduction and suspension or revocation of exporting rights. *Id.,* section VI.

Mr. Qiao and his colleagues were repeatedly instructed by Ministry officials on the importance of their coordination responsibility as Chamber officials delegated authority by the Ministry. For example, in 1994 MOFTEC Minister Wu Yi told Mr. Qiao and his colleagues, and personnel from other Chambers, that:

> Chambers must coordinate the import and export transactions of their members from the perspective of safeguarding the interests of their members and the normal order of China's foreign trade, and that such coordination and the imposition of industry-wide agreements was *a mandatory task.*

6

Business having the right to conduct foreign trade (including foreign-invested companies) had to obey the coordination of the chambers.

Chambers was to punish any individual business found in violation of the relevant governmental regulations and the industry-wide agreement.

Chambers could propose that government authorities impose sanctions upon such a non-compliant business.

MOFTEC would set up several examples by seriously punishing businesses which do not follow the coordination process.  This will have the benefits of increasing our country's export and establishing the coordination authority of the Chambers of Commerce.

*See* Minister Wu Yi's Speech on the Reform of Import & Export Chambers, Defendants' Trial Ex. 8.

In addition, as part of his export coordination work at the Chamber, Mr. Qiao was responsible for preventing and investigating the conduct of exporting at low prices, which would be subject to sanctions including fines, suspension and revocation of export license and export quotas.  As such, he was responsible for implementation of the Interim Regulations of the Ministry of Foreign Trade and Economic Cooperation on Punishment for Conduct of Exporting at Lower-than-Normal Price (March 20, 1996), Ex. 4 to Affidavit, arts. 3&9.

Mr. Qiao was specifically charged with the regulation of exports by Chinese manufacturers of vitamin C.  He was instructed and understood that this was an important industry bringing a significant volume of export income to the country, and one of the few industries where Chinese companies hold their own technology know-how and leading positions in the international market.

Each of the companies he was charged to regulate had significant government ownership and by their size and export volume, had significant implication for social stability and economic

growth of the local and national economies.  Like Mr. Qiao and his colleagues at the Chamber, who were appointed by the government, these companies' management came from the Communist Party and government agencies.   Mr. Qiao reported to the Ministry, and these companies also reported to provincial and government authorities who would sometimes directly contact Mr. Qiao and his colleagues as well.

In 1992, when Mr. Qiao joined the Chamber, the companies exporting vitamin C were all subject to export quota regulation and when Mr. Qiao joined the Chamber it became his responsibility to administer these regulations with which he had intimate familiarity. Specifically, it was Mr. Qiao's responsibility at the Chamber to implement MOFTEC's Interim Regulation of Export Goods, Order. No. 4, December 29, 1992 ("1992 Interim Regulation"), Ex. 3 to Affidavit.

All of the companies exporting vitamin C were members of the Chamber under Mr. Qiao's supervision because they were required to be members. 1992 Interim Regulation, section 4.  Particular methods of coordination were to be made *by the Chamber* and were to be strictly implemented after discussion and "approval" at member meetings. *Id*.  Mr. Qiao allowed no option to refuse to "approve" what Mr. Qiao put forward to be followed after such discussions.

Mr. Qiao, as the responsible official, developed recommendations for the Ministry of quota amounts and minimum export prices based on the coordination discussions with manufacturers he conducted.  These were adopted by the Ministry which then notified its offices in charge of issuing export licenses regarding the required prices and quantities.  Those offices then issued export licenses after reviewing contracts to make sure they were in compliance.

During this period, Mr. Qiao and his colleagues at the Chamber had continuing concern with the competition among Chinese vitamin C exporting companies.  As part of his export

coordination duties, Mr. Qiao prepared and submitted a report to the Ministry addressing the situation, and based on Mr. Qiao's report, the Ministry in turn submitted a report to the Chinese State Council, distributed to the Chamber and received by Mr. Qiao.  Mr. Qiao participated in the drafting of this report which reflected dissatisfaction with the activities of Chinese vitamin C companies and the dangers that low prices posed to Chinese national economic interests. *See* Wu Yi, MOFTEC's Report to State Council Concerning Current Vitamin C Export Issues and Suggestions for Solutions, [1996] Waijingmao Guanfa No. 185, p.3, Ex. 5 to Affidavit.

In 1997, a directive came from top Chinese officials to Mr. Qiao and his colleagues at the Chamber telling them to strengthen the regulation of vitamin C exports by creating a Sub-Committee within the Chamber to coordinate vitamin C exports.  Soon thereafter, Mr. Qiao was charged with drafting and implementing a regulation "Related to the strengthening of the Administration of Vitamin C Production and Export." Ex. 6 to Affidavit.

This regulation specified the standard for allocating export quotas, imposed qualification requirements for conducting vitamin C exports, and limited vitamin C exporting rights to 30 companies. *Id.* It also included mandates to strictly control vitamin C production scale. *Id.* It came into effect at the start of 1998 and was in effect through the early part of 2002.

To receive a vitamin C export license, an exporter had to observe volume limitations set by the Ministry and minimum price restrictions set through industry coordination mandated, directed and administered by the Sub-Committee, which Mr. Qiao administered and led. *Id.* A local or central MOFTEC export licensing office would issue an export license only when the export price and quantity stated in the export contract satisfied the volume and price requirements.

Pursuant to the regulation, Mr. Qiao, as the responsible Chamber official, directed efforts to form a "Vitamin C Export Coordination Group," which was later known as the Vitamin C Sub-Committee, for the purpose of conducting the industry coordination of vitamin C exports. And under the regulation all companies qualified to export Vitamin C were required to participate in and subject themselves to the coordination of the Sub-Committee. *Id.*, art. 6.

In accordance with the regulation, Mr. Qiao formulated specific coordination methods for the Sub-committee to implement and reported these back to the Ministry. Defendants were required to strictly implement industry coordination measures under the Chamber's supervision, with penalties imposed for any attempts at circumvention. *Id.,* art. 7.

The government agencies responsible for issuing export licenses were required to strictly review export contracts and issue export licenses only in accordance with the government mandated volume and price as coordinated and set by the Chamber. *Id.*, art. 8. Companies who failed to comply with the industry coordination which Mr. Qiao supervised were subject to sanctions, including export quota reduction or even revocation of exporting right. *Id.*, art. 10.

As the responsible Chamber official, Mr. Qiao prepared and submitted a request to the Ministry to formally establish the Sub-Committee in accordance with the Ministry's directive. In March 1998, the Ministry, formally approved that request, and that approval document was delivered to Mr. Qiao. Approval for Establishing VC Sub-Committee of China Chamber of Commerce of Medicines & Health Products Importers & Exporters (March 23, 1998) (the "1998 Approval Directive"), Ex. 7 to Affidavit.

The 1998 Approval Directive made the Sub-Committee a branch of the Chamber and placed it under the Chamber's leadership and administration. The Sub-Committee's personnel

were drawn from the Chamber and its members were vitamin C exporting companies who were members of the Chamber.

The Sub-Committee's major responsibility and regulatory function, also set out in the Approval Directive, was "to be responsible for coordinating the vitamin C export market, price and customers of China." Its stated mission, which Mr. Qiao drafted under the Ministry's guidance, was both to improve the competitiveness of the Chinese vitamin C industry in the global market and to promote the healthy development of China's vitamin C export through industry coordination. *Id.*

The 1998 Approval Directive remained in effect throughout Mr. Qiao's tenure at the Chamber. It was never revoked and was in effect throughout the time period at issue in this litigation. It guided Mr. Qiao's vitamin C export coordination and the Subcommittee's activities.

Pursuant to the 1998 Approval Directive, Mr. Qiao led and coordinated vitamin C exports as directed by the Ministry. As of 1998, that leadership and coordination was done through the quota mechanism described above. Although the designated mechanisms of regulation given to Mr. Qiao by the Ministry as tools to effectuate the responsibility of industry coordination were later to change, Mr. Qiao's Government-delegated responsibility to lead and coordinate vitamin C exports through the Sub-Committee never changed and there were always mechanisms through which Mr. Qiao could effect that control.

In 1997, with participation guidance of Ministry officials, Mr. Qiao drafted a Charter for the Sub-Committee. Charter of Vitamin C Sub-Committee of China Chamber of Commerce of Medicines and Health Products Importers & Exporters, (October 11, 1997), (the "1997 Charter"), Ex. 8 to Affidavit.

The 1997 Charter was in effect through early 2002 and instructed and required that

- the Sub-Committee perform coordination, direction, supervision and inspection functions (art. 5)

- Members comply with its directives, policies and regulations (art. 15)

- Members "strictly execute export coordinated price set by the Chamber…"   (*id.*)

The 1997 Charter also provided Mr. Qiao with the power to impose sanctions to ensure compliance with the industry coordination Mr. Qiao was to lead, and to recommend to government departments the suspension and revocation of exporting rights. *Id., a*rt. 16.

All Chinese vitamin C manufacturers, including Northeast Pharmaceutical Group Co., Ltd. ("NEPG"), Hebei Welcome Pharmaceutical Co., Ltd. ("Hebei"), Weisheng Pharmaceutical Co. Ltd. ("Weisheng") and Jiangsu Jiangshan Pharmaceutical Co., Ltd. ("JJPC") became Sub-Committee members.  All four companies remained Sub-Committee members throughout the period of time of Mr. Qiao's tenure at the Chamber and participated in the Sub-Committee meetings that Mr. Qiao called.

Neither China Pharmaceutical Group Co. Ltd. nor North China Pharmaceutical Group Co. Ltd., nor any person holding themselves out as representing these companies for any purpose of participating in the activities of the Chamber or the Sub-Committee, ever participated in any of the coordination meetings he called and required the manufacturing companies to attend. Affidavit, ¶ 24.

Mr. Qiao attended all coordination meetings held under the auspices and directives of the Chamber. He served as the Secretary General of the Sub-Committee throughout his tenure at the Chamber and also served as the Vice President from 1998 through 2001 and President from 2002 until he retired in 2011.

As the official of the Chamber responsible for coordination of the Chinese vitamin C industry, Mr. Qiao organized and presided over meetings with Chinese vitamin C manufacturers. He caused notices to be sent to Sub-Committee members of scheduled meetings (usually at the Chamber's offices). He identified export issues to be addressed by industry coordination, and required members to discuss and to agree upon appropriate solutions at these meetings.

Officials in the Ministry's Foreign Trade Department would regularly call meetings with Mr. Qiao and his colleagues at the Chamber to receive reports on its export coordination work, including in particular the coordination of vitamin C.  It was Mr. Qiao's responsibility to keep the Ministry well apprised of the Chamber's vitamin C export administration.  At the Ministry's direction, Mr. Qiao routinely prepared written pre-meeting reports which were submitted to the Ministry summarizing the Chamber's administration of industry coordination. He also periodically would respond to Ministry requests for information and other monitoring by the Ministry of the Chamber's activities.

Whether or not defendants agreed with Mr. Qiao's agendas, they were all required by Mr. Qiao and by his colleagues at the Chamber to participate in this process and to reach agreement on industry coordination measures.  These measures included developing export quota amounts for Ministry approval and insertion in its annual export plan which all exporters were required to follow, the periodic setting of minimum prices which all exporters were required to charge, and other measures aimed at coordinating activities such as production restrictions and shutdowns.

On many occasions at Sub-Committee meetings over which Mr. Qiao presided, he reminded defendants of the importance of exercising self discipline and compliance with industry coordination so that they act in ways consistent with the overall economic interests of the State.   In addition to the regular reminders Ministry officials gave to Mr. Qiao and his

colleagues, Ministry officials would also on occasion attend meetings where the manufacturing companies were reminded of their responsibilities and duties to reach and implement coordination agreements.

At a Sub-Committee meeting in Beijing attended by Mr. Qiao, his superior Chamber Chairman Wei Xiaorong, and Wang Wei (a MOFTEC Foreign Trade Department official) at the Chamber's offices, there was a discussion about quotas for the next year at which differing views were expressed.  At the conclusion Mr. Qiao set the total export volume at the same level of year 2000 (37,000 tons), directed how that quota would be allocated, and imposed reporting requirements on the companies.  At the conclusion of the meeting, the Chamber's Chairman Mr. Wei reminded the defendants that they must unite together and act in unison in competition with foreign companies so as to obtain overall benefits to the industry.

At a meeting held on April 13, 2001, called and presided over by Mr. Qiao, representatives of the four Chinese vitamin C manufacturers discussed international market circumstances, reported their respective capacity and production level, and commented on the possibility of lifting the export volume restriction in the future.  Representatives from Weisheng and Hebei Welcome complained that they were not able to obtain sufficient export licenses and asked that the restriction be lifted.  Yang Yonggeng, a MOFTEC Foreign Trade Department official in attendance, reminded the companies that vitamin C had been strictly regulated since 1997.  He told the companies that they were required to obey the Chamber's industry coordination and industry rules so as to advance the overall interests of the country.

At the conclusion of this discussion, Mr. Qiao changed the minimum export price from US$5.20 to US$3.20.  Three days later, Mr. Qiao and his colleagues issued a notice, again admonishing all vitamin C exporters to strictly adhere to the minimum price set by the Chamber

and that non-qualifying exports would result in the cancellation of quotas. As part of their regular reporting a copy of this notice was also sent to MOFTEC.

In late 2001, Mr. Qiao called and presided over Vitamin C Sub-Committee coordination meetings held under the Ministry's direct order to address potential foreign antidumping investigations.  These meetings were prompted by warnings forwarded to Mr. Qiao and his colleagues at the Chamber from the Chinese Embassies in Brussels and Berlin about a threatened antidumping investigation against Chinese vitamin C exports, and directions by the Ministry to Mr. Qiao and his colleagues to call a Sub-Committee meeting and develop a coordinated plan to address the situation.

Specifically, in September 2001, the Ministry's Foreign Trade Department sent to Mr. Qiao and his Chamber colleagues a Chinese Embassy report from Brussels warning of a possible dumping suit against Chinese vitamin C exports.   Ex. 9 to Affidavit.

Subsequently, on November 7, 2001, an official of the Ministry's Fair Trade Bureau (Xia Xiang) sent a situation report from China's Embassy in Berlin to the Chamber's liaison officer, Ms. Guan Ningyun, with the written directive that the Chamber convene a meeting of the Chinese Vitamin C producers to address the situation.  Ms. Guan forwarded to Mr. Qiao this report and that directive.  Exhibit 10 to Affidavit.

Prompted by that directive, on November 12, 2001, Mr. Qiao sent a notice to the Chinese vitamin C manufacturers, briefing them on the threat of antidumping investigation and calling for a meeting.

On November 14, 2001, Mr. Qiao sent another notice to NEPG, JJPC, Weisheng and Hebei, directing them to attend a meeting on November 16 at the Chamber's offices in Beijing to

discuss countermeasures in response to the antidumping investigation threats.  He specifically directed that top leaders of each company to attend this meeting.

Following Mr. Qiao's direction a meeting of the four manufacturers was convened at the Chamber's Beijing offices on November 16, 2001 at Chamber's offices in Beijing.    In attendance were the Chamber's Chairman Feng Hongzhang, the Vice Chairman Zhang Changxin, the Liaison Director Guan Ningyun and Mr. Qiao, who presided over the meeting. NEPG's factory director general Chen Gang and vice director general Du Chengxiang, JJPC's general manager Kong Tai, Weisheng's general manager Feng Zhengying, and Hebei's vice general manager Mi Zaoji and sales manager Zhang Yingren were in attendance.  Mr. Qiao drafted minutes for this meeting.

At the beginning of the meeting, the Chamber Chairman Feng spoke and reminded the defendants of the MOFTEC's mandate that they comply with industry coordination. He directed that a solution be found to address the antidumping threat in that meeting.

Mr. Qiao then reviewed with the manufacturers the imminent threats of anti-dumping proceedings as had been reported by MOFTEC, and informed them MOFTEC's direction that the Chamber address the situation with the defendants.  Mr. Qiao told the companies that there was a great likelihood that EU would commence the investigation and that such antidumping investigation would most likely be concluded with findings against the Chinese vitamin C exports and told them that a coordination measure would be set at the meeting to address this problem.

Mr. Qiao also advised them that industry coordination enforcement regulations promulgated by the Ministry were going to change in 2002.  He told them that the quota system administered by MOFTEC would be eliminated, and that instead the Chamber would be

empowered under a "verification & chop" regulation to review export contracts and affix a "chop" or seal on those it approved.  He told them that without such a "chop" government customs authorities would refuse to grant clearance or permission to export vitamin C.  At the time, Mr. Qiao was already participating in discussions with Ministry officials concerning the regulation and its contents, from which he understood that he would be enabled to exercise powerful oversight to ensure the implementation of whatever agreements might be required under the leadership and coordination of him and his colleagues at the Chamber.

Mr. Qiao told the manufacturers that all Chinese exports of vitamin C would be subject to the chop requirement, and that he and his staff would be directly responsible and authorized to decide which contracts would qualify for a chop.  Mr. Qiao told the manufacturers that he would refuse to give his approval to any export contract which did not comply with whatever coordination measures he and his colleagues at the Chamber would require them to adopt. Affidavit, ¶35.

Under Mr. Qiao's supervision and at his direction there was extended discussion among the defendants to reach agreement to increase the minimum export coordination price to $3/kg from $2.8 and to export only at certain allocated volumes.  Affidavit, ¶36.

Because there was some disagreement among the defendants as to volumes that could be exported, Mr. Qiao told them the volumes they would be required to accept, exercising the power he had under the existing 1997 Regulations (still in effect) and the ongoing 1998 Approval Directive, referencing as well the "verification & chop power" he was to be delegated.  *Id.*

At the conclusion of the discussion, and as directed by the Chamber, the attendees passed the required resolutions about minimum price and export volume allocation, and Mr. Qiao so reported to MOFTEC.  *Id.*

On December 19, 2001, Mr. Qiao called another meeting of the Chinese vitamin C manufacturers regarding the implementation of the coordination measures adopted at the November 2001 meeting.

This meeting, again attended by top officials of each Chinese vitamin C manufacturer at the direction of Mr. Qiao, was held in Shijiazhuang on December 21, 2001.  In attendance were the Chamber's Vice Chairman Zhang Changxin and Mr. Qiao, who presided over the meeting. Mr. Qiao again prepared minutes of the meeting.

Vice Chairman Zhang again reminded the manufacturers of their obligation to comply with industry coordination and exercise industry self-discipline.  At Mr. Qiao's directions, the manufacturers expressed their views on the implementation of the measures mandated at the November 2001 meeting.  While there were different views, Mr. Qiao instructed them on the specific implementation details.

Mr. Qiao again reviewed the contemplated changes to the form of vitamin C export regulation under the soon-to-be adopted Verification and Chop system, and told vitamin C manufacturers that industry coordination would continue to be required, and that he would not stamp approval on any contracts which did not comply.

Mr. Qiao told the manufacturers that he would continue to impose both pricing and volume restrictions.  He told them that export volumes of foreign trade companies would be charged against the respective manufacturers' export quota and that those who exported at a disguised low price or beyond the allocated volumes would be punished with significant export volume reduction.

The 1997 Regulation was formally repealed in March 2002. It was then replaced by the new mechanism had referenced at the November and December 2001 meetings, which had

previously been discussed between Mr. Qiao, his colleagues at the Chamber, and Ministry officials.

The new regulation, known as "verification and chop" was set forth in a "Notice Issued by the Ministry of Foreign Trade and Economic Cooperation and the General Administration of Customs for the Adjustment of the Catalogue of Products Subject to Price Review by Customs, MOFTEC MAO FA [2002] No. 187 (March 29, 2002) (the "2002 Regulation"), Exhibit 12 to Affidavit. This regulation directly supported the exercise and performance of Mr. Qiao's duties and Mr. Qiao was personally familiar with its contents.

The 2002 Regulation provided that it was to "*maintain* the order of market competition, make active efforts to avoid anti-dumping sanctions… *promote industry self-discipline* and facilitate the healthy development of exports."  All contracts covering export of vitamin C by anyone, regardless whether or not they were made by a Sub-committee member, would now be administered by the Chamber under authority delegated by the Ministry and before being submitted to Customs.  *Id.*

Under the regulation, all contracts were to be submitted to Mr. Qiao and his staff for review to ensure they were consistent with the self-discipline agreements reached under Mr. Qiao's supervision and direction.  *Id.* If Mr. Qiao and his staff verified that the contracts were consistent with those mandated agreements, they would affix the Chamber's "chop," and the shipment could proceed.  *Id.* The Chinese Customs would not review the contracts or any of their terms.  Instead, they would look for the Chamber's "chop."  If the Chamber's chop was not on the contract, for whatever reason, Customs would not accept the application for export and the export would not proceed.  *Id.*

In 2003, the Ministry and Customs issued a more detailed regulation.  Announcement of Ministry of Commerce of the People's Republic of China and General Administration of Customs of the People's Republic of China, No. 36, 2003 (November 29, 2003) (the "2003 Regulation"), Ex. 13 to Affidavit. This regulation as well directly supported performance of Mr. Qiao's duties and as part of his responsibilities Mr. Qiao was personally familiar with its contents.

Pursuant to the regulation, all vitamin C exporters were to submit their contracts to the Chamber, that Mr. Qiao would verify them based on the "industry agreements" adopted under its direction, and he would stamp the Chamber's chop on price and quantity.  *Id.* It specifically provided, consistent with the Chamber's existing practice, that the Chamber would not affix its chop to non-conforming contracts.  *Id.*

Pursuant to the 2002 and 2003 Regulations, which Mr. Qiao implemented, all vitamin C exporting companies are subject to the Chamber's direction, whether or not the company is a member of the Sub-Committee.   Thus, the 2003 Regulation provides, "[f]or V&C applications made by non-member exporters, the Chambers shall give them the same treatment as to member exporters."  2003 Regulation, item F.

Those trading companies which did not join the Sub-Committee nevertheless had their export volumes charged against the export quotas of the manufacturer who sold them the product, and their contracts were nevertheless subject to our price review.  As such, the trading companies' export sales remained under the control of the Chamber.

Mr. Qiao's responsibility to conduct industry coordination and the requirement of defendants to exercise self-discipline so as to advance the overall interests of the vitamin C industry continued after 2002.  Affidavit, ¶38.  With the power over the verification and chop

delegated by the Government, Mr. Qiao retained the ability to direct and coordinate agreements, to threaten to withhold its chop unless satisfactory agreements were reached, and retained the power to prohibit exports that were inconsistent with the agreements reached under our supervision.  Affidavit, ¶45.

Under verification and chop, as before, Chinese vitamin C manufacturers did not have the option of ignoring or not participating in the self-discipline process itself or the duty to coordinate which it entailed.  Affidavit, ¶50.  In order to obtain the Chamber's chop to export, they had no choice but to participate in the industry coordination.

The Ministry's mandate to effect general coordination of the vitamin C exports under the 1998 Approval Directive continued after 2002.  Mr. Qiao used the Chamber's verification and chop authority to review both prices and quantities, similar to the pre-2002 administration where there were minimum price and quantity requirements, and for certain periods of time would set export quotas applicable to Chinese vitamin C exports.

In light of the changes in 2002, Mr. Qiao called and presided over a meeting on May 23, 2002 of the senior management of the defendants for the purpose of amending the Sub-Committee Charter.

At the beginning of the meeting, the Chamber's Vice Chairman Zhang Changin briefed the manufacturers again about the changes in the manner of industry coordination and told the them that any company, whether a Sub-Committee member or not, could export vitamin C only if it submitted a contract that received the verification and chop approval of the Chamber. He reminded them that they had to implement the measurers imposed in November and December 2001.  If they failed to do so, the Chamber would not stamp its approval on their contracts and they would not be able to export.

Mr. Zhang then told defendants the Sub-Committee Charter was to be amended to reflect the changes in regulatory mechanisms. Subsequently at Mr. Qiao's direction, the defendants adopted a new Charter Mr. Qiao had drafted.

The new Charter provided that the Sub-Committee became a "self-disciplinary industry organization jointly established on a voluntary basis." Sub-Committee's 2002 Charter, art. 3. However, because the Chamber retained the power under the verification and chop system, as a practical matter, no manufacturer could abandon participation in the Sub-Committee or the meetings that the Chamber called because the decisions imposed at those meetings would limit and control its ability to export. Affidavit, ¶ 50.

The new Charter continued the principle set forth in the old Charter that the Sub-Committee was required to accept "guidance and supervision from the Chamber." Sub-Committee's 2002 Charter, art.5. The new Charter, like the old, continued to direct that the Sub-Committee "shall coordinate and guide vitamin C import and export business activities, promote self-discipline in the industry, maintain the normal order for vitamin C import and export operations, and protect the interests of the state, the industry and its members." *Id.,* art. 8. Members continued to be obliged to accept the coordination of the Sub-Committee. *Id.,* art.11.

After 2002, Mr. Qiao and his colleagues at the Chamber continued to be employed and compensated under MOFTEC's supervision, and were delegated new "verification and approval" authority which empowered them to compel all exporters to comply with industry coordination directions resulting from the self discipline mandated by the government. Exports of vitamin C, while no longer under the direct administration of the Chinese Government, continued to be subject to self-discipline under the direction and coordination of the Chamber, subject to the verification and chop enforcement powers delegated to the Chamber by the Chinese government.

While the Verification & Chop regulation opened up the possibility of suspension by chambers with the approval of the members Sub-Committees, the Chamber and the Ministry, under the new Charter, the Sub-Committee continued to be supervised and guided by the Chamber.  *Id*., art. 5.  Neither Mr. Qiao nor his colleagues ever considered the possibility of suspending the powerful tools they had been given to continue to coordinate vitamin C exports.

Mr. Qiao and his colleagues at the Chamber were never relieved by the Ministry of their coordination responsibilities, the Sub-Committee's authorizing mandate continued in effect, and the Chamber continued its process of mandatory coordination as before.   Affidavit, ¶51.

Mr. Qiao continued to call meetings with the manufacturer defendants, to direct defendants to discuss market changes and propose corresponding coordination measures, and to direct agreement be reached on self-discipline and coordination.  At the conclusion of such discussion, Mr. Qiao made decisions on coordination measures when it was appropriate.  As discussed above, Mr. Qiao told defendants that he would not stamp their export contracts until they were in compliance with the industry coordination and self-discipline requirements.

Following are examples of this mandatory coordination process the Chamber directed and supervised.

The meetings called by the Chamber in November-December 2001 were discussed above, as was the meeting in May 2002.  During 2002 through early 2003 each of the manufacturers on occasion presented contracts that would exceed their quota.  As Mr. Qiao and Mr. Zhang had told the manufacturers, in such circumstances Mr. Qiao's staff denied their contracts a chop and they had to await a following month.

On February 24, 2003, Mr. Qiao called a meeting of the manufacturers and directed them to discuss the market situation.  Prices had risen rapidly due to SARS and Roche had also shut

down production.  In light of the increasing demand and reduced supply, Mr. Qiao told the

defendants that the Chamber would not control export volume, but that the Chamber would track

export volumes of foreign trade companies and charge them against respective manufacturer's

quotas so that the Chamber could keep track of the vitamin C manufacturers' export volumes.

In early April 2003, Roche announced its American factory would resume production.

The effect of SARS on prices was also wearing off.  Distributors and brokers started to sell their

inventories and goods in transit at low prices and prices slipped quickly.  A price war started. On

June 11, 2003, Mr. Qiao called another meeting with the Chinese vitamin C manufacturers to

address the market changes.  Mr. Qiao directed defendants to discuss the feasibility of using the

minimum price to slow down the price decrease.   At the conclusion of the meeting, Mr. Qiao set

the minimum price at $9.20 and directed defendants not to offer prices below that price.

However, because of the fast changing market circumstances, that minimum price soon

became impossible. On July 26, 2003, Mr. Qiao organized a meeting with the Chinese

manufacturers at the Nanjing Central Hotel.  Mr. Qiao cancelled the $9.2 minimum price,

warned defendants not to be optimistic about the market and noted the increase number of

antidumping cases against Chinese products in the United States.  Mr. Qiao once again reminded

the defendants of the importance of complying with industry coordination as required by the

Ministry.  At Mr. Qiao's direction, each reported its 2003 production capacity.  Mr. Qiao then

and directed the manufacturers defendants to develop and implement production suspension as a

coordination measure.

On December 26, 2003, Mr. Qiao organized another meeting with the vitamin C

manufacturers.  The companies were directed by Mr. Qiao to discuss the market situation and the

industry coordination measures for the next year.  Mr. Qiao told them that the market situation

was of grave concern.  He said there was still excessive supply in the market, which would put downward pressure on prices.  At the conclusion of the meeting, and despite the objections of certain attendees, Mr. Qiao decided to impose production limitation in the first half of 2004 and each company to store 150 tons of vitamin C in a Shanghai warehouse starting from January 2004.

On February 17, 2004, Mr. Qiao called another meeting with Chinese vitamin C manufacturers.  In light of the continued price decreases, Mr. Qiao directed each manufacturer to increase their inventory storage in the Shanghai warehouse.   Over the objections of certain of the attendees Mr. Qiao determined the specific amount of inventory each manufacturer was to store in the warehouse.

On March 19, 2004, Mr. Qiao called and presided over a meeting with vitamin C manufacturers and reviewed Chinese Customs data about export price and volume with them. Chen Gang and Wang Renzhi of NEPG, Wang Qiang and Wang Qi of JJPC, Zhang Yingren of Hebei, Feng Zhenying and Wang Yaguang of Weisheng and others were in attendance.  He directed each manufacturer to report their production capacity and summarize current market conditions.  At the end of the meeting Mr. Qiao instructed the manufacturers to strictly comply with the coordination agreement tentatively reached in December 2003 and set the amount of inventory to be stored by each manufacturer in the Shanghai warehouse.

On May 12, 2004, Chamber officials called a meeting in its Beijing offices and Mr. Qiao required them to discuss a production suspension for June.  Weisheng stated it agreed to shut down its existing production line but wanted to do a trial run with its new 15,000 ton production line in June. The other defendants strongly opposed; they accused Weisheng of breaking the agreement of production suspension.

To force Weisheng's compliance, Mr. Qiao told Weisheng's general manager Feng Zhenying that he would use the Chamber's verification and chop power to not to provide its approval stamp on Weisheng's export contracts until Weisheng was in compliance.  After the meeting he again called Mr. Feng to pressure him to comply.  At a subsequent meeting in Shanghai on June 15, 2004, over which Mr. Qiao presided, Mr Feng agreed to also shut down Weisheng's new production line in October.

On April 19, 2005, Mr. Qiao presided over a Sub-Committee meeting in Beijing.  Huang Pinqi and Zhang Yingren of Welcome, Wang Renzhi and Wang Zhenghe of NEPG, Ying Xiangzhe and Wang Xiaobin of Weisheng, Wang Qi of JJPC and others were in attendance.  He told the vitamin C manufacturers that notwithstanding the unprecedented antitrust lawsuit, regulation of vitamin C prices and mandatory industry coordination meetings called by the Chamber would continue in order to follow Chinese government policy to assure orderly marketing and economic development.  He cited, in particular, continuing concerns about dumping.  At his direction, the manufacturers reviewed and commented on market conditions and at the conclusion of the meeting Mr. Qiao told them the minimum price directed by the Chamber would continue.

On November 16, 2005, Mr. Qiao presided over a Sub-Committee meeting in Hangzhou.  Du Chengxiang and Wang Renzhi of NEPG, Wang Qiang of JJPC, Zhang Yingren of Hebei, Wang Yaguang of Weisheng and others were in attendance.  Mr. Qiao directed the companies to comment on market circumstances and production capacity, reminded them of the importance of complying with the industry self-discipline and told them that Premier Wen Jiabao and State Council both instructed that industry self-discipline be strengthened.  In light of the market

circumstances, Mr. Qiao directed defendants to consider using production suspension as a coordination measure.

On December 23, 2005, Mr. Qiao presided over a Subcommittee meeting where he again directed the Chiese vitamin C manufacturers to implement the industry coordination measure of suspending production in April and May of 2006. Huang Pingqi and Zhang Yingren of Welcome, Feng Zhenying and Wang Yaguang of Weisheng, Kong Tai and Wang Qi of JJPC, Du Chengxiang, Wang Renzhi and An Xiaoxia of NEPG, Liu Lei of Hualong, Manager Wu and Gong Qingchuan of Taige were in attendance. Mr. Qiao warned the attendees that if any company quoted a lower price than the minimum export price or did not stop production as mandated, the Chamber would not issue export verification approvals to that company until it became compliant.

In June of 2006, after the Chamber acceded to requests from NEPG to postpone its production suspension until July, NEPG requested another extension for a month. Mr. Qiao denied NEPG' s request and made a telephone call to Du Chengxiang of NEPG to force NEPG to avoid further delay. Mr. Qiao reminded Mr. Du of NEPG's obligation to follow industry coordination and told him that if there was any continued delay the Chamber would impose a series of sanctions on NEPG, including denying verification approval.

Notwithstanding the Mr. Qiao was directed by Ministry officials to coordinate vitamin C exports, and he did in fact exercise his power to compel meetings and self coordination, the administration of mandated coordination and self-discipline was not perfect. Mr. Qiao and his colleagues at the Chamber could not force self-discipline in ways contrary to market realities or the basic laws of supply and demand.

At some meetings agreement was possible, while at others as matter of overriding economics it was not.  Often these matters required extended discussion and Mr. Qiao considered comments made by the industry before formulating decisions.  In some circumstances, the Chamber later had to consider modifying the coordination measures to address the market conditions with more practical measures in light of economic circumstances.

As with any other regulatory measures, there were attempts of circumvention. While Mr. Qiao and his colleagues reviewed all contracts before affixing the Chamber's chop and had refused to affix the chop to non-conforming contracts, their ability to investigate whether the export price was compliant beyond the face of the contracts was limited.

The Chamber had no control over pricing once the product left China.  In a falling market, buyers and brokers were able to obtain post chop price concessions and rebates which were beyond the ability of the Chamber to stop. Sometimes China's Foreign Exchange Authority requested Mr. Qiao to provide a statement to it so that proceeds collections in foreign currency which were less than contract prices could be remitted.  There were occasions where Mr. Qiao refused to give such a statement, such as in mid-2003, and this in turn presented exporters with payment delays and risks of penalties under exchange procedures; but customers and brokers continued to exert their power to exact price concessions.

There were several instances of basic changes in market dynamics, such as the withdrawal of vitamin C producers in other countries, the SARS outbreak in late 2002 through the middle of 2003, and a second epidemic in late 2003-2004, where prices rose significantly on their own.

By way of example regarding the imperfections in the Chamber's administration and the need to respond to basic economic situations, at the November and December 2001 meetings

discussed above, direct self-discipline measures on minimum export prices and export volume were adopted as Mr. Qiao had required.  At that time, implementation was expected in early 2002, but the government did not actually promulgate the 2002 verification and chop regulation until May.

At that time, Mr. Qiao received a report from the Customs showing that there had been an excess of more than 1,000 tons in the vitamin C export since January 1, 2002.  Because the market demand and supply were out of balance, the companies were unable to implement the agreement and they seized opportunities to make more sales when they could.  Mr. Qiao devoted significant time and effort to investigate and determined who made the excessive export, criticized them in a Subcommittee meeting, and deducted from the excessive amount from their remaining annual export allocation.

As another example, during the first SARS epidemic in late 2002-early 2003, vitamin C prices rose significantly.  However, as the vitamin C price increased, all manufacturer defendants expanded their production capacity.  While the Chamber was authorized to make recommendations to other government agencies on new capacity additions by Chinese manufacturers, this was something the Chamber was given no authority to regulate.  Consequently, in mid-2003, as the SARS outbreak subsided, there was excessive supply of vitamin C in the market and prices started falling.

At this point the defendants started a "price war" by making great price cuts in order to secure more export sales, and it was anticipated that the price would fall continuously in the second half of the year.  As discussed above, in June 2003, Mr. Qiao held a meeting with the manufacturers and directed them to develop industry coordination measures to stop the price war.  As directed, the defendants discussed market conditions and agreed to set a floor price of

$9.20. However, that measure was simply unrealistic in light of the market conditions. As a result, in July 2003, Mr. Qiao held another meeting with defendants and during that meeting the $9.20 price was cancelled.

Sometimes self-discipline was effective and sometimes it was not.  However, whether the measures adopted under Mr. Qiao's direction were effective or not, he required the Chinese vitamin C manufacturers at all times to participate in industry coordination discussions, following his agenda.   He required them to participate in the coordination process, as did his colleagues and superiors.  He reported to Ministry officials who told him to coordinate, and gave him the tools to coordinate. There may have been circumstances or practical situations where economic circumstances negated the agreements Mr. Qiao directed be reached, but he never gave the manufacturers a choice or the option not to attend meetings or not to reach agreements which he dictated when necessary to accomplish his delegated responsibilities.

Dated:  October 29, 2012                    Respectfully Submitted,

                                            ZELLE HOFMANN VOELBEL & MASON LLP


                                            By: */s/  Daniel S. Mason*_____
                                                Daniel S. Mason
                                                Jiangxiao Hou
                                                Eric W. Buetzow
                                                44 Montgomery Street - Suite 3400
                                                San Francisco, CA 94104
                                                Telephone:  (415) 693-0700
                                                Fax: (415) 693-0770

                                                *Attorneys for Defendants Shijiazhuang Pharma.*
                                                *Weisheng Pharmaceutical (Shijiazhuang) Co.,*
                                                *Ltd.* and *China Pharmaceutical Group, Ltd.*

GREENBERG TAURIG, LLP

    James I. Serota
    Scott A. Martin
    200 Park Avenue
    New York, New York 10036
    Telephone: (212)801-2277
    Fax: (212) 801-6400

    *Attorneys for Defendant Northeast
    Group Co., Ltd.*

BAKER & McKENZIE LLP

    Charles H. Critchlow
    Darrell Prescott
    1114 Avenue of the Americas
    New York, New York  10036-7703
    Telephone:  (212) 626-4476
    Fax:  (212) 626-4120

    *Attorneys for Defendants Hebei Welcome
    Pharmaceutical Co., Ltd.* and *North China
    Pharmaceutical Group Corp.*