# EXHIBIT B

CONFIDENTIAL AND LAWYERS ONLY

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: VITAMIN C ANTITRUST LITIGATION | 06-MD-1738 (BMC) (JO) |

# EXPERT REPORT OF
# LAWRENCE WU

June 29, 2012

## I.  INTRODUCTION

### A.  Qualifications and Experience

1.  I am an economist and Senior Vice President at NERA Economic Consulting.  I also am currently a Visiting Scholar at the Stanford Institute for Economic Policy Research at Stanford University.  I received my B.A. from Stanford University and my Ph.D. from the University of Chicago, Graduate School of Business.  Prior to joining NERA, I was a staff economist in the Bureau of Economics at the Federal Trade Commission (FTC).  At the FTC, I analyzed the competitive effects of numerous proposed mergers and a variety of potentially anticompetitive conduct.

2.  I have analyzed and calculated damages in connection with alleged price fixing.  I also have analyzed the competitive implications of mergers and acquisitions, as well as a broad range of business practices in many retail, manufacturing, and service industries.  I have provided written and oral expert testimony on numerous occasions, which include testimony in

1

CONFIDENTIAL AND LAWYERS ONLY

> Defendants have established an illegal cartel that is ongoing today and that has deliberately targeted and severely burdened consumers in the United States. The cartel and illegal conspiracy has existed since at least December 2001. The cartel has affected hundreds of millions of dollars of commerce in products found in nearly every American household. The conspiracy has included communications and meetings in which defendants have agreed to limit competition, control supply, and increase prices for vitamin C and vitamin C products in the United States.[4]

16. The plaintiffs contend that this alleged cartel involved participation in "meetings and conversations in China and elsewhere in which the prices, volume of sales and export to the United States, and market for vitamins were discussed and agreed upon."[5] This alleged cartel began in December 2001 with a meeting by defendants at the Western Medicine Department of the Association of Importers and Exporters of Medicines and Health Products of China (the "Chamber").[6] Following the price increases in 2002 that allegedly were the result of the cartel agreement in December 2001, the plaintiffs assert that prices rose to "as high as $7 per kilogram."[7]

17. However, plaintiffs have indicated that they also believe that the strength of the cartel waxed and waned. For example, they recognize that a large price increase in 2003 is "attributable in part to the outbreak of SARS in the Spring and Summer of 2003."[8] They also note that after the initial outbreak of SARS and the rise in prices, "cartel members began opportunistically reducing prices to obtain increased sales," which is a period that the industry has "[l]abeled a 'price war.'"[9]

18. In response to this "price war," the Chamber called an "emergency meeting" at the end of 2003 at which the defendants allegedly discussed "how they would rationalize the market

---

[4] Third Amended Complaint, ¶ 2.

[5] Third Amended Complaint, ¶ 61.

[6] Third Amended Complaint, ¶ 49. Although the Complaint refers to this entity as an "Association," the Court and documents in this case refer to it as the "Chamber," an institution through which China's Ministry of Commerce oversees and regulated the business of importing and exporting medicinal products in China, including vitamin C. See Memorandum, Decision, and Order of the Court dated September 6, 2001 (the "Court's 2011 Decision") at footnote 37, p. 45.

[7] Third Amended Complaint, ¶ 60.

[8] Third Amended Complaint, ¶ 67.

[9] Third Amended Complaint, ¶ 68.

effective in restricting the output that is produced or sold by its members. If a cartel cannot restrict its members from expanding their production or sales, then it is unlikely that the cartel will be able to prevent cheating on the cartel's agreed-upon prices.

34. Here, the evidence is that during the alleged cartel period, there were actually increases in the capacity of Chinese manufacturers to make vitamin C. Weisheng added 15,000 tons of production capacity in May 2004.[36] Hebei increased production capacity in July 2003[37] and planned for increases in production capacity of 11,000 tons in 2004.[38] Jiangshan and NEPG also increased capacity during the alleged cartel period. For instance, Jiangshan and NEPG were expected to add 5,000 tons and 7,000 tons of production capacity in October 2003.[39]

## C.   Summary

35. In summary, my review suggests that the market conditions in which the co-conspirators operated appear not to have been conducive to coordinated pricing. It was difficult for coordination to be effective even before the alleged cartel period when there were also government directed restrictions on export price and volume. It also appears that there were numerous instances of breakdowns in coordination during the alleged cartel period—or perhaps the complete absence of any agreement or coordination—as well.

36. In the sections that follow, I will assume—as I said I would for purposes of this report—that the alleged cartel was conspiring to set prices during the alleged cartel period and that the alleged cartel caused prices to be higher. However, whether the amount of the price overcharge is high or low is an empirical question, and one that will depend in part on the degree to which the co-conspirators were able to effectively coordinate their pricing during the cartel period. The overcharge could be high if the co-conspirators are able to coordinate effectively, but the overcharge could be small if they cannot. Moreover, there may be periods when the alleged cartel had no effect at all.

---

[36] JJPC0037094;HEB003844-003850; Bernheim Report, p. 33.
[37] NEPG025700.
[38] NEPG031087 and WSC0010548.
[39] HEB007553; WSC0010548; and JJPC0031469.

CONFIDENTIAL AND LAWYERS ONLY

# Exhibit 2
# Materials Considered

## Court Documents

- First Amended Complaint, dated November 23, 2005.

- Brief of Amicus Curiae, The Ministry of Commerce of the People's Republic of China in Support of the Defendants' Motion to Dismiss the Complaint, dated September 22, 2006.

- Plaintiffs' Memorandum in Support of the Ranis Company's Motion for Class Certification, dated April 11, 2007.

- Second Amended Class Action Complaint, dated September 27, 2007.

- Memorandum and Order, dated November 6, 2008.

- Third Amended Class Action Complaint, dated December 2, 2008.

- Memorandum Decision and Order, dated September 6, 2011 (the Court's 2011 Decision).

- Memorandum Decision and Order, dated January 26, 2012.

- Memorandum Decision and Order, dated June 15, 2012.

## Documents and Data Produced by Hebei

- Collection of Hebei contracts produced in this case.

- Hebei Monthly Output Data 2001-2007, Bates Stamp HEB13706.

- Hebei Monthly Unit Cost Data 2001-2007, Bates Stamp HEB13707.

- Hebei Sales 2002-2005, Bates Stamp HEB 819(b).

- Hebei Sales 2006-2007, Bates Stamp HEB 13716.

- North China Pharmaceutical Co., Ltd. Performance Report in First Half of 2000, Bates Stamp HEB007576.

- North China Pharmaceutical Co., Ltd. Performance Report in First Half of 2002, Bates Stamp HEB007582.

- Meeting Minutes, dated September 26, 2002, Bates Stamp HEB3763-HEB3765.

- The Four Chinese VC Manufacturers Fell into the "Prisoner's Dilemma", dated October 14, 2002, Bates Stamp HEB007562.

- Meeting Minutes, dated May 12, 2003, Bates Stamp HEB4101-HEB4103.

- E-mail Report, dated May 14, 2003, Bates Stamp HEB3679-HEB3682.

- E-mail Chain re The VC Market is About to Expand, dated July 16, 2003, Bates Stamp HEB3694-HEB3696.

- Latest Information about the Chinese Vitamin C Market in China, dated July 30, 2003, Bates Stamp HEB007556.

CONFIDENTIAL AND LAWYERS ONLY

- Notes, dated July 31, 2003, Bates Stamp HEB3792-HEB3793.

- North China Pharmaceutical Co., Ltd. Performance Report, dated July 2003, Bates Stamp HEB3844-HEB3850.

- "Weird Cycle Recurs" What is the Way Out of Raw Material Medicine?, dated December 31, 2003, Bates Stamp NEPG030507.

- Performance Report (2003), Hebei Welcome Pharmaceutical Co., Ltd.**,** Bates Stamp HEB3835-HEB3843.

- Letter on Adjusted Capacity, dated January 7, 2004, Bates Stamp NEPG025700.

- Application Report Regarding the Vitamin C GMP Reconstruction and Quality Balance, dated March 14, 2004, Bates Stamp HEB003644-HEB003658.

- Report after June 2004- NCPC Performance Report January-June of 2004, Bates Stamp HEB3828-HEB3834.

- E-mail Chain re. Market Update, dated August 26, 2004, Bates Stamp JJPC0033977.

- E-mail Chain re. Vitamin C., dated September 20, 2004, Bates Stamp JJPC0031469.

- Letter re. Production (pert. To HEB7582, 7556, 7553, 7562), dated January 25, 2008, Discovery Correspondence.

- VC Market: Who Will Be the Final Winner?, dated February 28, 2008, Bates Stamp HEB007553.

- C. Chinn Letter re. Produced Breakdown of Sales, dated May 15, 2008, Discovery Correspondence.

- Hebei List of Foreign Customers.

## **Documents and Data Produced by Weisheng**

- Collection of Weisheng contracts produced in this case.

- Weisheng List of Foreign Sales and Sales Subject to Arbitration Clauses.

- Weisheng Export Sales to the U.S. 2001-2005, Bates Stamp WSC_00000272.

- Weisheng Export Sales to the U.S. 2006 and 2007, Bates Stamp WSC_00018258.

- Weisheng Pharmaceutical Fax from G. Ji Ping to Z. HaiYan (Feng Exhibit 54), dated July 26, 2003, Bates Stamp WSC12381.

## **Documents and Data Produced by Aland (Jiangshan)**

- CD produced by counsel for Aland, which contains Aland's contracts with purchasers of Vitamin C.

- Export Volumes from Chinese Customs Data, Bates Stamp JJPC0035359.

- Export Volumes from Chinese Customs Data, Bates Stamp JJPC0035432.

- Total Imports and Exports (1995-2004), Bates Stamp JJPC32450.

2