# EXHIBIT A

769

```
09:33:14  1        THE COURT:  Let me just confirm, the parties want
09:33:16  2   me to read the stipulation now?
09:33:18  3        MR. SOUTHWICK:  Yes, please.
09:33:18  4        THE COURT:  All right.  Ladies and gentlemen, the
09:33:20  5   first order of business this morning is that the lawyers
09:33:22  6   have entered into another stipulation; you'll recall we had
09:33:26  7   one yesterday.  I'm going to read you that stipulation now.
09:33:30  8   Again, a stipulation is a binding agreement, as far as the
09:33:32  9   jury is concerned, as to certain factual issues to which the
09:33:38 10   parties have agreed.
09:33:38 11        All right.  The parties hereby stipulate to the
09:33:42 12   following facts.  With respect to JJPC/Aland, vitamin C
09:33:52 13   sales to the United States during the relevant period, the
09:33:56 14   sales that can be matched to an arbitration clause are
09:34:04 15   correctly set forth on Exhibit 3 and 4 to the report of
09:34:06 16   Philip J. Innes, dated November 8, 2008, which exhibits are
09:34:14 17   attached hereto, and no objection is made to these exhibits
09:34:18 18   being admitted into evidence.  And those are Exhibits 463
09:34:22 19   through 465.
09:34:26 20        With respect to Weisheng vitamin C sales to the
09:34:30 21   United States during the relevant period, the sales that can
09:34:32 22   be matched to an arbitration clause are correctly set forth
09:34:36 23   in Exhibit 3 to the report of Philip J. Innes dated
09:34:44 24   August 30, 2012, which exhibit is attached hereto, and no
09:34:48 25   objection is made to the exhibit being admitted into
```

Mary Agnes Drury, RPR
Official Court Reporter

770

```
09:34:52  1   evidence.
09:34:52  2        Now, you may not yet know what that means, but the
09:34:56  3   lawyers will make it clear to you.  These are stipulated
09:34:58  4   facts.
09:34:58  5        All right.  Plaintiffs may call their next
09:35:02  6   witness.
09:35:02  7        MR. SOUTHWICK:  Good morning, your Honor.  Jim
09:35:04  8   Southwick for the plaintiffs.  The plaintiffs call Douglas
09:35:08  9   Bernheim.
09:35:12 10        THE COURT:  All right.
09:35:12 11
09:35:12 12   B. DOUGLAS BERNHEIM, called by The Plaintiff, having been
09:35:12 13            first duly sworn, was examined and
09:35:32 14            testified as follows:
09:35:32 15        COURTROOM DEPUTY:  Please state and spell your
09:35:32 16   name for the record.
09:35:34 17        THE WITNESS:  It's Bert Douglas Bernheim.  Bert is
09:35:42 18   B-E-R-T.  Douglas is D-O-U-G-L-A-S.  And Bernheim is
09:35:44 19   B-E-R-N-H-E-I-M.
09:35:48 20        THE COURT:  All right.  You may inquire.
09:35:48 21   DIRECT EXAMINATION
09:35:52 22   BY MR. SOUTHWICK:
09:35:52 23   Q    Good morning, Mr. Bernheim.  What do you do for a
09:35:54 24   living?
09:35:54 25   A    My main occupation is that I'm a professor of economics
```

Mary Agnes Drury, RPR
Official Court Reporter

771

```
09:35:58  1   at Stanford University.
09:36:00  2   Q    And where is Stanford University?
09:36:02  3   A    It's in Palo Alto, California, which is in the
09:36:08  4   San Francisco Bay Area.
09:36:10  5   Q    And when did you come to New York for this meeting
09:36:14  6   today?
09:36:14  7   A    I came on Saturday.
09:36:16  8   Q    And over the last two days have you and I been meeting?
09:36:20  9   A    Yes, we have.
09:36:22 10   Q    And have we developed a set of slides to show to the
09:36:26 11   jury today?
09:36:26 12   A    Yes, we have.
09:36:26 13   Q    Okay.  We'll get to those in just a second.  Now, you
09:36:32 14   are sometimes referred to as Dr. Bernheim, right?
09:36:36 15   A    That's correct.
09:36:36 16   Q    Are you a medical doctor?
09:36:38 17   A    No, I'm not.
09:36:38 18   Q    What kind of doctor are you, sir?
09:36:40 19   A    The doctor refers to a doctorate, so I have a PhD in
09:36:46 20   economics.
09:36:46 21   Q    And where and when did you get your PhD in economics?
09:36:52 22   A    My PhD is from the Massachusetts Institute of
09:36:56 23   Technology, which is more commonly known as MIT, and I
09:37:02 24   received that in 1982, a little over 30 years ago.
09:37:04 25   Q    And before going to MIT did you attend college as an
```

Mary Agnes Drury, RPR
Official Court Reporter

772

```
09:37:10  1   undergraduate?
09:37:10  2   A    I did, yes.
09:37:12  3   Q    And where was that?
09:37:12  4   A    That was at Harvard University.
09:37:16  5   Q    And let's put up the first slide here.  A couple of
09:37:22  6   questions about some of these things on here.
09:37:24  7        You attended Harvard University and this says you
09:37:28  8   were summa cum laude.  What does that mean?
09:37:32  9   A    That's Latin.  That means with highest honors.
09:37:36 10   Q    Now, Dr. Bernheim, for the next few minutes here as we
09:37:40 11   go through who you are and where you've been, I'm going to
09:37:44 12   ask you to put your modesty aside a bit and tell the jurors
09:37:46 13   what you have accomplished in your career a little bit.
09:37:50 14        You mentioned that you teach at the Stanford
09:37:54 15   University.  This says you are the Edward Ames Edmonds
09:37:58 16   professor of economics.  What does that mean?
09:38:00 17   A    That's refers to what's called an endowed chair.  The
09:38:04 18   hierarchy within academics is that when you start as a
09:38:08 19   faculty member, you begin what's called an assistant
09:38:10 20   professor in what's called a tenure line position.  Tenure
09:38:16 21   is when you become a permanent member of the faculty.  As
09:38:20 22   assistant professor, you don't have tenure, but if you do
09:38:22 23   well, you're promoted to what's call associate professor.
09:38:28 24   Some of the time with tenure and some of the time without.
09:38:30 25   And then again, if you do well, you're promoted to full
```

Mary Agnes Drury, RPR
Official Court Reporter

Wu - direct - Critchlow                1329

1  A    This goes back to his four supply and demand variables
2  and what Doctor Berhneim assumes is when -- if there is a
3  change in the supply and demand variables, that will affect
4  the price of vitamin C in the next month and the month after
5  that and the month after that.
6           But he assumed that the way prices -- the price of
7  vitamin C is going to respond to a change in supply and demand
8  is the same for all of the supply and demand variables, and
9  when what I looked at it, that was not reasonable.  What I
10 wanted to do was say, we should look at how the price of
11 vitamin C responds to each variable individually because it
12 could be different.
13 Q    The final item, disentangling the SARS effect.
14 A    This goes back to the basic issue that when there
15 are -- are the price increase, and you will see those two
16 price increases during the class period, those are the price
17 increases that -- where and during which Doctor Berhneim
18 calculates most of the damages for the class.
19          Again, what happened during those price increases is
20 these epidemics.  So what we want to do is figure out what
21 caused prices to rise.  Was it SARS or was it something else?
22 Q    Doctor Wu, in his testimony a couple of days ago Doctor
23 Berhneim expressed the importance of doing sensitivity
24 analyses when you model.
25          What are sensitivity analyses?

                GR     OCR     CM     CRR     CSR

Wu - direct - Critchlow                1330

1  A    A sensitivity analysis is just a way of describing what
2  one does to check one's results.  It is what you might want to
3  do is you want to look at your assumptions.  You want to
4  change your assumptions, look at different ways of measuring
5  variables.  You want to see okay, if I change -- make certain
6  changes, how does that change my result.  Does it change in a
7  small way or in a big way?
8           That's essentially what I have done.  My report
9  essentially is a sensitivity analysis of Doctor Berhneim's
10 analysis.
11 Q    Did Doctor Berhneim's report indicate that he had done
12 the sensitivity analyses that you are talking about here?
13 A    He did not do the sensitivity analysis that I did.
14 Q    Okay.  Let's just go back now and dive a little bit
15 deeper into each one of these factors.
16          The first was sales subject to damages.
17          I think your criticism was the inclusion of certain
18 sales.
19          Can you just explain what Doctor Bernheim did right
20 or wrong in your view?
21 A    Sure.
22          Just to recap, the sales that are subject to damages
23 are sales shipped to the United States but excluding sales
24 that were made under a contract that had an arbitration
25 clause.  Again, all the lawyers agree on that and so we know

                GR     OCR     CM     CRR     CSR

Wu - direct - Critchlow                1331

1  we need to take out sales that were subject to an arbitration
2  clause.
3           What Doctor Berhneim did was he looked at a company
4  called NEPG and he said let's find out how many of those sales
5  were made subject to an arbitration clause and what he found
6  it was 100 percent.  All of the sales made by NEPG were
7  subject to an arbitration clause, which means they are not
8  subject to damages.
9           He did that, great.
10 Q    In fact, I believe those sales are actually excluded from
11 the definition of class in this case by name.
12 A    Yes, that's correct.
13          Doctor Bernheim did that right.  That's exactly
14 right.
15          Doctor Bernheim then looked at the sales by Hebei
16 and he looked at those sales, did a careful study of what
17 sales should be included and what sales should not be included
18 and ultimately found that 42 percent of Hebei's sales were
19 made subject to an arbitration clause.  So he took out
20 42 percent of Hebei's sales.
21          Okay, great.
22          He then looked at a company called JJPC and tried to
23 figure out which sales were subject to damages or
24 subject -- were subject to damages, that is, do not have an
25 arbitration clause that -- sales made under a contract that

                GR     OCR     CM     CRR     CSR

Wu - direct - Critchlow                1332

1  did not have an arbitration clause, and he found that for JJPC
2  27 percent of their sales had an arbitration clause.
3           So he took that out.  Great.
4           He then looked at a company called Weisheng, did a
5  careful analysis of that.  There were some issues that I point
6  out in my initial report, but after a little bit more
7  research, Doctor Bernheim looked through the transactions,
8  figured out that 26 percent of Weisheng's sales are made
9  subject to arbitration clause, and he took that out of
10 damages.
11          Okay, great.
12          The issue is that there are two other companies
13 sales that are included in his -- in his damages analysis.
14 Okay.  But there are companies that we have not done this kind
15 of analysis of the transactions to figure out how many sales
16 were made subject to an arbitration clause.  We actually don't
17 know anything about these companies.
18 Q    Doctor Wu, is that a problem?
19 A    Yes, that's a problem because when we want to calculate
20 damages, we are not supposed to guess and we are not supposed
21 to speculate, and given what we know about NEPG, Hebei, JJPC
22 and Weisheng, all of those companies had some sales that were
23 subject to an arbitration clause.  None of them had no sales.
24          NEPG, all of its sales were subject to an
25 arbitration clause.  So here we have a situation where there

                GR     OCR     CM     CRR     CSR

Wu - direct - Critchlow                1333

are two companies whose sales are in, are counted as damages but we actually don't know and we haven't done any investigation.

Q   Why not just pick a number?

A   We are not supposed to speculate and we are not supposed to guess.

Q   Are you aware of any basis in the record in this case upon which you could estimate how many sales by those two other companies were or were not subject to an arbitration clause?

A   I am not, no.

Q   Can you tell us how many sales by these two companies are involved here?

A   Sure. I have a chart that shows that.

This chart shows the following. It shows -- how tall the bar is refers to the sales volume of vitamin C in terms of kilograms. That's total sales and there is a bar for every month.

You will see each month along the bottom there, from 2001 to the middle of 2005. That's the damages period.

The blue line shows the sales that we have been able to verify as sales that were made that were not subject to an arbitration clause. They should be included.

The red bar shows the sales made by these two companies for which we do not have information about whether

              GR    OCR    CM    CRR    CSR

---

Wu - direct - Critchlow                1334

those sales are made subject to an arbitration clause or not. Those two companies are Tiger and Hualong.

Really, the issue has to do with the red bars. They are included in Doctor Bernheim's analysis but those -- it's the red bar I think is speculative.

Q   What did you do with the red bar, Doctor Wu?

A   To avoid speculating, my correction was to remove the red bar from the calculation of damages. So, in other words, when you have the price overcharged and you apply them to the sales that are actually made, I am going to apply them to the blue bar but I am not going to apply them to the red bar.

Q   What did you find when you removed the red bar?

A   I have a slide that shows the result of that.

Q   Maybe you could just walk through what is on the slide, Doctor Wu.

A   Okay.

What this shows is the -- the bar, the height of the bar is an estimate of damages, total damages. The very first bar shows Doctor Bernheim's estimate of damages which is $54 million.

Again, this is -- he calculates this by applying his price overcharged by all of the sales -- all of the sales which is the blue bar and the red bar.

All I did was take his overcharge, apply it to just the blue bar, not the red bar, and what I found is the damages

              GR    OCR    CM    CRR    CSR

---

Wu - direct - Critchlow                1335

fall to $46.6 million.

Q   Does this adjustment involve any change or alteration of the assumptions that Doctor Bernheim put into his economic model to predict damages?

A   No.

This is just counting up the sales right. This is just a counting.

Q   Can we go to the second adjustment that you made, which has to do with the benchmark period used to forecast the prices?

Can you explain what you think is wrong with what Doctor Bernheim did in respect of selecting benchmark periods?

A   Sure.

Doctor Bernheim uses two periods of time for his benchmark periods. There is a period before December 2001 and there is a period after January 2005.

What I think is wrong is using the pre-December 2001 period as a benchmark, and I think it is wrong because that pre-December 2001 period is not a period of competition or free market competition. Instead, it is a period where there is government regulation on quotas and licensing and so forth.

Q   What's your basis for saying there was government regulation in this period of time?

A   There are many documents that I have read that talk about the government regulation before December 2001. I think you

              GR    OCR    CM    CRR    CSR

---

Wu - direct - Critchlow                1336

heard testimony that there was regulation in this period before December 2001. That's -- that's the primary basis.

Q   Okay. Is there any other reason besides government regulation that you believe it was wrong to include the period before December 2001?

A   Yes, yes.

There is another reason, which is towards the end of that period, there were allegations of dumping. Okay. Dumping refers to a situation when companies -- when they sell products for export, that when they sell products for export they price it at below what they are charging domestic customers. They are charging foreign customers lower price than what they are charging their home country or domestic customers, or possibly selling at a price below cost.

That's not normal free market competition. It's something different called dumping. So that's not the kind of thing we want to be modeling where we are trying to figure out what would pricing have looked like in the class period -- I'm sorry -- had there been no agreement.

Q   I take it, you agree with Doctor Bernheim's selection of and use of the post January 2005 period?

A   I have looked at it. I have thought about his logic and why he included it.

Yes, I accepted it as reasonable.

Q   So is it fair to say, you thought that period of time was

              GR    OCR    CM    CRR    CSR

```
                Wu - direct - Critchlow              1373
 1   to really disentangle the SARS effect from -- disentangle the
 2   SARS effect.
 3           And once I make those two corrections, I find that
 4   the overcharge is only in a limited period of time, which is
 5   by the blue -- by the red that we saw in the prior chart and
 6   that's a nine percent overcharge.
 7           If I apply that nine percent overcharge in that red,
 8   in the period where we saw the red, by the sales subject to
 9   damages in that period, I get $2.2 million.
10   Q   Dr. Wu, there's an awfully big gap between $54.1 million
11   that Dr. Bernheim has in his report and $2.2 million and I'm
12   just wondering how if there was coordination that was
13   compelled by the Chinese government or there was some sort of
14   an agreement that was in place with respect to prices, how all
15   this could result in less than two-and-a-half million dollars
16   of estimated overcharge?
17           How can you say that that number is right and the
18   54 million figure is wrong?
19   A   This goes back to the corrections and these are
20   corrections that I think need to be made.
21           The correction on the sales subject to damages that
22   is excluding sales that are subject to an arbitration clause,
23   I think we should not be speculating or guessing, so that's
24   part of it.  And that reduced damages 46.6 million.  So, that
25   has nothing to do with Dr. Bernheim's model.

                         VB    OCR    CRR
```

```
                Wu - direct - Critchlow              1374
 1           The other corrections that relate to using the right
 2   benchmark and the proper adjustment for SARS, I don't think
 3   what I did is -- I think what I did was to capture the timing
 4   of the SARS effect better.  By looking at the Chinese article,
 5   I think I get the effect better.  And by making those
 6   corrections again, leaving Dr. Bernheim's model, the mechanics
 7   of the model intact, that's how I get his model resulting in
 8   $17.1 million.
 9           So, really, it's not a comparison between 54 million
10   and 2.2 million.  It's really 17 million to 2 million.
11           And then, to get from 17 million to 2 million, it's
12   these two corrections about how prices respond to supply and
13   demand and just really being careful about sorting out whether
14   SARS can explain the price elevation.
15           And I think all the corrections I did need to be
16   made.
17   Q   I think you talked about some of these results being
18   consistent with economic literature on cartel agreements.
19   Could you comment on that again.
20   A   So that is the other reason why I think I'm right because
21   I also thought about what I found in the context of the
22   economic literature on cartels and I got in just a little bit
23   earlier when we were talking about why it is that my green
24   line might be higher than the actual price.  And that goes
25   back to what economists now know about the theory of cartels.

                         VB    OCR    CRR
```

```
                Wu - direct - Critchlow              1375
 1           The old view might be something like if a cartel
 2   gets together to raise price, they raise price and keep prices
 3   high and then, it ends.  But what the new learning is, what
 4   economists now know is that that's not actually how cartels
 5   operate.
 6           There's frequent breakdowns and they may raise the
 7   price, but as soon as they raise the price, firms,
 8   participants in that cartel may say well, I don't know why I
 9   want to keep my price high.  I'm going to let the other guys
10   keep the high price, I think I'm going to lower the price and
11   try to get more sales.  And that's how price wars start.
12           And so, recognizing that price wars are an important
13   part of how a cartel may operate and if you look at the
14   documents we see references to price wars all the time,
15   Dr. Bernheim references unravelling of the cartel.  I mean,
16   this is just what happens and I think that's what we're
17   seeing.
18   Q   I think Dr. Bernheim claims that your results are not
19   plausible and I presume you think they are.
20           Can you explain the major criticisms that you see
21   Dr. Bernheim making of your approach and respond?
22   A   Sure.  Dr. Bernheim says my results are not plausible for
23   a number of reasons, but it really boils down to two.  And one
24   is that he says your results are not plausible because SARS
25   cannot explain the price elevation if a price elevation

                         VB    OCR    CRR
```

```
                Wu - direct - Critchlow              1376
 1   occurred before SARS even started.  Okay.  Obviously, SARS
 2   cannot cause something before it started.  But that criticism
 3   really goes back to finding the right variable to capture the
 4   SARS effect.
 5           If we're going to do a count of articles in English
 6   language newspapers that mention SARS, yes, you're going to
 7   miss it.  But if we're going to think about the possibility
 8   that people are not -- that SARS, that term has not yet been
 9   coined and we're going to talk about a virus and mysterious
10   disease, and look for articles might that talk about
11   Avian Flu, then you'll really see that SARS started in
12   November 2002.  So, I don't think I missed it at all.
13           And again, I go back to the chart on the easel.
14   Look at those circles.  Those reflect what actually happened
15   in the real world.  That first circle there, when prices
16   started to go up, that was the first case of SARS.  So, I just
17   think that criticism is based on his use of a variable that
18   doesn't capture the SARS effect.
19   Q   Any other plausibility criticisms that Dr. Bernheim
20   makes?
21   A   The second criticism is related to some of the things
22   that you just asked me about, which is it's not plausible that
23   my reforecasted price is above the actual price because supply
24   and demand isn't supposed to, according to Dr. Bernheim,
25   supply and demand and free market pricing is not supposed to

                         VB    OCR    CRR
```

```
                    Wu - cross - Southwick                    1409
 1              THE COURT:  Let's go ahead and finish.
 2              MR. SOUTHWICK:  Finish?  Okay.
 3              I'm going to move to strike everything after he said
 4   not specifically.
 5              THE COURT:  Yes, I'm going to grant that motion.
 6   BY MR. SOUTHWICK:
 7   Q     All right.  One of the issues you raised with
 8   Dr. Bernheim's work is a deduction you made for what you call
 9   speculative purchases, right?
10   A     Yes.
11   Q     And this was -- this was an arbitration clause issue,
12   right?
13   A     Yes.
14   Q     And I think you said we actually don't know anything
15   about these companies, right?
16   A     Well, we don't know whether the sales are subject to
17   arbitration clauses or not.
18              THE COURT:  Hang on one second, Mr. Southwick.  I'm
19   getting looks from the jurors like I made a mistake.  Maybe we
20   should break for lunch now.
21              Ladies and gentlemen, do you want to break for lunch
22   now?
23              One is eating a candy bar.  That's not good enough
24   for lunch.
25              Okay.  We'll break until 2:10.  Please don't talk

                    CMH    OCR    RMR    CRR    FCRR
```

```
                    Wu - cross - Southwick                    1410
 1   about the case amongst yourselves nor with anyone else.  See
 2   you then.
 3              (Jury exits.)
 4              (Luncheon recess.)
 5              (Continued on next page.)

                    CMH    OCR    RMR    CRR    FCRR
```

```
                    Wu - cross - Southwick                    1411
 1                       AFTERNOON SESSION
 2              (In open court.)
 3              (Judge BRIAN M. COGAN enters the courtroom.)
 4              THE COURTROOM DEPUTY:  All rise.
 5              THE COURT:  All right, let's have the jury, please.
 6              (Pause in the proceedings.)
 7
 8              (In open court.)
 9              THE COURTROOM DEPUTY:  All rise.
10              (Jury enters at 2:17 p.m.)
11              THE COURT:  All right, be seated.
12              You may continue.
13   CROSS-EXAMINATION
14   BY MR. SOUTHWICK:  (Continued)
15   Q     Good afternoon.
16              I want to turn now to the topic you discussed this
17   morning about speculative sales.
18   A     Yes.
19   Q     And you I think you deducted more than $7 million from
20   Dr. Bernheim based on what you called speculative sales?
21   A     Yes.
22   Q     And you described how, as an economist, you considered
23   whether or not to consider certain sales and you decided not
24   to include these; right?
25   A     Yes, on the -- on the basis of a couple of observations

                         VB    OCR    CRR
```

```
                    Wu - cross - Southwick                    1412
 1   when Dr. Bernheim did look at the sales by NPG, JJPC, Hebei
 2   and Weisheng, he did find that they had sales subject to
 3   arbitration clauses.  One, JPG where all of the sales were
 4   subject to arbitration clauses and, even at the low end, it
 5   was Weisheng and JJPC where a quarter of their sales were
 6   subject to arbitration clauses, so there's a huge range there.
 7              And all I was pointing out is that Dr. Bernheim
 8   includes in his damages calculations all of the sales from
 9   Tiger and Hualong, but we haven't actually done any analysis
10   to know whether any of those sales are subject to arbitration
11   clauses or not.
12              What we do know from the four manufacturers Hebei,
13   JGPC, Weisheng and, and...
14              MR. SOUTHWICK:  Judge.
15              THE COURT:  Dr. Wu, when Counsel asks you a question
16   that you can answer, that calls for a yes or no answer, try to
17   answer it just yes or no.
18              THE WITNESS:  Yes.
19              THE COURT:  If you can't answer it that way, then
20   you don't have to.  You can say I need a longer answer than
21   that.  If he asks you a question that way, then try to comply
22   with that.
23              THE WITNESS:  Okay.
24              THE COURT:  Continue.
25   Q     That's not really what happened though; is it?  You

                         VB    OCR    CRR
```

```
                    Proceedings                    1540
```

1  the Ministry's explanation for the relationship between the
2  Ministry and the Chamber.
3          And with the Court's permission, Mr. Critchlow will
4  address the point Mr. Isaacson has raised and may wish to
5  speak further on the Group Corp issue.
6          THE COURT:  When you say the point that Mr. Isaacson
7  has raised.
8          MR. CRITCHLOW:  I believe the advisory jury point,
9  Your Honor.
10         THE COURT:  All right.
11         MR. CRITCHLOW:  So, briefly as to Group Corp.  I
12 guess all I can do is repeat that the issue is whether
13 Group Corp entered into an agreement with competitors to fix
14 prices.
15         The documents that Mr. Isaacson cites in the nature
16 of reports, which are or full-year reports or half-year
17 reports contain no requests for direction from Group Corp, no
18 indication that any direction from Group Corp was given, no
19 indication that Group Corp itself actually entered into
20 agreements which was clearly done at the Chamber level,
21 according to the various minutes and, in fact, the only signed
22 agreement that we have in the record.
23         Mr. Isaacson had cited two Jiangsu documents which I
24 believe he says that indicate that Group Corp participated in
25 meetings.  If you look at one of them, which is the one of the

```
                   VB     OCR     CRR
```

```
                    Proceedings                    1541
```

1  two which purports to be notes not by Mr. Wang Qi but by
2  Mr. Wang Qiang, you will note that it does say North China
3  Pharmaceutical Group Corp.  And next to it, it has the name
4  Zhang Yingren.
5          The testimony is undisputed in the record that
6  Mr. Zhang Yingren was solely an employee of Hebei Welcome, had
7  no responsibilities whatsoever at Group Corp and I would
8  submit to Your Honor that Mr. Wang Qiang simply got it wrong.
9  That document can't stand in view of that testimony.  And the
10 other document is actually linked to that meeting, refers to
11 the same thing.
12         And so, for those reasons, I still believe,
13 Your Honor, that the overwhelming weight of the evidence, the
14 standard that needs to be looked at in a Rule 50 motion which
15 is not the Rule 54 motion but asks whether a reasonable jury
16 under the appropriate legal standard could find based on a
17 preponderance of the evidence that Group Corp knowingly
18 entered into an agreement, that this record clearly, clearly
19 does not allow for such a finding by any reasonable jury.
20         Briefly, with respect to the advisory jury point.
21 It is true that Your Honor indicated at the start of these
22 proceedings that that was a possibility, depending upon how
23 you decided to charge the jury and the verdict form that would
24 be used at the end.  I've looked very carefully at the charge
25 that you've given to us and a verdict form and it's a standard

```
                   VB     OCR     CRR
```

```
                    Proceedings                    1542
```

1  charge to a standard jury.  There's no indication here of any
2  particular special mechanism for an advisory jury so I'm
3  taking it that Your Honor is not intending to use an advisory
4  jury.
5          If that were contemplated, which I submit at this
6  late date is a difficult point to address, Your Honor's
7  discussed this in the past.  There are two case, both 30 years
8  old, one from the Second Circuit which is the Mara case.
9  There's one from the Eastern District, which is the Chance
10 case.  The Mara case clearly said no advisory jury under
11 situations like this.  Your Honor's suggested that the Chance
12 case said differently, but if you look at the Chance case, it
13 allowed an advisory jury on a predicatory issue of choice of
14 law, but said that the jury in Chance would still determine
15 the ultimate facts on the merits, and that's what we're
16 talking about here.
17         And actually, I think I go back to what my evidence
18 professor Weinstein said in his decision.  Judge Weinstein, in
19 the City of New York v Barrett case which is a 2004 case here
20 in the Eastern District, 317 F. Supp. 193, and he said -- and
21 it's pretty simple -- he said when in doubt, send it to the
22 jury and that's exactly what we've got right here.
23         And so, I don't think that's what we're looking at,
24 but that's defendant's position on the question, Your Honor.
25         THE COURT:  Okay.

```
                   VB     OCR     CRR
```

```
                    Proceedings                    1543
```

1          All right, well, let me start at the bottom, first.
2          I tend to agree that this is not going to be an
3  advisory jury.  I was concerned at the beginning of the case
4  that it might not be possible to avoid having the jury
5  determine some of the facts that I determined in the 44.1
6  inquiry.  However, that didn't happen.  It's entirely
7  possible.  There are a couple of slight overlaps that are
8  raised, I think, in plaintiff's motion in limine that was
9  filed early this morning, but I have no doubt that we can
10 straighten that out for the jury.
11         So, I will not be regarding the jury's verdict as
12 advisory.  It will be a binding verdict on the questions that
13 I am going to put to them and the charge that I'm going to
14 give to them.  So, that is not an issue.
15         Let me talk first about Tiger and Hualong.
16         MR. ISAACSON:  I'm sorry, to interrupt, Your Honor.
17         THE COURT:  Yes.
18         MR. ISAACSON:  Just to be, for the record, may we,
19 we just want to reserve our position that we would be entitled
20 to judgment as matter of law with regard to compulsion with
21 regards to conspiracy with respect to Hebei.
22         THE COURT:  Understood.  Your position is reserved.
23         If there was some kind of presumption that these
24 contracts have an arbitration clause, then I could understand
25 defendant's point.  But as we know, there is no such

```
                   VB     OCR     CRR
```

1  presumption possible. We don't know that there is an
2  arbitration clause. We don't know that there isn't. I think
3  when the plaintiff, which clearly has the burden of proof on
4  all elements of its damage claim, puts the contracts of sale
5  into -- it quantifies them for purposes of claiming damages on
6  them, it has met its burden of going forward on that issue.
7         It then becomes incumbent on the defendants, it
8  seems to me, to come back and say wait a minute, that's wrong,
9  those contracts should not be included. They are contracts.
10 They are prima facie evidence of sales and unless there's some
11 reason the defendants want to offer to show that they ought to
12 be excluded, then I think they should not be. So, I am
13 rejecting that point.
14        On the Act of State doctrine I will adhere to all of
15 the statements I made on my prior ruling holding it
16 inapplicable. I think this is clearly not a case where anyone
17 will be judging whether the Chinese government has acted in an
18 illegal fashion. Plaintiffs can only prevail here if the jury
19 determines that the Chinese government did not act. Period.
20 So, for that reason and the others that I've stated, I think
21 the Act of State doctrine is, the motion directed to that,
22 must be denied.
23        On the compulsion defense, I think we clearly have
24 factual issues. I see them now much better than I did at the
25 beginning of the case and even beyond that, more clearly than

                    VB    OCR    CRR

1  I did when I was writing the summary judgment decision. We
2  essentially start with minutes of meetings which show an
3  absence of compulsion; at least, a jury could reasonably find
4  that they show an absence of compulsion.
5         We then have witness testimony that says you can't
6  go strictly by the literal language of the minutes because
7  that's not what was going on. That's an issue for the jury to
8  determine who is right on that.
9         This notion that the minutes don't mean what they
10 say and the presentation of a unanimous agreement is not
11 necessarily indicative of the true state of affairs is not
12 implausible to me. It seems to me there are societies where
13 things are made to look like everyone is in perfect agreement
14 when, in fact, sometimes people have no choice. But that's an
15 argument for the jury.
16        I didn't hear any expert testimony from a
17 sociologist or a political scientist explaining how this is a
18 basic rubric of Chinese society and, while I may have some
19 individual views about that, that obviously has no role in
20 this case. So, I think we plainly have a factual issue on
21 compulsion and I'm very glad that we set up the trial this way
22 because I think it's really been teed-up excellently by both
23 sides and the jury will have the ability to determine who has
24 the more credible position on that.
25        The closest question is on Group Corp. I am going

                    VB    OCR    CRR

1  to adhere to my decision on summary judgment. I think
2  Mr. Isaacson is right; that there is a little more suggestion
3  than there was then that Group Corp was involved in this
4  sufficiently to put liability. I will tell you candidly, I'm
5  not entirely comfortable that there is enough there to sustain
6  a jury verdict.
7         It is certainly not uncommon for a parent
8  corporation or investors in a corporation to monitor the
9  financial activity of the corporation and it is also not
10 uncommon for there to be some shared facilities.
11        You know, it is not the fact of this case, although
12 it is common in many other cases, that a corporate family will
13 use a cash-sweep method where all cash and all subsidiaries is
14 swept up to the parent and then, doled out as operating funds
15 to the subsidiaries; even in that situation the parent is not
16 generally deemed to be acting for the subsidiary, but I do
17 think that it is a close enough issue where the exercise of
18 discretion suggests that I put it to the jury and let the jury
19 decide on it and then address it later, if necessary.
20
21        (Continued on following page.)
22
23
24
25

                    VB    OCR    CRR

                                           1547

1         THE COURT: (Continuing) I am therefore going to
2  reserve decision, which I think I can still do under Rule 50,
3  on that point. If I can't do it, then I am denying the motion
4  to dismiss at this stage pending the jury's verdict.
5         All right. That's my ruling on the Rule 50 motions.
6  Let's now start the charging conference.
7         What I propose to do is just ask in the first
8  instance if anybody has any objections or comments to part one
9  of the instructions. That's the basic, frankly, boiler plate
10 that we use in almost every case.
11        Anything there that's bothering anybody?
12        MR. ISAACSON: Nothing from plaintiffs, Your Honor.
13        MR. CRITCHLOW: And nothing for the defendants, Your
14 Honor.
15        THE COURT: All right. What I will do now is
16 starting with the legal elements of the claim, I will start on
17 page 14. I will call out each page and I will pause between
18 pages. If anyone has an objection to anything that appears on
19 the page, or something that they want to insert on that page,
20 they can tell me.
21        At the end of this process, if there are additional
22 instructions, you can give them to me then, or if you think
23 they are properly insertable as we go through page by page,
24 you can let me know. I will accept either way. You don't
25 pass the right to ask for an additional instruction just

                 GR    OCR    CM    CRR    CSR

                    Charge of Court                   1762

1  by a preponderance of the evidence, then you must award them a
2  sum of money that you believe will fairly and justly
3  compensate them for all damages to their business or property
4  that were a direct result or likely consequence of the conduct
5  that you have found to be unlawful.
6           The purpose of awarding damages in an antitrust
7  action is to put an injured plaintiff as near as possible in
8  the position in which it would have been if the alleged
9  antitrust violation had not occurred.  The law does not permit
10 you to award damages to punish a wrongdoer -- what we
11 sometimes refer to as punitive damages -- or to deter
12 defendants from particular conduct in the future, or to
13 provide a windfall to someone who has been the victim of an
14 antitrust violation.  You are also not permitted to award to
15 plaintiffs an amount for attorneys' fees or for the costs of
16 maintaining this lawsuit.  Antitrust damages are compensatory
17 only, only to the plaintiffs.  In other words, they are
18 designed to compensate plaintiffs for the particular injuries
19 they suffered as a result of the alleged violation of law.
20          Compensatory damages cannot be based on speculation
21 or sympathy.  Rather, they must be based on the evidence
22 presented at trial, and only on that evidence.
23          You must use sound discretion in fixing and award of
24 damages.  The law does not require that plaintiffs prove the
25 amount of their damages with mathematical precision, but only

                GR     OCR     CM     CRR     CSR

                    Charge of Court                   1763

1  with as much definiteness and accuracy as circumstances
2  permit.  It may be difficult for you to determine the precise
3  amount of damage suffered by plaintiffs.  If plaintiffs
4  establish with reasonable probability the existence of an
5  injury directly and proximately caused by defendants'
6  antitrust violation, you are permitted to make a just and
7  reasonable estimate of the damages.  So long as there is a
8  reasonable basis in the evidence for a damages award,
9  plaintiffs should not be denied a right to be fairly
10 compensated just because the damages cannot be determined with
11 absolute mathematical certainty.
12          The amount of damages must, however, be based on
13 reasonable, non-speculative assumptions and estimates.
14 Plaintiffs must prove the reasonableness of each of the
15 assumptions upon which the damages calculation is based.  If
16 you find that plaintiffs have failed to carry their burden of
17 providing a reasonable basis for determining damages, then
18 your verdict has to be for defendants.  If you find that
19 plaintiffs have provided a reasonable basis for determining
20 damages, then you may award damages based on a just and
21 reasonable estimate supported by the evidence.
22          Plaintiffs are seeking to recover damages on behalf
23 of a class of purchasers that consists of all persons or
24 entities, or assignees of such persons or entities, who
25 directly purchased vitamin C for delivery in the United

                GR     OCR     CM     CRR     CSR

                    Charge of Court                   1764

1  States, other than pursuant to a contract containing an
2  arbitration clause, from any of the defendants or their
3  coconspirators, other than Northeast Pharmaceutical Group
4  Company Limited, between December 1, 2001 to June 30, 2006.
5  Plaintiffs claim that the class members were harmed because
6  they paid higher prices for vitamin C than they would have
7  paid in the absence of the alleged price-fixing conspiracy.  A
8  proper method of calculating such damages is to award the
9  difference between the prices actually paid for these products
10 and the prices which would have been paid in the absence of
11 the alleged agreement to fix prices or limit supply.
12          The final damages figure to be awarded, if any, will
13 be stated by you in dollars during the class period, that is,
14 December 1, 2001 to June 30, 2006.  As I stated earlier, such
15 a determination must be supported by credible evidence of
16 damages and a fair basis for that amount, or no damages can be
17 awarded.
18          As I previously told you, plaintiffs are entitled to
19 recover for such injury that was the direct and proximate
20 result of the unlawful acts of defendants.  Plaintiffs are not
21 entitled to recover for injury that resulted from other
22 causes.
23          Plaintiffs claim that they suffered injury because
24 they paid increased prices for vitamin C as a result of
25 defendants' alleged anti trust violation.  In the normal

                GR     OCR     CM     CRR     CSR

                    Charge of Court                   1765

1  course of business activity, prices might rise for a variety
2  of factors that have nothing to do with antitrust laws.
3  Plaintiffs bear the burden of showing that their injuries were
4  caused by defendants' alleged antitrust violation.  If you
5  find that plaintiffs' alleged injuries were caused by factors
6  other than defendants' alleged antitrust violation, then you
7  must return a verdict for defendants.  If you find that the
8  price increase was caused in part by defendants' alleged
9  antitrust violation and in part by other factors, plaintiffs'
10 injuries only encompass the portion of the price increase that
11 was caused by defendants' alleged antitrust violation and you
12 may award damages only for that portion of plaintiffs' alleged
13 injuries.
14          Plaintiffs bear the burden of proving damages with
15 reasonable certainty, including apportioning damages between
16 lawful and unlawful causes.  If you find that there is no
17 reasonable basis to apportion plaintiffs' alleged injury
18 between lawful and unlawful causes, or that apportionment can
19 only be accomplished through speculation or guesswork, then
20 you may not award damages.
21          Each participant in a conspiracy that violates the
22 antitrust laws is jointly and severally liable for all the
23 damages resulting from the conspiracy.  This means that each
24 conspirator is fully liable for all of the damages caused by
25 acts of any other member of the conspiracy done pursuant to,

                GR     OCR     CM     CRR     CSR