**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE<br>VITAMIN C ANTITRUST LITIGATION<br><br>This Document Relates To:<br><br>*Animal Science Products, Inc., et al. v.*<br>*Hebei Welcome Pharmaceutical Co., Ltd., et*<br>*al.*, Case No. 1:05-CV-00453(BMC)(JO)<br>(E.D.N.Y.) | **MASTER FILE 1:06-MDL-1738**<br>**(BMC)(JO)** |

---

**MEMORANDUM OF LAW IN SUPPORT OF NORTH CHINA PHARMACEUTICAL**
**GROUP CORP.'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW**

---

BAKER & McKENZIE LLP
Charles H. Critchlow
Darrell Prescott
Catherine Y. Stillman
452 Fifth Avenue
New York, NY 10018
Tel: (212) 626-4476
Fax: (212) 626-4120

*Attorneys for Defendant*
*North China Pharmaceutical Group*
*Corporation*

**TABLE OF CONTENTS**

ARGUMENT ................................................................................................................................. 3

I.     The Legal Standard ............................................................................................................. 3

II.    The Overwhelming Factual Record Is that Only Hebei Welcome Participated in the
       Conspiracy .......................................................................................................................... 4

       A.     The Overwhelming Factual Record is that Mr. Huang Represented Hebei
              When He Attended Subcommittee Meetings ............................................................ 8

III.   None of the Evidence Adduced by Plaintiffs at Trial Overcomes the Overwhelming
       Weight of the Evidence that NCPGC Did Not Enter Into The Alleged Agreements ............ 9

       A.     The Chamber Website identification of Mr. Huang is Legally Insufficient to
              Support a Finding that NCPGC Participated in the Conspiracy ............................... 10

       B.     Non-Contemporaneous Website Pages of NCPGC are Legally Insufficient to
              Support a Finding that NCPGC Participated in the Conspiracy ............................... 14

       C.     Internally Contradictory Memoranda Authored by Wang Qiang of Jiangsu
              Jiangshan are Legally Insufficient to Support a Finding that NCPGC
              Participated in the Conspiracy ............................................................................... 16

       D.     Periodic Business Reports to NCPGC Do Not Provide a Legally Sufficient
              Basis to Support a Finding that NCPGC Participated in the Conspiracy ................. 19

       CONCLUSION .................................................................................................................. 21

## TABLE OF AUTHORITIES

**Cases**

*Aerotel, Ltd. v. Sprint Corp.*, 100 F. Supp.2d 189 (S.D.N.Y. 2000)................................................14

*American Protein Corp. v. AB Volvo*, 844 F.2d 56 (2d Cir. 1988)................................................10

*Bavaria Int'l Aircraft Leasing GmbH v. Clayton, Dubilier & Rice, Inc.,* No. 03-cv-03777, 2003 U.S. Dist. LEXIS 13197 (S.D.N.Y. July 30, 2003) ........................................2, 14

*Beck v. CONRAIL*, 394 F. Supp. 2d 632 (S.D.N.Y. 2005) ............................................................10

*Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276 (2d Cir. 1998) ...........................4

*Loral Fairchild Corp. v. Victor Co. of Japan, Ltd.*, 931 F. Supp. 1014 (E.D.N.Y. 1996) ...........................................................................................................................................3

*Montalbano v. HSN, Inc.*, 11-cv-96, 2011 U.S. Dist. LEXIS 101071 (N.D. Ill. Sept. 6, 2011) .......................................................................................................15

*Pyramyd Stone International Corp. v. Crossman Corporation,* 95 Civ. 6665 (JFK), 1997 U.S. Dist. LEXIS 1610, (S.D.N.Y. Feb 14, 1997)................................................10, 19, 20

*R & K Lombard Pharmacy Corp. v. Medicine Shoppe Int'l, Inc.*, 07-cv-288, 2008 U.S. Dist. LEXIS 17032 (E.D. Miss. March 5, 2008) ............................................................15

*United States v. Bestfoods*, 524 U.S. 51 (1998) .............................................................2, 9, 14, 20

**Statutes**

Fed. R. Civ. P. 50(a) ....................................................................................................................3

Fed. R. Civ. P. 50(b) ....................................................................................................................3

Defendant North China Pharmaceutical Group Corp. ("NCPGC") respectfully submits this Memorandum of Law in support of its renewed motion pursuant to Fed. R. Civ. P. 50(b) for judgment as a matter of law, dismissing plaintiffs' claims against it and vacating the jury's verdict against it [D.E. 675] and judgment entered against it thereon on March 14, 2013 [D.E. 676]. Such an order is required because on the record of this case no reasonable jury could have a legally sufficient basis to find for the plaintiff on the issue of whether NCPGC entered into the agreements in restraint of trade alleged in this case. Rather, such a finding could only be the result of surmise and conjecture as there was such an overwhelming amount of evidence in demonstrating that NCPGC did *not* enter into any such agreements that reasonable and fair minded jurors could not have arrived at a verdict against NCPGC.

As this Court set forth in the jury charge, the central issue for determination was whether defendants were members of a conspiracy or agreement to fix the price of vitamin C or restrict the quantities available for export. [Tr. 1747:24-1748:5, attached hereto as Exhibit A[1]; Jury charge, attached hereto as Exhibit B[2], at 15]. While Hebei Welcome Pharmaceutical Group Company, Ltd. ("Hebei" or "Hebei Welcome"), a company indirectly owned by NCPGC, concededly did enter into agreements which defendants maintained were compelled by the China Chamber of Commerce of Medicines and Health Products Importers & Exporters (the "Chamber"), NCPGC was not a member of the Chamber. And while Mr. Huang Pinqi, the General Manager and later President of Hebei, also held an executive position in NCPGC and attended Chamber meetings when he held such dual positions, it is a well-established principle of corporate law that directors and officers holding positions with a parent and subsidiary "can and do 'change hats,'" to represent such corporations separately despite their common ownership."

---

[1] All trial transcript excerpts referenced in this memorandum are attached hereto as Exhibit A.
[2] All excerpts from the Jury Charge referenced in this memorandum are attached hereto as Exhibit B.

*United States v. Bestfoods*, 524 U.S. 51, 69 (1998).  Indeed, when an officer is acting on behalf of a subsidiary, courts make a general *presumption* that they are wearing their "subsidiary hat" and not their "parent hat."  *Bavaria Int'l Aircraft Leasing GmbH v. Clayton, Dubilier & Rice, Inc.,* No. 03-cv-03777, 2003 U.S. Dist. LEXIS 13197, at &* (S.D.N.Y. July 30, 2003); *Bestfoods, supra.*

At the close of the evidence, NCPGC moved for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(a) on the ground that the evidence introduced at trial, uniformly demonstrating that it was Hebei that entered into agreements and that when Mr. Huang attended meetings he was representing Hebei,  could not possibly legally sustain a verdict in plaintiffs' favor and against NCPGC under this standard.  While denying that motion at that time, this Court nevertheless observed "I will tell you candidly,  I'm not entirely comfortable that there is enough there to sustain a jury verdict…but I do think it is a close enough issue where the exercise of discretion suggests that I put it to the jury and let the jury decide on it and then address it later, if necessary." [Tr. 1546:4-19].

In putting the question to the jury, this Court charged (as required by applicable law) that plaintiffs bore the burden of proving, and the jury had to find,  that "defendant North China Pharmaceutical Group *was a party to the agreements*, and that its officers or employees *specifically entered agreements* restraining trade *in their capacity as officers or employees of that particular defendant and not another entity*." [Tr. 1754:13-17; Jury Charge at 19 (emphasis added)].

Notwithstanding the overwhelming weight of the evidence that it was Hebei, not NCPGC, that entered into agreements, and that no officer or director of NCPGC specifically entered into any agreements in their capacity as NCPGC officers, the jury disregarded these

instructions and found for plaintiffs on a record that demonstrates only that Mr. Huang held dual officer capacities, but that when he attended Chamber meetings or chaired the subcommittee he did so as an officer of Hebei.  While plaintiffs have adduced limited marginal evidence such as corporate websites and reports by which they tried to argue by innuendo that NCPGC was a party to the agreements, none in fact so demonstrates;  and plaintiffs' contention -- unsupported by any facts -- that NCPGC entered into agreements or participated in any conspiracy is overwhelmingly and dispositively negated by undisputed evidence which is not only to the contrary, but which demonstrates its impossibility.

Accordingly, defendant NCPGC now renews its motion and requests that the verdict and judgment against it be vacated and that judgment be entered as a matter of law in its favor.

## ARGUMENT

### I.      THE LEGAL STANDARD

A Rule 50 motion "tests the sufficiency of evidence in support of a jury verdict."  *Loral Fairchild Corp. v. Victor Co. of Japan, Ltd.*, 931 F. Supp. 1014, 1022 (E.D.N.Y. 1996).  In evaluating a Rule 50 motion, "this court reviews the record to ascertain whether a reasonable jury could have reached the verdict in the case" and must uphold the jury's verdict only "[w]here substantial evidence supports its findings."  *Id.*   However, although a jury verdict is entitled to substantial deference, such deference is not absolute and a verdict cannot stand when it is found that the evidentiary basis upon which it rests is not legally sufficient.  Fed. R. Civ. P. 50(a).

This court may set aside a jury verdict pursuant to Fed. R. Civ. P. 50(b) "where (1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming

amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [it]." *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 289 (2d Cir. 1998) (affirming judgment as a matter of law under Rule 50(b)).   Further, granting a Rule 50(b) motion may be necessary to "protect[] neutral principles of law from powerful forces outside the scope of the law." *Flynn v. Goldman, Sachs & Co.*, 836 F. Supp. 152 (S.D.N.Y. 1993).

Such is the case here.  Plaintiffs' attempt to persuade the jury to impose liability on NCPGC succeeded only because of their invitation that the jury engage in sheer surmise and conjecture, and in the face of such an overwhelming amount of evidence in favor of NCPGC's non-involvement such that reasonable and fair minded persons could not have arrived at a verdict against it.[3]  More fundamentally, the critical and central principle of law which this case involves is the principle that individuals can hold dual positions in different corporations, without that circumstance in and of itself making one corporation liable for what were indisputably acts only of the other.  Granting the instant motion to uphold that principle by rendering judgment as a matter of law in favor of NCPGC is critical to defending and upholding that bedrock principle upon which the liability limitations of corporate structure depend.

## II.   THE OVERWHELMING FACTUAL RECORD IS THAT ONLY HEBEI WELCOME PARTICIPATED IN THE CONSPIRACY

The conspiracy at issue here allegedly commenced in late 2001 and involved the setting of vitamin C prices and quotas under the auspices of the Chamber, primarily at meetings of a

---

[3] Although plaintiffs will no doubt argue that a rule 50(b) motion should not involve weighing the credibility of the witnesses or otherwise considering the weight of the evidence (*see, e.g., Flynn v. Goldman, Sachs & Co.*, 836 F. Supp. 152 [S.D.N.Y. 1993]), that is emphatically not what the instant motion asks this Court to do.  Rather, setting aside those points, as will be shown below "there can be but one conclusion as to the verdict that reasonable [jurors] could have reached," (*id.*) given the prohibition against "sheer surmise and conjecture" and the requirement that a rule 50(b) motion be granted when "there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against it.". *Galdieri-Ambrosini, supra.*

vitamin C subcommittee organized by and held under the auspices of the Chamber.  From the very start, the record unambiguously establishes that only Hebei Welcome, and not its parent NCPGC[4], was called to those meetings, attended those meetings and entered into those agreements.  Thus:

- The invitation to the November 2001 organizational meeting was directed only to Hebei Welcome, only Hebei Welcome attended that meeting, and it was Hebei Welcome, not NCPGC, that executed the agreement which plaintiffs allege marked the inception of the conspiracy.  [PTX-134, attached hereto as Exhibit C]

- A subsequent December 2001 meeting likewise was the result of an invitation directed only to the members of  the vitamin C subcommittee organized by the Chamber for the purposes of discussing prices and quotas, and again was attended only by representatives of Hebei Welcome, and not NCPGC as reflected in the minutes of that meeting as well. [DTX-28, attached hereto as Exhibit D]

All other invitations, minutes, documents and notes are uniform in identifying Hebei personnel as the attendees.  Thus:

- Notes of an April 13, 2001 meeting identify attendees as being from Hebei Welcome, not NCPGC. [PTX-173, attached hereto as Exhibit E]

- A coordinated price announcement issued by the Chamber is directed to Hebei Welcome, not NCPGC. [DTX-21, attached hereto as Exhibit F]

---

[4] NCPGC presently owns about 30% of North China Pharmaceutical Company Limited ("NCPC Limited").  [Tr. 1243-1244]  Before 2004, NCPGC owned about 60% of NPCP Limited. [Tr. 1244]  From 2004 to 2006, the ownership percentage was reduced to about 40%.  [*id.*]  After 2006, it became the present percentage. [*id.*]  The shares of NCPC Limited that are not owned by NCPGC are publicly held in China.  [Tr. 1244-1245]  NCPC Limited in turn owns about 55% of the shares of Hebei Welcome.  The rest of the shares of Hebei Welcome are owned by an unrelated company in Hong Kong named Hong Kong Sanwei.  [*id.*]

- A May 20, 2002 vitamin C conference agenda, invitation is directed to Hebei Welcome. [PTX-37, attached hereto as Exhibit G]

- Notes of a May 23, 2002 meeting identify attendees as being from Hebei Welcome with no mention of NCPGC. [PTX-273-A, attached hereto as Exhibit H]

- Notes of a November 3, 2002 meeting identify attendees as being from Hebei Welcome with no mention of NCPGC. [PTX-50, attached hereto as Exhibit I]

- Notes of a February 24, 2003 meeting identify attendees as being from Hebei Welcome with no mention of NCPGC. [PTX-51, attached hereto as Exhibit J]

- Notes of a July 26, 2003 meeting identify attendees as being from Hebei Welcome with no mention of NCPGC. [PTX-53, attached hereto as Exhibit K]

- A memo discussing a February 17, 2004 meeting identifies attendees as being from Hebei Welcome with no mention of NCPGC. [PTX-81, attached hereto as Exhibit L]

- Notes of a March 19, 2004 meeting identify attendees as being from Hebei Welcome with no mention of NCPGC. [PTX-57, attached hereto as Exhibit M]

- Notes of an October 12, 2004 meeting identify attendees as being from Hebei Welcome with no mention of NCPGC. [PTX-58, attached hereto as Exhibit N]

- A website report of a November 23, 2004 meeting identifies the attendee as being the chief Executive of Welcome. [PTX-124, attached hereto as Exhibit O]

- A December 16, 2004 invitation to attend a meeting is directed to Hebei Welcome, not NCPGC. [PTX-62, attached hereto as Exhibit P]

- Notes of an April 19, 2005 meeting identify attendees as being from Hebei Welcome with no mention of NCPGC. [PTX-142, attached hereto as Exhibit Q]

- Notes of a May 19, 2005 meeting identify attendees as being from Hebei Welcome with no mention of NCPGC. [PTX-87, attached hereto as Exhibit R]

- Notes of a November 16, 2005 meeting identify the attendee as Zhang Yingren, who it is undisputed only held positions with Hebei Welcome and not NCPGC. [PTX-144, attached hereto as Exhibit S; Tr. 562:23-563:8, 1267:8-9].[5]

- Notes of a December 23, 2005 meeting identify attendees as being from Hebei Welcome with no mention of NCPGC. [DTX-68, attached hereto as Exhibit T]

- Notes of a June 23, 2006 meeting attribute a quota as being assigned to Hebei Welcome with no mention of NCPGC. [PTX-151, attached hereto as Exhibit U]

- Notes of an October "Supply Side West" meeting in Las Vegas, identify the participant as a representative of Hebei Welcome, not NCPGC. [PTX-149, attached hereto as Exhibit V]

This is not surprising, given that NCPGC was not a member of the Chamber of Commerce, and only Hebei Welcome was a member of the Vitamin C subcommittee, again as established by the uncontradicted testimony and documentary evidence. Thus, the By-Laws of the Vitamin C subcommittee [DTX 32-B, attached hereto as Exhibit W]:

- Identify Hebei Welcome, and not NCPGC, as a member of the Chamber. [p.1]

- List Hebei Welcome, and not NCPGC, as a member of the vitamin C subcommittee. [*id*.]

- Re-iterate that in order to be a member of the subcommittee, a company must be a member of the Chamber. [*id*., Provision 14(1)]

---

[5] The incorrect identification of Mr. Zhang as being from NCPGC and a further memorandum by Wang Qiang of Jiangsu concerning this meeting are discussed infra.

This undisputed documentary evidence corroborates the undisputed testimony of the witnesses to exactly the same effect.  Thus:

- Qiao Haili, the chief Chamber officer who organized the meetings and drafted the subcommittee Charter, testified that NCPGC was never a member of either the Chamber or the vitamin C subcommittee, and that under the subcommittee By-Laws  was not even eligible to be a member of the vitamin C subcommittee.  (Tr. 1017:25-1018:15).

- Yang Jianfu, chief legal officer of NCPGC testified that because NCPGC neither produced nor manufactured vitamin C it was impossible for it to be a member of the Chamber.  (Tr. 1260:2-20)

More generally, these witnesses also testified that NCPGC was an investment company that neither manufactured nor sold vitamin C, but rather invested in other companies.  *See* Huang testimony [Tr. 484:20-485:10]; Yang testimony [Tr. 1241:1-6, 1247:2-10].  There is no evidence in the record that NCPGC ever sold any vitamin C or gave any directions to Hebei in regards to how to conduct its day-to-day activities.  To the contrary, the testimony was that NCPGC does not in any way interfere or involve itself in the day-to-day activities -- including the manufacture, marketing or sales of vitamin C -- of the companies that it directly owns, including Hebei Welcome.  *See* Yang Testimony [Tr. 1241:1-6, 1242:19-25, 1246:4-20; 1247:8-20].

### A.    The Overwhelming Factual Record is that Mr. Huang Represented Hebei When He Attended Subcommittee Meetings

Turning specifically to Mr. Huang and his participation in the vitamin C subcommittee, the record is clear and explicit that every meeting he attended was attended in his capacity as a representative of Hebei Welcome.  This can be seen from the notes of every single meeting where Mr. Huang was shown to be in attendance.  Thus,

- In notes of an April 13, 2001 meeting, Mr. Huang was identified a representative of Hebei Welcome. [PTX-173 (Exhibit E)]

- In a notice issued for a meeting in May 2002, Mr. Huang was identified as a representative of Hebei Welcome whose attendance was pending. [PTX-37 (Exhibit G)]

- In notes of a November 3, 2002 meeting, Mr. Huang was identified as a representative of Hebei Welcome. [ PTX-50, (Exhibit I)]

- In notes of an October 12, 2004 meeting, Mr. Huang was identified as a representative of Hebei Welcome. [ PTX-58, (Exhibit N)]

- In notes for an April 19, 2005 meeting, Mr. Huang was identified as a representative of Hebei Welcome. [ PTX-142, (Exhibit Q)]

- In notes for a May 19, 2005 meeting, Mr. Huang was identified as a representative of Hebei Welcome. [PTX-87, (Exhibit R)]

- In notes for a December 23, 2005 meeting, Mr. Huang was identified as a representative of Hebei Welcome. [DTX-68, (Exhibit T)].

The record is utterly devoid of any note of any meeting at which prices or quotas were discussed identifying Mr. Huang as anything other than a representative of Hebei Welcome, let alone anything that would suggest, as required by the Court, that he specifically entered agreements restraining trade in his capacity as an officer or employee of NCPGC and not Hebei Welcome.

## III.   NONE OF THE EVIDENCE ADDUCED BY PLAINTIFFS AT TRIAL OVERCOMES THE OVERWHELMING WEIGHT OF THE EVIDENCE THAT NCPGC DID NOT ENTER INTO THE ALLEGED AGREEMENTS

It is a bedrock "principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries." *Bestfoods*, 542 U.S. at *61

(internal quotations and citation omitted).  Because a principal purpose for organizing a corporation is to permit its owners to limit their liability, there is a presumption of separateness between a corporation and its owners "which is entitled to substantial weight."  *Beck v. CONRAIL*, 394 F. Supp. 2d 632, 637-638 (S.D.N.Y. 2005), citing *American Protein Corp. v. AB Volvo*, 844 F.2d 56, 60 (2d Cir. 1988).  This presumption of separateness does not apply only if the parent corporation treats its subsidiary as a "mere department."  *Pyramyd*, 1997 U.S. Dist. LEXIS 1610, at *15.

At trial, plaintiffs cited to a handful of websites and documents attempting to establish, largely through innuendo and an invitation to speculate on a lack of corporate separateness between NCPGC and Hebei, and that it was NCPGC that supposedly participated in the alleged conspiracy and entered into the alleged agreements.  However, none of these materials or points contradicts the overwhelming amount of the evidence discussed above such that reasonable and fair minded jurors could arrive at the conclusion that plaintiffs had as a legal matter sustained their burden of proving that NCPGC participated in the alleged conspiracy and that its officers or employees specifically entered into agreements restraining trade in their capacity as officers or employees of NCPGC.

### A.    The Chamber Website identification of Mr. Huang is Legally Insufficient to Support a Finding that NCPGC Participated in the Conspiracy

Considerable emphasis was placed by plaintiffs on a Chamber website containing a chronological listing of events taking place in November-December 2004 which stated, in respect of a vitamin C subcommittee meeting held on November 23, 2004, that "[t]he committee decided during the meeting to elect the deputy General Manager of North China Pharmaceutical Group Corp., Mr. Huang Pinqi, as the next rotating President of the Committee for the year

2005." [PTX-124 (Exhibit O)]. There is, however, nothing to indicate or suggest that this was anything more than an identification of Mr. Huang by a position that he held, and the inference plaintiffs attempted at trial to draw from this circumstantial evidence that Mr. Huang attended any vitamin C subcommittee meetings in his capacity as an NCPGC officer amounted to an invitation to the jury to engage in surmise and conjecture, wholly unsupported and totally contradicted by the record. Thus:

- As reflected in this very entry describing the meeting at which the election of Mr. Huang occurred, it was attended only by Hebei Welcome [*id*.].

- Mr. Qiao Haili, who drafted the statement, testified that when Mr. Huang attended vitamin C subcommittee meetings he always attended solely as a representative of Hebei Welcome [Tr. 1018:16-1019:3].

- As noted above, every note of every vitamin C subcommittee meeting showing Mr. Huang in attendance *without exception* showed Mr. Huang as representing Hebei Welcome and only Hebei Welcome.

Asked to explain the reference to NCPGC in the identification of Mr. Huang, Mr. Qiao testified it was intended **only** to "show respect" and "did not mean that he represented North China Pharmaceutical Group":

> " **Q:**  Can you tell us why, since you've testified Mr. Huang  Pinqi never told you that he was representing North China  Pharmaceutical Group Corporation at any subcommittee  meeting, can you tell us why you identified him as being from North China Pharmaceutical Group Corporation?
>
> " **A:**   He was like that was the higher position of him as the deputy general manager at North China. As the person, that is an honor to be in that position. The way I wrote it is to show respect to him.
>
> " **Q:**   I may -- we may not be familiar with practices in China with respect to showing respect. Can you explain that, sir.

"**A:**  The position at the enterprise, sometimes, you know, the enterprise position is equivalent to an administrative position. For example, Mr. Huang Pinqi, he was a general manager at Welcome so his administrative position was director. And then from the director he was promoted to be the deputy general manager.  For a cadet or cadre in China, that is a big deal. So in order to show respect towards him, that's how I wrote it.  It did not mean that he represented North China Pharmaceutical Group."

(Tr. 1020:4-24; emphasis added).

Consistent with this testimony by Mr. Qiao, Mr. Huang testified that he maintained a separation between his duties as Deputy General Manager of NCPGC and his duties as General Manager, and later, Chairman, of Hebei Welcome.  He testified that his duties at NCPGC included technology, engineering, energy conservation, and a multi-year project to relocate NCPGC, while his responsibilities at Hebei Welcome were to attend an annual board meeting and review multiple reports regarding Hebei's business operations, personnel, finance, production, safety, profits, and product quality.  [Tr. 481:10-483:22].  Mr. Yang additionally testified that Mr. Huang did not report on Hebei's day-to-day business activities to anyone at NCPGC, either in his capacity as Deputy General Manager of NCPGC or in his capacity as General Manager and then Chairman of Hebei Welcome.  [Tr. 1258:13-1259:9].  Indeed, when Mr. Huang attended vitamin C subcommittee meetings, Mr. Yang of NCPGC had no knowledge whatsoever at the time that such meetings were taking place.  [Tr. 1262:1-1263:20].

The documents uniformly corroborate this uncontradicted testimony.  Thus, in addition to the fact that at every meeting Mr. Huang attended he was identified solely as a representative of Hebei Welcome (*see supra*), by the very By-Laws of the vitamin C subcommittee it was impossible for Mr. Huang to assume the rotating chairmanship in any capacity as an officer of NCPGC because in that capacity he would not be qualified to be on the subcommittee or to serve as its president.

Specifically, as noted above, provision 14(1) of the By-Laws requires that all members of the subcommittee be members of the Chamber (which NCPGC was not) and provision thirty-seven of the By-Laws provides that each president would serve for one year and that the president could "*only* be elected *from the representatives of* the member organizations…" [DTX-32-B (Exhibit W)] (emphasis added).  Thus Mr. Huang in his capacity as an officer of NCPGC was ineligible to serve as rotating president of the vitamin C subcommittee.  He could  serve as rotating president of the subcommittee only in his capacity as an officer of Hebei Welcome.

The point is reinforced in contemporaneous notes describing the nature of the subcommittee's rotating president position and the capacity in which it was held.  Thus:

- Notes of a May 2002 subcommittee meeting, held shortly before the By-Laws were adopted, state that "the four production enterprises will rotate their turn of acting as the vice Chairman of the Board.  The rotation order is as follows:  NEPG, Jiangshan, Weisheng and *Welcome.*"  [PTX-273-A (Exhibit H)]  (emphasis added).  No mention is made of NCPGC and instead it is clearly set forth that the rotation is to be to a representative of Welcome.

- Notes of a December 2005 subcommittee meeting, held at the conclusion of the year in which Mr. Huang held the rotating position, state that "The rotating chairman *of Welcome* was turned over to NEPG, which will assume the rotating Chairman for the year 2006." [DTX-68 (Exhibit T)] (emphasis added).

On the overwhelming and uncontradicted evidence, Mr. Huang, while having an NCPGC capacity as well as a Hebei capacity, plainly sat on the subcommittee and served as rotating Chairman solely in his capacity as an officer of Hebei Welcome and plainly participated in

13

vitamin C subcommittee meetings solely in his capacity as a representative of Hebei Welcome. The record is utterly devoid of any document or any testimony concerning what took place at any vitamin C subcommittee meeting discussing agreements, prices or quantities which is to the contrary.  Thus, under *Bestfoods* and the presumption of *Bavaria International*, no reasonable jury could find to the contrary, or conclude that merely because he held two positions, Mr. Huang specifically entered into agreements in his capacity as an officer of NCPGC without disregarding and doing violence to the applicable principles of law requiring that the separate existence of these companies be acknowledged and respected.

> **B.**     **Non-Contemporaneous Website Pages of NCPGC are Legally Insufficient to Support a Finding that NCPGC Participated in the Conspiracy**

At trial plaintiffs argued that NCPGC participated in the alleged conspiracy, pointing to website pages of NCPGC stating that it was "a leading pharmaceutical manufacturer in China," [PTX-300, attached hereto as Exhibit X] that its main business covered over 590 varieties including Vitamin C [PTX-301, attached hereto as Exhibit Y] and listing vitamin C as a product [PTX-302, attached hereto as Exhibit Z].

As an initial matter, as this court observed in overruling an objection to admitting websites into evidence, this issue reveals a "tension between the marketing and legal departments of every major corporate group."  (Trial Tr. 579:22-580:15).  And another court in this circuit has similarly remarked on the same "tension" and refused to disregard corporate separateness based on the statements on a corporate group's website.  Thus, in *Aerotel, Ltd. v. Sprint Corp*., 100 F. Supp.2d 189, 193 (S.D.N.Y. 2000), the plaintiff argued that Sprint Corporation presented its telecommunications services along with those of its subsidiaries to the marketplace under the common trade name "Sprint" without regard to its complex corporate structure, pointing to a

1998 Sprint web page which did, in fact, "talk generically about Sprint as a collective entity." *Id*. The court refused to consider such statements, which were "intended to be read by the consuming public," as having any bearing on the corporate structure of Sprint and the corporate separateness of its subsidiaries "given the sophistication and complexity of today's corporate world." *Id*.

Similarly, in *Montalbano v. HSN, Inc.*, 11-cv-96, 2011 U.S. Dist. LEXIS 101071 (N.D. Ill. Sept. 6, 2011), the court refused to disregard corporate separateness based on generalized statements on the corporate group's website, and in fact, specifically pointed to sworn testimony that each of the subsidiaries were separately managed and operated, despite a common website:

> "Even though the website states that Cornerstone Brands "distributes" catalogues, "operates" websites, and "runs" small retail stores, it is clear that "Cornerstone Brands" is being used as a shorthand for all Cornerstone subsidiaries. The website does not contradict the HSN defendants' sworn statements that each of Cornerstone's subsidiaries, including Cinmar and Territory Ahead, are independently managed and operated. "

*Montalbano v. HSN, Inc.*, 11-cv-96, 2011 U.S. Dist. LEXIS 101071, at *12 (N.D. Ill. Sept. 6, 2011). *See also R & K Lombard Pharmacy Corp. v. Medicine Shoppe Int'l, Inc.*, 07-cv-288, 2008 U.S. Dist. LEXIS 17032, at *11-12 (E.D. Miss. March 5, 2008) (refusing to disregard corporate separateness despite Cardinal Health's (the parent company) website's job listings for MSI (its subsidiary) on the grounds that a Cardinal Health employee's affidavit stated that the job postings that Cardinal Health submits for positions with its subsidiaries mention the name "Cardinal Health," as this is "the common brand under which most of [the] companies go to market.").

The websites adduced in evidence here, over defendants' objections, afford even less of a basis for finding NCPGC liable. They are websites from 2012, not the period of time at issue in

this case.  They contain nothing that indicates or suggests that NCPGC even now sells vitamin C, and as was the uncontradicted testimony at trial, a customer seeking to buy vitamin C, were it to click on the contact link, would be led to the telephone and separate location of a sales subsidiary of a company in the Group.  Yang testimony [Tr. at 1249:5-1250:13; DTX-96, attached hereto as Exhibit AA].  More pertinently, back in the period covered by this case, the NCPGC website clearly identified vitamin C sales activities as being handled by Hebei Welcome [DTX-97, attached hereto as Exhibit BB], listed Hebei Welcome as a member of its corporate group [DTX-98, attached hereto as Exhibit CC] and contained a link directly to the website of Hebei Welcome. [Tr. at 1255:21-1256:13; DTX-99, attached hereto as Exhibit DD].

Finally, and perhaps most fundamentally, none of the NCPGC websites contain anything to suggest, or from which it could reasonably be inferred, that NCPGC  specifically entered into any agreements restraining trade of vitamin C.  Such a conclusion, if based on these websites, would only be the result of surmise and speculative conjecture, directly contradicted by the overwhelming weight of the evidence in this case.  No reasonable jury could find contrary to the overwhelming amount of evidence supporting NCPGC's position that it had no such involvement that NCPGC entered into any such agreements.

### C.     Internally Contradictory Memoranda Authored by Wang Qiang of Jiangsu Jiangshan are Legally Insufficient to Support a Finding that NCPGC Participated in the Conspiracy

As noted above, there is a memorandum of November 16, 2005 subcommittee meeting which lists Zhang Yingren as participant opposite the name "North China Pharmaceutical" [PTX-144, attached hereto as Exhibit S].  As well, there is also a second memorandum attached to an email late in the evening on that same date (a) asking "Have you received yesterday's meeting memo?" (b) referring to a production termination "suggestion" put forward by the

Chamber "at this conference" and (c) stating that several companies, including  "North China Pharmaceutical" were supportive.  [PTX-259, attached hereto as Exhibit EE].  However, on the record in this case no reasonable jury could conclude from these documents, as required by the Court's instruction, that NCPGC was a party to agreements in restraint of trade and that its officers specifically entered into such agreements in their capacity as officers or employees of NCPGC.

This is because, in addition to the uncontradicted evidence summarized above that NCPGC neither was, nor could be a member of the vitamin C subcommittee,  both documents, produced from the files of Jiangsu,  plainly refer to the same vitamin C subcommittee meeting attended by Mr. Wang Qiang of Jiangsu and as such, they plainly refer to a meeting at which *only* Mr. Zhang Yingren was identified as being in attendance. *See* PTX-144 [Exhibit S].  And the uncontradicted record in this case is that Mr. Zhang Yingren was neither an officer nor an employee of NCPGC.  Thus:

- The uncontradicted evidence testimony at trial was that Mr. Zhang Yingren had no relationship whatsoever with NCPGC: he did not serve any role in that corporation, and was never an officer or employee of NCPGC.  *See* Huang Testimony [Tr. 563: 2-8]; Yang Testimony [Tr. 1267: 8-11].

- In every other memo of every other meeting Mr. Zhang Yingren is identified, without exception, as being affiliated with Hebei Welcome, with no mention of NCPGC.  *See* PTX-37 (5/20/02 meeting notice) [Exhibit G]; PTX-50 (11/3/02 meeting notes) [Exhibit I];  PTX-51 (2/24/03 meeting notes) [Exhibit J]; PTX-53 (7/26/03 meeting notes) [Exhibit K]; PTX-57 (3/19/04 meeting notes) [Exhibit

M]; PTX-58 (10/12/04 meeting notes) [Exhibit N];  PTX-134 (11/16/01 meeting

notes) [Exhibit C]; PTX-142 (4/19/05 meeting notes) [Exhibit Q]; PTX-149

(October 2006 "Supply Side West" notes) [Exhibit V].

- When Mr. Zhang's specific identification is given in documents, again it is given

    as an officer of Hebei Welcome with no connection or reference to NCPGC

    whatsoever.  *See* PTX-37 ("Vice President of Hebei Welcome") [Exhibit G],

    PTX-134 ("Sales Manager of Hebei Welcome") [Exhibit C].

Tellingly, plaintiffs themselves did not dispute at trial the fact that Mr. Zhang did not

work for NCPGC, instead arguing that when Hebei was in the room, even when it was just a

Hebei employee, other meeting participants were "aware" that North China was in the room -- a

conclusory assertion unsupported by facts. [Tr. at 1721:23-1722:2]    Mr. Wang Qiang, who did

not appear at trial and who wrote the memos, was neither an employee nor an officer of either

NCPGC or Hebei Welcome, and thus in no position to have any first hand knowledge concerning

Mr. Zhang.  Indeed, he appears to have attended only one other subcommittee meeting in which

he himself identified Mr. Zhang as representing Hebei Welcome [PTX-173 (4/13/01) [Exhibit

E]], and in the cover note to his November 16, 2005 memo second memorandum admitted only

to a "limited understanding."  [PTX 259, Exhibit EE].

Given the inherent contradictions in the Wang Qiang memoranda, their lack of factual

support,  and the overwhelming amount of evidence in favor of NCPGC's position adduced

above, no reasonable and fair minded jury could conclude, as required by the Court's instruction,

that NCPGC was a party to agreements in restraint of trade and that its officers specifically

entered into such agreements in their capacity as officers or employees of NCPGC.

D.       **Periodic Business Reports to NCPGC Do Not Provide a Legally Sufficient Basis to Support a Finding that NCPGC Participated in the Conspiracy**

Finally, plaintiffs attempt to use occasional or periodic reports purportedly submitted to NCPGC to buttress their case.  Thus, three "Work Summaries," one  for the first half of 2003 (PTX-305, attached hereto as Exhibit FF), one for 2004 (PTX-306, attached hereto as Exhibit GG), and another prepared for the first half of 2004 (PTX-119, attached hereto as Exhibit HH), all of which were prepared by Hebei and addressed NCPGC, are cited supposedly to support an inference that NCPGC interjected itself into the day-to-day operations of Hebei Welcome.

However, even a superficial reading of these reports reveals that they simply report on the activities of Hebei Welcome.  They neither indicate nor suggest that NCPGC was itself engaging in those activities, as opposed to merely receiving reports.  They seek no action, no decision, and no guidance in respect of the day-to-day marketing of vitamin C, and they contain no indication that NCPGC was invited to, or in fact interjected itself into such activities, let alone that NCPGC in any way entered into the specific agreements in restraint of trade -- a matter upon which plaintiffs bore the burden of proof.

It is well-established that the sending of monthly statements or reports does not suffice to pierce the corporate veil. *See Pyramyd Stone International Corp. v. Crossman Corporation,* 95 Civ. 6665 (JFK), 1997 U.S. Dist. LEXIS 1610, at *21-22 (S.D.N.Y. Feb 14, 1997) (sending monthly reports to parent company did not render a foreign subsidiary a mere department or alter-ego of its parent company).  And the fact that these Work Summaries report on Hebei's manufacturing operations, marketing, R&D and management or were sent to NCPGC would be well within NCPGC' s right to be involved with it subsidiary's performance in a way that is

wholly "consistent with the parent's investor status" and monitoring a subsidiary's performance

constitutes "appropriate parental involvement":

> "A parent corporation may be directly involved in the activities of its subsidiaries without incurring liability so long as that involvement is consistent with the parent's investor status.  Appropriate parental involvement includes: monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures. "

*Bestfoods*, 524 U.S. at 69.  See also *Pyramyd*, 1997 U.S. Dist. LEXIS 1610, at *21-22 ("While

Crosman-Germany sent monthly financial statements to Crosman-US, there is no indication that

this was anything more than a monthly report to stockholders . . . While it is true that [the parent]

exercises a great deal of control over [the subsidiary], . . . [s]uch control is inherent in the parent-

subsidiary relationship and does not justify labeling a subsidiary a 'mere department' of the

parent.") (internal quotations and citations omitted).  To the same effect, and also well within

that standard is PTX-111, attached hereto as Exhibit II, which although it contains no indication

that it was actually sent to NCPGC, and by its content was seeking approval from the publicly-

held North China Pharmaceutical Limited Corporation[6], has no suggestion or indication that

Hebei Welcome's parent companies were being asked to approve nothing other than a financial

restructuring of a subsidiary in which they held an ownership interest.  Within the standard of

*Bestfoods*, such a matter would be entirely appropriate for a parent to consider, and would not

provide a basis for piercing the corporate veil or finding that NCPGC specifically participated in

the agreements in respect of price and production which are at issue in this case.   It would be

complete, total and sheer surmise and conjecture to infer to the contrary.

---

[6] See Yang Jianfu testimony, Tr. at 1276:25-1278:24.

## CONCLUSION

From the outset, this has been a case involving an alleged conspiracy among manufacturers and sellers of vitamin C who were members of the Chamber and its vitamin C subcommittee, and who under the organization of that Chamber and subcommittee, held meetings and entered into agreements in respect of price and export volumes of vitamin C.  It was Hebei Welcome who was the member of the Chamber, Hebei Welcome who was the member of the vitamin C subcommittee, Hebei Welcome that entered into the initial agreement in November 2002 that plaintiffs allege marked the formation of the alleged conspiracy, and Hebei Welcome that was named as defendant when the Complaint was originally filed.

North China Pharmaceutical Group Corp., added two years after the original complaint was filed, was neither a member of the Chamber nor a member of the subcommittee.  By the very organizational By-Laws of the subcommittee it was not permitted to be a member.  There has been and remains no evidence that NCPGC entered into any agreements or that any NCPGC officer or employee, in their capacity as officers and employees of NCPGC, specifically entered into any such agreements.  Rather, the only evidence has been that an officer of NCPGC, who was also an officer of Hebei Welcome, sat on that subcommittee in his capacity as an officer of Hebei Welcome, and that NCPGC otherwise confined its activities to the legitimate activities a parent may properly conduct vis-à-vis an indirectly held subsidiary while preserving the corporate separateness of that subsidiary's day-to-day operations.

No evidence was presented at trial that sufficiently overcame the presumption of corporate separateness between NCPGC and Hebei and the bedrock principle of corporate law "deeply ingrained in our economic and legal systems" that a parent corporation is not liable for the acts of its subsidiaries.  The factual record is clear: only Hebei Welcome participated in the

alleged conspiracy, and Mr. Huang represented only Hebei Welcome when he attended the vitamin C subcommittee meetings.

The overwhelming amount of the evidence is in favor of this position and it was sheer surmise and conjecture for the jury to deliver a verdict to the contrary. North China Pharmaceutical Group Corp. accordingly renews its Rule 50(a) motion for judgment as a matter of law dismissing it from this case.

WHEREFORE, for the foregoing reasons, judgment should be entered as a matter of law dismissing North China Pharmaceutical Group Corp. from the instant action and setting aside the jury verdict against North China Pharmaceutical Group Corp.

Dated:  April 11, 2013                              Respectfully Submitted,

                                                          BAKER & McKENZIE LLP


                                        By:  __/s/_____
                                                 Charles H. Critchlow
                                                 Darrell Prescott
                                                 Catherine Y. Stillman
                                                 452 Fifth Avenue
                                                 New York, New York  10018
                                                 Telephone:  (212) 626-4476
                                                 Fax:  (212) 626-4120

                                                 *Attorneys for Defendant  North China Pharmaceutical Group Corp.*