**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

IN RE
VITAMIN C ANTITRUST LITIGATION

MASTER FILE 1:06-MDL-1738
(BMC)(JO)

This Document Relates To:

    *Animal Science Products, Inc., et al. v.*
*Hebei Welcome Pharmaceutical Co., Ltd., et*
*al.*, Case No. 1:05-CV-00453(BMC)(JO)
(E.D.N.Y.)

---

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS HEBEI**
**WELCOME PHARMACEUTICAL CO. LTD.'S AND NORTH CHINA**
**PHARMACEUTICAL GROUP CORPORATION'S RENEWED MOTION**
**FOR JUDGMENT AS A MATTER OF LAW BASED ON ACT OF STATE,**
**FOREIGN SOVEREIGN COMPULSION, AND INTERNATIONAL COMITY**

---

BAKER & McKENZIE LLP
Darrell Prescott
Charles H. Critchlow
Catherine Y. Stillman
452 Fifth Avenue
New York, NY 10018
Tel: (212) 626-4476
Fax: (212) 626-4120

*Attorneys for Defendants*
*Hebei Welcome Pharmaceutical Co. Ltd*
*and North China Pharmaceutical Group*
*Corporation*

## TABLE OF CONTENTS

I.     **Introduction** ........................................................................................................................ **1**

II.    **ARGUMENT** ..................................................................................................................... **4**

     A.    **Discussion of the Record** ................................................................................ **6**

     B.    **Discussion of the Law** .................................................................................. **16**

III.   **Conclusion** ................................................................................................................ **20**

# TABLE OF AUTHORITIES

**Page(s)**

Cases

*Banco Nacional de Cuba v. Sabbatino*,
   376 U.S. 398 (1964)......................................................................................................4, 18

*Chevron v. Natural Resources Defense Council, Inc.*,
   467 U.S. 837 (1984)............................................................................................................16

*Curley v. AMR Corp.*,
   153 F.3d 5 (2d Cir. 1998) ..................................................................................................16

*Hartford Fire Ins. Co. v. California*,
   509 U.S. 764 (1993)............................................................................................................19

*In re Oil Spill by the Amoco Cadiz*,
   954 F. 2d 1279 (7th Cir. 1992) .....................................................................................5, 17

*In re Vitamin C Antitrust Litig.*,
   584 F. Supp. 2d 546 (E.D.N.Y. Nov. 6, 2008) ...................................................................19

*In re Vitamin C Antitrust Litig.*,
   810 F. Supp.2d 522 (E.D.N.Y. 2011) .................................................................................20

*Interamerican Refining Corp. v. Texaco Maracaibo, Inc.*,
   307 F. Supp. 1291 (D. Del. 1970)......................................................................................18

*International Association of Machinists v. OPEC*,
   649 F.2d 1354 (9th Cir. 1981) ...........................................................................................18

*Konowaloff v. Metropolitan Museum of Art*,
   702 F. 3d 140 (2d Cir. 2012).........................................................................................5, 17

*Mannington Mills, Inc. v. Congoleum Corp.*,
   595 F.2d 1287 (3d Cir. 1979).......................................................................................18, 19

*O.N.E. Shipping Ltd. v. Flota Mercante Grancolombiana*,
   830 F.2d 449 (2d Cir., 1987).........................................................................................5, 17

*Trugman-Nash, Inc. v. New Zealand Dairy Board*,
   942 F. Supp. 905 (S.D.N.Y. 1996).....................................................................................18

*Underhill v. Hernandez*,
   168 U.S. 250 (1897)............................................................................................................17

*United States v. Pink, Banco de Espana v. Federal Reserve Board of New York*,
114 F.2d 438 (2d Cir. 1940)......................................................................................................5

**OTHER AUTHORITIES**

Fed. R. Civ. P. 50(a) ....................................................................................................................3

Fed. R. Civ. P. 50(b) ....................................................................................................................4

## I.     INTRODUCTION

Defendants Hebei Welcome Pharmaceutical Co. Ltd and North China Pharmaceutical Group Corp. respectfully submit this Memorandum of Law in support of their renewed motion for judgment dismissing plaintiffs' claims against them and vacating the jury's verdict against them [D.E. 675] and judgment entered against them thereon on March 14, 2013 [D.E. 676] on the grounds that it is barred as a matter of law by the doctrines of act of state, foreign sovereign compulsion and international comity.

These matters were initially raised by motion to dismiss (made by defendants and supported by the Chinese government as amicus curiae[1]) which was denied by Judge Trager in his decision of November 6, 2008 [D.E. 338].   Subsequently they were raised by a motion for summary judgment or in the alternative for determination of foreign law under Fed. R. Civ. P. 44.1 (again made by defendants and supported by the Chinese government as amicus curiae[2]) which was denied by this Court by decision dated September 6, 2011 [D.E. 440] (the "2011 Summary Judgment Decision"); and this Court subsequently denied a motion for permission to take an interlocutory appeal of certain aspects of that decision by its decision dated  February 9, 2012 [D.E. 2012].

---

[1] *See* D.E. 66 (Notice of Motion to Dismiss); D.E. 67 (Memorandum in Support of Motion to Dismiss);  D.E. 68 (Declaration of Richard Goldstein and supporting exhibits in support of motion); D.E. 69 (Brief of Amicus Curiae the Ministry of Commerce of the People's Republic of China in Support of Defendants' Motion to Dismiss); D.E. 70 (Declaration of Joel Mitnick in Support of the Brief of Amicus Curiae the Ministry of Commerce of the People's Republic of China); D.E. 72 (Defendants' Reply Memorandum in Support of Motion to Dismiss); D.E. 306 (Letter to the Honorable David G. Trager by Ministry of Commerce for the Peoples Republic of China).

[2] See D.E. 391 (Motion for Summary Judgment); D.E. 392 (Rule 56.1 Statement in Support of Motion for Summary Judgment); D.E. 393 (Memorandum in Support of Motion for Summary Judgment or, in the Alternative, for Determination of Foreign Law and Entry of Summary Judgment Pursuant to Rule 44.1, Fed. R. Civ. P); D.E. 394 (Affidavit/Declaration in Support of Motion for Summary Judgment, etc.); D.E. 398 (Reply in Support of Motion for Summary Judgment, etc.); D.E. 399 (Affidavit/Declaration in Support re Motion for Summary Judgment, Etc.).; D.E. 400 (Letter attaching Statement of the Ministry of Commerce of the PRC dated 8/31/09); D.E. 419 (Defendants' Response to Plaintiffs' Sur-Reply Opposing Summary Judgment and Determination of Foreign Law); D.E. 421 (letter to Judge Trager regarding District Court opinion in *MinMetals* case).

The legal questions as set forth in these motions included the proper interpretation of Chinese sovereign regulatory directives, which defendants submit were misinterpreted, the Court's failure to give proper deference to submissions of the Chinese government definitively explaining such regulation, the inappropriateness (in light of the fact that the issues presented in this case directly implicated such Chinese regulatory activity) of examining Chinese government acts in a judicial setting, and the failure to give proper deference to the actions of the Chinese government under rules of comity.

Flowing from the cited decisions, the question of whether defendants were compelled to reach agreements and set prices was put to a jury, and that jury then sat in judgment evaluating the credibility of testimony of a former Chinese government official who stated he compelled such meetings -- testimony given in respect of periods when he was a government official. Compounding that error, excluded from evidence by the Court and from consideration by that jury as a critical context for assessing the testimony of the former official were all pertinent Chinese directives, regulations and government pronouncements administered by that former official, the Chinese government's previous submissions on the question, and any testimony by that official or any other witness that the Chinese government compelled such conduct.

Specifically, at the very outset of trial, this Court indicated that government directives would "likely" not be allowed into evidence [Tr. at 4[3]] and thereafter, over the course of the trial definitively excluded all regulations and directives [Tr. at 922-927, 932-952], the Chinese government's submissions[4], and testimony that the government directed that defendants engage

---

[3] All trial transcript excerpts referenced in this memorandum are attached hereto as Exhibit A.

[4] *See* D.E. 69 (Brief of Amicus Curiae the Ministry of Commerce of the People's Republic of China in Support of Defendants' Motion to Dismiss, dated September 22, 2006) (the "MOFCOM Amicus Brief"), attached hereto as Exhibit B; D.E. 306-3 (Letter to the Honorable David G. Trager by Ministry of Commerce for the Peoples Republic of China dated June 9, 2008) attached hereto as Exhibit C; D.E. 400-2 (Statement of the Ministry of Commerce of the PRC dated August 31, 2009) attached hereto as Exhibit D.

in price discussions and agreements [*e.g.*, Tr. at 688:5-18; 533:1-16; 684:10-17; 692:3-25; 928:24-929:8; 1097:19-1098:2].[5]

At the close of the evidence, defendants made a Fed. R. Civ. P. 50(a) motion for judgment as a matter of law, citing the doctrines of act of state and foreign sovereign compulsion, calling to the Court's attention to most recent Second Circuit authority re-iterating the act of state doctrine and noting that the overwhelming amount of the evidence, and even acknowledged by prior rulings by the Magistrate Judge [D.E. 424; D.E. 506], was that the China Chamber of Commerce of Medicines and Health Products Importers and Exporters was in fact a part of the Chinese government.  [Tr. at 1524-1526, 1526 (compulsion), 1539-1540].[6]  This Court denied that motion based on its prior rulings and statements, holding that the Act of State doctrine was inapplicable and that compulsion (on the improperly limited evidentiary parameters discussed above) had to go to the jury. [Tr. 1544-1545].

The post-evidence motion, and the foregoing issues did not involve an assessment of the sufficiency of the evidence so much as a question of whether the entire matter should have been submitted to the jury at all, or if submitted was fatally flawed by the exclusion of evidence.  As

---

[5] Among the proposed trial exhibits necessarily excluded by these rulings were: DTX-3 (Regulations of the Ministry of Foreign Trade and Economic Cooperation on Enhancing Coordination of Export Commodity, Feb. 22, 1991); DTX-4 (MOFTEC Measures for Social Organizations, Feb. 26, 1991);  DTX-6 (Interim Provisions for Administration of Export Commodities, Dec. 29, 1992); DTX-7 (Notice of Ministry of Foreign Trade and Economic Cooperation regarding Printing and Distribution of Several Regulations for Personnel Management of Chambers of Commerce for Importers and Exporters, Sept. 23, 1994); DTX-9 (Interim Regulations of the Ministry of Foreign Trade and Economic Cooperation on Punishment for Conduct of Exporting at Lower-than-Normal Price, Mar. 20, 1996); DTX-10 (Ministry of Foreign Trade and Economic Cooperation Document, "Report Regarding the Current Vitamin C Export Circumstances and Recommendations of Counter Measures" 1996); DTX-12 (Notice Regarding the Administration of Vitamin C Production and Export by Ministry of Foreign Trade and Economic Cooperation and State Drug Administration, Nov. 27, 1997); DTX-13 (Approval for Establishing VC Sub-Committee of China Chamber of Commerce of Medicines & Health Products Importers & Exporters); DTX-29 (List of the Fourth Batch of Departmental Decisions Abolished by the Ministry of Foreign Trade and Economic Cooperation, Mar. 21, 2002); DTX-31 (Notice Issued by the Ministry of Foreign Trade and Economic Cooperation and the General Administration of Customs for the Adjustment of the Catalogue of Export Products Subject to Price Review by the Customs, Mar. 29, 2002); DTX-44 (Announcement of Ministry of Commerce of the People's Republic of China, General Administration of Customs of the People's Republic of China, Nov. 29, 2003).

[6] There was in fact no evidence to the contrary such that any reasonable jury could conclude otherwise.

such, the post-evidence motion was made more out of an abundance of caution to give the Court

one last chance to dismiss the case as a matter of law, as opposed to being required as any

necessary precondition to appeal.

Out of a similar abundance of caution, the instant motion now renews that motion under

Fed. R. Civ. P. 50(b). Notwithstanding its outcome, however, the operative provisions and

directives of the Chinese regulatory regime, submissions of the Chinese government in respect

thereof, and the evidentiary exclusions of trial will be ripe for review once the last post-trial

motion is decided; and the applicability of the principles of act of state, foreign sovereign

compulsion, and international comity will be presented to the appellate court for *de novo* review.


## II.      ARGUMENT

The act of state doctrine, the primary focus of the post-evidence motion, and the reason it

bars inquiry into the matters at issue in this case was discussed at length in the points and

authorities submitted in support of the initial motion to dismiss and the motion for summary

judgment or in the alternative determination of foreign law. *See* Defendants' Memorandum in

Support of Motion to Dismiss [D.E. 67 at pp. 14-23]; Defendants' Reply Memorandum in

Support of Motion to Dismiss [D.E. 72 at pp. 16-23]; Defendants Memorandum of Law in

Support of Motion for Summary Judgment or in the Alternative for Determination of Foreign

Law [D.E. 393 at  53-57]; Reply Memorandum in Support of Defendants' Motion for Summary

Judgment or in the Alternative for determination of Foreign Law [D.E. 398 at 35 *et seq.*].

Among other things, it was pointed out that the official acts of the Chinese government

were being placed directly at issue, and that as such there would be immense and unavoidable

foreign policy implications precisely of the sort the doctrine is designed to avoid. *Banco*

*Nacional de Cuba v. Sabbatino*, 376 U.S. 398 (1964).   As was noted, if it is impermissible for a

court in this country to inquire into the motivations for a foreign sovereign's actions, or to pass judgment upon their validity,[7] it is far more extreme for a U.S. Court to conclude such a regulation did not exist when the foreign government presents certified and consularized copies of the actual regulations and explains how the conduct complained of was done pursuant to, and in compliance of, such mandatory regulations.

Part and parcel of the problem here is that the Chinese government took the unprecedented step of actually explaining to the court its system of regulation and position that it was compelling the conduct in question here -- statements this Court elected to reject despite precedent holding that such statements generally should be deemed as conclusive.[8]

On the post-evidence motion, defendants called to the Court's attention more recent case law reaffirming the act of state doctrine and emphasizing once again the inappropriateness of inquiring into the details of a foreign government's sovereign actions or the merit of the results. *Konowaloff v. Metropolitan Museum of Art*, 702 F. 3d 140, 145 et seq, (2d Cir. 2012). We noted the substantial evidence in the record demonstrating that Mr. Qiao was in fact a government official and that the Chamber was a government instrumentality. We also noted the inter-relatedness of the compulsion doctrine.

---

[7] *See O.N.E. Shipping Ltd. v. Flota Mercante Grancolombiana*, 830 F.2d 449, 452 (2d Cir., 1987).

[8] *See* discussion in D.E. 393 at pp. 31 *et seq.* discussing *United States v. Pink,  Banco de Espana v. Federal Reserve Board of New York*, 114 F.2d 438, 443 (2d Cir. 1940), and the U.S. Brief in *Matsushita Elec. Co. v. Zenith Radio Corp.*, No. 83-2004, 1985 WL 669667 (June 17, 1985); discussion in D.E. 393 at 31 regarding the substantial deference rubric applied in *In re Oil Spill by the Amoco Cadiz*, 954 F. 2d 1279 (7th Cir. 1992); discussion in D.E. 398 at 33 *et seq.*

A.      Discussion of the Record

For the purpose of the instant renewal of that motion, which necessarily invited a reexamination of the Court's prior rulings rejecting application of the act of state and related doctrines, the pertinent facts include the following:

In 1997, the Ministry of Foreign Trade and Economic Cooperation ("MOFTEC"), currently known as the Ministry of Commerce ("MOFCOM"), and the State Drug Administration of the People's Republic of China issued a Notice Relating to Strengthening the Administration of Vitamin C Production and Export (the "1997 MOFTEC & SDA Notice") which required the Chamber of Commerce for Import & Export of Medicines & Health Products (the "Chamber") to establish the vitamin C subcommittee that would, among other things, "timely formulate and adjust export coordination price," the coordination of which "shall be formulated by the Chamber."  DTX-12, attached hereto as Exhibit E and annexed as Exhibit 6 the Affidavit of Qiao Haili, dated Aug. 5, 2012, submitted pursuant to Court Order of July 11, 2012 [D.E. 497-2] (the "Qiao Aff."), at 2.[9]  Among other things, that regulation provided that::

> 6.      The Chamber shall establish a Vitamin C Coordination Group (which was the temporary name of the *Vitamin C Sub-committee* before the Vitamin C Sub-committee is officially approved).  The main responsibilities of this Group are to *coordinate with respect to Vitamin C export market, price and customers, and to organize the enterprises in contacting foreign entities.  All enterprise qualified to operate Vitamin C export shall participate in such Coordination Group and subject themselves to the coordination of the Group.*  The specific method for coordination shall be formulated by the Chamber, and filed to MOFTEC for record.
>
> 7.      *Vitamin C Export Coordination Group shall timely organize meetings* for the major Vitamin C export enterprises according to the domestic and international market development, to *conduct studies on marketing strategies, timely formulate and adjust export coordination price, which the Vitamin C export enterprises must strictly implement in accordance with.*  With respect to the enterprises competing at low price and reducing price through any disguised

---

[9] The Qiao Affidavit, as well as the subsequent proffer of his proposed testimony submitted on October 29, 2013 [D.E. 576] are hereby incorporated by reference as a more complete elaboration of the testimony in respect of Chinese government regulation that would have been given at trial but for this Court's exclusionary rulings.

means, a penalty shall be imposed in strict accordance with Article 10 of this Notice.

DTX-12 (Exhibit E) (emphasis added), at 2.  As reflected on the first page of the document, this Notice was in effect until March 21, 2002.  It, thus, was in effect in November and December 2001, the very time when plaintiffs assert the conspiracy was formed.

Trial exhibits DTX-26 [November 16, 2001 meeting minutes] (attached hereto as Exhibit F) and DTX-28 [December 25, 2001 meeting minutes] (attached hereto as Exhibit G) show that the very conduct reflected in these meetings -- which plaintiffs claim was the hatching of this conspiracy -- was mandated by the 1997 MOFTEC & SDA Notice, including establishing the Vitamin C Sub-committee, coordinating the vitamin C export market with respect to price, and customers organizing the export enterprises, requiring all vitamin C export companies to participate and subject themselves to coordination of the group, to formulate and adjust export coordination price and to strictly implement it.

The 1997 MOFTEC & SDA Notice also clearly provides for penalties if the export enterprises violated any provision:

> 10.     With respect to the export enterprises with violations of relevant provisions hereof, if substantiated, penalties shall be imposed, specifically, the Vitamin C export quota may be reduced, in the worst case their Vitamin C export right shall be revoked.

DTX-12 (Exhibit E).  The minutes from the December 25, 2001 meeting, which was the "Second Meeting of Chinese Vitamin C Manufacturers," clearly provide for penalties for export enterprises that are not in strict compliance with the government-mandated export restrictions:

> 1.      The committed export volume as part of the industry self-discipline shall be strictly implemented.  From January 1, 2002, the Vitamin C products that are declared at customs for export by the aforementioned manufacturers shall be respectively recorded into the total export volume of each of such manufacturers . . . This work is crucial for the implementation of the self-discipline for Vitamin C export industry in 2002, and each import and export company shall actively co-operate and co-ordinate with the manufacturing companies with regard to their

confirmations.  ***Those import and export enterprises that are not in strict compliance with this requirement will be punished*** by Vitamin C Sub-Committee.

. . .

4.   <u>To punish any violations</u>.  With respect to the Vitamin C manufacturers with violations of using disguised low prices or exporting beyond given volume, etc., when confirmed upon investigation, ***a penalty will be imposed on the violating manufacturer***.  Namely, five times of the export volume that is in violation shall be deducted from the total allocated export volume of the violating manufacturer.  Penalties applicable to the violating foreign trade companies are to be formulated.

December 25, 2001 meeting minutes [DTX-28] (Exhibit G).  *See also* Chamber By-Laws [DTX-32-B] (attached hereto as Exhibit H), at 3-4.

At trial, Qiao Haili testified that he, in his capacity as the Chairman and Director of the Chamber, had the authority to implement penalties on violating manufacturers and did in fact impose penalties:

> **Q:** And it goes on to say at the end of Article 16 that at
> punishments -- and I'm paraphrasing -- the punishments
> conclude either a suspension and even -- and I'll quote,
> even cancel vitamin C export right of such violating member?
> **A:** *Yes.*
> **Q:** And during the time you were at the vitamin C
> subcommittee, Mr. Qiao, were these penalties -- were these
> potential penalties in effect?
> **A:** *Correct.*
> **Q:** And who had the -- excuse me, who had the power to
> impose these penalties?
> **A:** *The Ministry of Commerce had the authority, MOFTEC.*
> **Q:** And what was your role in imposing these penalties, if
> any?
> **A:** *I would report it back to MOFTEC and suggest that
> MOFTEC will implement the penalty.*
> **Q:** And did you have the power and authority to do that?
> **A:** *I had the authority.*

Testimony of Qiao Haili at Tr. 968:19-969:11.

> **Q:** And with respect to whether or not you could direct the
> companies to stop production, what authority do you have

there?

**A:** *I could instruct them to stop production.*

**Q:** What authority, if any, did you have to penalize or punish the vitamin C subcommittee members, the distributors, if they did not follow your directions in these regards?

**A:** *I stopped the verification and chop so they could not export, and the export was their lifeline.*

**Q:** Did you have authority to stop their export?

**A:** *Stop what?*

**Q:** Did you have the authority to stop their export?

**A:** *I did.*

Testimony of Qiao Haili at Tr. 921:5-17.

There is no ambiguity here. The conduct alleged by the complaint and by the trial testimony when the conspiracy was purportedly formed tracks precisely what was required by the 1997 Chinese law.

In 1998 MOFTEC stated that "*the major responsibilities of the VC Sub-committee are: to be responsible for coordinating the Vitamin C export market, price and customers of China ... .*" DTX-13, appended to Qiao Aff. as Ex. 7 (attached hereto as Exhibit I), at 1 (emphasis added). Again, there is no ambiguity here. Defendants were doing what the 1998 MOFTEC Notice, as well as the 1997 MOFTEC & SDA Notice required. This 1998 MOFTEC Notice was in effect not only when the conspiracy alleged in this case was supposedly formed, but throughout the time period thereafter. *See* Qiao Aff. (attached hereto as Exhibit J) ¶ ¶ 21, 44.

Effective May 1, 2002, the verify and chop regulation was promulgated by MOFTEC. It provided, among other things:

1. After adjustment, 30 categories of export products are subject to price review by the customs . . . . All of the products are subject to Price Verification and Chop ("PVC") by the chambers, and no longer subject to supervision and review by the customs. . . .

3. Following the adjustment made under this Notice, the relevant chambers must, by April 20, 2002, submit to Guangzhou Commodity Price Information Center of GAC information on industry-wide negotiated prices for those export products subject to price review, in both soft copy (in required format) and hard copy; . . .

> 4.  The relevant chambers of import and export shall follow the PVC procedures pursuant to the Provisional Rules on Export Price Verification and Chop for Key Products subject to Price Reviews of Export Products by the Customs (1997) MOFTEC GUAN ZON HAN ZI No. 21).  The adoption of PVC procedures shall be convenient for exporters while it is conducive for the chambers to coordinate export price and industry self-discipline.

See 2002 MOFTEC & Customs Notice [DTX-31, D.E. 170-2] (attached hereto as Exhibit K), at 6-7.[10]

Regulation under this directive was memorialized, amplified and clarified in 2003 and continued in effect throughout the relevant time period covered by this litigation (*i.e.*, up to and including June 30, 2006.  [DTX-44, appended to Qiao Aff. as Ex. 13] (attached hereto as Exhibit L).

The evidence at trial was overwhelming that defendants could not export vitamin C without complying with the verify and chop regulations. *See, e.g.*, Trial testimony of Wang Qi [Tr. 416:7-417:10], Qiao Haili [Tr. 930:5-931:18; 967:25-969:11; and Feng Zhenying [Tr. 683:1-21; 699:1-700:21, 711:1-25].

The MOFCOM amicus brief further informed the Court that the Chamber was established, in part, to regulate exports, including vitamin C, under MOFCOM's direction. MOFCOM Amicus Brief [D.E. 69] (Exhibit B), at 7.  According to MOFCOM, what the plaintiffs described as a "cartel" and an "ongoing combination and conspiracy to suppress competition" through price-fixing was, in fact, "a regulatory pricing regime ***mandated by the government of China*** -- a regime instituted to ensure orderly markets during China's transition to a market-driven economy and to promote, in this transitional period, the profitability of the industry through coordination of pricing and control of export volumes." *Id*., at 6 (emphasis added).  MOFCOM set forth the history and context of its regulation over vitamin C exports,

---

[10] The Court only allowed an excerpt from this regulation listing products subject to verification & chop to be put before the jury.

referencing the 1997 MOFTEC & SDA Notice as mandating that the vitamin C subcommittee "formulate and adjust [the] export coordination price, which the Vitamin C export enterprises must strictly implement." *Id*., at 11.

MOFCOM emphasized that "coordination" in this context referred to "the government mandated multilateral process in which prices were set" and that "***industry participants*** in this multilateral process, thus, ***acted pursuant to government compulsion***; when establishing price controls, they were exercising governmental regulatory power; and the price controls developed through this multilateral process were legally binding and governmentally-enforced." *Id*., at 12 (emphasis added). Ultimately,"[t]his system of Ministry-mandated and Chamber-administered 'coordination' was adopted to forestall potential market disorders that might have limited the development of a healthy vitamin C export industry during China's transition from a command economy to a market-driven economy." *Id*., at 13 and DTX-9, *supra* note 5.

MOFCOM twice again in this litigation submitted further statements to the Court which adopted and reiterated the statements and the certified apostilled regulations in its 2006 submission. *See Statement in In Re Vitamin C Antitrust Litigation*, dated June 9, 2008 [D.E. 306-3] ("[T]he Ministry specifically charged the [Chamber] with the authority and responsibility, subject to Ministry oversight, for regulating, through consultation, the price of vitamin C manufactured for export from China so as to maintain an orderly export.") (Exhibit C); *Statement In In Re Vitamin C Antitrust Litigation*, 06-MD-1738 (DGT), dated August 31, 2009 [E.D. 400-2] (The Ministry "would like to reiterate here that the alleged conduct by the defendant Chinese vitamin C exporters is the result of the defendants' performing their obligations to comply with Chinese laws, rather than conduct on their own initiative.") (Exhibit D).

Defendants, in turn, submitted a thorough affidavit from Professor Shen Sibao setting forth the applicable Chinese law.  [D.E. 394-2 (Nov. 23, 2009)].

Against this unequivocal evidence and regulations stating their terms in black and white plaintiffs did not present any evidence whatsoever of Chinese law and engaged no Chinese law expert.  Instead,  plaintiffs pulled public statements made by the Chinese government to the WTO off the internet.  *See* 2011 Summary Judgment Decision [D.E. 440], note 5.

The fallacy of plaintiffs' argument is that the WTO, having examined the matter, held otherwise.  In a July 5, 2011 report titled "China -- Measures Related to the Exportation of Various Raw Materials: Reports of the Panel," the WTO panel ruling on a complaint filed by the U.S. Trade Representative made clear that

> " China's MOFCOM . . . is responsible for the application of export licensing rules and for coordinating export license issuing agencies that are organized in local administrative authorities.  MOFCOM is responsible for imposing penalties on enterprises that do not comply with exportation license requirements.  Exportation of restricted goods without approval, or exportation in excess of a designated quota, is subject to investigation leading to potential criminal and administrative penalties.  Penalties include invalidation of applicable licenses and suspension or revocation of the right to engage in foreign trade for a period of up to three years.  "

World Trade Organization, China -- Measures Related to the Exportation of Various Raw Materials: Reports of the Panel, WT/DS394/R, WT/DS395/R, WT/DS398/R (July 5, 2011) (attached hereto as Exhibit M), at 222.[11]

Moreover, in so doing, the WTO panel agreed with submissions by the United States government -- submissions directly relying upon the submissions made by MOFCOM to this Court -- that China regulated on certain products through mandatory "self discipline" undertaken pursuant to directives of Chambers of Commerce acting pursuant to delegated government

---

[11] Although the WTO's appellate body later reversed this decision on other grounds, it left undisturbed the finding that China coordinated export prices and production rates through various Chambers.

authority.  First Written Submission of the United States of America, China -- Measures Related

to the Exportation of Various Raw Materials, ¶¶ 207-208, 216, 229, 352, WT/DS394,

WT/DS395, WT/DS398 (June 1, 2010).[12]

Likewise, the U.S. Trade Representative found on numerous occasions during the

relevant time period that the Chinese government continued to actively coordinate export prices

and production.  For example:

> Since its accession to the WTO, China has continued to impose restrictions and fees on exports of a few raw materials and intermediate products . . . . In both 2002 and 2003, the United States raised its concerns about continuing export regulation of raw materials and intermediate products bilaterally with China. . . . To date, however, China has refused to modify its export regulation practices in this area.  The United States will continue to strongly urge China to lift these restrictions in 2004.

United States Trade Representative, 2003 Report to Congress on China's WTO Compliance

(Dec. 11, 2003), at 29 (attached hereto as Exhibit N).

> The United States began to raise its concerns with China's coke export restrictions during high-level meetings in Washington in April 2004.  The United States urged China to put the practice of using export restrictions behind it, not just for coke but also for other products.

United States Trade Representative, 2004 Report to Congress on China's WTO Compliance

(Dec. 11, 2004), at 33 (attached hereto as Exhibit O).

> China's WTO accession agreement reinforces China's obligation to only maintain export restrictions allowed under WTO rules. . . . Nevertheless, since its accession to the WTO, China has continued to impose restrictions on exports of certain raw materials and intermediate products.

United States Trade Representative, 2006 Report to Congress on China's WTO Compliance

(Dec. 11, 2006), at 35-36 (attached hereto as Exhibit P).

---

[12] Available at http://www.ustr.gov/webfm_send/1948.

The statements of the U.S. Trade Representative of the executive branch of the US government and the WTO findings are all at odds with the decision of the Court that China, during the relevant time period at issue in this case, continued to control minimum prices, export quotas and production of vitamin C.

These contradictory mandates have placed the defendants and the Chinese government in a classic bind:  If defendants do as MOFCOM orders them to through the Chamber, as the WTO and U.S. Trade Representative found they were doing, they are subjected to US antitrust liability. Different fora, different authorities and different laws and regulations are pointing the defendants in several different directions all at once.

Predictably, this has provoked extreme dissatisfaction from the Chinese government which is already indicating that it will "cause problems for the international community" and "eventually harm the interests of the United States."  Katy Oglethorpe, *US Vitamin Fine "Unfair and Inappropriate" Says MOFCOM,* GLOBAL COMPETITION REVIEW, March 21, 2013 (attached hereto as Exhibit Q).  *See also* Laurie Burkitt, *China Criticizes U.S. Ruling on Vitamin C Makers*, WALL ST. J., March 19, 2013 (attached hereto as Exhibit R); Joy C. Shaw and Eliot Gao, *MOFCOM's Shang Says US judgment in Vitamin C Case Shows 'Disrespect'*, POLICY AND REGULATORY REPORT (Mar. 22, 2013) (attached hereto as Exhibit S).

This is precisely the sort of situation that the doctrines of act of state and international comity were meant to avoid.  Defendants submit once again, as they have previously in their Rule 12 motion, their Rule 56 motion and their Rule 50(a) motion that the Court should have declined to hear a case like this.  At this point, the verdict and judgment should be vacated on these grounds.

Nearly all references to "agreements" among the defendants state that they were reached under the auspices of the Chamber or at a meeting convened by the Chamber, and thus by the Chinese government. *See, e.g.*, PTX 78 (attached hereto as Exhibit T); PTX 53 (attached hereto as Exhibit U); PTX 137 (attached hereto as Exhibit V); PTX 81 (attached hereto as Exhibit W); PTX 57 (attached hereto as Exhibit X); Tr. 315:24-319:18; Tr. 319:19-321:9; Tr. 323:4-325:12; 328:14-330:2; 330:5-332:7.

As testified to by Mr. Huang, formerly of Hebei Welcome, approximately seventy to eighty percent of Hebei Welcome's vitamin C output during the years 2001 through 2006 was for the export market and therefore failure to comply with Chamber (*i.e*., Chinese government) mandates would have put Hebei Welcome out of business.  Tr. 562:3-9.

The evidence that the Chamber and the Vitamin C Sub-committee were part of the Chinese government is overwhelming.  *See, e.g.*, PTX 173 (attached hereto as Exhibit Y); Testimony of Qiao Haili [Tr. 903:14-911:24; 915:1-917:16; 966:15-967:10, 971:11-18, 972:15-22; 975:18-976:22; 1145:19-1149:8; 1161:2-19; 1170:5-20; 1194:22-1195:15]; Testimony of Feng Zhenying [Tr. 610:1-12; 683:1-14; 700;15-21, 711:1-25].  Mr. Qiao also explained the government policies that were being implemented.  *See* 909:16-911:18 (explaining that the impetus for the government regulation of vitamin C was "malicious competition" that "caused a tremendous amount of loss for the country" and "also caused the anti-dumping issues outside of the country."; 916:14-917:5 (explaining that "injury to the government of China" refers to a "big decline of U.S. currencies."); 917:23-919:4 ("Industry self-discipline does not mean independent actions from the enterprises.  Under the coordination of the Chamber, we convene meetings, discuss export pricing, and prevent malicious competition in order to protect the healthy

development of the VC exports.").  *See also* Tr. 930:5-931:18; 971:11-18; 973:7-974:7.  This is

precisely what the regulations, which MOFCOM put before this Court, required.

These are clearly governmental policies, not private commercial decisions.  And the jury

should not have sat in judgment upon them.

B.        Discussion of the Law

The content and operation of foreign law is an issue of law to be determined, in the first

instance, by the district court, subject to *de novo* review on appeal.  *See* Fed. R. Civ. P. 44.1 and

Advisory Comments; *see also Curley v. AMR Corp.*, 153 F.3d 5, 11 (2d Cir. 1998) ("[P]ursuant

to Fed. R. Civ. P. 44.1, a court's determination of foreign law is treated as a question of law.")

(citing *Seetransport Wiking Trader Schiffahrtsgesellschaft MBH & Co. v. Navimpex Centrala

Navala*, 29 F.3d 79, 91 (2d Cir. 1994) ("Because questions of foreign law are treated as questions

of law under Fed. R. Civ. P. 44.1, we subject the District Court's determinations on the foreign

law issues to *de novo* review.").

Here, this Court rejected the defenses raised by the defendants in, *inter alia*, Defendants'

Memorandum of Law in Support of Motion for Summary Judgment or in the Alternative for

Determination of Foreign Law [D.E. 393] based upon this Court's ruling that the foreign law

considered did not require defendants' actions.  That premise, however, was incorrect.

As previously cited by Defendants, the official statements of a foreign government as to

the meaning and operation of its laws must be deemed conclusive by a United States court [D.E.

393 at  31-35], or, at a minimum, be given substantial deference by such court [D.E. 393 at 35-

36].  "[A] court may not substitute its own construction of a statutory provision for a reasonable

interpretation made by the administrator of an agency."  *Chevron v. Natural Resources Defense

Council, Inc.*, 467 U.S. 837, 844 (1984).  Courts have accorded similar weight to the construction

placed on the laws by the state itself.  *See In re Oil Spill by the Amoco Cadiz*, 954 F.2d 1279, 1312 (7th Cir. 1992) ("Giving the conclusions of a sovereign nation less respect than those of an administrative agency is unacceptable.").

Defendants' arguments regarding its defenses have been set down at length in its various submissions, which defendants incorporate by reference hereto.[13]  In brief summary, these defenses included the act of state doctrine, the foreign sovereign compulsion doctrine, and the doctrine of international comity.

As described in defendants' prior submissions, the act of state doctrine is a principle of law "designed primarily to avoid judicial inquiry into the acts and conduct of the officials of the foreign state, its affairs and its policies and the underlying reasons and motivations of the actions of the foreign government."  *O.N.E. Shipping Ltd. v. Flota Mercante Grancolombiana, S.A.*, 830 F.2d 449, 452 (2d Cir. 1987) (citing *Hunt v. Mobil Oil*, 550 F.2d 68 (2d Cir. 1997).  The doctrine is grounded in important policy considerations, whereby "Every sovereign state is bound to respect the independence of every other sovereign state and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory."  *Underhill v. Hernandez*, 168 U.S. 250, 252 (1897); *see also Konowaloff v. Metropolitan Museum of Art*, 702 F. 3d 140, 145 *et seq*, (2d Cir. 2012) (the act of state doctrine "expresses the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder rather than further this country's pursuit of goals in the international sphere.") (quoting *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 423 (1964)).

---

[13] *See, e.g.* Defendants' Memorandum in Support of Motion to Dismiss [D.E. 67]; Defendants' Reply Memorandum in Support of Motion to Dismiss [D.E. 72];  Defendants Memorandum of Law in Support of Motion for Summary Judgment or in the Alternative for Determination of Foreign Law [D.E. 393]; Reply Memorandum in Support of Defendants' Motion for Summary Judgment or in the Alternative for determination of Foreign Law [D.E. 398]; Defendants' Memorandum of Law in Support of Motion for Certification for Interlocutory Appeal [D.E. 445]; Defendants' Reply Memorandum of Law in Support of Motion for Certification for Interlocutory Appeal [D.E. 450].

This doctrine has been applied frequently, and in a number of antitrust cases. *See, e.g., International Association of Machinists v. OPEC*, 649 F.2d 1354 (9th Cir. 1981); *Interamerican Refining Corp. v. Texaco Maracaibo, Inc.*, 307 F. Supp. 1291 (D. Del. 1970). It should similarly apply here. During these proceedings, the official acts of the Chinese government were being placed directly at issue, implicating foreign policy issues precisely of the sort the doctrine is designed to avoid. *See, e.g., Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398 (1964).

"Similar in effect [to the act of state doctrine] but somewhat conceptually distinct is the defense of foreign sovereign compulsion, which shields from antitrust liability the acts of parties carried out in obedience to the mandate of a foreign government." *Mannington Mills, Inc. v. Congoleum Corp.*, 595 F.2d 1287, 1293 (3d Cir. 1979). This doctrine too has been applied in the antitrust context. *See, e.g., Interamerican Refining*, 307 F. Supp. 1291; *see also Trugman-Nash, Inc. v. New Zealand Dairy Board*, 942 F. Supp. 905 (S.D.N.Y. 1996), *rev'd in part on rehearing*, 954 F. Supp. 733 (S.D.N.Y. 1997).

Application of the foreign sovereign compulsion defense recognizes that the defendant is caught in a conflict of laws, and cannot simultaneously obey the laws of both sovereigns. *See, e.g.,* Joint DOJ/FTC Antitrust Enforcement Guidelines for Int'l Operations ("Antitrust Guidelines"), § 3.32. That is exactly the situation here. Where the foreign government's mandate, as here, amounts to compulsion or coercion, and the foreign decree was basic and fundamental to the alleged antitrust behavior, this Court must dismiss the claims. *See, e.g., Mannington Mills,* 595 F.2d at 1293.

Foreign sovereign compulsion has been considered a subset of the broader doctrine of international comity, which "reflects the broad concept of respect among co-equal sovereign nations." *See* Antitrust Guidelines § 3.2 (citing *Hilton v. Guyot*, 159 U.S. 113, 186 (1895)). The

principle of international comity is also well-recognized as applicable to antitrust cases such as this one:

> The antitrust statutes enacted by Congress commit this country to the free enterprise system and the exercise of open competition.  If an American company is excluded from competition in a foreign country by fraudulent conduct on the part of another American company, then our national interests are adversely affected.  In a purely domestic situation, the right to a remedy would be clear.  When foreign nations are involved, however, it is unwise to ignore the fact that foreign policy, reciprocity, comity, and limitations of judicial power are considerations that should have a bearing on the decision to exercise or decline jurisdiction.

*Mannington Mills,* 595 F.2d at 1296.

Unlike the foreign sovereign compulsion doctrine, however, international comity is discretionary, and requires the court to engage in a "weighing of competing interests."  *Id.* at 1296.  This Court found, however, that the validity of this type of comity analysis had been called into question by the Supreme Court's decision in *Hartford Fire Ins. Co. v. California*, 509 U.S. 764 (1993).  Yet in *Hartford Fire*, unlike in this case, the defendants did not assert that foreign law required them to act in a fashion prohibited by the law of the United States.  Certainly, where such an allegation is made not only by the defendants, *but by the foreign government itself*, the full range of interests in the comity analysis should be carefully weighed by the Court.  And the interests of China in this matter, as has been repeatedly recognized by this Court, are apparent.  *See, e.g., In re Vitamin C Antitrust Litig.*, 584 F. Supp. 2d 546, 552 (E.D.N.Y. Nov. 6, 2008) ("[t]he Chinese government's appearance as amicus curiae is unprecedented … [and] alone demonstrates the importance the Chinese government places on this case."); *Id.* at 559 ("defendants and the [government] stress the importance to China of being able to manage the transition from a command to a market economy.").

This Court has also recognized that its analysis of the defendants' defenses of comity, foreign sovereign compulsion, and the act of state doctrine turn on its ruling that the Chinese government did not compel defendants' actions.  *See, e.g., In re Vitamin C Antitrust Litig.*, 810 F. Supp.2d 522, 543 (E.D.N.Y. 2011) ("Unless defendants' price-fixing was compelled by the Chinese government, dismissal on comity grounds would not be justified.");  *Id.* at 544 ("Of course, the [FSC] defense is not available for conduct going beyond what the foreign sovereign compelled.") (quoting Weber Waller, Antitrust and American Business Abroad § 8:23 n.6); *Id.* at 548 ("Because plaintiffs argue that verification and chop did not involve any compulsion, they reason that it was defendants' voluntary actions, rather than the sovereign acts of the Chinese government, that harmed them.").  Thus, a reconsideration of the Court's position on its interpretation of Chinese law would also result in dismissal of these claims on comity, foreign compulsion and act of state grounds.

III.     **CONCLUSION**

Defendants respectfully submit that given these circumstances, and on the points and authorities as previously cited and discussed, it was inappropriate to deny the post evidence motion in respect of act of state, and that it was inappropriate to submit to the jury questions necessarily requiring an examination into the motives and regulatory mechanisms of the Chinese government, turning on the credibility of the testimony of Mr. Qiao and without the benefit of a full record.

WHEREFORE, for the foregoing reasons, judgment should be entered as a matter of law dismissing Hebei Welcome Pharmaceutical Co., Ltd. and North China Pharmaceutical Group Corp. from the instant action and setting aside the jury verdict against them.

Dated:  April 11, 2013                              Respectfully Submitted,

                                                    BAKER & McKENZIE LLP


                                          By:   /s/ Charles H. Critchlow_____
                                              Darrell Prescott
                                              Charles H. Critchlow
                                              Catherine Y. Stillman
                                              452 Fifth Avenue
                                              New York, New York  10018
                                              Telephone:  (212) 626-4496
                                              Fax:  (212) 626-4120

                                              *Attorneys for Defendants Hebei Welcome Pharmaceutical Group Co. Ltd. and  North China Pharmaceutical Group Corp.*